No. 24-7246

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

UNION GOSPEL MISSION OF YAKIMA, WASHINGTON,
                                        Plaintiff-Appellee,

v.

ROBERT FERGUSON, in his official capacity as Attorney General of
Washington, ANDRETA ARMSTRONG, in her official capacity as Executive
Director of the Washington State Human Rights Commission; and GUADALUPE
GAMBOA, HAN TRAN, JEFF SBAIH, LUC JASMIN, and CHELSEA DIMAS,
in their official capacities as Commissioners of the Washington State Human
Rights Commission,
                                        Defendants-Appellants.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON AT YAKIMA
No. 1:23-cv-3027-MKD
The Honorable Mary K. Dimke
United States District Court Judge

---

# OPENING BRIEF OF APPELLANTS

---

ROBERT W. FERGUSON
*Attorney General*

CYNTHIA L. ALEXANDER, WSBA 46019
TERA M. HEINTZ, WSBA 54921
*Deputy Solicitors General*
1125 Washington St SE
Olympia, WA 98504
Cynthia.Alexander@atg.wa.gov
Tera.Heintz@atg.wa.gov
(206) 326-5488

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................1

II.   JURISDICTIONAL STATEMENT ...................................3

III.  STATUTORY AUTHORITIES .........................................3

IV.  STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ......3

V.   STATEMENT OF THE CASE ........................................4

    A.  The Washington Law Against Discrimination Prohibits Discrimination in Employment, But Exempts Small Employers, as Do Countless Other State and Federal Laws ..........................4

    B.  UGM Filed a Pre-Enforcement Challenge to the WLAD ...........9

    C.  The District Court Granted UGM's Motion for Preliminary Injunction ..................................................................12

VI.  STANDARD OF REVIEW ............................................14

VII. SUMMARY OF ARGUMENT .......................................14

VIII. ARGUMENT ..............................................................16

    A.  UGM Cannot Establish Standing to Obtain a Preliminary Injunction ..................................................................16

    B.  The District Court's Ruling that UGM Is Likely to Succeed on the Merits of Its Free Exercise Claim Is Incorrect and Would Provide Religious Employers Immunity from Any Law Containing an Exception .........................................................20

       1.  The WLAD is neutral and generally applicable .................22

          a.  The WLAD does not treat comparable secular activity more favorably than religious exercise .........................24

i

      b.   The WLAD does not provide for individualized exemptions and evidences no hostility to religion ........34

    2.   The WLAD Is Rationally Related to Legitimate Governmental Purposes ......................................................37

C.   The "Church Autonomy Doctrine" Does Not Afford UGM Broad Immunity to Discriminate in Hiring Non-Ministerial Employees ...................................................................................38

D.   UGM Does Not Have a First Amendment Associational Right to Discriminate in Hiring Non-Ministerial Employees ....42

E.   UGM Is Unlikely to Succeed on its Free Speech Claims ..........52

F.   The District Court Erred in Granting UGM's Preliminary Injunction Because UGM Cannot Demonstrate Any of the *Winter* Factors ..............................................................................55

    1.   UGM Cannot Show a Likelihood of Success on the Merits 55

    2.   UGM Cannot Show Irreparable Harm ................................56

    3.   The equities and public interest tip sharply against an injunction ...........................................................................57

IX.   CONCLUSION....................................................................................58

# TABLE OF AUTHORITIES

## Cases

*Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte,*
  481 U.S. 537 (1987) ...................................................... 48

*Benisek v. Lamone*,
  585 U.S. 155 (2018) ...................................................... 56

*Bob Jones Univ. v. United States*,
  461 U.S. 574 (1983) ...................................................... 33

*Bollard v. Cal. Province of the Soc'y of Jesus,*
  196 F.3d 940 (9th Cir. 1999) ...................................... 41

*Bowen v. Roy*,
  476 U.S. 693 (1986) ...................................................... 20

*Boy Scouts of Am. v. Dale,*
  530 U.S. 640 (2000) ...........................................43-44, 47-48, 50, 52

*Burwell v. Hobby Lobby Stores, Inc*.,
  573 U.S. 682 (2014) ...................................................... 50

*Cantwell v. Connecticut,*
  310 U.S. 296 (1940) ...................................................... 20

*CDK Glob. LLC v. Brnovich*,
  16 F.4th 1266 (9th Cir. 2021)...................................... 55

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*,
  447 U.S. 557 (1980) ..................................................53-55

*Centro De La Comunidad Hispana De Locust
  Valley v. Town of Oyster Bay,*
  868 F.3d 104 (2d Cir. 2017)........................................ 46

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) ....................................................21-23, 27, 36

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ..................................................... 17

*Doe v. Harris*,
   772 F.3d 563 (9th Cir. 2014).......................................... 56

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014)......................................... 57

*EEOC v. Fremont Christian Sch.*,
   781 F.2d 1362 (9th Cir. 1986)......................................... 40

*EEOC v. Miss. Coll.*,
   626 F.2d 477 (5th Cir. 1980).......................................... 41

*EEOC v. Pacific Press Pub. Ass'n*,
   676 F.2d 1272, 1280 (9th Cir. 1982),
   *abrogation on other grounds recognized by*
   *Am. Friends Serv. Comm. Corp. v. Thornburgh*,
   951 F.2d 957, 960 (9th Cir. 1991)..................................... 37, 40, 50

*Emp. Div. v. Smith*,
   494 U.S. 872 (1990) .......................................... 2, 15, 34

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*,
   82 F.4th 664 (2023)........................................23-24, 28, 30, 34-36

*Fulton v. City of Philadelphia*,
   593 U.S. 522 (2021) ......................................22, 27, 34-36, 58

*Greater Philadelphia Chamber of Com. v. City of Philadelphia*,
   949 F.3d 116 (3d Cir. 2020).......................................... 54

*Hishon v. King & Spalding*,
   467 U.S. 69 (1984) ............................................... 43, 47

iv

*Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.*,
   565 U.S. 171 (2012) ................................................................ 39, 42, 43, 51

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
   515 U.S. 557 (1995) ......................................................................... 44

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
   803 F.3d 389 (9th Cir. 2015) ........................................................ 46

*Kane v. De Blasio*,
   19 F.4th 152 (2d Cir. 2021) ...................................................... 27, 33

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022) ......................................................................... 23

*Levi Strauss & Co. v. Shilon*,
   121 F.3d 1309 (9th Cir. 1997) ...................................................... 53

*Lopez v. Candaele*,
   630 F.3d 775 (9th Cir. 2010) ........................................................ 18

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ......................................................................... 17

*Maryland v. King*,
   567 U.S. 1301 (2012) ...................................................................... 58

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
   584 U.S. 617 (2018) ............................................................. 23, 50, 58

*Murthy v. Missouri*,
   603 U.S. 43 (2024) .................................................................... 17, 19

*Obergefell v. Hodges*,
   576 U.S. 644 (2015) ......................................................................... 47

*Ockletree v. Franciscan Health Sys.*,
   317 P.3d 1009 (Wash. 2014) ........................................................... 7

*Our Lady of Guadalupe Sch. v Morrissey-Berru*,
   591 U.S. 732 (2020) .........................................2, 15, 20-21, 24, 33, 39, 40, 51

*Paramount Land Co. LP v. Cal. Pistachio Comm'n*,
   491 F.3d 1003 (9th Cir. 2007)......................................................... 56

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
   413 U.S. 376 (1973) ....................................................45, 52-53, 55

*Puri v. Khalsa*,
   844 F.3d 1152 ............................................................................... 40

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992) ............................................................... 37, 46

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
   772 F.2d 1164 (4th Cir. 1985)....................................................... 41

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) ............................................................... 48-51

*Roman v. Wolf*,
   977 F.3d 935 (9th Cir. 2020)......................................................... 14

*Rumsfeld v. Forum for Acad. & Institutional Rights*,
   547 U.S. 47 (2006) ....................................................................... 45

*Ry. Mail Ass'n v. Corsi*,
   326 U.S. 88 (1945) ....................................................................... 44

*Seattle Pacific Univ. v. Ferguson*,
   104 F.4th 50 (9th Cir. 2024).................................................... 21, 40

*Slattery v. Hochul*,
   61 F.4th 278 (2d Cir. 2023).......................................................... 47

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ..................................................................... 45

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,
  496 F. Supp. 3d 1195 (S.D. Ind. 2020) .................................................. 42, 44

*State v. Arlene's Flowers, Inc.*,
  441 P.3d 1203 (Wash. 2019),
  *cert. denied*, 141 S. Ct. 2884 (2021) ................................................. 21, 36, 37

*States v. Williams*,
  553 U.S. 285 (2008) ......................................................................... 53

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ........................................................................ 17-18

*Tandon v. Newsom, 593 U.S. 61 (2021)* ........................................ 24, 26, 30, 34

*Tingley v. Ferguson*,
  47 F.4th 1055 (9th Cir. 2022),
  *cert denied*, 144 S. Ct. 33 (2023) ................................................. 20-21, 28, 35

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
  471 U.S. 290 (1985) ........................................................................ 33

*Twitter, Inc. v. Paxton*,
  56 F.4th 1170 (2022) ....................................................................... 17

*Union Gospel Mission of Yakima v. Ferguson*,
  No. 1:23-CV-3027-MKD,
  2024 WL 4660918 (E.D. Wash. Nov. 1, 2024) ............................... 12, 24, 30

*Union Gospel Mission of Yakima v. Ferguson*,
  No. 23-2606, 2024 WL 3755954 (9th Cir. Aug. 12, 2024) ................... 12, 18

*United States v. Lee*,
  455 U.S. 252 (1982) ........................................................................ 33

*Valle Del Sol, Inc. v. Whiting*,
  709 F.3d 808 (9th Cir. 2013) ........................................................... 46, 54

*Williams-Yulee v. Fla. Bar,*
  575 U.S. 433 (2015) ...................................................... 37

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ................................................. 14, 16, 55-56, 58

*Wisconsin v. Mitchell,*
  508 U.S. 476 (1993) .................................................... 44

*Woods v. Seattle's Union Gospel Mission,*
  481 P.3d 1060 (Wash. 2021),
  *cert. denied*, 142 S. Ct. 1094 (2022) ......................... 7, 9-10, 22, 51

*Youth 71Five Ministries v. Williams,*
  No. 24-4101,
  2024 WL 3749842 (9th Cir. Aug. 8, 2024) ........................... 29, 30

## Constitutional Provisions

U.S. Const. amend. I ............................................... passim

U.S. Const. amend. XIV ................................................ 20

U.S. Const. art. III ............................................... 12, 19

## Federal Statutes

28 U.S.C. § 1331 ....................................................... 3

28 U.S.C. § 1343 ....................................................... 3

29 C.F.R. § 1904.1(a)(1) .............................................. 32

29 C.F.R. Part 541 .................................................... 31

29 U.S.C. § 213(a) .................................................... 31

29 U.S.C. § 630(b) .................................................. 6, 30

29 U.S.C. § 2611 (2)(B)(ii) ........................................... 32

29 U.S.C. § 2611 (4)(A)(i) ................................................................. 32

42 U.S.C. § 12111(5)(A) ...................................................................... 6

42 U.S.C. §2000e ................................................... 1, 6, 30, 41, 44

Washington Statutes

Wash. Rev. Code § 49.46.010(3)(a)-(q) ........................................ 31

Wash. Rev. Code § 49.46.020 ....................................................... 31

Wash. Rev. Code § 49.46.130 ....................................................... 31

Wash. Rev. Code § 49.46.210 ....................................................... 31

Wash. Rev. Code § 49.60 ....................................................... passim

Wash. Rev. Code § 49.60.010 ......................................................... 5

Wash. Rev. Code § 49.60.030 ......................................................... 4

Wash. Rev. Code § 49.60.040(11) ............................... 6-7, 24, 28, 36

Wash. Rev. Code § 49.60.040(29) ................................................... 5

Wash. Rev. Code § 49.60.120(4) ..................................................... 5

Wash. Rev. Code § 49.60.140 ......................................................... 5

Wash. Rev. Code § 49.60.180 ......................................................... 4

Wash. Rev. Code § 49.60.180(1) ................................................ 1, 25

Wash. Rev. Code § 49.60.180(1)-(3) ......................................... 5, 10

Wash. Rev. Code § 49.60.180(4) ........................................... 5, 10, 52

Wash. Rev. Code § 49.60.208 ....................................................... 10

Wash. Rev. Code § 49.60.208(1) ...................................................................... 11

Wash. Rev. Code § 49.60.230 ........................................................................... 5

Wash. Rev. Code § 49.60.240(3) ...................................................................... 6

Wash. Rev. Code § 49.60.250 ........................................................................... 6

Wash. Rev. Code § 51.12.020 ......................................................................... 32

## Rules

Fed. R. Civ. P. 65(b)(1) ............................................................................. 14, 55

## I.    INTRODUCTION

States and the federal government have long exempted small businesses from a wide range of laws, from Title VII to worker-safety rules to the Americans with Disabilities Act. The district court here, however, held that such small-business exemptions necessarily trigger wholesale exemptions for all religious employers—regardless of the religious employer's size or business activities, and regardless of whether it is hiring a minister or a janitor. That has never been the law, and this Court should reverse this unprecedented decision.

This case involves Union Gospel Mission of Yakima (UGM), a Washington nonprofit that employs a variety of staff, including IT technicians, thrift store associates, and dentists. UGM has a policy of hiring only job applicants who adhere to UGM's religious beliefs, including abstaining from sexual conduct outside of opposite-sex marriage. Although the State of Washington has never taken or threatened any enforcement action against UGM, UGM sued the Attorney General and Human Rights Commission, claiming that the Washington Law Against Discrimination (WLAD) violates the First Amendment because it prohibits employers from refusing to hire any person because of sexual orientation. Wash. Rev. Code § 49.60.180(1).

The district court issued a preliminary injunction, finding that the WLAD is likely not neutral and generally applicable under *Employment Division v. Smith*, 494 U.S. 872 (1990), because it exempts businesses with fewer than eight employees. According to the district court, this small business exemption somehow evidences religious discrimination even though the WLAD applies in exactly the same way to religious and secular employers: if they have fewer than eight employees, they are exempt; if they have more than eight employees, they are not. This makes no sense, and the court's reasoning would relieve religious organizations like UGM, as well as for-profit companies that claim a religious objection, from complying with innumerable laws of all types that include a small-business or other exception. The U.S. Supreme Court has expressly rejected this result: The right of free exercise "does not mean that religious institutions enjoy a general immunity from secular laws." *Our Lady of Guadalupe Sch. v Morrissey-Berru*, 591 U.S. 732, 746 (2020).

The district court's decision is wrong as a matter of law and should be reversed. As an initial matter, UGM lacks standing to obtain a preliminary injunction because the Defendants have disavowed enforcement of the WLAD against UGM in connection with hiring for the positions identified in UGM's complaint. But even if UGM could establish standing, it is unlikely to succeed

2

on the merits of any of its claims, and the district court's preliminary injunction should be vacated.

## II.    JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343, and this Court has appellate jurisdiction under 28 U.S.C. § 1291.

## III.    STATUTORY AUTHORITIES

All relevant statutory authorities appear in the Addendum to this brief.

## IV.    STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Does UGM lack standing to obtain a preliminary injunction where Defendants have disavowed enforcement of the WLAD with regard to hiring for the positions identified in UGM's complaint?

2.    Did the district court err in ruling that UGM is likely to succeed on the merits of its free exercise claim when the Washington Law Against Discrimination is neutral toward religion and generally applicable; does not provide for individualized exemptions or treat comparable secular organizations more favorably then UGM; and where there is no evidence the State has acted with hostility toward religion?

3.    Is UGM likely to succeed on the merits of its claim that a "church autonomy doctrine" affords it broad immunity to discriminate in hiring non-ministerial employees?

4.    Is UGM likely to succeed on the merits of its claim to a First Amendment associational right to discriminate in hiring non-ministerial employees?

5.    Is UGM likely to succeed on the merits of its free speech claim that it has a right to publish job applications that discriminate in hiring non-ministerial employees?

## V.    STATEMENT OF THE CASE

**A.    The Washington Law Against Discrimination Prohibits Discrimination in Employment, But Exempts Small Employers, as Do Countless Other State and Federal Laws**

The Washington Law Against Discrimination (WLAD) prohibits discrimination in employment, public accommodations, housing, commerce, and credit and insurance transactions in Washington. Wash. Rev. Code § 49.60.030, .180. The Washington Legislature determined that "practices of discrimination against any of [Washington's] inhabitants because of . . . sexual orientation . . . [are] a matter of state concern" and "that such discrimination threatens not only the rights and proper privileges of [the State's] inhabitants but

4

menaces the institutions and foundation of a free democratic state." Wash. Rev. Code § 49.60.010.

It is an "unfair practice" under the WLAD for an employer to "refuse to hire," to "discharge or bar any person from employment," or to "discriminate against any person in compensation or in other terms or conditions of employment" based on several protected grounds, including sexual orientation. Wash. Rev. Code § 49.60.180(1)-(3).[1] The statute also prohibits employers from printing or circulating any advertisement or application, or "mak[ing] any inquiry in connection with prospective employment," that "expresses any limitation, specification, or discrimination as to . . . sexual orientation." Wash. Rev. Code § 49.60.180(4).

A person aggrieved by an alleged unfair practice under the WLAD may file a complaint with the Washington State Human Rights Commission, which is empowered to "receive, impartially investigate, and pass upon complaints alleging unfair practices." Wash. Rev. Code §§ 49.60.120(4), .140, .230. If the Commission finds reasonable cause to believe discrimination occurred, it "endeavor[s] to eliminate the unfair practice by conference, conciliation, and

---

[1] The WLAD defines "sexual orientation" to mean "heterosexuality, homosexuality, bisexuality, and gender expression or identity." Wash. Rev. Code § 49.60.040(29).

persuasion." Wash. Rev. Code § 49.60.240(3). If this is unsuccessful, the Commission may initiate an enforcement action before an administrative law judge. Wash. Rev. Code § 49.60.250. The Attorney General is also authorized to enforce the WLAD. *State v. Sunnyside*, 550 P.3d 31, 41-45 (Wash. 2024).

Like many other state and federal laws, the WLAD exempts small businesses. Specifically, the WLAD's definition of "employer" is limited to "any person . . . who employs eight or more persons." Wash. Rev. Code § 49.60.040(11). Such exemptions are extremely common. For example, Title VII, which prohibits employers from discriminating against employees on the basis of sex, race, color, national origin, and religion, does not apply to employers with fewer than 15 employees. 42 U.S.C. § 2000e(b). The Americans with Disabilities Act (ADA), which prohibits employment discrimination against individuals with disabilities, similarly does not apply to employers with 15 or fewer employees. 42 U.S.C. § 12111(5)(A). The Age Discrimination in Employment Act (ADEA), likewise does not apply to employers with 20 or fewer employees. 29 U.S.C. § 630(b).

