No. 24-7246

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNION GOSPEL MISSION OF YAKIMA, WASHINGTON,

Plaintiff-Appellee,

v.

ROBERT FERGUSON, in his official capacity as Attorney General of Washington, ANDRETA ARMSTRONG, in her official capacity as Executive Director of the Washington State Human Rights Commission; and GUADALUPE GAMBOA, HAN TRAN, JEFF SBAIH, LUC JASMIN, and CHELSEA DIMAS, in their official capacities as Commissioners of the Washington State Human Rights Commission,

Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON AT YAKIMA
No. 1:23-cv-3027-MKD
The Honorable Mary K. Dimke
United States District Court Judge

## APPELLANTS' EXCERPTS OF RECORD
## VOLUME 2 OF 3

ROBERT W. FERGUSON
*Attorney General*

CYNTHIA L. ALEXANDER, WSBA 46019
TERA M. HEINTZ, WSBA 54921
  *Deputy Solicitors General*
1125 Washington St SE
Olympia, WA 98504
Cynthia.Alexander@atg.wa.gov
Tera.Heintz@atg.wa.gov
(206) 326-5488

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| **UNION GOSPEL MISSION OF YAKIMA, WASH.**, | |
| *Plaintiff,* | Civil Case No.: 1:23-cv-03027 |
| v. | |
| **ROBERT FERGUSON, ET AL.,** | **DECLARATION OF SCOTT THIELEN IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| *Defendants.* | |

I, Scott Thielen, hereby state and declare as follows:

1.    I am over the age of eighteen and make this declaration on my personal knowledge.

2.    I am the Chief Executive Officer of the Union Gospel Mission of Yakima, Wash.  ("the Mission"). I have held this position since July 2024. Prior to that I was the Vice President of Client Services for the Mission. I have worked at the Mission since 2016.

3.    As Chief Executive Officer, I direct the day-to-day operations of the Mission and provide final oversight and authority on all matters.

4.    I have reviewed the Declaration of the former CEO, James Johnson, filed in this case in support of the Mission's Motion for Preliminary Injunction (ECF No. 14-1) and everything contained therein remains true and correct, other than paragraph 2 because he is

Thielen Declaration - 1

no longer the Chief Executive Officer. In addition to that, I offer the following statements, based on my personal knowledge.

5.      The Mission currently has at least 14 open positions that it needs and intends to fill with qualified candidates as soon as possible.

6.      Those positions include: Front Desk Coordinator, Thrift Store Associate(s), Meal Ministry Cook/Mentor, Nurse, Safety Team, Retail Supervisor, Programs Assistant, Children and Family Specialist, New Life Program Manager, Director of Adult Shelter Ministries, Director of Workforce Stewardship (HR), Thrift Retail Manager, Store Manager, and Dental Ministry Clinic Dentist.

7.      True and correct copies of the job descriptions for these open positions are attached as Exhibit A to this declaration.

8.      Many of these positions are not ministerial positions and therefore not protected by the ministerial exception.

9.      The Mission does require every position to "serve ... as a minister of Christ." *See, e.g.,* Ex. A at 2. But that means that every single position is expected to be "imitators of God" (*Ephesians* 5:1) and to follow Jesus' command to "Go therefore and make disciples of all nations, baptizing them in the name of the Father and of the Son and of the Holy Spirit, teaching them to observe all that I have commanded you (*Matthew* 28:19, 20). In other words, all positions are "ministers" in the theological sense, with religious expectations to share the Christian faith.

10.     But the Mission understands that requiring every position to be a "minister of Christ" does not automatically make them legal ministerial positions protected by the ministerial exception.

Thielen Declaration - 2

11.    For example, the Mission understands that the current open positions for Front Desk Coordinator, Thrift Store Associate(s), Meal Ministry Cook/Mentor, Nurse, Safety Team, Retail Supervisor, Programs Assistant, and Children and Family Specialist are not ministerial employees protected by the First Amendment's "ministerial exception." None of these are clergy positions, reflect or hold a ministerial title, or allow the employee to profess themselves as such. None of these positions require certain religious training. And further, a number of these positions involve interaction with mostly fellow Mission employees.

12.    The Mission employs many other non-ministerial employees as well and will have continuing needs to do so.

13.    Even though these positions are not "ministers" protected by the ministerial exception, as with every single position at the Mission, they must share and adhere to the Mission's religious beliefs.

14.    As Mr. Johnson previously explained, part of the reason why the Mission requires every employee to share its faith is because every single employee is essential to forming the Mission's faith community inwardly (toward other employees), which therefore contributes to the success of the ministry outwardly (toward the community).

15.    The Mission views its staff as a faith family; and a family cannot accomplish anything if it is not in agreement on all of the same beliefs, goals, and purposes. Our faith family and our ministry of serving the less fortunate are inseparable.

16.    As such, all employees, regardless of position, (including our 14 current open positions) have inward-facing religious responsibilities to

Thielen Declaration - 3

cultivate fellowship, engage in discipleship, and support one another in their faith journeys through their speech and actions.

17.    The Mission hosts gatherings for all team members that strengthen and facilitate this internal faith community. The Mission engages daily in prayer, encourages staff participation in weekly chapel services, requires weekly participation in a local church, and routinely hosts worship services and sermons. These events deepen relationships between our employees and strengthen our sense of an organizational mission rooted in our common faith.

18.    And all employees are expected to pray with and for one another, share scripture and devotionals with one another, and set an example for one another about how to live a life that follows Christ in every respect. This also ensures Mission employees are not subjected to or willing participants in sinful habits, behaviors, or temptations. Thus, as the Bible says, "Iron sharpens iron, and one man sharpens another." (*Proverbs* 27:17).

19.    Indeed, the Bible commands Mission employees to "all agree" and that "there be no divisions among [us], but that [we] be united in the same mind and the same judgment," (*I Corinthians* 1:10); to "exhort one another every day" so "that none of [us] may be hardened by the deceitfulness of sin," (*Hebrews* 3:13); and to "[b]ear one another's burdens" to "fulfill the law of Christ," (*Galatians* 6:2).

20.    The Mission only hires coreligionists so that it can fulfill these biblical commands and to advance the ministry's religious calling "by being of the same mind, having the same love, and [by] being in full accord and of one mind." (*Philippians* 2:2).

Thielen Declaration - 4

21.     If the Mission cannot foster an inward community of co-believers who share the same faith and seek to advance the same goals with the same attitude, the Mission cannot achieve its overarching purpose to spread the Gospel through its social welfare work.

22.     The Mission employs more than 165 employees to fulfill its religious purpose and routinely hires more than 50 individuals per year. The Mission has frequent turnover for many positions.

23.     The Mission needs to fill the positions listed above as soon as possible. But it is fearful of fines, penalties, and punishment for violating the Washington Law Against Discrimination because it will require all of those employees to share and adhere to its biblical beliefs on marriage and sexuality.

24.     The Mission needs injunctive relief to protect its ability to hire these positions, and all other non-ministerial positions, consistent with its religious beliefs without facing liability or penalties.

25.     The Mission cannot further its religious calling, spread its religious message, or maintain a community of people striving to grow spiritually if it is not allowed to only employ those who agree with the Mission's Christian beliefs and practices and align their conduct with those beliefs.

26.     In order for the Mission to function and maintain its viability, it must be able to hire employees who share its religious views. If it is forced to hire those who do not, or those who do not adhere to those views, it may eventually be extinguished from public life.

Thielen Declaration - 5

**DECLARATION UNDER PENALTY OF PERJURY**

I, Scott Thielen, a citizen of the United States and a resident of the State of Washington, declare under penalty of perjury under 28 U.S.C. § 1746 that the above is true and correct to the best of my knowledge.

Executed this _____ day of September, 2024, at _Yakima_, _WA_.

_____
Scott Thielen, Chief Executive
Officer of the Union Gospel
Mission of Yakima, Wash.

Thielen Declaration - 6

# EXHIBIT A



Join Our Talent Community

## Front Desk Coordinator

Part Time
**Yakima, WA, US**

*30+ days ago*
Requisition ID: 1114

**Salary Range:**
$16.28 To 24.00 Hourly

### Job Purpose

Responsible for coordinating front office operations for the medical and dental clinics within the Care Center, including directing and onboarding volunteers, data collection, patient support and coordination, assisting with patient specialist referrals, interpreter services and various other supports to keep the clinics running smoothly.

### Duties and Responsibilities

**Culture Work**

- Establish professional, caring, strengths-based relationships built on truth, respect, encouragement, and trust.
- Maintain a high level of integrity in modeling and promoting the Mission's Christian culture, core values, policies, and procedures.
- Minister to our clients, showing them kindness and grace.

**Shared Work**

- Model the three virtues of an ideal team player: humble (motivation), hungry (passion), smart (emotional intelligence).
- Contribute as a member of the Care Center team, including Medical and Dental clinics, in a collaborative, team environment, and with volunteers.
- Work in a supportive capacity with supervisor and co-workers to solve departmental problems and accomplish shared goals in pursuit of established priorities.
- Encourage staff and volunteers to flourish in culture and in knowledge for YUGM specific needs.
- Guide the Dental clinic culture within the Care Center and integrate with YUGM teams in other departments as well.

**Individual Work**

*Spiritual Impact*

Back    Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A    1 of 50

**2-ER-026**

- Serve in this role as a minister of Christ, demonstrating the calling, character and competencies of a person who seeks to faithfully follow Jesus, stay in step with the Holy Spirit, and honor the Father. Carry out these responsibilities with the heart of a chaplain, spiritually caring for all those in your sphere of influence, including staff, patients, clients, volunteers, and community partners.

> *"Therefore, if anyone is in Christ, the new creation has come. The old has gone, the new is here!*
> *All this is from God, who reconciled us to himself through Christ and gave us the ministry of*
> *reconciliation: that God was reconciling the world to himself in Christ, not counting people's sins*
> *against them. And he has committed to us the message of reconciliation. We are therefore Christ's*
> *ambassadors, as though God were making his appeal through us."*
> *2 Corinthians 5:17-20a niv*

- Look for opportunities to lead others in prayer, counsel from God's Word, and model what it looks like to know God and experience His love and leadership.

*Care Center*

- Assist in coordinating front office volunteers, externs, and additional personnel.
- Assist in telephone and walk-in reception in English and Spanish.
- Keep the office and waiting area clean and organized.
- Assist at morning and evening clinics as staffing needs require.
- Assist with health promotion, education, and awareness when needed.
- Open office and prep for a day of clinic.
- Assist with interpreting as needed.
- Handle cash and make change.
- Maintain appropriate record keeping for patient prescriptions and referrals.
- Check Care Center mail daily.
- Interpret for providers as needed.
- Create new patient charts in medical, dental, and mental health electronic record.
- Check patients in and out before and after appointments.
- Assist patients in completing and updating forms when needed.

*Dental*

- Collect income verification documents and implement appropriate discount.
- Schedule patients based on emergent, non-emergent, and type of procedure needed with dentists and hygienists.
- Ensure both dentist and hygienist maintain a full schedule of patients.
- Collect payment at the time of visit.
- Follow up phone calls to collect payment.
- Ensure established patients stay up to date on income verification.
- Process end of day reconciliation.
- Prepare monthly collection statements to maintain patient accounts.

*Medical*

- Provide information and referral for clients, update resource information as needed.
- Report provider messages to patients regarding referrals, medications, and lab results.
- Assist in the case management of patients needing to apply for financial aid to fulfill referrals or receive medications.

Back        Apply

- Schedule patients according to variable provider availability as well as walk in needs.

Decl. of S. Thielan in Supp. of MPI - Exhibit A        2 of 50

2-ER-027

- Assist in maintaining full schedule of patients for providers each day.

*General*

- Attend as requested or required all YUGM trainings and meetings scheduled by the management team to keep current on any policy changes, new procedures, and other information essential to performing the job.
- Other duties as assigned in support of YUGM's mission and values.

**Qualifications**

- Interest in and the ability to understand and relate to low-income populations.
- Works well in a collaborative team environment, and with volunteers.
- Bilingual in Spanish and English, verbal and written, with good communication skills.
- Good problem-solving skills.
- Patience, empathy, and compassion toward patient needs.
- Understanding and ability to apply principles and rules of confidentiality (i.e., HIPPA).
- Ability to pay close attention to details.
- Computer, typing, design, and grammar skills.
- Organizational skills.
- Ability to handle phone inquiries in a professional manner.
- Demonstrated personal and work ethic reflecting YUGM's Core Values of Love, Professionalism and Outcomes.

Copyright © 2024, ADP, Inc. All rights reserved.

Powered by ADP

Privacy | Legal | Requirements | Artificial Intelligence

Back     Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A     3 of 50

**2-ER-028**



Join Our Talent Community

## Thrift Store Associate

Part Time
**Yakima, WA, US**

*30+ days ago*
Requisition ID: 1040

**Salary Range:**
$16.28 To 18.00 Hourly

At our three Thrift Stores (Lighthouse Thrift, Mission Thrift and Summit Thrift), we hire individuals to work in either our donation processing area, or in our retail area. Both of these areas are vitally important to our Thrift Store operations. You may indicate on your application if you have a strong desire for one area over the other. However, you could be offered a position in either of these areas depending on current need and best fit determined during the interview process.  Our Thrift Associate level positions are all part time, but there are opportunities for advancement into full time positions.

Due to the large number of applications we receive, you will only be contacted when we are intending to interview you for a current open position.  We do keep applications on file and may come back to your application at a later date.

All Yakima Union Gospel Mission employees help support the YUGM mission, vision and represent Christ in and to our community.

**OUR MISSION & VISON**

Our mission is to follow Christ in helping people move from homelessness to wholeness, so that every homeless person in Yakima County has the opportunity for permanent life transformation in Jesus Christ.

**Direct Work - Direct work will vary by position**

**Examples of direct work in our retail area:**

- Assist the Retail Management Team in the building of the team, by being an example of "revealing Christ" to all staff, donors, and customers.

Back    Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A    4 of 50

**2-ER-029**

- Provide a friendly and joyful welcoming to all customers when they enter the store and throughout their shopping experience.
- Assist the Retail Management team in register transactions including handling of cash and credit card payments and any non-cash purchases, in order to ensure accuracy and security of all transactions.
- Work with the Retail Management Team to establish and maintain customer service standards in order to ensure compliance with the company mission statement and to provide a pleasant shopping experience for each customer.
- Work with store staff in maintaining the physical appearance of the store on every shift, including by not limited to: communicating and restocking of janitorial and restroom supplies, removing safety hazards, picking up store merchandise and restoring to proper place, cleaning parking lot, sidewalks, windows and doors, store floors, break rooms(s), restrooms and other public areas, to ensure the safety and health of customers and employees.
- Maintain and clean out fitting rooms on a regular basis.
- Assist store staff in stocking store shelves and clothing racks, in order to provide customers with maximum shopping opportunities.
- Under the direction of the Retail Management team, assist store staff, as needed, to set up or change store displays in order to provide a pleasant shopping environment and to entice customers to shop new areas or items within the store.
- Communicate daily all events related to customer service issues or problems, register mistakes, employee issues or accidents, and general store operations to the manager, in order to ensure all issues are handled properly and in accordance with company policies and procedures.
- Attend as required, or requested, all training events provided by the company and all store meetings as schedule by the manager in order to keep current on any policy changes, new procedures, and other information essential to performing the job.

**Examples of direct work in our donation processing area:**

- Perform any of the required duties within the processing team. This includes all requirements related to accepting donations, presorting and pricing merchandise.
- Welcome donors in a timely manner in a way that they feel confident that Yakima Union Gospel Mission appreciates them and understands their value. Look for opportunities to pray with donors.
- As needed, handle the receiving and donation process with the utmost respect and care including greeting the donor, assisting in unloading donations, telling the Yakima Union Gospel Mission story, collecting donor information, repeating details back to donor and issuing a receipt.

Back      Apply

- Help maintain clean and well organized reception, presort and processing areas.
- Maintain clean and well organized personal processing station.
- Adhere to, daily, all employee policies and procedures at outlined in the Employee Policy and Procedures manual and the YUGM Mission Statement.
- Recognize quality merchandise and effectively seek guidance on pricing from Processing Manager.
- Work with and effectively communicate with the Processing Manager, other processing employees, volunteers and donors on a daily basis.
- Daily serve with fellow employees in a way that promotes a healthy and productive work environment.
- Adhere to daily and weekly production goals.
- Produce quick and accurate work in a fast-paced environment.
- Understand and comply with policies and procedures related to donated items, including prohibited items and pricing guides.
- Effectively use the donation receiving script to communicate appreciation, the Yakima Union Gospel Mission Story, and Corner of Your Field to donors.

**Working conditions and physical requirements can vary by position and location**

**All Thrift Associate positions require significant amounts of walking, standing, balancing, stooping, reaching and lifting throughout the shift.**

Copyright © 2024, ADP, Inc. All rights reserved.

Powered by ADP

Privacy | Legal | Requirements | Artificial Intelligence

Back        Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A                     6 of 50

**2-ER-031**



Join Our Talent Community

# Programs Assistant

Full Time
**Yakima, WA, US**

*30+ days ago*
Requisition ID: 1146

**Salary Range:**
$16.28 To 24.00 Hourly

### Job Purpose

This position aids the Recovery Services staff in realizing best client outcomes.

### Duties and Responsibilities

**Culture Work**

- Establish professional, caring, strengths-based relationships built on truth, respect, encouragement, and trust.
- Maintain a high level of integrity in modeling and promoting the Mission's Christian culture, core values, policies, and procedures.
- Ministering to our clients, showing them kindness and grace.
- Accept clients where they are and use professional skills to guide each one in the process of change with the goals of clients in mind.
- Create and maintain a culture of safety and trust, making client-centered decisions.

**Team Work**

- Model the three virtues of an ideal team player: humble (motivation), hungry (passion), smart (emotional intelligence).
- Collaborate with Recovery Services staff (Discovery, New Life, Bridge), all Client Services staff, and volunteers as fellow team members regarding client needs, logistics, progress towards goals, and healthy behaviors by attending and participating in related weekly and monthly team meetings.
- Support each other as employees and collaborate in establishing best practices and ensuring best outcomes for the people we serve.
- Meet regularly to discuss client needs and share ideas, successes and challenges in order to support each other, learn from each other and hold each other accountable to providing our best for our clients.
- Help cover for department needs within the Recovery Services department, in the absence or shortage of staff, or as needed.

Back    Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A          7 of 50

**2-ER-032**

**Direct Work**

*Spiritual Shepherding*

- Serve in this role as a minister of Christ, demonstrating the calling, character and competencies of a spiritual leader who seeks to faithfully follow Jesus, stay in step with the Holy Spirit, and honor the Father. Carry out these responsibilities with the heart of a chaplain, spiritually caring for all those in your sphere of influence, including staff, clients, volunteers, and community partners.

> *"Therefore, if anyone is in Christ, the new creation has come. The old has gone, the new is here!*
> *All this is from God, who reconciled us to himself through Christ and gave us the ministry of*
> *reconciliation: that God was reconciling the world to himself in Christ, not counting people's sins*
> *against them. And he has committed to us the message of reconciliation. We are therefore Christ's*
> *ambassadors, as though God were making his appeal through us."*
> *2 Corinthians 5:17-20a niv*

- Look for opportunities to lead Bible study, lead others in prayer, counsel from God's Word, and model what it looks like to know God and experience His love and leadership.

*Client Intakes and Exits*

- Intake: assist with room readiness, preparing client ID badge, key card, drug testing, documentation, and other personal client needs.
- Exit: assist with closing client database records, file client documents, and conclude details for graduated or dismissed clients.
- Upward Exit: assist with celebration events for upward exits, including arranging party supplies, informing staff and family/friends, planning event details, setup, and cleanup.

*Work Therapy coordination*

- Schedule program client work therapy assignments under the direction of program staff, including assigning shifts, establishing job descriptions, posting schedules, and training clients to access the client database to check schedules.

*Client Assistance and Supervision*

- Coordinate/provide transportation and other logistical support to clients as needed and approved/directed by the Recovery Services Director.
- Assist with client group activities to foster a supportive community environment and assist in individual social development.
- Participate in client daily life and activities such as meals, classes, special events, cleaning, and maintenance of shared spaces.
- Assist clients with essential needs such as hygiene products, laundry supplies, medication storage and dispensing, and emotional and spiritual support (e.g., prayer, walks, outings to local stores, etc.).
- Provide clients with consistent and loving accountability as part of their program experience. This includes room checks for cleanliness, bag inspections and room searches for contraband, drug testing, and general availability to clients needing guidance.
- Assist with difficult confrontations or dismissals to ensure that clients feel represented and safe.

*Case Management Assistance*

- Assist Recovery Services staff with client follow-up to case management and coaching.

**Back**    **Apply**

- Coordinate client needs with community resource providers, such as PACT, Comprehensive Mental Health, Yakima Neighborhood Health Services, Dial-a-Ride, etc.
- Provide basic case management for clients as needed, under the direction of program staff.

*Safety*

- Always maintain client confidentiality.
- Monitor client rooms and other living spaces for cleanliness, safety, and necessary supplies and furnishings. Also perform welfare and weekly accountability checks in client rooms.
- Assist in administering urinalysis and other drug testing/safety protocols.
- Provide accountability for clients and consistently confront behaviors in a safe manner.
- Work with Director of Recovery Services to implement disciplinary or dismissal actions with clients when necessary.

*Administrative Support*

- Meet regularly for supervision with Director of Recovery Services.
- Assist with daily tracking of client metrics for reporting program outcomes.
- Other needed tasks include: update client calendars, manage client use of program computers and tablets, distribute client mail daily, maintain office equipment and order supplies as needed, purchase items for program events such as food for parties, restocking hygiene or other supplies, Christmas gifts, birthday cards, etc.
- Serve other staff and clients by being a liaison when needed. This may include helping to resolve conflicts, addressing personal improvement issues, communication between departments, and generally being available to step in to address needs involving program clients.
- Attend as requested or required all YUGM trainings and meetings scheduled by the management team to keep current on any policy changes, new procedures, and other information essential to performing the job.
- Other duties as assigned in support of YUGM's mission and values.

**Qualifications**

**Required:**

- Strong organizational, customer service, and interpersonal skills, high level of professionalism and the ability to maintain confidentiality required.
- Strong Christian faith and ability to express this and share it with others.
- Ability to work independently under the pressure of deadlines, interruptions and changing priorities while maintaining a strong attention to detail. Reliable, resourceful, flexible.
- Teachable and able to learn new systems and approaches based on YUGM's unique perspective and response to homelessness and trauma.
- Strong interpersonal skills and the ability to maintain confidentiality required.
- Capable written, verbal, and spiritual communication skills.
- Proficiency with common Microsoft Office productivity hardware and software.
- Valid WDL, good driving record, proof of insurance.
- Comfortable driving a larger vehicle such as a suburban or 15-passenger van.
- Demonstrated personal and work ethic reflecting YUGM's Core Values of Love, Professionalism and Outcomes.

Back        Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A          9 of 50

**2-ER-034**

- Demonstrated ability to work with a team, as well as independently, under the pressure of deadlines, interruptions and changing priorities while maintaining a strong attention to detail.

**Preferred:**

- Spanish language abilities.
- Prior experience working with persons in crisis, demonstrating effective de-escalation, dispute resolution, and problem-solving skills.
- Prior experience working with individuals with mental health issues, physical disabilities, or developmental disabilities.
- Specific training and experience in the fields of homelessness, addiction, childhood trauma and poverty preferred.
- Some higher education in Social Work, Counseling, Education, Pastoral Ministry, or other related fields.

Copyright © 2024, ADP, Inc. All rights reserved.

Powered by *ADP*

Privacy  |  Legal  |  Requirements  |  Artificial Intelligence

Back          Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A          10 of 50

**2-ER-035**



Join Our Talent Community

## Safety Team (Weekend)

Part Time
**Yakima, WA, US**

*30+ days ago*
Requisition ID: 1141

**Salary Range:**
$17.00 To 24.00 Hourly

### Job Purpose

Work with Adult Shelter Services team to promote campus safety by supervising the shelter, performing rounds, monitoring security cameras, assisting with daily shelter operations, and other duties as needed.

### Duties and Responsibilities

**Spiritual Impact**

- Serve in this role as a minister of Christ, demonstrating the calling, character and competencies of a spiritual leader who seeks to faithfully follow Jesus, stay in step with the Holy Spirit, and honor the Father. Carry out these responsibilities with the heart of a chaplain, spiritually caring for all those in your sphere of influence, including staff, clients, volunteers, and community partners.

> *"Therefore, if anyone is in Christ, the new creation has come. The old has gone, the new is here! All this is from God, who reconciled us to himself through Christ and gave us the ministry of reconciliation: that God was reconciling the world to himself in Christ, not counting people's sins against them. And he has committed to us the message of reconciliation. We are therefore Christ's ambassadors, as though God were making his appeal through us."*
> *2 Corinthians 5:17-20a NIV*

- Look for opportunities to lead Bible study, lead others in prayer, counsel from God's Word, and model what it looks like to know God and experience His love and leadership.

**Promote YUGM Culture by:**

- Establish professional, caring, strengths-based relationships built on truth, respect, encouragement, and trust.
- Maintain a high level of integrity in modeling and promoting the Mission's Christian culture, core values, policies, and procedures.
- Ministering to our clients, showing them kindness and grace.

Back     Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A     11 of 50

**2-ER-036**

- Ensure a shelter culture of relational and client-centered care rather than relying on motivation by rewards/punishments.

**Share in the work of your team by:**

- Work with Adult Shelter team, communicate and collaborate openly with the goal of continually improving guest experience and services offered.
- Work in a supportive capacity with supervisor and co-workers to solve departmental problems and accomplish shared goals in pursuit of established priorities.

**Ensure your team can count on you, specifically, to:**

- Supervise shelter.
- Promote a safe environment by patrolling grounds to prevent loitering, substance abuse or other criminal activity from occurring on campus; locking/unlocking various gates; utilizing security technologies, including by not limited to security cameras and two-way radios.
- Respond to various emergencies, using training and available technologies to ensure the health and safety of guests and staff.
- Work with emergency services when required for medical reasons or in response to criminal activity.
- Report barred guests, unsafe conditions or facility problems to Adult Shelter Director or Shelter Managers, as appropriate.
- Distribute needed shelter resources (toilet paper, clothing, hygiene, etc.) to guests.
- Assist in daily shelter operations duties, such as laundry, cleaning, storage and organization of clothing and hygiene items, floor, and bathroom cleaning etc.
- Attend as requested or required all YUGM trainings and meetings scheduled by the management team to keep current on any policy changes, new procedures, and other information essential to performing the job.
- Other duties as assigned in support of YUGM's mission and values.

### Qualifications

- Strong interpersonal skills and the ability to maintain confidentiality are required.
- Prior experience working with persons in crisis, demonstrating effective de-escalation, dispute resolution and problem-solving skills.
- Demonstrated ability to work independently, and as part of a team, under pressures of conflict, interruptions and changing priorities while maintaining a strong focus on ministry.
- Specific training and experience in the fields of homelessness, addiction, childhood trauma and poverty (preferred).
- Capable written, verbal, and spiritual communication skills.
- Personal and work ethic that reflects YUGM's core values.
- Computer skills: Microsoft Office, typing proficiency, basis data entry skills, etc.
- Valid WDL, good driving record, proof of insurance.

---

Copyright © 2024, ADP, Inc. All rights reserved.

Back        Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A              12 of 50

**2-ER-037**

9/19/24, 3:44 PM Case 1:23-cv-03027-MKD    ECF No. 34-1    filed 09/20/24    PageID.668    Page 14 of 51

Powered by ADP

Privacy  |  Legal  |  Requirements  |  Artificial Intelligence

Back        Apply

9/19/24, 3:45 PM Case 1:23-cv-03027-MKD ECF No. 34-1 filed 09/20/24 PageID.669 Page 15 of 51



Join Our Talent Community

# Children and Family Specialist

Full Time
Yakima, WA, US

*27 days ago*
Requisition ID: 1148

**Salary Range:**
$16.28 To 24.00 Hourly

**Job Purpose**

Provide oversight and case management to families staying in Family Shelter. Maintain current level of programming for children staying in Family Shelter as well as develop more programs and coordinate needed services for children.

**Duties and Responsibilities**

**Culture Work**

- Establish professional, caring, strengths-based relationships built on truth, respect, encouragement, and trust.
- Maintain a high level of integrity in modeling and promoting the Mission's Christian culture, core values, policies, and procedures.
- Minister to our clients, showing them kindness and grace.

**Team Work**

- Model the three virtues of an ideal team player: humble (motivation), hungry (passion), smart (emotional intelligence).
- Collaborate with Family Shelter staff, all Client Services staff, and volunteers as fellow team members regarding client needs, logistics, progress towards goals, and healthy behaviors by attending and participating in related meetings as scheduled.
- Receive and share program information with other members of the Client Services team to support mission accomplishment.
- Work alongside and mentor those in other Client Services programs fulfilling their work therapy assignment in Family Shelter.
- Help cover for department needs within Family Shelter and other Client Services departments, in the absence or shortage of staff, or other times of need.

