APPEAL NO. 24-7246

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNION GOSPEL MISSION OF YAKIMA, WASHINGTON,

*Plaintiff-Appellee,*

v.

ROBERT FERGUSON, in his official capacity as Attorney General of Washington State; ANDRETA ARMSTRONG, in her official capacity as Executive Director of the Washington State Human Rights Commission; and GUADALUPE GAMBOA, HAN TRAN, JEFF SBAIH, LUC JASMIN, and CHELSEA DIMAS, in their official capacities as Commissioners of the Washington State Human Rights Commission,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Eastern District of Washington
Case No. 1:23-cv-03027-MKD

## APPELLEE'S ANSWERING BRIEF

JOHN J. BURSCH
DAVID A. CORTMAN
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
dcortman@ADFlegal.org

JAMES A. CAMPBELL
JACOB E. REED
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jcampbell@ADFlegal.org
jreed@ADFlegal.org

RYAN TUCKER
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rtucker@adflegal.org

*Counsel for Plaintiff-Appellee*

## CORPORATE DISCLOSURE STATEMENT

Union Gospel Mission of Yakima is a religious 501(c)(3) not-for-profit corporation. It issues no stock and has no parent corporation.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES ..................................................................... v

JURISDICTIONAL STATEMENT ........................................................... 1

STATEMENT OF THE ISSUES ................................................................ 2

PERTINENT STATUTES AND REGULATIONS ................................... 3

INTRODUCTION ..................................................................................... 4

STATEMENT OF THE CASE ................................................................. 8

    A.    The Mission is a Christian ministry that has served central Washington for nearly a century ............................... 8

    B.    The Mission employs only coreligionists to further its religious purposes and calling. ............................................. 9

    C.    The WLAD prohibits the Mission's coreligionist hiring practices .................................................................................... 11

    D.    This Court holds that the Mission has standing. ................. 13

    E.    The district court denies the State's second attempt to dismiss and grants a preliminary injunction. ....................... 15

SUMMARY OF ARGUMENT ................................................................ 19

STANDARD OF REVIEW ...................................................................... 22

ARGUMENT ........................................................................................... 22

I.    The Mission has already established standing, and the State hasn't carried its burden to prove mootness ................................. 22

II.    The District Court correctly held that the Mission is likely to succeed on its free exercise claim because the WLAD is not neutral or generally applicable and fails strict scrutiny ............... 28

A. The WLAD is not neutral or generally applicable because it exempts employers for secular reasons but not religious reasons. ...........................................28

    1. The district court properly applied *Tandon*. ...............28

    2. The State's counterarguments are wrong. .................31

B. The WLAD is not neutral or generally applicable because it allows for case-by-case exemptions. ....................38

C. The WLAD fails strict scrutiny. ...........................................40

III. The Mission is likely to succeed on its church autonomy claim because the WLAD interferes with the Mission's religiously based personnel decisions. ...........................................42

A. Church autonomy extends beyond the ministerial exception and protects the Mission's right to prefer coreligionists for all positions. ...............................................42

B. The State's limited view of church autonomy is wrong. ......45

    1. The Mission does not seek blanket immunity. ...........46

    2. Case law recognizes the coreligionist exemption. .......47

    3. The State's cited cases don't apply. .............................51

IV. The Mission is likely to succeed on its expressive association claim because the WLAD forces association with those who neither share nor can relay its beliefs. .........................................53

A. Expressive association applies in employment. ..................54

B. The WLAD burdens the Mission's expression.......................57

V. The Mission is likely to succeed on its speech claims because the WLAD restricts speech based on content. ...............................60

VI. The Mission satisfies the remaining preliminary injunction factors. ..................................................................................61

CONCLUSION ................................................................................ 64

STATEMENT OF RELATED CASES .................................................. 66

CERTIFICATE OF SERVICE ............................................................ 67

ADDENDUM .................................................................................. 68

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023) ................................................................ 57, 59

*Bayer v. Neiman Marcus Group, Inc.,*
    861 F.3d 853 (9th Cir. 2017) ........................................................ 24

*Benisek v. Lamone,*
    585 U.S. 155 (2018) ...................................................................... 62

*Bob Jones University v. United States,*
    461 U.S. 574 (1983) ...................................................................... 38

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000) .................................................... 53–54, 58–59

*Bryce v. Episcopal Church in the Diocese of Colorado,*
    289 F.3d 648 (10th Cir. 2002) ........................................... 44, 46–48

*Butler v. St. Stanislaus Kostka Catholic Academy,*
    609 F. Supp. 3d 184 (E.D.N.Y. 2022) ........................................... 48

*Chafin v. Chafin,*
    568 U.S. 165 (2013) ...................................................................... 24

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ...................................................................... 41

*CompassCare v. Hochul,*
    125 F.4th 49 (2d Cir. 2025) ............................................... 20, 55–56

*Corporation of Presiding Bishop of Church of Jesus Christ of
    Latter-day Saints v. Amos,*
    483 U.S. 327 (1987) ...................................................................... 47

*Darren Patterson Christian Academy v. Roy,*
    699 F. Supp. 3d 1163 (D. Colo. 2023) ........................................... 54

*Doe v. Harris*,
    772 F.3d 563 (9th Cir. 2014) ........................................................ 63

*EEOC v. Freemont Christian School*,
    781 F.2d 1362 (9th Cir. 1986) ..................................................... 51

*EEOC v. Mississippi College*,
    626 F.2d 477 (5th Cir. 1980) ....................................................... 52

*EEOC v. Pacific Press Publishing Association*,
    676 F.2d 1272 (9th Cir. 1982) ..................................................... 51

*EEOC v. Townley Engineering and Manufacturing Company*,
    859 F.2d 610 (9th Cir. 1988) ....................................................... 50

*Employment Division v. Smith*,
    494 U.S. 872 (1990) ..................................................................... 42

*Enyart v. National Conference of Bar Examiners, Inc.*,
    630 F.3d 1153 (9th Cir. 2011) ..................................................... 22

*Federal Bureau of Investigation v. Fikre*,
    601 U.S. 234 (2024) ....................................................... 23, 25, 28

*Fellowship of Christian Athletes v. San Jose Unified School
    District Board of Education*,
    82 F.4th 664 (9th Cir. 2023)...............22, 28–30, 33, 38–40, 62–64

*First Covenant Church of Seattle v. City of Seattle*,
    840 P.2d 174 (Wash. 1992)........................................................... 36

*Forsyth County v. Nationalist Movement*,
    505 U.S. 123 (1992) ..................................................................... 61

*Friends of the Earth, Inc. v. Laidlaw Environmental Services
    (TOC), Inc.*,
    528 U.S. 167 (2000) ..................................................................... 23

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021) .............................................. 28, 35, 38–41, 45

*Garrick v. Moody Bible Institute,*
   412 F. Supp. 3d 859 (N.D. Ill. 2019) ............................................ 49

*Green v. Miss United States of America, LLC,*
   52 F.4th 773 (9th Cir. 2022) .................................................... 57–58

*Hall v. Baptist Memorial Health Care Corp.,*
   215 F.3d 618 (6th Cir. 2000) ................................................. 46, 49

*Health Freedom Defense Fund, Inc. v. Carvalho,*
   104 F.4th 715 (9th Cir. 2024) ................................................. 25, 28

*Hishon v. King & Spalding,*
   467 U.S. 69 (1984) ....................................................................... 56

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,*
   565 U.S. 171 (2012) ................................................... 43, 52–53, 57

*Isaacson v. Mayes,*
   84 F.4th 1089 (9th Cir. 2023) ..................................................... 26

*Italian Colors Restaurant v. Becerra,*
   878 F.3d 1165 (9th Cir. 2018) ..................................................... 27

*Kane v. De Blasio,*
   19 F.4th 152 (2d Cir. 2021) ......................................................... 35

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North Amerieca,*
   344 U.S. 94 (1952) ....................................................................... 43

*Kennedy v. Bremerton School District,*
   597 U.S. 507 (2022) ................................................................. 7, 36

*Killinger v. Samford University,*
   113 F.3d 196 (11th Cir. 1997) ..................................................... 50

*Korte v. Sebelius,*
   735 F.3d 654 (7th Cir. 2013) ....................................................... 49

*Little v. Wuerl,*
   929 F.2d 944 (3d Cir. 1991) .................................................... 49–50

vii

*Markel v. Union of Orthodox Jewish Congregations of America,*
124 F.4th 796 (9th Cir. 2024) .......................................................... 43

*Mobilize the Message, LLC v. Bonta,*
50 F.4th 928 (9th Cir. 2022) ............................................................ 62

*Monclova Christian Academy v. Toledo-Lucas County Health
Department,*
984 F.3d 477 (6th Cir. 2020) ........................................................... 33

*Murthy v. Missouri,*
603 U.S. 43 (2024) ........................................................................... 27

*NLRB v. Catholic Bishop of Chicago,*
440 U.S. 490 (1979) ................................................................ 44, 46

*Obergefell v. Hodges,*
576 U.S. 644 (2015) ......................................................................... 59

*Our Lady of Guadalupe School v. Morrissey-Berru,*
591 U.S. 732 (2020) ........................................................... 42–43, 59

*Paramount Land Co. LP v. California Pistachio Commission,*
491 F.3d 1003 (9th Cir. 2007) ......................................................... 62

*Puri v. Khalsa,*
844 F.3d 1152 (9th Cir. 2017) ......................................................... 51

*R.W. v. Columbia Basin College,*
77 F.4th 1214 (9th Cir. 2023) .......................................................... 25

*Rayburn v. General Conference of Seventh-Day Adventists,*
772 F.2d 1164 (4th Cir. 1985) ......................................................... 52

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) .................................................................. 60–61

*Roberts v. U.S. Jaycees,*
468 U.S. 609 (1984) ......................................................................... 58

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
592 U.S. 14 (2020) ........................................................................... 62

*Seattle Pacific University v. Ferguson,*
 104 F.4th 50 (9th Cir. 2024) ................................................ 13, 15, 28

*Seattle's Union Gospel Mission v. Woods,*
 142 S. Ct. 1094 (2022) ...................................................... 43, 45, 49

*Serbian Eastern Orthodox Diocese for United States of America &
 Canada v. Milivojevich,*
 426 U.S. 696 (1976) ...................................................................... 43

*Slattery v. Hochul,*
 61 F.4th 278 (2d Cir. 2023) .............................................. 20, 54–55

*Spencer v. World Vision, Inc.,*
 633 F.3d 723 (9th Cir. 2011) ........................................................ 50

*Starkey v. Roman Catholic Archdiocese of Indianapolis,*
 41 F.4th 931 (7th Cir. 2022).......................................................... 53

*Starkey v. Roman Catholic Archdiocese of Indianapolis,*
 496 F. Supp. 3d 1195 (S.D. Ind. 2020) ......................................... 52

*Susan B. Anthony List v. Driehaus,*
 573 U.S. 149 (2014) ......................................................... 15, 23, 27

*Tandon v. Newsom,*
 593 U.S. 61 (2021) ............................................... 18, 28–29, 31–35

*Tandon v. Newsom,*
 992 F.3d 916 (9th Cir. 2021) ........................................................ 34

*Tingley v. Ferguson,*
 47 F.4th 1055 (9th Cir. 2022)........................................................ 35

*Tony & Susan Alamo Foundation v. Secretary of Labor,*
 471 U.S. 290 (1985) ...................................................................... 37

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
 582 U.S. 449 (2017) ...................................................................... 25

*Union Gospel Mission of Yakima v. Ferguson,*
 2023 WL 5674119 (E.D. Wash. Sept. 1, 2023) .............................. 14

*Union Gospel Mission of Yakima Washington v. Ferguson,*
    2024 WL 3755954 (9th Cir. Aug. 12, 2024) ............ 5, 11–15, 22–27

*United States v. Lee,*
    455 U.S. 252 (1982) ....................................................... 38

*United States v. United Foods, Inc.,*
    533 U.S. 405 (2001) ....................................................... 57

*Werft v. Desert Southwest Annual Conference of United Methodist Church,*
    377 F.3d 1099 (9th Cir. 2004) ...................................... 52

*Woods v. Seattle's Union Gospel Mission,*
    481 P.3d 1060 (Wash. 2021) ......................... 4, 12, 35, 39

*Yamada v. Snipes,*
    786 F.3d 1182 (9th Cir. 2015) ...................................... 22

*Yim v. City of Seattle,*
    63 F.4th 783 (9th Cir. 2023) ......................................... 61

*Youth 71Five Ministries v. Williams,*
    2024 WL 3749842 (9th Cir. Aug. 8, 2024) .............. 31, 41

**<u>Statutes</u>**

42 U.S.C. § 2000bb ................................................................. 36

42 U.S.C. § 2000e-1 ............................................................... 41

N.Y. Lab. L. § 203-e ............................................................... 54

Wash. Admin. Code § 162-16-240 .............................. 13, 38, 40

Wash. Rev. Code § 49.60.010 .............................................. 30

Wash. Rev. Code § 49.60.040 ............................... 12–13, 30–31

Wash. Rev. Code § 49.60.160 ............................................... 12

Wash. Rev. Code § 49.60.180 ................................ 11, 13, 38, 44, 60–61

x

Wash. Rev. Code § 49.60.208 ...................................................... 11, 60–61

Wash. Rev. Code § 49.60.222 ...................................................... 13, 31

Wash. Rev. Code § 49.60.230 ...................................................... 12

Wash. Rev. Code § 49.60.250 ...................................................... 12

Wash. Rev. Code § 49.60.260 ...................................................... 12

Wash. Rev. Code § 49.60.310 ...................................................... 12

**<u>Other Authorities</u>**

Athanasius G. Sirilla, *The "Nonministerial" Exception,* 99 Notre
    Dame L. Rev. 393 (2023) ........................................................ 44, 46

*Galatians* 6:2 .................................................................. 10, 45

*Hebrews* 3:13.................................................................. 10, 45

Helen M. Alvaré, *Church Autonomy After Our Lady of
    Guadalupe School: Too Broad? Or Broad as it Needs to Be?,*
    25 Tex. Rev. of L. & Pol. 319 (2021) ....................................... 11, 45

*I Corinthians* 1:10 ........................................................... 10, 45

Wash. Emp. Sec. Dep't, *Establishment Size* ............................... 30

## JURISDICTIONAL STATEMENT

Appellee agrees with Appellants' jurisdictional statement.

