**APPEAL NO. 24-7246**

**UNITED STATES COURT OF APPEALS FOR
THE NINTH CIRCUIT**

UNION GOSPEL MISSION OF YAKIMA, WASHINGTON,
*Plaintiff-Appellee*,

v.

ROBERT FERGUSON, in his official capacity as Attorney General of
Washington, ANDRETA ARMSTRONG, in her official capacity as
Executive Director of the Washington State Human Rights Commission; and
GUADALUPE GAMBOA, HAN TRAN, JEFF SBAIH, LUC JASMIN, and
CHELSEA DIMAS, in their official capacities as Commissioners of the
Washington State Human Rights Commission,
*Defendants-Appellants*.

Appeal from the United States District Court for the
Eastern District of Washington
Honorable Mary K. Dimke
(No. 1:23-cv-3027-MKD)

**BRIEF OF *AMICI CURIAE* COLSON CENTER FOR CHRISTIAN
WORLDVIEW ET AL. IN SUPPORT OF APPELLEE**

Ian Speir
COVENANT LAW PLLC
13395 Voyager Pkwy. #130-732
Colorado Springs, CO 80921
(719) 464-7357
ian@covtlaw.com

*Counsel for* Amici Curiae

## Corporate Disclosure Statement

The Colson Center for Christian Worldview, Cedarville University, Downtown Soup Kitchen d/b/a Downtown Hope Center, Samaritan's Purse, and Summit Ministries are each a religious nonprofit, nonstock, or not-for-profit corporation recognized as tax-exempt under § 501(c)(3). No organization issues stock, and none has a parent corporation.

# Table of Contents

Corporate Disclosure Statement ................................................................. i

Table of Contents ....................................................................................... ii

Table of Authorities ................................................................................... iii

Identity and Interest of *Amici Curiae* ...................................................... 1

Argument ..................................................................................................... 4

    I.    Faith-based personnel policies are widespread among ministry organizations throughout the country. ........................................................ 4

    II.   Shared faith commitments are crucial to successful ministry. ....................... 6

    III.    The First Amendment protects the right of religious organizations to build communities of the faithful. ........................................................ 9

    IV.    Judicial inquiries that fail to respect religious employment standards will foster personnel divisions, cripple the mission, and devastate ministry. ............. 13

Conclusion ................................................................................................. 16

Certificate of Compliance ........................................................................ 17

Certificate of Service ............................................................................... 17

# Table of Authorities

**Cases**

*Bryce v. Episcopal Church in Diocese of Colo.*, 289 F.3d 648 (10th Cir. 2002)…14

*Corp. of Presiding Bishop v. Amos*, 483 U.S. 327 (1987)……5, 7, 10, 11, 12, 14, 15

*Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968 (7th Cir. 2021)……..8, 16

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012)……………………………………………………7, 14

*Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94 (1952)……………………………12

*NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979)…………………...10, 11

*Obergefell v. Hodges*, 576 U.S. 644 (2015)……………………………………..13

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020)…5, 13, 16

*Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976)…………..12

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931 (7th Cir. 2022)…………………………………………………….7

*Union Gospel Mission of Yakima v. Ferguson*, 2024 WL 4660918 (E.D. Wash. 2024)……………………………………………4

*Watson v. Jones*, 80 U.S. 679 (1871)……………………………………………9, 12

*Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060 (Wash. 2021)………………………………………………………11

**Rules**

FRAP 29(a)(4)(E)………………………………………………………………..1

**Other Authorities**

CASS SUNSTEIN, CONFORMITY: THE POWER OF SOCIAL INFLUENCES (2019)………..8

Helen Alvaré, *Church Autonomy After Our Lady of Guadalupe School: Too Broad? Or Broad As It Needs to Be?*, 25 TEX. REV. L. & POLITICS 319 (2021)……...8

Laurence R. Iannaccone, *Why Strict Churches Are Strong*, 99 AM. J. SOCIOLOGY 1180 (Mar. 1994)…………………………………………………..9

Matthew K. Richards et al., *Religious-Based Employment Practices of Churches: An International Comparison in the Wake of* Hosanna-Tabor, 26 Temp. Int'l & Comp. L.J. 263 (2012)…………………………………………5

