No. 24-7246

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNION GOSPEL MISSION OF YAKIMA WASHINGTON,

*Plaintiff-Appellee,*

v.

ROBERT FERGUSON, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF WASHINGTON STATE; ET AL.,

*Defendants-Appellants.*

On Appeal From United States District Court
for the Eastern District of Washington
Case No. 1:23-CV-03027-MKD
The Honorable Mary K. Dimke, United States District Court Judge

## BRIEF OF PROFESSORS STEPHANIE BARCLAY, ROBERT F. COCHRAN JR., DAVID F. FORTE, RICHARD GARNETT, DOUGLAS LAYCOCK, MICHAEL W. MCCONNELL, AND ROBERT J. PUSHAW AS *AMICI CURIAE* IN SUPPORT OF APPELLEE

Vince Eisinger
CRANFILL SUMNER LLP
5420 Wake Park Boulevard, #300
Raleigh, NC 27607
(919) 863-8703
veisinger@cshlaw.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................i

TABLE OF AUTHORITIES .........................................................................ii

INTEREST OF *AMICI CURIAE*....................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.................................2

ARGUMENT ...............................................................................................4

    I.    The Church Autonomy Doctrine Historically Protected Religious
        Institutions from Government Interference. ...................................4

        A.    The History of Government Interference with Religion. ................4

        B.    The First Amendment Was Adopted to Protect Church
                Autonomy. .......................................................................9

        C.    Civil Courts During and After the Founding Era Enforced
                Church Autonomy. .........................................................12

    II.    The Church Autonomy Doctrine Prohibits Government Intrusion
         into the Mission's Decision Not to Hire Plaintiff.......................16

        A.    The Church Autonomy Doctrine Extends to Internal Affairs
                Beyond Ministerial Status. ...............................................17

        B.    Plaintiff's Employment Decisions Based on Religious
                Reasons Are Protected.....................................................23

CONCLUSION ..........................................................................................26

CERTIFICATE OF COMPLIANCE .............................................................27

CERTIFICATE OF FILING AND SERVICE.................................................27

i

# TABLE OF AUTHORITIES

**Cases**

*Ammons v. N. Pac. Union Conf. of Seventh-Day Adventist*,
  139 F.3d 903 (9th Cir. 1998) ................................................................ 17

*Behrend v. San Francisco Zen Ctr., Inc.*,
  103 F.4th 765 (9th Cir. 2024) ............................................................... 20

*Bell v. Presbyterian Church*,
  126 F.3d 328 (4th Cir. 1997) ................................................................ 19

*Billard v. Charlotte Cath. High Sch.*,
  101 F.4th 316 (4th Cir. 2024) ......................................................... 16, 17

*Bryce v. Episcopal Church in the Diocese of Colo.*,
  289 F.3d 648 (10th Cir. 2002) .............................................. 17, 19, 22, 23

*Chase v. Cheney*,
  58 Ill. 509 (Ill. 1871) .................................................................... 14, 15

*EEOC v. Catholic Univ. of Am.*,
  83 F.3d 455 (D.C. Cir. 1996) .......................................................... 17, 19

*German Reformed Church v. Commonwealth*,
  3 Pa. 282 (Pa. 1846) ........................................................................... 16

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*,
  565 U.S. 171 (2012) .................................................................... *passim*

*Hutchison v. Thomas*,
  789 F.2d 392 (6th Cir. 1986) ................................................................ 26

*Jones v. Wolf*,
  443 U.S. 595 (1979) ............................................................................ 25

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
  344 U.S. 94 (1952) .............................................................................. 17

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022) .............................................................................. 3

ii

*NLRB v. Roman Catholic Bishop of Chicago*,
    440 U.S. 490 (1979) ................................................................. 3, 21, 22

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    591 U.S. 732 (2020) ......................................................................*passim*

*Paul v. Watchtower Bible & Tract Soc'y of N.Y.*,
    819 F.2d 875 (9th Cir. 1987) ................................................................. 21

*Puri v. Khalsa*,
    844 F.3d 1152 (9th Cir. 2017) ............................................................... 21

*Rayburn v. Gen'l Conf. of Seventh-Day Adventists*,
    772 F.2d 1126 (4th Cir. 1985) ............................................................... 19

*Shannon v. Frost*,
    42 Ky. 253 (Ky. 1842) ..................................................................... 14, 15

*Spencer v. World Vision, Inc.*,
    633 F.3d 723 (9th Cir. 2011) ................................................................. 23

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,
    41 F.4th 931 (7th Cir. 2022) ........................................................ 20, 23, 24

*State v. Farris*,
    45 Mo. 183 (Mo. 1869) ........................................................................ 16

*Watson v. Jones*,
    13 Wall. 679 (1872) ............................................................ 13, 14, 15, 16

*Werft v. Desert Sw. Ann. Conf. of United Methodist Church*,
    377 F.3d 1099 (9th Cir. 2004) ............................................................... 19

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ............................................................................. 23

**Statutes**

42 U.S.C. § 2000e ........................................................................... 24

42 U.S.C. § 2000e-1 ....................................................................... 24

Act in Restraint of Annates of 1532 ................................................ 6

Act of Supremacy of 1534 ............................................................... 6

Act of Toleration of 1689 ................................................................. 7

Act of Uniformity of 1662 ............................................................... 6

Corporation Act of 1661 ................................................................... 6

Test Act of 1673 .............................................................................. 7

**Other Authorities**

1 Anson Phelps Stokes, *Church and State in the United States* (1950) ........................ 12

4 William Blackstone, *Commentaries on the Laws of England* (8th ed. 1778) .............. 8

Athanasius G. Sirilla, *The "Nonministerial" Exception*,
    90 Notre Dame L. Rev. 393 (2023) ........................................ 24

