NO. 24-7246

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNION GOSPEL MISSION OF YAKIMA, WASHINGTON,
*Plaintiff-Appellee,*

v.

ROBERT FERGUSON, in his official capacity as Attorney General of Washington State; ANDRETA ARMSTRONG, in her official capacity as Executive Director of the Washington State Human Rights Commission; and GUADALUPE GAMBOA, HAN TRAN, JEFF SBAIH, LUC JASMIN, AND CHELSEA DIMAS, in their official capacities as Commissioners of the Washington State Human Rights Commission, *Defendants-Appellants.*

On Appeal from the United States District Court
for the Eastern District Of Washington
No. 1:23-CV-3027-MKD

**Brief of Amicus Curiae Wyoming Rescue Mission
in Support of Appellee and for Affirmance**

Deborah J. Dewart
111 Magnolia Lane
Hubert, NC 28539
(910) 326-4554

Randall L. Wenger
Jeremy L. Samek
Janice Martino-Gottshall
Independence Law Center
23 N. Front St., First Fl
Harrisburg, PA 17101
(717) 657-4990
rwenger@indlawcenter.org

*Attorneys for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...............................................................ii

INTEREST OF AMICUS CURIAE..................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT......................2

ARGUMENT................................................................................7

I.    The Washington Law Against Discrimination, As Interpreted by the Washington Supreme Court, Threatens the Independence and Very Existence of Religious Organizations.................................................................7

II.   Operating a Religious Organization in Accordance with that Organization's Religious Doctrine is Not Invidious, Irrational or Arbitrary Discrimination..................................................11

III.  The Coreligionist Doctrine is Constitutionally Mandatory to Preserve a *Trilogy* of Core First Amendment Rights – Speech, Association and Religion.................................................15

    A. A Religious Organization is Engaged in Speaking a *Message* Inextricably Linked to its *Mission*. The Organization Must Retain the Exclusive Right to Select its Employees................................................................17

    B. A Religious Association Conveys its Message Not Only Through Speech, but Also the *Conduct* of its Representatives.................................................19

CONCLUSION............................................................................22

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023)…………………………………...………...8, 9, 13

*Bd. of Ed. of Westside Community Schools (Dist. 66) v. Mergens,*
    496 U.S. 226 (1990)……………………………………………..……18

*Bostock v. Clayton County, Ga,*
    140 S. Ct. 1731 (2020)……………………………………………3, 7, 9

*Boy Scouts of America v. Dale,*
    530 U. S. 640 (2000)……………………………………………………8

*Capitol Square Review & Advisory Bd. v. Pinette,*
    515 U.S. 753 (1995)……………………………………………..……18

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos,*
    483 U.S. 327 (1987)……………………………………………...6, 16

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021)……………………………………………………8

*Gay Rights Coalition of Georgetown Univ. Law Ctr. v. Georgetown Univ.,*
    536 A.2d 1 (D.C. 1987)…………………………………………………14

*Healy v. James,*
    408 U.S. 169 (1972)……………………………………………………15

*Heffron v. International Soc. for Krishna Consciousness, Inc.,*
    452 U.S. 640 (1981)……………………………………………………18

*Hobbie v. Unemployment Appeals Comm'n of Florida,*
    480 U.S. 136 (1987)……………………………………………………11

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*,
565 U.S. 171 (2012) (Alito, J., concurring)……………………………..17

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*,
515 U.S. 557 (1995)…………………………………………………...8, 18

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
344 U.S. 94 (1951)………………………………………………………10

*Lamb's Chapel v. Center Moriches Union Free School Dist.*,
508 U.S. 384 (1993)……………………………………………………18

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
584 U.S. 617 (2018)………………………………………………………8

*Matal v. Tam*,
137 S. Ct. 1744 (2017)…………………………. ....................... 19

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
138 S. Ct. 2361 (2018)……………………………………………… 18