As enacted, the WLAD also exempted from its definition of "employer" "any religious or sectarian organization not organized for private profit." Wash.

Rev. Code § 49.60.040(11). Washington courts, however, have narrowed this exemption in light of state constitutional considerations.

In *Ockletree v. Franciscan Health System*, 317 P.3d 1009, 1013 (Wash. 2014), the Washington Supreme Court examined whether the WLAD's exclusion of nonprofit religious or sectarian organizations from the definition of "employer" violated the Washington Constitution's privileges or immunities clause in an as-applied challenge by a former employee. Wash. Rev. Code § 49.60.040(11). In a fractured opinion, the court held that excluding religious organizations from the WLAD's definition of "employer" in challenges brought by employees whose job description and responsibilities are unrelated to any religious practice or activity would violate the state constitution's privileges or immunities clause. *Ockletree*, 317 P.3d at 1028 (Wiggins, J., concurring in part and dissenting in part) (opinion containing the narrowest ground supporting the majority result and thus representing the court's holding).

Seven years later, the Washington Supreme Court revisited the WLAD's religious employer provision in *Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060, 1067 (Wash. 2021), *cert. denied*, 142 S. Ct. 1094 (2022). In *Woods*, the court considered whether the WLAD's religious-employer exemption violated the state constitution's privileges or immunities clause by improperly

favoring religious employers. *Id.* at 1064. The court reaffirmed that the WLAD's exemption of religious nonprofits from the definition of "employer" was facially constitutional under the state constitution. *Id.* at 1065 n.2 (rejecting argument "that no set of circumstances exist under which the religious employer exemption can be constitutionally applied"). It held, however, that the exemption "may be constitutionally invalid" as applied to the plaintiff, a bisexual job applicant. *Id.* at 1063.

The court held that the WLAD's religious employer exemption was limited to employees who are "ministers" as defined by the U.S. Supreme Court's First Amendment jurisprudence. *Id.* at 1068-69. Under that standard, determining whether an employee is a "minister" requires a fact-specific assessment of a non-exclusive "variety of factors" set forth in federal case law. *Id.* These factors include the level of religious training and examination required for the job, any religious commission the employee received, any requirement to instruct on religious subjects, any duties to pray with others or attend religious services as part of the job, and the extent to which the church and the employer hold the employee out to the world as a minister. *Id.* (citing *Our Lady of Guadalupe Sch.*, 591 U.S. at 749-51). The Washington Supreme Court concluded that adopting the "ministerial" framework from federal law struck the

appropriate balance between the First Amendment's protections of religious employers from "state interference with religious freedoms," *id.* at 1067, and the state constitutional prohibitions on favored treatment for certain classes of businesses. *Id.* at 1069.

In reaching this result in *Woods*, the Washington Supreme Court made clear that its decision "do[es] not opine on the effect of this decision on every prospective employee seeking work with any religious nonprofit such as universities, elementary schools, and houses of worship." *Id.* at 1065 n.2 (listing examples of other religious employers in Washington that, depending on the facts, may fall under the religious employer exemption). Instead, the decision outlined the factual inquiry that should be applied on remand to the individual plaintiff's claims. *Id.* at 1067-70.

### B.   UGM Filed a Pre-Enforcement Challenge to the WLAD

UGM is a nonprofit religious organization that requires its employees to "adhere to certain Christian behavior requirements—including abstaining from any sexual conduct outside of biblical marriage between one man and one woman[.]" 3-ER-285–86. UGM requires its employees to be "coreligionists," which it defines as "those who agree with its religious beliefs and who will adhere to its religious tenets and behavior requirements." 3-ER-333–34.

On March 2, 2023, UGM filed suit against the Washington Attorney General and the Executive Director and Commissioners of the Washington State Human Rights Commission (HRC) (collectively, the State). 3-ER-284–336. UGM's complaint asks the district court to "[d]eclare that the recent narrowed interpretation of the WLAD" by the Washington Supreme Court in *Woods* is unconstitutional under the First Amendment of the U.S. Constitution. 3-ER-333–34.

Specifically, UGM alleges that the WLAD's employment discrimination provisions, Wash. Rev. Code § 49.60.180(1)-(3), violate UGM's First Amendment rights under the Religion Clauses, Free Exercise Clause, expressive association protection, and Establishment Clause. 3-ER-323–33. It also challenges the WLAD's provisions regarding employment advertisements, Wash. Rev. Code § 49.60.180(4), and religious affiliation disclosures, Wash. Rev. Code § 49.60.208, as violating the Free Speech Clause. 3-ER-330–32. The WLAD's employment advertisement provision provides that it is an unfair practice for an employer "[t]o print, or circulate, or cause to be printed or circulated any statement, advertisement, or publication, or to use any form of application for employment, or to make any inquiry in connection with prospective employment, which expresses any limitation, specification, or

discrimination as to" any protected class. Wash. Rev. Code § 49.60.180(4). The WLAD's religious-affiliation disclosure provision provides that it is an unfair practice for an employer to "[r]equire an employee to disclose his or her sincerely held religious affiliation or beliefs, unless the disclosure is for the purpose of providing a religious accommodation at the request of the employee." Wash. Rev. Code § 49.60.208(1). UGM does not allege it has ever taken adverse action against an LGBTQ+ employee or prospective employee as a result of its employment policies, but instead argues that the mere existence of the WLAD is sufficient to allow UGM to bring a pre-enforcement challenge. 3-ER-313–28.

The State moved to dismiss UGM's complaint for lack of standing. 3-ER-257–83. UGM filed a cross motion for a preliminary injunction that would prohibit the State from enforcing (including through investigations) the WLAD against UGM for (1) preferring and hiring only coreligionists (those who agree with and adhere to UGM's religious tenets and behavior requirements) for its non-ministerial positions, including its IT technician and operations assistant positions; and (2) publishing and communicating its religious beliefs and behavior requirements for non-ministerial employees to others. 3-ER-214–41. The district court granted the State's motion to dismiss and denied UGM's motion for preliminary injunction as moot. 3-ER-213. UGM appealed, and this

Court reversed, holding that UGM's claims satisfied Article III standing and remanding UGM's motion for preliminary injunction for the district court to decide. *Union Gospel Mission of Yakima v. Ferguson*, No. 23-2606, 2024 WL 3755954 (9th Cir. Aug. 12, 2024).

On remand, the State filed a Notice and Stipulation of Enforcement Position stating that the State "will not enforce the WLAD against UGM in connection with the positions and Religious Hiring Policy as identified in its Complaint and related attachments." 2-ER-105. UGM renewed its preliminary injunction motion. 2-ER-76–103.

## C. The District Court Granted UGM's Motion for Preliminary Injunction

The district court granted UGM's preliminary injunction motion, enjoining the State "from enforcing (including through investigations) the WLAD against [UGM] for preferring and hiring only coreligionists—those who agree with and will adhere to the religious tenets and behavior requirements— for its non-ministerial positions." *Union Gospel Mission of Yakima v. Ferguson*, No. 1:23-CV-3027-MKD, 2024 WL 4660918, at *1 (E.D. Wash. Nov. 1, 2024) (1-ER-16–17). The court held that UGM is likely to succeed on the merits of its free exercise claim because it concluded that the WLAD "likely is not neutral or generally applicable" and therefore is subject to strict scrutiny. *Id.* at *3

(1-ER-10). The court acknowledged that "'the WLAD treats religious employers with fewer than eight employees exactly as it treats comparable secular employers—they are both exempt.'" *Id.* at *4 (1-ER-10–11) (quoting ECF No. 36 at 19). But the court nonetheless determined that the WLAD treats comparable secular activity more favorably than religious activities because it exempts employers with fewer than eight employees. *Id.* According to the court, this exemption "likely undermines the statute's stated interest in 'eliminat[ing]' and 'prevent[ing]' discrimination." *Id.* at *3 (quoting Wash. Rev. Code § 49.60.010) (1-ER-10).

The court also determined that the WLAD likely fails strict scrutiny. *Id.* at *4 (1-ER-12). In the court's view, the WLAD is broader than necessary because it could still serve its purpose without applying to religious employers. *Id.* The court also held that the WLAD likely is "impermissibly underinclusive" and therefore not narrowly tailored because it "places stricter limits on religious activities than it does secular activities that 'create the same problem.'" *Id.* (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015)) (1-ER-13).

The court found that UGM established likelihood of irreparable harm through the "loss of First Amendment freedoms," *id.*, and the "hampering of [its] ability to hire staff consistent with its religious beliefs," *id*. at *5 (cleaned up)

(1-ER-13, 15). The court also found that the balance of equities and public interest favored issuing a preliminary injunction. *Id*. (1-ER-15).

## VI.    STANDARD OF REVIEW

This Court reviews a district court's decision to grant or deny a preliminary injunction for abuse of discretion. *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020). The district court's legal conclusions are reviewed de novo and its factual findings for clear error. *Id.*

To obtain a preliminary injunction, a party must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); Fed. R. Civ. P. 65(b)(1).

## VII.   SUMMARY OF ARGUMENT

This Court should reverse the district court's grant of a preliminary injunction for UGM. As an initial matter, UGM lacks standing to obtain a preliminary injunction because the State has disavowed enforcement of the WLAD against UGM in connection with the positions and Religious Hiring Policy identified in UGM's complaint. Even if UGM could establish standing, the district court erred in holding that the WLAD is not neutral and generally

14

applicable under *Employment Division v. Smith* because it includes a small business exemption. The WLAD's small business exemption applies evenhandedly to secular and religious entities alike, and does not treat any comparable secular organization more favorably than UGM. The district court's decision to the contrary distorts free exercise caselaw, in the process undermining all manner of federal and state laws that routinely exempt small businesses, or contain other similar exemptions that apply across the board. The district court's decision grants religious organizations—or even large for-profit corporations that claim a conflict with their owner's religious beliefs—the "general immunity from secular laws" that the Supreme Court has consistently denied. *See Our Lady of Guadalupe Sch.*, 591 U.S. at 746.

This Court need not reach UGM's remaining First Amendment challenges. But if it reaches these arguments, it should reject each of them as wholly unsupported by precedent. UGM admits that neither the Supreme Court nor this Circuit has ever adopted the sweepingly broad "co-religionist" exemption UGM advocates here. The Supreme Court has also directly rejected UGM's argument that it has a broad free association right to discriminate in employment. UGM's free speech claims similarly fail because the Supreme Court has long recognized that publishing discriminatory job advertisements and

15

employment policies is speech proposing illegal conduct that is categorically excluded from First Amendment protections.

Finally, UGM is not entitled to the extraordinary remedy of preliminary relief because it meets none of the other *Winter* factors. UGM cannot show a likelihood of irreparable harm, particularly as the State has explicitly disavowed any enforcement of the WLAD against UGM with respect to the positions at issue in this litigation. UGM likewise cannot show that the equities and public interest tip in its favor, given that UGM proposes to derail longstanding anti-discrimination law that protects employees statewide.

## VIII. ARGUMENT

### A.    UGM Cannot Establish Standing to Obtain a Preliminary Injunction

This Court should reverse the district court's preliminary injunction because UGM cannot establish standing to obtain such an injunction. To establish standing at this stage, UGM must show it has suffered, or will suffer, an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted). UGM must support each of these elements "with the manner and degree of evidence required at the successive stages of the

litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Because UGM requests "forward-looking relief," it must demonstrate "a real and immediate threat" of future injury. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citing *O'Shea* v. *Littleton*, 414 U.S. 488, 496 (1974); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur" (internal quotation marks omitted))). In the First Amendment context, the injury-in-fact element may be satisfied "by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising [the] right to free expression." *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1174 (2022) (internal quotation marks omitted).

UGM cannot show it is "likely to succeed" in carrying this burden. *Murthy*, 603 U.S. at 69. To start, since UGM's prior appeal in this case, the State has entered into a stipulation explicitly disavowing that it will "enforce the WLAD against UGM in connection with the positions and Religious Hiring Policy as identified in its Complaint and related attachments." 2-ER-105. While this Court previously relied on the State's prior failure to disavow enforcement of the WLAD to find that UGM faced a credible threat of enforcement, *Union Gospel Mission of Yakima*, 2024 WL 3755954, at *3, UGM cannot show such a

credible threat persists in light of the State's enforcement disavowal. *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010) (holding that a plaintiff's "claims of future harm lack credibility when . . . the enforcing authority has disavowed the applicability of the challenged law to the plaintiffs"); *see also Driehaus*, 573 U.S. at 159 (A plaintiff may bring a pre-enforcement suit by alleging (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) that is "proscribed by a statute," *and* (3) there exists "a credible threat of prosecution thereunder." (internal quotation marks omitted)).

Second, while UGM submitted briefing stating that it would need to hire for additional non-ministerial positions not referenced in the complaint, *see, e.g.*, 2-ER-83, UGM had already publicly posted at least some of those positions *before* it obtained an order from the district court preliminarily enjoining the State from enforcing the WLAD with regard to such positions. 2-ER-20, 25–75. Indeed, UGM appears to have posted one of those job openings just days prior to pressing the district court to issue a preliminary injunction on the ground that it needed immediate relief, apparently feeling no chilling effect at all. *See* 2-ER-57 (printout from September 19, 2024, reflecting job posted "10 days ago"). UGM's briefing before the district court makes clear that it has faced no

18

chilling effect or harm that would support jurisdiction. Thus, UGM cannot establish it faces any chilling effect in the absence of a preliminary injunction.

Third, UGM cannot rely on the possibility of private enforcement of the WLAD to establish standing against the State at this stage because that possibility is purely hypothetical. *Murthy*, 603 U.S. at 72 ("[S]peculat[ion] about the decisions of third parties" cannot show likelihood of imminent future harm necessary to establish standing at preliminary injunction stage). Moreover, preliminarily enjoining the State does not redress the possibility of private enforcement against UGM because the preliminary injunction is not binding on third parties not before the Court. *Id.* at 73-74 (finding plaintiffs lacked standing where they alleged self-censorship due to actions by non-parties who would not be "obliged to honor an incidental legal determination" in an injunction order against the government). *Murthy* makes clear that, in such circumstances, UGM cannot meet the redressability prong of Article III. *Id*. at 73 (finding plaintiffs lacked standing where they could not show "a risk of future censorship traceable to the *defendants*.").

The district court's preliminary injunction order should be reversed on standing grounds.

**B.** **The District Court's Ruling that UGM Is Likely to Succeed on the Merits of Its Free Exercise Claim Is Incorrect and Would Provide Religious Employers Immunity from Any Law Containing an Exception**

The district court's ruling that UGM is likely to succeed on the merits of its free exercise claim contorts the law to an extreme that the Supreme Court has expressly disallowed. The Free Exercise Clause of the First Amendment, which applies to the States through the Fourteenth Amendment, *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. Const. amend. 1. It was "historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause." *Bowen v. Roy*, 476 U.S. 693, 703 (1986).

The right of free exercise, however, "does not mean that religious institutions enjoy a general immunity from secular laws." *Our Lady of Guadalupe Sch.*, 591 U.S. at 746. The Free Exercise Clause "'does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability.'" *Tingley v. Ferguson*, 47 F.4th 1055, 1084 (9th Cir. 2022), *cert denied*, 144 S. Ct. 33 (2023) (quoting *Emp. Div. v. Smith*, 494 U.S. at 879). Instead, it "protect[s] their autonomy with respect to internal management decisions that are essential to the institution's central mission," such as "the

20

selection of the individuals who play certain key roles." *Our Lady of Guadalupe Sch.,* 591 U.S. at 746. Neutral, generally applicable laws are subject to rational basis review even if they incidentally burden religious practice. *Tingley*, 47 F.4th at 1084 (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993)).

Under these principles, "[a] religious employer is not given carte blanche with respect to all employees, ministerial and non-ministerial alike." *Seattle Pacific Univ. v. Ferguson*, 104 F.4th 50, 58 (9th Cir. 2024). But the district court's illogical ruling that the WLAD is not neutral and generally applicable because it contains a small-business exception disregards these fundamental principles and gives religious employers exactly this type of carte blanche. The district court's sweeping decision would relieve religious organizations such as UGM of the obligation to comply with all manner of laws that include a small-business or other exception. The decision is wrong as a matter of law, and should be reversed.

### 1. The WLAD is neutral and generally applicable

"The WLAD is a neutral, generally applicable law" and is rationally related to a legitimate governmental interest in preventing discrimination. *State v. Arlene's Flowers, Inc.*, 441 P.3d 1203, 1231 (Wash. 2019), *cert. denied*, 141

S. Ct. 2884 (2021). In enacting the WLAD, the Washington Legislature sought to balance the rights of employees to be free from discrimination in the workplace with the right of religious employers to choose those who reflect the employers' beliefs when hiring ministers. *Woods v. Seattle's Union Gospel Mission*, 481 P.3d at 1062.

To be generally applicable, a law "cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543. A law is not generally applicable if it (1) includes a formal mechanism for granting individualized, discretionary exemptions; or (2) "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533-36 (2021). But there is nothing inherently wrong with laws that contain exemptions. As long as the exemptions are not individualized and discretionary, the law is subject to rational basis review under *Smith*. *Id.* at 533.

Laws are not neutral "if the object of a law is to infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533; *see Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022) (holding that a neutral law neither facially discriminates against religious practice nor has religious exercise as its object). The government "cannot impose regulations that

are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018).

This Court recently distilled the Supreme Court's current free exercise jurisprudence into three "bedrock requirements" in *Fellowship of Christian Athletes v. San Jose Unified School District*, 82 F.4th 664, 686 (2023) (en banc) (*FCA*). First, a neutral and generally applicable law "may not have 'a mechanism for individualized exemptions.'" *Id.* (quoting *Fulton*, 593 U.S. at 533). Second, "the government may not 'treat . . . comparable secular activity more favorably than religious exercise.'" *Id.* (citing *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam)). And third, the "government may not act in a manner 'hostile to . . . religious beliefs' or inconsistent with the Free Exercise Clause's bar on even 'subtle departures from neutrality.'" *Id.* (citing *Masterpiece Cakeshop*, 584 U.S. at 638; *Lukumi*, 508 U.S. at 534).

The WLAD transgresses none of the three prongs articulated in *FCA*. The district court addressed only the second prong, holding that the WLAD is not neutral and generally applicable because its exemption for employers with fewer than eight employees, Wash. Rev. Code § 49.60.040(11), "put[s] for-profit, non-

religious organizations on unequal footing with [UGM] and other religious organizations like it." *Union Gospel Mission of Yakima*, 2024 WL 4660918, at *3. (1-ER-10). Although it found *Tandon* "dispositive," the district court not only misread *Tandon's* holding, but would impermissibly expand that holding to swallow the ministerial exception and provide religious organizations the "general immunity from secular laws" that the Supreme Court has consistently denied. *See Our Lady of Guadalupe Sch.*, 591 U.S. at 746.