**Direct Work**

Back    Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A          14 of 50

**2-ER-039**

*Spiritual Impact*

- Serve in this role as a minister of Christ, demonstrating the calling, character and competencies of a person who seeks to faithfully follow Jesus, stay in step with the Holy Spirit, and honor the Father. Carry out these responsibilities with the heart of a chaplain, spiritually caring for all those in your sphere of influence, including staff, clients, volunteers, and community partners.

*"Therefore, if anyone is in Christ, the new creation has come. The old has gone, the new is here! All this is from God, who reconciled us to himself through Christ and gave us the ministry of reconciliation: that God was reconciling the world to himself in Christ, not counting people's sins against them. And he has committed to us the message of reconciliation. We are therefore Christ's ambassadors, as though God were making his appeal through us."*

*2 Corinthians 5:17-20a NIV*

- Look for opportunities to lead others in prayer, counsel from God's Word, and model what it looks like to know God and experience His love and leadership.

*Case Management and Client Care*

- Welcome families to the UGM shelter: fill out needed registration information using both paper forms and computer registration software. Review policies and guidelines with each family. Give each family a tour of the Family Shelter area, including the dining room. Provide basic hygiene items upon check in of each family.
- Endeavor to find out where each guest is spiritually. Pray with each family and present the plan of salvation using scriptures when appropriate.
- Host each meal where we have families in attendance. Host other meals as assigned. Monitor the activity in the dining room, making sure meals are finished in a timely manner and guests maintain appropriate behavior.
- Maintain accurate records of all Family Shelter Guests as directed.
- Monitor and meet with guests as needed to hold them accountable to the tasks they are to be accomplishing.

*Children & Family Development*

- Assist Family Shelter Director in assessing each guest family to determine their needs and develop measurable steps for them to take to exit the Family Shelter in a positive manner.
- Oversee and organize the Kids Klub Program for 3 – 8-year-olds. Screen and train volunteers to participate in programs for our children and families. Maintain curriculum and supplies for children's programs. Be aware of ACE's and train volunteers on the impact of ACEs on those staying in Family Shelter.
- Develop programs that will enhance the stay of children in Family Shelter and introduce them to relationship with Jesus.

*Safety*

- Monitor client rooms and other living spaces for cleanliness, safety, and necessary supplies and furnishings. Provide guests with appropriate cleaning supplies, so that they can keep their room clean during their stay.
- Coordinate room inspections, looking for cleanliness, drugs, alcohol, smoke smell, pornographic material, and weapons.
- Assist in administering urinalysis and other drug testing and safety protocols.

**Back**     **Apply**

Decl. of S. Thielan in Supp. of MPI - Exhibit A                    15 of 50

**2-ER-040**

- Work with the Family Shelter Director to implement disciplinary or dismissal actions with clients when necessary.

*General*

- Be available to clean all Family Shelter rooms as soon as guests check out. Coordinate the washing of all linens.
- Maintain cleanliness of the areas outside Family Shelter rooms as well as the "behind the gate area".
- Assist in maintaining the kids clothing room, linens, towels, diapers hygiene bags as needed. Keep current inventories of Family Shelter supplies.
- Attend as requested or required all YUGM trainings and meetings scheduled by the management team to keep current on any policy changes, new procedures, and other information essential to performing the job.
- Other duties as assigned in support of YUGM's mission and values.

**Qualifications**

- Must be proficient with computers, particularly MS Office and Google Documents.
- Has organizational skills with past personnel and management experience.
- A Christian who is a member and currently involved in his or her local church.
- Has good written and verbal communication skills.
- Willing to work with volunteers and those in long term programs doing work therapy.
- Has a pleasant demeanor that communicates the love of Christ to our guests and volunteers in person or on the phone.
- Education and/or experience developing children's/youth programs. Must have a servant's heart and willing to work as part of the team
- Must also be able to perform janitorial/housekeeping tasks as needed.
- Current WA Driver's License
- Appropriate dress— casual business attire.
- Bilingual in Spanish and English preferable
- Ability to handle sensitive and confidential issues professionally and maintain confidentiality.
- Education—two or four-year degree or equivalent work-related experience.

Copyright © 2024, ADP, Inc. All rights reserved.

Powered by ADP

Back          Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A                    16 of 50

**2-ER-041**

Privacy | Legal | Requirements | Artificial Intelligence

Back    Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A        17 of 50

**2-ER-042**

9/19/24, 3:48 PM



Join Our Talent Community

# Meal Ministry Cook/Mentor

Part Time
Yakima, WA, US

*30+ days ago*
Requisition ID: 1124

**Salary Range:**
$16.28 To 24.00 Hourly

### Job Purpose

Keeping in mind the finished work of Christ, and the need to clearly display the Gospel in both word and deed, this position is responsible for cooking meals, mentoring work therapy clients, and encouraging our guests as we minister lovingly through food and relationships.

### Duties and Responsibilities

**Culture Work**

- Establish professional, caring, strengths-based relationships built on truth, respect, encouragement, and trust.
- Maintain a high level of integrity in modeling and promoting the Mission's Christian culture, core values, policies, and procedures.
- Minister to our clients, showing them kindness and grace.

**Team Work**

- Model the three virtues of an ideal team player: humble (motivation), hungry (passion), smart (emotional intelligence).
- Work in a supportive capacity with the Meal Ministry Manager and co-workers to solve departmental challenges and accomplish shared goals in pursuit of established priorities.
- Receive and share program information and work collaboratively with other members of the Client Services Ministries Team and other departments to support mission accomplishment and client experience.
- Be available to fill in for co-worker vacations and sickness as needed and requested, if possible.
- When interpersonal conflict occurs, go directly to the staff member involved or, in the case of volunteer conflict, to the Meal Ministry Manager. The Meal Ministry Manager is always available for coaching in conflict situations.

**Direct Work**

*Spiritual Impact*

Back    Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A    18 of 50

**2-ER-043**

- Serve in this role as a minister of Christ, demonstrating the calling, character and competencies of a person who seeks to faithfully follow Jesus, stay in step with the Holy Spirit, and honor the Father. Carry out these responsibilities with the heart of a chaplain, spiritually caring for all those in your sphere of influence, including staff, clients, volunteers, and community partners.

> *"Therefore, if anyone is in Christ, the new creation has come. The old has gone, the new is here!*
> *All this is from God, who reconciled us to himself through Christ and gave us the ministry of*
> *reconciliation: that God was reconciling the world to himself in Christ, not counting people's sins*
> *against them. And he has committed to us the message of reconciliation. We are therefore Christ's*
> *ambassadors, as though God were making his appeal through us."*
> *2 Corinthians 5:17-20a niv*

- Look for opportunities to lead others in prayer, counsel from God's Word, and model what it looks like to know God and experience His love and leadership.

*General*

- Work as scheduled by the Meal Ministry Manager.
- Work together to complete set-up, food preparation, and serving meals on time as scheduled. Serve our clients with Christ-like hospitality.
- In dining spaces, clean up after every meal served, ensuring tables are wiped down and clean and the room is reset.
- Prepare meals for our guests and maintain an orderly, clean kitchen.
- Work together with Pantry Staff to get our supplies to the kitchen; assist other cooks to transport food from the distribution warehouse to the kitchen as time allows.
- Take laundry, cardboard, and garbage out at the end of each shift.

*Work Therapy Clients/Volunteers/Guests*

- Demonstrate the fruit of the Spirit to both clients and volunteers: love, joy, peace, patience, kindness, gentleness and self-control recognizing that staff are a representative of Christ.
- Both coach to and demonstrate biblical conflict resolution with work therapy clients.
- Act with patience and empathy toward clients, understanding that the majority of population served has experienced significant trauma.
- Train and mentor all program clients present for work therapy, helping each one learn he/she has value and can value others by redirecting difficult emotions.
- Ensure that a staff member is always present to supervise whenever meal services are being prepared and provided by volunteers or program clients, recognizing that work therapy is for client therapy, not free labor.
- Lead work therapy clients and volunteers by helping with clean up and sanitizing daily for pest control.

*Other*

- Complete all reports as directed by the Meal Ministry Manager (meal counts, inventory, hours worked, etc.).
- Assist with special, planned events that are served by the Meal Ministry Team.
- Attend as requested or required all YUGM trainings and meetings scheduled by the management team to keep current on any policy changes, new procedures, and other information essential to performing the job.
- Other duties as assigned in support of YUGM's mission and values.

Back      Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A          19 of 50

**2-ER-044**

**Qualifications**

- Cooking knowledge, and experience in cooking for large groups of people.
- Washington State Food Worker Card.
- Strong organizational, customer service, interpersonal skills, and the ability to maintain confidentiality are required.
- Ability to work independently under the pressure of deadlines, interruptions and changing priorities while maintaining a strong attention to detail. Reliable, resourceful, flexible.
- Ability to work alongside and/or supervise volunteers and clients representing a variety of backgrounds - cultural, economic, and addiction recovery.
- Excellent written and verbal communication skills.
- Valid WDL, good driving record, proof of insurance.
- Demonstrated personal and work ethic reflecting YUGM's Core Values of Love, Professionalism and Outcomes.

Copyright © 2024, ADP, Inc. All rights reserved.

Powered by ADP

Privacy   |   Legal   |   Requirements   |   Artificial Intelligence

Back        Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A                    20 of 50

**2-ER-045**



Join Our Talent Community

# Dental Ministry Clinic Dentist

Full Time
**Yakima, WA, US**

*30+ days ago*
Requisition ID: 1123

**Salary Range:**
$150,000.00 To 180,000.00 Annually

### Job Purpose

This position provides the spiritual ministry of Christ-like care for the whole person, promotes oral health through the diagnosis and treatment of dental disease, while also fulfilling our mission, vision, and values.

### Duties and Responsibilities

*Our Care Center provides whole-person care for patients in our valley that have nowhere else to turn for their medical and dental needs due to significant barriers to care.*

**Culture Work**

- Establish professional, caring, strengths-based relationships built on truth, respect, encouragement, and trust.
- Maintain a high level of integrity in modeling and promoting the Mission's Christian culture, core values, policies, and procedures.
- Minister to our clients, showing them kindness and grace.
- Embrace the needs of the clinic and its patients and volunteers to showcase a clinic that allows Christ's hands to be apparent through thoughtful and understanding care that is at or above standard level of care.

**Shared Work**

- Model the three virtues of an ideal team player: humble (motivation), hungry (passion), smart (emotional intelligence).
- Work as a member of the Care Center Team, including both Medical and Dental (and mental health in the future), to solve organizational problems and accomplish shared goals in pursuit of strategic priorities.
- Develop staff and volunteers in both culture and knowledge for YUGM specific needs.
- Guide the team culture within the dental program and integrate with members of other teams to support mission accomplishment.

Back    Apply

- Coordinate community engagement opportunities for dental staff.

**Individual Work**

*Spiritual Shepherding*

- Serve in this role as a minister of Christ, demonstrating the calling, character and competencies of a spiritual leader who seeks to faithfully follow Jesus, stay in step with the Holy Spirit, and honor the Father. Carry out these responsibilities with the heart of a chaplain, spiritually caring for all those in your sphere of influence, including staff, clients, volunteers, and community partners.

> *"Therefore, if anyone is in Christ, the new creation has come. The old has gone, the new is here! All this is from God, who reconciled us to himself through Christ and gave us the ministry of reconciliation: that God was reconciling the world to himself in Christ, not counting people's sins against them. And he has committed to us the message of reconciliation. We are therefore Christ's ambassadors, as though God were making his appeal through us."*
> *2 Corinthians 5:17-20a niv*

- Look for opportunities to lead Bible study, lead others in prayer, counsel from God's Word, and model what it looks like to know God and experience His love and leadership.

*Oversee*

- Supervise direct reports and ensure that all supervisory actions are executed in a professional and timely manner.
- Educate, when necessary, the need and function of oral health related to whole person health in our organization and within our broader Yakima community.
- Work with the Director of Medical Services to establish Care Center goals and appropriate policies.
- Ensure clinic is current on all legal standards of practice and protocols within reason.

*Dental Operations*
Perform a broad range of general dentistry which includes:

- Educate patients on good oral hygiene habits
- Collaborate with Care Center staff to achieve the common goal of patient health
- Prescribe any necessary medications
- Provide emergent care
- Perform palliative care
- Prepare and place restorations (composite and amalgam)
- Conduct intraoral, extraoral, TMJ and oral cancer screening evaluations
- Create models for dental appliances
- Interpret x-rays and perform diagnostic tests
- Administer local anesthetics
- Diagnose and treat oral diseases
- Create detailed treatment plans for patients
- Perform surgical procedures on teeth, bone, and soft tissues
- Fabricate and maintain dental prosthetics
- Educate patients on post operative care
- Guide and lead the dental staff to work together in a professional manner

*Collaborate*                    **Back**        **Apply**

Decl. of S. Thielan in Supp. of MPI - Exhibit A                    22 of 50

**2-ER-047**

- Support, train, and recruit dentist volunteers.
- Attend as requested or required all YUGM trainings and meetings scheduled by the management team to keep current on any policy changes, new procedures, and other information essential to performing the job.
- Other duties as assigned in support of YUGM's mission and values.

**Qualifications**

- Licensed Dentist in the State of Washington.
- Has experience in the provision of comprehensive dental care in a low resource setting.
- Competent to apply the laws and regulations for operating a reduce fee dental clinic.
- Excellent written and verbal communication skills, proven interest in leadership in the dental field.
- Proficiency with medical records software and Microsoft Office products.
- Work history of high levels of organizational skill, professionalism, and discretion.
- Demonstrated personal and work ethic reflecting YUGM's Core Values of Love, Professionalism and Outcomes as well as Christian Culture.

**Working Conditions**

- Full-time working 30 hours a week, currently Tuesday through Friday. These may be scheduled or variable days, depending on needs of the clinic and the clinics volunteer dentists.
- Access to lab space, pano, digital x-rays. XL Dent as electronic health record.
- The primary duties of this position are performed in a well-lighted, temperature-controlled environment.  The noise level in the environment is usually moderate.

Copyright © 2024, ADP, Inc. All rights reserved.

Powered by ADP

Privacy  |  Legal  |  Requirements  |  Artificial Intelligence

Back        Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A                    23 of 50

**2-ER-048**

 

Join Our Talent Community

# Director of Adult Shelter Ministries

Full Time
**Yakima, WA, US**

*30+ days ago*
Requisition ID: 1145

**Salary Range:**
$31.49 To 43.27 Hourly

### Job Purpose

Oversee ministry to spiritual and physical needs of homeless persons, ensuring traumatized clients experience YUGM's ministries as a sanctuary prepared by God for their healing and restoration, resulting in permanent and measurable life transformation. This position provides program leadership and oversight for all phases of YUGM's adult shelter ministries, including outreach, day and night shelter.

### Duties and Responsibilities

**Promote YUGM Culture by:**

- Consistently living out the beliefs and actions described in YUGM's Faith Policy.
- Establishing professional, caring, strengths-based relationships built on truth, respect, encouragement, and trust.
- Ministering to our clients in kindness and grace, as to promote a shelter culture of relational and client-centered care rather than relying on motivation by rewards/punishments.

**Shared in the work of your team by:**

- Communicating and collaborating openly with the goal of continually improving our guest experience of YUGM's Christian message and ministries.
- Modeling the three virtues of an ideal team player: humble (motivation), hungry (passion), smart (emotional intelligence).
- Supporting your managers and directors in solving departmental problems and accomplishing the shared goal of following Christ in helping people move from homelessness to wholeness.
- Internally, working as part of the Client Services team, and with other YUGM departments, communicating and collaborating openly with the goal of continually improving client experience and services offered. In addition, working closely with the

Back    Apply

2-ER-049

Decl. of S. Thielan in Supp. of MPI - Exhibit A     24 of 50

**2-ER-049**

volunteer department to schedule, train and supervise volunteers in the adult shelter and with data collection to ensure accurate records.

- Externally, working with local law enforcement, area businesses, and local service providers to respond to immediate outreach needs. Promote unity and teamwork through excellent communication and community education.
- Working as a member of the YUGM Leadership Team to solve organizational problems, meet program needs, and accomplish shared goals in pursuit of strategic priorities.

**Ensure your team can count on you, specifically, to:**

*Spiritual Shepherding*

- Serve in this role as **a minister of Christ**, demonstrating the calling, character and competencies of a spiritual leader who seeks to faithfully follow Jesus, stay in step with the Holy Spirit, and honor the Father. Carry out these responsibilities with the heart of a chaplain, spiritually caring for all those in your sphere of influence, including staff, clients, volunteers, and community partners.

*"Therefore, if anyone is in Christ, the new creation has come. The old has gone, the new is here! All this is from God, who reconciled us to himself through Christ and gave us the ministry of reconciliation: that God was reconciling the world to himself in Christ, not counting people's sins against them. And he has committed to us the message of reconciliation. We are therefore Christ's ambassadors, as though God were making his appeal through us."*

*2 Corinthians 5:17-20a niv*

- Look for opportunities to lead Bible study, lead others in prayer, counsel from God's Word, and model what it looks like to know God and experience His love and leadership.

*Provide Ministry Oversight*

- Work closely with the VP of Client Services to develop and adapt **shelter vision, policies, and procedures** which meet YUGM goals, and current felt needs based on available resources, weather and other factors.
- Oversee **outreach**, emergency day and night shelter, and meal ministries for challenging clients who have high barriers including, but not limited to: active substance use disorders, mental illness, developmental barriers, trauma, PTSD, and antisocial behaviors.
- Oversee coordination of **resources** from various YUGM departments and external service providers, assembling and managing teams of staff and volunteers, maintaining and regularly reporting extensive statistics and records, working together with law enforcement, local businesses and other service providers to respond to immediate needs in our community.
- Oversee the **recruiting, training and management** of all department staff by the Shelter Ministry Manager and review the credentials of volunteers, as applicable.
- Creatively and actively plan and facilitate **program functions**, including: providing spiritual engagement opportunities for English and Spanish speakers, case management for those needing access to partner services, and preparation for those with substance use disorders for entry into residential recovery programming. Provide corrective actions when needed.

Back        Apply

2-ER-050

Decl. of S. Thielan in Supp. of MPI - Exhibit A        25 of 50

2-ER-050

- Incorporate industry best-practices, all available learning and research, input from leaders and peers, and regular client feedback to **establish and continuously improve** outreach and emergency shelter standards, curriculum and criteria that most effectively support clients to move forward with solutions to their homelessness.
- Be available to support Adult Shelter Ministry **managers** to provide support as requested for staff, volunteers, or clients dealing with mental, emotional, social, or spiritual needs.

*Lead with Trauma-Informed Care*

- Serve YUGM and the Yakima Valley as an expert on sheltering homeless individuals with high levels of childhood trauma, including **assisting in** staff development, public communication and relations.
- **Counteract the spiritual lies** told by our guests' childhood abuse, neglect and trauma by making our shelter a sanctuary of Christian hospitality in which every person is treated as being made in the Image of God (Gen 1:26-27), loved by God (Ps 138:6), and sought by Christ (Lk 19:10).
- Ensure that **ministry staff** know our guests at a personal level so that they experience respect and dignity throughout our efforts to promote their spiritual development. The staff are responsible for conducting or facilitating group-oriented engagement such as services, bible studies, chapels, etc. and, also, individually engaging guests with scripture, prayer, pastoral care, and evangelism.
- Remember that our guests were not kept safe as children, making it essential that you **promote the safety of YUGM programs and property** by patrolling grounds; preventing loitering, substance abuse or other criminal activity from occurring on campus; locking/unlocking various gates; utilizing security technologies (security cameras, two-way radios, etc). We must show our guests that God is trustworthy and capable of keeping them safe!
- Remember that as children our guests often had no support, making it essential that you respond to various emergencies, using your training and available technologies to **ensure the health and safety of guests and staff**. Work with emergency services when required for medical reasons or in response to criminal activity. We must show guests that God sees them & cares!
- Ensure that ministry staff show our guests **Christian hospitality** by assisting in daily operational duties, such as:
  - laundry, cleaning, storage and organization of clothing and hygiene items, floor, and bathroom cleaning etc.
  - Fulfilling *James 2:14-18* teaching to express God's love and our faith in Christ by meeting guests' practical needs as best as possible with available resources.
- Ensure a safe, dignifying and uplifting **physical and interpersonal environment** for daily program functions, utilizing a shelter culture of relational and client-centered care rather than relying on motivation by rewards/punishments.

*Engage with Staff, Volunteers and Community*

- Work closely with the DOVE department to schedule, train and supervise **volunteers** in the shelter.

2-ER-051

- Represent YUGM with **community providers** who offer services and resources for client growth, including Treatment Centers, DSHS, NHS, SSA, Law Services, Next

9/19/24, 3:46 PM Case 1:23-cv-03027-MKD    ECF No. 34-1    filed 09/20/24    PageID.682   Page 28 of 51

Step Housing, Oxford, other Rescue Missions, etc.
- When required, assist **Adult Shelter staff** with duties and requirements to support the team.

*Performance Standards*

- Ensure that accurate and timely **written measures and records** for shelter management are maintained that conform to industry best practices and support continuous improvement.
- Manage **program responsibilities** including calendaring, documentation, data and metrics reporting, space management, etc.
- Be available for **office hours** for the purposes of leading, managing, and coaching.
- Attend as requested or required all **YUGM trainings and meetings** scheduled by the management team to keep current on any policy changes, new procedures, and other information essential to performing the job. Serve as a member of the YUGM Leadership Team.
- Other duties as assigned in support of YUGM's mission and values.

**Qualifications**

*Required*

- Demonstrated capacity in conducting religious services.
- Demonstrated experience maintaining safety *and* positive ministry environment.
- Demonstrated love for needy persons.
- Able to train, lead and supervise others.
- Highly organized and task-oriented during chaos.
- Ability to empathize, love and show compassion for people in homelessness and addiction.
- Strong interpersonal skills and the ability to maintain confidentiality are required.
- Prior experience working with persons in crisis, demonstrating effective de-escalation, dispute resolution and problem-solving skills.
- Demonstrated ability to work independently, and as part of a team, under pressures of conflict, interruptions and changing priorities while maintaining a strong focus on ministry.
- Capable written, verbal, and spiritual communication skills.
- Personal and work ethic that reflects YUGM's core values.
- Computer skills: Microsoft Office, typing proficiency, basis data entry skills, etc.
- Valid WDL, good driving record, proof of insurance.

*Preferred*

- Prior experience as a supervisor and working with persons in homelessness, demonstrating effective de-escalation, dispute resolution, and problem-solving skills.
- Post-secondary certification in a related field, with additional specific training and experience in the fields of homelessness, addiction, childhood trauma and poverty.
- Familiar with the geography of Yakima and surrounding areas.
- Experience working with those experiencing homelessness.

Back    Apply    2-ER-052

https://workforcenow.adp.com/mascsr/default/mdf/recruitment/recruitment.html?cid=d0f76ce8-12b0-416b-9e68-bfb9fefaf962&ccId=9200155275156_2...    4/5

**2-ER-052**

- Specific training and experience in the fields of homelessness, addiction, childhood trauma and poverty.
- Experience with database management systems.
- Conversant in Spanish.

Copyright © 2024, ADP, Inc. All rights reserved.

Powered by ADP

Privacy  |  Legal  |  Requirements  |  Artificial Intelligence

2-ER-053

Back          Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A                              28 of 50

2-ER-053



Join Our Talent Community

## Director of Workforce Stewardship (HR)

Full Time
**Yakima, WA, US**

*30+ days ago*
Requisition ID: 1138

**Salary Range:**
$65,500.00 To 90,000.00 Annually

### Job Purpose

This position fulfills the spiritual ministry of administration named in 1 Corinthians 12:28 by directing the stewardship of YUGM's workforce ("human resources") and related systems, policies, & information.

### Duties and Responsibilities

**1 Corinthians 12:28 says that God has called some people to serve His Kingdom through the skilled management of technical tasks required for the implementation of ministry, or "Administration." Stewarding our workforce means curating this local, human part of God's Kingdom-resources.**

**Promote YUGM Culture by:**

- Establishing professional, caring, strengths-based relationships built on truth, respect, encouragement, and trust. Eph 4:15
- Maintaining a high level of integrity in modeling and promoting the Mission's Christian culture, core values, policies, and procedures. 1 Cor 11:1
- Ministering to our staff, volunteers, prospective employees, clients, and the community showing them kindness and grace. Phil 2:3-4

**Share in the work of your team by:**

- Working in cooperation with YUGM Thrift Administration department in maintaining appropriate continuity of policies and procedures and when necessary to provide back-up within the overall organizational HR needs.
- As part of the Finance and Admin Department management team, helping ensure proper implementation, security, use and management of the department SharePoint site, MS Teams channels, ADP database and other pertinent systems.

**Ensure your team can count on you, specifically, to:**

- Be a leader within God's Ministry of Reconciliation (2 Cor 5:18-19) by:
  - Facilitating the unity and peace of the workforce (Ro 12:16; John17:20-21), as needed investigate employee issues and conflicts and help bring them to resolution.
  - Proactively seeking opportunities to pray with, encourage, and display the Fruits of the Spirit (Gal. 5:22-23) and YUGMs Core Values to employees, applicants, clients, and others to whom we represent YUGM.

Back     Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A          29 of 50

## 2-ER-054

- Participating in regular group opportunities to pray for individuals, departments, strategic plans, and other needs (1 Thess 5:17)
- Serve as the in-house expert on all matters pertaining to stewardship of the workforce; of worker-related laws, policies, and procedures; of employee engagement, training, and development.
  - Ensure that YUGM remains up-to-date and in compliance with applicable employment law. This includes keeping up-to-date with case law applicable to faith-based organizations with religious exemptions or protections.
  - Ensure continuous quality improvement of YUGM HR services, and application of HR best practices.
  - Monitor YUGM compliance to both externally and internally set compensation guidelines and laws, providing information as necessary to Executive Leadership to help YUGM maintain appropriate competitiveness, compliance, and consistency regarding our compensation packages.
- Direct & facilitate the recruiting and hiring, training and development, evaluation, discipline, and termination of employees to establish and maintain a ministry workforce capable of fulfilling YUGM's religious purposes, values, outcomes, and objectives.
- Manage YUGM employee benefits programs, Support YUGM interface with WA State work-related insurance and benefits programs, L&I Claims, and YUGM driver's insurance programs, ensuring organizational compliance and prompt claims handling.
- Ensure information is secure, accurate and accessible for personnel files, job descriptions, employee handbooks and other policy and procedure documents.
- Make full use of ADP software system, researching system capabilities, customizing the system to meet YUGM needs, implementing and documenting processes and procedures, and making sure YUGM stays in compliance with established procedures.
- Other duties as assigned in support of YUGM's mission and values.

**Qualifications**

- Demonstrated personal and work ethic reflecting YUGM's Core Values of Love, Professionalism and Outcomes
- Bachelor's degree in Human Resources, Business Administration, or a related field and at least 5 years' experience working in a related capacity; **or** at least 9 years direct experience in business administration, including at least 3 years of experience in management-level Human Resources.
- aPHR certification preferred
- Work history of high levels of discretion and confidentiality
- Strong supervisory and leadership skills
- Excellent organizational and interpersonal skills, high level of professionalism
- Proficiency with modern software systems and ability to adapt to new systems
- Excellent analytical and problem-solving skills and ability to research appropriate legal or other guidelines and provide appropriate recommendations

Copyright © 2024, ADP, Inc. All rights reserved.

Powered by ADP

Back      Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A                30 of 50

**2-ER-055**

9/19/24, 3:47 PM   Case 1:23-cv-03027-MKD   ECF No. 34-1   filed 09/20/24   PageID.686   Page 32 of 51

Privacy  |  Legal  |  Requirements  |  Artificial Intelligence

Back        Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A                          31 of 50

**2-ER-056**

9/19/24, 3:45 PM   Case 1:23-cv-03027-MKD   ECF No. 34-1   filed 09/20/24   PageID.687   Page 33 of 51



Join Our Talent Community

## New Life Program Manager

Full Time
Yakima, WA, US

*10 days ago*
Requisition ID: 1150

**Salary Range:**
$24.00 To 31.48 Hourly

### Job Purpose

This position exists to assist homeless men and women as they move through the process of change toward living a new life in Christ, gaining freedom from barriers, addictions, cycles of self-destructive behavior, and hopelessness. This role provides guidance and advocacy for clients in the context of an intensive, long-term residential discipleship and recovery process.

### Duties and Responsibilities

**Culture Work**

- Establish professional, caring, strengths-based relationships built on truth, respect, encouragement, and trust.
- Maintain a high level of integrity in modeling and promoting the Mission's Christian culture, core values, policies, and procedures.
- Ministering to our clients, showing them kindness and grace.
- Accept clients where they are and use professional skills to guide each one in the process of change with the goals of clients in mind.
- Create and maintain a culture of safety and trust, making client-centered decisions.