## STATEMENT OF THE ISSUES

1. This Court held that the Mission has standing to challenge the WLAD. After remand, the State filed a notice of stipulation that only disclaimed enforcement against the Mission's ministerial positions and did not disclaim enforcement against all its non-ministerial positions. Did the State's filing moot the case?

2. The district court held that the WLAD is not neutral or generally applicable—because it exempts small employers for secular reasons—and fails strict scrutiny as applied to the Mission. Did the court abuse its discretion by holding that the Mission is likely to succeed on its free exercise claim and by entering a preliminary injunction?

3. The doctrine of church autonomy protects religious organizations from state interference in certain employment matters. Similarly, the right to expressive association protects groups' ability to associate in pursuit of religious ends. Here, the WLAD prohibits the Mission from requiring that its employees share its religious beliefs on marriage and sexuality. Is the Mission likely to succeed on its church autonomy and expressive association claims?

4. The WLAD bans the Mission from publishing job advertisements that say the applicant must share and follow the Mission's religious beliefs or from asking applicants about their religious beliefs. Is the Mission likely to succeed on its free speech claim?

## PERTINENT STATUTES AND REGULATIONS

Pertinent constitutional provisions, statutes, and regulations are attached as an addendum.

## INTRODUCTION

The Union Gospel Mission of Yakima is a Christian rescue ministry that has served the less fortunate of central Washington for nearly a century. Since opening its doors, the Mission's goal has been to spread the Gospel of Jesus Christ through everything it does—from feeding the hungry to housing the homeless. To accomplish its religious calling, the Mission must employ faithful agents who share and adhere to the Mission's religious beliefs. This is nothing new. Religious and non-religious organizations alike require that their employees share the organization's values and vision. And state and federal employment laws almost universally protect this right for religious organizations by exempting them and allowing them to hire coreligionists.

Washington is a stark outlier. In 2021, the Washington Supreme Court held that religious organizations could be penalized under the Washington Law Against Discrimination (WLAD) for declining to hire someone who challenged and desired to change the organization's understanding of marriage. *Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060 (Wash. 2021). Soon after, the Attorney General threatened a Christian university for violating the WLAD because the school required staff to follow its religious beliefs on sexual morality. The Mission, having a near-identical policy, sued and sought a pre-liminary injunction.

4

The district court first dismissed on standing. But just five months ago, this Court concluded that the Mission faces a credible threat of enforcement and has standing to challenge the WLAD. *Union Gospel Mission of Yakima Washington v. Ferguson,* No. 23-2606, 2024 WL 3755954, at *1 (9th Cir. Aug. 12, 2024).

On remand, the district court preliminarily enjoined Defendants-Appellants ("the State") from enforcing the WLAD against the Mission. Correctly applying *Tandon v. Newsom*, the court held that the WLAD is not neutral or generally applicable because it exempts employers with fewer than eight employees but does not exempt the Mission's religious exercise. 1-ER-009–013. The law also fails strict scrutiny because it is underinclusive and not narrowly tailored. *Id.* And the Mission would likely face irreparable harm without an injunction because it had open positions to fill, and the State refused to disavow enforcement against all the Mission's non-ministerial positions. *See* SER-005, 088–92.

The district court got it right. First, the Mission is likely to succeed on one—or more—of its claims. The WLAD violates the Free Exercise Clause because it forces the Mission to hire those who hold differing beliefs about marriage and sexuality, yet allows thousands of other employers to refuse to hire those same people. That treats the religious Mission worse than thousands of other secular employers. The WLAD also interferes with the ministry's right to decide who is fit to inculcate its religious views and ideals—a right protected by both

5

church autonomy and expressive association. And the WLAD silences the Mission's speech about marriage and sexuality by forbidding the posting of job advertisements that tell applicants they must share these beliefs, and by prohibiting the Mission from asking applicants about their beliefs on these issues.

Second, the Mission faces irreparable harm if the injunction is lifted. The Mission routinely fills non-ministerial positions—upwards of 50 annually—and it cannot (and need not) ask the government's permission for every hire.

Third, the injunction benefits the public interest by preserving constitutional rights. The State can enforce the WLAD as it did from 1949 to 2021. Indeed, it can just treat the Mission as it treats countless other employers.

The State's complaints about the district court's decision lack merit. After losing on standing at this Court, the State tried to *moot* the case by filing a notice that supposedly disavowed enforcement—but only against two of the Mission's positions. 2-ER-104–05. That argument failed below, so now the State argues that the same notice eliminated *standing*. The Court should not credit this inadequate litigation maneuver. The Mission challenges the WLAD as applied to *all* of its employees, not just the positions addressed by the State's notice.

The State also says the district court's ruling would relieve businesses everywhere from "complying with innumerable laws of all

6

types." Opening Br. at 2. That's false. Just because a law is not neutral and generally applicable doesn't mean religious observers everywhere automatically get a pass. For one, the law must burden a sincere religious practice. Second, strict scrutiny still applies. And third, a successful free exercise claim only results in a limited exemption from the part of the law that burdens the religious exercise. The ruling protects the Mission from religious discrimination; it does not create a "general immunity from secular laws." *Id.* (citation omitted).

In the end, the WLAD does not apply "in an evenhanded, across-the-board way." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022). The First Amendment demands that the State treat the Mission at least as well as the *best*-treated secular employer. The district court correctly recognized that it hasn't. This Court should affirm.

## STATEMENT OF THE CASE

### A.   The Mission is a Christian ministry that has served central Washington for nearly a century.

The Mission was founded in 1936 to "spread the Gospel of the Lord Jesus Christ." 3-ER-242. For close to a century, the Mission has advanced this purpose by serving the less fortunate no matter who they are, what they believe, or how they identify. 3-ER-242–45. It aids some of the most vulnerable through its homeless shelter, recovery programs, health clinics, and meal services. *Id.* The Mission's social-welfare services are exceptionally impactful. In its 2021-2022 fiscal year, the Mission handed out 141,629 free meals, provided 30,167 nights of shelter, and helped dozens regain sobriety. 3-ER-243. What makes the Mission unique is that it believes spiritual welfare carries more weight than physical assistance; it aims to see every client develop a relationship with Jesus Christ. *See* 3-ER-242–45.

The Mission's Bible-based religious beliefs guide and permeate everything it does. 3-ER-243. These beliefs compel the Mission to carry out its acts of service, share the Gospel with everyone at all times, and mentor and disciple others—including co-workers and volunteers—to create a robust Christian environment and further its religious purpose. 3-ER-242–48.

The Mission holds traditional Christian beliefs on marriage and sexuality. It believes "God created humans in His image"; that "He

8

made humanity expressed in two complementary and immutable sexes, male and female, each displaying features of His nature"; and that "[f]or their joy and well-being, God commanded human sexual expression to be completely contained within the marriage of one man to one woman." 3-ER-245–46. Any sexual expression outside of marriage between one man and one woman conflicts with the Mission's beliefs. *Id.*

## B. The Mission employs only coreligionists to further its religious purposes and calling.

The Mission is a religious *organization*, so it advances its religious goals through its 165-plus employees, who are its hands, feet, and voice. 3-ER-246; 2-ER-023. To this end, the Mission only employs coreligionists—those who agree with the Mission's Christian beliefs and practices (internally) and align their conduct with those beliefs (externally). 3-ER-246–48. All employees, regardless of position, are required to follow the Mission's understanding of marriage and sexuality and to abstain from contrary conduct, including same-sex relationships and sexual activity. *Id.*; 2-ER-021.

Applicants interested in working at the Mission learn before and during the application process that they must share the Mission's religious beliefs to work there. 3-ER-247. All employees sign and agree to the Mission's Statement of Faith, core values, job description duties and requirements, and employee handbook. *Id.* The Mission routinely receives applications from people that openly disagree with—and

sometimes express hostility to—its religious beliefs and hiring requirements. 3-ER-247–48, 301–303. The Mission is forced to screen out such applicants. *Id.*

The Mission employs only those who share and live out its faith for many reasons. Every single employee is essential to forming the Mission's faith community inwardly (toward other employees), which contributes to the success of the ministry outwardly (toward the community). 2-ER-021–023. That's why all employees have inward-facing religious responsibilities to support one another in their faith journeys, for example, by praying with and for one another, sharing scripture and devotionals, and setting an example on how to live a life that follows Christ in every respect. 2-ER-021–022. This spiritually supportive environment facilitates the Bible's commands that Christians: (a) are to "be united in the same mind and the same judgment," (*I Corinthians* 1:10); (b) should "exhort one another every day" so that they will not "be hardened by the deceitfulness of sin," (*Hebrews* 3:13); and (c) should "[b]ear one another's burdens" to "fulfill the law of Christ," (*Galatians* 6:2). 2-ER-22.

Maintaining a community of likeminded believers also ensures that the Mission presents a united, correct, and consistent Christian message to the people it cares for, and to the world. 2-ER-021–022. If the Mission cannot foster an inward community of co-believers who share the same faith and seek to advance the same goals with the same

spirit, the Mission cannot achieve its overarching purpose to spread the Gospel through its social welfare work. 2-ER-23. Harmonization of employee values and mission is critical to secular organizations. *See* Helen M. Alvaré, *Church Autonomy After Our Lady of Guadalupe School: Too Broad? Or Broad as it Needs to Be?*, 25 Tex. Rev. of L. & Pol. 319–75 (2021). For religious organizations like the Mission, they are indispensable.

### C. The WLAD prohibits the Mission's coreligionist hiring practices.

"The Washington Law Against Discrimination ('WLAD') prohibits discrimination in employment because of sexual orientation." *Union Gospel Mission,* 2024 WL 3755954, at *1; *see also* Wash. Rev. Code § 49.60.180(1), (2), (3). The WLAD's "publication ban" prohibits employers from posting statements and job applications that limit employment based on sexual orientation, and it forbids asking about an applicant's sexual orientation. *Id.* § 49.60.180(4). And the WLAD prevents employers from "[r]equir[ing] an employee to disclose his or her sincerely held religious affiliation or beliefs." *Id.* § 49.60.208(1).

Violating the WLAD carries heavy consequences. The Washington State Human Rights Commission ("the Commission") has broad power to enforce the WLAD. *See Union Gospel Mission*, 2024 WL 3755954, at *1. Enforcement includes the possibility of contempt and criminal

11

penalties, payment of backpay, and forced hiring, among other things. Wash. Rev. Code §§ 49.60.160, 49.60.310, 49.60.250, 49.60.260(1).

The Washington Attorney General also independently enforces the WLAD. SER-067. What's more, "the State is only one enforcer." *Union Gospel Mission*, 2024 WL 3755954, at *3. Private parties can sue employers, *id.* at *1, and file complaints with the Commission, triggering an arduous, expensive, and distracting investigatory process, Wash. Rev. Code § 49.60.230.

Since its 1949 enactment, the WLAD completely exempted all religious nonprofits. *Id.* § 49.60.040(11) ("'Employer' ... does not include any religious or sectarian organization not organized for private profit"). This was of apiece with employment laws around the country. But in 2021 the Washington Supreme Court wiped away this decades-old religious protection, holding the exemption unconstitutional as applied to claims of sexual orientation discrimination, unless the position fell under the ministerial exception. *Woods*, 481 P.3d 1060. In short, the state supreme court "narrowed the religious-employer exemption to correspond to the ministerial exception under the U.S. Supreme Court's First Amendment jurisprudence." *Union Gospel Mission*, 2024 WL 3755954, at *1.

Yet the WLAD continues to exempt other entities for secular reasons. Most notably, the WLAD exempts employers (including for-profits) based on their size—those with fewer than eight employees are

12

exempt from the law entirely. Wash. Rev. Code § 49.60.040(11). That's not all. "[D]istinctly private" organizations are exempt from the WLAD's public accommodation arm. *Id.* § 49.60.040(2). And public or private educational institutions can separate student housing based on sex and "make distinctions on the basis of marital or families with children status." *Id.* § 49.60.222(3). The Commission can also exempt employers under a bona fide occupational qualification ("BFOQ"), *id.* § 49.60.180(1), when it "believes" that a "protected status will be essential to or will contribute to the accomplishment of the purposes of the job," Wash. Admin. Code § 162-16-240.