PETER GREER & CHRIS HORST, MISSION DRIFT: THE UNSPOKEN CRISIS FACING LEADERS, CHARITIES, AND CHURCHES (2014)……………………………...9

Proverbs 27:17……………………………………………………………………...8

Thomas C. Berg, *Partly Acculturated Religious Activity: A Case for Accommodating Religious Nonprofits*, 91 NOTRE DAME L. REV. 1341 (2016)….7, 9

## Identity and Interest of *Amici Curiae*[1]

Like appellee Union Gospel Mission of Yakima, Washington ("Yakima Mission"), each *amicus* is an evangelical Christian ministry that hires only those committed to its religious beliefs and moral vision. All *amici* require their employees to affirm and abide by religious standards. The religious missions of *amici* are not simply statements on paper; rather, they are embodied in and lived out by leaders and staff who carry on ministry work every day. For organizations like these, it is imperative that employees both support the religious mission and share the religious convictions that animate it. *Amici* submit this brief to explain why faith-based personnel policies are mission-critical and constitutionally protected.

**The Colson Center for Christian Worldview** is a nonprofit ministry founded by the late Charles W. Colson, one of the most important evangelical Christian figures of the late twentieth century. The Colson Center exists to build and resource a national and global movement of Christians committed to cultural restoration and to living and defending a Christian worldview. Through daily and weekly *BreakPoint* commentaries, the Colson Educators program, lectures and conferences, and its flagship Colson Fellows Program, The Colson Center educates

---

[1] Consistent with Fed. R. App. P. 29(a)(4)(E), no counsel for a party authored this brief in whole or in part, and no person other than *amici* or their counsel made a monetary contribution to its preparation or submission. Counsel for each set of parties granted consent to the filing of this brief.

and equips believers with a robust Christian worldview so they can thoughtfully engage with the culture and work toward reshaping the world in light of God's kingdom.

**Cedarville University**, established in 1887, is a religious, nonprofit institution of higher education. Cedarville transforms lives through excellent education and intentional discipleship in submission to biblical authority. It is chartered by the State of Ohio, certified by the Ohio Department of Higher Education, and accredited by the Higher Learning Commission, an institutional accreditation agency recognized by the U.S. Department of Education. The University has over 5,500 students including undergraduate, graduate, and dual-enrolled students, in more than 175 areas of study, from all 50 states and several other countries. The University employs approximately 610 full-time employees, comprised of faculty and staff, plus over 2,000 part-time employees, most of whom are students. The University Bylaws state, "Cedarville University is a Baptist university of arts, sciences, professional, and graduate programs, committed to the **WORD OF GOD** and the **TESTIMONY** of **JESUS CHRIST**."

The Downtown Soup Kitchen d/b/a **Downtown Hope Center** is a private, nonprofit religious organization that provides free shelter, food, showers, clothing, laundry services, job-skills training, and religious instruction to the homeless in Anchorage, Alaska. Over the past 40 years, Hope Center has extended a helping

2

hand to thousands of individuals and families from all walks of life. Each month, Hope Center provides over 12,000 warm lunches, 1,200 showers, and over 2,200 loads of laundry to those in need, and shelters 70 homeless women each night—all for free. Hope Center is a biblically-based, faith-driven organization that serves people in destitute conditions and desperate situations, seeking to move them from human suffering to human flourishing through the life-transforming power of the Gospel. Hope Center carries out this mission through a variety of programs, but all are actuated by a shared Christian conviction in the dignity of every human life, especially the poor. To accomplish its mission, Hope Center employs people who themselves have experienced the love of God in Christ Jesus and who extend that love to everyone they serve. Their employees not only support the religious mission but also share the religious convictions that give it life.

**Samaritan's Purse** is a nondenominational evangelical Christian organization providing spiritual and physical aid to hurting people around the world. Since 1970, Samaritan's Purse has helped meet the needs of people who are victims of war, poverty, natural disasters, disease, and famine with the purpose of sharing God's love through His Son, Jesus Christ. Samaritan's Purse serves the church worldwide to promote the Gospel of the Lord Jesus Christ through acts of service and by sharing the life-giving message of the Gospel.