Branton Nestor, *Judicial Power and Church Autonomy*,
    100 Notre Dame L. Rev. --- (2025) ................................... *passim*

C.S. Lewis, *English Literature in the
Sixteenth Century Excluding Drama* (1954) ...................................... 6

*Disestablishment and Religious Dissent: Church-State
Relations in the New American States 1776–1833*
(Carl H. Esbeck & Jonathan Den Hartog eds., 2019) ......................... 9

Douglas Laycock, *Towards a General Theory of the Religion Clauses:
The Case of Church Labor Relations and the Right to Church Autonomy*,
    81 Colum. L. Rev. 1373 (1981) ......................................... 14

iv

E.F. Churchill, *The Dispensing Power of the Crown in Ecclesiastical Affairs*, 38 L. Q. Rev. 297 (1922) ................................................................. 5

Harold J. Berman, *Law and Revolution: The Formation of the Western Legal Tradition* (1983) ..................................... 5

James Madison, *Memorial and Remonstrance Against Religious Assessments*, in 8 *The Papers of James Madison* 295 (Rutland et al. eds., 1973) ................................. 10

Jason J. Muehlhoff, *A Ministerial Exception For All Seasons*, 45 Harv. J. L. & Pub. Pol'y 465 (2022) ............................................. 17

John Locke, *A Letter Concerning Toleration* (Goldie ed. 2010) (1690) ........................ 7

John Locke, *A Letter Concerning Toleration* (J. Brook ed., 1796) (1689) .................. 10

Kevin Pybas, *Disestablishment in the Louisiana and Missouri Territories*, in *Disestablishment and Religious Dissent: Church-State Relations in the New American States 1776–1833* ............................................................. 11, 12

Lael D. Weinberger, *The Origins of Church Autonomy: Religious Liberty After Disestablishment* (2024) ...................................................*passim*

Lael Weinberger, *The Limits of Church Autonomy*, 98 Notre Dame L. Rev. 1253 (2023) ............................................. 18, 26

Letter from James Madison to John Carroll (Nov. 20, 1806), in *The Records of the Am. Catholic Historical Soc'y. of Phila.*, 20:63 (1909) ................. 11

Michael D. Breidenbach, *Our Dear-Bought Liberty: Catholics and Religious Toleration in Early America* (2021) ................................................. 8

Michael W. McConnell, *Reflections on Hosanna-Tabor*, 35 Harv. J. L. & Pub. Pol'y 821 (2012) ............................................. 11

Nathan S. Chapman & Michael W. McConnell, *Agreeing to Disagree: How the Establishment Clause Protects Religious Diversity and Freedom of Conscience* (2023) ........................................... 8, 9, 10

Richard W. Garnett, *'The Freedom of the Church': (Towards) an Exposition, Translation, and Defense*, 21 J. Contemp. Legal Issues 33 (2013) ............................................. 18

v

Thomas C. Berg et al., *Religious Freedom,*
*Church-State Separation, and the Ministerial Exception*,
 106 Nw. U. L. Rev. Colloquy 175 (2011)......................................................4, 12

W. Cole Durham & Robert Smith, 1 Religious Orgs. & the Law (2017).....................25

W. Cole Durham, Jr., *Religious Autonomy at the Crossroads*, in
*Law, Religion, and Freedom: Conceptualizing a Common Right*
(W. Cole Durham, Jr. et al. eds., 2021) ................................................................18-19

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are professors Stephanie Barclay, Professor of Law at Georgetown Law School; Robert F. Cochran, Professor Emeritus at the Caruso School of Law at Pepperdine University; David F. Forte, Emeritus Professor of Law at Cleveland State University; Richard Garnett, Paul J. Schierl/Fort Howard Corporation Professor of Law at the University of Notre Dame Law School; Douglas Laycock, the Robert E. Scott Distinguished Professor Emeritus at the University of Virginia School of Law and the Alice McKean Young Regents Chair Emeritus at the University of Texas School of Law; Michael W. McConnell, the Richard and Frances Mallery Professor at Stanford Law School; and Robert J. Pushaw, the James Wilson Endowed Professor of Law at the Caruso School of Law at Pepperdine University. *Amici* are legal scholars whose research and writing focuses on religious liberty.

---

[1] Counsel for *amici curiae* states pursuant to Fed. R. App. P. 29(a)(4)(E) that (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (3) no person, other than *amici curiae* or their counsel, contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief pursuant to Fed. R. App. 29(a)(2).

## INTRODUCTION AND SUMMARY OF ARGUMENT

The church autonomy doctrine protects the "right of religious institutions to decide for themselves, free from state interference, matters of church government, as well as those of faith and doctrine." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 737 (2020) (cleaned up). Religious institutions—not civil courts—decide matters of religious doctrine. And religious institutions—not disgruntled plaintiffs— determine matters of church government, leadership, and discipline. Such protections are deeply rooted in our constitutional tradition and fundamental to our country's scheme of religious freedom. Constitutional text, history, and tradition confirm church autonomy's centrality to the Religion Clauses ratified by the Framers and passed down to Americans today.

Defendants ask this Court to radically curtail this fundamental liberty and adjudicate a quintessentially religious question: whether a religious institution like Union Gospel Mission of Yakima, Washington (the "Mission") can be forced to employ applicants who may knowingly and openly violate the religious institution's religious teachings and beliefs. That is a striking request—and this Court should decline this invitation to decide the Mission's religious doctrine and religious personnel decisions.

As the Mission has shown, its hiring decisions are based on a sincere religious belief regarding a moral principle necessary for employees tasked with religious functions within the institution, including sharing the Mission's religious mission. Decisions about these kinds of internal religious matters are protected by the church

2

autonomy doctrine as defined by the Supreme Court in *NLRB v. Roman Catholic Bishop of Chicago*, 440 U.S. 490, 507 (1979); *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 182 (2012); and *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732, 746–47 (2020).