*Obergefell v. Hodges*,
576 U.S. 644 (2015)……………………………………. ....................... *passim*

*Ockletree v. Franciscan Health System*,
317 P.3d 1009 (Wash. 2014)…………………………………………5

*Petruska v. Gannon University*,
462 F.3d 294 (3d Cir. 2006)…………………………. ........................17

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988)…………………………………….......................... 18

*Seattle Pac. Univ. v. Ferguson*,
104 F.4th 50 (2024)…………………………………................ 19, 20, 21

*Spencer v. World Vision, Inc.*,
619 F.3d 1109 (9th Cir. 2010)…………………………….................... 16, 17

*Thomas v. Review Bd. of Ind. Emp't*,
  450 U.S. 707 (1981)……………………….. .................................... 11

*United States v. United Foods, Inc.*,
  533 U.S. 405 (2001)……………………… .................................... 19

*Washington v. Glucksberg*,
  521 U.S. 702 (1997)……………………… .................................... 15

*Watson v. Jones*,
  80 U.S. (13 Wall.) 679 (1872)…………………..................................... 19

*West Virginia State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943)……………………… .................................... 9

*Widmar v. Vincent*,
  454 U.S. 263 (1981)……………………… .................................... 18

*Wooley v. Maynard*,
  430 U.S. 705 (1977)……………………… .................................... 18

**Statutes**

42 U.S.C. § 2000e-1……………………………… .................................... 16

**Other Authorities**

Michael W. McConnell, *"God is Dead and We have Killed Him!"*
  *Freedom of Religion in the Post-Modern Age*, 1993 BYU L. REV. 163,
  187 (1993)……………………………………….. .................................... 14

## INTEREST OF AMICUS CURIAE[1]

Amicus Curiae urges the Court to affirm the decision of the District Court.

Amicus Curiae Wyoming Rescue Mission (WRM) is a religious non-profit organization that serves the entire state of Wyoming through its Christ-centered, multi-faceted ministry. WRM shelters homeless people and provides free meals, clothing and other necessary items to individuals who are in need of a helping hand. It also offers numerous outreach programs, including transitional housing programs for both men and women and recovery programs for those individuals struggling with drug and alcohol addiction. WRM's mission is to restore individuals to community independence with the love of Christ. Essential to this mission is WRM's desire and goal to share the good news of Jesus Christ and see lives transformed through the healing power of the Gospel. WRM's religious beliefs motivate and shape everything it does.

---

[1] No counsel for a party authored this brief in whole or in part, and no party, party's counsel, or any person other than amicus curiae or their counsel contributed money intended to fund preparation or submission of this brief. Pursuant to FRAP 29, counsel for all parties received timely notice of the intent to file and have consented in writing to the filing of this brief.

WRM believes religious organizations must remain free to hire any or all of its employees, based not only on whether a prospective employee agrees with the religious beliefs of the organization, but also whether there is a shared commitment to live consistently with those beliefs. WRM is increasingly experiencing the conflict caused by the prevailing culture's push to marginalize people and religious organizations who adhere to orthodox Christian beliefs on human sexuality, marriage and gender. WRM believes the State of Washington's unconstitutional disregard of coreligionist hiring will be harmful not only to religious organizations but also to the people they seek to serve and the community at large.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Washington lawmakers enacted the Washington Law Against Discrimination (WLAD), to protect citizens from discrimination in employment. Sexual orientation and religion are two among several protected categories. In addition, the law, as enacted, recognized nonprofit religious organizations' right to employ coreligionists by excluding religion from the WLAD's list of protected classes applicable to a religious employer. This provision ensured that nonprofit religious

organizations were protected in their ability to hire employees who both believe what the organization believes, and who seek to live consistently with those beliefs. This protection is essential to the ability of religious organizations to exist and operate according to their religious mission. However, the Washington Supreme Court has severely restricted the rights of religious employers by limiting the religious employer exemption to the "ministerial exception." Without its intended protections for religious employers, the WLAD wields a sword to those employers whose religious beliefs are at odds with the State's stance on the sensitive topics of marriage, sexuality and gender identity, all of which are encompassed in the WLAD's definition of "sexual orientation."