### a.   The WLAD does not treat comparable secular activity more favorably than religious exercise

The district court's ruling that the WLAD treats comparable secular activity more favorably than religious activity defies common sense. In reaching this holding, the court fundamentally mischaracterized Washington law and free exercise precedent. If it stands, the ruling would dramatically constrict the State's ability to enforce employment discrimination laws and ensure that employment opportunities remain open to all—including protections from discrimination on the basis of race, sex, disability, and a host of other protected characteristics. It would also hamstring the ability of states and the federal government to exempt small businesses from all manner of regulations—including those that apply evenhandedly to secular and religious organizations—without essentially immunizing religious groups from compliance, thus

upsetting the delicate balancing of policy interests required to reach democratic consensus. The Free Exercise Clause cannot be interpreted as such a legislative straitjacket, particularly where UGM has established *no* differential treatment between secular and religious employers under any of the WLAD's exemptions.

Here, there is no circumstance in which the WLAD would ban a religious employer's conduct but allow a comparable secular employer's identical conduct. The religious exercise at issue in this case is UGM's rejection of candidates for employment who do not "adhere to certain Christian belief and behavior requirements—including abstaining from any sexual conduct outside of biblical marriage between one man and one woman[.]" 3-ER-285–86. The WLAD does not permit any covered employer, secular or otherwise, to "refuse to hire any person because of . . . sexual orientation." Wash. Rev. Code § 49.60.180(1).

Small employers fall outside the WLAD's coverage, but that is true of secular and religious employers alike. The small-business exemption includes all businesses with fewer than eight employees, without any consideration whatsoever of religious or secular status.

The district court deemed this irrelevant under the Supreme Court's decision in *Tandon*, but its holding badly misunderstands that decision. In

*Tandon*, the Supreme Court assessed California's pandemic restrictions that prohibited more than three households from gathering for religious exercise. *Tandon*, 593 U.S. at 63. Because California allowed more than three households to gather at hair salons, retail stores, or for other "comparable secular activities"—i.e., other activities that comparably contributed "against the asserted government interest" in reducing the spread of COVID-19—the Supreme Court concluded that the law was not generally applicable. *Id.* at 62-63. It was in this context that the Court said that government regulations are not neutral and generally applicable when they "treat any *comparable* secular activity more favorably than religious exercise." *Id.* at 62 (emphasis added). The Court looked to the comparable activity—gatherings of more than three households—to determine whether secular activity was being treated more favorably.

Here, the district court failed to determine that the WLAD treated any *comparable* secular activity more favorably. Having fewer than eight employees is not a "secular activity," and it is not comparable for First Amendment purposes to UGM's religious objection to hiring employees that do not adhere to its Christian lifestyle and behavior requirements. If the WLAD exempted only small secular employers but not small religious ones, then it would not be neutral

and generally applicable. But the WLAD treats religious employers with fewer than eight employees exactly as it treats comparable secular employers—they are both exempt. There can be no credible argument that the WLAD's small business exception is any sort of "religious gerrymander." *Lukumi*, 508 U.S. at 534. The district court's ruling in effect says that if a state exempts any sort of employer from antidiscrimination laws, then it must exempt all religious employers from the same laws, but that has never been the law. *Kane v. De Blasio*, 19 F.4th 152, 166 (2d Cir. 2021) ("[N]either the Supreme Court . . . nor any other court of which we are aware has ever hinted that a law must apply to all people, everywhere, at all times, to be 'generally applicable.'").

The Supreme Court has made clear that a law may contain exemptions without triggering strict scrutiny, so long as the exemptions are not individualized and discretionary. *Fulton*, 593 U.S. at 533. The exemptions contained in the WLAD are categorical. Their application does not depend on individualized discretion, and the exemptions do not invite "the government to decide which reasons for not complying with the [law] are worthy of solicitude." *Id.* at 537. The small employer exemption applies whether the employer is religious or secular—the treatment is exactly the same. *See* Wash. Rev. Code § 49.60.040(11).

In *Tingley v. Ferguson*, this Court similarly rejected the notion that a law is not neutral or generally applicable unless it covers every conceivable related harm. 47 F.4th at 1088-89. There, the Court rejected the plaintiff's arguments that other types of therapy might lead to "the very types of psychological harms" that the challenged law prohibiting conversion therapy attempted to address. *Id.* at 1089. There was no constitutional fatality because no law must address every conceivable harm.

*FCA* likewise does not support the district court's interpretation of the WLAD. In *FCA*, a ministry group lost recognition as an official student group because of its policy that student leaders could not be gay. *FCA*, 82 F.4th at 674-75. The ministry group brought a free exercise challenge to the school board's non-discrimination policy. *Id.* at 675. In assessing whether the non-discrimination policy treated secular activities more favorably than religious activities, this Court looked to the conduct of other, secular student groups that were also subject to the non-discrimination policy—the comparable secular activity. *Id.* at 689. Some of those secular student groups restricted membership based on sex, which was also prohibited by the same non-discrimination policy, but retained their official status. *Id.* The *FCA* Court found that the government's "selective enforcement" of its policy created a differential treatment between

28

comparable secular and religious student groups and violated *Tandon's* requirement that laws not treat comparable secular activity more favorably than religious activity. *Id.* at 689-90.

Similarly, *Youth 71Five Ministries v. Williams*, No. 24-4101, 2024 WL 3749842 (9th Cir. Aug. 8, 2024), involved a plaintiff nonprofit's challenge to Oregon's decision revoking the ministry's funding because its policy of hiring only Christians violated the state's rule that grantees must not discriminate in hiring, subcontracting, or the delivery of services. *Id.* at *1. While the state "strictly enforced [its rule] against 71Five, it has looked the other way with secular groups that also receive state funding," including groups that served only "girl-identifying youth" or "African and African American families." *Id.* at *2. This Court concluded that this differential treatment—allowing other nonprofits that violated the non-discrimination policy in the same way to retain state funding—mirrored the First Amendment violation in *Tandon* and *FCA*. *Id.* at *3-4.

Both *FCA* and *Youth 71Five* involved religious plaintiffs that were penalized for violating a policy when secular parties were not similarly penalized. But here, UGM can identify no secular employers who are exempt from complying with the WLAD under circumstances in which UGM must

29

comply. There are no such circumstances. To the contrary, the WLAD actually treats UGM and similar religious organizations more favorably than secular employers because only religious employers may avail themselves of the ministerial exemption.

The district court's ruling is out of line with established free exercise jurisprudence and represents a drastic expansion of *Tandon*. The district court did not conduct any form of comparability analysis. It instead simply assessed "whether the WLAD treats Plaintiff—a religious organization—differently than secular employers with fewer than eight employees." *Union Gospel Mission of Yakima*, 2024 WL 4660918, at *4 (1-ER-11). Under this reasoning, any religious organization would be free to flout the requirements of any state or federal laws with an exemption, such as Title VII, the ADA, and the ADEA because each contains a small-business exclusion.

Indeed, under the district court's logic, the existence of *any exemption* whatsoever in a law, even when the exemption is available to religious and secular organizations alike, must be treated as a proper comparator for any religious activity or religious entity that is not exempted under the law. This ruling would mean that no law could be deemed generally applicable unless it

contained no exceptions, even exceptions that apply evenhandedly to secular and religious organizations alike.

Any number of generally applicable state and federal employment laws beyond the antidiscrimination context contain such exemptions and would therefore be implicated by the district court's reasoning. For example, the Fair Labor Standards Act exempts executive, administrative, professional, and certain outside sales employees from minimum wage and overtime pay requirements. 29 U.S.C. § 213(a); 29 C.F.R. Part 541. Similarly, the Washington Minimum Wage Act contains several exceptions to the definition of "employee," ranging from individuals employed in casual labor in a private home to those employed as seamen on a non-American vessel. Wash. Rev. Code § 49.46.010(3)(a)-(q). If one of these exceptions applies, the employer does not have to comply with protections in the Act such as paying minimum wage, overtime, or sick leave. Wash. Rev. Code §§ 49.46.020, .130, .210. The Washington Industrial Insurance Act, which ensures that injured workers receive treatment, wage replacement benefits, and disability benefits if they are injured at work, also contains exceptions for several "employments," including private gardeners, jockeys, certain musicians, and newspaper vendors. Wash. Rev. Code § 51.12.020. The Family and Medical Leave Act, which provides

employees with up to 12 weeks of unpaid, job-protected leave per year for certain family and medical reasons, exempts employers with fewer than 50 employees from its requirements. 29 U.S.C. §§ 2611(2)(B)(ii), (4)(A)(i). And the Occupational Safety and Health Administration, which oversees workplace safety conditions, exempts employers with fewer than 10 employees from certain workplace injury and illness recordkeeping requirements. 29 C.F.R. § 1904.1(a)(1).

Applying the district court's logic would mean that laws such as these cannot contain any exemptions unless religious entities are completely exempt from the law's application. The district court's analysis would effectively eliminate the comparability requirement altogether, as the court's holding would find a lack of neutrality and general applicability whenever any exemption applies to secular activity, *even if it also applies to the identical religious activity*. But that is not what the Free Exercise Clause requires. This extreme result cannot be reconciled with the Supreme Court's admonition that the right of free exercise "does not mean that religious institutions enjoy a general immunity from secular laws." *Our Lady of Guadalupe Sch.*, 591 U.S. at 746. It is absurd to deem a provision that applies whether the employer is religious or secular—and treats both exactly the same—as evidence of religious discrimination.

"[N]either the Supreme Court . . . nor any other court of which we are aware has ever hinted that a law must apply to all people, everywhere, at all times, to be 'generally applicable.'" *Kane*, 19 F.4th at 166. Indeed, the Supreme Court has upheld a variety of generally applicable regulations over sincere religious objections. *See, e.g.*, *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 303 (1985) (requiring religious organization to comply with minimum wage laws); *Bob Jones Univ. v. United States*, 461 U.S. 574, 603-05 (1983) (upholding government's denial of a university's nonprofit tax status because it discriminates based on race); *United States v. Lee*, 455 U.S. 252, 261 (1982) (requiring employer to pay social security taxes over religious objections). Of course, those constitutionally sound regulations also had exceptions. *Tony & Susan Alamo Found.*, 471 U.S. at 295 (detailing two prerequisite conditions before minimum wage laws apply); *Bob Jones Univ.*, 461 U.S. at 613 (listing other tax-exempt organizations); *Lee*, 455 U.S. at 256 (detailing exemption from paying social security taxes). *Tandon* did not overrule decades of precedent *sub silentio* and the district court erred in concluding otherwise.

Exclusions for small businesses in the WLAD from the definition of "employer" do not destroy general applicability and neutrality. Because the

WLAD applies even-handedly to comparable secular and religious organizations with fewer than eight employees, the district court erred in finding that the WLAD is not a neutral and generally applicable law under *Smith*.

### b. The WLAD does not provide for individualized exemptions and evidences no hostility to religion

The district court did not reach the remaining two requirements this Court set forth in *FCA*, and this Court need not address them. But if the Court reaches these issues, it should find that the WLAD runs afoul of neither.

First, the WLAD contains no "mechanism for individualized exemptions." *FCA*, 82 F.4th at 686; *Fulton*, 593 U.S. at 533. A policy is not "generally applicable" under this prong if "it invites the government to consider the particular reasons for a person's conduct" and whether they "are worthy of solicitude." *Fulton*, 593 U.S. at 533 (quoting *Smith*, 494 U.S. at 884).

In *Fulton*, the Supreme Court held that that the City of Philadelphia violated the Free Exercise Clause when it refused to contract with Catholic Social Services unless it agreed to certify same-sex couples as foster parents. *Id.* at 527. But the City's contract with foster-care agencies included a written provision giving a city official "sole discretion" to make exceptions to the contract's non-discrimination rule. *Id.* at 535. The Court held that "the inclusion of a formal system of entirely discretionary exceptions in [the challenged law]

renders the contractual non-discrimination requirement not generally applicable." *Id.* at 536-37.

This Court has likewise found this requirement violated when the statute or policy contains express grants of broad discretion. In *FCA*, this Court held that a school district policy was not generally applicable because it granted the district discretion to decide "on an ad hoc basis" whether to allow student groups to exclude other students on prohibited grounds. *FCA*, 82 F.4th at 687.

In contrast, in *Tingley*, this Court found a state law prohibiting licensed therapists from engaging in conversion therapy was generally applicable under this prong of *Fulton* because the statute lacked a formal discretionary mechanism for individual exceptions. *Tingley*, 47 F.4th at 1088. The Court observed that there was "no provision in the Washington law for individual exceptions that would allow secular exemptions but not religious ones." *Tingley*, 47 F.4th at 1088 (cleaned up).

Similarly here, the WLAD contains no mechanism for individualized exemptions. Instead, it contains categorical exemptions, including for employers with fewer than eight employees. Wash. Rev. Code § 49.60.040(11). This exemption applies to all employers, regardless of whether they are secular or religious. No government entity has discretion in administering these

exemptions. *Cf. FCA*, 82 F.4th at 687 (challenged policies "not generally applicable because the [government] retains discretion to grant individualized exemptions"); *Fulton*, 593 U.S. at 544 (Barrett, J., concurring) (stressing that strict scrutiny was triggered by the "individualized exemptions from [the government contract's] nondiscrimination rule"). The WLAD is generally applicable.

Turning to *FCA*'s final prong, the WLAD is not hostile to religion. The Free Exercise Clause bars even "'subtle departures from neutrality.'" *FCA*, 82 F.4th at 686 (quoting *Masterpiece Cakeshop*, 584 U.S. at 638). Here, however, neither the WLAD's text nor the Legislature's actions demonstrate hostility towards religion. *Cf. Lukumi*, 508 U.S. at 532-42 (holding that the law at issue was not neutral because the legislative history showed clear intent to target practitioners of the Santeria faith). Plaintiffs offer no contrary argument.

### 2. The WLAD Is Rationally Related to Legitimate Governmental Purposes

As a neutral and generally applicable law, the WLAD should be upheld because it rationally relates to the government's legitimate interest in preventing discrimination. *Arlene's Flowers*, 441 P.3d at 1231. UGM has not attempted to argue otherwise.

Moreover, the WLAD is constitutional even if this Court were to apply strict scrutiny. To satisfy strict scrutiny, a statute must be "narrowly tailored to serve compelling state interests." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992). The First Amendment requires laws to be "narrowly tailored, not . . . perfectly tailored." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015) (internal quotation marks omitted). Preventing discrimination is a compelling government interest. *See, e.g.*, *E.E.O.C. v. Pacific Press Pub. Ass'n*, 676 F.2d 1272, 1280 (9th Cir. 1982) ("Congress' purpose to end discrimination is equally if not more compelling than other interests that have been held to justify legislation that burdened the exercise of religious convictions."), *abrogation on other grounds recognized by Am. Friends Serv. Comm. Corp. v. Thornburgh*, 951 F.2d 957, 960 (9th Cir. 1991); *Arlene's Flowers*, 441 P.3d at 1234-35 (collecting cases from numerous courts that "have heard religious free exercise challenges to [antidiscrimination] laws and upheld them under strict scrutiny"). The WLAD's prohibition on discrimination in hiring is precisely tailored to achieve the State's interest in providing equal opportunity to participate in the workforce while honoring the ministerial exception as set forth by the U.S. Supreme Court.

C.     **The "Church Autonomy Doctrine" Does Not Afford UGM Broad Immunity to Discriminate in Hiring Non-Ministerial Employees**

The district court did not reach any of the other arguments UGM posited in support of its preliminary injunction motion. If this Court reaches these issues, UGM is unlikely to succeed on the merits of any of them.

First, UGM argues that what it calls the "coreligionist exception" or "church autonomy doctrine" affords broader protection from antidiscrimination laws than the ministerial exception. 2-ER-89–93; 3-ER-231–32. According to UGM, the WLAD infringes its autonomy by preventing it from refusing to hire someone because of sexual orientation. 2-ER-92–93. But, as UGM concedes, the U.S. Supreme Court has never recognized "that the co-religionist exemption" as articulated by UGM is "embedded in the First Amendment." 2-ER-163. Adopting UGM's argument would grant religious organizations broad immunity to discriminate against non-ministerial employees on the basis of race, sex, or any other protected characteristic under the WLAD, and open the door to immunity to all sorts of secular laws. No court has adopted such a sweeping immunity for religious organizations.

To the contrary, the Supreme Court has interpreted the doctrine as granting limited protections to churches and other religious institutions "to decide matters 'of faith and doctrine' without government intrusion" and to

make internal management decisions that are "essential to the institution's central mission," such as "the selection of the individuals who play certain key roles" within the organization. *Our Lady of Guadalupe Sch.*, 591 U.S. at 746 (explaining "the independence of religious institutions in matters of 'faith and doctrine' is closely linked to independence in what [the Court has] termed 'matters of church government'").

But the doctrine "does not mean that religious institutions enjoy a general immunity from secular laws." *Id.* The Supreme Court has specifically limited the doctrine's application in the employment context to employees performing a ministerial role, as determined through a number of factors including the level of religious training and examination required for the job, any religious commission the employee received, any requirement to instruct on religious subjects, any duties to pray with others or attend religious services as part of the job, and the extent to which the church and the employer hold the employee out to the world as a minister. *Our Lady of Guadalupe Sch*, 591 U.S. at 749-51; *cf. Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.*, 565 U.S. 171, 204 (2012) (Alito, J. concurring) (noting that "a purely secular teacher would not qualify for the 'ministerial' exception" at a religious school).

As this Court has similarly recognized, "[a] religious employer is not given carte blanche with respect to all employees, ministerial and non-ministerial alike." *Seattle Pacific Univ.*, 104 F.4th at 58. Instead, a wall of Circuit authority has recognized that the employment of non-ministerial employees is not part of "church autonomy" and can instead be decided under neutral and generally applicable legal principles. *See, e.g.*, *Puri v. Khalsa*, 844 F.3d 1152, 1158 (9th Cir. 2017) (framing the "church autonomy" doctrine as applicable "to any state law cause of action that would otherwise impinge on the church's prerogative to choose *its ministers* or to exercise its religious beliefs in the context of employing *its ministers*" (quoting *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 950 (9th Cir. 1999) (emphasis added))); *see also EEOC v. Fremont Christian Sch.*, 781 F.2d 1362 (9th Cir. 1986) (religious school could not enforce religious belief that only men can be the head of a household by paying health insurance benefits to married men but not to married women); *Pacific Press Pub. Ass'n*, 676 F.2d at 1276-77, 1280 (religious publishing house barred from firing an employee for filing a discrimination complaint with the EEOC, even though church doctrine prohibited members from filing lawsuits against the church); *Bollard*, 196 F.3d at 947 (recognizing that "[i]n the case of lay employees, the particularly strong religious interests

surrounding a church's choice of its representative are missing, and we have concluded that applying Title VII is constitutionally permissible").