**Team Work**

- Model the three virtues of an ideal team player: humble (motivation), hungry (passion), smart (emotional intelligence).
- Collaborate with Recovery Services staff (Discovery, New Life, Bridge), all Client Services staff, and volunteers as fellow team members regarding client needs, logistics, progress towards goals, and healthy behaviors by attending and participating in related weekly and monthly team meetings.
- Support each other as employees and collaborate in establishing best practices and ensuring best outcomes for the people we serve.
- Meet regularly to discuss client needs and share ideas, successes, and challenges to support each other, learn from each other and hold each other accountable to providing our best for our clients.

Back    Apply

- Help cover for department needs within New Life and the broader Recovery Services department, in the absence or shortage of staff, or other times of need.

**Direct Work**

*Spiritual Shepherding*

- Serve in this role as a minister of Christ, demonstrating the calling, character and competencies of a spiritual leader who seeks to faithfully follow Jesus, stay in step with the Holy Spirit, and honor the Father. Carry out these responsibilities with the heart of a chaplain, spiritually caring for all those in your sphere of influence, including staff, clients, volunteers, and community partners.

*"Therefore, if anyone is in Christ, the new creation has come. The old has gone, the new is here! All this is from God, who reconciled us to himself through Christ and gave us the ministry of reconciliation: that God was reconciling the world to himself in Christ, not counting people's sins against them. And he has committed to us the message of reconciliation. We are therefore Christ's ambassadors, as though God were making his appeal through us."*
*2 Corinthians 5:17-20a niv*

- Look for opportunities to lead Bible study, lead others in prayer, counsel from God's Word, and model what it looks like to know God and experience His love and leadership.

*Program Oversight*

- Provide one-on-one support for Staff, Volunteers, and Clients dealing with mental, emotional, social, volitional and spiritual needs.
- Serve YUGM and the Yakima Valley as a leading professional in caring for the needs of homeless individuals with high levels of childhood trauma, including assisting in staff development, public communication, and donor relations.
- Creatively and actively plan and facilitate program functions, to include classes, recreational activities, holiday and appreciation events, disciplinary issues, and aftercare.
- Provide coaching for Staff, Volunteers, and Clients, and provide disciplinary actions when needed. This includes contracts and exit strategies.
- Manage program responsibilities including budgeting, calendaring, documentation, data and metrics reporting, space management, etc.

*Staff, Volunteers and Community*

- Lead, train and supervise New Life staff (Case Managers and volunteers) to directly guide clients, ensuring that appropriate client-centered decision-making is being employed.
- Develop strong network relationships with community providers who offer services and resources for client growth, learning, health (medical, mental, dental, pharmacy), legal (records, citizenship), and social assistance.

*Case Management*

- Meet at least weekly with each client on case load for supportive coaching conversations and to provide spiritual guidance and support.

Back        Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A        33 of 50

**2-ER-058**

- Provide 1 on 1 support for clients dealing with mental, emotional, social, volitional, and spiritual needs.
- Provide direct client support through 1 on 1 case management appointments and related tracking, scheduling, and recording case notes.
- Coach clients through *The Genesis Process* relapse prevention curriculum.
- Document client sessions using DAP format electronic case notes.
- Assess client's readiness to move from one phase of program to another.

*Building Community*

- Teach group classes in biblical studies, life skills, addiction/recovery, etc. as assigned by the Recovery Services Director.
- Coordinate/provide transportation and other logistical support to clients as needed and approved/directed by the Recovery Services Director.
- Organize and implement client group activities to foster a supportive community environment and assist in individual social development.
- Participate in client daily life and activities such as meals, classes, special events, cleaning, and maintenance of shared spaces.
- Ensure and model that lounge and recreation areas are maintained.

*Client Intakes and Exits*

- Initial Intake – Notify staff of new enrollments, enroll client in Casebook database, schedule client to see mental health prescriber as needed. (Utilizing the current regular MH prescriber unless otherwise instructed)
- Evaluations – Interview client to determine long-term program goals and explain program rules and guidelines. Also connect client to Program Assistant for work therapy overview and scheduling.
- Exits – Assist in closing client records, facilitate cleaning rooms, any other assigned duties.

*Safety*

- Always maintain client confidentiality.
- Monitor client rooms and other living spaces for cleanliness, safety, and necessary supplies and furnishings. Also perform welfare and accountability checks in client rooms.
- Coordinate and participate in administering urinalysis and other drug testing/safety protocols.
- Provide accountability for clients and consistently confront behaviors in a safe manner.
- Work with Recovery Services Director to implement disciplinary or dismissal actions with clients when necessary.

*Admin & Logistics*

- Meet regularly for supervision with Recovery Services Director.
- Assist the Recovery Services Director with administration such as recording measurable data, completing client surveys, gathering other necessary client information and program data to continue improving program effectiveness.
- Work to support and develop high-impact volunteers.
- Communicate regularly with other staff and organizations as needed.
- Participate in additional professional skills development and training as needed.

Back        Apply

- Attend as requested or required all YUGM trainings and meetings scheduled by the management team to keep current on any policy changes, new procedures, and other information essential to performing the job.
- Other duties as assigned in support of YUGM's mission and values.

**Qualifications**

**Required:**

- Strong Christian faith and ability to express this and share it with others.
- Teachable and able to learn new systems and approaches based on the YUGM's unique perspective and response to homelessness and trauma.
- Familiarity with basic case management and counseling techniques.
- Some knowledge of mental health conditions, ACE's, Motivational Interviewing, and development of strengths-based treatment plans is preferred.
- Ability to coordinate care with community partners such as mental health agencies, parole officers, or social service organizations.
- Strong interpersonal skills and the ability to maintain confidentiality required.
- Capable written, verbal, and spiritual communication skills.
- Proficiency with common Microsoft Office productivity hardware and software.
- Valid WDL, good driving record, proof of insurance.
- Comfortable driving larger vehicles such as a suburban or 15-passenger van.
- Demonstrated personal and work ethic reflecting YUGM's Core Values of Love, Professionalism and Outcomes.
- Demonstrated ability to work with a team, as well as independently, under the pressure of deadlines, interruptions and changing priorities while maintaining a strong attention to detail.

**Preferred:**

- Spanish language abilities.
- Prior experience working with persons in crisis, demonstrating effective de-escalation, dispute resolution, and problem-solving skills.
- Prior experience working with individuals with mental health issues, physical disabilities, or developmental disabilities.
- Specific training and experience in the fields of homelessness, addiction, childhood trauma and poverty preferred.
- Some higher education in Social Work, Counseling, Education, Pastoral Ministry, or other related fields.

Copyright © 2024, ADP, Inc. All rights reserved.

Powered by ADP

Back        Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A        35 of 50

**2-ER-060**

Privacy  |  Legal  |  Requirements  |  Artificial Intelligence

Back        Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A              36 of 50

**2-ER-061**



Join Our Talent Community

# Nurse

**Full Time**
**Yakima, WA, US**

*30+ days ago*
Requisition ID: 1139

**Salary Range:**
$35.00 To 45.00 Hourly

### Job Purpose

This nurse will oversee the care of our homeless patients through the management of our Shelter Care program, organize the clinic's dispensary, oversee nurse students, and be the clinic liaison for programs on campus needing medical assistance.

### Duties and Responsibilities

**Promote YUGM Culture by:**

- Consistently living out the beliefs and actions described in YUGM's Faith Policy.
- Establishing professional, caring, strengths-based relationships built on truth, respect, encouragement, and trust.
- Ministering to our patients and clients with kindness and grace, as to promote a culture of relational and client-centered care rather than relying on motivation by rewards/punishments.

**Share in the work of your team by:**

- Communicating and collaborating openly with the goal of continually improving our guest experience of YUGM's Christian message and ministries.
- Modeling the three virtues of an ideal team player: humble (motivation), hungry (passion), smart (emotional intelligence).
- Overseeing the organization of Shelter Care along with Adult Shelter staff and Case Managers.
- Triaging patients when necessary to Care Center provider volunteers or to the Director of Care Center Ministries.
- Assisting in development and renovation of respite care alongside Adult Shelter staff and Director of Care Center Ministries.
- Meeting regularly to collaborate with Case Managers about program and shelter patients.
- Attending community partner meetings to facilitate unified care of our clients.
- Cultivating community partnerships in our community as needed.

**Ensure your team can count on you, specifically, to:**

*Offer Spiritual Impact*

Back    Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A        37 of 50

**2-ER-062**

- Serve in this role as a **minister of Christ**, demonstrating the calling, character and competencies of a spiritual leader who seeks to faithfully follow Jesus, stay in step with the Holy Spirit, and honor the Father. Carry out these responsibilities with the heart of a chaplain, spiritually caring for all those in your sphere of influence, including staff, patients, clients, volunteers, and community partners.

> *"Therefore, if anyone is in Christ, the new creation has come. The old has gone, the new is here! All this is from God, who reconciled us to himself through Christ and gave us the ministry of reconciliation: that God was reconciling the world to himself in Christ, not counting people's sins against them. And he has committed to us the message of reconciliation. We are therefore Christ's ambassadors, as though God were making his appeal through us." 2 Corinthians 5:17-20a niv*

- Look for **opportunities** to lead Bible study, lead others in prayer, counsel from God's Word, and model what it looks like to know God and experience His love and leadership.

### Oversee Shelter Care

- Oversee the **care of patients** within Shelter Care. This includes (but is not limited to) wound care, medication management, bathing, case management, triage, etc.
- Organize **students** who are seeing patients in shelter care. Students may be DO, RN, BSN, or PT level.
- Triage **incoming list** of shelter care patients from adult shelter requests.
- Participate in care for patients on **outreach** team as needed for those not on our campus

### Support YUGM Program Needs

- Coordinate care needs with Family Shelter in collaboration with Care Center Manager.
- Coordinate care needs with recovery programs (Discovery, New Life, Bridge).
- Act as medical liaison for clients needing community support alongside program case workers.
- Coordinate client dental needs with Dental Clinic Manager.
- Develop and maintain positive and therapeutic relationships with program leaders, and support communication and relationship building with clinic providers.

### General

- Respond to medical emergencies on campus such as overdoses and trauma.
- Keep accurate medical documentation and data as requested in electronic medical record.
- Provide loving and trauma-informed care of all patients based in our Christian values.
- Attend, as requested or required, all YUGM trainings and meetings scheduled by the management team to keep current on any policy changes, new procedures, and other information essential to performing the job.
- Other duties as assigned in support of YUGM's mission and values.

### Qualifications

- LPN, RN or higher-level training, with current license (or able to be licensed by job hire date)
- Computer competency
- Management skills and ability to lead students and volunteers in the culture of YUGM
- Works well in a team environment
- Fluent in Spanish appreciated but not required
- Good written and verbal communication

**Back**    **Apply**

- Demonstrated personal and work ethic reflecting YUGM's Core Values of Love, Professionalism and Outcomes

Copyright © 2024, ADP, Inc. All rights reserved.

Powered by ADP

Privacy  |  Legal  |  Requirements  |  Artificial Intelligence

Back        Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A                39 of 50

**2-ER-064**



Join Our Talent Community

## Retail Supervisor

Full Time
Yakima, WA, US

*30+ days ago*
Requisition ID: 1143

**Salary Range:**
$16.50 To 20.69 Hourly

### Job Purpose

Fulfill all duties of Lead Retail Associate and assist retail managers (front end and retail floor) in providing oversight and directing staff to ensure daily store operations, tasks and projects are completed.

### Duties and Responsibilities

#### Culture Work

- Establish professional, caring, strengths-based relationships built on truth, respect, encouragement, and trust.
- Maintain a high level of integrity in modeling and promoting the Mission's Christian culture, core values, policies, and procedures.
- Minister to our clients, donors, volunteers, and customers, showing them kindness and grace.

#### Team Work

- Instructing, training, and coaching each person you work with is an instrumental part of this role.
- Communicate well with others including guests, donors, staff, and volunteers.
- Work well in a collaborative, team environment, and with volunteers.

#### Direct Work

- Assist the Retail Management team in leading and creating a culture that "reveals Christ" to all staff, donors, and customers and ensures compliance with the company's mission statement.
- Assist the Retail Management team in providing onsite supervision and leadership to the retail team, ensuring staff stay on task and complete daily projects.
- Direct as needed or assigned CJ (Community Jobs) workers and volunteers on retail floor
- Assist the Retail Management team in register transactions including handling of cash and credit card payments and any non-cash purchases, to ensure the accuracy and security of all transactions.
- Work with manager to accomplish daily projects.

Back    **Apply**

2-ER-065

- Assist retail management in overseeing cashiers, registers, and customer transactions, ensuring they are processed promptly, accurately, and according to company policy.
  - Opening and closing tills; morning, mid-day and at closing
  - Ensure proper "CLOSE OF DAY" procedures are followed
  - Make change for tills
  - Prepare and ensure accuracy of deposits
  - Maintain adequate change in the safe and make available to cashiers
  - Identify and promptly communicate any accounting related issues to management
  - Ensure that cash is never left unattended or unsecure.
- Identify and communicate any accounting related issues to management promptly.
- Assist cashiers in dealing with difficult customers and resolving customer complaints.
- Work with store staff in maintaining the physical appearance of the store on every shift, including, but not limited to: communicating and restocking of janitorial and restroom supplies, removing safety hazards, picking up store merchandise and restoring to proper place, cleaning parking lot, sidewalks, windows and doors, store floors, break room(s), restrooms and other public areas, to ensure the safety and health of customers and employees.
- Assist store staff in stocking store shelves and clothing racks to provide customers with maximum shopping opportunities.
- Under the direction of the Retail Management team, assist store staff, as needed, to set up or change store displays to provide a pleasant shopping environment and to entice customers to shop new areas or items within the store.
- Communicate all events related to customer service issues or problems, register mistakes, employee issues or accidents, and general store operations to the manager, to ensure all issues are handled properly and in accordance with company policies and procedures.
- Attend as requested or required all YUGM trainings and meetings scheduled by the management team to keep current on any policy changes, new procedures, and other information essential to performing the job.
- Other duties as assigned in support of YUGM's mission and values.

## Qualifications

### Knowledge, Skills, and Abilities

- Must have a commitment to the mission of the Yakima Union Gospel Mission.
- Must be a people person with a pleasant and willing attitude and have a servant's heart.
- Experience in retail operations preferred.
- Excellent communication skills (both oral and written) with an excellent command of the English language.
- Excellent math and money handling skills.
- Ability to interpret a variety of instructions furnished in written or oral form.
- Ability to operate a cash register and credit card machine.
- Ability to operate general office machines, copier, fax, printers, scanners.

### Planning and Organizing

Back          Apply

- Must be detail-oriented and have solid organizational skills.

- Must be a problem solver and be able to work with a minimum of supervision and take initiative.
- Excellent time management skills.
- Must possess a demonstrable level of skill and proficiency in planning so to meet established goals.

Copyright © 2024, ADP, Inc. All rights reserved.

Powered by ADP

Privacy  |  Legal  |  Requirements  |  Artificial Intelligence

Back       Apply

9/19/24, 3:50 PM    Case 1:23-cv-03027-MKD    ECF No. 34-1    filed 09/20/24    PageID.698    Page 44 of 51

 

Join Our Talent Community

## Store Manager

Full Time
**Yakima, WA, US**

*30+ days ago*
Requisition ID: 1136

**Salary Range:**
$17.00 To 29.00 Hourly

### Job Purpose

Oversee and manage the retail and processing departments of the thrift store. Provide coaching, training, and mentorship to the team. Responsible for all store performance as it relates to metrics, goals, merchandising, cleanliness, and quality customer experience.

### Duties and Responsibilities

**Culture Work**

- Establish professional, caring, strengths-based relationships built on truth, respect, encouragement, and trust.
- Maintain a high level of integrity in modeling and promoting the Mission's Christian culture, core values, policies, and procedures.
- Minister to our clients, donors, volunteers, and customers, showing them kindness and grace.

**Shared Work**

- Communicate well with others including guests, donors, staff, and volunteers.
- Work well in a collaborative, team environment, partnering with other Retail & Processing Managers to ensure consistency across all YUGM stores.

**Individual Work**

*Supervision & Leadership*

- Lead employees and build the team spirit by being an example of "revealing Christ" to all staff, volunteers, donors, and customers.
- Work closely with the overall thrift management team to place the right people in the right places on the team.  Train, coach, ensure performance management and disciplinary processes are utilized timely and properly, and when needed terminate store staff, in close coordination with YUGM HR and the Thrift Administration Director.  This includes proper execution of necessary

Back    Apply

paperwork related to employees including documenting coaching opportunities, hiring paperwork, termination paperwork, etc.

- Provide onsite supervision and leadership to retail and processing teams, including prioritizing daily projects, creating daily task lists, and directing staff to ensure projects are completed.
- Communicate all events related to customer service issues/problems, employee issues/accidents and general store operations with Regional Retail and/or Processing Director to ensure all issues are handled properly and in accordance with company policies and procedures.
- Provide a positive and encouraging atmosphere for staff to promote further professional development and growth within Yakima Union Gospel Mission.  Communicate regularly with Thrift Administration Director to ensure all store issues, praises, employee relations, etc. are addressed.

- Oversee Asst. Manager, supervisor and/or Lead training, coaching and assist in solving customer/donor related issues and ensuring daily projects are completed.

*Financial & Inventory*

- Lead and equip team in performing all required retail job duties.  This includes but is not limited to duties related to register transactions, handling cash and credit card payments, checks, voids, and refunds to ensure accuracy and security in all transactions.
- Oversee the opening and closing of the till and ensure accuracy:
  - Make change for tills as needed
  - Oversee that the closing of the tills is done properly at the end of the day AND the overall closing out of the day.
  - Identify and communicate any accounting related issues to management promptly.
  - Prepare deposits for the accounting department to pick up.
- Complete, with accuracy and a high level of organization, all administrative needs of the store, including but not limited to:
  - Daily Reconciliation Sales Reports
  - Bank deposits
  - Daily Sales charts
  - Category Sales charts
  - Donation charts.
- Properly save and store all paperwork to ensure truthful reporting and recording of daily sales and donations.
- Set appropriate daily goals and plan the day according to projections/targets.  Review Cyfe/ThriftTrac Dashboards daily to understand and communicate targets to team.

*Retail/ Customer Service*

- Oversee creation and maintenance of a welcoming environment in the store, including biblical hospitality and thankfulness for all customers/donors.  This includes:
  - Ensuring staff provide a timely welcome as they enter the store or drive up to the donation area.
  - Responding to questions/concerns with a positive and helpful attitude.
  - Thanking donors for their generosity.
- Establish and maintain customer service standards that ensure compliance with the company mission statement.
- Tell the Yakima Union Gospel Mission story and incorporate how our thrift stores support the work of The Mission to staff and customers. Back        Apply

2-ER-069

*Processing/ Donor Relations*

- Oversee the processing area to ensure it remains clean and well-organized.
- Lead and equip team in performing all required processing job duties.  This includes but is not limited to duties related to accepting donations, resorting, and pricing merchandise.
- Recognize the value and appropriate pricing needs of items prior to those items reaching the sales floor.  Train staff on pricing standards and ensure pricing guide values are adhered to.
- Lead team in ensuring the effective use of the donation receiving script to communicate appreciation, the Yakima Union Gospel Mission story, and the Gift Card Program to donors.
- Ensure all staff adhere to all donor service standards, policies & procedures.
- Stay up to date and well informed with the ever-changing procedures of the warehouse and clarify any questions pertaining to changing policies with the Processing Director.
- Effectively communicate with Distribution Manager and/or drivers about daily donation pick up and drop off plans.

*Store Operations/ Other*

- Schedule staff appropriately to ensure the team is well equipped for daily needs.  Create weekly/daily schedules in Deputy.
- Work with Thrift Administration Director to build a robust team of volunteers & CJ Workers by recruiting, scheduling, directing, and caring for volunteer/ CJ Workers needs.
- Communicate with staff all relevant information about products, promotions, policies, or procedures that will assist them in fulfilling their duties.
- Ensure daily reports and metrics are properly completed and provided to Thrift Leadership Team in a timely manner.
- Manage the continual set up and updating of store displays to provide a pleasant shopping environment and to entice customers to shop new areas or items in the store.
- Work with store staff to maintain the physical appearance of the store including, but not limited to:
  - Ordering and maintaining needed janitorial and restroom supplies.
  - Removing safety hazards.
  - Picking up store merchandise and restoring to proper place.
  - Ensuring the cleaning of parking lot, sidewalks, windows and doors, store floors, restrooms and other public areas for the safety and health of customers and employees.
- Attend as requested or required all YUGM trainings and meetings scheduled by the management team to keep current on any policy changes, new procedures, and other information essential to performing the job.
- Other duties as assigned in support of YUGM's mission and values.

## Qualifications

- Must be a people person with a pleasant and willing attitude and have a servant's heart.
- Excellent communication skills (both oral and written) with an excellent command of the English Language.
- Must have a commitment to the Yakima Union Gospel Mission and Mission Statement.
- Must be detail-oriented and have solid organizational skills.
- Must be problem solver and be able to work with a minimum amount of supervision and take initiative.

Back          Apply

- Excellent time management skills
- Must possess a demonstrable level of skill and proficiency in planning in order to meet established goals.
- Strong ability to delegate tasks.
- Microsoft Office, including Word and Excel (spreadsheets).
- Email communications (including attachments).
- Ability to operate general office machines, copier, fax, printers and scanners.
- Ability to access websites to help evaluate the value of donated items.
- Ability to read and define problems, collect data, establish facts and draw valid conclusions.
- Ability to interpret a variety of instructions furnished in written or oral form.

Copyright © 2024, ADP, Inc. All rights reserved.

Powered by ADP

Privacy   |   Legal   |   Requirements   |   Artificial Intelligence

Back        Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A          46 of 50

2-ER-071



Join Our Talent Community

# Thrift Retail Manager

Yakima, WA, US

*27 days ago*
Requisition ID: 1149

**Salary Range:**
$17.00 To 29.00 Hourly

### Job Purpose

Oversee and manage the retail department of the thrift store and provide coaching, training, and mentorship of the retail team.   Responsible for team performance as it relates to store metrics, goals, merchandising, cleanliness, and quality customer experience.

### Duties and Responsibilities

**Culture Work**

- Establish professional, caring, strengths-based relationships built on truth, respect, encouragement, and trust.
- Maintain a high level of integrity in modeling and promoting the Mission's Christian culture, core values, policies, and procedures.
- Minister to our clients, donors, volunteers, and customers, showing them kindness and grace.

**Team Work**

- Instructing, training, and coaching each person you work with is an instrumental part of this role.
- Communicate well with others including guests, donors, staff, and volunteers.
- Work well in a collaborative, team environment, and with volunteers.

**Direct Work**

- Supervisory & Leadership
  - Lead the Retail Management team in the building of the team, by being an example of "revealing Christ" to all staff, donors, and customers.
  - Work closely with the management team to place the right people in the right places on the team.  Responsible for hiring, training, coaching and termination of all retail staff.  This includes proper execution of necessary paperwork related to employees including documenting coaching opportunities, hiring paperwork, termination paperwork, worker's compensation paperwork, etc.

Back    Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A    47 of 50

**2-ER-072**

- Provide onsite supervision and leadership to the retail team, including prioritizing daily projects, creating daily task lists, and directing staff to ensure projects are completed.
- Schedule and oversee the work of CJ (Community Jobs) workers and volunteers on the sales floor.
- Provide a positive and encouraging atmosphere for retail staff to promote further professional development and growth within the Yakima Union Gospel Mission.
- Schedule staff appropriately to ensure the team is well equipped for daily needs. Work with Admin Director to create weekly/daily schedules in Deputy.
- Communicate all events related to customer service issues/problems, employee issues/accidents and general store operations to the Thrift Leadership Team to ensure all issues are handled properly and in accordance with company policies and procedures.
- Oversee Assistant Managers, Supervisors, and Leads training, coaching, and assist in solving transaction/customer related issues and in accomplishing daily projects.
- Communicate regularly with the management team to ensure all store issues, employee relations, etc. are properly addressed.
- Assist cashiers in dealing with difficult transactions/customers and resolving customer complaints.
- Communicate with staff any relevant information about products, promotions, policies, or procedures that will help them fulfill their duties.
- Customer Service
  - Provide a friendly and joyful welcome to all customers when they enter the store and throughout their shopping experience, including responding to questions and concerns.
  - Establish and maintain customer service standards to ensure compliance with the company mission statement and to provide a pleasant shopping experience for each customer.
  - Be able to tell the Yakima Union Gospel Mission story and incorporate how our thrift stores support the work of the mission to staff and customers.
- Financial & Inventory
  - Oversee all register transactions including handling of cash and credit card payments and any non-cash purchases, to ensure the accuracy and security of all transactions, such as:
  - Opening tills and ensuring accuracy
    - Making change for tills
    - Closing/opening tills mid-day
    - Closing tills at the end of the day AND closing out the day
    - Identify and communicate any accounting related issues to management promptly.
    - Prepare deposits for the accounting department to pick up.
  - Complete, with accuracy and a high level of organization, all administrative needs of the store, including but not limited to daily Reconciliation Sales Reports, bank deposits, Daily Sales charts, Category Sales charts, and Donation charts.  Properly save and store all paperwork to ensure truthful reporting and recording of daily sales and donations.
  - Must be able to appropriately set daily goals and plan their day according to projections/targets.  Review Cyfe/ThriftTrac Dashboards daily to understand and communicate targets to team.
- Store Operations / Other
  - Ensure that daily reports and metrics are properly completed and provided to Thrift Leadership Team in a timely manner.
  - Manage the continual set up and change of store displays to ensure the physical appearance of the store is appropriately maintained. This includes but is not limited to: clean and well-organized register areas, restocking of supplies, removing safety hazards, recovering store merchandise, cleaning parking lot and sidewalks to ensure the safety of customers and

Decl. of S. Thielan in Supp. of MPI - Exhibit A          48 of 50

2-ER-073

employees, ensure cleanliness of entryway, keep shopping carts area clean and well maintained, ensure staff are dressed to company professional standards.

- Work with, and effectively communicate with, the Processing Manager daily to ensure all the operational needs of the store are being met. This includes leading morning huddles, including praying together as a team, explaining daily project lists, communicating daily sales goals, and celebrating met goals. Facilitate and promote an encouraging, positive and unified relationship between Processing and Retail departments.
- Partner with other Retail Managers to ensure consistency across all YUGM retail stores.
- Work with other managers to build a robust team of volunteers by recruiting, scheduling, directing, and caring for volunteer needs.
- Attend as requested or required, all YUGM trainings and store meetings as scheduled by the management team to keep current on any policy changes, new procedures, and other information essential to performing the job.
- Other duties as assigned in support of YUGM's mission and values.

**Qualifications**

**Knowledge, Skills, and Abilities**

- Must have a commitment to the mission of the Yakima Union Gospel Mission.
- Must be a people person with a pleasant and willing attitude and have a servant's heart.
- Experience in retail operations preferred.
- Excellent communication skills (both oral and written) with an excellent command of the English language.
- Excellent math and money handling skills.
- Ability to interpret a variety of instructions furnished in written or oral form.
- Ability to operate a cash register and credit card machine.
- Ability to operate general office machines, copier, fax, printers, scanners.

**Planning and Organizing**

- Must be detail-oriented and have solid organizational skills.
- Must be a problem solver and be able to work with a minimum of supervision and take initiative.
- Excellent time management skills.
- Must possess a demonstrable level of skill and proficiency in planning to meet established goals.

---

Copyright © 2024, ADP, Inc. All rights reserved.

Powered by ADP Back to Apply

Decl. of S. Thielan in Supp. of MPI - Exhibit A 49 of 50

**2-ER-074**

Privacy  |  Legal  |  Requirements  |  Artificial Intelligence

**Back**     **Apply**

Decl. of S. Thielan in Supp. of MPI - Exhibit A                      50 of 50

**2-ER-075**

1

Katherine Anderson
WA Bar No. 41707

2

Ryan Tucker*
AZ Bar No. 034382

3

Jeremiah Galus*

4

AZ Bar No. 30469
ALLIANCE DEFENDING FREEDOM

5

15100 N. 90th Street
Scottsdale, AZ 85260

6

Telephone: (480) 444-0020

7

kanderson@ADFlegal.org
rtucker@ADFlegal.org

8

jgalus@ADFlegal.org

Jacob Reed*
VA Bar No. 97181
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
jreed@ADFlegal.org

*Counsel for Plaintiff*

* Admitted *Pro Hac Vice*

9

10

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**

11

12

**UNION GOSPEL MISSION OF YAKIMA, WASH.**,

13

*Plaintiff,*

14

v.