After *Woods* gutted the WLAD's religious employer exemption, the Attorney General's Office investigated Seattle Pacific University because that Christian school prohibited employees "from engaging in sexual intimacy outside of [one man to one woman] marriage." *Seattle Pac. Univ. v. Ferguson,* 104 F.4th 50, 56 (9th Cir. 2024) ("*SPU*"). The Attorney General called this "illegal discrimination" and solicited complaints. *Id.* Seattle Pacific sued, and this Court held that the university failed to allege an injury for the investigation itself because it "carrie[d] no stick," but the university had standing to challenge future WLAD enforcement. *Id.* at 57, 66.

### D.   This Court holds that the Mission has standing.

The Mission "has similar, if not the same, employment practices and policies as SPU." *Union Gospel Mission*, 2024 WL 3755954, at *2.

Around the same time as the SPU investigation, the Mission received increasing public backlash against its religious beliefs and employment practices, including a *Newsweek* article that scrutinized the Mission's employment application and a *Reddit* thread where many people made hostile remarks about the Mission's beliefs and practices. 3-ER-318–20, 253–54. In response, the Mission stopped using *Indeed.com* and removed two non-ministerial job postings for an IT technician and operations assistant that needed filled. *Id.*

The Mission then sued and requested a preliminary injunction allowing it to prefer and hire coreligionists "for its non-ministerial positions," which included the IT technician and operations assistant. 3-ER-220. The district court dismissed the case for lack of standing and the preliminary injunction motion as moot. *Union Gospel Mission of Yakima v. Ferguson*, No. 1:23-CV-3027-MKD, 2023 WL 5674119, at *1 (E.D. Wash. Sept. 1, 2023), *rev'd and remanded*, No. 23-2606, 2024 WL 3755954 (9th Cir. Aug. 12, 2024).

The Mission appealed. After "the State repeatedly refuse[d] to disavow enforcement" at oral argument, *Union Gospel Mission*, 2024 WL 3755954, at *3, it filed a Rule 28(j) letter saying for the first time that the Mission's IT technician and operations assistant were "ministers who 'minister to members of the public.'" Appellees' Rule 28(j) Letter, *Union Gospel Mission of Yakima v. Ferguson*, No. 23-2606 (9th Cir. Aug. 8, 2024), DktEntry 50.1. The State argued this letter

14

eliminated any enforcement threat. But the letter did not say those positions fell under the First Amendment's ministerial exception, nor did it mention the Mission's many *non-ministerial* positions. *See id.*

Four days later, this Court reversed and held the Mission has standing under *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) and *SPU*, 104 F.4th 50. *Union Gospel Mission*, 2024 WL 3755954, at *3. First, the Mission intends to "continue" its requirement "that *all employees*, including those in positions such as IT technician and operations assistant, adhere to its religious beliefs, which encompass those concerning its view of sexual morality." *Id.* at *2 (emphasis added). Second, the Mission's policy—which applies to "ministers and non-ministers alike"—is arguably proscribed by the WLAD. *Id.* (quoting *SPU*, 104 F.4th at 60). Third, the Mission faces a credible threat of prosecution because the State "repeatedly refuse[s] to disavow enforcement to the extent that [the Mission] seeks to hire *non-ministerial employees*," private parties can enforce the WLAD too, and the threat has forced the Mission to "self-censor its conduct and its speech." *Id.* at *3 (emphasis added). Plus, the Mission's injuries were redressable. *Id.*

### E. The district court denies the State's second attempt to dismiss and grants a preliminary injunction.

On remand, the parties filed supplemental briefs. The State addressed the merits, but—like it did with its 28(j) letter before this

Court—filed an after-the-fact stipulation notice that purported to disclaim WLAD enforcement as to the Mission's IT technician and operations assistant positions and the mere publishing of the Mission's Religious Hiring Statement. 2-ER-105. The State claimed this mooted the case. SER-130–34.

The Mission submitted a supplemental declaration explaining it has many non-ministerial positions, including at least 14 open jobs that it intended to fill as soon as possible. 2-ER-019–23; *see* 2-ER-026–75 (job descriptions for open positions). The Mission briefed the merits and reiterated that it was not—nor was it ever—seeking relief *only* for the IT technician and operations assistant positions. SER-108–16. The Mission explained that it risked WLAD enforcement any time it hired a non-minister, so it needed injunctive relief to protect its ability to hire coreligionists for *all* positions. *Id.*; *see also* 2-ER-019–23.

At a motion-for-preliminary-injunction hearing, the district court asked whether the State would disavow enforcement of the WLAD as applied to the Mission's other open positions that it detailed. SER-005. The State answered: "No, Your Honor. We don't disavow with respect to those[.]" *Id*. The district court recognized that the State was taking "inconsistent positions" because it was asking the court to "just assume that defendants aren't going to take any action when in fact [they] won't formally disavow enforcement." SER-011.

16

The district court denied the State's second motion to dismiss for mootness. SER-086–92. The case was not moot because the State's "stipulation does not cover the entirety of the relief sought in Plaintiff's Complaint"—relief protecting *all* non-ministerial employees. SER-088. The "upshot" of the State's refusal to disavow enforcement as to the Mission's *other* positions is that the State views them as "non-ministerial and thus unshielded from the WLAD's ministerial exception." SER-090–91. This put the Mission to the "Hobson's choice" of choosing to either fill its other "positions and face credible risk of WLAD enforcement," or to "refrain from hiring for these additional positions and remain understaffed." SER-091.

The district court granted the Mission's motion for preliminary injunction because the Mission was likely to succeed on the merits of its free exercise claim. 1-ER-2–17. The WLAD was not neutral or generally applicable because it "exempts employers with fewer than eight employees, ... putting for-profit, non-religious organizations on unequal footing with [the Mission] and other religious organizations like it." 1-ER-010. Because "certain secular employers are shielded from WLAD enforcement" but the Mission is not, the State "undermines the statute's stated interest in 'eliminating' and 'preventing' discrimination." 1-ER-010 (cleaned up). The court rejected the State's argument that the WLAD was generally applicable because small religious employers could also use the secular small business exemption. 1-ER-

011. The court explained that "[c]omparability is concerned with the risks various activities pose," so the question is "whether the WLAD treats [the Mission]—a religious organization—differently than secular employers with fewer than eight employees." 1-ER-011 (quoting *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam)). It does, so it's not neutral and generally applicable. *Id.*

The WLAD failed strict scrutiny because it "places stricter limits on religious activities than it does secular activities" that undermine the law's stated interest in preventing discrimination. 1-ER-013. Moreover, the fact that the WLAD completely exempted religious organizations for over 70 years showed that there is a "less restrictive measure" to advance the State's interest. 1-ER-012 (cleaned up).

The district court held that the Mission showed irreparable harm because it "demonstrated a colorable" First Amendment claim and the State's "express refusal to disavow enforcement of the WLAD ... suggests [the Mission] is likely to suffer an irreparable injury" if it fills its positions "consistent with its religious views." 1-ER-014–015. This "hampering of [the Mission's] ability to hire staff consistent with its religious beliefs likely constitutes an enduring harm that will irreparably risk [the Mission's] continued existence." 1-ER-015 (cleaned up). Lastly, "the balance of equities and public interest ... favors issuing a preliminary injunction," protecting the Mission's constitutional rights. 1-ER-015.

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion in granting a preliminary injunction.

To start, this Court has already concluded that the Mission has standing. That's still true. The State's attempt to moot the case through its so-called notice of enforcement fails because all the notice does is confirm that the State *will* enforce the WLAD against the Mission's other non-ministerial positions. The State refused to disavow enforcement for those positions when given a chance by the district court. The State has the burden to prove mootness, and it fails to make it absolutely clear that the Mission faces no risk of harm.

On the merits, enforcement of the WLAD infringes the Mission's First Amendment rights four times over.

First, the WLAD violates the Free Exercise Clause. The WLAD burdens the Mission's religious exercise of employing only coreligionists, and it is not neutral or generally applicable. The WLAD exempts thousands of small secular employers, allowing them to do exactly what the Mission does with no risk of penalty. As the district court rightly held, this puts "for-profit, non-religious organizations" on better "footing" than the Mission. 1-ER-010. It makes no difference that small religious employers are also exempt. For one, the Mission is a large employer, and the Free Exercise Clause requires treating the religious exercise *at issue* as good as *any* comparable secular conduct—like small

19

secular employers. For another, the WLAD does not exempt small religious employers for religious reasons, but for a secular reason—their size. A law that allows exemptions for secular reasons but not religious ones fails neutrality and general applicability. And the WLAD's BFOQ process is a system of individualized exemptions that gives the State discretion to decide what reasons merit an exemption. This too triggers strict scrutiny. But the State cannot proffer a compelling reason why it must deny the Mission an exemption when thousands of secular employers are exempt.

Second, the WLAD violates both Religion Clauses by interfering with the Mission's autonomy to select and hire coreligionists for all positions. Courts and governments have recognized this right for decades. That is why nearly every employment law in the country allows religious organizations to hire according to their faith.

Third, the WLAD infringes the Mission's right to expressive association. That is because the WLAD would force the Mission to associate with staff who do not adhere to the same religious views and thus cannot express these views to the world. The Second Circuit recently held—twice—that this right can be raised in the employment context. *See Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023); *CompassCare v. Hochul*, 125 F.4th 49 (2d Cir. 2025). A contrary holding here would create a direct circuit split.

Fourth, the WLAD restricts speech based on content and viewpoint by (1) prohibiting the Mission from posting job advertisements that tell applicants they must share the Mission's religious views on marriage and sexuality, and (2) asking applicants about the same. Because the Mission's underlying right to make employment decisions based on religion is protected, its speech is too.

Finally, the Mission will likely suffer irreparable harm absent the injunction because, as the State has made clear, it will enforce the WLAD against the Mission's non-ministerial positions. The Mission has open non-ministerial positions, and it has frequent turnover, so the Mission is always hiring. And it will never be safe from penalties and investigation unless the WLAD is enjoined.

This Court can affirm on any ground supported by the record. It should do so and protect the Mission's First Amendment rights.

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for an abuse of discretion, *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 680 (9th Cir. 2023) (en banc) ("*FCA*"), and may affirm "on any ground supported by the record," *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1159 (9th Cir. 2011). Standing and mootness are reviewed de novo. *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 861 (9th Cir. 2017).

Plaintiffs seeking a preliminary injunction must establish (1) a likelihood of success on the merits, (2) likely irreparable harm absent an injunction, (3) the equities tip in his favor, and (4) an injunction benefits the public interest. *FCA*, 82 F.4th at 683–84.

## ARGUMENT

### I. The Mission has already established standing, and the State hasn't carried its burden to prove mootness.

"[S]tanding is determined as of the *commencement* of litigation." *Yamada v. Snipes*, 786 F.3d 1182, 1203 (9th Cir. 2015) (emphasis added) (cleaned up). This required the Mission to establish an actual or imminent injury traceable to the State that is likely to be redressed by a favorable decision. *Union Gospel Mission,* 2024 WL 3755954, at *1. As this Court already held, the Mission met that burden. *Id.* at *2. The Mission sufficiently "alleged an intention to engage in a course of conduct arguably affected with a constitutional interest" (its

coreligionist hiring practice), that practice was "proscribed" by the WLAD, and it faces "a credible threat of prosecution thereunder." *Id.* at *2–3 (quoting and applying *SBA List*, 573 U.S. at 160) (cleaned up). So courts have a "virtually unflagging obligation to hear and resolve" the issues presented in this case. *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 240 (2024) (cleaned up). The State's arguments fail for three reasons.

First, the State conflates mootness with standing.[1] The State says that after losing an appeal on standing, the notice it filed in the district court cured all threats to the Mission. Opening Br. at 17–18. But cessation goes to mootness, not standing. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000) (distinguishing standing and mootness). That distinction matters because for mootness, the State has the "formidable burden of showing that it is *absolutely clear* that [its] allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 189 (emphasis added). This "holds for governmental defendants no less than for private ones." *Fikre*, 601 U.S. at 241.

The State cannot meet this strict standard because it has not ceased or disavowed the challenged conduct at issue—WLAD enforcement against the Mission for its employment decisions about *all*

---

[1] The State understands this. It argued *mootness* below. SER-130–34 (arguing case is "moot"); SER-088 (holding case "is not moot").

non-ministers. *Union Gospel Mission*, 2024 WL 3755954, at \*2–3. The State's notice only says it will not enforce against the IT technician and operations assistant. 2-ER-105. But it expressly refuses to disavow enforcement against the Mission's other non-ministerial positions, including the open positions the Mission needed to fill. *See* SER-005; 2-ER-021 (Mission employs many other non-ministers); 2-ER-020– 21(listing open non-ministerial positions). The Mission routinely hires non-ministers for various positions, and its need for injunctive relief has never been limited to two positions. *See* 3-ER-334 (praying for injunction to "prefer employing coreligionists"); 3-ER-220 (requesting injunctive relief "for its non-ministerial positions").