**Summit Ministries** is a nonprofit ministry that equips and supports rising generations to embrace God's truth and champion a biblical worldview. Every year, it hosts a series of two-week summer conferences for over 1,700 high school and college students, bringing together prominent Christian speakers and intellectuals to help students navigate fundamental questions about life, Christian faith, and the common good. Its "Summit Gap Year" is a two-semester Christian gap-year program that has trained hundreds of students over the past ten years to worship God by seeking truth, building relationships, and living intentionally. The publishing division of Summit Ministries offers curriculum and other educational resources to more than 60,000 students each year in Christian schools, homeschools, and churches. Its podcasts and online content reached an audience of 100 million in 2024.

## Argument

### I.    Faith-based personnel policies are widespread among ministry organizations throughout the country.

As a Christian ministry, Yakima Mission holds its employees to religious standards, requiring them "adhere to certain Christian belief and behavioral requirements," including on matters of marriage and sexuality, all in pursuit of the "overarching goal" to spread the Gospel and teach others about Christ. *Union Gospel Mission of Yakima v. Ferguson*, 2024 WL 4660918, at *2 (E.D. Wash. 2024).

Faith-based personnel policies like Yakima Mission's are not unusual. Across the country, "religious organizations routinely require their employees to affirm a

personal conviction of the faith, to comply with the faith's teachings, and to adhere to religious-based standards of personal behavior." Matthew K. Richards et al., *Religious-Based Employment Practices of Churches: An International Comparison in the Wake of* Hosanna-Tabor, 26 TEMP. INT'L & COMP. L.J. 263, 269 (2012); *see, e.g.*, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 740 (2020) (school required teachers to "model and promote Catholic faith and morals" (cleaned up)); *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 330 n.4 (1987) (nonprofit gymnasium could require its janitor to "observe the Church's standards in such matters as regular church attendance, tithing, and abstinence").

*Amici* are evangelical Christian ministries that, like Yakima Mission, maintain faith-based personnel policies and require employees to abide by them. These standards apply to everyone—ministers and non-ministers alike. Like many religious organizations, *amici* expect their employees to exhibit Christian belief and conduct in every aspect of their lives. These standards are embodied in their statements of faith, corporate documents, organizational policies, employee handbooks, job descriptions, performance reviews, and elsewhere—reflecting a deeply held conviction that ministry work is inseparable from the faith that animates it. Like Yakima Mission, all of *amici*'s activities are shaped by their commitment to the Gospel and to a Christian worldview. All employees bear a responsibility to model and uphold these commitments in their lives and work.

## II.    Shared faith commitments are crucial to successful ministry.

Religious organizations like Yakima Mission and *amici* are not just employers of labor. They are not simply enterprises that provide a service. Rather, they are ministries with unique religious callings. They are communities of believers working together to accomplish a religious mission. For them, faith and mission are inseparable: what they believe shapes everything they do. But faith and mission are neither self-defining nor self-sustaining. They depend on and are given expression through actual people—the leaders and staff who embody the faith and live out the mission every day.

This is true of educational ministries like *amici* The Colson Center, Cedarville University, and Summit Ministries, which seek to teach biblical values, model Christian virtue, and inculcate a Christian worldview. It is true of ministries that provide humanitarian relief and aid like *amici* Downtown Hope Center and Samaritan's Purse, which care for the poor and vulnerable in fulfillment of Christ's commandment to serve the lost and the least. Indeed, it is true of any ministry for whom faith is a matter of public expression. "Religious groups are the archetype of associations formed for expressive purposes." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200 (2012) (Alito & Kagan, JJ.,

concurring). The formation of faith *inwardly* shapes the profession of faith *outwardly*. The mission and the message go hand in hand.