We submit this *amicus* brief to amplify why affirmation of the district court's decision is not only mandated by those Supreme Court precedents, but also by the original understanding of the First Amendment, which the Supreme Court has consistently relied on in adjudicating such disputes. *See, e.g.*, *Our Lady*, 591 U.S. at 747–48; *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523–24 (2022). We also note that the ministerial status of the Mission employee is irrelevant because, for the Mission, important aspects of employment decisions are religious and concern matters of internal faith, doctrine, and discipline.

This is not a hard case, but it is an important one. Unless protected, religious groups will be prevented from structuring and governing their communities in accordance with their beliefs and moral principles. The alternative would allow litigants to use secular courts to force secular values on religious institutions—inevitably leading to the kind of strife and conflict that the First Amendment was designed to prevent. The Framers knew (from experience) how destructive such existential contests become, and they therefore protected the freedom of religious groups to operate without government intrusion. A faithful application of the First Amendment as they understood it requires reversal.

## ARGUMENT

### I.    The Church Autonomy Doctrine Historically Protected Religious Institutions from Government Interference.

The church autonomy doctrine has long protected the "right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Hosanna-Tabor*, 565 U.S. 171, 186 (2012) (cleaned up). The church autonomy doctrine must be interpreted by reference to history and tradition. *Id.* at 181–85; *Our Lady*, 591 U.S. at 748. Such historical practices demonstrate that the church autonomy doctrine enshrined in the First Amendment was designed to end the long and abusive pattern of government interference with religious institutions, including over matters of doctrine and personnel.

### A.    The History of Government Interference with Religion.

The conceptual foundations for church autonomy are ancient. But for most of Western history, the union—or at least the interdependence—of throne and altar was common. It was not until the Investiture Crisis of the 11th century that something like a legal notion of a "freedom of the church" began to emerge. *See, e.g.*, Thomas C. Berg et al., *Religious Freedom, Church-State Separation, and the Ministerial Exception*, 106 Nw. U. L. Rev. Colloquy 175, 179 (2011). The Investiture Crisis arose out of a disagreement between the Pope and the Holy Roman Emperor over who would select bishops. Only after some fifty years of civil war in Germany did Emperor Henry V agree to "guarantee[e] that bishops and abbots would be freely elected by the church alone."

Harold J. Berman, *Law and Revolution: The Formation of the Western Legal Tradition* 98 (1983). Yet the Church's victory was in some ways more formal than actual, as monarchs often exercised *de facto* control over the election process and ecclesiastical matters more generally.

English kings similarly attempted to control the Church. For example, when Pope Gregory VII insisted on his clergy's celibacy, William I (1028–87) saw the situation "from a more worldly point of view" and granted dispensations to the English priests. E.F. Churchill, *The Dispensing Power of the Crown in Ecclesiastical Affairs*, 38 L. Q. Rev. 297, 298 (1922). And while William's successor, Henry I (1068–1135), eventually agreed to enforce the celibacy of the clergy, he too dispensed with the requirement for any offending priest willing to "pay the price of his protection." *Id.* Thus, as Florence of Worcester recounted, "all went home and the decrees stood for nought; all held their wives by the King's leave as they had done before." *Id.*

The English nobility correctly saw such royal intermeddling in Church affairs as a threat to their own prerogatives. So, at Runnymede in 1215, the English barons demanded and the King accepted in the Magna Carta that "'the English church shall be free, and shall have its rights undiminished and its liberties unimpaired.'" *Hosanna-Tabor*, 565 U.S. at 182.

The question of who, exactly, was in charge of the Church came to a head during the reign of Henry VIII. Henry's court officials failed to secure a papal annulment of his marriage to Queen Catherine of Aragon so that the King could marry Anne Boleyn.

Facing a politically fraught decision, Rome delayed its answer. Enraged, Henry took matters into his own hands. With the aid of Parliament and his ecclesial allies, Henry was declared supreme head of the English Church in 1534. *See* Act of Supremacy of 1534, 26 Hen. VIII, ch. 1; *see also* Act in Restraint of Annates of 1532, 25 Hen. VIII, ch. 20.

This union of civil and religious authority under a single autocrat resulted in bloodshed. In the years after the Act of Supremacy, the major parties in the profound religious disagreements each sought to wield civil power. Many of England's leading statesmen and clergy met violent ends at the hands of royal executioners. As C.S. Lewis observed in *English Literature in the Sixteenth Century Excluding Drama* 200–01 (1954), "Behind every system of sixteenth-century thought, however learnedly it is argued, lurks cruelty and Ogpu"—*i.e.*, the secret police.

This entanglement of English politics and theology eventually contributed to the outbreak of the English Civil War in 1642 and the trial and execution of Charles I in 1649. Following the restoration of the monarchy in 1660, Charles II's government reenacted his father's persecutions, ordering all ministers to pledge their allegiance or face being labeled seditious and removed from their positions. Similarly, teachers of many stripes "were required to 'conform[] to the Liturgy of the Church of England' and not 'to endeavour any change or alteration' of the church." *Our Lady*, 591 U.S. at 748 (quoting Act of Uniformity of 1662, 14 Cha. II, ch. 4); *see also* Corporation Act of 1661, 13 Cha. II. St. 2, ch. 1 (requiring communion in the Church of England as condition for

6

holding elected office); Test Act of 1673, 25 Cha. II, ch. 2 (requiring all government officers to take oaths that included rejecting the doctrine of transubstantiation).

The effects were profound. Following the restoration, England imprisoned, exiled, or otherwise suppressed thousands of Catholics and Protestant non-conformists, including Baptist minister John Bunyan, who wrote *Pilgrim's Progress* while in prison for preaching without a license.