This case follows a growing trend of challenges to religious practices using anti-discrimination laws aimed at sexual orientation and gender identity. This trend resulted from a misunderstanding of *Obergefell v. Hodges*, 576 U.S. 644 (2015), and *Bostock v. Clayton County, Ga*, 140 S. Ct. 1731 (2020). Despite the widespread misunderstanding, subsequent decisions by the Supreme Court have focused on the need to preserve religious liberty when the inevitable collision between anti-discrimination laws and First Amendment rights occurs.

Plaintiff-Appellee Union Gospel Mission of Yakima Washington ("the Mission") is a nonprofit religious organization that was founded as a Christian ministry in 1936. Since its founding, the Mission has faithfully served its community by ministering to the homeless and those members of its community who have needed a helping hand. The Mission serves all people regardless of who they are and what they believe by providing food, shelter for the homeless and addiction recovery programs. The Mission also partners with volunteer health professionals to offer free medical and dental services to those who cannot pay for them. In addition to serving those individuals who come to them in need of help, Mission teams visit homeless areas of the community to bring food, clothing and supplies and offer shelter, help and hope. The Mission also maintains three thrift stores that provide revenue and support for its programs and services.

For over 80 years, the Mission has pursued its religious purpose, guided by its sincere and deeply-rooted religious beliefs. Those beliefs include specific views on marriage and sexuality, topics which from time out of mind, have been understood and encompassed within the context of most religious creeds and doctrines. Indeed, human sexuality is

4

inseparable from most religious doctrinal belief systems and expectations as to conduct within those belief systems. For religious employers whose existence is defined and guided by their beliefs, including time-honored beliefs on marriage and sexuality, it is imperative for those employers to seek out employees who share those beliefs.

Religious employers' pursuit of employees who share their mission is not invidious but indispensable to maintaining the character of the religious organization. A religious employer should be free to hire those who both believe what the organization believes and who seek to live consistently with those beliefs. Recognition of coreligionist protections for religious organizations is essential to religious freedom, freedom of speech and freedom of association. Without these protections, religious groups cannot carry out their religious mission.

The Washington Supreme Court has determined to impose and elevate its own views about human sexuality above the views and rights of the Mission—the Mission's *constitutional* rights (religion, speech, association) and its admittedly constitutional statutory exemption. *See Ockletree v. Franciscan Health System*, 317 P.3d 1009, 1017 (Wash. 2014) ("exemptions for religious organizations from civil discrimination suits

5

protect religious freedom by avoiding state interference with religious autonomy and practice"); *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 336 (1987).

The First Amendment rights undergirding the coreligionist doctrine are critical to the ability of the Mission and other religious employers to carry out their religious purpose. The end result of laws such as the WLAD are clear—religious organizations will be forced to choose between their religious mission and continuing to operate. We all suffer the consequences when we shut down religious organizations and lose their unique contributions and service to our communities. Unless this Court steps in to provide meaningful First Amendment protection, states will have carte blanche to prevent faith-based nonprofits from associating around and promoting religious views, views which the United States Supreme Court in *Obergefell* declared to be "decent and honorable." *Obergefell*, 576 U.S. at 672.

6

# ARGUMENT

## I. The Washington Law Against Discrimination, As Interpreted by the Washington Supreme Court, Threatens the Independence and Very Existence of Religious Organizations.