Courts across the nation have also long recognized that non-ministerial employees may bring employment discrimination claims against religious employers, even if those employment decisions are motivated by religious beliefs. *See, e.g., Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) (holding that "[l]ike any other person or organization," a church's "employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions"); *EEOC v. Miss. Coll.*, 626 F.2d 477, 485 (5th Cir. 1980) (holding that while college faculty were expected to be practicing Christians, that does not "make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern"). And to expand church autonomy to include all decisions about employment in a religious organization "would render the ministerial exception superfluous," *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 496 F. Supp. 3d 1195, 1206 (S.D. Ind. 2020) (rejecting argument that the overarching principle of religious autonomy "bars employment discrimination claims arising from a religious employer's

application of religious doctrine regardless of whether the employee qualifies as a minister").

Given this controlling case law, UGM is unlikely to succeed on the merits of its claims that the First Amendment provides a "coreligionist exemption" that bars the WLAD from being enforced against religious employers whenever discrimination is motivated by religious belief.

**D.    UGM Does Not Have a First Amendment Associational Right to Discriminate in Hiring Non-Ministerial Employees**

If it reaches the issue, this Court should also reject UGM's claim to a First Amendment associational right to discriminate on the basis of sexual orientation in hiring non-ministerial employees. Neither the Supreme Court nor this Court has ever recognized such a broad-reaching right. And adopting UGM's argument would tear a gaping hole in employment discrimination laws. While the Supreme Court in *Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.*, 565 U.S. at 189, recognized the First Amendment's "special solicitude" to religious organizations permitting discrimination against "ministerial employees," UGM does not assert that more limited right here. 3-ER-251 (stating that the positions at issue "are not ministerial positions and therefore not protected by the ministerial exception"). Instead, UGM asserts a broader associational right—a right that is "enjoyed by religious and secular groups

alike," whether the association is "the Lutheran Church, a labor union, or a social club." *Hosanna-Tabor*, 565 U.S. at 189. UGM's theory is that any expressive purpose, such as not wishing to associate with LGBTQ+ people or any other group of people, would suffice. But adopting this argument would open the door to employment discrimination based on race, sex, age, and religion, reverting to a shameful era of "white applicants only" want-ads. *Cf. Boy Scouts of Am. v. Dale,* 530 U.S. 640, 660 (2000) (recognizing that First Amendment protections, once applicable, apply regardless of expression's "social acceptance") (citing *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per curiam) (overturning conviction of Ku Klux Klan leader advocating political reform through lawbreaking on First Amendment grounds)).

Neither the Supreme Court nor this Court has ever recognized this broad associational right in the employment context. To the contrary, the Supreme Court explicitly rejected a free association right to discriminate in employment in *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984). There, the Court held that the right of expressive association does not permit discrimination on the basis of sex against law firm partners in violation of Title VII. *See also Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) ("In *Hishon*, we rejected the argument that Title VII infringed employers' First Amendment rights."); *cf. Ry. Mail Ass'n v.*

*Corsi*, 326 U.S. 88, 94 (1945) (rejecting free association right to discriminate and finding "no constitutional basis for the contention that a state cannot protect workers from exclusion solely on the basis of race, color or creed by an organization").

UGM's associational claim relies primarily on *Boy Scouts of America v. Dale,* 530 U.S. at 648, but *Dale* addressed a *private club's* right to choose volunteer leaders, not the right of an *employer* to discriminate in hiring and firing non-ministerial employees. *See, e.g.*, *Starkey*, 496 F. Supp. 3d at 1209 ("*Dale* did not arise from the employment context. The plaintiff sought membership in a private organization. The freedom of association cases relied upon in *Dale* reveal the doctrine's applicability to parade groups, political parties, and other non-employment contexts."), *appeal dismissed*, No. 20-3265, 2021 WL 9181051 (7th Cir. Jul. 22, 2021). *Dale* highlighted this private aspect as material to its analysis. *See, e.g*., *Dale*, 530 U.S. at 657 (recognizing that state's expansion of public accommodations laws from "commercial entities" to purely "private entit[ies]" increased the "potential for conflict between state public accommodations laws and the First Amendment rights of organizations"); *id.* at 659 n.4 (citing the statement in *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos*., 515 U.S. 557, 581 (1995), that a "private club could exclude an

applicant whose manifest views were at odds with a position taken by the club's existing members").

The Supreme Court has never treated *employment* discrimination as similarly expressive; rather, it has treated employment discrimination as commercial and transactional conduct. For example, in upholding an ordinance prohibiting discriminatory help-wanted advertisements, the Supreme Court held that ["d]iscrimination in employment is not only commercial activity, it is illegal commercial activity." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 388 (1973). And in *Rumsfeld v. Forum for Academic and Institutional Rights*, 547 U.S. 47, 62 (2006), the Supreme Court acknowledged that government "can prohibit employers from discriminating in hiring on the basis of race," and that, for example, requiring an "an employer to take down a sign reading 'White Applicants Only'" regulates transactional or commercial conduct rather than expression. *See also Sorrell v. IMS Health Inc.,* 564 U.S. 552, 567 (2011) (characterizing bans on "White Applicants Only" signs and other discriminatory hiring decision as "restrictions directed at commerce or conduct" with only "incidental burdens on speech").

This Court has likewise characterized regulations in the employment context as regulating commercial conduct or commercial speech rather than

45

regulating an expressive relationship or speech. *Valle Del Sol, Inc. v. Whiting*, 709 F.3d 808, 818 (9th Cir. 2013) (solicitation of day laborers and "attempts to hire, hiring, picking up and transporting workers to work at a different location" constitute commercial speech subject to intermediate scrutiny); *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015) (holding that "decision of a franchisor and a franchisee to form a business relationship and their resulting business activities [] exhibits nothing that even the most vivid imagination might deem uniquely expressive" (internal quotation marks omitted); *see also Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay,* 868 F.3d 104 (2d Cir. 2017) (characterizing potential employers' solicitation of day laborers as commercial speech because it involves advertisements and negotiations for work). *Cf. R.A.V. v. City of St. Paul*, 505 U.S. at 390 ("Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy.").

UGM's reliance on the Second Circuit's noncontrolling decision in *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023), is thus unavailing. In holding that a crisis pregnancy center adequately alleged an expressive association challenge to a state law prohibiting discrimination against employees based on

46

their reproductive health decisions, *Slattery* did not consider the Supreme Court's rejection of a free association right to discriminate in employment as reflected in *Hishon* and similar cases, or the distinction between private and public organizations. *Slattery* also departs from this Court's treatment of employment discrimination as transactional conduct or speech. Moreover, unlike here, the state law in *Slattery* did not forbid discrimination on constitutionally protected traits or grounds. *See Obergefell v. Hodges*, 576 U.S. 644, 675 (2015) (holding that same-sex couples may not be denied the fundamental right to marry under the Due Process and Equal Protection Clauses). *Slattery's* analysis is thus unpersuasive and should not be adopted by this Court.

Even assuming that *Dale* applied here (it does not), UGM does not show WLAD's prohibition against discriminating in employment "seriously burdens" its expressive association as required to assert such a right. *Dale* recognized that "an expressive association can[not] erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message." *Dale,* 530 U.S. at 653*; see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 626-27 (1984) (rejecting First Amendment associational right by private club seeking to exclude women members because Jaycees had not proven that admitting women "serious[ly] burdens" its expressive

association by "imped[ing] the organization's ability to engage in [its] protected activities or to disseminate its preferred views"); *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 548 (1987) (club's failure to demonstrate that admitting women "will affect in any significant way the existing members' ability to carry out their various purposes" defeated First Amendment associational claim). In *Dale*, the "significant" burden flowed from the plaintiff's leadership role in the Boy Scouts and his public-facing role as "one of a group of gay Scouts who have become leaders in their community and are open and honest about their sexual orientation." 530 U.S. at 653 (internal quotation marks omitted).

Here, UGM fails to show a similar "serious" and "significant" burden on its expressive activities. UGM contends that the positions at issue here are non-ministerial, including positions like IT technician or operations assistant, with no outward-facing or leadership role. 3-ER-251. And UGM's only argument suggesting that application of anti-discrimination laws to these non-ministerial positions would present a burden are conclusory assertions about the desire to shield employees and guests "from sinful habits, behaviors, and temptations," 3-ER-248, and unsupported hypotheticals about how a "co-religionist" IT technician, for example, might be expected (presumably more than a secular IT

technician) to assist UGM employees "in a loving, Christ-like manner, not with foul language, impatience, or insensitivity" or understand "how the misuse of technology—perhaps, for example, employees visiting questionable websites—could damage the Mission's religious message or its reputation as a Christian ministry." 3-ER-251–52.

But these types of bald assertions about burden are similar to those found insufficient in *Jaycees*. Refraining from the use of foul language or acting with patience and sensitivity has nothing to do with sexual orientation. *See Jaycees*, 468 U.S. at 627-28 (holding that in the absence of a "substantial" showing, court will not accept "unsupported generalizations" and "stereotyping" underlying contentions that non-discrimination will "change the content or impact of the organization's speech"). And UGM's other conclusory assertions amount to statements that "mere acceptance of a member from a particular group would impair its message," which are wholly insufficient to establish a significant burden on associational rights. *Dale*, 530 U.S. at 653; *see also Jaycees*, 468 U.S. at 627 (finding no basis for concluding the admission of women as full voting members would impede organization's ability to engage in any protected activities or disseminate its preferred views). Thus, this Court need not even

decide whether UGM has a free association right to discriminate in employment because UGM has not met the threshold requirement for asserting that right here.

But even if this Court assumed that UGM could assert a free association right to discriminate against non-ministerial employees, such a right is not "absolute." *Dale*, 530 U.S. at 648. Even where enforcement of the law causes "some incidental abridgment" of protected activities, courts will uphold the law where the "effect is no greater than is necessary to accomplish the State's legitimate purposes." *Jaycees*, 468 U.S. at 628.

The Supreme Court and this Court have repeatedly recognized that states have a compelling interest in providing individuals an equal opportunity to participate in the workforce. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014) ("The Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal."); *Masterpiece Cakeshop*, 584 U.S. at 631 ("[T]he laws and the Constitution can, and in some instances must, protect [same-sex couples] in the exercise of their civil rights. The exercise of their freedom on terms equal to others must be given great weight and respect by the courts."); *Pacific Press Pub. Ass'n*, 676 F.2d at 1280 ("Congress' purpose to end discrimination is

equally if not more compelling than other interests that have been held to justify legislation that burdened the exercise of religious convictions.").

And here, like the law in *Jaycees*, the WLAD addresses "precisely [] the substantive problem which legitimately concerns the State and abridges no more speech or associational freedom than is necessary to accomplish that purpose." *Jaycees*, 468 U.S. at 628-29 (internal quotation marks omitted). Critically, the WLAD exempts "ministerial employees" from its scope. *Woods*, 481 P.3d at 1067-70. UGM is thus exempted from complying with the WLAD with respect to employees bearing "the responsibility of educating and forming students in the faith" or who perform "an important role in transmitting" UGM's faith to others. *Our Lady of Guadalupe Sch.*, 591 U.S. at 762 (applying ministerial exception to teachers entrusted "with the responsibility of educating and forming students in the faith"); *Hosanna-Tabor*, 565 U.S. at 192 (applying ministerial exception to teachers at religious schools playing an "important role in transmitting the Lutheran faith to the next generation"). Thus, where an employee plays a key role in UGM's expressive mission, the WLAD will not generally apply. And the WLAD does not target UGM's message. UGM is free to spread its message accordingly.

Thus, even if *Dale* applied here, this Court should reject UGM's free association challenge to the WLAD.

**E.    UGM Is Unlikely to Succeed on its Free Speech Claims**

The district court did not address UGM's free speech claims. If this Court does consider these claims, it should determine that UGM is unlikely to succeed on the merits.

First, UGM's challenge to the WLAD's provision regarding job advertisements, Wash. Rev. Code § 49.60.180(4), falters out of the gate. UGM concedes that publishing its Religious Hiring Statement, 3-ER-337–38, would violate the WLAD's prohibition on job announcements and advertisements that "express[] any limitation, specification, or discrimination as to . . . marital status [or] sexual orientation." Wash. Rev. Code § 49.60.180(4). 3-ER-320–21; 3-ER-235–36. Assuming this Court rejects UGM's arguments that it has a constitutional right to discriminate against non-ministerial employees on the basis of sexual orientation, UGM's hiring policy proposes illegal activity and thus falls outside First Amendment protection. *Pittsburgh Press Co.*, 413 U.S. at 388. When speech proposes illegal activity, First Amendment protections do not apply and the Court's inquiry ends. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 563-64 (1980).

The U.S. Supreme Court explicitly recognized that "[d]iscrimination in employment is not only commercial activity, it is illegal commercial activity." *Pittsburgh Press Co.*, 413 U.S. at 388. The Court in *Pittsburgh Press* upheld a regulation prohibiting job advertisements indicating a preference for men or women employees because the underlying employment practice— discriminatory hiring based on sex—was itself illegal and not protected. *Id.*

Although the Supreme Court has since applied First Amendment protections to commercial speech, subject to intermediate scrutiny under *Central Hudson*, the Court continues to recognize that "[t]he government may ban . . . commercial speech related to illegal activity" without triggering First Amendment scrutiny. *Central Hudson*, 447 U.S. at 563-64 (citing *Pittsburgh Press Co.*, 413 U.S. at 388); *United States v. Williams*, 553 U.S. 285, 297 (2008) ("Offers to engage in illegal transactions are categorically excluded from First Amendment protection."); *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1312 (9th Cir. 1997) ("For commercial speech to come within the protection of the First Amendment, it must concern lawful activity."). As *Central Hudson* explained, "the First Amendment's concern for commercial speech is based on the informational function of advertising" and thus there "can be no constitutional objection to the suppression of commercial messages that do not

accurately inform the public about lawful activity." 447 U.S. at 563 (internal citations omitted); *see also Valle del Sol, Inc.*, 709 F.3d at 818 (holding that provisions regulating the "hiring, picking up and transporting [of] workers" impacted speech "soliciting a commercial transaction or speech necessary to the consummation of a commercial transaction" subject to *Central Hudson* scrutiny); *Greater Philadelphia Chamber of Commerce v. City of Philadelphia*, 949 F.3d 116, 137 (3d Cir. 2020) (holding that potential employer's questions about a job applicant's salary history were motivated primarily by economic concerns and subject to *Central Hudson* scrutiny "[b]ecause the speech occur[ed] in the context of employment negotiations," and was thus "part of a proposal of possible employment" (internal quotation marks omitted)).

Here, UGM concedes that its hiring policies violate the WLAD and are therefore illegal if the WLAD is constitutional. While UGM certainly has a First Amendment interest in expressing its sincerely held religious beliefs, any First Amendment interest in publishing a job advertisement that discriminates on the basis of a protected characteristic would be "altogether absent when the

commercial activity itself is illegal." *Pittsburgh Press Co.*, 413 U.S. at 389.[2]

UGM has little likelihood of succeeding on the merits of its free speech claims.

**F.    The District Court Erred in Granting UGM's Preliminary Injunction Because UGM Cannot Demonstrate Any of the *Winter* Factors**

The district court erred in granting a preliminary injunction because UGM cannot make a "clear showing" that: (1) it is likely to succeed on the merits; (2) it would suffer irreparable harm; (3) the balance of equities tips in its favor; and (4) a preliminary injunction is in the public interest. Fed. R. Civ. P. 65(b)(1); *Winter*, 555 U.S. at 20.

**1.    UGM Cannot Show a Likelihood of Success on the Merits**

As detailed above, UGM cannot show a likelihood of success on the merits. As such, the Court is not required to consider the remaining preliminary injunction factors and should vacate the preliminary injunction on this ground alone. *See CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1274 (9th Cir. 2021); *Pimentel v. Dreyfus*, 670 F.3d 1096, 1111 (9th Cir. 2012) (per curiam).

---

[2] To the extent this Court finds it necessary to analyze the remaining prongs of *Central Hudson*, it should remand to the district court to conduct this fact-intensive analysis. The remaining three *Central Hudson* factors are: whether (2) the asserted governmental interest is substantial, (3) the regulation directly advances the governmental interest, and (4) the regulation is more extensive than necessary to serve the government's stated interest. 447 U.S. at 564-66.

## 2. UGM Cannot Show Irreparable Harm

Even if this Court considers the remaining *Winter* factors, they weigh heavily against UGM. UGM's only argument for demonstrating irreparable harm below was that it was likely to succeed on the merits. 3-ER-239. But even in the First Amendment context, the Supreme Court has recognized that "a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 585 U.S. 155, 158, 160-61 (2018) (per curiam) (affirming denial of a preliminary injunction based on equities and public interest even assuming likelihood of success on First Amendment challenge); *Paramount Land Co. LP v. Cal. Pistachio Comm'n*, 491 F.3d 1003, 1012 (9th Cir. 2007) ("[S]imply raising a serious [First Amendment] claim is not enough to tip the hardship scales."); *Doe v. Harris*, 772 F.3d 563, 582-83 (9th Cir. 2014) ("'Even where a plaintiff has demonstrated a likelihood of success on the merits of a First Amendment claim,'" the plaintiff must establish the remaining *Winter* factors and courts should "not simply assume that these elements 'collapse into the merits of the First Amendment claim.'" (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1128 (9th Cir. 2011)). UGM's failure to show a likelihood of success means it has no basis for asserting irreparable harm.

Moreover, this is a unique case in which UGM cannot demonstrate irreparable harm regardless of the merits of its First Amendment claims because the State has disavowed enforcement of the WLAD against UGM for the positions at issue in this litigation. 2-ER-105. The State's Notice and Stipulation of Enforcement Position makes clear that UGM has not and will not face any of the enforcement action its CEO fears. *See* 3-ER-242–56. In particular, the Notice directly addresses all of UGM's concerns that the State may enforce the WLAD against it for publishing its Religious Hiring Statement and for hiring an IT technician and operations assistant with the duties described in UGM's pleadings. There simply is no "likelihood" that UGM will suffer any harm related to those actions, let alone the irreparable harm that is required to enjoin the State.

### 3. The equities and public interest tip sharply against an injunction

The final two *Winter* factors—the balance of the equities and the public interest—also weigh heavily against UGM. Where the government is a party, these factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

The equities and public interest tip sharply in the State's favor because "any time a State is enjoined by a court from effectuating statutes enacted by

representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Beyond this interest, the public has a strong interest in ensuring equal opportunity in employment. While there is no harm in enjoining unconstitutional acts, that rule does not apply where, as here, UGM's constitutional theories are unsupported by precedent and have no limiting principle. The public interest would be harmed by adoption of these novel theories to enjoin a state antidiscrimination law. *See, e.g., Fulton*, 593 U.S. at 542 ("We do not doubt that this interest [in equal treatment of gay foster parents and foster children] is a weighty one, for '[o]ur society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth.'" (quoting *Masterpiece Cakeshop*, 584 U.S. at 631)). UGM satisfies none of the *Winter* factors and this Court should reverse the preliminary injunction entered by the district court.