15

**ROBERT FERGUSON, ET AL.,**

16

*Defendants.*

Civil Case No.: 1:23-cv-03027

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

OCTOBER 11, 2024, AT 10:00 A.M. WITH ORAL ARGUMENT

17

18

19

20

21

22

23

# TABLE OF CONTENTS

Table of Authorities.................................................................... iii

Introduction ...................................................................................1

Summary of Facts ..........................................................................3

   A.  The Mission's employment practices are essential to its religious
       purpose and calling. ............................................................3

   B.  The WLAD applies to religious organizations. ...............................4

   C.  The Ninth Circuit holds the Mission has standing. .......................5

   D.  The Mission still faces harm for filling its non-ministerial
       positions..............................................................................6

Argument ........................................................................................8

   I.  The Mission is likely to succeed on its church autonomy claim......8

   A.  Church autonomy protects non-ministerial decisions....................8

   B.  Federal courts apply the church autonomy doctrine.....................9

   C.  The WLAD violates the Mission's autonomy...............................11

   II.  The Mission is likely to succeed on its free exercise claim............12

   A.  The WLAD triggers strict scrutiny because it treats comparable
       secular groups better than the Mission.......................................13

   B.  The WLAD triggers strict scrutiny because it contains
       mechanisms for individualized exemptions. ...............................15

   C.  The WLAD cannot survive strict scrutiny....................................17

   III. The Mission is likely to succeed on its expressive association and
       free speech claims. .........................................................................18

Supplemental Mem. in Support of Mot. for Prelim. Inj. - i

IV. An injunction protects the Mission's constitutional rights, prevents irreparable harm, and benefits the public interest.......19

Conclusion ............................................... 20

Certificate of Service .................................... 22

Supplemental Mem. in Support of Mot. for Prelim. Inj. - ii

# TABLE OF AUTHORITIES

**Cases**

*Boy Scouts of America v. Dale,*
530 U.S. 640 (2000) ................................................................18

*Bryce v. Episcopal Church in the Diocese of Colorado,*
289 F.3d 648 (10th Cir. 2002) ....................................... 9, 10, 11

*Butler v. St. Stanislaus Kostka Catholic Academy,*
609 F. Supp. 3d 184 (E.D.N.Y. 2022) ...................................10

*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos,*
483 U.S. 327 (1987) ..........................................................10, 16

*Darren Patterson Christian Academy v. Roy,*
699 F. Supp. 3d 1163 (D. Colo. 2023).....................................18

*Equal Employment Opportunity Commission v. Mississippi College,*
626 F.2d 477 (5th Cir. 1980) ................................................11

*Fellowship of Christian Athletes v. San Jose Unified School District Board of Education,*
82 F.4th 664 (9th Cir. 2023)........................................... passim

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021) ............................................. 12, 16, 17

*Garrick v. Moody Bible Institute,*
412 F. Supp. 3d 859 (N.D. Ill. 2019) ....................................10

*Green v. Miss United States of America, LLC,*
52 F.4th 773 (9th Cir. 2022)...................................................19

*Hall v. Baptist Memorial Health Care Corporation,*
215 F.3d 618 (6th Cir. 2000) ................................................10

*Health Freedom Defense Fund, Inc. v. Carvalho,*
   104 F.4th 715 (9th Cir. 2024)............................................................20

*Hosanna-Tabor Evangelical Lutheran Church & School v. Equal*
   *Employment Opportunity Commission,*
   565 U.S. 171 (2012) .......................................................................8

*Killinger v. Samford University,*
   113 F.3d 196 (11th Cir. 1997) ........................................................11

*Little v. Wuerl,*
   929 F.2d 944 (3d Cir. 1991)...........................................................11

*Our Lady of Guadalupe School v. Morrissey-Berru,*
   591 U.S. 732 (2020) ..................................................................8, 17

*Seattle Pacific University v. Ferguson,*
   104 F.4th 50 (9th Cir. 2024)..........................................................5, 6

*Seattle Pacific University v. Ferguson,*
   No. 3:22-cv-05540 (W.D. Wash. Oct. 26, 2022) ...................................16

*Seattle's Union Gospel Mission v. Woods,*
   142 S.Ct. 1094 (2022) .............................................................8, 10, 12

*Serbian Eastern Orthodox Diocese for United States of America &*
   *Canada v. Milivojevich,*
   426 U.S. 696 (1976) .......................................................................9

*Slattery v. Hochul,*
   61 F.4th 278 (2d Cir. 2023) ............................................................18

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.,*
   41 F.4th 931 (7th Cir. 2022)............................................................9

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) .......................................................................5

Supplemental Mem. in Support of Mot. for Prelim. Inj. - iv

*Tandon v. Newsom,*
   593 U.S. 61 (2021) ........................................................... 13, 14

*Union Gospel Mission of Yakima Washington v. Ferguson,*
   No. 23-2606, 2024 WL 3755954 (9th Cir. 2024) .......................... passim

*Woods v. Seattle's Union Gospel Mission,*
   481 P.3d 1060 (Wash. 2021) ........................................... 5, 8, 16

*Youth 71Five Ministries v. Williams,*
   No. 24-4101, 2024 WL 3749842 (9th Cir. Aug. 8, 2024) ..................... 15

**Statutes**

Wash. Rev. Code § 49.60.010 ................................................. 13

Wash. Rev. Code § 49.60.040 .............................................. 5, 13

Wash. Rev. Code § 49.60.180 .......................................... 5, 11, 16

Wash. Rev. Code § 49.60.208 ................................................. 5

Wash. Rev. Code § 49.60.222 ................................................. 13

**Regulations**

Wash. Admin. Code 162-16-240 .............................................. 16

**Constitutional Provisions**

42 U.S.C. § 2000 ............................................................ 18

Supplemental Mem. in Support of Mot. for Prelim. Inj. - v

1    The Ninth Circuit reversed and remanded this case and instructed

2 this Court "to decide [the Mission's] motion for a preliminary injunction

3 in the first instance." *Union Gospel Mission of Yakima Washington v.*

4 *Ferguson*, No. 23-2606, 2024 WL 3755954, at *3 (9th Cir. Aug. 12,

5 2024). The Mission renews its Motion for a Preliminary Injunction

6 ("MPI"), incorporates all arguments made therein, and supplements it

7 with this Memorandum and the Declaration of Scott Thielen. The

8 Mission requests that the Court enjoin Defendants from enforcing the

9 Washington Law Against Discrimination ("WLAD") against the Mission

10 for preferring and hiring only coreligionists—those who agree with and

11 adhere to its religious beliefs and behavior requirements—for all of its

12 positions, regardless of whether or not they are ministerial. [1]

13                              **INTRODUCTION**

14    The Mission is a Christian rescue mission that furthers its

15 ministry goal to live out and spread the Gospel of Jesus Christ through

16 all of its employees. To accomplish its religious calling, the Mission

17 must employ faithful agents who share and adhere to the Mission's

18 religious beliefs, both internally and externally. If it can't do this, it will

19 _____

20 [1] The Mission previously requested an injunction to publish its
Religious Hiring Statement without penalty. *See* ECF 14 at 7. The State

21 has now said—eighteen months *after* this suit was filed and *after* the
Ninth Circuit held the Mission has standing—that it "will not enforce

22 the WLAD ... in connection with the positions and Religious Hiring
Policy as identified in its Complaint and related attachments." ECF No.

23 31 at 2.

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 1

1  lose its uniqueness, fall short of its religious mission, and eventually
2  will be reduced to a secular organization.

3      Yet the WLAD poses this exact threat to the Mission. It forces the
4  Mission—on pain of substantial penalties—to employ those who do not
5  share or live out the Mission's beliefs on marriage and sexuality. The
6  Ninth Circuit held that the Mission need not sit and wait in fear for the
7  State to come knocking—it can seek to enjoin this unconstitutional law
8  *now*. After losing at the Ninth Circuit, the State now says—for the first
9  time in 18 months of litigation—it will not enforce the WLAD as applied
10 to the Mission's IT technician and operations assistant. But the State
11 cannot suddenly say magic words to make this case go away. And it
12 doesn't fix the problem, because the Mission challenges the WLAD as
13 applied to all of its employees, regardless of position, and regardless of
14 whether the State believes if one is religious enough to be "ministerial."
15 The Mission needs to fill at least 14 open positions right now and up to
16 50 annually. If the WLAD is not enjoined, the Mission is required to
17 seek the government's permission for every position it hires—an
18 unworkable and unconstitutional task—and risks penalties for using its
19 religiously based criteria to fill these positions. The Mission requires
20 every employee to live out and share its faith. The government doesn't
21 get to second-guess that decision.

22
23

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 2

The Mission is likely to succeed on its claims. First, the WLAD infringes the Mission's autonomy to make employment decisions rooted in its religious beliefs, regardless of position. Second, the WLAD triggers—and fails—strict scrutiny because it is not neutral or generally applicable for at least two reasons: (1) because it permits private organizations, educational institutions, and small employers to discriminate freely; and (2) because the State can make case-by-case discretionary decisions about when the WLAD applies and when it doesn't. Third, the WLAD violates the Mission's right to expressive association.

This Court should issue an injunction to ensure the Mission can fill all of its current open positions without incurring WLAD liability.

<u>SUMMARY OF FACTS</u>

**A. The Mission's employment practices are essential to its religious purpose and calling.**

The Mission's Christian religious beliefs guide everything it does. ECF No. 14-1 ¶¶ 8–9. Each day it offers desperately needed lodging, food, and assistance to the less fortunate no matter who they are or their beliefs, orientation, or identity. ECF No. 14-1 ¶ 10. The Mission's foremost goal is to "spread the Gospel of the Lord Jesus Christ" in and through all of its services. ECF No. 1-1 at 3. The Mission accomplishes its goals through its 165-plus employees who represent the ministry as its hands, feet, and mouthpiece. ECF No. 14-1 ¶¶ 21, 31; Thielen Decl. ¶

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 3

22. So the Mission only employs coreligionists—those who share and live out the Mission's religious beliefs, including the belief that "human sexual expression" is only proper "within the marriage of one man to one woman." ECF No. 14-1. ¶¶ 26, 34.

The Mission requires every employee to live out their faith inward-facing (toward other employees), which therefore contributes to the success of the ministry outward-facing (toward the community). Thielen Decl. ¶ 14. So every employee, regardless of position held, has inward-facing religious responsibilities to cultivate fellowship, engage in discipleship, and support one another in their faith journeys through their speech and actions. *Id.* ¶¶ 15–16. For example, employees worship together, pray for one another, share scripture and devotionals, and strive to exemplify to each other what it means to follow Christ in every respect. *Id.* ¶¶ 17–20. Working with likeminded Christians also helps ensure employees are not subjected to or willing participants in sinful habits, behaviors, and temptations. *Id.* ¶ 18. If the Mission is forced to hire someone who does not share its religious beliefs—including beliefs on marriage and sexuality—it cannot foster an inward community of co-believers, thus undermining the Mission's calling to spread the Gospel through its social welfare work. *Id.* ¶ 21, 25–26.

**B. The WLAD applies to religious organizations.**

The WLAD prohibits employers with eight or more employees from discriminating in employment based on sexual orientation. Wash.

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 4

1   Rev. Code §§ 49.60.040(11), 49.60.180. The WLAD used to exempt

2   religious nonprofit organizations, but in 2021, the Washington Supreme

3   Court "narrowed the religious-employer exemption to correspond to the

4   ministerial exception under the U.S. Supreme Court's First Amendment

5   jurisprudence." *Union Gospel Mission,* 2024 WL 3755954, at *1 (citing

6   *Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060, 1069–70

7   (Wash. 2021)). The WLAD now applies to a religious organization's non-

8   ministers. *Id.* at *2; *see also* ECF No. 23 at 16, 18 (finding the same).

9   Besides employment *actions*, the WLAD's "disclosure provision" forbids

10   the Mission from *asking* applicants "to disclose … sincerely held

11   religious affiliation or beliefs." Wash. Rev. Code § 49.60.208.

**C. The Ninth Circuit holds the Mission has standing.**

13   The Ninth Circuit recently held Seattle Pacific University had

14   standing to challenge future WLAD enforcement as applied to its

15   religiously based employment decisions. *Seattle Pac. Univ. v. Ferguson*,

16   104 F.4th 50 (9th Cir. 2024). Last month, the Ninth Circuit similarly

17   held that the Mission had pre-enforcement standing under the three-

18   prong test set out in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149

19   (2014). *See Union Gospel Mission*, 2024 WL 3755954.

20   First, the Mission "mandate[s] that *all employees* ... adhere to its

21   religious beliefs, which encompass those concerning its view of sexual

22   morality." *Id.* at *2 (emphasis added). And the Mission "will continue to

23   adhere to these hiring practices." *Id.* Second, the Mission's hiring

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 5

1  practices are arguably proscribed by the WLAD, because like *SPU*, they

2  "apply" to "ministers and non-ministers alike." *Id.* (quoting *SPU*, 104

3  F.4th at 60). Third, the Mission faces a "credible threat of prosecution"

4  because: (1) it "intends to engage in conduct arguably proscribed by

5  multiple sections of the WLAD"; (2) "the State repeatedly refuse[s] to

6  disavow enforcement to the extent that [the Mission] seeks to hire *non-*

7  *ministerial employees*"; (3) "the State is only one enforcer of the WLAD";

8  and (4) the "WLAD, as interpreted by the Washington Supreme Court

9  in *Woods* in 2021, is relatively new." *Id.* at *2-3 (emphasis added). The

10 Ninth Circuit then held the Mission's claims were redressable and

11 remanded for this Court to decide the MPI "in the first instance." *Id.*

12 **D. The Mission still faces harm for filling its non-ministerial**
   **positions.**

13

14 On September 11, the State filed a Notice claiming for the first

15 time—after eighteen months of litigation and after losing its standing

16 fight—that it now will not enforce the WLAD "with respect to [the

17 Mission's] IT Technician and Operations Assistant." ECF No. 31 at 2.

18 But the Mission employs many non-ministers, hiring upwards of 50 per

19 year. ECF No. 1 ¶¶ 128, 130; Thielen Decl. ¶ 22. Although the Mission

20 noted the IT technician and operations assistant positions needed to be

21 filled right away when it filed its MPI, the requested relief was not

22 limited to those positions. ECF No. 14 at 7. Instead, the Mission sought

23 (and still seeks) an injunction as applied to all positions *Id.*

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 6

The State tried (and failed) to do the same thing at the Ninth Circuit. There, before the court issued its decision but *after* oral argument, the State purported to "disavow enforcement as to ministers" and "concede[d]" that "the IT technician and operations assistant are ministers who 'minister to members of the public.'" *See* Appellees' Rule 28(j) Letter, DktEntry 50.1, *Union Gospel Mission*, No. 23-2606 (9th Cir. Aug. 12, 2024). But that didn't change the court's decision and nothing in its opinion isolated the issue to the two listed positions.

So the Mission still risks WLAD penalties by requiring any one of its many non-minister positions to adhere to its biblical beliefs on marriage and sexuality. Thielen Decl. ¶¶ 23–24. Moreover, the Mission is burdened by having to obtain permission from the State to use its religious hiring criteria before hiring someone. The Mission currently has at least 14 open positions, *id.* ¶¶ 5–6, including multiple non-ministers, like a Front Desk Coordinator, Thrift Store Associate, Meal Ministry Cook, Nurse, Programs Assistant, and Safety Team, *id.* ¶¶ 8, 11–12. And the Mission has frequent turnover for many positions. *Id.* ¶ 22. The Mission thus needs an injunction prohibiting enforcement of the WLAD as applied to all positions.[2]

---

[2] The Mission recognizes that it refers to every position as a "minister," and it does so because all are expected to share the Christian faith. Thielen Decl. ¶ 9; ECF No. 1-4. But the Mission also understands that the Supreme Court has stated that "a variety of factors" determines if a

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 7

## ARGUMENT

**I.    The Mission is likely to succeed on its church autonomy claim.**

**A. Church autonomy protects non-ministerial decisions.**

The Religion Clauses "protect" the Mission's "autonomy with respect to internal management decisions that are essential to [its] central mission." *Our Lady,* 591 U.S. at 746. One "component of this autonomy" is the ministerial exception. *Id*. The ministerial exception protects a religious organizations' decisions about its ministers whether or not the decision is based on religious grounds. *See id.* at 746–47; *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012). This case is not about the ministerial exception because the Mission remains exempt from the WLAD for its ministerial decisions. *Woods*, 481 P.3d at 1067.

But church autonomy is a "broad principle," *Our Lady*, 344 U.S. at 747, and "is not so narrowly confined" to the ministerial exception, *Seattle's Union Gospel Mission v. Woods*, 142 S.Ct. 1094, 1096 (2022) (Alito, J., respecting the denial of certiorari). Another component protects the Mission's freedom to make decisions for *all* employees free

---

position is protected by the ministerial exception, and "[s]imply giving an employee the title of 'minister' is not enough to justify the exception." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 751–52 (2020). So the Mission does not believe that every position would qualify for the ministerial exception under the legal test. Thielen Decl. ¶ 10.

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 8

1    from penalty when those decisions are "based on religious doctrine."

2    *Bryce v. Episcopal Church in the Diocese of Colorado,* 289 F.3d 648, 660

3    (10th Cir. 2002). Church autonomy thus protects the Mission's right to

4    require all of its employees to follow "the standard of morals required of

5    them." *Serbian E. Orthodox Diocese for U.S. of Am. & Canada v.*

6    *Milivojevich*, 426 U.S. 696, 714 (1976) (cleaned up).

7        In short, the Mission cannot be penalized when it makes

8    personnel decisions rooted in its religious belief, practice, or adherence,

9    no matter how others label that decision. *Bryce*, 289 F.3d at 660; *see*

10    *also Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th

11    931, 947 (7th Cir. 2022) (Easterbrook, J., concurring) ("that [Catholic

12    school's] adherence to Roman Catholic doctrine produces a form of sex

13    discrimination does not make the action less religiously based").

14    **B. Federal courts apply the church autonomy doctrine.**

15        *Bryce* illustrates how church autonomy works in the face of

16    employment discrimination law. There a church terminated its youth

17    pastor after discovering she was in a same-sex union. *Bryce*, 289 F.3d at

18    651–53. The former pastor sued for sex discrimination under Title VII.

19    *Id.* The Tenth Circuit explained that a religious organization's

20    "constitutional protection extends beyond the selection of clergy to other

21    internal church matters." *Id*. at 656. The court then declined to apply

22    the ministerial exception and held the "broader church autonomy

23    doctrine" barred the former pastor's claims because the church's

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 9

termination decision was "based on religious doctrine." *Id*. at 656–58, 658 n.2, 660; *accord Butler v. St. Stanislaus Kostka Catholic Acad.*, 609 F. Supp. 3d 184, 188, 198–204 (E.D.N.Y. 2022), *appeal dismissed* (Aug. 26, 2022) (sexual orientation discrimination claim barred by the church autonomy doctrine "[e]ven if [teacher] did not qualify as a ministerial employee" because school "proffered a religious reason for termination"); *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 871–73 (N.D. Ill. 2019) (church autonomy barred claim where reasons for termination "were rooted firmly in [college's] religious beliefs").

*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos* buttresses the church autonomy doctrine. 483 U.S. 327 (1987). There the Supreme Court explained how—absent an exemption for religious organizations—Title VII would force religious groups to alter the way they "carry out their religious missions" to avoid "potential liability," *id.* at 335–36, thereby "burden[ing] the exercise of religion," *id.* at 338.

And "courts of appeals have generally protected the autonomy of religious organization to hire personnel who share their beliefs." *Seattle's Union*, 142 S.Ct. at 1095; *see, e.g.*, *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 623 (6th Cir. 2000) (religious groups have a "constitutionally-protected interest ... in making religiously-motivated employment decisions"); *Little v. Wuerl*, 929 F.2d 944, 947, 951 (3d Cir.

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 10

1  1991) (penalizing Catholic school for employment decision "would

2  arguably violate both [Religion Clauses]"); *EEOC v. Mississippi Coll.*,

3  626 F.2d 477, 485 (5th Cir. 1980) (Title VII's religious exemption avoids

4  "conflicts [with] the religion clauses"); *Killinger v. Samford Univ.*, 113

5  F.3d 196, 201 (11th Cir. 1997) (same).

6  **C. The WLAD violates the Mission's autonomy.**

7  The WLAD infringes the Mission's autonomy by forbidding it from

8  "refus[ing] to hire" or "discharg[ing] or bar[ring] any person from

9  employment" because of "sexual orientation." Wash. Rev. Code §

10  49.60.180. With no statutory protection for the Mission remaining, the

11  Religion Clauses must step in to protect its employment "decision[s]

12  based on religious doctrine." *Bryce*, 289 F.3d at 660.

13  The Mission requires *every employee*—no matter the position—to

14  share and follow its beliefs on marriage and sexuality so that it presents

15  a credible, consistent, and accurate message to the world. ECF No. 14 ¶

16  44. And it ensures the Mission creates an internal environment of co-

17  believers who are "united in the same mind," who "exhort one another,"

18  and who "bear" each other's "burdens." Thielen Decl. ¶ 19 (quoting *I*

19  *Corinthians* 1:10, *Hebrews* 3:13, and *Galatians* 6:2). This deepens

20  employee relationships and contributes to the overall success of the

21  ministry in sharing and spreading its Christian faith.

22  For example, the Mission needs to hire a front desk coordinator, a

23  nurse, and a cook (among other positions). As with all positions, these

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 11

employees must "demonstrat[e] the calling, character and competencies of a person who seeks to faithfully follow Jesus" and must "spiritually car[e] for all those in [their] sphere of influence, including staff, clients, volunteers, and community partners." Thielen Decl., Ex. A at 2, 19, 38. So they are expected to "lead others in prayer, counsel from God's Word, and model what it looks like to know God and experience His love and leadership." *Id.* The Mission must be able to decide for itself who is the best fit to accomplish these religious goals.

In sum, the WLAD mandates, on pain of substantial penalties, that the Mission hire those who do not share its beliefs on marriage and sexuality. This "undermines [its] autonomy" and "continued viability." *Seattle's Union*, 142 S.Ct. at 1096. Eventually, the Mission will be reduced to a secular social welfare organization, destroying the very purpose for which it was founded 88 years ago. The Mission "does not seek to impose [its] beliefs on anyone else," it only desires to "continue serving" the people of Yakima while adhering to its faith. *Fulton v. City of Philadelphia*, 593 U.S. 522, 542 (2021). Church autonomy protects this right and bars enforcement of the WLAD against the Mission.

## II.    The Mission is likely to succeed on its free exercise claim.

The Mission is also likely to succeed on the merits of its free exercise claim because the WLAD is not neutral or generally applicable and cannot satisfy strict scrutiny. *Id.* at 533. As explained in the MPI, the WLAD violates these "bedrock requirements." *Fellowship of*

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 12

*Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 686 (9th Cir. 2023) (cleaned up) ("*FCA*"); *see* ECF No. 14 at 19–21.

### A. The WLAD triggers strict scrutiny because it treats comparable secular groups better than the Mission.

First, a law is "not neutral or generally and therefore trigger[s] strict scrutiny ... whenever [it] treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). One exception is enough. *Id.* WLAD contains several.

The WLAD treats comparable secular organizations better than the Mission. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* at 62. Here, the State's interest is to "eliminat[e] and prevent[ ] discrimination." Wash. Rev. Code § 49.60.010. But the WLAD exempts "distinctly private" organizations from its public accommodation arm, *id.* § 49.60.040(2), and permits public or private educational institutions to separate and give preferential treatment based on sex, *id.* § 49.60.222(3). And the WLAD exempts employers (even *for-profit* ones) with fewer than eight employees. *Id.* § 49.60.040(11). These exemptions blatantly allow secular organizations "to discriminate expressly—even on otherwise protected grounds" thereby undercutting the State's claimed interest. *FCA*, 82 F.4th at 689.

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 13

1    It doesn't matter that small religious employers are also exempt,

2  as the State has argued. *See* ECF No. 16 at 13. Nor does it matter that

3  the other exemptions pertain to public accommodations and housing.

4  *Tandon* "summarily rejected" such a narrow rule. *See* 593 U.S. at 64.

5  What matters is if the State permits *any* comparable secular conduct

6  that undermines its interests. *Id.* at 62. The secular conduct need not be

7  identical. For instance, the majority in *Tandon* rejected the dissent's

8  view that in-home secular gatherings were "the obvious comparator" to

9  in-home religious gatherings *Id.* at 65 (Kagan, J., dissenting). Instead,

10  the Court held *in-home* religious gatherings were "comparable" to less-

11  regulated *public* gatherings because both posed the same risk to the

12  state's interest in stopping Covid. *Id.* at 63–64.

13    And consider the Ninth Circuit's recent en banc decision in *FCA*,

14  which was decided after the Mission appealed the dismissal order. 82

15  F.4th 664. There, a public school district stripped a Christian student

16  group of official status because the group—which "welcome[d] all

17  students" to join—required its leaders to affirm its "core religious

18  beliefs." *Id.* at 672. The school district asserted interests in "prohibiting

19  discrimination" and "ensuring equal access for all students." *Id.* at 689.

20  But the Ninth Circuit held that the nondiscrimination policies were not

21  neutral or generally applicable because other secular clubs were

22  permitted to "discriminate expressly—even on otherwise protected

23

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 14

1    grounds." *Id.* The South Asian Heritage Club and Senior Women Club,

2    for example, could restrict membership based on ethnicity and sex. *Id.*

3    at 688–89. Even though these groups discriminated differently, their

4    "exclusionary membership requirements pose[d] an identical risk to the

5    [d]istrict's stated interest in ensuring access for all student[s] to all

6    programs." *Id.* at 689.

7         *Tandon* and *FCA* control here. The WLAD purports to eliminate

8    and prevent discrimination but small secular employers, private

9    organizations, and educational institutions can discriminate freely. And

10   they're comparable to the Mission because they present the same "risk"

11   to the State's interest in eliminating and preventing discrimination.

12   However sliced, "there is no meaningful constitutionally acceptable

13   distinction between the types of [discrimination] at play here." *Id.*; *see*

14   *also Youth 71Five Ministries v. Williams,* No. 24-4101, 2024 WL

15   3749842, at *3 (9th Cir. Aug. 8, 2024) (Oregon violated Free Exercise

16   Clause under *Tandon* and *FCA* by awarding grants to secular groups

17   that discriminated in "providing services" but denying grants to a

18   religious organization that required employees to share its religious

19   beliefs). As a result, strict scrutiny applies. *FCA*, 82 F.4th at 690.

20   **B. The WLAD triggers strict scrutiny because it contains**
        **mechanisms for individualized exemptions.**

21

22        The WLAD also uses "a mechanism for individualized exemptions"

23   that allows the State "to decide which reasons for not complying with

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 15

1  [the WLAD] are worthy of solicitude." *Fulton*, 593 U.S. at 533, 537.

2  First, application of the WLAD's religious employer exemption, post-

3  *Woods*, now depends on the State's case-by-case assessment of whether

4  a particular position is religious enough to merit "ministerial"

5  protection. *Woods*, 481 P.3d at 1067 (explaining the "appropriate

6  parameters" of the statutory exemption is fact specific). In fact, the

7  Attorney General admitted that his office will investigate religious

8  organizations in order to "sort[ ] out" and "categor[ize]" employees to

9  "determine which positions are ministerial and which are not." Reply in

10 Supp. of Mot. to Dismiss at 6, *Seattle Pac. Univ. v. Ferguson*, No. 3:22-

11 cv-05540 (W.D. Wash. Oct. 26, 2022). This places a "significant burden"

12 on the Mission by requiring it, "on pain of substantial liability, to

13 predict" which of its 165-plus positions the State "will consider

14 religious" to merit protection. *Amos*, 483 U.S. at 336.

15     Second, the Commission can allow employment discrimination if it

16 decides it is "based upon a bona fide occupational qualification." Wash.

17 Rev. Code § 49.60.180(1). The BFOQ is "an exception to the rule that an

18 employer ... may not discriminate on the basis of protected status."

19 Wash. Admin. Code 162-16-240. And it applies in the Commission's sole

20 discretion when it "believes" a "protected status will be essential to or

21 will contribute to the accomplishment of the purposes of the job." *Id.*

22 This discretion defeats general applicability. And requiring the Mission

23

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 16

1    to seek permission to hire coreligionists for each position before actually

2    doing so "risk[s] [government] entanglement in religious issues," *Our*

3    *Lady*, 591 U.S. at 761, is unworkable, and poses an additional

4    unconstitutional burden on the Mission's religious exercise.

5       Whether it be the State's application of the religious employer

6    exemption or the BFOQ, one thing is clear: the State is able to decide

7    what reasons for not complying with the WLAD are permissible. This

8    "broad discretion to grant exemptions on less than clear considerations

9    removes [the WLAD] from the realm of general applicability and thus

10    subjects [it] to strict scrutiny." *FCA*, 82 F.4th at 688.