The State's notice is a litigation tactic; its real enforcement position has not changed, and there remains "present harm left to enjoin." *Bayer*, 861 F.3d at 864 (cleaned up); *accord Chafin v. Chafin,* 568 U.S. 165, 172 (2013) ("a case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party" (cleaned up)). Every time the Mission uses its religiously based criteria to hire a non-minister (like its Front Desk Coordinator, Nurse, or Cook), it violates the WLAD and risks punishment. The district court rightly recognized this and granted "effective relief," protecting the Mission for all non-ministerial positions. SER-092 (citation omitted).

24

In addition to the State failing to unequivocally disavow total enforcement, the need for an injunction remains. The State cannot simply "suspend its challenged conduct after being sued"—indeed, after losing on standing before this Court—to "win dismissal." *Fikre*, 601 U.S. at 241. For 18 months, the State vehemently contested the Mission's standing; only after "vigorous questioning at argument" by this Court in the first appeal did the State later purport to disavow enforcement (but only for the IT technician and operations assistant). *Health Freedom Def. Fund, Inc. v. Carvalho*, 104 F.4th 715, 723 (9th Cir. 2024). It appears the State "waited to see how the oral argument in this [C]ourt proceeded," and the timing of its notice "is suspect." *Id*; *see also R.W. v. Columbia Basin Coll.*, 77 F.4th 1214, 1226 (9th Cir. 2023) (case was not moot despite "strategic timing" of sending letter "after more than three years of litigation, but only one month before" arguing mootness). An "announcement" like the State's here "does not moot this case." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 457 n.1 (2017).

Second, the Mission still makes a clear showing of a credible threat of enforcement that warrants injunctive relief. The Mission "intends to engage in conduct arguably proscribed by multiple sections of the WLAD," and as just explained, the State continues to "refuse to disavow enforcement to the extent that [the Mission] seeks to hire *non-ministerial employees*." *Union Gospel Mission*, 2024 WL 3755954, at *3

25

(emphasis added). The State's unwillingness to disclaim enforcement for *all* non-ministerial positions—including the open positions for which the Mission submitted job descriptions—proves this is still a live case and controversy.

The State faults the Mission for posting some non-ministerial positions on its website. Opening Br. at 18–19. But the State has it backwards: chill alone does not *create* a credible threat, but a credible threat may cause a party to chill. *See Isaacson v. Mayes*, 84 F.4th 1089, 1098–99 (9th Cir. 2023) ("Plaintiffs need not allege a chilling effect" to bring pre-enforcement claim; question is "whether the harm is sufficiently likely"). And this Court's standing decision did not hinge on a chilling effect. *Union Gospel Mission*, 2024 WL 3755954, at *3. It held the Mission faces a credible threat because it has a "concrete plan to violate the law," the State will not disavow, there are "many enforcers" of the WLAD, and the challenged provision of the WLAD "is relatively new." *Id.* at *2–3 (cleaned up).

Indeed, the Mission *was still self-censoring its conduct and speech*. The Mission did not post its Religious Hiring Statement until after it obtained a preliminary injunction. *See* SER-015–16 (explaining continued chill of posting statement). And the Mission has over 165 employees and frequent turnover; it must fill some positions to operate. That's why it asked for an immediate injunction so it could fill those

positions "consistent with its religious beliefs without facing liability or penalties." 2-ER-023.

Third, this Court already rejected the argument that the "possibility of private enforcement" defeats standing. Opening Br. at 19; *see Union Gospel Mission*, 2024 WL 3755954, at *3 ("We may also find in favor of standing when the government is only one of the many enforcers of the challenged statute." (cleaned up)). The State's argument ignores precedent—third-party enforcement compounds the risk the Mission faces and "bolster[s]" its threat of enforcement. *SBA List*, 573 U.S. at 164; *accord Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1173 (9th Cir. 2018) ("private ... right of action to sue for damages" supported threat of enforcement).

*Murthy v. Missouri* doesn't alter this result. 603 U.S. 43 (2024). The claimed injury in *Murthy* was based on the federal government's "coercion" and "significant encouragement" directed toward social media companies to suppress private users' speech. *Id.* at 69. The Court held that the plaintiffs failed to show Facebook's, Twitter's, and YouTube's past censorship was traceable to the government. *Id.* at 69–73. Here, the Mission's imminent injury is not a product of Washington officials' "coercing" or "encouraging" private parties to file WLAD complaints. To the contrary, the Washington Attorney General and Human Rights Commission enforce the WLAD independently—no middleman required. The preliminary injunction "directly redress[es] the injury

stemming from [the State's] threat of enforcement." *SPU,* 104 F.4th at 63. Holding otherwise would ignore decades of precedent.

The Court "must view any strategic moves designed to keep [it] from reviewing challenged conduct with a critical eye," *Health Freedom,* 104 F.4th at 723 (cleaned up), and should reject the State's attempt to "manipulate[ ]" its "constitutional authority," *Fikre,* 601 U.S. at 241.

## II. The District Court correctly held that the Mission is likely to succeed on its free exercise claim because the WLAD is not neutral or generally applicable and fails strict scrutiny.

The State's enforcement of the WLAD violates at least two "bedrock requirements of the Free Exercise Clause." *FCA,* 82 F.4th at 686. First, the WLAD treats "comparable secular activity more favorably than religious exercise" because it allows certain employers to discriminate freely for secular reasons. *Id.* (*quoting Tandon,* 593 U.S. at 62). Second, the WLAD's BFOQ exemption tool is "a mechanism for individualized exemptions." *Id.* (quoting *Fulton v. City of Phila.,* 593 U.S. 522, 533 (2021)) (cleaned up).

### A. The WLAD is not neutral or generally applicable because it exempts employers for secular reasons but not religious reasons.

#### 1. The district court properly applied *Tandon.*

A law is "not neutral and generally applicable, and therefore trigger[s] strict scrutiny ... whenever [it] treat[s] *any* comparable

secular activity more favorably than religious exercise." *Tandon,* 593 U.S. at 62. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* Treating one secular comparator better than the religious exercise at issue is enough. *Id.*

This Court faithfully applied that principle in *FCA.* There, a public school district stripped a Christian student group of official status because the group—which "welcome[d] all students" to join—required its leaders to affirm its "core religious beliefs." *FCA,* 82 F.4th at 672. The school district asserted interests in "prohibiting discrimination" and "ensuring equal access for all students," yet it allowed certain student groups to exclude members on secular grounds. *Id.* at 689. The South Asian Heritage Club and Senior Women Club, for example, could restrict membership based on ethnicity and sex. *Id.* at 688–89. While those preferences "serve[d] important purposes" for those groups, it made "equal sense that a religious group be allowed to require that its leaders agree with the group's most fundamental beliefs." *Id.* at 689. Although the groups restricted differently, their "exclusionary membership requirements pose[d] an identical risk to the [d]istrict's stated interest[s]," rendering the policy not neutral or generally applicable. *Id.*

*Tandon* and *FCA* control here. The WLAD's purpose is to "eliminat[e] and prevent[ ]" "discrimination." Wash. Rev. Code

§ 49.60.010; 1-ER-010. But the WLAD allows other entities to "discriminate expressly—even on otherwise protected grounds," *FCA*, 82 F.4th at 689, undermining the State's interest.

Start with small employers. Employers with fewer than eight employees (including for-profits) are categorically exempted from the WLAD and can hire or fire—for any reason—without facing liability. Wash. Rev. Code § 49.60.040(11). Small employers' hiring activities are "comparable" to the Mission's activity of requiring employees to share its beliefs on marriage and sexuality because they "pose[s] an identical risk" to the State's interest in preventing and eliminating discrimination. *FCA*, 82 F.4th at 689. Thousands of Washington employers[2] can decline to hire for any reason—even protected classifications—while the Mission faces penalties for hiring only those who share its beliefs. The district court got it right: this "put[s] for-profit, non-religious organizations on unequal footing with [the Mission] and other religious organizations like it." 1-ER-010. Such a law is not generally applicable.

---

[2] Per the State of Washington's Employment Security Department, in 2023, over 58% of Washington Employers employed four or fewer employees (124,621 out of 213,074 establishments). And nearly 75% of Washington employers employed nine or fewer employees (159,661 out of 213,074 total establishments). Thus, (save for employers with exactly nine employees who would be subject to the WLAD) almost three-quarters of Washington employers fall within the WLAD's small employer exemption. *See* Wash. Emp. Sec. Dep't, *Establishment Size*, http://bit.ly/4awefWh (last visited Jan. 27, 2025).

Next consider private membership clubs and educational institutions. "[D]istinctly private" organizations are exempt from the WLAD's public accommodation provisions, Wash. Rev. Code § 49.60.040(2), and "public or private educational institution[s]" can discriminate based on "sex" or "on the basis of marital or families with children status," *id.* § 49.60.222(3). So both can discriminate without facing WLAD enforcement, while the Mission is prohibited from favoring those who share its religious beliefs. This is so even though the Mission serves everybody regardless of background, belief, or identity. 3-ER-243. Nor does it matter that those entities discriminate in services rather than employment. *Youth 71Five Ministries v. Williams*, No. 24-4101, 2024 WL 3749842, at *4 (9th Cir. Aug. 8, 2024) (non-discrimination rule not generally applicable when secular groups could "discriminate in the provision of their services" but religious organization's hiring practices were prohibited).

## 2. The State's counterarguments are wrong.

The State's main response is that the Mission is only comparable to secular employers with eight or more employees—not small, exempt employers. Opening Br. at 25–34. That's wrong. "Comparability is concerned with the risks various activities pose" to the State's interests, not the size of who poses the risk. *Tandon*, 593 U.S. at 62. The question is whether the State "treat[s] *any* comparable secular activity" better than the "*religious exercise at issue*"—here, the Mission's requirement

31

that employees share its religious beliefs about marriage and sexuality. *Id.* (second emphasis added). Thousands of small secular employers can insist employees adhere to similar requirements for social or ideological reasons, among others. For example, a small non-profit that supports the LGBT community could refuse to hire heterosexual or non-transgender applicants. But the Mission risks punishment under the WLAD when it engages in religious-based ideological hiring practices. It matters not that other large employers are treated "as poorly as" the Mission. *Id.*

*Tandon* "summarily rejected" a narrow rule that the secular activity must be identical to the religious activity to trigger strict scrutiny. 593 U.S. at 63–64; c*ontra* Opening Br. at 25, 32. There, California banned at-home private gatherings of three or more households but allowed various public places like "hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants to bring together more than three households at a time." *Tandon*, 593 U.S. at 63. The Supreme Court rebuffed the dissent's (and a panel of this Court's) view that those larger public gatherings were not analogous to private "at-home religious gatherings" and the "obvious comparator" to at-home religious exercise was "at-home secular gatherings." *Id.* at 65 (Kagan, J., dissenting).

The dissent argued that because California "adopted a blanket restriction on at-home gatherings of all kinds," its ban was neutral and generally applicable. *Id.* But the majority took a broader view, holding that *private* at-home religious gatherings had to be treated as well as *public* places like "hardware stores and hair salons" even if that meant treating them "unlike at-home secular gatherings." *Id.* The less-regulated public gatherings posed the same *risks* to preventing Covid-19 and so were "comparable" enough. *Id.* at 63–64 (per curiam opinion).

The State's argument here follows the same flawed reasoning as the *Tandon* dissent. The State would have this Court compare the Mission *only* to large (eight or more employees) secular employers just as the *Tandon* dissenters argued at-home religious gatherings were comparable only to at-home secular gatherings. Comparability is not so narrow-sighted. In *FCA*, this Court rejected the school district's attempt to "draw a distinction between school-operated and student-operated programs." 82 F.4th at 689. And there, this Court held the Girls' Circle—a non-approved student group that discriminated based on sex—was comparable to the Fellowship of Christian Athletes. *Id.* Indeed, "comparable" secular entities are often "in other ways very different." *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 481 (6th Cir. 2020); *see also id.* at 482 (private Christian schools were comparable to "gyms, tanning salons, office

buildings, and the Hollywood Casino," which were open during the pandemic even though *all schools* were closed).

Similarly, the State says the WLAD is generally applicable because it treats small religious employers the same as small secular employers—"they are both exempt." Opening Br. at 27. That, too, is incorrect. *Tandon* requires an evaluation of "the religious exercise at issue," not weighing some other religious entities to the secular comparator. *Tandon*, 593 U.S. at 62. For instance, in *Tandon* itself, houses of worship were treated on par with hair salons, movie theaters, and the like. Under California's restrictions, "[i]ndoor services at houses of worship" were permitted subject to 25% or 50% capacity restrictions and outdoor services without limits. *Tandon v. Newsom*, 992 F.3d 916, 918 (9th Cir. 2021), *application for injunction granted*, 593 U.S. 61. But the Supreme Court did not ask whether houses of worship were comparable to hair salons, movie theaters, and other places. Indeed, it was irrelevant that the individual religious petitioners could have exercised their religion under different circumstances—for example, by gathering with more than three households at a house of worship. What mattered was the "religious exercise at issue"—private at-home religious gatherings for Bible studies and worship. *Tandon*, 593 U.S. at 62–63. The same is true here: *the Mission's* religious exercise of hiring coreligionists is the focus, not whether the Mission could freely hire coreligionists if it had fewer than eight employees.