Religious organizations define and carry out their missions principally "through [their] appointments," that is, through their selection of personnel. *Id.* at 188 (maj. op.). Like *amici*, many organizations insist that their employees profess and practice the same faith. These organizations are "entitled to limit … staff to people who will be role models by living the life prescribed by the faith." *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 946 (7th Cir. 2022) (Easterbrook, J., concurring). Shared faith is crucial to ministry because "religious beliefs are intertwined with the energy and commitment that make [religious] entities vigorous." Thomas C. Berg, *Partly Acculturated Religious Activity: A Case for Accommodating Religious Nonprofits*, 91 NOTRE DAME L. REV. 1341, 1354 (2016). A religious mission doesn't exist in a vacuum. It is bound up with and animated by distinct religious commitments, and it is embodied in the employees who faithfully carry the mission forward.

But shared faith commitments don't just advance the mission outwardly. They also form the community inwardly. As Justice Brennan observed in his concurrence in *Amos*, "[d]etermining that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them, is ... a means by which a religious community defines itself." 483 U.S. at 342

(Brennan, J. concurring). For any organization, "personnel is policy." *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968, 979 (7th Cir. 2021) (en banc). But for religious organizations, the stakes are higher. Those who join hands in ministry define and give shape to what an organization believes and does. For them, personnel is *identity*. It's not just what they do—it's who they are.

Social science affirms these insights in two ways. First, "iron sharpens iron" (*Proverbs* 27:17). People learn through what sociologists call modeling, that is, by observing and imitating the conduct of those around them. "[M]uch of human behavior is a product of social influences" because "the actions and statements of other people provide information about what is true and what is right." CASS SUNSTEIN, CONFORMITY: THE POWER OF SOCIAL INFLUENCES 7, xxv (2019) (emphasis deleted). This is particularly important in religious settings. "Throughout history, religious traditions have emphasized the value of keeping good company and attending to the example of good or holy persons" because "people tend to become more like those with whom they associate." Helen Alvaré, *Church Autonomy After* Our Lady of Guadalupe School*: Too Broad? Or Broad As It Needs to Be?*, 25 TEX. REV. L. & POLITICS 319, 363 (2021) (quotation omitted).

Second, organizations that actually demand something of their employees—requiring them to commit to standards of belief and conduct—are more likely to succeed. Shared commitment fosters a strong sense of community identity and

inspires the energy and religious devotion crucial to mission success. *See* Berg, *supra*, at 1356–57; PETER GREER & CHRIS HORST, MISSION DRIFT: THE UNSPOKEN CRISIS FACING LEADERS, CHARITIES, AND CHURCHES 36–37 (2014). As one economics-of-religion scholar has put it: "Strictness works." Laurence R. Iannaccone, *Why Strict Churches Are Strong*, 99 AM. J. SOCIOLOGY 1180, 1183 (Mar. 1994). Religious standards mitigate free-rider problems, raise overall levels of commitment, increase participation, and enhance the benefits of membership. *Id.* These benefits hold "across both Christian and Jewish denominations" and "remai[n] strong even after controlling for personal beliefs." *Id.* at 1200.

In short, faith is formed and fostered through association. This is why *amici*, like thousands of religious employers across the country, insist that leaders and staff commit to and abide by religious standards of belief and conduct. As fellow believers, leaders are able to mentor staff. And all employees, regardless of their position, can encourage one another in their journeys of faith and in pursuit of the mission. This deepens relationships, tightens the bond between leaders and staff, and strengthens a sense of organizational identity rooted in common faith and practice.

## III. The First Amendment protects the right of religious organizations to build communities of the faithful.

"It is of the essence of" religious organizations that they get to decide who may "unite themselves" therein "to assist in the expression and dissemination" of the faith. *Watson v. Jones*, 80 U.S. 679, 729 (1871). Faith-based personnel standards

9

are at the core of religious identity and a key way that organizations "define and carry out their religious missions." *Amos*, 483 U.S. at 339; *id.* at 342 (Brennan, J. concurring).