These coercive policies led to John Locke's famous argument for religious tolerance. As he explained, it was "necessary" to "distinguish exactly the Business of Civil Government from that of Religion." John Locke, *A Letter Concerning Toleration* 12 (Goldie ed. 2010) (1690). Failure to recognize the distinction between civil and religious authority, he warned, would result in endless "controversies" between those whose priority was "Mens Souls" and those responsible for "the Commonwealth." *Id.* Government is "constituted only for preserving and advancing" life, liberty, and property, while the church attends to "the Salvation of ... souls." *Id.* at 13, 15. Members of a church join it "free[ly]" and it "follows that the Right of making its Laws" must "belong to" the church itself. *Id.* at 16.

Locke's argument made a lasting impact. As part of the Glorious Revolution, England moderated its approach by passing the Act of Toleration of 1689 (1 Will. & Mary, ch. 18), granting non-conforming Protestants limited freedom of worship if they swore allegiance to the Crown. But the Act of Toleration was only a halfway reform. Protestant nonconformists were still prohibited from holding public office, and the

7

statute completely excluded Roman Catholics and non-trinitarians from its protections. *See* Michael D. Breidenbach, *Our Dear-Bought Liberty: Catholics and Religious Toleration in Early America* (2021). Many who disagreed with the state on matters of religion continued to face state interference with church government and other forms of persecution and suppression. *See, e.g.*, 4 William Blackstone, *Commentaries on the Laws of England* 55 (8th ed. 1778). The Crown still appointed the leadership of the established Church of England, and the rank-and-file clergy were still appointed under government authority.

Beginning with the Pilgrims' departure for New England in 1620, many religious dissenters in Great Britain chose to leave rather than suffer under the Crown's heavy-handed interference. In the ensuing decades, thousands of "Puritans fled to New England, where they hoped to elect their own ministers and establish their own modes of worship." *Hosanna-Tabor*, 565 U.S. at 182. "William Penn, the Quaker proprietor of what would eventually become Pennsylvania and Delaware, also sought independence from the Church of England," and "[t]he charter creating the province of Pennsylvania [in 1681] contained no clause establishing a religion." *Id.* at 183. Maryland, similarly, was founded as a haven for Roman Catholics from the discriminatory policies of the Crown. Nathan S. Chapman & Michael W. McConnell, *Agreeing to Disagree: How the Establishment Clause Protects Religious Diversity and Freedom of Conscience* 36 (2023).

8

Still, many colonial governments continued to exercise varying degrees of "control over doctrine, governance, and personnel of the church." *Id.* at 18. In particular, colonists were often subject to laws giving government authorities "the power to appoint and discipline clergy" and "laws governing doctrine." *Id.* at 19. These "principal means of government control" resulted, predictably, in "protest[s] against government control of religion," including "attack[s] on the establishment . . . from ***within*** the church." *Id.* at 19–20 (emphasis added).

### B. The First Amendment Was Adopted to Protect Church Autonomy.

It was "against this background that the First Amendment was adopted." *Our Lady*, 591 U.S. at 748. Establishment had created conflict, and "the founding generation sought to prevent a repetition of these practices in our country" by setting a firm boundary: the First Amendment's categorical prohibition on laws "respecting an establishment of religion or prohibiting the free exercise thereof." *Id.* at 746. The First Amendment removed government authority from the center of religious debates— rejecting "government control over doctrine, governance, and personnel" of any religious institution. Chapman & McConnell, *supra*, 187. Gradually, states began dismantling their religious establishments. *Id.*; *see Disestablishment and Religious Dissent: Church-State Relations in the New American States 1776–1833* (Carl H. Esbeck & Jonathan Den Hartog eds., 2019).

The Framers understood this prohibition on government power over religious institutions to be necessary to prevent the abuses historically stemming from state

control.   Disestablishment sought "to distinguish exactly the business of civil government from that of religion, and to settle the just bounds that lie between the one and the other."   John Locke, *A Letter Concerning Toleration* 10 (J. Brook ed., 1796) (1689).

Perhaps most famously, James Madison skewered the contention that a "Civil Magistrate is a competent Judge of Religious truth" as "an arrogant pretension falsified by the contradictory opinions of Rulers in all ages, and throughout the world."   James Madison, *Memorial and Remonstrance Against Religious Assessments*, in 8 *The Papers of James Madison* 295, 301 (Rutland et al. eds., 1973).   While the theological and political reasons for rejecting government control over religious institutions varied, they broadly maintained that (1) civil government lacked authority over religious institutional matters (a non-establishment principle), and (2) religious institutions were entitled to freedom from interference by civil government in their internal ecclesiastical matters (a free-exercise principle). *See, e.g.*, Chapman & McConnell, *supra*, 27–32, 42–49 (tracing the arguments over establishments); Lael D. Weinberger, *The Origins of Church Autonomy: Religious Liberty After Disestablishment*, https://tinyurl.com/3k5yhrza, at 12–32 (2024); Branton Nestor, *Judicial Power and Church Autonomy*, 100 Notre Dame L. Rev. --- (2025), https://tinyurl.com/yc8pwm4r.

Unlike previous attempts to preserve the freedom of the church, the Framers' novel step of imposing a structural, constitutional restraint on government largely

10

managed to limit government interference with religion.  This was reflected by early "episode[s]" in federal constitutional practice.  *Hosanna-Tabor*, 565 U.S. at 184–85.

For example, when the first Roman Catholic Bishop in the United States, John Carroll, asked then-Secretary of State Madison for advice on who should be appointed to head the Catholic Church in New Orleans, Madison refused, responding that he should not take part in the decision because the "selection of [religious] functionaries ... is entirely ecclesiastical."  Letter from James Madison to John Carroll (Nov. 20, 1806), in *The Records of the Am. Catholic Historical Soc'y. of Phila.*, 20:63, at 63–64 (1909); *see also* Michael W. McConnell, *Reflections on Hosanna-Tabor*, 35 Harv. J. L. & Pub. Pol'y 821, 830 (2012).  Madison withheld comment not because he lacked an opinion, but because he did not believe that his opinions should be shared in his official capacity as Secretary of State.  Madison was consistent in his views on the freedom of the church as President—as the Supreme Court has noted, he refused to allow a secular charter to strip an institution of its religious autonomy.  *See Hosanna-Tabor*, 565 U.S. at 184–85.