There is an alarming surge in the use of anti-discrimination laws to compel uniformity of thought and action about sexual mores, contrary to *Obergefell*'s admonition that religious organizations and persons should be free to organize their lives around these issues. This is hardly a shocking development. Indeed, it was a foreseeable result of the Supreme Court's rulings in *Obergefell* and *Bostock*. The Court put its thumb on the scale on issues of profound cultural and religious significance but could not lift a finger to relieve the burdens it had inadvertently created. *Obergefell*, 576 U.S. at 711 (Roberts, C.J., dissenting) ("[f]ederal courts . . . do not have the flexibility of legislatures to address concerns of parties not before the court"). Justice Thomas warned of "potentially ruinous consequences for religious liberty." *Id.* at 734 (Thomas, J., dissenting). Unfortunately, the Court's promises to preserve religious liberty, *see id.* at 679-680, ring hollow if Washington State gets its way. The warnings proved prescient, as even the majority's reference to the First Amendment rights of religious organizations in

7

*Obergefell* has been ignored and undercut by the Washington Supreme Court. *See id.* ("The First Amendment ensures that religious organizations . . . are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered.").

Subsequent decisions have served to clarify and preserve First Amendment liberties in the face of government wielding it anti-discrimination punitive authority. *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 584 U.S. 617 (2018), provided protection against open government hostility to religion. In *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), the Supreme Court ruled that the City violated the Free Exercise rights of a foster care agency by refusing to contract with the ministry because of its stance against placing foster children with same-sex couples. More recently, in *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023), the Supreme Court considered the impact of Colorado's sweeping public accommodations law on a website designer's free speech. Reviewing its rulings in *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995), and *Boy*

*Scouts of America v. Dale*, 530 U. S. 640 (2000), the Court concluded, "in both cases this Court held that the State could not use its public accommodations statute to deny speakers the right 'to choose the content of [their] own message[s].'" *303 Creative*, 600 U.S. at 194, *quoting Hurley*, 515 U.S. at 573.

Despite the clarifications from these cases, misinterpretations of *Obergefell* and *Bostock* continue to result in brazen efforts to coerce uniformity of thought about the nature of marriage and sexuality, redefining basic biology and concepts that have stood for millennia. Attempts to compel uniform thought are dangerous to a free society where the government must respect a wide range of diverse viewpoints. In the past, "[s]truggles to coerce uniformity . . . have been waged by many good as well as by evil men." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 640 (1943). These efforts are ultimately futile. "Compulsory unification of opinion achieves only the unanimity of the graveyard." *Id.* at 641. Religious organizations and individuals are especially threatened by laws and policies that prohibit "discrimination" based on sexual orientation and/or gender identity.

Strong convictions about marriage and sexuality often characterize a system of religious doctrine. The Mission holds religious beliefs about marriage and sexuality that are baked into the religious worldview that undergirds its mission, message and choice of messengers. The Constitution guarantees the Mission and other religious organizations "independence from secular control or manipulation" in matters of "faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1951). Washington crushes that independence, and its assault on religious freedom will inevitably create additional collateral damage. A clear ruling is needed in this Circuit to guard the liberty of religious organizations to employ those who maintain the same beliefs and who seek to live consistently with those beliefs. Without these protections, religious employers will be unable to preserve their identity and pursue their mission while remaining faithful to their core beliefs.

## II.  Operating a Religious Organization in Accordance with that Organization's Religious Doctrine is Not Invidious, Irrational or Arbitrary Discrimination.

This case is an employment discrimination action against a religious organization. But the action of a *religious* organization, motivated by its *religious* doctrine, is not arbitrary, irrational, unreasonable or invidious. Indeed, the Mission's selection of employees who support its religious identity and purpose is not "discrimination" at all. This is not a case where the law may proscribe refusal to conduct business with an entire group based on personal animosity or *irrelevant* criteria. It is *relevant* for a religious employer to consider a prospective employee's agreement (or disagreement) with its religious doctrine and mission. A court's refusal to consider religious motivation and relevance—and to distinguish that from invidious discrimination— "tends to exhibit hostility, not neutrality, towards religion." *Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 142 n.7 (1987); *See also Thomas v. Review Bd. of Ind. Emp't*, 450 U.S. 707, 708 (1981).