## IX. CONCLUSION

For the reasons set forth above, the State respectfully requests that this Court reverse the district court's preliminary injunction order.

RESPECTFULLY SUBMITTED this 30th day of December, 2024.

ROBERT W. FERGUSON
 *Attorney General*

*s/Cynthia L. Alexander*
CYNTHIA L. ALEXANDER, WSBA 46019
TERA M. HEINTZ, WSBA 54921
 *Deputy Solicitors General*
1125 Washington St SE
Olympia, WA 98504
Cynthia.Alexander@atg.wa.gov
Tera.Heintz@atg.wa.gov
360-753-6200

**Table of Contents**
**Addendum – Pages 1-63**

| Statute | Description | Page |
|---|---|---|
| U.S. Const. art. III | Judicial Branch | 1 |
| U.S. Const. amend. I | Freedoms concerning religion, expression, assembly, and the right to petition | 2 |
| U.S. Const. amend. XIV | Equal Protection | 3 |
| Fed. R. Civ. P. 65(b)(1) | Injunctions and Restraining Orders | 4 |
| 29 U.S.C. § 213(a) | Fair Labor Standards Act Exemptions | 6 |
| 29 U.S.C.§ 630 | Age Discrimination in Employment – Definitions | 9 |
| 28 U.S.C. § 1291 | Final decisions of district courts | 12 |
| 28 U.S.C. § 1331 | Federal question | 13 |
| 28 U.S.C. § 1343 | Civil rights and elective franchise | 14 |
| 29 U.S.C. § 2611 | Family and Medical Leave – Definitions | 15 |
| 42 U.S.C. § 2000e (Title VII) | Definitions | 18 |
| 42 U.S.C. § 12111 | Americans with Disabilities Act - Definitions | 22 |

| | | |
|---|---|---|
| 29 C.F.R. § 1904.1 | Occupational Safety and Health Administration – Partial exemption | 25 |
| Wash. Rev. Code § 49.46.010 | Minimum Wage Requirements and Labor Standards – Definitions | 26 |
| Wash. Rev. Code § 49.46.020 | Minimum Wage Requirements and Labor Standards – Minimum hourly wage – Paid sick leave | 29 |
| Wash. Rev. Code § 49.46.130 | Minimum Wage Requirements and Labor Standards – Minimum rate of compensation for employment in excess of forty hour workweek - Exceptions | 30 |
| Wash. Rev. Code § 49.46.210 | Minimum Wage Requirements and Labor Standards – Paid sick leave – Authorized purposes - Limitations | 34 |
| Wash. Rev. Code § 49.60.010 | Discrimination – Human Rights Commission, Purpose of Chapter | 40 |
| Wash. Rev. Code § 49.60.030 | Discrimination – Human Rights Commission, Freedom from discrimination— Declaration of civil rights | 41 |
| Wash. Rev. Code § 49.60.040 | Discrimination – Human Rights Commission - Definitions | 43 |

| | | |
|---|---|---|
| Wash. Rev. Code § 49.60.120 | Discrimination – Human Rights Commission - Certain powers and duties of commission | 49 |
| Wash. Rev. Code § 49.60.140 | Discrimination – Human Rights Commission - Commission may hold hearings and subpoena witnesses | 51 |
| Wash. Rev. Code § 49.60.160 | Discrimination – Human Rights Commission - Refusals may be punished as contempt of court | 52 |
| Wash. Rev. Code § 49.60.180 | Discrimination – Human Rights Commission - Unfair practices of employers | 53 |
| Wash. Rev. Code § 49.60.208 | Discrimination – Human Rights Commission - Unfair practice— Religious affiliation disclosure | 55 |
| Wash. Rev. Code § 49.60.230 | Discrimination – Human Rights Commission - Complaint may be filed with commission | 56 |
| Wash. Rev. Code § 49.60.240 | Discrimination – Human Rights Commission - Complaint investigated— Procedure—Conference, conciliation—Agreement, findings—Rules. | 57 |

| Wash. Rev. Code § 49.60.250 | Discrimination – Human Rights Commission - Hearing of complaint by administrative law judge—Limitation of relief—Penalties— Order—Arbitration. | 59 |
| Wash. Rev. Code § 51.12.020 | Industrial Insurance – Employments excluded | 62 |

**U.S. Const. art. III**

Section 1:    The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

Section 2:    The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State,—between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.
In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.
The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

Section 3:    Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court.
The Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted.

1

**U.S. Const. amend. I**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

**U.S. Const. amend. XIV**

Section 1:    All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Section 2:    Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice-President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

Section 3:    No person shall be a Senator or Representative in Congress, or elector of President and Vice-President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

Section 4:    The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

Section 5:    The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

**Fed. R. Civ. P. 65(b)(1)**
**Injunctions and Restraining Orders**

(a) Preliminary Injunction.

(1) Notice. The court may issue a preliminary injunction only on notice to the adverse party.

(2) Consolidating the Hearing with the Trial on the Merits. Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing. Even when consolidation is not ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial. But the court must preserve any party's right to a jury trial.

(b) Temporary Restraining Order.

(1) Issuing Without Notice. The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

(2) Contents; Expiration. Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record. The order expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record.

(3) Expediting the Preliminary-Injunction Hearing. If the order is issued without notice, the motion for a preliminary injunction must be set for hearing at the earliest possible time, taking precedence over all other matters except hearings on older matters of the same character. At the hearing, the party who obtained the order must proceed with the motion; if the party does not, the court must dissolve the order.

(4) Motion to Dissolve. On 2 days' notice to the party who obtained the order without notice—or on shorter notice set by the court—the adverse party may appear and move to dissolve or modify the order. The court must then hear and decide the motion as promptly as justice requires.

(c) Security. The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court

4

considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The United States, its officers, and its agencies are not required to give security.

(d) Contents and Scope of Every Injunction and Restraining Order.

(1) Contents. Every order granting an injunction and every restraining order must:

(A) state the reasons why it issued;

(B) state its terms specifically; and

(C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required.

(2) Persons Bound. The order binds only the following who receive actual notice of it by personal service or otherwise:

(A) the parties;

(B) the parties' officers, agents, servants, employees, and attorneys; and

(C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

(e) Other Laws Not Modified. These rules do not modify the following:

(1) any federal statute relating to temporary restraining orders or preliminary injunctions in actions affecting employer and employee;

(2) 28 U.S.C. §2361, which relates to preliminary injunctions in actions of interpleader or in the nature of interpleader; or

(3) 28 U.S.C. §2284, which relates to actions that must be heard and decided by a three-judge district court.

(f) Copyright Impoundment. This rule applies to copyright-impoundment proceedings.

**29 U.S.C. § 213(a)**
**Fair Labor Standards Act**
**Exemptions**

(a) Minimum wage and maximum hour requirements

The provisions of sections 206 (except subsection (d) in the case of paragraph (1) of this subsection) and 207 of this title shall not apply with respect to-

(1) any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary, subject to the provisions of subchapter II of chapter 5 of title 5, except that an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities); or

(2) Repealed. Pub. L. 101–157, §3(c)(1), Nov. 17, 1989, 103 Stat. 939 .

(3) any employee employed by an establishment which is an amusement or recreational establishment, organized camp, or religious or non-profit educational conference center, if (A) it does not operate for more than seven months in any calendar year, or (B) during the preceding calendar year, its average receipts for any six months of such year were not more than 331/3 per centum of its average receipts for the other six months of such year, except that the exemption from sections 206 and 207 of this title provided by this paragraph does not apply with respect to any employee of a private entity engaged in providing services or facilities (other than, in the case of the exemption from section 206 of this title, a private entity engaged in providing services and facilities directly related to skiing) in a national park or a national forest, or on land in the National Wildlife Refuge System, under a contract with the Secretary of the Interior or the Secretary of Agriculture; or

(4) Repealed. Pub. L. 101–157, §3(c)(1), Nov. 17, 1989, 103 Stat. 939.

(5) any employee employed in the catching, taking, propagating, harvesting, cultivating, or farming of any kind of fish, shellfish, crustacea, sponges, seaweeds, or other aquatic forms of animal and vegetable life, or in the first processing, canning or packing such marine products at sea as an incident to, or

in conjunction with, such fishing operations, including the going to and returning from work and loading and unloading when performed by any such employee; or

(6) any employee employed in agriculture (A) if such employee is employed by an employer who did not, during any calendar quarter during the preceding calendar year, use more than five hundred man-days of agricultural labor, (B) if such employee is the parent, spouse, child, or other member of his employer's immediate family, (C) if such employee (i) is employed as a hand harvest laborer and is paid on a piece rate basis in an operation which has been, and is customarily and generally recognized as having been, paid on a piece rate basis in the region of employment, (ii) commutes daily from his permanent residence to the farm on which he is so employed, and (iii) has been employed in agriculture less than thirteen weeks during the preceding calendar year, (D) if such employee (other than an employee described in clause (C) of this subsection) (i) is sixteen years of age or under and is employed as a hand harvest laborer, is paid on a piece rate basis in an operation which has been, and is customarily and generally recognized as having been, paid on a piece rate basis in the region of employment, (ii) is employed on the same farm as his parent or person standing in the place of his parent, and (iii) is paid at the same piece rate as employees over age sixteen are paid on the same farm, or (E) if such employee is principally engaged in the range production of livestock; or

(7) any employee to the extent that such employee is exempted by regulations, order, or certificate of the Secretary issued under section 214 of this title; or

(8) any employee employed in connection with the publication of any weekly, semiweekly, or daily newspaper with a circulation of less than four thousand the major part of which circulation is within the county where published or counties contiguous thereto; or

(9) Repealed. Pub. L. 93–259, §23(a)(1), Apr. 8, 1974, 88 Stat. 69 .

(10) any switchboard operator employed by an independently owned public telephone company which has not more than seven hundred and fifty stations; or

(11) Repealed. Pub. L. 93–259, §10(a), Apr. 8, 1974, 88 Stat. 63 .

(12) any employee employed as a seaman on a vessel other than an American vessel; or

(13), (14) Repealed. Pub. L. 93–259, §§9(b)(1), 23(b)(1), Apr. 8, 1974, 88 Stat. 63 , 69.

(15) any employee employed on a casual basis in domestic service employment to provide babysitting services or any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary); or

7

(16) a criminal investigator who is paid availability pay under section 5545a of title 5;

(17) any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is-

(A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;

(B) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;

(C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or

(D) a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills, and who, in the case of an employee who is compensated on an hourly basis, is compensated at a rate of not less than $27.63 an hour; or

(18) any employee who is a border patrol agent, as defined in section 5550(a) of title 5; or

(19) any employee employed to play baseball who is compensated pursuant to a contract that provides for a weekly salary for services performed during the league's championship season (but not spring training or the off season) at a rate that is not less than a weekly salary equal to the minimum wage under section 206(a) of this title for a workweek of 40 hours, irrespective of the number of hours the employee devotes to baseball related activities.

**29 U.S.C. § 630**
**Age Discrimination in Employment**
**Definitions**

For the purposes of this chapter--

(a) The term "person" means one or more individuals, partnerships, associations, labor organizations, corporations, business trusts, legal representatives, or any organized groups of persons.

(b) The term "employer" means a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year: Provided, That prior to June 30, 1968, employers having fewer than fifty employees shall not be considered employers. The term also means (1) any agent of such a person, and (2) a State or political subdivision of a State and any agency or instrumentality of a State or a political subdivision of a State, and any interstate agency, but such term does not include the United States, or a corporation wholly owned by the Government of the United States.

(c) The term "employment agency" means any person regularly undertaking with or without compensation to procure employees for an employer and includes an agent of such a person; but shall not include an agency of the United States.

(d) The term "labor organization" means a labor organization engaged in an industry affecting commerce, and any agent of such an organization, and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization.

(e) A labor organization shall be deemed to be engaged in an industry affecting commerce if (1) it maintains or operates a hiring hall or hiring office which procures employees for an employer or procures for employees opportunities to work for an employer, or (2) the number of its members (or, where it is a labor organization composed of other labor organizations or their representatives, if the aggregate number of the members of such other labor organization) is fifty or more prior to

9

July 1, 1968, or twenty-five or more on or after July 1, 1968, and such labor organization—

(1) is the certified representative of employees under the provisions of the National Labor Relations Act, as amended, or the Railway Labor Act, as amended; or

(2) although not certified, is a national or international labor organization or a local labor organization recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting commerce; or

(3) has chartered a local labor organization or subsidiary body which is representing or actively seeking to represent employees of employers within the meaning of paragraph (1) or (2); or

(4) has been chartered by a labor organization representing or actively seeking to represent employees within the meaning of paragraph (1) or (2) as the local or subordinate body through which such employees may enjoy membership or become affiliated with such labor organization; or

(5) is a conference, general committee, joint or system board, or joint council subordinate to a national or international labor organization, which includes a labor organization engaged in an industry affecting commerce within the meaning of any of the preceding paragraphs of this subsection.

(f) The term "employee" means an individual employed by any employer except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policymaking level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency, or political subdivision. The term "employee" includes any individual who is a citizen of the United States employed by an employer in a workplace in a foreign country.

(g) The term "commerce" means trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and any place outside thereof; or within the District of Columbia, or a possession of the United States; or between points in the same State but through a point outside thereof.

10

(h) The term "industry affecting commerce" means any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry "affecting commerce" within the meaning of the Labor-Management Reporting and Disclosure Act of 1959.

(i) The term "State" includes a State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, Wake Island, the Canal Zone, and Outer Continental Shelf lands defined in the Outer Continental Shelf Lands Act.

(j) The term "firefighter" means an employee, the duties of whose position are primarily to perform work directly connected with the control and extinguishment of fires or the maintenance and use of firefighting apparatus and equipment, including an employee engaged in this activity who is transferred to a supervisory or administrative position.

(k) The term "law enforcement officer" means an employee, the duties of whose position are primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of a State, including an employee engaged in this activity who is transferred to a supervisory or administrative position. For the purpose of this subsection, "detention" includes the duties of employees assigned to guard individuals incarcerated in any penal institution.

(l) The term "compensation, terms, conditions, or privileges of employment" encompasses all employee benefits, including such benefits provided pursuant to a bona fide employee benefit plan.

**28 U.S.C. § 1291**
**Final decisions of district courts**

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

**28 U.S.C. § 1331**
**Federal question**

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

**28 U.S.C. § 1343**
**Civil rights and elective franchise**

(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

(b) For purposes of this section--

(1) the District of Columbia shall be considered to be a State; and

(2) any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**29 U.S.C. § 2611**
**Family and Medical Leave**
**Definitions**

As used in this subchapter:

  (1) Commerce

     The terms "commerce" and "industry or activity affecting commerce" mean any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce, and include "commerce" and any "industry affecting commerce", as defined in paragraphs (1) and (3) of section 142 of this title.

  (2) Eligible employee

    (A) In general

     The term "eligible employee" means an employee who has been employed-

     (i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and

     (ii) for at least 1,250 hours of service with such employer during the previous 12-month period.

    (B) Exclusions

     The term "eligible employee" does not include-

     (i) any Federal officer or employee covered under subchapter V of chapter 63 of title 5; or

     (ii) any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50.

    (C) Determination

     For purposes of determining whether an employee meets the hours of service requirement specified in subparagraph (A)(ii), the legal standards established under section 207 of this title shall apply.

  (3) Employ; employee; State

     The terms "employ", "employee", and "State" have the same meanings given such terms in subsections (c), (e), and (g) of section 203 of this title.

  (4) Employer

    (A) In general

15

The term "employer"-

(i) means any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year;

(ii) includes-

(I) any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer; and

(II) any successor in interest of an employer;

(iii) includes any "public agency", as defined in section 203(x) of this title; and

(iv) includes the General Accounting Office and the Library of Congress.

(B) Public agency

For purposes of subparagraph (A)(iii), a public agency shall be considered to be a person engaged in commerce or in an industry or activity affecting commerce.

(5) Employment benefits

The term "employment benefits" means all benefits provided or made available to employees by an employer, including group life insurance, health insurance, disability insurance, sick leave, annual leave, educational benefits, and pensions, regardless of whether such benefits are provided by a practice or written policy of an employer or through an "employee benefit plan", as defined in section 1002(3) of this title.

(6) Health care provider

The term "health care provider" means-

(A) a doctor of medicine or osteopathy who is authorized to practice medicine or surgery (as appropriate) by the State in which the doctor practices; or

(B) any other person determined by the Secretary to be capable of providing health care services.

(7) Parent

The term "parent" means the biological parent of an employee or an individual who stood in loco parentis to an employee when the employee was a son or daughter.

(8) Person

The term "person" has the same meaning given such term in section 203(a) of this title.

16

(9) Reduced leave schedule

    The term "reduced leave schedule" means a leave schedule that reduces the usual number of hours per workweek, or hours per workday, of an employee.

(10) Secretary

    The term "Secretary" means the Secretary of Labor.

(11) Serious health condition

    The term "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves-

    (A) inpatient care in a hospital, hospice, or residential medical care facility; or

    (B) continuing treatment by a health care provider.

(12) Son or daughter

    The term "son or daughter" means a biological, adopted, or foster child, a stepchild, a legal ward, or a child of a person standing in loco parentis, who is-

    (A) under 18 years of age; or

    (B) 18 years of age or older and incapable of self-care because of a mental or physical disability.

(13) Spouse

    The term "spouse" means a husband or wife, as the case may be.

17

**42 U.S.C. §2000e (Title VII)**
**Definitions**

For the purposes of this subchapter—

(a) The term "person" includes one or more individuals, governments, governmental agencies, political subdivisions, labor unions, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, or receivers.

(b) The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of Title 5), or (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of Title 26, except that during the first year after March 24, 1972, persons having fewer than twenty-five employees (and their agents) shall not be considered employers.

(c) The term "employment agency" means any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person.

(d) The term "labor organization" means a labor organization engaged in an industry affecting commerce, and any agent of such an organization, and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization.