11    **C. The WLAD cannot survive strict scrutiny.**

12       The WLAD cannot survive strict scrutiny unless "it advances

13    interests of the highest order and is narrowly tailored to achieve those

14    interests." *Fulton*, 593 U.S. at 541. And the State cannot rely on a

15    "broadly formulated" interest in preventing discrimination "generally"

16    but must have "an interest in denying an exception" to the Mission. *Id.*

17    The State lacks such an interest. There is no legitimate justification for

18    forcing the Mission to hire those who do not share and live out its

19    religious beliefs. And the WLAD's other exemptions "undermine" any

20    contention that the State's interest in eradicating discrimination "can

21    brook no departures." *Id.* at 542.

22       Nor is the WLAD narrowly tailored. If the State "can achieve its

23    interests in a manner that does not burden religion, it must do so." *Id.*

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 17

1    at 541. For over 70 years Washington advanced its interests while

2    exempting nonprofit religious organizations. What's more, federal law

3    proves such an accommodation is more than possible. *See* 42 U.S.C. §

4    2000e1(a) (religious organizations can prefer "individuals of a particular

5    religion to perform work connected with the carrying on ... of its

6    activities"). The WLAD fails strict scrutiny as applied to the Mission.

**III.    The Mission is likely to succeed on its expressive association and free speech claims.**

The WLAD also violates the Mission's First Amendment right "to associate with others in pursuit of ... religious ... ends[,]" including its "freedom not to associate" with people who "may impair [its] ability" to express its views. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647–48 (2000); *see* ECF No. 14 at 21–22. The State's lone response thus far is to argue that this right somehow does not apply because the Mission pays its employees. ECF No. 16 at 15–16. But the right to expressive association applies even in the employment context. For instance, the Second Circuit held the right to expressive association allows an employer "to limit its employees to people who share its views and will effectively convey its message." *Slattery v. Hochul,* 61 F.4th 278, 291 (2d Cir. 2023); *accord Darren Patterson Christian Acad. v. Roy,* 699 F. Supp. 3d 1163, 1184 (D. Colo. 2023) (forcing Christian school to "hire those who disagree with its religious expression and evangelistic mission" violates expressive association); *see also Green v. Miss United*

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 18

1  *States of Am., LLC,* 52 F.4th 773, 804–05 (9th Cir. 2022) (Vandyke, J.,

2  concurring) (similar). So this also triggers strict scrutiny, which the

3  State cannot survive. *See supra* § II.C.

4      Further, the disclosure provision restricts the Mission from asking

5  potential employees about their religious beliefs about marriage and

6  sexuality. *See* ECF No. 14 at 23–25. The State had argued that the

7  disclosure provision "does not restrict [the Mission's] speech in any

8  way." ECF No. 16 at 19. But the Ninth Circuit effectively rejected this

9  argument, holding that the Mission's "requirement that employees and

10 prospective employees disclose their sincerely held religious affiliation

11 or beliefs[ ] arguably violates" the disclosure provision. *Union Gospel*

12 *Mission*, 2024 WL 3755954, at *2.[3]

13 **IV.  An injunction protects the Mission's constitutional rights,**
       **prevents irreparable harm, and benefits the public**
14     **interest.**

15     The Mission satisfies the remaining factors for a preliminary

16 injunction. The Mission suffers irreparable harm every single day by

17 being put to the choice of risking potential WLAD liability for hiring

18 according to its faith, or freezing hiring altogether—which would

19 eventually cause the Mission to shut its doors. In any event,

20 "irreparable harm is relatively easy to establish in a First Amendment

21

22 _____

   [3] As explained in the MPI, the Mission also requests an injunction to
23 permit it to ask employees and prospective employees about their
   religious beliefs, including those beliefs on marriage and sexuality.

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 19

**2-ER-100**

1    case because the party seeking the injunction need only demonstrate

2    the existence of a colorable First Amendment claim." *FCA*, 82 F.4th at

3    694–95 (cleaned up). The Mission has done more than that here.

4        Nor does the State's notice of enforcement about the IT technician

5    and operations assistant change this. First, the Mission seeks an

6    injunction protecting it from WLAD liability for filling any one of its

7    many non-ministerial positions. That's upwards of 50 positions a year—

8    and 14 right now—not just the IT technician and operations assistant.

9    ECF No. 1 ¶ 130. Second, the State's sudden "about-face occurred only

10    after vigorous questioning at argument" before the Ninth Circuit,

11    suggesting that it is motivated "by litigation tactics." *Health Freedom*

12    *Def. Fund, Inc. v. Carvalho*, 104 F.4th 715, 723 (9th Cir. 2024). This

13    "timing is suspect" and "[l]itigants" who attempt to "tactically

14    manipulate the federal courts in this way should not be given any

15    benefit of the doubt." *Id.*

16        Lastly, the balance of hardships "tip[ ] sharply" in the Mission's

17    favor because it has "raised serious First Amendment questions," and

18    "it is always in the public interest to prevent the violation of a party's

19    constitutional rights." *FCA*, 82 F.4th at 695 (cleaned up).

## CONCLUSION

20

21    The Court should issue a preliminary injunction.

22

23

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 20

Respectfully submitted this 20th day of September, 2024,

_s/ Katherine Anderson_
Katherine Anderson
WA Bar No. 41707
Ryan Tucker*
AZ Bar No. 034382
Jeremiah Galus*
AZ Bar No. 30469
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
kanderson@ADFlegal.org
rtucker@ADFlegal.org
jgalus@ADFlegal.org

Jacob E. Reed*
VA Bar No. 97181
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
jreed@ADFlegal.org

*Counsel for Plaintiff*

* Admitted *Pro Hac Vice*

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 21

1

<u>**CERTIFICATE OF SERVICE**</u>

2

I hereby certify that on September 20th, 2024, I electronically filed

3

the foregoing paper with the Clerk of Court using the ECF system

4

which will send notification of such filing to all counsel of record.

5

6

        *s/ Katherine Anderson*
        Katherine Anderson

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Supplemental Mem. in Support of Mot. for Prelim. Inj. - 22

1  ROBERT W. FERGUSON
   Attorney General
2  DANIEL J. JEON
   Assistant Attorney General
3  Attorney General of Washington
   Wing Luke Civil Rights Division
4  800 Fifth Avenue, Suite 2000
   Seattle, WA 98104
5  (206) 464-7744

6

7
                    **UNITED STATES DISTRICT COURT**
8                   **EASTERN DISTRICT OF WASHINGTON**

9  UNION GOSPEL MISSION OF            NO. 1:23-cv-3027-MKD
   YAKIMA, WASH.,
10                                    DEFENDANTS' NOTICE
                Plaintiff,            AND STIPULATION OF
11                                    ENFORCEMENT POSITION
            v.
12
   ROBERT FERGUSON, in his
13 official capacity as Attorney
   General of Washington State,
14 ANDRETA ARMSTRONG, in
   her official capacity as Executive
15 Director of the Washington State
   Human Rights Commission; and
16 DEBORAH COOK,
   GUADALUPE GAMBOA, JEFF
17 SBAIH, and HAN TRAN, in
   their official capacities as
18 Commissioners of the
   Washington State Human Rights
19 Commission,

20              Defendants.

21

22

DEFENDANTS' NOTICE AND              1        ATTORNEY GENERAL OF WASHINGTON
STIPULATION OF ENFORCEMENT                            Civil Rights Division
POSITION                                        800 Fifth Avenue, Suite 2000
1:23-CV-3027-MKD                                    Seattle, WA  98104
                                                      (206) 464-7744

**2-ER-104**

1    Attorney General Robert Ferguson, Executive Director Andreta Armstrong,

2    and Commissioners Guadalupe Gamboa, Han Tran, Jeff Sbaih, Luc Jasmin, and

3    Chelsea Dimas[1] (Defendants) hereby submit this Notice and Stipulation regarding

4    their enforcement of the Washington Law Against Discrimination (WLAD),

5    RCW 49.60 *et seq.*, against Plaintiff Union Gospel Mission of Yakima (UGM).

6    UGM challenges enforcement of the WLAD to its employment practices

7    with respect to its IT Technician and Operations Assistant and publication of its

8    Religious Hiring Policy. Defendants have never investigated UGM about its

9    religious employment practices at all, let alone with respect to these positions or

10    hiring policy. Based on the allegations in UGM's Complaint and the employment

11    records and sworn declaration attached thereto, ECF Nos. 1-8, and taking those

12    allegations as true, Defendants stipulate that they will not enforce the WLAD

13    against UGM in connection with the positions and Religious Hiring Policy as

14    identified in its Complaint and related attachments.

15    DATED this 11th day of September, 2024.

16    //

17    //

18    //

19

20    [1] Plaintiff named Deborah Cook as a Defendant in her official capacity as a Commissioner of the Washington State Human Rights Commission. Ms. Cook no longer serves as a Commissioner. Luc Jasmin and Chelsea Dimas have been

21    appointed as Commissioners and are substituted as Defendants in their official capacity as Commissioners of the Washington State Human Rights Commission

22    pursuant to Fed. R. Civ. P. 25(d).

DEFENDANTS' NOTICE AND                    2                    ATTORNEY GENERAL OF WASHINGTON
STIPULATION OF ENFORCEMENT                                                    Civil Rights Division
POSITION                                                                800 Fifth Avenue, Suite 2000
1:23-CV-3027-MKD                                                          Seattle, WA  98104
                                                                          (206) 464-7744

**2-ER-105**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Respectfully submitted,

ROBERT W. FERGUSON
Attorney General of Washington

_____
DANIEL J. JEON, WSBA #58087
Assistant Attorney General
Wing Luke Civil Rights Division
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
daniel.jeon@atg.wa.gov

DEFENDANTS' NOTICE AND
STIPULATION OF ENFORCEMENT
POSITION
1:23-CV-3027-MKD

3

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

**2-ER-106**

1

**CERTIFICATE OF SERVICE**

2        I hereby certify that the foregoing document was electronically filed with

3   the United States District Court using the CM/ECF system. I further certify that

4   all participants in the case are registered CM/ECF users and that service will be

5   accomplished by the appellate CM/ECF system.

6        DATED this 11th day of September, 2024.

7

8   _____
    TIFFANY JENNINGS

9   Paralegal

10

11

12

13

14

15

16

17

18

19

20

21

22

DEFENDANTS' NOTICE AND                    4
STIPULATION OF ENFORCEMENT
POSITION
1:23-CV-3027-MKD

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF WASHINGTON
 2
    UNION GOSPEL MISSION OF YAKIMA,  ) Case No. 1:23-cv-3027-MKD
 3  WASHINGTON,                      )
                                     ) May 31, 2023
 4                       Plaintiff,  )
                                     ) Richland, Washington
 5  v.                               )
                                     ) Video Conference Motion
 6  ROBERT FERGUSON, et al.,         ) Hearing
                                     )
 7  _____ Defendants. ) Pages 1 to 76

 8

 9               BEFORE THE HONORABLE MARY K. DIMKE
                 UNITED STATES DISTRICT COURT JUDGE
10
                          APPEARANCES:
11
    For the Plaintiff:         Ryan J. Tucker
12                             Rtucker@adflegal.org
                               Jacob Ethan Reed
13                             Jreed@adflegal.org
                               Alliance Defending Freedom
14                             15100 North 90th Street
                               Scottsdale, AZ 85260
15                             480-444-0020

16                             David Knox DeWolf
                               David@albrechtlawfirm.com
17                             5105 E 3rd Avenue
                               Suite 101
18                             Spokane Valley, WA  99201
                               509-495-1246
19
    For the Defendants:        David Ward
20                             David.ward@atg.wa.gov
                               Daniel Jeon
21                             Daniel.jeon@atg.wa.gov
                               Washington State Attorney
22                             General's Office
                               800 Fifth Avenue
23                             Suite 2000
                               Seattle, WA 98104
24                             206-340-6788

25
```

2

1    Official Court Reporter:        Kimberly J. Allen, CCR #2758
2                                    United States District Courthouse
                                     P.O. Box 685
3                                    Richland, Washington 99352
                                     (509) 943-8175

4    Proceedings reported by mechanical stenography; transcript
     produced by computer-aided transcription.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

## INDEX

**Proceedings:**                                                        **Page**

        Argument on Motion to Dismiss by Mr.          7
        Ward
        Argument on Motion to Dismiss by Mr.          23
        Tucker
        Further Argument on Motion to Dismiss         37
        by Mr. Ward
        Further Argument on Motion to Dismiss         42
        by Mr. Tucker
        Further Argument on Motion to Dismiss         47
        by Mr. Ward
        Argument on Preliminary Injunction by         49
        Mr. Tucker
        Argument on Preliminary Injunction by         63
        Mr. Ward
        Further Argument on Preliminary               71
        Injunction by Mr. Tucker
        Comments by The Court                         73

## WITNESS INDEX

**Plaintiff Witness:**                                                   **Page**

   None

\*\*\*\*\*

**Defense Witnesses:**                                                   **Page**

   None

4

**EXHIBITS ADMITTED**

| **Plaintiff Number** | **Description** | **Page** |
|---|---|---|
| | None | |

| **Defense Number** | **Description** | **Page** |
|---|---|---|
| | None | |

**GENERAL INDEX**

**Page**

Reporter's Certificate.............................76

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*                     5
*Video Conference Motion Hearing/May 31, 2023*

1    (Call to Order of the Court)

2        THE COURTROOM DEPUTY:  Matter before the Court is *Union*

3    *Gospel of Yakima v. Robert Ferguson, et al.*, 1:23-cv-3027-MKD.

4    Time set for a motion hearing.

09:05:42  5        Counsel, each time you address the Court, if you could

6    please state your name to assist the court reporter in making an

7    accurate record.  And also, when you're not addressing the

8    Court, please ensure that your microphone is muted.

9        Counsel, please state your presence for the Court and

09:05:56  10    record, beginning with counsel for the plaintiff.

11        MR. TUCKER:  Yes.  Ryan Tucker and also have Jacob Reed

12    in the room with me on behalf of Union Gospel Mission and,

13    likewise -- on the Zoom call, David DeWolf is likewise counsel

14    for the plaintiff.

09:06:14  15        THE COURT:  Good morning.

16        MR. TUCKER:  Good morning.

17        MR. DeWOLF:  Good morning.

18        MR. WARD:  And, Your Honor, on behalf of Defendants, the

19    Attorney General Robert Ferguson, Andreta Armstrong, and the

09:06:25  20    Commissioners of the Washington State Human Rights Commission,

21    I'm appearing, David Ward.

22        THE COURT:  Good morning.

23        MR. WARD:  And I also have co-counsel who -- would you

24    like to make your introduction?

09:06:36  25        MR. JEON:  Good morning, Your Honor.  Daniel Jeon for

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-112**

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*          6
*Video Conference Motion Hearing/May 31, 2023*

1    defendants as well.

2          THE COURT:  Good morning.

3          All right, Counsel, today we're here for argument on two

4    separate motions.  First, I would like to take argument on the

09:06:49  5    defendants' motion to dismiss.  As part of your comments, I did

6    issue a text order last week asking the parties to be prepared

7    to discuss the issue of whether a stay would be appropriate

8    while the Ninth Circuit decides the Seattle Pacific University

9    matter.  The way I see Judge Bryan's order is that he dismissed

09:07:09  10   on two grounds; one, the *Younger* abstention, which is not at

11   issue here; but second, on the issue of redressability, which I

12   do think is an issue here.

13         And so I would like the parties to comment on that,

14   including whether they believe that the framing of this

09:07:22  15   complaint, the relief requested is sufficiently different to --

16   as to whether a stay would be appropriate or not, considering

17   those issues.

18         After we take full argument on the motion to dismiss,

19   then we'll turn to the motion for a preliminary injunction,

09:07:39  20   unless -- had the parties anticipated or discussed any other

21   procedure for today?  Mr. Tucker?

22         MR. TUCKER:  No, Your Honor.

23         THE COURT:  All right.  Mr. Ward, does that process work

24   for you?

09:07:50  25         MR. WARD:  Yes, Your Honor.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-113**

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Motion to Dismiss by Mr. Ward*

7

1    THE COURT:  All right.  We'll begin with defendants'

2    motion to dismiss.  It's defense's motion, so I'll hear from

3    Mr. Ward first.

4    MR. WARD:  Thank you, Your Honor.

09:08:00  5    And before I start, do you have any time limit for the

6    motions?

7    THE COURT:  That's a great question.  I should have

8    started with that.  I have the entire morning booked, and so you

9    have until noon.  So please frame your comments with knowing I

09:08:17  10    can give you about an hour and a half on each motion.

11    MR. WARD:  Thank you, Your Honor.  I don't anticipate

12    we'll need that much, but it's nice to have that much time.

13    And, Your Honor, again, David Ward appearing for

14    defendants.  I would like to reserve time for rebuttal.  I

09:08:32  15    think, given the time period that you're allowing, ten minutes

16    probably for rebuttal.  But I'd like to begin --

17    THE COURT:  I am not -- I am not particularly

18    formalistic about the timing of motions.  If something comes up

19    in the course of argument, I may hear from each of you two or

09:08:48  20    three times, so I don't have --

21    MR. WARD:  Okay.

22    THE COURT:  -- I don't have a strict argument, response,

23    rebuttable.  We'll see how the argument develops.

24    MR. WARD:  Okay.  Thank you, Your Honor.

09:08:58  25    And to begin with the issue you asked us to be prepared

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-114**

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*          8
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Motion to Dismiss by Mr. Ward*

1    to discuss, whether a stay would be appropriate in this case

2    until the Ninth Circuit issues its decision in the *Seattle*

3    *Pacific University v. Ferguson* case, defendants have not

4    requested a stay as part of their pleadings in this matter, and

09:09:16    5    we don't believe a stay is necessarily warranted in this case,

6    based on the issues that the Court has raised.

7             As the Court has recognized, there are some differences

8    between the *SPU* case and this case.  In particular, that *Younger*

9    abstention was an issue that Judge Bryan relied upon in granting

09:09:41    10   the motion to dismiss in the *SPU* case.

11            The issue of redressability is up in both cases.  It's

12   an active issue in both cases.  But I don't believe there's

13   certainty that the Ninth Circuit decision will necessarily reach

14   that issue.  There's not a lot of certainty that there will be a

09:10:04    15   simplification of the issues, depending on the Ninth Circuit's

16   decision.

17            And looking at the *Landis* factors for issuing a stay,

18   you know, a key question is whether the case could be

19   simplified, and I don't think we have that kind of certainty

09:10:19    20   here, although I would acknowledge it is a possibility.

21            So defendants are not advocating for a stay here.  We do

22   recognize that the Court has the inherent authority to raise

23   this issue sua sponte, but we would not seek one on our own

24   initiative.

09:10:38    25            So getting to the merits of our motion to dismiss, this

```
                Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD     9
                     Video Conference Motion Hearing/May 31, 2023
                     Argument on Motion to Dismiss by Mr. Ward
```

1    case was brought out of the blue, from defendants' perspective.

2    Defendants had not had any kind of contact with the Union Gospel

3    Mission of Yakima regarding their religious hiring practices

4    before we received the complaint in this matter.  And defendants

09:11:06  5    have not taken or threatened any enforcement actions against the

6    organization.

7             Under these circumstances, UGM's highly unusual

8    complaint in this matter must be dismissed because it does not

9    present any judiciable claims.

09:11:23  10            As a threshold matter, UGM lacks standing to bring the

11    claims in its complaint because it fails all three prongs that

12    must be satisfied in order to have standing.  First, UGM has not

13    suffered any injury, in fact.  Second, defendants have not

14    caused any of UGM's alleged injuries.  And finally, none of

09:11:40  15    their alleged injuries -- I'm sorry -- their alleged injuries

16    are not redressable by this Court.

17             And it -- in addition to that, there is the ripeness

18    doctrine, and UGM's speculative claims here are just simply not

19    ripe for review.

09:11:55  20            So I'd like to begin with the standing issue.  Standing

21    is obviously a threshold issue for the Court to decide, and it

22    goes to the Court's subject matter jurisdiction.  And UGM has

23    the burden to demonstrate that it satisfies every element of

24    standing for every claim and every form of relief it sought.  As

09:12:11  25    I mentioned before, the three elements of standing are familiar:

```
                Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD    10
                     Video Conference Motion Hearing/May 31, 2023
                     Argument on Motion to Dismiss by Mr. Ward
```

            1   injury in fact, causation, and redressability.  And injury in

            2   fact is what I'd like to start with.

            3           An injury in fact has to be, obviously, concrete and

            4   particularized, where enforcement is actual or imminent.  It

09:12:29    5   can't be conjectural or hypothetical.  And here, there is no

            6   actual enforcement alleged against UGM of the statute or court

            7   decision that they are complaining about, nor is enforcement

            8   imminent on the part of defendants.  UGM is simply speculating

            9   that it could be the target of an action by defendants, such as

09:12:52   10   an investigation or an enforcement action under the Washington

           11   Law Against Discrimination, at some point in the future.  But it

           12   does not allege that defendants have taken or threatened any

           13   kind of action against them, and nor could they.

           14           The only thing that UGM points to is a single letter

09:13:10   15   that the Attorney General's office sent to Seattle Pacific

           16   University last year.  That letter sought information about the

           17   university's hiring practices after the university -- or

           18   sorry -- after the Attorney General's office had received

           19   hundreds of complaints from members of the public.  The letter

09:13:27   20   requested information from Seattle Pacific University, but there

           21   were absolutely no consequences to the university if it declined

           22   to provide the information that was requested by the Attorney

           23   General's office.

           24           The letter that was sent specifically noted, as well,

09:13:42   25   that the Attorney General had not made any determination as to

```
                Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD      11
                      Video Conference Motion Hearing/May 31, 2023
                        Argument on Motion to Dismiss by Mr. Ward
```

1    whether SPU had violated the law, and did not threaten any legal

2    action.

3         Seattle Pacific University did in that case decline to

4    provide the information that had been requested by the Attorney

09:13:56  5    General's office, and instead, they filed a lawsuit against the

6    Attorney General, which, as you know, Judge Bryan dismissed on

7    both redressability and *Younger* abstention grounds.

8         And here as well, UGM's complaint should be dismissed

9    for lack of standing.

09:14:11  10        THE COURT:  Let me ask a couple of questions about the

11   *SPU* matter.  Has the Attorney General's office or any of the

12   other entities involved in this action taken any further steps

13   with respect to the *SPU* matter beyond the letter that was at

14   issue in the litigation?

09:14:26  15        MR. WARD:  No, Your Honor.

16        THE COURT:  All right.  No further action has been taken

17   since that matter was dismissed?

18        MR. WARD:  No, Your Honor.

19        THE COURT:  All right.  And has --

09:14:37  20        MR. WARD:  The --

21        THE COURT:  -- the Attorney General's office or any of

22   the other entities at issue sent any type of similar letters to

23   other entities, based on the Supreme Court's interpretation in

24   *Woods*?

09:14:51  25        MR. WARD:  No, Your Honor.

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*        12
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Motion to Dismiss by Mr. Ward*

1       THE COURT:  All right.  And, I'm sorry, you indicated

2   you might have been wanting to follow up or clarify on a

3   question I just asked when I started another one.

4       Was there something you wanted to add?

09:15:01    5       MR. WARD:  No, Your Honor.  I was just going to point

6   out that the briefing is ongoing in the *SPU v. Ferguson* case,

7   and our brief is due this -- the Attorney General's office's

8   brief is due this Friday in response to Seattle Pacific

9   University's opening brief.

09:15:21   10       THE COURT:  All right.  Thank you.

11       MR. WARD:  Yes.

12       Now, when we look at injury in fact, the US Supreme

13   Court's decision in 2021 in *Whole Woman's Health v. Jackson* is

14   very instructive.  The Court in that case emphasized that

09:15:39   15   there's no unqualified right to a pre-enforcement review of

16   constitutional claims in federal court.  The Supreme Court noted

17   that in such cases pre-enforcement challenges are frequently

18   brought as defenses to state law claims, if there's an actual

19   case or controversy brought in state court.

09:15:59   20       The Court also emphasized that the mere chilling effect

21   of having a potentially unconstitutional law on the books is not

22   sufficient to confer an injury in fact.  There must be proof of

23   a more concrete injury.

24       In order to maintain a pre-enforcement challenge before

09:16:14   25   the -- a government entity takes action against a party, there

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-119**

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*          13
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Motion to Dismiss by Mr. Ward*

1    has to be a credible threat of prosecution.  That's been

2    emphasized by the US Supreme Court in the *Driehaus* case.  This

3    analysis includes three factors: whether the plaintiffs have

4    articulated a concrete plan to violate the law in question;

09:16:34    5    whether the prosecuting authorities have communicated a specific

6    warning or threat to initiate proceedings; and third, the

7    history of past prosecution or enforcement under the alleged

8    statute.

9         Now, on the first point, we don't have a lot of facts

09:16:51   10    here to determine whether the WLAD, the Washington Law Against

11    Discrimination, even would apply to the Union Gospel Mission's

12    employment practices.  Defendants, as I mentioned before, did

13    not have any knowledge of UGM's hiring practices before this

14    complaint was filed.  They were not under investigation.  They

09:17:13   15    were not subject to any enforcement actions by defendants,

16    particularly with respect to their religious hiring practices.

17         UGM is maintaining in their complaint that they are

18    subject to the WLAD because they have non-ministerial as well as

19    ministerial employees.  However, in the exhibits that are

09:17:38   20    attached to their complaint, which are part of the pleading

21    under Rule 10(c), UGM asserts a very different story.  They

22    assert, in particular in Exhibit 4 to their complaint, that all

23    of their employees are, quote, what is called a minister, by law

24    and judicial decision.  The job descriptions for the two

09:18:00   25    positions that they have put forward here as examples of where

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-120**

```
              Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD        14
                    Video Conference Motion Hearing/May 31, 2023
                     Argument on Motion to Dismiss by Mr. Ward
```

          1   they are allegedly chilled in hiring, their IT technician and

          2   operations assistant positions, similarly those job descriptions

          3   indicate that the employees are expected to minister to Union

          4   Gospel Mission's clients and others in the Mission.

09:18:25  5       So on the face, we have some conflicting information

          6   from UGM itself about whether it employs ministerial or

          7   non-ministerial employees.  If they do actually only employ

          8   ministerial employees, there's no question that the WLAD would

          9   not apply to them, and any effort by the Court in this case to

09:18:47 10   decide matters would simply constitute an advisory opinion

         11   because UGM would not be subject to the WLAD plainly under *Woods*

         12   or under US Supreme Court precedent.

         13       Now, on the second point, to whether there's a credible

         14   threat of prosecution, whether the prosecuting authorities have

09:19:04 15   communicated a specific warning or threat to initiate

         16   proceedings, as I mentioned before, there is zero evidence or

         17   allegation that any of the defendants have communicated such a

         18   specific warning or threat to initiate proceedings against UGM.

         19   And there are cases where -- you know, cited in the parties'

09:19:26 20   briefs such as the *Yellen* case or *Bonta* case, where there were

         21   such specific threats in the form of communications from the

         22   government to the parties who were alleging injury, that the

         23   law -- that they would -- that the law that was being challenged

         24   was applicable to them.

09:19:45 25       No such communication has gone forward to Union Gospel

```
                    KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
                           OFFICIAL COURT REPORTER
```

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*          15
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Motion to Dismiss by Mr. Ward*

1   Mission.  Indeed, even in the *SPU* case, the letter from the

2   Attorney General's office specifically said that there had been

3   no determination of whether they were violating the law.  It was

4   an inquiry to open an investigation based on complaints that

5   were received from many members of the public.  And that, again,

6   was only communication that any of the defendants have issued to

7   anyone in the state regarding the possible application of the

8   WLAD to a religious organization.

9          That is simply not sufficient to meet the second

10   criteria, to show a specific and credible threat of prosecution.

11          On the third point, the history of past prosecution or

12   enforcement of the challenged statute, again, this is very

13   sparse.  As UGM itself acknowledges, there simply is not a

14   history of past prosecution enforcement of the WLAD against

15   religious organizations as employers.

16          Now, UGM suggests that the reason for the sparse

17   enforcement is because the *Woods* decision is only two years old,

18   the decision from the Washington Supreme Court that is

19   essentially what UGM is challenging in this case.  However, UGM

20   entirely ignores that in 2014 the Washington Supreme Court in

21   *Ockletree V. Franciscan Health Systems* also had held that the

22   WLAD's religious employer exemption was unconstitutional as

23   applied to a particular plaintiff.  And in that case what we

24   would regard as the controlling opinion in this case by Justice

25   Wiggins indicated that the WLAD could be applied against a

```
          Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD    16
                   Video Conference Motion Hearing/May 31, 2023
                     Argument on Motion to Dismiss by Mr. Ward
```

 1   religious employer in cases where the job duties of the employee

 2   were wholly unrelated to religious -- religious belief or

 3   practice.

 4          So it's been almost ten years since the Washington

09:21:50   5   Supreme Court has held that the WLAD's religious employer

 6   exemption can be, in appropriate cases, applied to religious

 7   employers.  And in that history, there is simply no record that

 8   defendants, or anyone else, has brought an enforcement action

 9   against UGM based on its religious hiring practices.  That,

09:22:17  10   again, would mitigate against finding that there is a credible

11   threat of prosecution, because the history of past prosecution

12   and enforcement is simply not there.

13          When we're looking at cases that address injury in fact,

14   this case is more like the cases we cited in our brief, the

09:22:34  15   *School of Ozarks v. Biden*, for instance, from the Eighth Circuit

16   and *Thomas v. Anchorage Equal Rights Commission*, cases where

17   there simply was not enough to show that there was a credible

18   threat of prosecution against the party who was seeking to bring

19   a pre-enforcement challenge to a statute.

09:22:54  20          Turning to the second prong of standing, causation, in

21   order to have standing, plaintiffs have to show -- a plaintiff

22   must show that their alleged injuries are fairly traceable to

23   the actions of defendants.  Here, there's really no evidence or

24   allegation that defendants have done anything to cause any

09:23:18  25   injury to UGM.