34

And make no mistake, the WLAD does not exempt small religious employers because they are *religious*, but because they fall within a *secular* exemption based on size. The State counters that "[h]aving fewer than eight employees is not a 'secular activity.'" Opening Br. at 26. But whatever the State's reasons for exempting employers with fewer than eight employees—relief from compliance burdens, costs, administrative oversight—it was not to protect religion. *See Woods*, 481 P.3d at 1064 (noting the WLAD exempts "small employers *and* religious nonprofits" (emphasis added)). The WLAD thus "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton,* 593 U.S. at 534. So strict scrutiny applies. *Id.* at 543–46; *Tandon*, 593 U.S. at 62.

Nor do any of the State's cited cases override *Tandon* and *FCA*. The State's quote plucked from *Kane v. De Blasio* comes from a portion of that opinion that addressed whether the vaccine mandate was *facially* constitutional. 19 F.4th 152, 165–66 (2d Cir. 2021) (per curiam). There, the city's interest "in stemming the spread of COVID-19" among students was not undermined by failing to regulate groups of employees who never "c[a]me into prolonged daily contact with large groups of students." *Id.* Likewise, in *Tingley v. Ferguson*, this Court found that the two therapies at issue did not pose the same risks to the government's asserted interest, and so were not comparable. 47 F.4th 1055, 1078 (9th Cir. 2022). But the same cannot be said of the small-

35

employer exemption here, which undermines directly the State's interest in stopping employment discrimination.

So the State turns to a policy argument, arguing that if a law (like the WLAD) has secular exemptions then religious groups will get "general immunity." Opening Br. at 30–34. Not even close. First, the law at issue must burden a "sincere religious practice." *Kennedy,* 597 U.S. at 525. Second, even if the law is not neutral or generally applicable, the government can still justify a religious burden under strict scrutiny. *Id.* Third, if a non-neutral/generally applicable law burdens a religious practice and fails strict scrutiny, only the precise religious exercise at issue is protected; it does not give religious employers freedom to disregard the law.

What's more, all the federal laws the State cites—the FLSA, the FMLA, and OSHA rules—are already subject to strict scrutiny under the Religious Freedom Restoration Act (assuming there's a religious burden). 42 U.S.C. § 2000bb, *et seq.* Likewise, strict scrutiny applies to neutral and generally applicable laws under Washington's Constitution. *First Covenant Church of Seattle v. City of Seattle,* 840 P.2d 174, 187 (Wash. 1992) ("State action is constitutional under the free exercise clause of article 1 if the action results in no infringement of a citizen's right or if a compelling state interest justifies any burden on the free exercise of religion."). Yet neither RFRA nor Washington's free exercise clause have led to "wholesale exemptions for all religious employers,"

Opening Br. at 1, and neither will faithfully applying the general applicability requirement here.

Plus, employment laws across the country already categorically exempt religious employers, proving the sky will not fall if the government must treat religious activity equal to the best-treated secular activity. *See* Pet. for a Writ of Cert. at 202a–251a, *Seattle's Union Gospel Mission v. Woods,* 142 S. Ct. 1094 (2022) (No. 21-144) (listing a 50-state survey of religious employer exemptions).[3] That was even the case in Washington for the 72 years before *Woods*: religious nonprofits *did* enjoy general immunity from the WLAD, yet society did not crumble.

Lastly, the State says the Supreme Court has "upheld a variety" of "regulations over sincere religious objections," even though they "also had exceptions." Opening Br. at 33. But the cases cited in support predate *Fulton* and *Tandon*, and did not evaluate whether the challenged regulations were generally applicable. The Court instead rejected the free exercise claim in *Tony & Susan Alamo Foundation v. Secretary of Labor* because the law there did not substantially burden anyone's religious exercise. *See* 471 U.S. 290, 304–05 (1985) (law did not "interfere with the associates' right to freely exercise their religious beliefs"). And the Court rejected the free-exercise claims in *Bob Jones*

---

[3] A copy of the certiorari petition can be found on the Supreme Court's website: https://bit.ly/4ggbvNK (*see* pdf pages 260–309).

*University v. United States* and *United States v. Lee* only after applying strict scrutiny. *Bob Jones*, 461 U.S. 574, 604 (1983); *Lee*, 455 U.S. 252, 258–60 (1982).

At bottom, the WLAD exempts some employers from the WLAD for a secular reason—their size—yet prohibits the Mission's religious exercise of hiring only employees who share its faith. "[T]here is no meaningful constitutionally acceptable distinction between the types of exclusions at play here." *FCA*, 82 F.4th at 689. The WLAD must undergo strict scrutiny.

### B. The WLAD is not neutral or generally applicable because it allows for case-by-case exemptions.

The WLAD also fails general applicability because it contains "a mechanism for individualized exemptions" that allows the State "to decide which reasons for not complying with [the WLAD] are worthy of solicitude." *Fulton*, 593 U.S. at 533, 537 (cleaned up). The State can exempt employment conduct if the State decides it is "based upon a bona fide occupational qualification." Wash. Rev. Code § 49.60.180(1). The BFOQ "is an exception to the rule that an employer ... may not discriminate on the basis of protected status." Wash. Admin. Code § 162-16-240. The Commission can apply a BFOQ in its sole discretion when it "believes" a "protected status will be essential to or will contribute to the accomplishment of the purposes of the job." *Id.* The

"mere existence" of this discretion defeats general applicability. *FCA*, 82 F.4th at 687; *accord Fulton*, 593 U.S. at 537.

The WLAD has another system of individualized exemptions: application of the WLAD's religious-employer exemption, post-*Woods*, now depends on the State's case-by-case assessment of whether a particular position is religious enough to merit "ministerial" status. *Woods*, 481 P.3d at 1067 (explaining the "appropriate parameters" of the exemption is fact specific). That's exactly what the Attorney General did in the *SPU* matter where his office sought to "sort[ ] out" and "categor[ize]" employees to "determine which positions are ministerial and which are not." Reply in Supp. of Mot. to Dismiss at 6, *Seattle Pac. Univ. v. Ferguson*, No. 3:22-cv-05540 (W.D. Wash. Oct. 14, 2022).

Again, *FCA* is on point. There, the school district had "significant discretion" to excuse student groups from its "'broad' and 'comprehensive'" non-discrimination policies. *FCA*, 82 F.4th at 687. This included "discretion to allow student groups to discriminate based on other 'non-discriminatory' criteria" available on a "case-by-case basis." *Id.* at 688. This Court held that the school district's "broad discretion to grant exemptions on less than clear considerations removes its non-discrimination policies from the realm of general applicability and thus subjects the policy to strict scrutiny." *Id.*

Same here. The BFOQ exemption gives the Commission broad discretion to decide if an employer is allowed to "discriminate." No

criteria are provided; the exemption is available if the Commission "believes" it important. Wash. Admin. Code § 162-16-240. Likewise, religious organizations may—or may not—be able to fill certain positions with coreligionists without risking liability, contingent solely on whether the Attorney General thinks the position is a minister and thus qualifies for the WLAD's existing religious-employer exemption. "[T]he very fact" that the BFOQ and the religious-employer exemption "require a case-by-case analysis is antithetical to a generally applicable policy" and therefore triggers strict scrutiny. *FCA*, 82 F.4th at 688.

## C. The WLAD fails strict scrutiny.

To survive strict scrutiny, the WLAD must "advance[ ] interests of the highest order" and be "narrowly tailored to achieve those interests." *Fulton*, 593 U.S. at 541 (cleaned up). The State cannot "rely on broadly formulated interests" but "must scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Id.* (cleaned up). So the State must prove that it has a compelling interest "in denying an exception" to the Mission, *id.*, and that there are no "less restrictive measures" to achieve its goals, *FCA*, 82 F.4th at 694. It cannot satisfy either requirement.

There is no legitimate justification for forcing the Mission to hire those who do not share and live out its religious beliefs. The State asserts it has a compelling interest in "[p]reventing discrimination." Opening Br. at 37. But that interest is stated at a "high level of

40

generality" and does not explain why the State must ban the Mission's religiously based hiring decisions when the vast majority of Washington employers can discriminate without penalty. In any event, the WLAD's small employer exemption—as well as the exemptions for BFOQs, private clubs, and educational institutions—"undermines" any contention that the State's interest in preventing discrimination "can brook no departures." *Fulton*, 593 U.S. at 542; *accord Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 547 (1993*)* ("a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited" (cleaned up)).

Nor is the WLAD narrowly tailored. If the State "can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541. For over 70 years, Washington advanced its interests while exempting nonprofit religious organizations entirely. So does federal law. 42 U.S.C. § 2000e-1(a) (religious organizations can prefer "individuals of a particular religion to perform work connected with the carrying on ... of its activities"); *accord Youth 71Five*, 2024 WL 3749842, at *4 (concluding state agency's non-discrimination rule was "likely … not narrowly tailored" because it "reaches beyond the strictures" of state law).

41

The WLAD burdens the Mission's religious practice of hiring coreligionists, is not neutral or generally applicable, and fails strict scrutiny as applied to the Mission. This Court should affirm.[4]

## III. The Mission is likely to succeed on its church autonomy claim because the WLAD interferes with the Mission's religiously based personnel decisions.

The Court should also affirm because the State's enforcement of the WLAD infringes the Mission's internal autonomy by penalizing it for setting religious qualifications for its employees. Both Religion Clauses forbid this entanglement in religious matters.

### A. Church autonomy extends beyond the ministerial exception and protects the Mission's right to prefer coreligionists for all positions.

The First Amendment protects the right of religious organizations "to decide matters of faith and doctrine" and assures "independence" in "matters of church government." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (cleaned up). This autonomy includes the freedom to decide matters of "church discipline" and "ecclesiastical government," as well as the right to require its members to "conform[ ]" to the "standard of morals required of them." *Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich,* 426 U.S. 696,

---

[4] If the Court determines the WLAD is neutral and generally applicable, the Mission preserves the argument for appeal that *Employment Division v. Smith*, 494 U.S. 872 (1990), should be overruled.

714 (1976) (cleaned up). And it protects religious organizations from "secular control or manipulation" and "state interference." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

One "component" of this autonomy is the ministerial exception. *Our Lady*, 591 U.S. at 746. The ministerial exception turns on "who" not "what." If an employee qualifies as a "minister," then a religious organization has immunity to hire, fire, or make other personnel decisions about that employee for any reason. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 194 (2012) ("The purpose of the [ministerial] exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason."). A "religious organization need not provide any religious justification to invoke the ministerial exception." *Markel v. Union of Orthodox Jewish Congregations of Am.*, 124 F.4th 796, 808 (9th Cir. 2024).

But Church autonomy is a "broad principle," *Our Lady,* 591 U.S. at 747, and "is not so narrowly confined" to the ministerial exception, *Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094, 1096 (2022) (Alito, J., respecting the denial of certiorari). Another component of church autonomy protects a religious organization's ability to require that *all* of its employees meet "the standard of morals required of them." *Milivojevich*, 426 U.S. at 714 (cleaned up). Sometimes called the

"coreligionist exemption," this protection turns on "what" not "who," and prohibits penalizing employment decisions that are "based on religious doctrine" no matter how others label that decision. *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 660 (10th Cir. 2002); *see generally* Athanasius G. Sirilla*, The "Nonministerial" Exception,* 99 Notre Dame L. Rev. 393 (2023) (discussing the same principal).

Yet that is exactly what the WLAD does. *See* Wash. Rev. Code § 49.60.180 (unfair practice to "refuse to hire" or "discharge or bar any person from employment" because of sexual orientation). The Mission requires *every* employee—ministerial and non-ministerial alike—to share and follow its beliefs on marriage and sexuality. The reasoning is "based on religious doctrine," *Bryce*, 289 F.3d at 660, and therefore it's constitutionally protected. Scrutinizing such decisions would require the State to examine what the Mission's faith proscribes or prescribes, and whether the religion was truly followed or violated. The Religion Clauses bar that. *NLRB v. Cath. Bishop of Chi.,* 440 U.S. 490, 501–04 (1979) ("very process of inquiry" into religious schools' employment decisions "impinge on rights guaranteed by the Religion Clauses").

The Mission employs only coreligionists so that it presents a credible, consistent, and accurate message to the world. 3-ER-248. Hiring coreligionists also ensures the Mission creates an internal environment of believers who are "united in the same mind," who "exhort one another," and who "bear" each other's "burdens." 2-ER-022

44

(quoting *I Corinthians 1:10*, *Hebrews 3:13*, and *Galatians 6:2*). For example, every employee, regardless of the position held, has inward-facing religious responsibilities to cultivate fellowship, engage in discipleship, and support one another in their faith journeys through their speech and actions. 2-ER-021–022. All of this defines who the Mission is and advances its Gospel-driven social welfare work. 2-ER-023. The Mission considers every position essential to its religious purposes, character, and message. 2-ER-021; 3-ER-246–48. Many secular organizations do the same. Alvaré, *Church Autonomy*, *supra*.