The First Amendment right to maintain faith-based standards is not limited to employees whose duties can be categorized as "religious." This is a core teaching of *Amos*. Most religious organizations don't segregate employees based on "religious" or "secular" responsibilities; such a distinction is alien to ministry work. It would essentially cleave faith from mission, separating what an organization believes from what it does and then sifting employees accordingly. For courts to police such a distinction would entail intrusive inquiries into whether a given ministry activity is, to the secular judicial eye, sufficiently "religious." But as *Amos* explained, "it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious." 483 U.S. at 336. And the Supreme Court has warned against judicial standards that would require organizations to explain in "good faith" how their personnel policies "relat[e] to the … religious mission." *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979). For "[i]t is not only the conclusions that may be reached … , but also the very process of inquiry" that "impinge[s] on rights guaranteed by the Religion Clauses." *Id.*

Religious exemptions to nondiscrimination statutes were crafted for this purpose: to avoid burdening religious employers in ways the First Amendment prohibits. These exemptions advance important constitutional principles. They prevent the government from becoming entangled in "intrusive inquir[ies] into religious belief" (in accordance with the Establishment Clause), and they protect religious groups from "significant governmental interference" with their religious missions (in accordance with the Free Exercise Clause). *Amos*, 483 U.S. at 339; *cf. Catholic Bishop*, 440 U.S. at 506–07 (narrowly interpreting labor law to avoid similar entanglement problem). *Amos* illustrates the point well. The Supreme Court there faulted the district court for thinking that the job of a ministry's janitor was unrelated to "any conceivable religious belief or ritual." 483 U.S. at 332 (quotation omitted). That, the Court said, is "the kind of intrusive inquiry into religious belief" that Title VII's religious exemption "avoids." *Id.* at 339.

The WLAD's religious exemption once accomplished the same purpose. But no longer. After the decision in *Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060 (Wash. 2021), Washington officials are now armed with new legal tools to demand intrusive inquiries into a ministry's beliefs and practices so they can determine whether *they think* job activities are sufficiently "religious" to merit protection or sufficiently "secular" to warrant liability. This is anathema to the First Amendment.

As officially interpreted, the WLAD effaces a ministry's personnel policy and fundamentally alters its internal religious structure. It is a ministry's leadership that sets personnel policy. Yet through the WLAD, Washington officials can now substitute their own secular preferences for a ministry's religious standards, sorting employees and job positions into "secular" and "religious" categories. The Religion Clauses prohibit carving up ministry this way. Government may not blue-pencil a ministry's internal structure to limit control by religious leaders—however much officials might disapprove of leaders' religious convictions. *See Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 108–09 (1952). Nor may secular courts overrule religious leaders' decisions "on matters of discipline, faith, [and] internal organization"—however unwise a court thinks those decisions may be. *See Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713 (1976).

"It is of the essence of" religious organizations that they, and they alone, get to decide who may "unite themselves" therein "to assist in the expression and dissemination" of the faith. *Watson v. Jones*, 80 U.S. at 729. Faith-based personnel standards are at the core of this constitutional protection, and they are matters on which Washington officials are "bound to accept" the decisions of ministry leadership. *Serbian*, 426 U.S. at 713.

12

**IV.    Judicial inquiries that fail to respect religious employment standards will foster personnel divisions, cripple the mission, and devastate ministry.**

Religious employment standards are a key element of a ministry's "internal organization." *Id.* But if applying these standards can be a basis for statutory liability, it will have a profound chilling effect on religious exercise. Faced with the prospect of discrimination claims premised on personnel standards, religious employers in Washington and elsewhere will be forced into an expensive and existential gamble: either maintain their faith-based policies and risk sizeable judgments for damages and attorney's fees, or water down their policies and forsake a crucial element of their religious identity and mission.

Washington's narrow interpretation of the WLAD's religious exemption now means that, unless the employee is a minister, any religious employment standard prohibiting same-sex conduct is *per se* unlawful. Yet religious employment standards often include provisions addressing same-sex conduct, and *amici*, like Yakima Mission, maintain such standards in line with historical understandings of biblical teaching. The Supreme Court has said *amici*'s views are "decent and honorable" and entitled to "protection." *Obergefell v. Hodges*, 576 U.S. 644, 672, 679–80 (2015). But Washington's interpretation would force them to choose between asking their employees to adhere to these standards or being penalized as discriminators. The First Amendment forbids putting religious employers to this choice.