As President, Thomas Jefferson advanced similar religious autonomy principles.  For example, when he was informed in 1804 that local authorities had barred entry into a Catholic church in the Orleans Territory in response to a dispute over control of the parish, he complained that this "was an error.  On our principles all church-discipline is voluntary; and never to be enforced by the public authority."  Kevin Pybas, *Disestablishment in the Louisiana and Missouri Territories*, in *Disestablishment and*

11

*Religious Dissent: Church-State Relations in the New American States 1776–1833*, at 273, 281–82.

Jefferson penned another letter a few days later in response to a missive from Ursuline Nuns who ran an orphanage and Catholic school in New Orleans. Jefferson assured the nuns that the Louisiana Purchase would not undermine their "broad right of self-governance and religious liberty," despite Catholic France ceding control over the territory to the non-Catholic United States. *Id.* at 281; *see also* 1 Anson Phelps Stokes, *Church and State in the United States* 678 (1950). Jefferson explained that "[t]he principles of the constitution … are a sure guaranty to you that [your property and rights] will be preserved to you sacred and inviolate, and that your institution will be permitted to govern itself according to [its] own voluntary rules, without interference from the civil authority." Pybas, *supra*, at 281. Like Madison, "Jefferson also saw church-state separation as guaranteeing the autonomy, independence, and freedom of religious organizations—not just churches but religious schools as well." Berg, *supra*, at 182–83.

### C.    Civil Courts During and After the Founding Era Enforced Church Autonomy.

"Given this understanding of the Religion Clauses—and the absence of government employment regulation generally—it was some time before questions about government interference with a church's ability to select its own ministers" and to manage its "ecclesiastical" affairs "came before the courts." *Hosanna-Tabor*, 565 U.S. at 185. When such cases arose, civil courts "confirm[ed] that it was impermissible for

12

the government to contradict a church's determination of who can act as its ministers." *Id.* Civil courts more broadly held that "'whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of the church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them.'" *Id.* (quoting *Watson v. Jones*, 13 Wall. 679, 727 (1872)). Such decisions "'radiate[d] … a spirit of freedom for religious organizations, an independence from secular control or manipulation.'" *Id.* (cleaned up).

The church autonomy doctrine historically protected the "right of religious institutions to decide for themselves, free from state interference, matters of church government, as well as those of faith and doctrine." *Id.* at 186 (cleaned up); *see also Watson*, 13 Wall. at 727 ("questions of discipline, or of faith, or ecclesiastical rule, custom, or law"). Over religious questions, civil courts traditionally could "exercise no jurisdiction." *Watson*, 13 Wall. at 733.

*First*, the church autonomy doctrine shielded questions of religious doctrine from civil courts. These included (i) what theological doctrine to embrace, (ii) what religious practices to inculcate, (iii) what ecclesiastical government structure to adopt (and what religious positions to create), and (iv) what theological and moral standard to require of church leaders and members. *See, e.g.*, Weinberger, *supra*, at 23–32; Nestor, *Church Autonomy*, *supra*, at 15–32. When a religious institution authoritatively interpreted religious doctrine, the civil court could not exercise judicial power to review or reverse that religious decision—instead, such a religious determination was "final" and

13

"binding" on civil courts. *Watson*, 13 Wall. at 727; *see also, e.g.*, *Chase v. Cheney*, 58 Ill. 509, 535–38 (Ill. 1871) (questions of "ecclesiastical cognizance"); Nestor, *Church Autonomy*, *supra*, at 17–32 (collecting cases).

*Second*, the church autonomy doctrine also shielded questions of ecclesiastical governance and discipline from civil courts. Such protection included the church's authority (i) to select what type of church government to adopt, (ii) to determine who would lead and serve the church, (iii) to decide who would be part of the religious institution, and (iv) to take necessary actions—including firing and expelling—church leaders and members in order to safeguard the faith and mission of the religious institution. *See, e.g.*, Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 Colum. L. Rev. 1373 (1981); Weinberger, *Origins of Church Autonomy*, *supra*, at 23–32; Nestor, *Church Autonomy*, *supra*, at 15–32. When a religious institution resolved questions of "church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them," the civil court could "exercise no jurisdiction" to review or reverse the ecclesiastical decision. *Watson*, 13 Wall. at 733; *see also Shannon v. Frost*, 42 Ky. 253, 258–62 (Ky. 1842) (ecclesiastical "supervision or control"); *see also, e.g.*, Nestor, *Church Autonomy*, *supra*, at 17–32 (collecting cases).

The church autonomy doctrine historically provided such protection for religious institutions in order to protect free-exercise and non-establishment principles.

14

*Hosanna-Tabor*, 565 U.S. at 184; *see also, e.g.*, Weinberger, *Origins of Church Autonomy*, *supra*, at 15–19; Nestor, *Church Autonomy*, *supra*, at 17–32. Such principles are implicated where, for example, a lawsuit threatens to interfere with a religious institution's determination of who should advance its religious mission.