Religious organizations do not engage in invidious discrimination when they select, from a pool of applicants, those employees who are most closely aligned with the religious beliefs of the organization. Religious

11

organizations do not exist merely to provide a framework to exchange human labor or services. Religious organizations hire employees to speak and act on the employer's behalf; however, that speech and conduct is not limited to expressions towards outsiders. The importance of hiring coreligionists extends also to the building of an internal community of like-minded coreligionists who share a commitment to strengthen each other in their faith and encourage one another to live out their faith. If employees are not committed to the association's purposes, they are more likely to weaken or misrepresent the group. When a group is not cohesive in its beliefs, the ability to encourage and provide accountability for each other is compromised. Over time, the association's fundamental identity may be distorted beyond recognition.

The clash between anti-discrimination principles and the First Amendment is particularly volatile when a practice of religious significance is encompassed in legislation and religious persons or groups are swept within the ambit of the new law. However, this clash should not be difficult to reconcile. Sexual beliefs and actions based on those beliefs ought to be treated no differently than any other religious beliefs and actions that a religious organization associates around and expects

employees to share. The problem arises instead because strong cultural forces have been pushing to castigate and marginalize anyone whose traditional beliefs about sexual morality contradict the current zeitgeist.

The Supreme Court in *303 Creative*, 600 U.S. 570, has articulated what the outcome must be when laws like the WLAD collide with First Amendment rights: "When a state public accommodations law and the Constitution collide, there can be no question which must prevail." *Id.* at 592. (citing the U.S. Const., Art. VI, cl.2). Leaving no doubt on how the collision caused by Colorado's anti-discrimination law must be resolved, the Court concluded:

> [T]he opportunity to think for ourselves and to express those thoughts freely is among our most cherished liberties and part of what keeps our Republic strong. Of course, abiding the Constitution's commitment to the freedom of speech means all of us will encounter ideas we consider "unattractive," "misguided, or even hurtful." But tolerance, not coercion, is our Nation's answer. The First Amendment envisions the United States as a rich and complex place where all persons are free to think and speak as they wish, not as the government demands.

*Id.* at 603 (internal citations omitted).

Government should not legislate a particular view of sexual morality and compel religious institutions and individuals to facilitate it.

13

When the D.C. Circuit addressed the question "of imposing official orthodoxy on controversial issues of religious, moral, ethical and philosophical importance, upon an entity whose role is to inquire into such matters" it concluded that "[t]he First Amendment not only ensures that questions on difficult social topics will be asked, it also *forbids government from dictating the answers*." *Gay Rights Coalition of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 24 n.19 (D.C. 1987) (emphasis added). Religious voices have shaped views of sexual morality for centuries. These deeply religious convictions shape the way people of faith live their daily lives, both privately and in public. Advocates of social change with respect to sexuality tend to be "anything but indifferent toward the teachings of traditional religion—and since they are not indifferent they are not tolerant." Michael W. McConnell, *"God is Dead and We have Killed Him!" Freedom of Religion in the Post-Modern Age*, 1993 BYU L. REV. 163, 187 (1993). Political power can be used to squeeze religious views out of public debate about social issues, as this case demonstrates.

### III. The Coreligionist Doctrine is Constitutionally Mandatory to Preserve a *Trilogy* of Core First Amendment Rights—Speech, Association and Religion.

Speech, association and religion would qualify as fundamental rights even without the First Amendment. These three intertwined rights are "deeply rooted in this Nation's history and tradition" and are "implicit in the concept of ordered liberty," so that "neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg,* 521 U.S. 702, 721 (1997) (citations omitted).