(e) A labor organization shall be deemed to be engaged in an industry affecting commerce if (1) it maintains or operates a hiring hall or hiring office which procures employees for an employer or procures for employees opportunities to work for an

18

employer, or (2) the number of its members (or, where it is a labor organization composed of other labor organizations or their representatives, if the aggregate number of the members of such other labor organization) is (A) twenty-five or more during the first year after March 24, 1972, or (B) fifteen or more thereafter, and such labor organization—

(1) is the certified representative of employees under the provisions of the National Labor Relations Act, as amended, or the Railway Labor Act, as amended;

(2) although not certified, is a national or international labor organization or a local labor organization recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting commerce; or

(3) has chartered a local labor organization or subsidiary body which is representing or actively seeking to represent employees of employers within the meaning of paragraph (1) or (2); or

(4) has been chartered by a labor organization representing or actively seeking to represent employees within the meaning of paragraph (1) or (2) as the local or subordinate body through which such employees may enjoy membership or become affiliated with such labor organization; or

(5) is a conference, general committee, joint or system board, or joint council subordinate to a national or international labor organization, which includes a labor organization engaged in an industry affecting commerce within the meaning of any of the preceding paragraphs of this subsection.

(f) The term "employee" means an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision. With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States.

(g) The term "commerce" means trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and

19

any place outside thereof; or within the District of Columbia, or a possession of the United States; or between points in the same State but through a point outside thereof.

(h) The term "industry affecting commerce" means any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry "affecting commerce" within the meaning of the Labor-Management Reporting and Disclosure Act of 1959, and further includes any governmental industry, business, or activity.

(i) The term "State" includes a State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, Wake Island, the Canal Zone, and Outer Continental Shelf lands defined in the Outer Continental Shelf Lands Act.

(j) The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

(k) The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise. This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion: Provided, That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion.

(l) The term "complaining party" means the Commission, the Attorney General, or a person who may bring an action or proceeding under this subchapter.

(m) The term "demonstrates" means meets the burdens of production and persuasion.

20

(n) The term "respondent" means an employer, employment agency, labor organization, joint labor-management committee controlling apprenticeship or other training or retraining program, including an on-the-job training program, or Federal entity subject to section 2000e-16 of this title.

**42 U.S.C. § 12111**
**Americans with Disabilities Act**
**Definitions**

As used in this subchapter:

(1) Commission: The term "Commission" means the Equal Employment Opportunity Commission established by section 2000e-4 of this title.

(2) Covered entity: The term "covered entity" means an employer, employment agency, labor organization, or joint labor-management committee.

(3) Direct threat: The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.

(4) Employee: The term "employee" means an individual employed by an employer. With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States.

(5) Employer

(A) In general: The term "employer" means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person, except that, for two years following the effective date of this subchapter, an employer means a person engaged in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year, and any agent of such person.

(B) Exceptions: The term "employer" does not include--

(i) the United States, a corporation wholly owned by the government of the United States, or an Indian tribe; or

(ii) a bona fide private membership club (other than a labor organization) that is exempt from taxation under section 501(c) of Title 26.

(6) Illegal use of drugs

(A) In general:    The term "illegal use of drugs" means the use of drugs, the possession or distribution of which is unlawful under the Controlled Substances Act. Such term does not include the use of a drug taken under supervision by a licensed health care professional, or other uses authorized by the Controlled Substances Act or other provisions of Federal law.

(B) Drugs:   The term "drug" means a controlled substance, as defined in schedules I through V of section 202 of the Controlled Substances Act.

(7) Person, etc.:    The terms "person", "labor organization", "employment agency", "commerce", and "industry affecting commerce", shall have the same meaning given such terms in section 2000e of this title.

(8) Qualified individual:  The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

(9) Reasonable accommodation:      The term "reasonable accommodation" may include--

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

(10) Undue hardship

(A) In general:      The term "undue hardship" means an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B).

23

(B) Factors to be considered:    In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include--

(i) the nature and cost of the accommodation needed under this chapter;

(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

**29 C.F.R. § 1904.1**
**Occupational Safety and Health Administration**
**Partial exemption**

(a) *Basic requirement.*

(1) If your company had 10 or fewer employees at all times during the last calendar year, you do not need to keep OSHA injury and illness records unless OSHA or the Bureau of Labor Statistics informs you in writing that you must keep records under § 1904.41 or § 1904.42. However, as required by § 1904.39, all employers covered by the OSH Act must report to OSHA any work-related incident that results in a fatality, the in-patient hospitalization of one or more employees, an employee amputation, or an employee loss of an eye.

(2) If your company had more than ten (10) employees at any time during the last calendar year, you must keep OSHA injury and illness records unless your establishment is classified as a partially exempt industry under § 1904.2.

(b) *Implementation —*

(1) *Is the partial exemption for size based on the size of my entire company or on the size of an individual business establishment?* The partial exemption for size is based on the number of employees in the entire company.

(2) *How do I determine the size of my company to find out if I qualify for the partial exemption for size?* To determine if you are exempt because of size, you need to determine your company's peak employment during the last calendar year. If you had no more than 10 employees at any time in the last calendar year, your company qualifies for the partial exemption for size.

25

**Wash. Rev. Code 49.46.010**
**Minimum Wage Requirements and Labor Standards**
**Definitions**

As used in this chapter:

(1) "Director" means the director of labor and industries;

(2) "Employ" includes to permit to work;

(3) "Employee" includes any individual employed by an employer but shall not include:

(a) Any individual (i) employed as a hand harvest laborer and paid on a piece rate basis in an operation which has been, and is generally and customarily recognized as having been, paid on a piece rate basis in the region of employment; (ii) who commutes daily from his or her permanent residence to the farm on which he or she is employed; and (iii) who has been employed in agriculture less than thirteen weeks during the preceding calendar year;

(b) Any individual employed in casual labor in or about a private home, unless performed in the course of the employer's trade, business, or profession;

(c) Any individual employed in a bona fide executive, administrative, or professional capacity or in the capacity of outside salesperson as those terms are defined and delimited by rules of the director. However, those terms shall be defined and delimited by the human resources director pursuant to chapter **41.06** RCW for employees employed under the director of personnel's jurisdiction;

(d) Any individual engaged in the activities of an educational, charitable, religious, state or local governmental body or agency, or nonprofit organization where the employer-employee relationship does not in fact exist or where the services are rendered to such organizations gratuitously. If the individual receives reimbursement in lieu of compensation for normally incurred out-of-pocket expenses or receives a nominal amount of compensation per unit of voluntary service rendered, an employer-employee relationship is deemed not to exist for the purpose of this section or for purposes of membership or qualification in any state, local government, or publicly supported retirement system other than that provided under chapter 41.24 RCW;

(e) Any individual employed full time by any state or local governmental body or agency who provides voluntary services but only with regard to the provision of the voluntary services. The voluntary services and any compensation therefor shall not affect or add to qualification, entitlement, or benefit rights under any state, local government, or publicly supported retirement system other than that provided under chapter 41.24 RCW;

(f) Any newspaper vendor, carrier, or delivery person selling or distributing newspapers on the street, to offices, to businesses, or from house to house and any freelance news correspondent or "stringer" who, using his or her own equipment, chooses to submit material for publication for free or a fee when such material is published;

(g) Any carrier subject to regulation by Part 1 of the Interstate Commerce Act;

(h) Any individual engaged in forest protection and fire prevention activities;

(i) Any individual employed by any charitable institution charged with child care responsibilities engaged primarily in the development of character or citizenship or promoting health or physical fitness or providing or sponsoring recreational opportunities or facilities for young people or members of the armed forces of the United States;

(j) Any individual whose duties require that he or she reside or sleep at the place of his or her employment or who otherwise spends a substantial portion of his or her work time subject to call, and not engaged in the performance of active duties;

(k) Any resident, inmate, or patient of a state, county, or municipal correctional, detention, treatment or rehabilitative institution;

(l) Any individual who holds a public elective or appointive office of the state, any county, city, town, municipal corporation or quasi municipal corporation, political subdivision, or any instrumentality thereof, or any employee of the state legislature;

(m) All vessel operating crews of the Washington state ferries operated by the department of transportation;

(n) Any individual employed as a seaman on a vessel other than an American vessel;

(o) Any farm intern providing his or her services to a small farm which has a special certificate issued under RCW 49.12.471;

(p) An individual who is at least 16 years old but under twenty-one years old, in his or her capacity as a player for a junior ice hockey team that is a member of a regional, national, or international league and that contracts with an arena owned, operated, or managed by a public facilities district created under chapter **36.100** RCW; or

(q) Any individual who has entered into a contract to play baseball at the minor league level and who is compensated pursuant to the terms of a collective bargaining agreement that expressly provides for wages and working conditions;

(4) "Employer" includes any individual, partnership, association, corporation, business trust, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee;

(5) "Occupation" means any occupation, service, trade, business, industry, or branch or group of industries or employment or class of employment in which employees are gainfully employed;

(6) "Retail or service establishment" means an establishment seventy-five percent of whose annual dollar volume of sales of goods or services, or both, is not for resale and is recognized as retail sales or services in the particular industry;

(7) "Wage" means compensation due to an employee by reason of employment, payable in legal tender of the United States or checks on banks convertible into cash on demand at full face value, subject to such deductions, charges, or allowances as may be permitted by rules of the director.

**Wash. Rev. Code § 49.46.020**
**Minimum Wage Requirements and Labor Standards**
**Minimum hourly wage – Paid sick leave**

(1)(a) Beginning January 1, 2017, and until January 1, 2018, every employer shall pay to each of his or her employees who has reached the age of eighteen years wages at a rate of not less than eleven dollars per hour.

(b) Beginning January 1, 2018, and until January 1, 2019, every employer shall pay to each of his or her employees who has reached the age of eighteen years wages at a rate of not less than eleven dollars and fifty cents per hour.

(c) Beginning January 1, 2019, and until January 1, 2020, every employer shall pay to each of his or her employees who has reached the age of eighteen years wages at a rate of not less than twelve dollars per hour.

(d) Beginning January 1, 2020, and until January 1, 2021, every employer shall pay to each of his or her employees who has reached the age of eighteen years wages at a rate of not less than thirteen dollars and fifty cents per hour.

(2)(a) Beginning on January 1, 2021, and each following January 1st as set forth under (b) of this subsection, every employer shall pay to each of his or her employees who has reached the age of eighteen years wages at a rate of not less than the amount established under (b) of this subsection.

(b) On September 30, 2020, and on each following September 30th, the department of labor and industries shall calculate an adjusted minimum wage rate to maintain employee purchasing power by increasing the current year's minimum wage rate by the rate of inflation. The adjusted minimum wage rate shall be calculated to the nearest cent using the consumer price index for urban wage earners and clerical workers, CPI-W, or a successor index, for the twelve months prior to each September 1st as calculated by the United States department of labor. Each adjusted minimum wage rate calculated under this subsection (2)(b) takes effect on the following January 1st.

(3) An employer must pay to its employees: (a) All tips and gratuities; and (b) all service charges as defined under RCW 49.46.160 except those that, pursuant to RCW 49.46.160, are itemized as not being payable to the employee or employees servicing the customer. Tips and service charges paid to an employee are in addition to, and may not count towards, the employee's hourly minimum wage.

(4) Beginning January 1, 2018, except as provided in RCW 49.46.180, every employer must provide to each of its employees paid sick leave as provided in RCW 49.46.200 and 49.46.210.

(5) The director shall by regulation establish the minimum wage for employees under the age of eighteen years.

29

**Wash. Rev. Code § 49.46.130**
**Minimum Wage Requirements and Labor Standards**
**Minimum rate of compensation for employment in excess of forty hour workweek – Exceptions**

(1) Except as otherwise provided in this section, no employer shall employ any of his or her employees for a workweek longer than forty hours unless such employee receives compensation for his or her employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he or she is employed.

(2) This section does not apply to:

(a) Any person exempted pursuant to RCW 49.46.010(3). The payment of compensation or provision of compensatory time off in addition to a salary shall not be a factor in determining whether a person is exempted under RCW 49.46.010(3)(c);

(b) Employees who request compensating time off in lieu of overtime pay;

(c) Any individual employed as a seaman whether or not the seaman is employed on a vessel other than an American vessel;

(d) Seasonal employees who are employed at concessions and recreational establishments at agricultural fairs, including those seasonal employees employed by agricultural fairs, within the state provided that the period of employment for any seasonal employee at any or all agricultural fairs does not exceed fourteen working days a year;

(e) Any individual employed as a motion picture projectionist if that employee is covered by a contract or collective bargaining agreement which regulates hours of work and overtime pay;

(f) An individual employed as a truck or bus driver who is subject to the provisions of the Federal Motor Carrier Act (49 U.S.C. Sec. 3101 et seq. and 49 U.S.C. Sec. 10101 et seq.), if the compensation system under which the truck or bus driver is paid includes overtime pay, reasonably equivalent to that required by this subsection, for working longer than forty hours per week;

(g) Any individual employed as an agricultural employee. This exemption from subsection (1) of this section applies only until December 31, 2021;

(h) Any industry in which federal law provides for an overtime payment based on a workweek other than forty hours. However, the provisions of the federal law regarding overtime payment based on a workweek other than forty hours shall nevertheless apply to employees covered by this section without regard to the existence of actual federal jurisdiction over the industrial activity of the particular employer within this state. For the purposes of this subsection, "industry" means a trade, business, industry, or other activity, or branch, or group

30

thereof, in which individuals are gainfully employed (section 3(h) of the Fair Labor Standards Act of 1938, as amended (Public Law 93-259));

(i) Any hours worked by an employee of a carrier by air subject to the provisions of subchapter II of the Railway Labor Act (45 U.S.C. Sec. 181 et seq.), when such hours are voluntarily worked by the employee pursuant to a shift-trading practice under which the employee has the opportunity in the same or in other workweeks to reduce hours worked by voluntarily offering a shift for trade or reassignment; and

(j) Any individual licensed under chapter 18.85 RCW unless the individual is providing real estate brokerage services under a written contract with a real estate firm which provides that the individual is an employee. For purposes of this subsection (2)(j), "real estate brokerage services" and "real estate firm" mean the same as defined in RCW 18.85.011.

(3) No employer shall be deemed to have violated subsection (1) of this section by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified in subsection (1) of this section if:

(a) The regular rate of pay of the employee is in excess of one and one-half times the minimum hourly rate required under RCW 49.46.020; and

(b) More than half of the employee's compensation for a representative period, of not less than one month, represents commissions on goods or services.

In determining the proportion of compensation representing commissions, all earnings resulting from the application of a bona fide commission rate is to be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee.

(4) No employer of commissioned salespeople primarily engaged in the business of selling automobiles, trucks, recreational vessels, recreational vessel trailers, recreational vehicle trailers, recreational campers, manufactured housing, or farm implements to ultimate purchasers shall violate subsection (1) of this section with respect to such commissioned salespeople if the commissioned salespeople are paid the greater of:

(a) Compensation at the hourly rate, which may not be less than the rate required under RCW 49.46.020, for each hour worked up to forty hours per week, and compensation of one and one-half times that hourly rate for all hours worked over forty hours in one week; or

(b) A straight commission, a salary plus commission, or a salary plus bonus applied to gross salary.

(5) No public agency shall be deemed to have violated subsection (1) of this section with respect to the employment of any employee in fire protection activities or any employee in law enforcement activities (including security

31

personnel in correctional institutions) if: (a) In a work period of twenty-eight consecutive days the employee receives for tours of duty which in the aggregate exceed two hundred forty hours; or (b) in the case of such an employee to whom a work period of at least seven but less than twenty-eight days applies, in his or her work period the employee receives for tours of duty which in the aggregate exceed a number of hours which bears the same ratio to the number of consecutive days in his or her work period as two hundred forty hours bears to twenty-eight days; compensation at a rate not less than one and one-half times the regular rate at which he or she is employed.

(6)(a) Beginning January 1, 2022, any agricultural employee shall not be employed for more than 55 hours in any one workweek unless the agricultural employee receives one and one-half times that agricultural employee's regular rate of pay for all hours worked over 55 in any one workweek.

(b) Beginning January 1, 2023, any agricultural employee shall not be employed for more than 48 hours in any one workweek unless the agricultural employee receives one and one-half times that agricultural employee's regular rate of pay for all hours worked over 48 in any one workweek.

(c) Beginning January 1, 2024, any agricultural employee shall not be employed for more than 40 hours in any one workweek unless the agricultural employee receives one and one-half times that agricultural employee's regular rate of pay for all hours worked over 40 in any one workweek.

(7)(a) No damages, statutory or civil penalties, attorneys' fees and costs, or other type of relief may be granted against an employer to an agricultural or dairy employee seeking unpaid overtime due to the employee's historical exclusion from overtime under subsection (2)(g) of this section, as it existed on November 4, 2020.

(b) This subsection applies to all claims, causes of actions, and proceedings commenced on or after November 5, 2020, regardless of when the claim or cause of action arose. To this extent, this subsection applies retroactively, but in all other respects it applies prospectively.

(c) This subsection does not apply to dairy employees entitled to back pay or other relief as a result of being a member in the class of plaintiffs in *Martinez-Cuevas v. DeRuyter Bros. Dairy*, 196 Wn.2d 506 (2020).

(8) For the purposes of this section, "agricultural employee" means any individual employed: (a) On a farm, in the employ of any person, in connection with the cultivation of the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including raising, shearing, feeding, caring for, training, and management of livestock, bees, poultry, and furbearing animals and wildlife, or in the employ of the owner or tenant or other operator of a farm in connection with the operation, management, conservation, improvement, or

maintenance of such farm and its tools and equipment; (b) in packing, packaging, grading, storing or delivering to storage, or to market or to a carrier for transportation to market, any agricultural or horticultural commodity; or (c) [in] commercial canning, commercial freezing, or any other commercial processing, or with respect to services performed in connection with the cultivation, raising, harvesting, and processing of oysters or in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption. An agricultural employee does not include a dairy employee.

(9) For the purposes of this section, "dairy employee" includes any employee engaged in dairy cattle and milk production activities described in code 112120 of the North American industry classification system.

**Wash. Rev. Code § 49.46.210**
**Minimum Wage Requirements and Labor Standards**
**Paid sick leave – Authorized purposes – Limitations**

(1) Beginning January 1, 2018, except as provided in RCW 49.46.180, every employer shall provide each of its employees paid sick leave as follows:

(a) An employee shall accrue at least one hour of paid sick leave for every forty hours worked as an employee. An employer may provide paid sick leave in advance of accrual provided that such front-loading meets or exceeds the requirements of this section for accrual, use, and carryover of paid sick leave.

(b) An employee is authorized to use paid sick leave for the following reasons:

(i) An absence resulting from an employee's mental or physical illness, injury, or health condition; to accommodate the employee's need for medical diagnosis, care, or treatment of a mental or physical illness, injury, or health condition; or an employee's need for preventive medical care;

(ii) To allow the employee to provide care for a family member with a mental or physical illness, injury, or health condition; care of a family member who needs medical diagnosis, care, or treatment of a mental or physical illness, injury, or health condition; or care for a family member who needs preventive medical care; and

(iii) When the employee's place of business has been closed by order of a public official for any health-related reason, or when an employee's child's school or place of care has been closed for such a reason.

(c) An employee is authorized to use paid sick leave for absences that qualify for leave under the domestic violence leave act, chapter 49.76 RCW.