```
                Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD      17
                    Video Conference Motion Hearing/May 31, 2023
                    Argument on Motion to Dismiss by Mr. Ward
```

1          In the complaint, UGM complains primarily about the

2    conduct of third parties towards them, particularly posts that

3    appeared on Reddit, posts that -- or voice-mails that were

4    received by them from third parties.  But defendants are not

09:23:39  5    responsible for that, and the conduct that allegedly chills

6    their speech is not fairly traceable to defendants.

7          At bottom, what UGM is unhappy about in this case is the

8    *Woods* decision from the Washington Supreme Court.  The *Woods*

9    decision goes to some -- you know, the *Woods* decision was an

09:24:01  10   as-applied challenge to the religious employer exemption under

11   the WLAD.  It did not, as UGM suggests, open the door to, I'd

12   say, the parade of horribles that they have put forward in this

13   case.  It was an as-applied challenge to the religious employer

14   exemption.

09:24:24  15         The Washington Supreme Court was very careful in its

16   analysis.  Contrary to what UGM has suggested, the Washington

17   Supreme Court did look to federal constitutional law very

18   carefully in its analysis, and under the facts of that case,

19   they decided that the plaintiff in the case, Matthew Woods,

09:24:45  20   could proceed forward with his case, but they did not rule in

21   his favor.  Instead, the Court said that if Mr. Woods could show

22   that the position he sought at the Seattle Union Gospel Mission

23   was a non-ministerial position -- he was seeking a position as a

24   lawyer in their legal aid clinic -- that he could have a valid

09:25:07  25   claim under the WLAD against Seattle Union Gospel Mission.

```
            Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD      18
                   Video Conference Motion Hearing/May 31, 2023
                   Argument on Motion to Dismiss by Mr. Ward
```

           1        And what *Woods* emphasizes is that -- again, this was an

           2   as-applied challenge.  The Washington Supreme Court upheld the

           3   facial constitutionality of the WLAD's religious employer

           4   exemption.  It did not strike it down.  It was a decision that I

09:25:30   5   think will have to be applied in future cases on a case-by-case

           6   basis, as one would do with as-applied challenges.

           7        UGM's fears that it's going to be subject to enforcement

           8   action at this point is simply speculation because they've

           9   received no kind of threat from any of the defendants of such an

09:25:49  10   action.

          11        But the issues here also get to the point in *Woods* that

          12   *Woods* was a state court decision by the highest court of

          13   Washington state.  Seattle's Union Gospel Mission sought review

          14   of the decision in the US Supreme Court, and the US Supreme

09:26:08  15   Court denied review of that case.  At this point, to the extent

          16   that UGM is challenging the *Woods* decision in this case, they

          17   cannot ask this Court to review it; only the US Supreme Court

          18   can review the *Woods* decision.  This Court cannot overturn the

          19   *Woods* decision.

09:26:28  20        UGM tries to suggest that it's not challenging the *Woods*

          21   decision, but that assertion is contradicted in its complaint,

          22   which repeatedly cites *Woods*' narrowed interpretation of the

          23   WLAD as the basis of their alleged injuries, and explicitly

          24   requests a declaration that this narrowed interpretation is

09:26:46  25   unconstitutional.

```
            Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD      19
                    Video Conference Motion Hearing/May 31, 2023
                     Argument on Motion to Dismiss by Mr. Ward
```

1              And these are getting to redressability questions, Your

2      Honor, because any decision by this Court on plaintiff's

3      complaint would not be binding on Washington state courts.

4      *Woods* would still be the applicable -- would still be applicable

09:27:01  5    in Washington state courts, and UGM would still be potentially

6      open, in state courts, to lawsuits by private parties to enforce

7      the WLAD.

8              UGM's complaint here alleged that its First Amendment

9      rights are being chilled by the *Woods* decision.  And to the

09:27:23  10   extent the Court can offer any relief on that, it can't do

11     anything in this action to restrain private parties from

12     enforcing the WLAD, potentially, against Union Gospel Mission.

13     And that defeats redressability in this case because any order

14     by this Court will not relieve UGM of the potential of threat of

09:27:47  15   a WLAD lawsuit.  And UGM itself points to the threat of lawsuits

16     by private parties as one of their alleged injuries, in

17     Paragraph 165 of their complaint.  They also mention this is a

18     potential -- is an injury in their reply brief on the motion to

19     dismiss.

09:28:05  20           Now, there's not a whole lot of case law that considers

21     this kind of issue, but I will note that in the *Whole Woman's*

22     *Health v. Jackson* decision, which we discussed in our brief, and

23     I discussed earlier here, the statute that was being challenged

24     in that case was Texas' law that essentially sought to prevent

09:28:32  25   pre-enforcement review of a statute that restricted abortion in

```
                    Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD        20
                            Video Conference Motion Hearing/May 31, 2023
                            Argument on Motion to Dismiss by Mr. Ward
```

1    the state by giving only private parties the right to enforce

2    the law.  Parties -- the Attorney General of Texas, along with

3    others, was nonetheless sued in that case by people who were

4    challenging -- wanted to challenge the constitutionality of the

09:28:54    5    law.  But the Court held that they could not sue the Attorney

6    General because the Attorney General did not have the authority

7    to enforce the law.

8            But in making this decision, Justice Gorsuch emphasized

9    the point that even if the Attorney General of Texas had the

09:29:10    10    authority to enforce the law -- to enforce the law, any

11    injunction that the Court could issue would only apply to the

12    defendants before the Court.  It would not apply to the private

13    parties who would also be able to bring enforcement actions

14    against people who were seeking abortions or who violated the

09:29:32    15    law.

16            And that goes, I think, again to the issue of

17    redressability here, where the US Supreme Court was recognizing

18    that -- you know, without using the term "redressability," that

19    it's not -- the Court cannot provide effective relief in a case

09:29:47    20    where somebody is challenging a law that private parties are

21    just as well equipped to enforce as government officials.  And,

22    indeed, under Washington state law, the Washington Supreme Court

23    has emphasized that private parties are essential to enforcement

24    of the WLAD and, in fact, serve as private attorney generals

09:30:07    25    [sic] when they bring actions under the WLAD.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

2-ER-127

```
            Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD    21
                    Video Conference Motion Hearing/May 31, 2023
                      Argument on Motion to Dismiss by Mr. Ward
```

          1              So redressability in this case is -- cannot be provided

          2      by this Court because there's no ability of this Court to

          3      immunize UGM from the alleged injuries they complain about.

          4      They complain about the possibility that the WLAD will be

09:30:25  5      enforced against them, and this Court cannot restrain everyone

          6      in the state from -- from doing that.

          7              So that's, again, where redressability is a key issue in

          8      this case.

          9              Finally, I would like to turn to the issue of ripeness.

09:30:44  10     Prudential ripeness -- under the prudential ripeness doctrine,

          11     courts look to whether a case is fit for review, as well as

          12     hardship in withholding a decision in determining whether the

          13     Prudential ripeness prong is met.  Two factors are key in

          14     determining the fitness of issues of review.  One is that the

09:31:04  15     issues -- are the issues purely legal?  And two, is the

          16     challenged action final?

          17             Now, here, the issues that are in this case are not

          18     purely legal, as UGM suggests.  Instead, as I noted earlier,

          19     UGM's own pleadings in this case create, at least at minimum, a

09:31:25  20     contradiction about whether they employ ministerial or

          21     non-ministerial employees, or both.  If they only employ

          22     ministerial employees, as their exhibits to their complaint

          23     suggest, the WLAD doesn't apply at all to them, and anything

          24     that this Court would do would simply be an advisory decision --

09:31:45  25     I'm sorry, an advisory opinion.  And so further factual

```
                 Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD    22
                      Video Conference Motion Hearing/May 31, 2023
                      Argument on Motion to Dismiss by Mr. Ward
```

1    development would be required in order to resolve that issue.

2           Also here, the challenged action by UGM is not final.

3    To the extent they're -- you know, the action they're

4    challenging is enforcement of the WLAD, there's just no

5 [09:32:08]   enforcement history at all by defendants against UGM, and the

6    only enforcement -- alleged enforcement action that they point

7    to is a single letter that was sent to Seattle Pacific

8    University, which is also not a final action, because that

9    letter indicated that the Attorney General's office had not made

10 [09:32:28]   any determination that there was a violation of the law but was

11   simply seeking information.

12          THE COURT:  Isn't one of UGM's arguments that they are

13   entitled as one of the -- the First Amendment rights they are

14   asserting to hire only people of their own religion,

15 [09:32:48]   co-religionists?  And isn't that a purely legal issue as opposed

16   to the underlying factual inquiry that would be necessary to

17   determine ministerial and non-ministerial employees?  Isn't

18   the -- one of the other arguments they assert, about their

19   entity should have the right to hire only co-religionists, isn't

20 [09:33:05]   that purely a legal issue?

21          MR. WARD:  Your Honor, that would be purely a legal

22   issue if they actually had, but it's not one that should be

23   reached if they don't have standing to maintain this action in

24   the first place.  That is an issue that really should be teed up

25 [09:33:17]   in a case where you're not dealing with an employer who you

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*   23
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Motion to Dismiss by Mr. Tucker*

1    can't even tell whether they have non-ministerial employees,

2    because otherwise, if they only employed ministerial employees,

3    there's no need to reach the co-religionist issue at all because

4    they would not be subject to the WLAD.

09:33:37    5         So in closing, Your Honor, I would like to urge the

6    Court to dismiss UGM's complaint with prejudice for lack of

7    standing or lack of ripeness.  And I would also just echo what

8    the Ninth Circuit said in *Thomas v. Anchorage Equal Rights*

9    *Commission*, that this is a case in search of controversy, and

09:34:06   10    it's not judiciable, for the reasons we've discussed in our

11    briefing and here today.

12         Thank you, Your Honor.

13         THE COURT:  Thank you.

14         All right.  Mr. Tucker, are you making the arguments on

09:34:18   15    behalf of the plaintiffs?

16         MR. TUCKER:  (Inaudible.)

17         THE COURT:  Oh, Mr. Tucker, I think you might be on

18    mute, sir.

19         MR. TUCKER:  I'm terribly sorry, Your Honor.

09:34:27   20         THE COURT:  That's all right.

21         MR. TUCKER:  Yes, the answer to the question is "yes."

22         Ryan Tucker on behalf of the Union Gospel Mission of

23    Yakima.

24         I'll start first with the Court's question that it posed

09:34:42   25    both last week and then also this morning as to whether or not

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

2-ER-130

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*    24
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Motion to Dismiss by Mr. Tucker*

1    the case should be stayed pending the outcome in *SPU v.*

2    *Ferguson*.  I'm pleased to report, at least initially, we agree.

3    We agree with the defense that the case should not, in fact, be

4    stayed, but here's why.  There's really three different, I

09:35:01  5    think, reasons why that is the case.

6         First is the fact that the Mission continues to have

7    ongoing harm.  It's chilling its speech.  It has a religious

8    hiring statement that it would like to post.  It has two

9    non-ministerial positions.

09:35:19  10         And, Your Honor, if I could just pause for a moment, I

11    think there's some feedback.  I don't know if that's on -- I

12    just want to make sure Your Honor can hear me.

13         THE COURT:  I'm not having any feedback issue.

14         Is -- I just want to confirm:  Is everyone else muted?

09:35:32  15    Because sometimes that can happen when someone is not muted.

16         MR. TUCKER:  Okay.

17         THE COURT:  Okay.  All right.  Is the feedback

18    distracting to you, Mr. Tucker?

19         MR. TUCKER:  No, I --

09:35:40  20         THE COURT:  Okay.

21         MR. TUCKER:  No, I can manage.

22         THE COURT:  Okay.

23         MR. TUCKER:  So, I'm sorry, Your Honor, going back,

24    there's three different reasons.  First is the continuing,

09:35:49  25    ongoing harm that the Mission has.  It's chilling its speech.

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*          25
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Motion to Dismiss by Mr. Tucker*

1    It has a hiring statement.  It has two non-ministerial positions

2    that it would like to post, two that it would like to fill by

3    July 1st, this fiscal year.  And in order to do that, it

4    necessarily needs relief from this Court.

09:36:10   5         And in addition to those two non-ministerial employees,

6    the Mission also has approximately four dozen positions

7    throughout the year that it needs to -- to hire.  Excuse me.

8         So I think just from a practical perspective -- sorry,

9    Your Honor -- we have a case that's pending at the Ninth.  We

09:36:40  10    don't know when the Ninth is actually going to issue its

11    decision.  And so the Mission is simply not in a position to be

12    able to wait a year, let alone months, or even weeks, for a

13    final determination from the Ninth.  So the ongoing harm is the

14    first reason why.

09:36:58  15         The second one is the fact that the claims and the facts

16    in the *SPU* case are -- are different.  If you look at the

17    underlying complaint brought by Seattle Pacific, they bring

18    claims of retaliation, targeting, hostility.  Those are claims

19    that -- that we do not allege in this lawsuit.  They also

09:37:19  20    underscore the need for declaratory relief relative to the

21    ministerial exception.  The ministerial exception claims are not

22    claims that we have brought also in this lawsuit.  The

23    ministerial exception claims, though, however, I think were at

24    least part and parcel to the -- to the reason why the -- the

09:37:42  25    judge, Judge Bryan, chose to dismiss that case on redressability

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-132**

```
              Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD    26
                      Video Conference Motion Hearing/May 31, 2023
                       Argument on Motion to Dismiss by Mr. Tucker
```

```
            1    grounds.  He looked at it and said, "Well, wait a second.  I'm

            2    going to have to go through and potentially parse through all of

            3    these different positions to determine whether or not they're

            4    ministers or not."

09:37:57    5         We're not asking for that here.  There's no need for the

            6    Court to do so.

            7         The third reason why the -- the case, I think, should

            8    not be stayed, it has to do with what Judge Bryan found really

            9    to be the most important reason why that case was dismissed, and

09:38:17   10    that deals with the abstention issues.  On the one hand, the

           11    defendants are saying, "Look, we sent a letter.  Because of that

           12    letter, the ongoing quasi-criminal investigation, SPU can't have

           13    its day in court because of abstention grounds."  So the one

           14    hand they're saying that.  They're saying abstention requires

09:38:42   15    dismissal there.  And then they come over here to this case and

           16    say, "Well, guess what?  You guys didn't get a letter, and so

           17    there's no case or controversy."

           18         Under the defendants' theory, Seattle -- the Union

           19    Gospel Mission of Yakima could never have its day in court.  And

09:38:57   20    so I think, you know, that issue alone again underscores why not

           21    just the fact that the stay would be inappropriate but also

           22    underscores the rights that -- that Yakima has to being in court

           23    here today.

           24         Now, let me sort of transition here to some of the

09:39:19   25    arguments that opposing counsel referenced, and let me sort of
```

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*      27
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Motion to Dismiss by Mr. Tucker*

1    frame this with this overarching point, and that is the fact

2    that this case is about whether, really, the state can force a

3    religious organization to hire employees who do not share its

4    religious beliefs.  The Union Gospel Mission of Yakima believes

09:39:43   5    the answer to that question is certainly "no," as doing so would

6    not only undermine its autonomy, but would actually put into

7    question its continued viability.

8        It was started in 1936.  It was founded as a Christian

9    ministry to serve the less fortunate and to spread its religious

09:40:03  10    beliefs and ideals in that community.  Because the Mission is a

11    religious organization, just like a house of worship, it

12    maintains an internal community of like-minded believers who

13    agree with and adhere to its religious beliefs, so that the

14    Mission is able to effectively and accurately further its

09:40:22  15    ministry work.

16        Yet, the Washington Law Against Discrimination, WLAD,

17    impedes the Mission's ability to do just that by penalizing the

18    Mission for employing only those who are completely on board

19    with religious beliefs.  This isn't hypothetical.  It's

09:40:40  20    concrete.  In fact, the Attorney General made that very clear,

21    that the First Amendment does not protect non-ministerial

22    employees.  So that's why the Mission brought this lawsuit,

23    that's why the Mission paused hiring for its two open

24    non-ministerial positions, again, positions it hopes to fill by

09:41:00  25    July 1st, and withheld its speech on those topics, all to avoid

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-134**

```
            Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD        28
                    Video Conference Motion Hearing/May 31, 2023
                    Argument on Motion to Dismiss by Mr. Tucker
```

1     WLAD enforcement and penalties.

2            As opposing counsel referenced, there are -- turning to

3     the standing arguments, of course, there are three standing

4     elements.  The *Susan B. Anthony List* outlines those well, the

09:41:17   5     Supreme Court decision from 2014, the first being injury in

6     fact.  And when we look at injury in fact, there are three

7     elements below that.  The first one:  Whether the plaintiff has

8     alleged an intention to engage in a course of conduct arguably

9     affected the constitutional interest.  Defendants don't really

09:41:35   10    challenge that one.

11           They also don't really challenge the -- whether the

12    conduct is arguably prescribed by the law being challenged.  So

13    again, that one is not really at issue.

14           But I would say, as an aside, because I do think this is

09:41:48   15    a very important admission by the Attorney General in the *SPU*

16    case, if you look at Page 17 of their motion to dismiss, they

17    say very clearly that the First Amendment clearly protects, it

18    goes on to say, employment practices with respect to its

19    ministers, but those protections do not extend to discrimination

09:42:08   20    against, and it goes on, non-ministerial employees whom the

21    WLAD's prohibition of employment discrimination on the basis of

22    sexual orientation applies.

23           So it's very clear that to the extent you have

24    co-religionists, people that do not classify as ministers, that

09:42:28   25    you are in trouble and in potential violation of the WLAD.

```
                    Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD        29
                          Video Conference Motion Hearing/May 31, 2023
                          Argument on Motion to Dismiss by Mr. Tucker
```

             1          The element under injury in fact that opposing counsel

             2   focused primarily on, and where we have the greatest

             3   disagreement, is this credible threat of enforcement.  And as

             4   Mr. Ward mentioned, you look at the *Thomas* factors, and when

09:42:49     5   analyzing those *Thomas* factors, the first is whether or not

             6   there's a concrete plan -- whether the plaintiff has alleged a

             7   concrete plan to violate the law.  This one, again, is not at

             8   issue.  We have alleged that in our complaint, that we intend to

             9   resume hiring on Indeed.com, that we would like to continue

09:43:09    10   hiring only co-religionists for its IT technician and operation

            11   assistant, and, really, for other non-ministerial positions as

            12   well, but for the WLAD and its enforcement.

            13          The second one that counsel spent some time on was

            14   whether or not there's a specific warning or threat.  And I

09:43:31    15   really want to emphasize to the Court the importance of some

            16   recent Ninth Circuit case law that I think is directly on point.

            17   One is the *Tingly* decision from 2022.  Its standing analysis is

            18   on point here.  And there the Court said you don't need a

            19   specific threat to the Mission.  I don't have to receive a

09:43:54    20   letter from the Attorney General or from the Commission in order

            21   to be able to meet this -- this element.  In fact, very

            22   importantly, *Tingly,* and other Ninth Circuit cases, says that

            23   the failure to disavow is -- is enough.  If you read *Tingly*, it

            24   says:  We have interpreted the government's failure to disavow

09:44:17    25   enforcement of the law as weighing in favor of standing.

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*    30
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Motion to Dismiss by Mr. Tucker*

1    We -- we see that also in the *Italian Colors* case.  We

2    see that also in *Cal Trucking*, which is another important Ninth

3    Circuit decision, where there was an opportunity during the

4    hearing itself for opposing counsel to disavow.  And the failure

09:44:40    5    to disavow meant that there really -- there is a case in

6    controversy.

7        So I think here the main point is the defendants really

8    have to answer the question:  Either the Union Gospel Mission

9    can hire those who it wants to hire or it can't.  If defendants

09:44:58    10    say, "Well, we are not sure, it's unclear," then we get to stay

11    in court.  If the defendants want to say, "Sure, go ahead, you

12    can hire who you want," well, then I admit that we wouldn't have

13    a case or controversy.  But we've had this case on file for two

14    months, and I have not heard that to this point.

09:45:16    15        Past enforcement, this third *Thomas* factor, I think is

16    the least important as far as when you -- when you weigh them.

17    Here we still have -- have checked the box, if you will, on this

18    one.  The issue of -- or the history of past enforcement carries

19    little weight when the challenged law is either new or even, in

09:45:39    20    this instance, when there has been little enforcement or a

21    recent change to its enforcement.  The *Tingly* case again

22    discusses that.

23        THE COURT:  What about -- what about defendants'

24    argument that the change in law really isn't all that recent,

09:45:53    25    that the Court signaled its understanding of the law or its

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

2-ER-137

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*    31
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Motion to Dismiss by Mr. Tucker*

1    interpretation of the law back in *Ockletree* in 2014, so the

2    change really isn't that recent, so the fact that in nine years

3    there's been no enforcement of the way that plaintiffs are

4    concerned about, with the exception of one letter sent to SPU,

09:46:12    5    so how do you respond to that?

6        MR. TUCKER:  A few different responses.  First off, Your

7    Honor, I respectfully disagree with the, I think, opposing

8    side's view of *Ockletree*.  Of course, that is not shocking,

9    because I think there's law review articles trying to figure out

09:46:27    10    exactly what that case meant.  That was a very fractured

11    decision, and even the concurring opinion that's cited by

12    opposing counsel is -- I don't agree that that is actually what

13    that case held.

14        But putting aside our disagreement as to what *Ockletree*

09:46:44    15    actually says in 2014, the reality is we have ongoing harm now,

16    and we have enforcement now, by government officials

17    interpreting the law now to provide that -- that religious

18    organizations, like the Mission, no longer have the ability to

19    hire non-ministerial employees.  That -- that enforcement did

09:47:08    20    not happen until this past year, after the Attorney General

21    decided to go after a similarly situated religious organization

22    like Seattle Pacific.

23        And, again, if you look at -- you know, the fact is we

24    don't need an actual letter directed to us.  The fact that past

09:47:31    25    enforcement -- again, it's not even necessary to have past

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*          32
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Motion to Dismiss by Mr. Tucker*

1   enforcement at all, but even the fact that they've gone after a

2   similarly situated entity, if you look at the *Lopez* case, a

3   Ninth Circuit decision from 2010 that we cite in our papers, it

4   says that as well.

5          Moving to the second, *SBA List* factor, causation and

6   traceability, I think the main point there, Your Honor, just

7   sort of jump to the chase on that, is the causation.  Causation

8   is met when the defendants have -- have authority to -- to

9   enforce the law.

10          Here, you know, we have sued the defendants that have

11   that ability.  When you look at, in 1983 actions, it's the state

12   official's power to enforce the challenged provision that

13   demonstrates that requisite causal connection for standing

14   purposes.  That's the *Planned Parenthood* case out of the Ninth

15   Circuit in 2004.

16          You know, and, again, the real injury here is the

17   enforcement of the WLAD, not the actions of third parties.  We

18   do include what is going on on the outside, the fact that we

19   have, in fact, been the target of inquiries from others that do

20   not care for our religious beliefs.  They have had Reddit

21   exchanges; we've received voice-mails.  That's really color to

22   further underscore the concern.  But if you go back and look

23   even at the *Tingly* case again, you've got a Christian counselor

24   who didn't have any of that.  There he was chilling, and there

25   was the failure by the defendants to disavow that led to -- to

09:47:48
09:48:11
09:48:34
09:48:58
09:49:17

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-139**

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*    33
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Motion to Dismiss by Mr. Tucker*

1    standing.

2          The third component on *SBA List* is redressability.  This

3    one, really the burden, in fact, is -- on us is -- is minimal, I

4    would say, or modest when you look at court precedent.  There,

09:49:40  5    in the *Lujan* decision, the Supreme Court case a few years back,

6    said that if the plaintiff is an object of the law, there's

7    ordinarily little question that the action or inaction caused

8    him injury, and then a judgment preventing or requiring the

9    action will redress it.

09:49:55  10          I think the main argument that defendants make here is,

11    well, wait a second, look, these guys simply want to relitigate

12    *Woods*.  No, Your Honor, that -- the distinction here is -- you

13    know, we're not asking the Court to declare that the Washington

14    Supreme Court decision in *Woods*, that they erred in

09:50:17  15    interpretation of the state constitution.

16          What we're asking for here is to declare that the WLAD,

17    as it sits today, and enforcement of that law by Washington

18    state officials, infringes on the federal Constitution.  And I

19    think importantly, if you go back and look, yes, there was a

09:50:38  20    cert denial in that case, but I think the statement by Justice

21    Alito actually really crystallizes, in fact, how we ended up

22    here today.  You know, Justice Alito says that the Supreme

23    Court -- the Washington Supreme Court's decision there to

24    narrowly construe the Washington religious exemption (inaudible)

09:51:00  25    avoid the conflict with the state constitution may have created

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-140**

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*    34
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Motion to Dismiss by Mr. Tucker*

1    a conflict with the federal Constitution.  That's exactly why

2    we're here today.

3           So we're not here to have a second bite at the apple at

4    *Woods*.  We're here because of a federal constitutional issue.

09:51:15  5    And if you think about it, too, in the context -- let's say that

6    the legislature, for example, had simply amended the WLAD this

7    last year.  I wouldn't be suing the Washington legislature as a

8    result.  Instead, what you would do is you would sue those who

9    are actually enforcing it.

09:51:31  10           Well, that's exactly what we've done here.  We've sued

11    the government enforcement officials that can pursue complaints

12    against the Mission itself.

13           You know, there's also -- there was some concern about,

14    you know, whether or not, you know, relief relative to some

09:51:56  15    injury was enough.  If you look at the *Larson* case, again, out

16    of the Ninth Circuit, 450 -- or, I'm sorry, the *Larson* case out

17    of the United States Supreme Court held that an injunction that

18    relieved some injury is sufficient in the redressability

19    analysis.  The *Wolfson* case we also cite, Ninth Circuit, also

09:52:17  20    bolsters that argument, and I will rely on that briefing and not

21    regurgitate it ad nauseam.

22           Before I turn briefly to ripeness, you know, again,

23    there were a couple points that opposing counsel made.  There

24    was a reference to *Whole Woman's Health*, a US Supreme Court

09:52:40  25    decision.  You know, there I think it's important to recognize