The State impedes the Mission's religious exercise and entangles itself in purely religious matters by telling the organization that it is illegal to ask employees to share its beliefs on marriage and sexuality. This "undermine[s] [its] autonomy" and "continued viability." *Seattle's Union*, 142 S. Ct. at 1096. If the Mission cannot enlist those who sincerely share its faith, it will be reduced to a secular social welfare organization. It could no longer ensure that all its employees share the Gospel or endeavor to live out their faith. The Mission "does not seek to impose [its] beliefs on anyone else," it desires only to "continue serving" the people of Yakima while adhering to its faith. *Fulton*, 593 U.S. at 542. Church autonomy protects this right.

### B.    The State's limited view of church autonomy is wrong.

The State offers several reasons why the church autonomy doctrine doesn't apply here. All lack merit.

### 1. The Mission does not seek blanket immunity.

The State claims that the coreligionist exemption would allow religious organizations to discriminate against non-ministers for any reason. Opening Br. at 38–39. Not so. As already explained, the coreligionist exemption protects employment decisions "rooted in religious belief," *Bryce*, 289 F.3d at 657 (citation omitted), including the decision not to hire "an employee whose conduct or religious beliefs are inconsistent with those of [the] employer," *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 624 (6th Cir. 2000). Unlike the ministerial exception, this protection extends to all employees but applies *only* to religiously based decisions.

That's not to say the government cannot engage in a limited inquiry. After all, courts routinely do so in ministerial exception cases by looking at a position's duties and function. But once a religious organization proffers a sincere religious reason for an employment decision, further scrutiny must end, lest the State entangle itself in religious matters. *Cath. Bishop of Chi.*, 440 U.S. at 502 ("very process of inquiry" would infringe Religion Clauses); *cf. Bryce*, 289 F.3d at 657 (courts can resolve "purely secular decisions"); *see also* Sirilla, *The "Nonministerial" Exception, supra*, at 419–22 (discussing the sincerity requirement under church autonomy).

And the State's purported concerns about "discrimination" as to non-ministers is belied by the fact that nearly every state (and the

federal government) allows religious organizations to prefer coreligionists. *See* Pet. for a Writ of Cert. at 202a–251a, *Seattle's Union Gospel Mission,* 142 S. Ct. 1094 (No. 21-144). Washington is the outlier here.

### 2. Case law recognizes the coreligionist exemption.

The State says there is "a wall of Circuit authority" rejecting the constitutional right to employ coreligionists. Opening Br. at 40. Quite the opposite: the authority supports the Mission's autonomy rights.

First, *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos* supports the right at issue here. 483 U.S. 327, 334–36 (1987). There, the Court explained how—absent an exemption for religious organizations—Title VII would force religious groups to alter the way they "carry out their religious missions" to avoid "potential liability," *id.* at 335–36, thereby "burden[ing] the exercise of religion," *id.* at 338. Justice Brennan concurred, explaining that the First Amendment protects religious organizations' right to define themselves by deciding "that certain activities are in furtherance of [their] religious mission, and that only those committed to that mission should conduct them." *Id.* at 342 (Brennan, J., concurring). If religious organizations have no statutory protection to exercise that right—the precise problem here—the Constitution must step in.

Second, *Bryce* held church autonomy applies when a church fires an employee for living contrary to its teachings. 289 F.3d at 660. The church there learned that its youth pastor was in a same-sex union and

fired her for not following Episcopal doctrine. *Id.* at 651–53. The employee sued for sex discrimination. *Id.* The Tenth Circuit explained that a religious organization's "constitutional protection extends beyond the selection of clergy to other internal church matters." *Id.* at 656. It declined to apply the ministerial exception and held the "broader church autonomy doctrine" protects "personnel decision[s]" "rooted in religious belief." *Id.* at 656–58, 658 n.2. Because the termination decision was "based on religious doctrine" the employee's discrimination claims were barred. *Id.* at 660.[5]

Third, other federal courts have likewise applied church-autonomy principles to bar employment-discrimination claims. In *Butler v. St. Stanislaus Kostka Catholic Academy*, the court held church autonomy barred a sexual orientation discrimination claim "[e]ven if [the employee] did not qualify as a ministerial employee" because the school "proffered a religious reason for termination." 609 F. Supp. 3d 184, 188, 198–204 (E.D.N.Y. 2022), *appeal dismissed* (Aug. 26, 2022). And in *Garrick v. Moody Bible Institute*, the district court held that the

---

[5] *Bryce*'s holding is not limited to claims relying on a religious organization's speech alone. There, the employee alleged sexual harassment based on the church's statements about homosexuality. But the court's holding was not limited to protecting the church's discussion on those issues. Rather, the statements "related to [the employee's] employment within the church" and the court held the church's underlying "personnel decision" to fire her was protected by church autonomy. *Id.* at 659, 660.

"overarching principle of religious autonomy" barred a discrimination claim where Moody's reasons for termination "were rooted firmly in its religious beliefs." 412 F. Supp. 3d 859, 871–73 (N.D. Ill. 2019).

Fourth, the "courts of appeals have generally protected the autonomy of religious organization to hire personnel who share their beliefs." *Seattle's Union*, 142 S. Ct. at 1094. These cases typically note the constitutional problems that would arise under nondiscrimination laws absent an exemption for religious organizations. *E.g.*, *Korte v. Sebelius,* 735 F.3d 654, 678 (7th Cir. 2013) (Title VII's religious employer exemption is a "legislative application[ ] of the church-autonomy doctrine.").

For instance, in *Hall,* the Sixth Circuit explained that Title VII exempts religious employers because of their "constitutionally-protected interest ... in making religiously-motivated employment decisions." 215 F.3d at 623. So a religious college's decision to terminate a lesbian student-services specialist due to her conflicting religious beliefs and conduct was protected. *Id.* at 623–25.

The same was true in *Little v. Wuerl*, where the Third Circuit acknowledged Title VII's exemption was enacted "to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices." 929 F.2d 944, 951 (3d Cir. 1991). There, a Catholic school refused to rehire a teacher because she divorced and remarried without an annulment, contrary to Catholic

49

doctrine. *Id.* at 945–46. The court noted that penalizing the school would "arguably violate both the free exercise clause and the establishment clause." *Id.* at 947; *accord Killinger v. Samford Univ.*, 113 F.3d 196, 201 (11th Cir. 1997) (Title VII religious employer exemption "avoid[s] First Amendment concerns").

This Court has expressed similar constitutional concerns. In *Spencer v. World Vision, Inc.*, Judge O'Scannlain concluded that a "cramped reading" of Title VII's religious exemption "raises serious questions under both the Free Exercise Clause and the Establishment Clause." 633 F.3d 723, 729 (9th Cir. 2011) (per curiam) (O'Scannlain, J., concurring). In the same case, Judge Kleinfeld framed the exact issue the Mission faces today: "If the government coerced staffing of religious institutions by persons who rejected or even were hostile to the religions the institutions were intended to advance, then the shield against discrimination would destroy the freedom of Americans to practice their religions." *Id.* at 742 (Kleinfeld, J., concurring). And in *EEOC v. Townley Engineering and Manufacturing Company*, this Court stated that "even without [the religious employer exemption], the First Amendment would limit Title VII's ability to regulate the employment relationships within churches and similar organizations." 859 F.2d 610, 618 n.13 (9th Cir. 1988).

### 3. The State's cited cases don't apply.

The States' selective quoting from a handful of cases doesn't change anything. First, *Puri v. Khalsa* recognized an independent church autonomy defense apart from the ministerial exception and only held it didn't apply because defendants didn't provide a "*religious justification*" for denying plaintiffs board positions at a company that owned a religious group. 844 F.3d 1152, 1167 (9th Cir. 2017) (cleaned up) (emphasis added). There was no need to address religion; the dispute could be resolved by looking to state law and secular corporate documents. *Id.*

Second, *EEOC v. Fremont Christian School* and *EEOC v. Pacific Press Publishing Association* are inapposite because the Court found there to be no burden on the alleged religious exercises. *Freemont Christian Sch.*, 781 F.2d 1362, 1368 (9th Cir. 1986) (pastor testified it would be sinful to treat women unequally and so there was "no significant impact" on the school's religious beliefs); *Pacific Press*, 676 F.2d 1272, 1279 (9th Cir. 1982) (no "significant impact" because Church believed it should pay wages equally). The Court found a burden on Pacific Press's belief that church members should not sue the church but upheld the claim under strict scrutiny. *Pacific Press*, 676 F.2d at 1279–81. That conclusion is no longer good law, as the Supreme Court has since clarified that church autonomy involves no interest balancing, for "the First Amendment has struck the balance for us." *Hosanna-*

*Tabor*, 565 U.S. at 196; *see also Werft v. Desert Sw. Ann. Conf. of United Methodist Church*, 377 F.3d 1099, 1102 (9th Cir. 2004) (per curiam) ("the balancing test contemplates that some statutes may still have such an adverse impact on religious liberty as to render judicial review of a Church's compliance with the statute a violation of the Free Exercise Clause").

Third, the State's quote to *EEOC v. Mississippi College*, Opening Br. at 41, only explains that the college's faculty members did not automatically qualify as ministers simply because of the school's requirement to exemplify the faith, 626 F.2d 477, 485 (5th Cir. 1980). Still, a broad interpretation of Title VII's exemption was "required to avoid" "conflicts" with the "religion clauses." *Id.*

Fourth, *Rayburn v. General Conference of Seventh-Day Adventists* held that the position at issue fell within the ministerial exception. 772 F.2d 1164, 1172 (4th Cir. 1985). That court's general statement about Title VII liability for other positions didn't hold that religiously rooted decisions were unprotected; instead, "religious institutions may base relevant hiring decisions upon religious preferences." *Id.* at 1166.

Lastly, the district court in *Starkey v. Roman Catholic Archdiocese of Indianapolis* held church autonomy didn't warrant "dismissal on the pleadings" because it was factually disputed whether the employee's position "was religious or secular." 496 F. Supp. 3d 1195, 1207 (S.D. Ind. 2020). But as explained, church autonomy extends beyond the

52

ministerial exception; the coreligionist exemption focuses on the reasons for the decision, not the nature of the position at issue. And there the Seventh Circuit noted on appeal, "church autonomy means what it says: churches must have independence in matters of faith and doctrine and in closely linked matters of internal government." 41 F.4th 931, 942 (7th Cir. 2022) (cleaned up).

## IV. The Mission is likely to succeed on its expressive association claim because the WLAD forces association with those who neither share nor can relay its beliefs.

By prohibiting the Mission from hiring only coreligionists, the WLAD also violates the Mission's First Amendment right "to associate with others in pursuit of ... religious ... ends," including its "freedom not to associate" with people who "may impair [its] ability" to express its views. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647–48 (2000) (cleaned up). The right applies because (1) the Mission "engages in 'expressive association,'" and (2) "[t]he forced inclusion" of a nonbeliever "affects in a significant way [the Mission's] ability to advocate public or private viewpoints." *Id.*

First, the Mission is an expressive association. "Religious groups are the archetype of associations formed for expressive purposes, and their fundamental rights surely include the freedom to choose who is qualified to serve as a voice for their faith." *Hosanna-Tabor*, 565 U.S. at 200–201 (Alito, J., concurring). Indeed, the Mission's central purpose is

53

to "to spread the Gospel of the Lord Jesus Christ" with the rest of the world, including with shelter guests, recovery program participants, thrift store shoppers, and the homeless on the streets. 3-ER-290.

Second, forcing the Mission to accept those who reject its beliefs on marriage and sexuality would "significantly burden" the ministry's ability to espouse that Gospel message. *Dale*, 530 U.S. at 653. Not only would those individuals be incapable of authentically communicating the Mission's Christian tenets, but their "presence" alone would "force" the Mission "to send a message, both to [its clients] and the world, that [its religion] accepts homosexual conduct" as morally permissible. *Id.*; *see also Darren Patterson Christian Acad. v. Roy,* 699 F. Supp. 3d 1163, 1184–85 (D. Colo. 2023) (forcing Christian school to "hire those who disagree with its religious expression and evangelistic mission" violates expressive association).

## A. Expressive association applies in employment.

The State says expressive association cannot apply in the employment context. Opening Br. 43–47. But the Second Circuit recently affirmed *twice* that it does. A contrary finding here would create a direct circuit split.

First, in *Slattery v. Hochul*, New York passed a law that prohibited employment discrimination based on a person's "reproductive health decision making." 61 F.4th at 283 (quoting N.Y. Lab. L. § 203-e(2)(a)). A pro-life pregnancy center that hired only people who oppose

abortion argued the law violated its freedom of expressive association "by preventing it from disassociating itself from employees who, among other things, seek abortions," which would "undermine[ ] its anti-abortion message." *Id.*

The Second Circuit agreed, holding the center's "right to expressive association allows [it] to determine that its message will be effectively conveyed only by employees who sincerely share its views." *Id.* at 288. In deciding whether someone "holds certain views," the pregnancy center asked "whether that person has engaged or will engage in conduct antithetical to those views." *Id.* If the applicant answered, "yes," the center would not hire the person. Yet because the law "force[d]" the center to employ "individuals who act or have acted against the very mission of its organization," it infringed the center's rights. *Id.* Nor did it matter that the law forced association in *employment*: "compelled hiring, like compelled membership, may be a way in which a government mandate can affect in a significant way a group's ability to advocate public or private viewpoints." *Id.* (cleaned up).