13

The adverse consequences don't end there. First, to avoid liability, religious employers in Washington will have to refashion their personnel policies to align not with internal faith and mission, but with an ever-shifting set of government-imposed orthodoxies. The First Amendment, by contrast, envisions a separation of church from state—a "private sphere" where religious organizations are free to believe, internally organize, and "govern themselves in accordance with their own beliefs." *Hosanna-Tabor*, 565 U.S. at 199 (Alito & Kagan, JJ., concurring). This necessarily includes the freedom to make "personnel decision[s] based on religious doctrine," even as to non-ministerial employees. *Bryce v. Episcopal Church in Diocese of Colo.*, 289 F.3d 648, 660 & n.2 (10th Cir. 2002); *Amos*, 483 U.S. at 340. Thus, when a religious institution sets a religious standard that employees must meet, courts cannot second-guess that judgment without profound incursions upon religious autonomy. *See Hosanna-Tabor*, 565 U.S. at 190 (First Amendment precludes "government interference with an internal church decision that affects ... faith and mission").

Second, punishing religious ministries for asking all employees (ministerial or not) to abide by their religious teachings will impose artificial personnel distinctions and foster internal divisions. Ministries will have to forsake a common set of religious commitments that bind all employees and segregate their personnel into (i) "religious employees" held to standards of religious belief and moral conduct

14

and (ii) "secular employees" of whom less or nothing is expected. This produces a sort of religious caste system that will devastate ministry work. It will force organizations to predict which activities a court will consider religious, which *Amos* said is a "significant burden." 483 U.S. at 336. It will eviscerate the shared faith commitments crucial to missional success. Worst of all, it will thrust an inconsistent double standard into the heart of ministry work, fueling employee resentment, destroying their faith-centered unity, and crippling the mission. *See Our Lady*, 591 U.S. at 746.

Punishing religious ministries for having unified religious standards will manifest in other ways, too. For example, ministry leaders such as pastoral staff will be ministerial employees under the *Hosanna-Tabor* exception and thus can be held to religious standards of conduct. Yet other staff, like IT employees, cannot be held to the same standard even though their duties are just as crucial to the religious mission. Allowing judges to police these distinctions—choosing the employees to whom religious standards do or don't apply—will divide leaders from their staff, disrupting internal processes that are the lifeblood of ministry. Ministry leaders cannot be models and mentors in faith if staff don't share their religious convictions. And how does an organization raise up leaders from within if it can't hold all employees to mission-critical religious standards?

"Religion permeates the ministerial workplace in ways it does not in other workplaces." *Demkovich*, 3 F.4th at 979. Courts cannot tinker with an essential feature of this workplace—common faith commitments that bind employees and the ministry together—without weakening the internal cohesion and missional energy that allow ministries to thrive.

## Conclusion

*Amici* ask this Court to affirm the lower court's decision. In doing so, the Court need not hold that religious organizations "enjoy a general immunity from secular laws." *Our Lady*, 591 U.S. at 746. The Court need only recognize that when a religious organization sincerely determines that an applicant or employee fails to meet a faith-based employment standard, that determination is constitutionally protected and cannot be a basis for liability.

Respectfully submitted,

*/s/ Ian Speir*

Ian Speir
COVENANT LAW PLLC
13395 Voyager Pkwy. #130-732
Colorado Springs, CO 80921
(719) 464-7357
ian@covtlaw.com

*Counsel for* Amici Curiae

## Certificate of Compliance

This brief complies with the length limitation of Fed. R. App. P. 29(a)(5) and Circuit Rule 29 because it contains 3,527 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the requirements of Fed. R. App. P. 32(a) and Circuit Rule 32(b) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 (Version 2412) in 14-point Times New Roman font.

/s/*Ian Speir*
Ian Speir

## Certificate of Service

I certify that on January 30, 2025, the foregoing brief was served on counsel for all parties by means of the Court's ECF/ACMS system.

/s/*Ian Speir*
Ian Speir

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-7246

I am the attorney or self-represented party.

**This brief contains** | 3,527 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated | | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Ian Speir | **Date** | 1/30/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*