The church autonomy doctrine reflected free-exercise principles—protecting the freedom of religious institutions from civil courts. Early courts maintained that the church autonomy doctrine "secured religious liberty from the invasion of the civil authority," and that civil courts could "exercise no jurisdiction" over such ecclesiastical matters lest they violate the "full and free right" of religious institutions. *Watson*, 13 Wall. at 728, 730, 733; *see also, e.g.*, *Chase*, 58 Ill. at 535–38 ("freedom of religious profession and worship"); *Shannon*, 42 Ky. at 258–59 ("religious liberty"). Such free-exercise principles—a deep protection for religious institutions—were one foundation for church autonomy in early American practice. *See, e.g.*, Weinberger, *Origins of Church Autonomy*, *supra*, at 15–19; Nestor, *Church Autonomy*, *supra*, at 17–32 (collecting cases).

The church autonomy doctrine also reflected non-establishment principles—keeping civil courts from appointing religious personnel or determining religious doctrine. Early courts often framed such non-establishment concerns in terms of both civil court competence and civil court authority. And civil courts broadly agreed that over matters of "strictly and purely ecclesiastical character"—matters that "concern[]" theological controversy, church discipline, ecclesiastical government, or the conformity

15

of the members of the church to the standard of morals required of them"—the civil courts "exercise[d] no jurisdiction." *Watson*, 13 Wall. at 733; *see also, e.g.*, *State v. Farris*, 45 Mo. 183, 197–201 (Mo. 1869); *German Reformed Church v. Commonwealth*, 3 Pa. 282, 289–91 (Pa. 1846). Such non-establishment principles—a structural constraint on civil court power—were another basis for the church autonomy doctrine. *See, e.g.*, Weinberger, *Origins of Church Autonomy*, *supra*, at 15–19; Nestor, *Church Autonomy*, *supra*, at 17–32 (collecting cases); *see also Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 325 (4th Cir. 2024) (noting that church autonomy "operates structurally … to 'categorically prohibit[ ] federal and state governments from becoming involved in religious leadership disputes.'").

*          *          *

The church autonomy doctrine remedied the long and abusive pattern of government control over religious institutions. It provides an important protection for a religious organization's autonomy in decisions about "theological controversy, church discipline, ecclesiastical government, [and] the conformity of members" to required standards, free from state interference. *Watson*, 13 Wall. at 733.

## II.     The Church Autonomy Doctrine Prohibits Government Intrusion into the Mission's Decision Not to Hire Plaintiff.

The present case presents a dispute about religious organizations' right to determine the criteria for employees engaged in ministry activities, which fits easily within the protection of church autonomy.

16

A.   **The Church Autonomy Doctrine Extends to Internal Affairs Beyond Ministerial Status.**

Church autonomy cases establish that the doctrine broadly safeguards religious institutions' right to govern their own internal affairs whenever their actions are "based on religious doctrine." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 656–60, 658 n.2 (10th Cir. 2002); *see also Ammons v. N. Pac. Union Conf. of Seventh-Day Adventist*, 139 F.3d 903 (9th Cir. 1998). "[A] long line of Supreme Court cases … affirm the fundamental right of churches to 'decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 462 (D.C. Cir. 1996) (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)); *see also Billard*, 101 F.4th at 332 (First Amendment protected Catholic school's decision to fire a lay teacher whose "duties included conforming his instruction to Christian thought" where the school "considered it 'vital' to its religious mission that its lay teachers bring a Catholic perspective to bear" on both secular and religious topics). The church autonomy doctrine therefore protects decisions of religious organizations that are based on religious grounds, whether or not any affected employees are ministers.

The "ministerial exception" is just one application of "the general principle of church autonomy," *Our Lady*, 591 U.S. at 746, albeit one that has historically been one of the most litigated areas of church autonomy, *see, e.g.*, Jason J. Muehlhoff, *A Ministerial Exception For All Seasons*, 45 Harv. J. L. & Pub. Pol'y 465, 467 (2022).

17

The ministerial exception rests on protecting "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady*, 591 U.S. at 747 (emphasis added). This includes "internal management decisions that are essential to the institution's central mission." *Id.* at 746. What is special about ministers is that decisions concerning them are protected *even when the decision is not based on religious grounds*. State interference "would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion." *Id.*

To be sure, church autonomy is not a magic wand that religious institutions can wave to avoid any law they don't like, and the distinction between what falls under the church autonomy doctrine and what doesn't is not easily reduced to a bright-line rule with respect to non-ministers. *See* Richard W. Garnett, *'The Freedom of the Church': (Towards) an Exposition, Translation, and Defense*, 21 J. Contemp. Legal Issues 33, 50 (2013); Lael Weinberger, *The Limits of Church Autonomy*, 98 Notre Dame L. Rev. 1253 (2023).

But the church autonomy doctrine's protections are "broad" and well-established. *Our Lady*, 591 U.S. at 747. They include matters such as "fundamental beliefs (*e.g.*, doctrine, dogma, polity, governance, and canon law), core ministry (matters of worship, ritual, liturgy, *counseling*, confession, teaching, and *humanitarian care*), and core administrative functions (the selection, supervision, and discipline of personnel, church membership decisions, administration of property, and control of finances)." W. Cole

18

Durham, Jr., *Religious Autonomy at the Crossroads*, in *Law, Religion, and Freedom: Conceptualizing a Common Right* 265–67 (W. Cole Durham, Jr. et al., eds., 2021) (emphases added); *see also Our Lady*, 591 U.S. at 747.

Thus, while this Court has allowed *some* Title VII claims to proceed against religious institutions—such as when those claims are "more similar to a negligence claim than a typical Title VII employment discrimination claim"—it has disallowed claims that "would require a civil court to inquire into religious justifications for personnel" and other "decisions." *Werft v. Desert Sw. Ann. Conf. of United Methodist Church*, 377 F.3d 1099, 1101–03 (9th Cir. 2004); *accord Rayburn v. Gen'l Conf. of Seventh-Day Adventists*, 772 F.2d 1126, 1171 (4th Cir. 1985) ("employment decisions may be subject to Title VII scrutiny" *only* "where the decision does *not* involve the church's spiritual functions" (emphasis added)); *Hosanna-Tabor*, 565 U.S. at 190 ("valid and neutral" employment discrimination laws do not apply to "an internal church decision that affects the faith and mission of the church itself"). What matters is whether the religious institution is taking an "ecclesiastical" action or a "purely secular" one. *Bell v. Presbyterian Church*, 126 F.3d 328, 331 (4th Cir. 1997) (citations omitted); *see also Bryce*, 289 F.3d at 657, and *Catholic University*, 83 F.3d at 466. A dispute "rooted in religious belief," *Bryce*, 289 F.3d at 657, is by definition not "purely secular." If the action is "ecclesiastical," the church autonomy doctrine bars state interference.