Without the robust protection for hiring coreligionists, the Mission would forfeit all three core First Amendment rights. These basic liberties "are protected not only against heavy-handed frontal attack, but also from being stifled by *more subtle governmental interference.*" *Healy v. James*, 408 U.S. 169, 183 (1972) (emphasis added), *quoting Bates v. City of Little Rock,* 361 U.S. 516, 523 (1960). Here, the WLAD is wielded as a sword to force a religious organization to hire employees who have little or no interest in abiding by the organization's religiously-based conditions for employment. The state court's distortion of the Supreme Court's longstanding protection for religious hiring obstructs the

15

Mission's ability to form a cohesive association with persons who will faithfully disseminate its message.

Recognizing the unique constitutional protection for religion, the Civil Rights Act of 1964 (Title VII) accommodates religious employers by exempting them from the prohibition against religious discrimination. 42 U.S.C. § 2000e-1. The Supreme Court upheld the exemption against Establishment and Equal Protection Clause challenges, observing that government should not interfere with "the ability of religious organizations to define and carry out their religious missions." *Amos,* 483 U.S. at 335 (building engineer discharged by nonprofit gymnasium associated with church). This broad exemption allows a religious employer to terminate (or refuse to hire) an employee "for exclusively religious reasons, *without respect to the nature of their duties.*" *Spencer v. World Vision, Inc.*, 619 F.3d 1109, 1111 n.3 (9th Cir. 2010) (emphasis added). In *Spencer*, this Circuit upheld World Vision's termination of three employees who performed maintenance, office and shipping services. All of them initially signed the required "Statement of Faith, Core Values, and Mission Statement" but later were terminated when they renounced the religious doctrine that defines World Vision's

16

mission. *Id.* at 1111. Similarly, the Constitution protects the Mission's right to select employees who support its religious identity and mission, especially when that religious expectation for employees happens to contradict prevailing orthodoxy of society.

### A. Because a Religious Organization is Engaged in Speaking a *Message* Inextricably Linked to its *Mission*, the Organization Must Retain the Exclusive Right to Select its Employees.

"Religious groups are the archetype of associations formed for expressive purposes, and their fundamental rights surely include the freedom to choose who is qualified to serve as a voice for their faith." *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,* 565 U.S. 171, 200-201 (2012) (Alito, J., concurring). Every religious organization has a religious *mission* and the right to disseminate its *message* to further that mission. Religious organizations are "dedicated to the collective expression and propagation of shared religious ideals." *Id.* at 200. The free exercise of religion requires that an organization "retain the corollary right to select its voice." *Petruska v. Gannon University*, 462 F.3d 294, 306 (3d Cir. 2006). Even secular expressive associations enjoy comparable rights to join together to advocate a cause and select those who will disseminate its message.

17

Religious speech,

> far from being a First Amendment orphan, is as fully
> protected under the Free Speech Clause as secular
> private expression. . . . [G]overnment suppression of
> speech has so commonly been directed *precisely* at
> religious speech that a free-speech clause without
> religion would be Hamlet without the prince.

*Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995). *See also Lamb's Chapel v. Center Moriches Union Free School Dist.,* 508 U.S. 384 (1993); *Bd. of Ed. of Westside Community Schools (Dist. 66) v. Mergens,* 496 U.S. 226 (1990); *Widmar v. Vincent,* 454 U.S. 263 (1981); *Heffron v. International Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640 (1981). Regardless of motives, the State "may not substitute its judgment as to how best to speak" for that of an organization. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 791 (1988); *See also Nat'l Inst. of Family & Life Advocates v. Becerra,* 138 S. Ct. 2361, 2376 (2018) (crisis pregnancy centers protected against compelled speech regarding state-financed abortions). Compelling an organization to retain an unwanted employee (or pay a hefty fine) is tantamount to compelled speech. *See, e.g., Wooley v. Maynard,* 430 U.S. 705, 717 (1977); *Hurley,* 515 U.S. at 573. Even a secular business may create a unique brand, free of government compulsion, to convey a message to the public.

18

*See, e.g., Matal v. Tam*, 137 S. Ct. 1744, 1760 (2017) (trademark); *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001) (mushroom producer).