(d) An employee is entitled to use accrued paid sick leave beginning on the ninetieth calendar day after the commencement of his or her employment.

(e) Employers are not prevented from providing more generous paid sick leave policies or permitting use of paid sick leave for additional purposes.

(f) An employer may require employees to give reasonable notice of an absence from work, so long as such notice does not interfere with an employee's lawful use of paid sick leave.

(g) For absences exceeding three days, an employer may require verification that an employee's use of paid sick leave is for an authorized purpose. If an employer requires verification, verification must be provided to the employer within a reasonable time period during or after the leave. An employer's requirements for verification may not result in an unreasonable burden or expense

34

on the employee and may not exceed privacy or verification requirements otherwise established by law.

(h) An employer may not require, as a condition of an employee taking paid sick leave, that the employee search for or find a replacement worker to cover the hours during which the employee is on paid sick leave.

(i) For each hour of paid sick leave used, an employee shall be paid the greater of the minimum hourly wage rate established in this chapter or his or her normal hourly compensation. The employer is responsible for providing regular notification to employees about the amount of paid sick leave available to the employee.

(j) Except as provided in (l) of this subsection, accrued and unused paid sick leave carries over to the following year, but an employer is not required to allow an employee to carry over paid sick leave in excess of 40 hours.

(k) Except as provided in (l) of this subsection, an employer is not required to provide financial or other reimbursement for accrued and unused paid sick leave to any employee upon the employee's termination, resignation, retirement, or other separation from employment. When there is a separation from employment and the employee is rehired within 12 months of separation by the same employer, whether at the same or a different business location of the employer, previously accrued unused paid sick leave shall be reinstated and the previous period of employment shall be counted for purposes of determining the employee's eligibility to use paid sick leave under subsection (1)(d) of this section. For purposes of this subsection (1)(k), "previously accrued and unused paid sick leave" does not include sick leave paid out to a construction worker under (l) of this subsection.

(l)(i) A construction industry employer must pay a construction worker, who has not met the 90th day eligibility under (d) of this subsection at the time of separation, the balance of the worker's accrued and unused paid sick leave at the end of the established pay period following the worker's separation pursuant to RCW 49.48.010(2).

(ii) The definitions in this subsection (1)(l)(ii) apply throughout this subsection (1)(l) unless the context clearly requires otherwise.

(A) "Construction worker" means a worker who performed service, maintenance, or construction work on a jobsite, in the field or in a fabrication shop using the tools of the worker's trade or craft.

(B) "Construction industry employer" means an employer in the industry described in North American industry classification system industry code 23, except for residential building construction code 2361.

(2) For purposes of this section, "family member" means any of the following:

35

(a) A child, including a biological, adopted, or foster child, stepchild, or a child to whom the employee stands in loco parentis, is a legal guardian, or is a de facto parent, regardless of age or dependency status;

(b) A biological, adoptive, de facto, or foster parent, stepparent, or legal guardian of an employee or the employee's spouse or registered domestic partner, or a person who stood in loco parentis when the employee was a minor child;

(c) A spouse;

(d) A registered domestic partner;

(e) A grandparent;

(f) A grandchild; or

(g) A sibling.

(3) An employer may not adopt or enforce any policy that counts the use of paid sick leave time as an absence that may lead to or result in discipline against the employee.

(4) An employer may not discriminate or retaliate against an employee for his or her exercise of any rights under this chapter including the use of paid sick leave.

(5)(a) The definitions in this subsection apply to this subsection:

(i) "Average hourly compensation" means a driver's compensation during passenger platform time from, or facilitated by, the transportation network company, during the 365 days immediately prior to the day that paid sick time is used, divided by the total hours of passenger platform time worked by the driver on that transportation network company's driver platform during that period. "Average hourly compensation" does not include tips.

(ii) "Driver," "driver platform," "passenger platform time," and "transportation network company" have the meanings provided in RCW 49.46.300.

(iii) "Earned paid sick time" is the time provided by a transportation network company to a driver as calculated under this subsection. For each hour of earned paid sick time used by a driver, the transportation network company shall compensate the driver at a rate equal to the driver's average hourly compensation.

(iv) For purposes of drivers, "family member" means any of the following:

(A) A child, including a biological, adopted, or foster child, stepchild, or a child to whom the driver stands in loco parentis, is a legal guardian, or is a de facto parent, regardless of age or dependency status;

(B) A biological, adoptive, de facto, or foster parent, stepparent, or legal guardian of a driver or the driver's spouse or registered domestic partner, or a person who stood in loco parentis when the driver was a minor child;

(C) A spouse;

(D) A registered domestic partner;

(E) A grandparent;

36

(F) A grandchild; or

(G) A sibling.

(b) Beginning January 1, 2023, a transportation network company must provide to each driver operating on its driver platform compensation for earned paid sick time as required by this subsection and subject to the provisions of this subsection. A driver shall accrue one hour of earned paid sick time for every 40 hours of passenger platform time worked.

(c) A driver is entitled to use accrued earned paid sick time upon recording 90 hours of passenger platform time on the transportation network company's driver platform.

(d) For each hour of earned paid sick time used, a driver shall be paid the driver's average hourly compensation.

(e) A transportation network company shall establish an accessible system for drivers to request and use earned paid sick time. The system must be available to drivers via smartphone application and online web portal.

(f) A driver may carry over up to 40 hours of unused earned paid sick time to the next calendar year. If a driver carries over unused earned paid sick time to the following year, accrual of earned paid sick time in the subsequent year must be in addition to the hours accrued in the previous year and carried over.

(g) A driver is entitled to use accrued earned paid sick time if the driver has used the transportation network company's platform as a driver within 90 calendar days preceding the driver's request to use earned paid sick time.

(h) A driver is entitled to use earned paid sick time for the following reasons:

(i) An absence resulting from the driver's mental or physical illness, injury, or health condition; to accommodate the driver's need for medical diagnosis, care, or treatment of a mental or physical illness, injury, or health condition; or an employee's need for preventive medical care;

(ii) To allow the driver to provide care for a family member with a mental or physical illness, injury, or health condition; care of a family member who needs medical diagnosis, care, or treatment of a mental or physical illness, injury, or health condition; or care for a family member who needs preventive medical care;

(iii) When the driver's child's school or place of care has been closed by order of a public official for any health-related reason;

(iv) For absences for which an employee would be entitled for leave under RCW 49.76.030; and

(v) During a deactivation or other status that prevents the driver from performing network services on the transportation network company's platform, unless the deactivation or status is due to a verified allegation of sexual assault or physical assault perpetrated by the driver.

37

(i) If a driver does not record any passenger platform time in a transportation network company's driver platform for 365 or more consecutive days, any unused earned paid sick time accrued up to that point with that transportation network company is no longer valid or recognized.

(j) Drivers may use accrued days of earned paid sick time in increments of a minimum of four or more hours. Drivers are entitled to request four or more hours of earned paid sick time for immediate use, including consecutive days of use. Drivers are not entitled to use more than eight hours of earned paid sick time within a single calendar day.

(k) A transportation network company shall compensate a driver for requested hours or days of earned paid sick time no later than 14 calendar days or the next regularly scheduled date of compensation following the requested hours or days of earned paid sick time.

(l) A transportation network company shall not request or require reasonable verification of a driver's qualifying illness except as would be permitted to be requested of an employee under subsection (1)(g) of this section. If a transportation network company requires verification pursuant to this subsection, the transportation network company must compensate the driver for the requested hours or days of earned paid sick time no later than the driver's next regularly scheduled date of compensation after satisfactory verification is provided.

(m) If a driver accepts an offer of prearranged services for compensation from a transportation network company during the four-hour period or periods for which the driver requested earned paid sick time, a transportation network company may determine that the driver did not use earned paid sick time for an authorized purpose.

(n) A transportation network company shall provide each driver with:

(i) Written notification of the current rate of average hourly compensation while a passenger is in the vehicle during the most recent calendar month for use of earned paid sick time;

(ii) An updated amount of accrued earned paid sick time since the last notification;

(iii) Reduced earned paid sick time since the last notification;

(iv) Any unused earned paid sick time available for use; and

(v) Any amount that the transportation network company may subtract from the driver's compensation for earned paid sick time. The transportation network company shall provide this information to the driver no less than monthly. The transportation network company may choose a reasonable system for providing this notification, including but not limited to: A pay stub; a weekly summary of compensation information; or an online system where drivers can access their own earned paid sick time information. A transportation network company is not

required to provide this information to a driver if the driver has not worked any days since the last notification.

(o) A transportation network company may not adopt or enforce any policy that counts the use of earned paid sick time as an absence that may lead to or result in any action that adversely affects the driver's use of the transportation network.

(p) A transportation network company may not take any action against a driver that adversely affects the driver's use of the transportation network due to his or her exercise of any rights under this subsection including the use of earned paid sick time.

(q) The department may adopt rules to implement this subsection.

**Wash. Rev. Code § 49.60.010**
**Discrimination – Human Rights Commission**
**Purpose of chapter**

This chapter shall be known as the "law against discrimination." It is an exercise of the police power of the state for the protection of the public welfare, health, and peace of the people of this state, and in fulfillment of the provisions of the Constitution of this state concerning civil rights. The legislature hereby finds and declares that practices of discrimination against any of its inhabitants because of race, creed, color, national origin, citizenship or immigration status, families with children, sex, marital status, sexual orientation, age, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability are a matter of state concern, that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state. A state agency is herein created with powers with respect to elimination and prevention of discrimination in employment, in credit and insurance transactions, in places of public resort, accommodation, or amusement, and in real property transactions because of race, creed, color, national origin, citizenship or immigration status, families with children, sex, marital status, sexual orientation, age, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability; and the commission established hereunder is hereby given general jurisdiction and power for such purposes.

**Wash. Rev. Code § 49.60.030**
**Discrimination – Human Rights Commission**
**Freedom from discrimination—Declaration of civil rights**

(1) The right to be free from discrimination because of race, creed, color, national origin, citizenship or immigration status, sex, honorably discharged veteran or military status, sexual orientation, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability is recognized as and declared to be a civil right. This right shall include, but not be limited to:

(a) The right to obtain and hold employment without discrimination;

(b) The right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement;

(c) The right to engage in real estate transactions without discrimination, including discrimination against families with children;

(d) The right to engage in credit transactions without discrimination;

(e) The right to engage in insurance transactions or transactions with health maintenance organizations without discrimination: PROVIDED, That a practice which is not unlawful under RCW 48.30.300, 48.44.220, or 48.46.370 does not constitute an unfair practice for the purposes of this subparagraph;

(f) The right to engage in commerce free from any discriminatory boycotts or blacklists. Discriminatory boycotts or blacklists for purposes of this section shall be defined as the formation or execution of any express or implied agreement, understanding, policy or contractual arrangement for economic benefit between any persons which is not specifically authorized by the laws of the United States and which is required or imposed, either directly or indirectly, overtly or covertly, by a foreign government or foreign person in order to restrict, condition, prohibit, or interfere with or in order to exclude any person or persons from any business relationship on the basis of race, color, creed, religion, sex, honorably discharged veteran or military status, sexual orientation, the presence of any sensory, mental, or physical disability, or the use of a trained dog guide or service animal by a person with a disability, or national origin, citizenship or immigration status, or lawful business relationship: PROVIDED HOWEVER, That nothing herein contained shall

41

prohibit the use of boycotts as authorized by law pertaining to labor disputes and unfair labor practices; and

(g) The right of a mother to breastfeed her child in any place of public resort, accommodation, assemblage, or amusement.

(2) Any person deeming himself or herself injured by any act in violation of this chapter shall have a civil action in a court of competent jurisdiction to enjoin further violations, or to recover the actual damages sustained by the person, or both, together with the cost of suit including reasonable attorneys' fees or any other appropriate remedy authorized by this chapter or the United States Civil Rights Act of 1964 as amended, or the Federal Fair Housing Amendments Act of 1988 (42 U.S.C. Sec. 3601 et seq.).

(3) Except for any unfair practice committed by an employer against an employee or a prospective employee, or any unfair practice in a real estate transaction which is the basis for relief specified in the amendments to RCW 49.60.225 contained in chapter 69, Laws of 1993, any unfair practice prohibited by this chapter which is committed in the course of trade or commerce as defined in the Consumer Protection Act, chapter 19.86 RCW, is, for the purpose of applying that chapter, a matter affecting the public interest, is not reasonable in relation to the development and preservation of business, and is an unfair or deceptive act in trade or commerce.

**Wash. Rev. Code § 49.60.040**
**Discrimination – Human Rights Commission**
**Definitions**

The definitions in this section apply throughout this chapter unless the context clearly requires otherwise.

(1) "Aggrieved person" means any person who: (a) Claims to have been injured by an unfair practice in a real estate transaction; or (b) believes that he or she will be injured by an unfair practice in a real estate transaction that is about to occur.

(2) "Any place of public resort, accommodation, assemblage, or amusement" includes, but is not limited to, any place, licensed or unlicensed, kept for gain, hire, or reward, or where charges are made for admission, service, occupancy, or use of any property or facilities, whether conducted for the entertainment, housing, or lodging of transient guests, or for the benefit, use, or accommodation of those seeking health, recreation, or rest, or for the burial or other disposition of human remains, or for the sale of goods, merchandise, services, or personal property, or for the rendering of personal services, or for public conveyance or transportation on land, water, or in the air, including the stations and terminals thereof and the garaging of vehicles, or where food or beverages of any kind are sold for consumption on the premises, or where public amusement, entertainment, sports, or recreation of any kind is offered with or without charge, or where medical service or care is made available, or where the public gathers, congregates, or assembles for amusement, recreation, or public purposes, or public halls, public elevators, and public washrooms of buildings and structures occupied by two or more tenants, or by the owner and one or more tenants, or any public library or educational institution, or schools of special instruction, or nursery schools, or day care centers or children's camps: PROVIDED, That nothing contained in this definition shall be construed to include or apply to any institute, bona fide club, or place of accommodation, which is by its nature distinctly private, including fraternal organizations, though where public use is permitted that use shall be covered by this chapter; nor shall anything contained in this definition apply to any educational facility, columbarium, crematory, mausoleum, or cemetery operated or maintained by a bona fide religious or sectarian institution.

(3) "Commission" means the Washington state human rights commission.

(4) "Complainant" means the person who files a complaint in a real estate transaction.

(5) "Covered multifamily dwelling" means: (a) Buildings consisting of four or more dwelling units if such buildings have one or more elevators; and (b) ground floor dwelling units in other buildings consisting of four or more dwelling units.

(6) "Credit transaction" includes any open or closed end credit transaction, whether in the nature of a loan, retail installment transaction, credit card issue or charge, or otherwise, and whether for personal or for business purposes, in which a service, finance, or interest charge is imposed, or which provides for repayment in scheduled payments, when such credit is extended in the regular course of any trade or commerce, including but not limited to transactions by banks, savings and loan associations or other financial lending institutions of whatever nature, stock brokers, or by a merchant or mercantile establishment which as part of its ordinary business permits or provides that payment for purchases of property or service therefrom may be deferred.

(7)(a) "Disability" means the presence of a sensory, mental, or physical impairment that:

(i) Is medically cognizable or diagnosable; or

(ii) Exists as a record or history; or

(iii) Is perceived to exist whether or not it exists in fact.

(b) A disability exists whether it is temporary or permanent, common or uncommon, mitigated or unmitigated, or whether or not it limits the ability to work generally or work at a particular job or whether or not it limits any other activity within the scope of this chapter.

(c) For purposes of this definition, "impairment" includes, but is not limited to:

(i) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genitor-urinary [genitourinary], hemic and lymphatic, skin, and endocrine; or

(ii) Any mental, developmental, traumatic, or psychological disorder, including but not limited to cognitive limitation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

44

(d) Only for the purposes of qualifying for reasonable accommodation in employment, an impairment must be known or shown through an interactive process to exist in fact and:

(i) The impairment must have a substantially limiting effect upon the individual's ability to perform his or her job, the individual's ability to apply or be considered for a job, or the individual's access to equal benefits, privileges, or terms or conditions of employment; or

(ii) The employee must have put the employer on notice of the existence of an impairment, and medical documentation must establish a reasonable likelihood that engaging in job functions without an accommodation would aggravate the impairment to the extent that it would create a substantially limiting effect.

(e) For purposes of (d) of this subsection, a limitation is not substantial if it has only a trivial effect.

(8) "Dog guide" means a dog that is trained for the purpose of guiding blind persons or a dog that is trained for the purpose of assisting hearing impaired persons.

(9) "Dwelling" means any building, structure, or portion thereof that is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land that is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

(10) "Employee" does not include any individual employed by his or her parents, spouse, or child, or in the domestic service of any person.

(11) "Employer" includes any person acting in the interest of an employer, directly or indirectly, who employs eight or more persons, and does not include any religious or sectarian organization not organized for private profit.

(12) "Employment agency" includes any person undertaking with or without compensation to recruit, procure, refer, or place employees for an employer.

(13) "Families with children status" means one or more individuals who have not attained the age of eighteen years being domiciled with a parent or another person having legal custody of such individual or individuals, or with the designee of such parent or other person having such legal custody, with the written permission of such parent or other person. Families with children status also applies to any person who

is pregnant or is in the process of securing legal custody of any individual who has not attained the age of eighteen years.

(14) "Full enjoyment of" includes the right to purchase any service, commodity, or article of personal property offered or sold on, or by, any establishment to the public, and the admission of any person to accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement, without acts directly or indirectly causing persons of any particular race, creed, color, sex, sexual orientation, national origin, or with any sensory, mental, or physical disability, or the use of a trained dog guide or service animal by a person with a disability, to be treated as not welcome, accepted, desired, or solicited.

(15) "Honorably discharged veteran or military status" means a person who is:

(a) A veteran, as defined in RCW 41.04.007; or

(b) An active or reserve member in any branch of the armed forces of the United States, including the national guard, coast guard, and armed forces reserves.

(16) "Labor organization" includes any organization which exists for the purpose, in whole or in part, of dealing with employers concerning grievances or terms or conditions of employment, or for other mutual aid or protection in connection with employment.

(17) "Marital status" means the legal status of being married, single, separated, divorced, or widowed.

(18) "National origin" includes "ancestry."

(19) "Person" includes one or more individuals, partnerships, associations, organizations, corporations, cooperatives, legal representatives, trustees and receivers, or any group of persons; it includes any owner, lessee, proprietor, manager, agent, or employee, whether one or more natural persons; and further includes any political or civil subdivisions of the state and any agency or instrumentality of the state or of any political or civil subdivision thereof.

(20) "Premises" means the interior or exterior spaces, parts, components, or elements of a building, including individual dwelling units and the public and common use areas of a building.

(21) "Race" is inclusive of traits historically associated or perceived to be associated with race including, but not limited to, hair texture and protective hairstyles. For purposes of this subsection, "protective hairstyles" includes, but is not limited to, such hairstyles as afros, braids, locks, and twists.