```
                 Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD    35
                       Video Conference Motion Hearing/May 31, 2023
                          Argument on Motion to Dismiss by Mr. Tucker
```

          1   that the Court there, in looking at the standing analysis, you

          2   know, held that there was no case or controversy as to certain

          3   defendants.  Standing was appropriate (inaudible) some

          4   defendants, but standing was not appropriate against the state

09:53:03  5   court judge and the state court clerk.  Here we have the right

          6   enforcement officials.  It's really apples and oranges to our

          7   particular situation.

          8         Counsel also referenced, I think in passing, the *Yellen*

          9   decision.  Again, I -- I go back to the well on this.  A failure

09:53:24 10   to disavow means that we have the right to be here in court.

         11   The *Yellen* case actually says that directly on Page 850, citing

         12   again *Cal Trucking*, which is another Ninth Circuit decision.  So

         13   if you look at really the Ninth Circuit case law in the last

         14   36 months, 48 months, it really spells out exactly why we have

09:53:46 15   standing in this particular case.

         16         Now, as to ripeness, I agree again with opposing

         17   counsel's comment that -- you know, and Your Honor's question

         18   relative to, well, if I'm only asked to comment whether or not

         19   we've got a right to hire co-religionists, isn't that a legal

09:54:05 20   issue, it is.  And this is a purely legal matter.  There was a

         21   reference to the fact that, well, wait a second, if you look at

         22   their exhibits, they're being unclear about the fact that

         23   they -- who they call ministers and who they don't.

         24         Well, obviously, this Mission is a Christian ministry.

09:54:27 25   We cite several paragraphs in our complaint talking about the

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*    36
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Motion to Dismiss by Mr. Tucker*

1    fact that we believe, and that Yakima Mission believes, that

2    it's called by Christ to share the gospel, and so they are on a

3    mission to share the gospel of Christ with others.  In that

4    sense, they do consider themselves to be ministers in a biblical

09:54:47    5    sense, but there's a difference between being a minister in the

6    biblical sense and a minister for purposes of the law, and we

7    have readily admitted that there are certain positions at

8    Yakima, including the very two that we need to hire within 30

9    days, that are non-ministerial positions.  Those are positions

09:55:05    10    that -- that look -- that are -- that are inward in nature,

11    meaning there's an importance to being able to maintain a

12    framework of like-minded individuals in a religious institution.

13        If you think about an individual like Mr. Woods, even in

14    the Seattle case, who says, "I want to come into this religious

09:55:30    15    organization, and I want to change your belief system because I

16    disagree with it," that will unravel the very fabric that binds

17    that institution together.  And, again, Justice Alito, in the

18    statement denying that cert petition -- and the reason that case

19    went back down is because the Supreme Court looked at it and

09:55:53    20    said, "Not now"; the procedural posture.  But I think the

21    warning that Justice Alito gave there, the very fact that if

22    religious organizations don't have the right to -- to bring on,

23    to hire those that are like-minded, then that will completely

24    destroy religious organizations in toto across the board.

09:56:14    25        I'm going to hold -- I have additional thoughts on that,

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-143**

*Union Gospel Mission of Yakima v. Ferguson*/1:23-cv-3027-MKD          37
Video Conference Motion Hearing/May 31, 2023
Further Argument on Motion to Dismiss by Mr. Ward

1    but they're more merits-based, and so I think with that, if Your

2    Honor doesn't have any questions, I can -- I can rest on the

3    briefing that we have relative to the motion to dismiss.

4              THE COURT:  All right.  I do not at this time.

09:56:31   5    I'll turn back to Mr. Ward.

6              MR. WARD:  (Inaudible.)

7              THE COURT:  Oh, you're on mute, Mr. Ward.

8              MR. WARD:  Sorry.  I knew I would do that.

9              THE COURT:  That's all right.

09:56:50  10              MR. WARD:  Thank you, Your Honor.

11              I would like to make a few points in response, in

12   rebuttal.  First, I appreciate that Your Honor brought up the

13   *Ockletree* case, because it was literally ignored by the briefing

14   of plaintiffs in this case, and it is a decision that has been

09:57:12  15   in effect for nine years, and there has been no enforcement

16   authority actions that they can point to under that.

17              UGM seems to suggest that the case law says that

18   basically they have standing regardless of any -- you know,

19   having received no communication from us, having received --

09:57:32  20   having such a sparse history of enforcement.  But that's not

21   simply what the cases stand for.  I mean, the *Tingly* case, for

22   instance, concerned a new statute that was only on the books for

23   a few months, that it had clearly applied to the party who was

24   bringing the challenge.

09:57:50  25              Here, we have court decisions from the Washington

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-144**

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*     38
*Video Conference Motion Hearing/May 31, 2023*
*Further Argument on Motion to Dismiss by Mr. Ward*

1    Supreme Court going back to 2014 that have held that religious

2    employers, under proper circumstances, may be subject to

3    as-applied challenges under the WLAD and no history of

4    enforcement.  That is a key distinction.  I mean, a key

09:58:12    5    distinction as well in the *Yellen* and *Cal Trucking* cases that

6    were cited by UGM is that in those cases, the defendants had

7    actually -- the state officials had actually issued letters to

8    the parties -- I'm sorry, the people challenging the law,

9    indicating that the law would be enforced against them or they

09:58:33    10    interpreted the law as being, you know, enforced against them.

11    And we simply don't have that here with UGM.  We don't even have

12    that with SPU.  I mean, in the *SPU* case, the Attorney General's

13    letter simply said that it was opening an inquiry based on

14    complaints, and that it made no conclusion that there was a

09:58:52    15    violation of law.

16             On the issue of, you know, reaching the co-religionist

17    issues in this case, I will point out, I mean, in *Woods* --

18             THE COURT:  Mr. Ward, before --

19             MR. WARD:  Please.

09:59:05    20             THE COURT:  -- before you move on, and I have not --

21    obviously, I think only one brief has been filed with respect to

22    the *SPU* matter.  It's my understanding Judge Bryan did not

23    decide but assumed for the purposes of the decision in that case

24    that the first two factors of standing were met.

09:59:23    25             Is that an issue as to the briefing that's taking place

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*     39
*Video Conference Motion Hearing/May 31, 2023*
*Further Argument on Motion to Dismiss by Mr. Ward*

1    before the Ninth Circuit right now?

2         MR. WARD:  Your Honor, in their opening brief, Seattle

3    Pacific University did brief the injury-in-fact issue.

4         THE COURT:  Okay.

09:59:36  5    MR. WARD:  But we have not filed our response brief yet.

6         THE COURT:  All right.  Well, I --

7         MR. WARD:  I don't recall if there was causation.  Yeah.

8         THE COURT:  Since it's due on Friday, I expected you

9    might know whether there's going to be some discussion of injury

09:59:47  10   in fact.

11        MR. WARD:  Yes, Your Honor.  I can disclose that there

12   will be some discussion of that, yes.

13        THE COURT:  Okay.  I'm just trying to analyze what

14   issues are likely to be before the Ninth Circuit that are

09:59:57  15   substantially related to the issues here, because one of the

16   issues is:  Is the letter that SPU sent, if that is not an

17   injury in fact for SPU, I don't see how it would be for UGM.

18   And so that is one of the issues I'm analyzing, is the

19   likelihood that that particular issue is before the Ninth

10:00:17  20   Circuit in terms of deciding about whether it's appropriate to

21   proceed now or see what the Ninth Circuit has to say about that

22   particular issue, given the context.

23        So thank you for the answer.

24        MR. WARD:  Okay.  Yes, Your Honor.

10:00:27  25   On a few other points to address, on redressability, the

```
            Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD    40
                     Video Conference Motion Hearing/May 31, 2023
                     Further Argument on Motion to Dismiss by Mr. Ward
```

1   ability of private parties to sue to enforce the WLAD, in

2   addition to the defendants in this case, is a key distinction

3   between this case and the *Wolfson* case that UGM has pointed to.

4   In the *Wolfson* case, the Ninth Circuit held that a challenged

10:00:54   5   judicial canon that restricted the speech of judicial candidates

6   in Arizona could be redressed through a favorable decision by

7   the Ninth Circuit because the injunctive relief was sought

8   against everyone who had the authority to enforce the law.  The

9   Court said, without a possibility of enforcement, there's

10:01:15   10   redressability and there's, therefore, standing.

11           But again, here we just have a case where any actions

12   taken by this Court will not restrain private parties from

13   having the ability to bring a WLAD action if they are aggrieved

14   under the WLAD and believe that they have been discriminated

10:01:33   15   against in employment by the Union Gospel Mission, and this is

16   something that can't be controlled.

17           I would also, I think, point out the question of co --

18   whether UGM has a right to hire only co-religionists under the

19   First Amendment, that's obviously a merits issue.  That's not

10:02:00   20   really appropriate for us to get into the merits of that on

21   especially a motion to dismiss.  But the question of whether,

22   you know, UGM can only hire co-religionists and has a right to

23   do so was one that the *Woods* decision, while not -- did, in

24   effect, reach under the facts of that case because in that case,

10:02:23   25   Mr. Woods made it clear that -- to Seattle Union Gospel Mission

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*    41
*Video Conference Motion Hearing/May 31, 2023*
*Further Argument on Motion to Dismiss by Mr. Ward*

1   that he disagreed with Seattle Union Gospel Mission's positions

2   on marriage of same-sex couples and sexual intimacy between

3   same-sex couples.  And the Court really could not have ruled in

4   the way it did in *Woods* if it believed that his disagreement

10:02:50  5   with SUGM, Seattle Union Gospel Mission's, religious beliefs on

6   sexuality and marriage were a basis for -- a legitimate basis

7   for them to refuse to employ him as a -- if he were a

8   non-ministerial employee.

9        So that's, you know, a case where I think *Woods* does not

10:03:13  10   address that issue explicitly, but implicitly, I believe the

11   *Woods* decision does say that co-religious -- did reject, in a

12   sense, the co-religionist argument that is being advanced here.

13        And finally, Your Honor, I would note that, you know,

14   Union Gospel Mission again has said here that they are not

10:03:42  15   asserting that any of their employees -- particularly the

16   operations assistant and the IT technician positions, are --

17   they're not asserting that those are ministerial positions, but

18   again, if you look at their complaint, Exhibit 4 to the

19   complaint asserts that all employees of Union Gospel Mission are

10:03:59  20   ministers by -- what are known as ministers by law and court

21   decision.  So that's not in the biblical sense, that is in the

22   legal sense that they've taken that position before, so I think

23   there is, again, some matter of factual dispute as to whether --

24   and it's unclear to us, whether UGM does, in fact, employ

10:04:20  25   non-ministerial employees.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

```
           Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD    42
                   Video Conference Motion Hearing/May 31, 2023
                  Further Argument on Motion to Dismiss by Mr. Tucker
```

             1        So with that, Your Honor, I will conclude and again urge

             2   the Court to dismiss UGM's complaint for lack of justiciability.

             3        Thank you.

             4        THE COURT:  Mr. Tucker, anything further on the motion

10:04:36     5   to dismiss?

             6        Oh, Mr. Tucker, you're on mute.

             7        MR. TUCKER:  I'm sorry, Your Honor.

             8        THE COURT:  That's all right.

             9        MR. TUCKER:  As to that -- yes, I would like just a

10:04:48    10   couple of things in response.

            11        As to the latter point, on whether or not the Mission

            12   itself has created some sort of factual dispute based on the

            13   filings with the Court, Justice Thomas, maybe one other on the

            14   Supreme Court, has certainly indicated that they believe that --

10:05:12    15   or that religious organizations should have the right to declare

            16   for themselves who ministers are.  And as much as I would like

            17   that to be the law of the land, there are not five votes at the

            18   US Supreme Court right now that actually say that.

            19        Now, if opposing counsel, if -- if the -- if the

10:05:33    20   defendants want to admit that every single employee at the Union

            21   Gospel Mission is, indeed, a minister, then I would agree that

            22   we don't have an issue here.  But the reality is we have

            23   positions that we ourselves view as non-ministerial; we have

            24   admitted as much and said as much in our -- in our filings.  If

10:05:55    25   you look, of course, even at the job descriptions of an IT tech

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*    43
*Video Conference Motion Hearing/May 31, 2023*
*Further Argument on Motion to Dismiss by Mr. Tucker*

1    professional, as well as an administrative assistant, then I

2    think that further underscores that.

3         And interestingly enough, there was actually a case just

4    this Friday out of North Carolina -- I'm sorry, out of Florida,

10:06:17   5    the Middle District of Florida in a case styled *Ratliff v.*

6    *Wycliffe Associates* -- yeah, *Associates*, where the Court looked

7    at that and likewise -- you don't have -- Your Honor doesn't

8    need to go here because you don't need to analyze whether or not

9    this is a ministerial position or not, but I don't think there's

10:06:36   10   any question whether it's judicially or, certainly with us, as

11   to whether or not an IT professional is -- is a minister or not.

12   The terms used internally, again, are because we have a mission

13   to spread the gospel message, so that is why the term "minister"

14   is used.

10:06:56   15        Your Honor mentioned some -- you know, what you were

16   grappling with was this idea of the letter, the importance of

17   the letter.  The reality is we don't need a letter for -- to

18   have standing.  I think *SBA List* says that.  I think *Tingly* says

19   that as well.  Our injury is really different.  We've got a

10:07:19   20   self-chill.  We're not -- and the inability to hire.  We have

21   not sued the Attorney General saying that "you're retaliatory

22   towards us, that you are hostile in -- in asking for truckloads'

23   worth of internal documents that we use to govern our own body."

24   That is not the challenge here.  And so there's quite a bit of

10:07:45   25   difference.

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*          44
*Video Conference Motion Hearing/May 31, 2023*
*Further Argument on Motion to Dismiss by Mr. Tucker*

1      And like I said, if you go back and look at *Tingly*, if

2    you look at even the Ninth Circuit decisions like, I think, *Cal*

3    *Trucking* and even maybe *Yellen*, the important deciding factor

4    there is disavow, and the fact is -- still haven't heard it

10:08:04  5    today -- the failure to disavow means that we actually do, in

6    fact, have a case in controversy here as well.

7      On -- on *Wolfson,* on the redressability question there,

8    third parties can still file complaints even in that Ninth

9    Circuit decision.  I think the fact that, and I think this -- I

10:08:27 10    think the analysis is bolstered actually by the documents that

11    the defendants have brought forth.  They actually included in

12    their papers evidence of these third-party complaints that have

13    been -- that were brought both before this lawsuit and also

14    while this lawsuit has been pending.  And so we've had at least,

10:08:46 15    I think, five different complaints filed against us, so I think

16    that shows that this is, indeed, a concrete concern.

17      And I'd say lastly, sort of moving backwards, the

18    *Ockletree* decision again, if you read that, if you look at the

19    part that the defendants are quoting there, there's disagreement

10:09:09 20    on that concurrence and what was actually meant by that.  I

21    think if you read it, that judge was actually reframing what he

22    thought the appropriate inquiry should have been because they

23    were posed a question by the federal court.  I just disagree

24    with that analysis.  To me, again, it's neither here nor there,

10:09:29 25    because we're facing ongoing harm now, and the Attorney General

```
                    Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD      45
                       Video Conference Motion Hearing/May 31, 2023
                     Further Argument on Motion to Dismiss by Mr. Tucker
```

1   didn't announce that they would enforce the WLAD on these

2   grounds until after the *Woods* decision, and so timing-wise, I

3   think that's -- that's an important piece of -- of this

4   analysis.

10:09:53   5       And then, also, I question why in the world *Woods* was

6   even necessary if *Ockletree* already resolved the issue.  There

7   were a lot of questions that came as a result of that decision

8   from the Washington Supreme Court.  And I think the clarity

9   came, though, post-*Woods* when the Attorney General said

10:10:12  10  pointblank:  If you've got ministers, you're okay.  If you have

11  non-ministers, you're not.

12       Guess what?  Union Gospel Mission of Yakima has

13  non-ministerial positions, which means we're directly in the

14  bull's eye.

10:10:30  15       And with that, Your Honor, I -- I rest on our briefing.

16  I would respectfully ask the Court to retain the case, and I can

17  move on, Your Honor, towards the merits, if you'd like, or

18  pause.

19       THE COURT:  Not quite yet.  Mr. Tucker, a moment ago you

10:10:47  20  mentioned something about five complaints.

21       Can you expand on that?  I just want to make sure I

22  heard you correctly.

23       MR. TUCKER:  Yes, Your Honor.  In the -- in response

24  to -- let me grab my notebook here.

10:11:01  25       In response to the motion for preliminary injunction,

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*      46
*Video Conference Motion Hearing/May 31, 2023*
*Further Argument on Motion to Dismiss by Mr. Tucker*

1   there were exhibits.  There was a declaration by opposing

2   counsel -- or, I'm sorry, by -- there were a few different

3   complaints.  There was an Exhibit A to the Gonzalez declaration.

4   That was a Commission complaint against the Mission alleging

5   disability discrimination.  There was an Exhibit B to the

6   Gonzalez declaration; there was a complaint there against the

7   Mission alleging sex discrimination.  Exhibit C was one

8   involving retaliation; D was regarding a contractor alleging

9   religious discrimination as well.

10          And in addition, Your Honor, to I think those

11  complaints, I think our standing is also bolstered by the fact

12  that if you look at our complaint, we actually cut and paste --

13  one of the applicants for an IT position gave some very hostile

14  responses to those inquiries, and so we've got both evidence of

15  the fact that individuals have actually filed complaints

16  historically, and then also we're dealing with it in realtime.

17          And, quite frankly, that's why we have the religious

18  hiring statement.  One of the things that the Mission is trying

19  to do is to be abundantly clear to the public as to what its

20  position is so as to avoid someone coming in and saying, "Well,

21  gosh, I didn't really know these were your beliefs."  We want to

22  be abundantly clear:  We are who we are.  We have beliefs on

23  biblical sexuality that some may agree with and others may not,

24  but we have the right -- and this starts to get into the

25  merits -- but we have the right to hire individuals that are

10:11:26   5
10:11:50   10
10:12:16   15
10:12:31   20
10:12:51   25

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*     47
*Video Conference Motion Hearing/May 31, 2023*
*Further Argument on Motion to Dismiss by Mr. Ward*

1    like-minded, that believe like we do.

2         THE COURT:  All right.  Mr. Ward, it's defense's motion.

3    You get the final word.

4         Anything further?

10:13:06    5         MR. WARD:  Yes, Your -- yes, Your Honor.

6         Just to pick up on the last point that was being raised

7    about complaints about the Union Gospel Mission that may have

8    been received by either the Attorney General's office or the

9    Human Rights Commission, none of those complaints have been

10:13:22    10   acted upon because, one, I mean, some of them are out of time,

11   some of them are brought by people who don't have coverage under

12   the WLAD as contractors.  None of them are challenges to the

13   religious hiring practices of UGM.  And I think even UGM would

14   acknowledge that it is subject to disability discrimination

10:13:45    15   claims and -- which was certainly an issue in the *Ockletree*

16   where disability discrimination was alleged and was found that

17   the WLAD's religious employer exemption did not apply there for

18   a non-ministerial -- well, for an employee whose duties were not

19   religious in nature.

10:14:03    20        So the fact that these complaints have been filed I

21   think just shows that there's a lack of complaints that have

22   been received by either, you know, the Human Rights Commission

23   or by the Attorney General's office over the religious hiring

24   practices that are at issue in this case, and again, go back to

10:14:20    25   the lack of enforcement and the lack -- which again turns to the

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-154**

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*    48
*Video Conference Motion Hearing/May 31, 2023*
*Further Argument on Motion to Dismiss by Mr. Ward*

1    lack of a concrete and particularized injury or an injury in

2    fact that has been suffered by UGM.

3        THE COURT:  What about their argument that there's an

4    ongoing harm because they would like to hire consistent with

10:14:37  5    what they believe is their First Amendment rights, and they feel

6    as though they cannot do that because it would put them in

7    direct conflict with the way in which the Attorney General's

8    office says they interpret the statute?  How is that not an

9    ongoing harm to the entity, that they cannot hire at this stage

10:14:53  10    positions that they need because of what they perceive as the

11    direct conflict?

12        MR. WARD:  Your Honor, any alleged chill that they have

13    here is self-inflicted, in our view, because we have not

14    threatened any enforcement against them, we have not taken any

10:15:07  15    action against them, and there's been no investigation of them.

16    So, you know, this would be something that we view as a

17    self-inflicted harm that is not actionable.

18        THE COURT:  So your position is that they actually have

19    to take the action that they would -- that they believe is

10:15:28  20    subject to First Amendment protection to expose themselves to

21    that liability before they have a sufficient concrete injury in

22    order to address these issues in court?

23        MR. WARD:  Your Honor, I wouldn't say that.  I would say

24    that they have to have something that is more concrete and

10:15:46  25    particularized than what we have here today, which is zero

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-155**

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*   49
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Preliminary Injunction by Mr. Tucker*

1    history of enforcement against them, zero threat of enforcement

2    against them by the Attorney General's office or any of the

3    defendants.

4         And I do believe that, you know, none of the cases that

5    have been cited here say that without some kind of a concrete

6    and particularized threat of an injury, that you have a basis to

7    bring this kind of a suit at this point.

8         THE COURT:  Thank you.  Anything further at this stage,

9    Mr. Ward, on the motion to dismiss?

10        MR. WARD:  No, Your Honor.  Thank you.

11        THE COURT:  All right.  We'll turn to the motion for a

12   preliminary injunction.  That is plaintiff's motion, so I will

13   hear from Mr. Tucker first.

14        MR. TUCKER:  Thank you, Your Honor.

15        When considering motions for preliminary injunction,

16   there are four standard factors that the courts often look at,

17   with primary focus, of course, on the likelihood of success

18   component.  And so I'll get into these more substantively, but

19   there are four different claims, if you will, that we think

20   would allow us to receive preliminary injunctive relief.

21        The first, which I'll go into in greater detail here

22   momentarily, is, of course, the religious autonomy argument, the

23   fact that the WLAD intrudes on the Mission's autonomy and

24   freedom to decide for itself matters of internal governance.

25        The second one is free exercise, so separate and apart

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-156**

```
              Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD      50
                     Video Conference Motion Hearing/May 31, 2023
                     Argument on Preliminary Injunction by Mr. Tucker
```

1    from religious autonomy.  The reality is that the WLAD is not

2    generally applicable because it exempts small employers, and

3    I'll touch upon that in more detail here momentarily.

4           Third, certainly not third on our list, and I do want to

5    emphasize this -- this cause of action, expressive association

6    is another form by which the Court may give us relief, and

7    there, the WLAD forces the Mission to employ those who are not

8    totally aligned with its religious beliefs.  And if you look

9    at -- there was recent case out of the Second Circuit just a few

10   months ago called *Slattery*, that's 61 F.4th 278, pinpoint cite

11   288, that is directly on point to what we have here, and so I

12   would encourage -- encourage the Court to focus on that.

13          And then lastly, speech as well.  The WLAD's, what we

14   call, publication and disclosure provisions also limit what the

15   Mission may say in its job advertising.

16          So taking those sort of one step at a time in the

17   likelihood of success, let's start first with the co-religionist

18   exemption.  And let me step back for a moment and just talk

19   about history.  For literally decades, the idea that religious

20   institutions can hire co-religionists has been well engrained in

21   not just the law but also sort of commonsensically.  You can go

22   back 150 years to the *Watson v. Jones* case, the US Supreme

23   Court, and see language in that, embedded in that case; you can

24   jump ahead to the '50s and look at the *Kedroff* case as well that

25   talks about the importance of religious autonomy.

```
              Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD    51
                    Video Conference Motion Hearing/May 31, 2023
                    Argument on Preliminary Injunction by Mr. Tucker
```

1    And the way I like, I think, best to explain this, Your

2    Honor, is if you think about religious autonomy as like an

3    umbrella, so you have at the top of the umbrella religious

4    autonomy, and then as offshoots from that, underneath the

10:19:20    5    doctrine of religious autonomy, on one side you have the

6    ministerial exception, and in that -- in that -- in that space,

7    in that bucket, the ministerial exception applies to a narrow

8    collection of employees, but it has very broad protection.

9    On the other side underneath that umbrella you have the

10:19:40    10    co-religious exemption.  Unlike the ministerial exception, the

11    co-religionist exemption applies to a broad collection of

12    employees, and in our instance, we believe every single employee

13    at the Yakima Mission, but it has more narrow application.  The

14    protection itself means that there is a shielding of employment

10:20:02    15    decisions that are rooted in religious practice, observance, or

16    belief.

17    I would just say at the outset, because I know it's

18    going to be brought up, I'll just deal with it on the front end,

19    we're not saying that if someone files a complaint that the

10:20:19    20    Commission or that the Attorney General can't inquire about that

21    particular allegation.  What we are saying, though, is that in

22    response to that, if the complaint relates or is tied to an

23    employment decision that is based upon a religious practice,

24    observance, or belief, at that point, that's when the inquiry

10:20:44    25    stops.

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*          52
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Preliminary Injunction by Mr. Tucker*

1    So, again, going back to the case law and what this --

2    what this looks like, the co-religionist doctrine or exemption

3    and the constitutionality, how it's embedded in the Constitution

4    is -- is not foreign to other courts, certainly other circuit

5    courts.  In fact, if you look, there's at least six different

6    courts of appeals, albeit looking at it in the confines of

7    Title VII, but have made very clear that a narrow reading of

8    Title VII's religious exemption would necessarily raise federal

9    constitutional issues.  So I'll explain that here a little bit

10   more concretely.

11   If you look at the *Hall* case out of the Sixth, the

12   *Little* case out of the Third, *Mississippi College* out of the

13   Fifth, the *Killinger* decision out of the Eleventh, what these

14   cases hold is that you have embedded in the context of Title

15   VII, you have a religious exemption, and what the courts are

16   saying is, look, thank goodness there's a religious exemption

17   that exists there in Title VII, because if you take that

18   exemption away, all of a sudden you've got federal

19   constitutional problems.

20   And for decades, decades this has not been an issue.  In

21   fact, if you look across the United States, all of these states

22   have a corollary to Title VII in their state statutes.  The

23   problem that exists, and Washington is an anomaly, is that now

24   that corollary, that religious exemption that would cover

25   non-ministerial employees is now absent.  It is completely gone.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-159**

```
               Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD     53
                    Video Conference Motion Hearing/May 31, 2023
                    Argument on Preliminary Injunction by Mr. Tucker
```

 1    And because it's gone, we now have a federal constitutional

 2    issue.  And those cases from those circuits underscore that

 3    exact point.

 4            And if Your Honor is concerned about, well, okay, what

 5    about the Ninth Circuit?  Well, I think the Ninth Circuit has

 6    given us a preview of what they would hold in this instance.  If

 7    you look at the *EEOC v. Townley Engineering* case -- granted it

 8    wasn't the main point of it, but the Ninth Circuit said it --

 9    they said even without -- and they're referring to Title VII's

10    religious exemption -- it says:  The First Amendment would limit

11    Title VII's ability to regulate the employment relationships

12    within churches and similar organizations.

13            The *World Vision* case, if you look at the concurring

14    opinions in that case, *Spencer v. World Vision*, Judge Kleinfeld

15    actually gave a really, I think, eye-opening quote there that

16    sort of underscores again why we're here today.  He said:  If

17    the government coerced staffing of religious institutions by

18    persons who rejected or even were hostile to the religions of

19    the institutions they were intended to advance, then the shield

20    against discrimination would destroy the freedom of Americans to

21    practice their religion.

22            So I think the Ninth Circuit has already told us what it

23    thinks about co-religionist exemption and whether or not it's

24    actually embedded in the US Constitution.  In addition to that,

25    even other circuits outside the Title VII context, *Bryce*, the

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*   54
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Preliminary Injunction by Mr. Tucker*

1   *Bryce* decision we actually cite out of the Tenth Circuit.  That

2   case involved an employee who was in a same-sex relationship,

3   and it was a dispute about -- about discipline.  And the Court

4   said that ecclesiastical -- it was an ecclesiastical one about

5   discipline, faith, internal organization, or ecclesiastical

6   rule, customer law, and was not a purely secular dispute.

7          We also cite, just more recently there was a case out of

8   the Southern District of New York that also said this exact same

9   thing.

10          So I think it's fairly apparent that this is embedded in

11   not just case law but obviously the federal Constitution

12   requires it.  The unfortunate thing here -- and we litigate

13   across the United States -- Washington is an anomaly.  It's out

14   on an island.  I mean, if we step back from the legalese for a

15   moment and just think about the prospect that somehow a

16   religious organization could be forced to hire some activist

17   that has a differing view on biblical sexuality, that's how

18   *Woods* came about.  But it's nonsensical to think that somehow

19   we've reached a world where a religious organization can't hire

20   a co-religionist.  I get lost in these sometimes.  When I step

21   back from it, I just think there's no way that that can be.  And

22   I think --

23          THE COURT:  But, Mr. Tucker, how do I square the

24   argument that you are making with the Supreme Court's decisions

25   in *Hosanna-Tabor* and *Our Lady of Guadalupe Schools* where this --

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-161**

```
                Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD    55
                     Video Conference Motion Hearing/May 31, 2023
                     Argument on Preliminary Injunction by Mr. Tucker
```

 1    when -- you know, analyzing the issue and rights of religious

 2    entities to choose, you know, their management and their

 3    ministers without interference from the government, and

 4    balancing that with the right of individuals not to be

10:25:52   5    discriminated against?  The Supreme Court is the one who has

 6    established this, you know, ministerial exception for where

 7    there can be government regulation and interference.

 8         How do I square the argument that you are making with

 9    the Supreme Court -- at least what I view the Supreme Court's

10:26:07  10    most recent pronouncements about the way that those issues

11    intersect?

12         MR. TUCKER:  Well, the -- we applaud both -- we have

13    applauded both of those decisions, and they do -- they do mix

14    well together.  Again, the ministerial exception you put in one

10:26:21  15    bucket, so you have individuals that, if you're deemed a

16    minister, then you have broad protections of -- if a

17    discrimination complaint is alleged.  The problem is you're

18    going to have positions like an IT professional, like an

19    administrative assistant, who aren't necessarily meeting -- if

10:26:40  20    you look at the factors, for example, in *Hosanna-Tabor* and then

21    further expounded upon in *Our Lady of Guadalupe*, there are

22    individuals that fall outside those lines, where they're not

23    really there to necessarily minister to others.  These are -- in

24    the co-religionist space, you're looking at internally, these

10:27:01  25    are almost inward-facing employees that don't necessarily have