Second, in *CompassCare v. Hochul*, a pregnancy care center and other groups claimed the same New York law infringed their expressive association. 125 F.4th at 57. Like Washington here, New York argued "employers have *no* freedom of expressive association." *Id.* at 59. The court rejected that contention and, relying on *Slattery*, held that a "mission-based organization that advocates for a particular cause or set

55

of beliefs" may show that "the compelled retention of a specific employee would impair its ability to express its message." *Id.* at 61.[6]

Nor does *Hishon v. King & Spalding* help the State. 467 U.S. 69 (1984). There a woman sued a large law firm for sex discrimination after being passed over for partnership. *Id.* at 72. The law firm argued that making the woman partner would violate its expressive association rights. *Id.* at 78. The Supreme Court attributed four sentences to the issue and *did not* hold that the right to expressive association was inapplicable to employment disputes. *Id.* Rather, the law firm failed to show how making a woman partner would impede its ability to "contribut[e] to the ideas and beliefs of our society." *Id.* (cleaned up). *I.e.*, there was no impact on the law firm's expression.

Finally, the fact that the Mission pays its associational members does not transform its expression into "commercial" conduct or speech. *Contra* Opening Br. at 45–46. The Mission voices a message. And it does not turn a profit. There is nothing "commercial" about spreading

---

[6] To be sure, *CompassCare* noted that employers must show that the challenged law "threatens" the association's "very mission." 125 F.4th at 61. They can do so by stating "the responsibilities of the position[s] at issue," including whether it "involves speaking for the organization." *Id.* The Mission satisfies that standard here because "all positions" at the Mission have "religious expectations to share the Christian faith." 2-ER-020. And all are agents of the Mission and required to evangelize. *Id.*; 3-ER-295–296; *see, e.g.*, 2-ER-027, 033, 036, 040, 044, 047, 050, 054, 058, 063 (job descriptions listing spiritual duties).

the Gospel of Jesus Christ. *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001) ("commercial speech [is] usually defined as speech that does no more than propose a commercial transaction"). As the Supreme Court has repeatedly held, speakers do not "shed their First Amendment protections by employing the corporate form to disseminate their speech." *303 Creative LLC v. Elenis,* 600 U.S. 570, 594 (2023); *see also Green v. Miss United States of Am., LLC*, 52 F.4th 773, 803–05 (9th Cir. 2022) (Vandyke, J., concurring) (explaining commercial aspects does not defeat expressive association).

The Mission's associational rights fully apply here.

### B.    The WLAD burdens the Mission's expression.

The State says the WLAD doesn't burden the Mission's collective expression. Opening Br. at 47–51. But of course it does. "When it comes to the expression and inculcation of religious doctrine, there can be no doubt that the messenger matters." *Hosanna-Tabor*, 565 U.S. at 200–201 (Alito, J., concurring). The WLAD forces the Mission to employ those who do not follow the same beliefs on marriage and sexuality, and thus who cannot effectively share those beliefs with others.

The Mission thoroughly explained that the "inclusion of nonbelievers" would "undermine[ ] its ability to be an example of and propagate its Christian teachings and ideals." 3-ER-318; *see also* 3-ER-315 ("Each [employee] conversation should be consistent with scriptural mandates."). The record is filled with this evidence. *See* 3-ER-290–303,

57

3-ER-313–323 (Verified Complaint); 3-ER-242–256 (Johnson Declaration); 2-ER-019–024 (Thielen Declaration). If an employee believes same-sex marriage and conduct is permitted by the Bible, he necessarily cannot express the Mission's opposite view. Unsurprisingly, the Mission has decided such a person would not be an appropriate person to inculcate its beliefs to others. The First Amendment demands deference to the Mission's determination. *See Dale*, 530 U.S. at 653 (deference given "to an association's view of what would impair its expression"); *Green*, 52 F.4th at 807 (Vandyke, J., concurring) (same).

Courts do not "inquire further" when the record "contains written evidence of [the association's] viewpoint." *Dale*, 530 U.S. at 651. So this case is nothing like *Roberts v. U.S. Jaycees,* where the Jaycees claimed that admitting women as members would infringe its expressive association. 468 U.S. 609 (1984). There, the Jacyees relied on a "hypothesis" that "women *might* have a different attitude" on certain public issues and "generalizations about the relative interests and perspectives of men and women." *Id.* at 627–28 (emphasis added). But here the Mission does not rely on "generalizations"—it directly asks applicants whether they adhere to the Bible's view on marriage and sexuality. If they do not, they cannot accurately represent the Mission.

The messenger matters. Imagine forcing Democrats to hire Republicans, PETA to hire carnivore dieters, Greenpeace to hire coal miners, or Advocates for Trans Equality to hire J.K. Rowling—as

marketers to promote and speak the groups' message. The groups' credibility would be eviscerated, their purposes thwarted. So too here.

The Mission's right to associate is doubly protected because it is a religious organization with a freestanding right to internal autonomy. The State may think sexual orientation "has nothing to do," Opening Br. at 49, with the Mission's faith or how it impacts the ministry, but that's not for the State to decide. "State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion. The First Amendment outlaws such intrusion." *Our Lady*, 591 U.S. at 746.

Beliefs about marriage and sexuality are fundamental to religious organizations' theology. *See Obergefell v. Hodges,* 576 U.S. 644, 672 (2015) ("Many who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical premises."). Because the WLAD would require the Mission to accept employees who can neither affirm nor communicate those central beliefs, it violates the Mission's right "to choose the content of [its] own messages." *303 Creative*, 600 U.S. at 592 (cleaned up). This also triggers strict scrutiny, *Dale*, 530 U.S. at 648, which, as explained, the WLAD cannot withstand, *see supra* § II(C).

## V.     The Mission is likely to succeed on its speech claims because the WLAD restricts speech based on content.

The WLAD's publication ban, Wash. Rev. Code § 49.60.180, and disclosure provision, *id.* § 49.60.208(1), prohibit the Mission's speech based on its content and viewpoint and are presumptively unconstitutional. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

First, the publication ban makes it unlawful to "express[ ] any limitation, specification, or discrimination as to ... sexual orientation" through (1) "any statement, advertisement, or publication," (2) "any form of application for employment," or (3) "any inquiry in connection with prospective employment." Wash. Rev. Code § 49.60.180(4). There's no question that the ban explicitly regulates speech by limiting "express[ion]." *Id.* And it does so by viewpoint—employers can speak in a way that encourages people of all sexual orientations to apply, but the Mission cannot tell potential applicants that they need to follow its beliefs about marriage and sexuality. For example, the Mission would be free to communicate its religious beliefs if they stated that same-sex marriage was permissible, but because the Mission's sincere beliefs teach otherwise, the WLAD silences the Mission.

The State doesn't dispute this, instead it says the publication ban only restricts speech incidental to the Mission's underlying employment conduct. But because the Mission's right to hire only coreligionists is protected by the First Amendment, its speech is too. Moreover, the

60

publication ban gives the Commission unbridled discretion to allow speech that would otherwise be barred by the publication ban through its authority to grant a BFOQ. Wash. Rev. Code § 49.60.180(4) (prohibiting speech "unless based upon a bona fide occupational qualification"). There are no "objective factors," the Commission "need not provide any explanation for [its] decision[s]," and thus "[n]othing in the law ... prevents [the Commission] from encouraging some views and discouraging others." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 133 (1992). The First Amendment prohibits all that.

Next, the State doesn't even argue the disclosure provision, Wash. Rev. Code § 49.60.208(1), is constitutional under the Free Speech Clause. It's not. The disclosure provision prevents the Mission—*a religious charity*—from asking non-ministerial employees about *religion*. That unconstitutionally shuts off an entire category of speech. *Reed,* 576 U.S. at 169; *see Yim v. City of Seattle*, 63 F.4th 783, 789 (9th Cir. 2023) (city ordinance that prohibited landlords from "requiring disclosure or inquiring about" criminal history of prospective tenants regulated protected speech).

## VI. The Mission satisfies the remaining preliminary injunction factors.

The district court did not abuse its discretion in holding that the Mission satisfies the remaining factors warranting a preliminary injunction. In First Amendment cases, the Mission's likelihood of

success on just one of its claims is "determinative" and the Court may "confine [its] analysis to that factor." *Mobilize the Message, LLC v. Bonta*, 50 F.4th 928, 934 (9th Cir. 2022). Moreover, the Mission will suffer irreparable harm absent the injunction, which protects constitutional rights. The injunction benefits the public interest, too.

*Irreparable harm.* "It is axiomatic that 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *FCA*, 82 F.4th at 694 (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020)). The Mission satisfies the irreparable harm factor because it has "demonstrate[d] the existence of a colorable First Amendment claim" times four. *Id.* at 694–95.

The State cites three cases—all decided before *Roman Catholic Diocese* and *FCA*—claiming more is required. Wrong. In *Benisek v. Lamone*, the Court *assumed* plaintiffs were likely to succeed on gerrymandering claims but held there was no possibility of irreparable harm because the plaintiffs waited six years to ask for an injunction and the date for a "new districting scheme" had "already come and gone." 585 U.S. 155, 158–60 (2018) (per curiam) (citation omitted). In *Paramount Land Co. LP v. California Pistachio Commission*, the plaintiffs *failed* to show a likelihood of success. 491 F.3d 1003, 1012 (9th Cir. 2007). And *Doe v. Harris* supports a finding of irreparable harm here. 772 F.3d 563 (9th Cir. 2014). There, this Court held the plaintiffs

faced irreparable harm because they were likely to succeed on their First Amendment claims and that was "sufficient to merit the grant of relief." *Id.* at 583 (cleaned up).

And the Mission will likely suffer irreparable harm in addition to its likelihood of success. Absent an injunction, the Mission suffers irreparable harm every day by being put to the choice of risking potential draconian penalties under the WLAD for hiring according to its faith, or chilling and curtailing its operations. *See, e.g.*, 3-ER-321–323. This dilemma between practicing its religion or keeping its doors open "constitutes an enduring harm that will irreparably risk [the Mission's] continued existence." 1-ER-015 (quoting *FCA*, 82 F.4th at 695) (cleaned up).

On this point, the State merely repeats its standing argument. *Compare* Opening Br. at 57 *with id.* at 17. Yet, as the district court correctly explained (as discussed above in § I), the State's "express refusal to disavow enforcement of the WLAD as it relates to all but two of [the Mission's] open positions ... suggests [the Mission] is likely to suffer an irreparable injury if it engages in the process of hiring for these positions in a way that is consistent with its religious views." 1-ER-014–015. That's upwards of 50 positions a year. The State refuses to say all non-ministerial positions are safe, removing any doubt that irreparable harm is likely.

***Public interest and balance of equities.*** When a government entity opposes injunctive relief, "the third and fourth factors—the balance of equities and the public interest—merge." *FCA,* 82 F.4th at 695 (cleaned up). The Mission has not only "raised serious First Amendment questions," but also demonstrated why it will succeed on them, and that "compels a finding that the balance of hardships tips sharply in its favor." *Id.* (cleaned up). Plus, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (cleaned up). The preliminary injunction permits the Mission to continue its longstanding religious hiring practices without risking investigations, fines, and penalties under the WLAD—how things were from 1949 until *Woods* was decided in 2021. Just as there was no harm to the public interest then, an injunction causes no harm to the public interest now.

## CONCLUSION

This Court recently held, en banc, that "[a]nti-discrimination laws and policies serve undeniably admirable goals, but when those goals collide with the protections of the Constitution, they must yield—no matter how well-intentioned." *Id.* The WLAD must yield here.

This Court should affirm.

Respectfully submitted,

Dated: January 27, 2025

By: */s/ Ryan Tucker*

JOHN J. BURSCH
DAVID A. CORTMAN
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org
dcortman@ADFlegal.org

JAMES A. CAMPBELL
JACOB E. REED
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jcampbell@ADFlegal.org
jreed@ADFlegal.org

RYAN TUCKER
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rtucker@adflegal.org

*Counsel for Plaintiff-Appellee*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Appellee is aware of no related cases pending before this Court.

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2025, I electronically filed the foregoing Answering Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Ryan Tucker*
Ryan Tucker
January 27, 2025                    Attorney for Plaintiff-Appellant

# ADDENDUM

Except for the following, all applicable statutes, etc., are contained in the brief or addendum of Defendants'-Appellants':

## 42 U.S.C. § 2000bb
## Congressional findings and declaration of purposes

(a) Findings

The Congress finds that--

(1) the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

(2) laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;

(3) governments should not substantially burden religious exercise without compelling justification;

(4) in Employment Division v. Smith, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and

(5) the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

(b) Purposes

The purposes of this chapter are--

(1) to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

68

(2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

## 42 U.S.C. § 2000e-1
## Exemption

(a) Inapplicability of subchapter to certain aliens and employees of religious entities

This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

(b) Compliance with statute as violative of foreign law

It shall not be unlawful under section 2000e-2 or 2000e-3 of this title for an employer (or a corporation controlled by an employer), labor organization, employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining (including on-the-job training programs) to take any action otherwise prohibited by such section, with respect to an employee in a workplace in a foreign country if compliance with such section would cause such employer (or such corporation), such organization, such agency, or such committee to violate the law of the foreign country in which such workplace is located.