The Supreme Court in *Our Lady* (reversing this Court) left no doubt that the church autonomy doctrine broadly protects "internal management decisions that are

19

essential to the institution's central mission."  591 U.S. at 746.  This can include, but is not limited to, "the selection of the individuals who play certain key roles,"  such as lay employees who "serve[] as a messenger" of religious organizations, perform duties "at the core of the mission" of the organization, lead prayer, and whose "employment agreements and [employee] handbooks specif[y] in no uncertain terms that they [are] expected to help" carry out the organization's religious mission.  *Id.* at 746, 753–54, 756–60; *see also id.* at 762 n.1 (Thomas, J., concurring) (church autonomy includes "laity" who have been "entrusted with carrying out the religious mission of the organization"); *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 940 (7th Cir. 2022) (guidance counselor was a minister because she participated in students' spiritual formation, led public prayer, and her "employment agreements" required her "to carry out [the school's] religious mission").

This Court's most recent church autonomy precedent faithfully applied this directive in the context of the ministerial exception: "Since the purpose of the [ministerial] exception is to ensure a religious organization's independence in matters of faith, doctrine, and government, surely it applies just as readily to those who perform vital, but not necessarily hierarchical, functions."  *Behrend v. San Francisco Zen Ctr., Inc.*, 103 F.4th 765, 770  (9th Cir. 2024).  And because "judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition," a "religious institution's explanation of the role of such employees in the life of the religion in question is

important." *Our Lady*, 591 U.S. at 757; *see also id.* at 765 (Thomas, J., concurring) ("[W]e should defer to [religious] groups' good-faith understandings of which individuals are charged with carrying out the organizations' religious missions.").[2]

Enforcing certain religious standards among employees, regardless of formal ministerial status, is often integral to a religious institution's ability to define its doctrines and moral standards and to communicate those beliefs to its members and next generation. The Supreme Court made this clear in *NLRB v. Catholic Bishop of Chicago*, shielding religious schools from government interference with managing their lay teachers. 440 U.S. 490 (1979). In that case, unions filed petitions with the National Labor Relations Board ("NLRB") seeking to represent only the lay teachers employed by a group of schools operated by two Catholic corporations. *Id.* at 493. The church schools objected to the unions' petitions, arguing in relevant part that the First Amendment precluded NLRB's jurisdiction over these employees. *Id.* After the Board granted the unions' petitions, the church schools sued.

The Supreme Court observed that if the National Labor Relations Act granted NLRB jurisdiction over church schools, it would be forced to decide "serious First

---

[2] This Court has previously recognized this principle. *See Paul v. Watchtower Bible & Tract Soc'y of N.Y.*, 819 F.2d 875, 878 n.1 (9th Cir. 1987) (church autonomy doctrine protects the decision to exclude someone as a matter of church law or policy); *Puri v. Khalsa*, 844 F.3d 1152, 1160 (9th Cir. 2017) ("[A]n employee whose 'job duties reflect a role in conveying the Church's message and carrying out its mission' is likely to be covered by the [ministerial] exception, even if the employee devotes only a small portion of the workday to strictly religious duties." (citations omitted)).

21

Amendment questions" about NLRB's jurisdiction over lay teachers employed by these schools. *Id.* at 504. Even though the unions sought to organize only lay teachers, the Board's inquiries would "implicate sensitive issues that open the door to conflicts between clergy-administrators" and government. *Id.* at 503. Because religious schools, by their very nature, "involve substantial religious activity and purpose" (*id.* at 503 (quotation omitted)), the Board would have to decide whether the "challenged actions were mandated by [schools'] religious creeds," "involv[ing] inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission" (*id.* at 502).

Other federal courts recognize the constitutional protection afforded to a church's management of its employees, regardless of their formal ministerial status. For example, in *Bryce v. Episcopal Church*, a female youth minister who participated in a civil commitment ceremony with another woman sued her church under Title VII, alleging that church members later made offensive remarks at various church meetings and in church documents. 289 F.3d at 657–58. The court bypassed the specific ministerial question, holding that the church's actions were protected by the general principle of autonomy over "church governance and doctrine protected by the First Amendment." *Id.* at 658. The court "[found] this inquiry [into the ministerial exception] unnecessary … because Bryce's claims are based solely on communications that are protected by the First Amendment under the broader church autonomy doctrine." *Id.* at 658 n.2. The court explained that objections to religious organizations' "personnel decision[s]" are

22

constitutionally protected when "the alleged misconduct is rooted in 'religious belief.'"
*Id.* at 657 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)).

### B. Plaintiff's Employment Decisions Based on Religious Reasons Are Protected.

Though it arrived at the correct decision, the district court failed to acknowledge that the Mission's hiring decisions are based on a sincerely held religious belief. Because of Title VII's exemption for religious employers, Plaintiff is entitled to make religiously motivated hiring decisions.

***Title VII.*** Absent application by this Court, Title VII's religious exemption is a dead letter, so long as a plaintiff can artfully plead that the religious organization's decision was not *religious* discrimination but rather *religiously motivated* sex discrimination. Where a religious entity (like the Mission) declines to hire an applicant based on the applicant's religious beliefs and conduct (including sexual ethics), that religious determination is shielded under the statutory exemption for religious hiring decisions.