**B.   A Religious Association Conveys its Message Not Only Through Speech, but Also the *Conduct* of its Representatives.**

Religion is a comprehensive worldview, not a compartment detached from daily life. Representatives of a religious organization not only speak *about* religion—they must model its values in their interactions with each other, first inside but also outside of the organization. The Supreme Court has long recognized that a religious organization can require conformity to its moral standards as a condition of membership. *Watson v. Jones,* 80 U.S. (13 Wall.) 679 (1872). That same principle applies to the conduct of employees hired by a religious organization—an issue recently addressed by this Court in *Seattle Pacific University v. Ferguson*, 104 F.4th 50 (2024).

Seattle Pacific University (SPU), a private Christian university, filed a lawsuit to preserve its religious independence and rights when the moral standards in its employment policies became the target of a state investigation. The Washington Attorney General commenced its

investigation after receiving complaints that SPU's employment policies. which prohibited employees from engaging in same-sex intercourse and marriage, violated the WLAD. Pursuant to the enforcement authority of the WLAD, the Attorney General sent SPU a letter requesting information and documents relating to SPU's hiring practices, including job descriptions.

SPU filed suit against the Attorney General to enjoin the investigation and any future enforcement of the WLAD. While the Attorney General defended its requirement that SPU show how it planned to "refuse to hire, fire, or otherwise discriminate against non-ministerial employees because of the sexual orientation," this Court recognized that the Attorney General was mischaracterizing the issue. Rather, SPU had made it "crystal clear that SPU has applied and will continue to apply its sexual conduct policies to *all* regular faculty and staff, ministers and non-ministers alike." *Id.* at 60 (emphasis in original). Indeed, SPU had alleged in its complaint that if it failed to abide by the moral standards contained in its policies in all its employment decisions, it would be "automatically disaffiliated from the Free Methodist Church." *Id.* Noting that the Attorney General had already denounced SPU's

action as "illegal discrimination" and had actively solicited additional complaints against SPU, this Court recognized that SPU's continued adherence to its religious mission in its employment policies would likely violate the WLAD and subject it to a substantial threat of enforcement. *See id*. Holding that these factors were sufficient to demonstrate a pre-enforcement injury, this Court found that SPU had standing to pursue its pre-enforcement injury claims. *See id*. at 66.

Like SPU, the Mission's comprehensive worldview is foundational to its existence, its integrity and its effective operation as a religious organization. Because this worldview encompasses both beliefs and conduct, the Mission recognizes that it cannot fulfill its religious purposes unless its employees accept, support and model its core beliefs and values. Those core beliefs are reflected and woven throughout the Mission's founding documents and its statement of faith, job descriptions and employee documents. But those documents are meaningless if the Mission is prohibited from hiring and maintaining a workforce of individuals who share and live consistently with the Mission's beliefs, so as to faithfully carry out the Mission's religious work. The conduct of a religious organization's employees is what gives credence and integrity

to the stated beliefs that undergird and drive the work of a religious organization.

## CONCLUSION

This Court should affirm the decision of the District Court and affirm the constitutional right of a religious organization to hire persons who will faithfully believe, live consistent with, represent, and fulfill its religious mission.

Respectfully submitted,

/s/ Randall L. Wenger
Randall L. Wenger
Jeremy L. Samek
Janice Martino-Gottshall
Independence Law Center
23 N. Front St., First Fl
Harrisburg, PA 17101
(717) 657-4990
rwenger@indlawcenter.org

Deborah J. Dewart
111 Magnolia Lane
Hubert, NC 28539
(910) 326-4554

*Attorneys for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

<u>/s/ Randall L. Wenger</u>
Randall L. Wenger
*Attorney for Amicus Curiae*

February 3, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-7246

I am the attorney or self-represented party.

**This brief contains** | 4,041 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [              ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Randall L. Wenger | **Date** | 2/3/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**  *Rev. 12/01/22*