(22) "Real estate transaction" includes the sale, appraisal, brokering, exchange, purchase, rental, or lease of real property, transacting or applying for a real estate loan, or the provision of brokerage services.

(23) "Real property" includes buildings, structures, dwellings, real estate, lands, tenements, leaseholds, interests in real estate cooperatives, condominiums, and hereditaments, corporeal and incorporeal, or any interest therein.

(24) "Respondent" means any person accused in a complaint or amended complaint of an unfair practice in a real estate transaction.

(25) "Service animal" means any dog or miniature horse, as discussed in RCW 49.60.214, that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. The work or tasks performed by the service animal must be directly related to the individual's disability. Examples of work or tasks include, but are not limited to, assisting individuals who are blind or have low vision with navigation and other tasks, alerting individuals who are deaf or hard of hearing to the presence of people or sounds, providing nonviolent protection or rescue work, pulling a wheelchair, assisting an individual during a seizure, alerting individuals to the presence of allergens, retrieving items such as medicine or the telephone, providing physical support and assistance with balance and stability to individuals with mobility disabilities, and helping persons with psychiatric and neurological disabilities by preventing or interrupting impulsive or destructive behaviors. The crime deterrent effects of an animal's presence and the provision of emotional support, well-being, comfort, or companionship do not constitute work or tasks. This subsection does not apply to RCW 49.60.222 through 49.60.227 with respect to housing accommodations or real estate transactions.

(26) "Sex" means gender.

(27) "Sexual orientation" means heterosexuality, homosexuality, bisexuality, and gender expression or identity. As used in this definition, "gender expression or identity" means having or being perceived as having a gender identity, self-image, appearance, behavior, or expression, whether or not that gender identity, self-image,

appearance, behavior, or expression is different from that traditionally associated with the sex assigned to that person at birth

**Wash. Rev. Code § 49.60.120**
**Discrimination – Human Rights Commission**
**Certain powers and duties of commission**

The commission shall have the functions, powers, and duties:

(1) To appoint an executive director and chief examiner, and such investigators, examiners, clerks, and other employees and agents as it may deem necessary, fix their compensation within the limitations provided by law, and prescribe their duties.

(2) To obtain upon request and utilize the services of all governmental departments and agencies.

(3) To adopt, amend, and rescind suitable rules to carry out the provisions of this chapter, and the policies and practices of the commission in connection therewith.

(4) To receive, impartially investigate, and pass upon complaints alleging unfair practices as defined in this chapter.

(5) To issue such publications and results of investigations and research as in its judgment will tend to promote good will and minimize or eliminate discrimination because of sex, sexual orientation, race, creed, color, national origin, citizenship or immigration status, marital status, age, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability, or the use of a trained dog guide or service animal by a person with a disability.

(6) To make such technical studies as are appropriate to effectuate the purposes and policies of this chapter and to publish and distribute the reports of such studies.

(7) To cooperate and act jointly or by division of labor with the United States or other states, with other Washington state agencies, commissions, and other government entities, and with political subdivisions of the state of Washington and their respective human rights agencies to carry out the purposes of this chapter. However, the powers which may be exercised by the commission under this subsection permit investigations and complaint dispositions only if the investigations are designed to reveal, or the complaint deals only with, allegations which, if proven, would constitute unfair practices under this chapter. The commission may perform such services for these agencies and be reimbursed therefor.

49

(8) To foster good relations between minority and majority population groups of the state through seminars, conferences, educational programs, and other intergroup relations activities.

**Wash. Rev. Code § 49.60.140**
**Discrimination – Human Rights Commission**
**Commission may hold hearings and subpoena witnesses**

The commission has power to hold hearings, subpoena witnesses, compel their attendance, administer oaths, take the testimony of any person under oath, and in connection therewith, to require the production for examination of any books or papers relating to any matter under investigation or in question before the commission. The commission may make rules as to the issuance of subpoenas by individual members, as to service of complaints, decisions, orders, recommendations and other process or papers of the commission, its member, agent, or agency, either personally or by registered mail, return receipt requested, or by leaving a copy thereof at the principal office or place of business of the person required to be served. The return post office receipt, when service is by registered mail, shall be proof of service of the same.

**Wash. Rev. Code § 49.60.160**
**Discrimination – Human Rights Commission**
**Refusals may be punished as contempt of court**

In case of contumacy or refusal to obey a subpoena issued to any person, the superior court of any county within the jurisdiction of which the investigation, proceeding, or hearing is carried on or within the jurisdiction of which the person guilty of contumacy or refusal to obey is found or resides or transacts business, upon application by the commission shall have jurisdiction to issue to such person an order requiring such person to appear before the commission, its member, agent, or agency, there to produce evidence if so ordered, or there to give testimony touching the matter under investigation or in question. Any failure to obey such order of the court may be punished by the court as a contempt thereof.

**Wash. Rev. Code § 49.60.180**
**Discrimination – Human Rights Commission**
**Unfair practices of employers**

It is an unfair practice for any employer:

(1) To refuse to hire any person because of age, sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability, unless based upon a bona fide occupational qualification: PROVIDED, That the prohibition against discrimination because of such disability shall not apply if the particular disability prevents the proper performance of the particular worker involved: PROVIDED, That this section shall not be construed to require an employer to establish employment goals or quotas based on sexual orientation.

(2) To discharge or bar any person from employment because of age, sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability.

(3) To discriminate against any person in compensation or in other terms or conditions of employment because of age, sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability: PROVIDED, That it shall not be an unfair practice for an employer to segregate washrooms or locker facilities on the basis of sex, or to base other terms and conditions of employment on the sex of employees where the commission by regulation or ruling in a particular instance has found the employment practice to be appropriate for the practical realization of equality of opportunity between the sexes.

(4) To print, or circulate, or cause to be printed or circulated any statement, advertisement, or publication, or to use any form of application for employment, or to make any inquiry in connection with prospective employment, which expresses any limitation, specification, or discrimination as to age, sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by

a person with a disability, or any intent to make any such limitation, specification, or discrimination, unless based upon a bona fide occupational qualification: PROVIDED, Nothing contained herein shall prohibit advertising in a foreign language.

**Wash. Rev. Code § 49.60.208**
**Discrimination – Human Rights Commission**
**Unfair practice—Religious affiliation disclosure**

It is an unfair practice for an employer to:

(1) Require an employee to disclose his or her sincerely held religious affiliation or beliefs, unless the disclosure is for the purpose of providing a religious accommodation at the request of the employee; or

(2) Require or authorize an employee to disclose information about the religious affiliation of another employee, unless the individual whose religious affiliation will be disclosed (a) expressly consents to the disclosure, and (b) has knowledge of the purpose for the disclosure.

**Wash. Rev. Code § 49.60.230**
**Discrimination – Human Rights Commission**
**Complaint may be filed with commission**

(1) Who may file a complaint:

(a) Any person claiming to be aggrieved by an alleged unfair practice may, personally or by his or her attorney, make, sign, and file with the commission a complaint in writing under oath or by declaration. The complaint shall state the name of the person alleged to have committed the unfair practice and the particulars thereof, and contain such other information as may be required by the commission.

(b) Whenever it has reason to believe that any person has been engaged or is engaging in an unfair practice, the commission may issue a complaint.

(c) Any employer or principal whose employees, or agents, or any of them, refuse or threaten to refuse to comply with the provisions of this chapter may file with the commission a written complaint under oath or by declaration asking for assistance by conciliation or other remedial action.

**Wash. Rev. Code § 49.60.240**
**Discrimination – Human Rights Commission**
**Complaint investigated—Procedure—Conference, conciliation—Agreement, findings—Rules.**

(1)(a) Except as provided for in (c) of this subsection, after the filing of any complaint, the chairperson of the commission shall refer it to the appropriate section of the commission's staff for prompt review and evaluation of the complaint. If the facts as stated in the complaint do not constitute an unfair practice under this chapter, a finding of no reasonable cause may be made without further investigation. If the facts as stated could constitute an unfair practice under this chapter, a full investigation and ascertainment of the facts shall be conducted.

(b) If the complainant has limitations related to language proficiency or cognitive or other disability, as part of the review and evaluation under (a) of this subsection, the commission's staff must contact the complainant directly and make appropriate inquiry of the complainant as to the facts of the complaint.

(c) After the filing of a complaint alleging an unfair practice in a real estate transaction pursuant to RCW 49.60.222 through 49.60.225, the chairperson of the commission shall refer it to the appropriate section of the commission's staff for prompt investigation and ascertainment of the facts alleged in the complaint.

(2) The investigation shall be limited to the alleged facts contained in the complaint. The results of the investigation shall be reduced to written findings of fact, and a finding shall be made that there is or that there is not reasonable cause for believing that an unfair practice has been or is being committed. A copy of the findings shall be provided to the complainant and to the person named in such complaint, hereinafter referred to as the respondent.

(3) If the finding is made that there is reasonable cause for believing that an unfair practice has been or is being committed, the commission's staff shall immediately endeavor to eliminate the unfair practice by conference, conciliation, and persuasion.

If an agreement is reached for the elimination of such unfair practice as a result of such conference, conciliation, and persuasion, the agreement shall be reduced to writing and signed by the respondent, and an order shall be entered by the commission setting forth the terms of said agreement. No order shall be entered by the commission at this stage of the proceedings except upon such written agreement, except that during the period beginning with the filing of complaints alleging an

unfair practice with respect to real estate transactions pursuant to RCW 49.60.222 through 49.60.225, and ending with the filing of a finding of reasonable cause or a dismissal by the commission, the commission staff shall, to the extent feasible, engage in conciliation with respect to such complaint. Any conciliation agreement arising out of conciliation efforts by the commission shall be an agreement between the respondent and the complainant and shall be subject to the approval of the commission. Each conciliation agreement shall be made public unless the complainant and respondent otherwise agree and the commission determines that disclosure is not required to further the purposes of this chapter.

If no such agreement can be reached, a finding to that effect shall be made and reduced to writing, with a copy thereof provided to the complainant and the respondent.

(4) The commission may adopt rules, including procedural time requirements, for processing complaints alleging an unfair practice with respect to real estate transactions pursuant to RCW 49.60.222 through 49.60.225 and which may be consistent with the federal fair housing amendments act of 1988 (42 U.S.C. Sec. 3601 et seq.), but which in no case shall exceed or be more restrictive than the requirements or standards of such act.

**Wash. Rev. Code § 49.60.250**
**Discrimination – Human Rights Commission**
**Hearing of complaint by administrative law judge—Limitation of relief—Penalties—Order—Arbitration.**

(1) In case of failure to reach an agreement for the elimination of such unfair practice, and upon the entry of findings to that effect, the entire file, including the complaint and any and all findings made, shall be certified to the chairperson of the commission. The chairperson of the commission shall thereupon request the appointment of an administrative law judge under Title 34 RCW to hear the complaint and shall cause to be issued and served in the name of the commission a written notice, together with a copy of the complaint, as the same may have been amended, requiring the respondent to answer the charges of the complaint at a hearing before the administrative law judge, at a time and place to be specified in such notice.

(2) The place of any such hearing may be the office of the commission or another place designated by it. The case in support of the complaint shall be presented at the hearing by counsel for the commission: PROVIDED, That the complainant may retain independent counsel and submit testimony and be fully heard. No member or employee of the commission who previously made the investigation or caused the notice to be issued shall participate in the hearing except as a witness, nor shall the member or employee participate in the deliberations of the administrative law judge in such case. Any endeavors or negotiations for conciliation shall not be received in evidence.

(3) The respondent shall file a written answer to the complaint and appear at the hearing in person or otherwise, with or without counsel, and submit testimony and be fully heard. The respondent has the right to cross-examine the complainant.

(4) The administrative law judge conducting any hearing may permit reasonable amendment to any complaint or answer. Testimony taken at the hearing shall be under oath and recorded.

(5) If, upon all the evidence, the administrative law judge finds that the respondent has engaged in any unfair practice, the administrative law judge shall state findings of fact and shall issue and file with the commission and cause to be served on such respondent an order requiring such respondent to cease and desist from such unfair practice and to take such affirmative action, including, (but not limited to) hiring, reinstatement or upgrading of employees, with or without back pay, an admission or

restoration to full membership rights in any respondent organization, or to take such other action as, in the judgment of the administrative law judge, will effectuate the purposes of this chapter, including action that could be ordered by a court, except that damages for humiliation and mental suffering shall not exceed twenty thousand dollars, and including a requirement for report of the matter on compliance. Relief available for violations of RCW 49.60.222 through 49.60.224 shall be limited to the relief specified in RCW 49.60.225.

(6) If a determination is made that retaliatory action, as defined in RCW 42.40.050, has been taken against a whistleblower, as defined in RCW 42.40.020, the administrative law judge may, in addition to any other remedy, require restoration of benefits, back pay, and any increases in compensation that would have occurred, with interest; impose a civil penalty upon the retaliator of up to five thousand dollars; and issue an order to the state employer to suspend the retaliator for up to thirty days without pay. At a minimum, the administrative law judge shall require that a letter of reprimand be placed in the retaliator's personnel file. No agency shall issue any nondisclosure order or policy, execute any nondisclosure agreement, or spend any funds requiring information that is public under the public records act, chapter 42.56 RCW, be kept confidential; except that nothing in this section shall affect any state or federal law requiring information be kept confidential. All penalties recovered shall be paid into the state treasury and credited to the general fund.

(7) The final order of the administrative law judge shall include a notice to the parties of the right to obtain judicial review of the order by appeal in accordance with the provisions of RCW 34.05.510 through 34.05.598, and that such appeal must be served and filed within thirty days after the service of the order on the parties.

(8) If, upon all the evidence, the administrative law judge finds that the respondent has not engaged in any alleged unfair practice, the administrative law judge shall state findings of fact and shall similarly issue and file an order dismissing the complaint.

(9) An order dismissing a complaint may include an award of reasonable attorneys' fees in favor of the respondent if the administrative law judge concludes that the complaint was frivolous, unreasonable, or groundless.

(10) The commission shall establish rules of practice to govern, expedite, and effectuate the foregoing procedure.

(11) Instead of filing with the commission, a complainant may pursue arbitration conducted by the American arbitration association or another arbitrator mutually agreed by the parties, with the cost of arbitration shared equally by the complainant and the respondent.

**Wash. Rev. Code § 51.12.020**
**Industrial Insurance**
**Employments excluded**

The following are the only employments which shall not be included within the mandatory coverage of this title:

(1) Any person employed as a domestic servant in a private home by an employer who has less than two employees regularly employed forty or more hours a week in such employment.

(2) Any person employed to do gardening, maintenance, or repair, in or about the private home of the employer. For the purposes of this subsection, "maintenance" means the work of keeping in proper condition, "repair" means to restore to sound condition after damage, and "private home" means a person's place of residence.

(3) A person whose employment is not in the course of the trade, business, or profession of his or her employer and is not in or about the private home of the employer.

(4) Any person performing services in return for aid or sustenance only, received from any religious or charitable organization.

(5) Sole proprietors or partners.

(6) Any child under eighteen years of age employed by his or her parent or parents in agricultural activities on the family farm.

(7) Jockeys while participating in or preparing horses for race meets licensed by the Washington horse racing commission pursuant to chapter 67.16 RCW.

(8)(a) Except as otherwise provided in (b) of this subsection, any bona fide officer of a corporation voluntarily elected or voluntarily appointed in accordance with the articles of incorporation or bylaws of the corporation, who at all times during the period involved is also a bona fide director, and who is also a shareholder of the corporation. Only such officers who exercise substantial control in the daily management of the corporation and whose primary responsibilities do not include the performance of manual labor are included within this subsection.

(b) Alternatively, a corporation that is not a "public company" as defined in RCW 23B.01.400 may exempt eight or fewer bona fide officers, who are voluntarily elected or voluntarily appointed in accordance with the articles of incorporation or bylaws of the corporation and who exercise substantial control in the daily management of the corporation, from coverage under this title without regard to the officers' performance of manual labor if the exempted officer is a shareholder of the corporation, or may exempt any number of officers if all the exempted officers are related by blood within the third degree or marriage. If a corporation that is not a "public company" elects to be covered under (a) of this

subsection, the corporation's election must be made on a form prescribed by the department and under such reasonable rules as the department may adopt.

(c) Determinations respecting the status of persons performing services for a corporation shall be made, in part, by reference to Title 23B RCW and to compliance by the corporation with its own articles of incorporation and bylaws. For the purpose of determining coverage under this title, substance shall control over form, and mandatory coverage under this title shall extend to all workers of this state, regardless of honorary titles conferred upon those actually serving as workers.

(d) A corporation may elect to cover officers who are exempted by this subsection in the manner provided by RCW 51.12.110.

(9) Services rendered by a musician or entertainer under a contract with a purchaser of the services, for a specific engagement or engagements when such musician or entertainer performs no other duties for the purchaser and is not regularly and continuously employed by the purchaser. A purchaser does not include the leader of a group or recognized entity who employs other than on a casual basis musicians or entertainers.

(10) Services performed by a newspaper vendor, carrier, or delivery person selling or distributing newspapers on the street, to offices, to businesses, or from house to house and any freelance news correspondent or "stringer" who, using his or her own equipment, chooses to submit material for publication for free or a fee when such material is published.

(11) Services performed by an insurance producer, as defined in RCW 48.17.010, or a surplus line broker licensed under chapter 48.15 RCW.

(12) Services performed by a booth renter. However, a person exempted under this subsection may elect coverage under RCW 51.32.030.

(13) Members of a limited liability company, if either:

(a) Management of the company is vested in its members, and the members for whom exemption is sought would qualify for exemption under subsection (5) of this section were the company a sole proprietorship or partnership; or

(b) Management of the company is vested in one or more managers, and the members for whom the exemption is sought are managers who would qualify for exemption under subsection (8) of this section were the company a corporation.

(14) For hire vehicle operators under chapter 46.72 RCW who own or lease the for hire vehicle, chauffeurs under chapter 46.72A RCW who own or lease the limousine, and operators of taxicabs under chapter 81.72 RCW who own or lease the taxicab. An owner or lessee may elect coverage in the manner provided by RCW 51.32.030.

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32 (a)(7)(C), and Ninth Circuit Rule 32-1, I certify that the attached answering brief is proportionately spaced, has a typeface of 14 points or more, and contains 11919 words.

DATED this 30th day of December, 2024.

*s/Cynthia L. Alexander*
CYNTHIA L. ALEXANDER, WSBA 46019
   *Deputy Solicitor General*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, counsel for Defendants-Appellees

is aware of no related cases pending before this Court.

DATED this 30th day of December 2024.

*s/Cynthia L. Alexander*
CYNTHIA L. ALEXANDER, WSBA 46019
*Deputy Solicitor General*