```
                 Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD    56
                      Video Conference Motion Hearing/May 31, 2023
                      Argument on Preliminary Injunction by Mr. Tucker
```

 1   the job description, they don't have the requirement necessarily

 2   of -- of teaching, espousing the faith, being required to take

 3   certain doctrinal courses that the Supreme Court viewed in

 4   *Hosanna-Tabor* and also in *Our Lady of Guadalupe.*

10:27:25  5        The Supreme Court, you know, admittedly hasn't taken a

 6   case to recognize yet that the co-religionist exemption is,

 7   indeed, embedded in the First Amendment.  The -- these other

 8   circuit courts, I think, have -- have spelled out what that

 9   answer is.  But the reason the Court has not had the opportunity

10:27:45 10   is because for decades this has been a nonissue.  It didn't

11   become an issue until last year when Attorney General Ferguson

12   came out and said, "Guess what?  The WLAD doesn't apply to

13   non-ministerial positions."

14        States across the union have exemptions already

10:28:03 15   embedded, so this constitutional issue never arises because it's

16   not a concern.  And, again, if you go look at *Hall*, if you look

17   at *Little*, those cases are saying, "Thank goodness we've got

18   this exemption, because otherwise we'd have to deal with this

19   constitutional issue."  It's a backstop --

10:28:18 20        THE COURT:  But why would the Supreme Court set up this

21   distinction if, in fact, every position would be considered, you

22   know, co-religionist, whatever it may be?  Why would this

23   distinction be necessary, that the Supreme Court has set up, if

24   your theory is the law?

10:28:36 25        MR. TUCKER:  Well, I think -- I think the Court has --

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*   57
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Preliminary Injunction by Mr. Tucker*

1  has historically been very incremental and only wants to deal

2  with the facts in those particular instances.  I think -- I

3  think in -- in those instances, both in *Hosanna-Tabor,* as well

4  as in *Our Lady of Guadalupe*, we were focused on the -- the fact

10:29:05  5  that they were teachers, they're only looking at the -- those

6  that were before them.  And here, we're talking outside the

7  confines of teachers themselves.  And the -- the Court, I would

8  have liked them to have taken the *Woods* decision.  They did not.

9  And so -- as Justice Alito, though, highlighted in that cert

10:29:32  10  denial, he made very clear there's going to come a day where we

11  have to deal with this, and we believe that this -- that this is

12  apparent, certainly, in this particular instance.

13      Beyond even the co-religionist argument, Your Honor,

14  there's still three other reasons why Your Honor could grant

10:29:50  15  preliminary injunctive relief here.  On the free exercise front,

16  again, very briefly, the WLAD is not neutral and generally

17  applicable.  The purpose -- the stated purpose of the WLAD is to

18  eliminate and prevent discrimination.

19      The problem is when you look at it, it has an exemption

10:30:10  20  for small employers, so if you're under eight employees, you

21  can -- you can discriminate, really, with no -- with no question

22  or no issue.  And when you start building in treating religious

23  organizations differently, if you go and look at the *Fulton*

24  case, *Fulton v. City of Philadelphia*, it's a very important case

10:30:34  25  relative to general applicability and its -- and how it relates

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-164**

```
         Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD        58
                    Video Conference Motion Hearing/May 31, 2023
                    Argument on Preliminary Injunction by Mr. Tucker
```

         1    to this particular case.

         2          In addition to that, you've got individualized

         3    exemptions.  You've got the Commission, in essence, being able

         4    to -- in certain instances, they're authorized under the

10:30:54 5    statute -- you look at 49.60.180, Subsection 3, it says that the

         6    Commission is authorized, quote, by regulation or ruling in a

         7    particular instance, end quote, to permit any employment

         8    practice if the Commission finds the practice to be appropriate

         9    for the practical realization of a quality of opportunity

10:31:15 10   between the sexes.  So now you've got the Commission being able

         11   to say, "Well, yeah, I think this is going to provide equality

         12   or opportunity for the sexes, so we're going to go ahead and

         13   give a pass on this."

         14         Whenever you have the ability of a Commission like that

10:31:28 15   to give a pass to make these individualized exemptions, then

         16   that too, also is a free exercise violation, when you look at

         17   the *Fulton* case.

         18         THE COURT:  I thought the responsive brief indicated

         19   that that exemption was no longer -- because of subsequent

10:31:44 20   either legislative action or court decisions was -- can no

         21   longer be used.

         22         Did I misunderstand the brief, Mr. Tucker?

         23         MR. TUCKER:  Well, even if you -- I think, Your Honor,

         24   even if it's not used at all, if you go back and look at *Fulton*,

10:31:58 25   the *Fulton* decision from the Supreme Court actually is the

```
                  Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD    59
                         Video Conference Motion Hearing/May 31, 2023
                         Argument on Preliminary Injunction by Mr. Tucker
```

 1    response to that.  It doesn't matter whether or not it's

 2    actually -- if it's on the books and it's not being used, it's

 3    neither here nor there.  It's a --

 4         THE COURT:  I think that's actually not true.  The

 5    question is whether if it's -- if there's a deliberate choice

 6    for it to not be used or if there is subsequent legal authority

 7    that says it can't be used.  I think there is a distinction

 8    between those issues, because it goes to the issue of

 9    discretion, and if the discretion no longer exists because the

10    statute has been, you know, deemed unconstitutional, even though

11    it may still be on the books, I think there's an issue there,

12    and that's what I'm trying to get to the issue of, is what is

13    your understanding of the status of that statute?  Is it a

14    discretion they are not using it, or is there a legal barrier to

15    them using it?

16         MR. TUCKER:  My understanding, Your Honor, was that it

17    was discretionary, but, you know, it's not -- it's not a point

18    that is, again, needed even for preliminary injunctive relief

19    here because even the one I referenced before, the fact that

20    religious organizations are being treated less than employers

21    that have seven or less employees in and of itself makes this

22    not generally applicable.  And so even on that basis alone,

23    again, I would say we could win on free exercise.

24         Beyond that, and I mentioned this sort of at the outset

25    as I was providing a roadmap, one area that I think has gained

```
        Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD    60
                  Video Conference Motion Hearing/May 31, 2023
                  Argument on Preliminary Injunction by Mr. Tucker
```

           1    importance even since the filing of this lawsuit is the

           2    expressive association claim that we have.  There, when you look

           3    at what's required under expressive association, you have -- you

           4    know, a couple different elements need to be met there.  One is

10:33:39   5    whether or not the group engages in expressive association.

           6    Here, if you look at Exhibit 1 to our complaint, we say very

           7    clearly that the Mission's purpose is to spread the gospel of

           8    the Lord Jesus Christ, so we certainly have an express purpose,

           9    and we engage in expressive association by spreading the gospel

10:34:00   10   of Jesus Christ.

           11          The second one, element there is whether the forced

           12   inclusion of a person significantly affects the group's ability

           13   to express its message.  And here the courts have provided that

           14   you must give deference to the organization in deciding what

10:34:19   15   would or would not impair the message of the organization.

           16          I'll just jump to the main point here.  If you look at

           17   the *Slattery* case, again out of the Second, there it was a

           18   pro-life center that challenged a state employment statute, a

           19   nondiscrimination law that prevented discrimination based on

10:34:40   20   reproductive health decisionmaking, whether or not they obtained

           21   an abortion or had an abortion.  There the Second Circuit held

           22   that the center had the right to determine whether or not its

           23   employees will effectively convey its message.

           24          Now, the response that you're going to hear momentarily

10:34:55   25   is, "Well, wait a second.  Timeout.  You know, the -- you know,

```
                  KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
                         OFFICIAL COURT REPORTER
```

2-ER-167

```
            Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD    61
                    Video Conference Motion Hearing/May 31, 2023
                    Argument on Preliminary Injunction by Mr. Tucker
```

1    this right of expressive association doesn't apply in the

2    employment context."  Again, that is what happened in the Second

3    Circuit case.  It's not just the Second Circuit that has found

4    this.  The Fifth Circuit has found this as well in *Bear Creek*.

10:35:13   5    And, Your Honor, I think if you're interested, although I don't

6    think the Ninth Circuit squarely addressed it, if you look most

7    recently, just this last year, in the concurring opinion in the

8    *Green v. Miss United States of America* case, the concurrence

9    there again makes very clear -- again, it's a concurring

10:35:33   10    opinion, not the -- not the majority but the concurring opinion

11    there makes clear that this right is found in the employment

12    context itself.

13         And so, again, I think the expressive association claim

14    is -- is not just third on the list, it's actually a very

10:35:52   15    important point and one on which the Court can rely.

16         The fourth is speech.  In the speech context, as we've

17    talked about before, the Mission has -- has chilled its speech

18    based on what we define as the publication ban in our papers and

19    then also the disclosure provision.  And we feel that,

10:36:15   20    obviously, the inability not just to post, but also the

21    inability to actually have a conversation with, to require

22    disclosure of certain information is, indeed, a restriction on

23    speech.

24         The State says, "Well, no, no, no.  That doesn't

10:36:33   25    really -- there's really no restriction of speech here."  I

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*      62
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Preliminary Injunction by Mr. Tucker*

1    think I would point Your Honor back to the -- another Ninth

2    Circuit decision from this very year, from 2023.  It's *Yim v.*

3    *the City of Seattle*, 63 F.4th 783, where the Court held, I think

4    very similarly or analogously here, that -- it involved some

5    landlord/tenant issues, but it basically said that a law that

6    prohibited, quote, requiring disclosure or inquiring about

7    prospective tenants' criminal records infringed upon the

8    landlord's speech.  So our inability to inquire about their

9    positions on issues of biblical sexuality, again, that is a

10   speech concern.

11        Then very briefly, Your Honor, so I can wrap up the main

12   portion of this, the other preliminary injunction factors, like

13   irreparable harm, we've talked about the harm previously; the

14   Mission's rights, again, are chilled.  That alone -- you know, I

15   don't want to go back and relitigate -- or rediscuss the

16   standing elements, but certainly chill itself alone, *SBA List* to

17   me -- *SBA List* and *Tingly* really solidify that, but they also

18   help us in this instance as well, making very clear what injury

19   is.

20        The State's response to this is, "Well, you know, some

21   of these harms, they may be modest in kind."

22        I'm not aware, Your Honor, that there's a distinction

23   between modest or extreme harm, in the context of preliminary

24   injunctions, and so rather than put that on some sort of sliding

25   scale, I don't think that's necessary.  The reality is that we

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-169**

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*    63
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Preliminary Injunction by Mr. Ward*

1    have been harmed.

2        And then as it relates to the balance of -- of equities

3    of the public interest piece, again, here there's no -- there's

4    no burden on the government for not being able to

10:38:36    5    unconstitutionally enforce a law, and certainly the Attorney

6    General and the Commission remain free to enforce the WLAD

7    against others.

8        I think it's very important to note -- I don't know if

9    I've mentioned this previously -- that this is an as-applied

10:38:54    10    request.  You know, we're not asking for the world.  We're

11    asking as it relates to the Union Gospel Mission of Yakima.

12        And if -- if there's no further questions, Your Honor,

13    that concludes at least my opening on the motion for preliminary

14    injunction.

10:39:11    15        THE COURT:  Thank you Mr. Tucker.

16        Mr. Ward, are you making the argument on behalf of

17    defendants on this matter as well?

18        MR. WARD:  Yes, Your Honor.

19        THE COURT:  All right.

10:39:21    20        MR. WARD:  Thank you.

21        I'd like to begin by just noting what is an obvious

22    point:  That the Court need not, and, indeed, cannot, consider

23    the preliminary injunction motion if it finds that UGM lacks

24    standing to bring this case.  So the standing issue is the

10:39:40    25    threshold issue, obviously, here.  But even if we were to get

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*     64
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Preliminary Injunction by Mr. Ward*

1    past that and to look to plaintiff's motion for a preliminary

2    injunction, it must be denied.  UGM has failed to make a showing

3    that it is likely to succeed on the merits of its claim and that

4    it is entitled to the extraordinary remedy of a preliminary

5    injunction.

6         It has not shown any of the other factors that are

7    required for a preliminary injunction, including irreparable

8    injury, balance of hardships, or public interest.  Primarily it

9    just argues on those factors that if it makes a strong showing

10   of likelihood of success on the merits of its claims, it will

11   automatically satisfy the other factors for an injunction.

12        But here there's simply very thin bases as a matter of

13   law and as a matter of precedent, particularly in the Ninth

14   Circuit, for the merits of plaintiff's claims.

15        I'd like to begin with something that I think is -- was

16   raised by my opposing counsel in his argument and is in,

17   obviously, the briefs of the parties, too.  As I understand it,

18   the position of UGM is that somebody could bring a

19   discrimination claim to the Human Rights Commission or to the

20   Attorney General's office, but any inquiry into the alleged

21   discrimination would have to stop as soon as a religious belief

22   is asserted as a basis for the discrimination.  And that

23   position is underscored in UGM's briefing as well.

24        This is a theory that has not been accepted by any

25   court.  And it's quite a sweeping theory.  Under this theory,

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-171**

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*   65
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Preliminary Injunction by Mr. Ward*

1   religious employers would have to be exempt from any claim for

2   discrimination in employment, regardless of the employee's job

3   position or duties, whenever the employer asserts a religious

4   belief to justify the discrimination.

5        And I think Your Honor's questioning about the, you

6   know, development of the ministerial exception is on point here,

7   because certainly the US Supreme Court has never gone as far as

8   this has been suggested and has not adopted this as a rule.

9   Indeed, as my opposing counsel concedes, there's no Supreme

10  Court precedent on this issue, there's no Ninth Circuit

11  precedent either, that recognizes the sweeping co-religionist

12  exemption that plaintiffs are putting forward here.

13       Now, there is -- there is an exemption in Title VII that

14  is sometimes called Section 702, that provides an exemption

15  under Title VII for employers to -- to prefer to hire people who

16  share their religious -- religious affiliation.  This has been

17  on the books for quite some time, but it has not prevented

18  courts from around the country, including the Ninth Circuit,

19  from saying that just because an employer has a religious basis

20  for discriminating against somebody based on sex or race or

21  national origin, Title -- you know, Section 702 of Title VII

22  does not give them a free pass for that discrimination, that

23  courts still can hear sex discrimination cases, for instance,

24  even if they are motivated by the religious belief of an

25  employer.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-172**

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD* 66
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Preliminary Injunction by Mr. Ward*

1    And in our briefing, we cited a couple of cases from the

2    1980s from the Ninth Circuit, *Pacific Press* and *Fremont*

3    *Christian School* case, and there are literally dozens of cases

4    from around the country that also have found, again, that it is

5 (10:43:21)    possible, even if an employer has religious beliefs that are

6    discriminatory based on sex or other protected characteristics

7    under Title VII, that a party can still move forward with a

8    discrimination claim, notwithstanding the religious motivation

9    behind the discrimination.

10 (10:43:40)    So again, I don't think there's been even remotely close

11    to a showing of likelihood of success on a co-religionist theory

12    that, really, has not been adopted anywhere, and much less in

13    the Ninth Circuit.

14    Similar arguments can go towards the argument that the

15 (10:44:00)    WLAD is not a neutral law of general applicability. As I

16    understand it, UGM's argument on this point is that the WLAD is

17    not a neutral law of general applicability because it exempts

18    small employers, people who employ less than eight people.

19    But Title VII, as I would point out, also exempts small

20 (10:44:23)    employers, people who employ less than 15 employees, and there's

21    been no question under federal law that that -- there's been no

22    holdings under federal law that that kind of small employer

23    exemption, as long as it's neutrally applied, does not violate,

24    you know, the rule that -- against having a neutral law of

25 (10:44:42)    general applicability. Under both --

```
              Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD      67
                   Video Conference Motion Hearing/May 31, 2023
                   Argument on Preliminary Injunction by Mr. Ward
```

1    THE COURT:  But given the way that -- given the way that

2    the Supreme Court has been looking at issues related to

3    neutrally applicable, so *Tandon*, *Kennedy*, when you're allowing

4    secular behavior to happen in a way that -- and not with respect

10:45:01  5    to religious-related behavior, what is your view on the way that

6    will be applied and interpreted to a provision such as this?

7    MR. WARD:  Religion is treated the same way: small

8    religious employers are exempt; large religious employers are

9    not exempt.  And that's the same for private -- for secular

10:45:23  10    businesses: smaller ones -- smaller secular employers are

11    exempt; larger secular employers are not.  Religion -- it's

12    neutral towards religion.  It does not distinguish or

13    discriminate in any way based on religion, so it's a neutral law

14    in that regard.

10:45:41  15    And *Tandon*, I believe, is even a case that we cited in

16    our briefing for support for this proposition that this

17    exemption is neutrally applied, so I believe it actually

18    supports, you know, our position on this.

19    And as Your Honor recognized during my opposing

10:46:02  20    counsel's presentation, we did, in our briefing, note that a

21    provision in the Washington Law Against Discrimination that was

22    adopted in 1971 that gave discretion to the Commission to adopt

23    rules and regulations meant to ensure practical equal -- or

24    practically equality of the sexes, that was adopted in 1971, but

10:46:31  25    the following year, 1972, the Washington voters approved the

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*        68
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Preliminary Injunction by Mr. Ward*

1    Equal Rights Amendment.  And in 1978, the Washington Supreme

2    Court held that the Equal Rights Amendment adopted in 1972 swept

3    away any statutes that permit special treatment of one sex,

4    because of the ERA.

5        So the statute is not -- that exception is not operable.

6    It hasn't been for -- nearly since it was adopted, and it is not

7    something that serves as a basis to show that the WLAD is not a

8    neutral law of general applicability.

9        THE COURT:  Well, and that's the question I was asking,

10   is it --

11       MR. WARD:  Yeah.

12       THE COURT:  -- a situation where discretion is granted,

13   it's just not used; or has it subsequently been determined

14   legally it can't be used?  Because I think that's a different

15   issue when you're discussing the First Amendment-related issues

16   of whether there's discretion and neutral applicability.  So

17   thank you for the clarification.

18       MR. WARD:  Yes, Your Honor.

19       Now, turning to arguments regarding the First Amendment

20   right to expressive association as a basis for UGM's claims,

21   again, the theory that they're advancing here is not one that

22   has been adopted by the Ninth Circuit; it's not one that has

23   been adopted by the United States Supreme Court.  There is just

24   very little precedent for holding that the right to expressive

25   association applies in the context of employment.

10:46:49
10:47:07
10:47:17
10:47:34
10:47:58

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*    69
*Video Conference Motion Hearing/May 31, 2023*
*Argument on Preliminary Injunction by Mr. Ward*

1    It has not been, you know, held in, for instance, the

2    *Dale* case that is relied upon substantially by -- by plaintiff.

3    The *Dale* case did not concern employment.  It was about

4    membership in the Boy Scouts of America as a private

5    organization, and it was a claim that had been brought under New

6    Jersey's public accommodations law, not their employment

7    discrimination laws.  So *Dale* does not provide support.  And

8    there have been other cases from around the country that we

9    cited in our brief, such as the *Billard* case out of North

10    Carolina, that recognize that *Dale* does not sweep so far.

11    There's also cases from the Supreme Court, such as

12    *Hishon v. King & Spaulding* from the 1980s, where an employer

13    attempted to assert that its rights of expressive association

14    applied in its context of denial of partnerships to women, and

15    that was not a successful argument in the US Supreme Court.

16    The *Slattery* decision is recent, it's from the Second

17    Circuit, it is not binding on this Court, and it's not one that

18    is consistent with case law in the Ninth Circuit or it's not one

19    that is -- you know, that I think the Court should look to

20    because it is not controlling on this Court, and it's not one

21    that is supported by other cases.

22    Finally, in issues related to First Amendment rights to

23    free speech, plaintiffs here are asserting that defendants have

24    chilled them from posting job advertisements for their positions

25    that they wish to hire for.  As we noted in our briefing, the

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-176**

```
              Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD      70
                   Video Conference Motion Hearing/May 31, 2023
                   Argument on Preliminary Injunction by Mr. Ward
```

           1    job posting that they -- you know, the religious hiring

           2    statement that they wish to publish, however, does not actually

           3    say that they will refuse to hire anyone based on a protected

           4    category under the WLAD.  But in any case, there are

10:50:08   5    advertisements for positions that they are seeking to publish,

           6    they are commercial speech, and they are entitled to less First

           7    Amendment protection.  And there's case law cited by defendants

           8    here that if you are hired -- if you are making a job posting

           9    that violates the law -- that you know, seeks to hire -- you

10:50:33   10   know, discriminate in hiring, that is not speech that is

           11   protected.  So, to a large extent, plaintiff's free speech

           12   arguments here would depend on their likelihood of success on

           13   the merits of their other claims.

           14        Finally, just to mention -- plaintiff raises a claim

10:50:54   15   under -- that they call the disclosure requirement, I believe,

           16   under the WLAD, which is, I think, RCW 29 -- or 49.60.208, I

           17   believe is the section.  This is a provision of the WLAD that

           18   prohibits employers from requiring employees to disclose their

           19   religious beliefs or religious affiliation.  On its face, it

10:51:20   20   does not require employees -- or employers to restrict their

           21   speech.  It just protects the right of employees not to

           22   disclose.  And that way it distinguishes it from the *Yim v. City*

           23   *of Seattle* case cited by plaintiff, where there was an ordinance

           24   by the City of Seattle that prohibited not only requiring

10:51:42   25   disclosure but also inquiring about criminal histories.  So

```
              Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD    71
                     Video Conference Motion Hearing/May 31, 2023
                  Further Argument on Preliminary Injunction by Mr. Tucker
```

1    that's a distinction, and it's also just one that, this is a law

2    that there is no indication that it's ever been applied, as far

3    as we can tell in -- against anyone.

4         I think that will conclude my argument.  I know that we

10:52:09  5    are getting close to two hours, and I appreciate the Court's

6    patience, and I will stop there for now.

7         Thank you.

8         THE COURT:  All right.  Thank you.

9         Mr. Tucker.

10:52:22  10   MR. TUCKER:  Your Honor, just very briefly, a couple

11   points.  I want to go back just to the -- Your Honor's comment

12   earlier about sort of weighing what to do about *Hosanna-Tabor*,

13   *Our Lady of Guadalupe*, and then to just sort of maybe -- maybe

14   add a little bit more color to the ministerial exception and

10:52:41  15   co-religionist exemption sort of distinction.

16        I think it's important to note that the ministerial

17   exception is broader in that courts do not question the reason

18   for hiring or firing decision if the position is ministerial.

19   The Court simply stays out of it, in that instance, once that

10:52:57  20   determination is made.

21        On the other hand, with the co-religionist exemption,

22   that applies, of course, to non-ministerial employees.  Courts

23   can, and sometimes do, involve themselves in these disputes, but

24   when the employer or applicant for that non-ministerial position

10:53:16  25   does not share the employee's or employer's religious beliefs,

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*   72
*Video Conference Motion Hearing/May 31, 2023*
*Further Argument on Preliminary Injunction by Mr. Tucker*

1   then the First Amendment steps in to protect the religious

2   employer in that instance.  So I just wanted to draw that

3   distinction.

4        Working backwards, some of the comments that defendants'

10:53:34   5   counsel made, going back to the expressive association, there

6   was a reference to -- to the Supreme Court's decision in the

7   *King & Spaulding* case, that was certainly pre-*Dale*, which --

8   which is, obviously, a similar decision in this -- in this

9   arena, but I think it's important to recognize there that if you

10:53:52   10   go back and look at the *King & Spaulding* case, the Court didn't

11   say that the right is inapplicable but only said that the law

12   firm there had failed to show how its expression would, in fact,

13   be altered.  So it really failed, if you will, both *Dale*

14   factors, even though it was pre-*Dale*, you don't have a group

10:54:09   15   engaging in, you know, that expressive association or -- or a

16   showing that somehow forced inclusion of a person would

17   significantly affect the group's ability to express its message.

18   So I think that's readily distinguishable.

19        And, again, I do think -- I understand that the -- that

10:54:26   20   the *Slattery* decision is in the Second Circuit, but it is very

21   much -- the analysis is very much on point here, and I do think

22   that, as I mentioned, the Fifth Circuit has tackled this in the

23   *Bear Creek* decision.  And, again, I would point Your Honor, if

24   you want to -- if -- something closer to home in the Ninth

10:54:51   25   Circuit, the concurring decision in *Green v. Miss United States*,

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-179**

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*   73
*Video Conference Motion Hearing/May 31, 2023*
*Comments by The Court*

1   that's the 52 F.4th, pinpoint cite, 804 to 805, is where Judge

2   VanDyke really discusses that particular element.

3           Also, Your Honor, you know, you referenced -- in

4   relation to the neutral and generally applicable discussion, I

10:55:18   5   think you were right on target, Your Honor, when you mentioned

6   *Tandon*.  You know, and we have a disagreement, obviously, with

7   opposing counsel on what *Tandon* means, but we know that during

8   the line of COVID cases that came out, one thing that eventually

9   became abundantly clear, with *Tandon* at least, was that you

10:55:37   10   can't treat religious organizations lower, as second class.  And

11   so here, I think, you know religion -- religious organizations

12   are put on a -- on a different plateau, and when you have

13   organizations that, by the mere fact they've got seven or eight

14   individuals, are able to indiscriminately discriminate, I think

10:56:03   15   that underscores the free exercise concern there as well.

16           I think that's all I have, Your Honor, in rebuttal to

17   Mr. Ward's comments.

18           THE COURT:  All right.  Like last time, I'll offer you

19   each one more opportunity.

10:56:19   20           Mr. Ward, anything else you'd like to say at this time?

21           MR. WARD:  Your Honor, it may be exhaustion, but I'm

22   going to say "no."

23           THE COURT:  All right.  Okay.  That will conclude the

24   arguments today.  Counsel, I am not going to be ruling today.  I

10:56:35   25   will issue an order, obviously, first on the motion to dismiss.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

**2-ER-180**

```
                Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD          74
                     Video Conference Motion Hearing/May 31, 2023
                                Comments by The Court
```

1    Depending upon the results of that, then we'll take up the issue

2    of the preliminary injunction.

3            Given some other pending matters I have, it's my

4    expectation to have an order on the motion to dismiss within 30

10:56:51  5  days, and then I will move to the preliminary injunction after

6    that, so -- if that issue is still pending before the Court, so

7    just in terms of managing your expectations of when you may hear

8    from me.  So that's my plan moving forward.

9            Any questions?  Mr. Tucker?

10:57:11  10  MR. TUCKER:  No, Your Honor.  I would -- I would just --

11   I appreciate that -- the timing there.  I would just underscore

12   the fact that on the preliminary injunction side, we are

13   attempting to hire those two non-ministerial positions within

14   the fiscal year, if at all possible, but understand the Court's

10:57:29  15  restrictions on its large caseload as well.

16           THE COURT:  And your fiscal year starts in September?

17           MR. TUCKER:  It actually ends June 30th, begins July 1.

18   So that's the -- that's the immediate concern that we have.

19           THE COURT:  All right.  Thank you.

10:57:44  20  Mr. Ward?

21           MR. WARD:  Nothing further, Your Honor.

22           THE COURT:  All right.  I will do my best to move up

23   that timetable, but as I am certain you are aware, we are down a

24   judge here in Eastern Washington, and so that has made the

10:58:00  25  schedule a bit on the hectic side, and so I did move you all up,

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

2-ER-181

*Union Gospel Mission of Yakima v. Ferguson/1:23-cv-3027-MKD*    75
*Video Conference Motion Hearing/May 31, 2023*
*Comments by The Court*

1  given this is a preliminary injunction, in terms of prioritizing

2  you over other cases.  I will try to continue to do that, but

3  I'm just trying to manage your expectations moving forward.

4       All right.  I very much -- very much appreciate the

5  helpful and insightful arguments today.  Thank you for making

6  yourselves all available.  I found this very, very helpful.  So

7  thank you all, and that concludes this matter.

8       Court's in recess.

9       MR. TUCKER:  Thank you, Your Honor.

10      MR. WARD:  Thank you, Your Honor.

11      (Hearing concluded at 10:58 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

76

1                   C E R T I F I C A T E

2

3       I, KIMBERLY J. ALLEN, do hereby certify:

4            That I am an Official Court Reporter for the United

5   States District Court for the Eastern District of Washington in

6   Richland, Washington;

7            That the foregoing proceedings were taken on the date

8   and at the time and place as shown on the first page hereto; and

9            That the foregoing proceedings are a full, true and

10  accurate transcription of the requested proceedings, duly

11  transcribed by me or under my direction.

12           I do further certify that I am not a relative of,

13  employee of, or counsel for any of said parties, or otherwise

14  interested in the event of said proceedings.

15           DATED this 28th day of September, 2023.

16

17

18

19           _____

20           Kimberly J. Allen, CRR, RMR, RPR, CCR(WA)
             Washington CCR No. 2758
21           Official Court Reporter
             Richland, Washington
22

23

24

25

KIMBERLY J. ALLEN, CRR, RPR, CSR
OFFICIAL COURT REPORTER

**2-ER-183**