(c) Control of corporation incorporated in foreign country

(1) If an employer controls a corporation whose place of incorporation is a foreign country, any practice prohibited by section 2000e-2 or 2000e-3 of this title engaged in by such corporation shall be presumed to be engaged in by such employer.

(2) Sections 2000e-2 and 2000e-3 of this title shall not apply with respect to the foreign operations of an employer that is a foreign person not controlled by an American employer.

(3) For purposes of this subsection, the determination of whether an employer controls a corporation shall be based on--

    (A) the interrelation of operations;

    (B) the common management;

    (C) the centralized control of labor relations; and

    (D) the common ownership or financial control, of the employer and the corporation.

## N.Y. Lab. L. § 203-e
## Prohibition of discrimination based on an employee's or a dependent's reproductive health decision making

1. An employer shall be prohibited from accessing an employee's personal information regarding the employee's or the employee's dependent's reproductive health decision making, including but not limited to, the decision to use or access a particular drug, device or medical service without the employee's prior informed affirmative written consent.

2. An employer shall not:

(a) discriminate nor take any retaliatory personnel action against an employee with respect to compensation, terms, conditions, or privileges of employment because of or on the basis of the employee's or dependent's reproductive health decision making, including, but not limited to, a decision to use or access a particular drug, device or medical service; or

(b) require an employee to sign a waiver or other document which purports to deny an employee the right to make their own reproductive health care decisions, including use of a particular drug, device, or medical service.

3. An employee may bring a civil action in any court of competent jurisdiction against an employer alleged to have violated the provisions of this section. In any civil action alleging a violation of this section, the court may:

(a) award damages, including, but not limited to, back pay, benefits and reasonable attorneys' fees and costs incurred to a prevailing plaintiff;

(b) afford injunctive relief against any employer that commits or proposes to commit a violation of the provisions of this section;

(c) order reinstatement; and/or

(d) award liquidated damages equal to one hundred percent of the award for damages pursuant to paragraph (a) of this subdivision unless an employer proves a good faith basis to believe that its actions in violation of this section were in compliance with the law.

4. Nothing in this section shall be construed to limit any rights of an employee provided through any other provision of law, common law or collective bargaining unit.

5. Any act of retaliation for an employee exercising any rights granted under this section shall subject an employer to separate civil penalties under this section. For the purposes of this section, retaliation or retaliatory personnel action shall mean discharging, suspending, demoting, or otherwise penalizing an employee for:

(a) making or threatening to make, a complaint to an employer, co-worker, or to a public body, that rights guaranteed under this section have been violated;

(b) causing to be instituted any proceeding under or related to this section; or

(c) providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry into any such violation of a law, rule, or regulation by such employer.

6. An employer that provides an employee handbook to its employees must include in the handbook notice of employee rights and remedies under this section.

7. If any word, phrase, clause, sentence, paragraph, subdivision, or part of this section or the application thereof to any person or circumstances shall, for any reason, be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair, or invalidate the remainder thereof, and the application thereof to other persons or circumstances, but shall be confined in its operation to the word, phrase, clause, sentence, paragraph, subdivision, or part thereof directly involved in the controversy in which such judgment shall have been rendered and to the person or circumstances involved. It is hereby declared to be the intent of the legislature that this section would have been enacted even if such invalid provisions had not been included herein.

## Wash. Admin. Code § 162-16-240
## Bona fide occupational qualification.

Under the law against discrimination, there is an exception to the rule that an employer, employment agency, labor union, or other person may not discriminate on the basis of protected status; that is if a bona fide occupational qualification (BFOQ) applies. The commission believes that the BFOQ exception should be applied narrowly to jobs for which a particular quality of protected status will be essential to or will contribute to the accomplishment of the purposes of the job. The following examples illustrate how the commission applies BFOQs:

(1) Where it is necessary for the purpose of authenticity or genuineness (e.g., model, actor, actress) or maintaining conventional standards of sexual privacy (e.g., locker room attendant, intimate apparel fitter) the commission will consider protected status to be a BFOQ.

(2) A 911 emergency response service needs operators who are bilingual in English and Spanish. The job qualification should be spoken language competency, not national origin.

(3) An employer refuses to consider a person with a disability for a receptionist position on the basis that the person's disability "would make customers and other coworkers uncomfortable." This is not a valid BFOQ.

(4) A person with a disability applies for promotion to a position at a different site within the firm. The firm does not promote the person because doing so would compel the firm to install an assistive device on equipment at that site to enable the person to properly perform the job. This is not a valid BFOQ.

## Wash. Rev. Code § 49.60.222
## Unfair practices with respect to real estate transactions, facilities, or services

(1) It is an unfair practice for any person, whether acting for himself, herself, or another, because of sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, families with children status, honorably discharged veteran or military status, the presence of any sensory, mental, or physical disability, or the use of a trained dog guide or service animal by a person with a disability:

(a) To refuse to engage in a real estate transaction with a person;

(b) To discriminate against a person in the terms, conditions, or privileges of a real estate transaction or in the furnishing of facilities or services in connection therewith;

(c) To refuse to receive or to fail to transmit a bona fide offer to engage in a real estate transaction from a person;

(d) To refuse to negotiate for a real estate transaction with a person;

(e) To represent to a person that real property is not available for inspection, sale, rental, or lease when in fact it is so available, or to fail to bring a property listing to his or her attention, or to refuse to permit the person to inspect real property;

73

(f) To discriminate in the sale or rental, or to otherwise make unavailable or deny a dwelling, to any person; or to a person residing in or intending to reside in that dwelling after it is sold, rented, or made available; or to any person associated with the person buying or renting;

(g) To make, print, circulate, post, or mail, or cause to be so made or published a statement, advertisement, or sign, or to use a form of application for a real estate transaction, or to make a record or inquiry in connection with a prospective real estate transaction, which indicates, directly or indirectly, an intent to make a limitation, specification, or discrimination with respect thereto;

(h) To offer, solicit, accept, use, or retain a listing of real property with the understanding that a person may be discriminated against in a real estate transaction or in the furnishing of facilities or services in connection therewith;

(i) To expel a person from occupancy of real property;

(j) To discriminate in the course of negotiating, executing, or financing a real estate transaction whether by mortgage, deed of trust, contract, or other instrument imposing a lien or other security in real property, or in negotiating or executing any item or service related thereto including issuance of title insurance, mortgage insurance, loan guarantee, or other aspect of the transaction. Nothing in this section shall limit the effect of RCW 49.60.176 relating to unfair practices in credit transactions; or

(k) To attempt to do any of the unfair practices defined in this section.

(2) For the purposes of this chapter discrimination based on the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person who is blind, deaf, or physically disabled includes:

(a) A refusal to permit, at the expense of the person with a disability, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the dwelling, except that, in the case of a rental, the landlord may, where it is reasonable to do so, condition

74

permission for a modification on the renter agreeing to restore the interior of the dwelling to the condition that existed before the modification, reasonable wear and tear excepted;

(b) To refuse to make reasonable accommodation in rules, policies, practices, or services when such accommodations may be necessary to afford a person with the presence of any sensory, mental, or physical disability and/or the use of a trained dog guide or service animal by a person who is blind, deaf, or physically disabled equal opportunity to use and enjoy a dwelling; or

(c) To fail to design and construct covered multifamily dwellings and premises in conformance with the federal fair housing amendments act of 1988 (42 U.S.C. Sec. 3601 et seq.) and all other applicable laws or regulations pertaining to access by persons with any sensory, mental, or physical disability or use of a trained dog guide or service animal. Whenever the requirements of applicable laws or regulations differ, the requirements which require greater accessibility for persons with any sensory, mental, or physical disability shall govern.

Nothing in (a) or (b) of this subsection shall apply to: (i) A single-family house rented or leased by the owner if the owner does not own or have an interest in the proceeds of the rental or lease of more than three such single-family houses at one time, the rental or lease occurred without the use of a salesperson, or a broker as defined in RCW 18.85.011, and the rental or lease occurred without the publication, posting, or mailing of any advertisement, sign, or statement in violation of subsection (1)(g) of this section; or (ii) rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other if the owner maintains and occupies one of the rooms or units as his or her residence.

(3) Notwithstanding any other provision of this chapter, it shall not be an unfair practice or a denial of civil rights for any public or private educational institution to separate the sexes or give preference to or limit use of dormitories, residence halls, or other student housing to persons of one sex or to make distinctions on the basis of marital or families with children status.

(4) Except pursuant to subsection (2)(a) of this section, this section shall not be construed to require structural changes, modifications, or additions to make facilities accessible to a person with a disability except as otherwise required by law. Nothing in this section affects the rights, responsibilities, and remedies of landlords and tenants pursuant to chapter 59.18 or 59.20 RCW, including the right to post and enforce reasonable rules of conduct and safety for all tenants and their guests, provided that chapters 59.18 and 59.20 RCW are only affected to the extent they are inconsistent with the nondiscrimination requirements of this chapter. Nothing in this section limits the applicability of any reasonable federal, state, or local restrictions regarding the maximum number of occupants permitted to occupy a dwelling.

(5) Notwithstanding any other provision of this chapter, it shall not be an unfair practice for any public establishment providing for accommodations offered for the full enjoyment of transient guests as defined by RCW 9.91.010(1)(c) to make distinctions on the basis of families with children status. Nothing in this section shall limit the effect of RCW 49.60.215 relating to unfair practices in places of public accommodation.

(6) Nothing in this chapter prohibiting discrimination based on families with children status applies to housing for older persons as defined by the federal fair housing amendments act of 1988, 42 U.S.C. Sec. 3607(b)(1) through (3), as amended by the housing for older persons act of 1995, P.L. 104-76, as enacted on December 28, 1995. Nothing in this chapter authorizes requirements for housing for older persons different than the requirements in the federal fair housing amendments act of 1988, 42 U.S.C. Sec. 3607(b)(1) through (3), as amended by the housing for older persons act of 1995, P.L. 104-76, as enacted on December 28, 1995.

(7) Nothing in this chapter shall apply to real estate transactions involving the sharing of a dwelling unit, or rental or sublease of a portion of a dwelling unit, when the dwelling unit is to be occupied by the owner or subleasor. For purposes of this section, "dwelling unit" has the same meaning as in RCW 59.18.030.

**Wash. Rev. Code § 49.60.260**
**Enforcement of orders of administrative law judge--Appellate review of court order**

(1) The commission or any person entitled to relief of a final order may petition the court within the county wherein any unfair practice occurred or wherein any person charged with an unfair practice resides or transacts business for the enforcement of any final order which is not complied with and is issued by the commission or an administrative law judge under the provisions of this chapter and for appropriate temporary relief or a restraining order, and shall certify and file in court the final order sought to be enforced. Within five days after filing such petition in court, the commission or any person entitled to relief of a final order shall cause a notice of the petition to be sent by certified mail to all parties or their representatives.

(2) If within sixty days after the date the administrative law judge's order concerning an unfair practice in a real estate transaction is entered, no petition has been filed under subsection (1) of this section and the commission has not sought enforcement of the final order under this section, any person entitled to relief under the final order may petition for a decree enforcing the order in the superior courts of the state of Washington for the county in which the unfair practice in a real estate transaction under RCW 49.60.222 through 49.60.224 is alleged to have occurred.

(3) From the time the petition is filed, the court shall have jurisdiction of the proceedings and of the questions determined thereon, and shall have the power to grant such temporary relief or restraining order as it deems just and suitable.

(4) If the petition shows that there is a final order issued by the commission or administrative law judge under RCW 49.60.240 or 49.60.250 and that the order has not been complied with in whole or in part, the court shall issue an order directing the person who is alleged to have not complied with the administrative order to appear in court at a time designated in the order, not less than ten days from the date thereof, and show cause why the administrative order should not be enforced according to the terms. The commission or any person entitled

to relief of any final order shall immediately serve the noncomplying party with a copy of the court order and the petition.

(5) The administrative order shall be enforced by the court if the person does not appear, or if the person appears and the court finds that:

(a) The order is regular on its face;

(b) The order has not been complied with; and

(c) The person's answer discloses no valid reason why the order should not be enforced, or that the reason given in the person's answer could have been raised by review under RCW 34.05.510 through 34.05.598, and the person has given no valid excuse for failing to use that remedy.

(6) The jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to appellate review by the supreme court or the court of appeals, on appeal, by either party, irrespective of the nature of the decree or judgment. The review shall be taken and prosecuted in the same manner and form and with the same effect as is provided in other cases.


## Wash. Rev. Code § 49.60.310
## Misdemeanor to interfere with or resist commission

Any person who wilfully resists, prevents, impedes, or interferes with the commission or any of its members or representatives in the performance of duty under this chapter, or who wilfully violates an order of the commission, is guilty of a misdemeanor; but procedure for the review of the order shall not be deemed to be such wilful conduct.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-7246

I am the attorney or self-represented party.

**This brief contains** 13,988 **words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Ryan Tucker **Date** 01/27/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*