There is no dispute that the Mission is a religious organization entitled to protection by Title VII. *See Spencer v. World Vision, Inc.*, 633 F.3d 723 (9th Cir. 2011) (O'Scannlain, J., concurring). That the Mission's "adherence to [religious] doctrine produces a form of sex discrimination," as defined by the Supreme Court's interpretation of Title VII, "does not make the action less religiously based." *Starkey*, 41 F.4th at 947 (Easterbrook, J., concurring).

23

This is dispositive.  Title VII excepts from its coverage "a religious corporation … with respect to the employment of individuals of a particular religion."  42 U.S.C. § 2000e-1(a).  "Any temptation to limit this exception to authorizing the employment of coreligionists … is squelched by the definitional clause in § 2000e(j)," providing that "religion" includes "'*all* aspects of religious observance and practice, as well as belief.'" *Starkey*, 41 F.4th at 946 (Easterbrook, J. concurring) (quoting 42 U.S.C. § 2000e(j) (emphasis added)).  Thus, Title VII ensures that a "religious [organization] is entitled to limit its staff to people who will be role models by living the life prescribed by the faith, which is part of 'religion' as § 2000e(j) defines that word."  *Id.*  A Title VII religious exemption that does not exempt a religious organization's employment decisions made for religious reasons is no religious exemption at all.

**Church Autonomy.**  Even if Title VII did not exempt religious observance and practice, the First Amendment protects the Mission's practices. The "principles of the First Amendment" carefully protect "religious freedom." *Hosanna-Tabor*, 565 U.S. at 187.  This freedom protects church authority over "internal management decisions that are essential to the institution's central mission." *Our Lady*, 591 U.S. at 746; *see also, e.g.*, Weinberger, *Origins of Church Autonomy*, *supra*, at 15–19; Nestor, *Church Autonomy*, *supra*, at 17–32; Athanasius G. Sirilla, *The "Nonministerial" Exception*, 90 Notre Dame L. Rev. 393, 406 (2023).  If the First Amendment did not protect employers like the Mission—the freedom of a religious institution to require its religious agents to adhere to its religious standards— religious organizations would often not be able to pursue or to protect their religious missions at all.

The district court did not reach the issue of extending "neutral principles" as an exception to church autonomy. Such an extension would allow for "neutral principles" (*e.g.*, Title VII) to sweep away church autonomy (*e.g.*, control over religious hiring) when "facially discriminatory" hiring policies are in place (*e.g.*, sexual prohibitions for religious employees). Should this court reach the issue of "neutral principles," it should decline to extend the exception for three reasons.

*First*, Supreme Court precedent on church autonomy has already rejected the idea that "valid and neutral" employment discrimination laws trump "internal church decision[s] that affect[] the faith and mission of the church itself." *Hosanna-Tabor*, 565 U.S. at 190 (rejecting application of neutral employment law to church decisionmaking); *Our Lady*, 591 U.S. at 736–38 (same).

*Second*, the Court should recognize the appropriate place for "neutral principles." When the Supreme Court has used this term, it has done so to *protect* religious autonomy, not undermine it. The Supreme Court has invoked neutral principles in disputes over church land and property use, where it views "neutral principles" as working "to protect religious autonomy" by "assuring that secular courts would intervene in religious affairs only when the religious community itself had expressly stated in terms accessible to a secular court how a particular controversy should be resolved." W. Cole Durham & Robert Smith, 1 Religious Orgs. & the Law § 5:16 (2017); *see also Jones v. Wolf*, 443 U.S. 595 (1979) (cautioning that civil courts still "must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body").

25

*Third*, when properly applied, the "neutral principles" exception would swallow the rule of church autonomy. *See* Weinberger, *The Limits of Church Autonomy*, *supra*, at 1277–79. Essentially every lawsuit against a religious institution, with clever pleading by clever plaintiffs, could be adjudicated by "neutral principles." *See, e.g.*, *Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986) ("The 'neutral principles' doctrine has never been extended to religious controversies in the areas of church government, order and discipline, nor should it be.").

## CONCLUSION

The church autonomy doctrine, together with other constitutional and statutory protections for religious organizations, provides critical protections for religious institutions in our constitutional system. Such protections safeguard "the right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Our Lady*, 591 U.S. at 737. The district court arrived at the correct decision—albeit on different grounds—and this Court should affirm.

Dated:  January 31, 2025                    Respectfully submitted,

                                            */s/ Vince Eisinger*
                                            Vince Eisinger
                                            CRANFILL SUMNER LLP
                                            5420 Wade Park Boulevard, #300
                                            Raleigh, NC 27607
                                            (919) 863-8703
                                            veisinger@cshlaw.com

                                            *Counsel for Amici Curiae*

26

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

this brief contains 6,454 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f)

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

this brief has been prepared in a proportionally-spaced typeface using Microsoft Word in 14 point Times New Roman.

Dated:  January 31, 2025          Respectfully submitted,

*/s/ Vince Eisinger*
Vince Eisinger
CRANFILL SUMNER LLP
5420 Wade Park Boulevard, #300
Raleigh, NC 27607
(919) 863-8703
veisinger@cshlaw.com

*Counsel for Amici Curiae*

27

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that I electronically filed the foregoing amicus brief in support of Plaintiff-Appellee with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the Court's CM/ECF system on January 31, 2025.  I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.


Dated:  January 31, 2025                    Respectfully submitted,

                                            */s/ Vince Eisinger*
                                            Vince Eisinger
                                            CRANFILL SUMNER LLP
                                            5420 Wade Park Boulevard, #300
                                            Raleigh, NC 27607
                                            (919) 863-8703
                                            veisinger@cshlaw.com

                                            *Counsel for Amici Curiae*