# No. 24-7246

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNION GOSPEL MISSION OF YAKIMA, WASHINGTON,

*Plaintiff-Appellee*,

v.

ROBERT FERGUSON, in his official capacity as Attorney General of Washington, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Eastern District of Washington
Case No. 1:23-cv-03027
District Judge Mary K. Dimke

**BRIEF OF AMICUS CURIAE STATE OF MONTANA AND
19 OTHER STATES SUPPORTING PLAINTIFF-APPELLEE AND
AFFIRMANCE**

AUSTIN KNUDSEN
*Attorney General of Montana*

CHRISTIAN B. CORRIGAN
*Solicitor General*

PETER M. TORSTENSEN, JR.
*Deputy Solicitor General*

MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................ii

INTERESTS OF AMICI CURIAE.........................................................1

STATEMENT OF THE CASE..............................................................2

SUMMARY OF THE ARGUMENT .......................................................4

ARGUMENT....................................................................................5

I. The church autonomy doctrine protects the Mission's hiring
   decisions.................................................................................5

   A. The doctrine protects religious organizations. .............................5

   B. The doctrine applies to personnel decisions based on religious
      doctrine.................................................................................8

CONCLUSION ...............................................................................13

ADDITIONAL COUNSEL .................................................................15

CERTIFICATE OF COMPLIANCE ......................................................17

i

TABLE OF AUTHORITIES

## Cases

*Bell v. Presbyterian Church (U.S.A.)*,
  126 F.3d 328 (4th Cir. 1997) ................................................................. 2

*Bouldin v. Alexander*,
  82 U.S. (15 Wall.) 131 (1872) ............................................................... 9

*Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.*,
  796 N.E. 2d 286 (Ind. 2003) ........................................................... 10-11

*Bryce v. Episcopal Church in the Diocese of Colo.*,
  289 F.3d 648 (10th Cir. 2002) ..................................................... 5, 9, 10

*Butler v. St. Stanislas Kostka Cath. Acad.*,
  609 F. Supp. 3d 184 (E.D.N.Y. 2022) ........................................... 11, 13

*Conlon v. Intervarsity Christian Fellowship/USA*,
  777 F.3d 829 (6th Cir. 2015) ...................................................5, 6-7, 8

*Corp. of Presiding Bishop v. Amos*,
  483 U.S. 327 (1987) ........................................................................9, 10

*EEOC v. Townley Eng'g & Mfg. Co.*,
  859 F.2d 610 (9th Cir. 1988) ...........................................................5-6

*Garrick v. Moody Bible Inst.*,
  412 F. Supp. 3d 859 (N.D. Ill. 2019) ........................................ 10, 11, 12

*Grussgott v. Milwaukee Jewish Day Sch., Inc.*,
  882 F.3d 655 (7th Cir. 2018) .......................................................13-14

*Hollins v. Methodist Healthcare, Inc.*,
  474 F.3d 223 (6th Cir. 2007) ................................................................ 7

*Hosanna-Tabor v. EEOC*,
  565 U.S. 171 (2012) .......................................................................5, 9

*Kedroff v. St. Nicholas Cathedral*,
  344 U.S. 94 (1952) .........................................................................1, 2

*Korte v. Sebelius*,
735 F.3d 654 (7th Cir. 2013) ............................................................. 4-5

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*,
503 F.3d 217 (3d Cir. 2007) .............................................................. 6

*Natal v. Christian & Missionary All.*,
878 F.2d 1575 (1st Cir. 1989) .................................................... 7, 11, 14

*NLRB v. Cath. Bishop of Chi.*,
440 U.S. 490 (1979) ...................................................................... 11-12

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
591 U.S. 732 (2020) ......................................................... 2, 5, 8, 9, 12

*Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*,
819 F.2d 875 (9th Cir. 1987) ............................................................ 9

*Penn. v. N.Y. Methodist Hosp.*,
884 F.3d 416 (2d Cir. 2018) ............................................................. 7

*Scharon v. St. Luke's Episcopal Presbyterian Hosp.*,
929 F.2d 360 (8th Cir. 1991) ............................................................ 7

*Serbian E. Orthodox Diocese v. Milivojevich*,
426 U.S. 696 (1976) ..................................................................... 1, 2

*Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*,
363 F.3d 299 (4th Cir. 2004) ......................................................... 7, 8

*Sterlinski v. Cath. Bishop of Chi.*,
934 F.3d 568 (7th Cir. 2019) ...................................................... 12-13

## Other

Helen M. Alvaré, *Church Autonomy After* Our Lady of Guadalupe
School*: Too Broad? Or Broad as It Needs to Be?*, 25 TEX. REV. LAW &
POL. 319 (2021) ............................................................................. 13

### INTERESTS OF AMICI CURIAE

The church autonomy doctrine protects religious organizations'
freedom in "matters of church government as well as those of faith and
doctrine." *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952). This
doctrine protects states as well: It allows religious organizations to con-
duct their internal affairs, and it protects states from becoming "entan-
gled in essentially religious controversies." *Serbian E. Orthodox Diocese
v. Milivojevich*, 426 U.S. 696, 709 (1976). The district court declined to
rule on Union Gospel Mission's First Amendment church autonomy de-
fense, but that defense provides an independent basis to affirm the dis-
trict court. To ensure that courts maintain clear standards for determin-
ing when the church autonomy doctrine applies to employment-discrim-
ination claims and to prevent state entanglement with religious affairs,
the States of Montana, Alabama, Arkansas, Florida, Idaho, Iowa, Kan-
sas, Louisiana, Mississippi, Missouri, Nebraska, Ohio, Oklahoma, South
Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, and West Vir-
ginia ("Amici States") submit this amicus brief in support of Union Gospel
Mission. Amici States urge this Court to affirm.

STATEMENT OF THE CASE

The church autonomy doctrine enables religious organizations to "decide for themselves, free from state interference, matters of church governance as well as those of faith and doctrine." *Kedroff*, 344 U.S. at 116; *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 737 (2020) (cleaned up). So "courts must defer to the decisions of religious organizations 'on matters of discipline, faith, internal organization, or ecclesiastical rule, custom or law.'" *Bell v. Presbyterian Church* (*U.S.A.*), 126 F.3d 328, 330-31 (4th Cir. 1997). This deference protects religious organizations and states: it protects religious organizations' freedom to manage their internal affairs and prevents states from becoming embroiled in "religious controversies." *Milivojevich*, 426 U.S. at 709.

Union Gospel Mission ("Mission") exists to "spread the Gospel of the Lord Jesus Christ" through "Christ centered rescue, recovery and restoration to men, women and children in need." 3-ER-247–48, ¶¶4-5. It implements that goal by modeling "Christ in helping people move from homelessness to wholeness." 3-ER-248, ¶7. The Mission's Articles of Incorporation state that its beliefs are rooted in the Bible, which it believes "is the inspired, infallible, authoritative and final Word of God;

2

constituting unchanging truth for all people across time, place and culture." 3-ER-247, ¶8. "The Mission's religious beliefs guide and permeate everything the Mission does," including its interactions with the public "through its employees, who are expected to participate in … evangelism and be an example to others of what it means to be a Christian and how to strive to properly represent Christ." 3-ER-248, ¶9; 3-ER-250, ¶21.

Because the Mission believes that "it must maintain an internal community of shared faith" in service of its Christian discipleship, it requires its employees to attend daily prayer sessions and weekly chapel services, in addition to requiring all employees "to embrace and follow its beliefs." 3-ER-250–51, ¶¶23-24, 29. To that end, the Mission requires employees to comply with its Statement of Faith and core values. 3-ER-252, ¶40. Among those core values and beliefs is a teaching that "the only proper form of sexual expression is between one man and one woman in the context of marriage[.]" 3-ER-251, ¶27. So the Mission will not employ individuals who actively engage in behavior contrary to its religious beliefs, including homosexual behavior. 3-ER-252, ¶35.

That hiring policy places the Mission at odds with the Washington Law Against Discrimination ("WLAD"), which the Washington Supreme

3

Court interprets to bar discrimination on the basis of sexual orientation. 3-ER-209. The Washington Supreme Court also held that the WLAD's religious exemption, which applies to religious nonprofit organizations, should parallel the ministerial exception—*i.e.*, only apply to "ministerial" positions—as explained in *Our Lady* and *Hosanna-Tabor*. 1-ER-3–4. And Washington's Attorney General has "expressed an intention to enforce this new interpretation of the WLAD." 1-ER-4. But the district court correctly granted a preliminary injunction against the WLAD's application to the Mission, finding that the Mission was likely to succeed on the merits of its Free Exercise claim and that it met the remaining *Winters* factors. 1-ER-8–16.[1]

## SUMMARY OF THE ARGUMENT

The church autonomy doctrine marks a "boundary between two separate polities"—"the secular and the religious"—and it requires civil courts to accept religious organizations' resolution of internal religious

---

[1] The district court didn't consider the Mission's church autonomy argument in granting the preliminary injunction. 1-ER-8 ("Because Plaintiff has demonstrated a likelihood of success on the merits of this claim, Court need not address Plaintiff's church autonomy, Expressive Association, and Free Speech claims."). While this Court likewise need not reach the church autonomy doctrine, it provides an additional basis to affirm the district court's decision.

disputes as binding and outside their sphere. *Korte v. Sebelius*, 735 F.3d 654, 677 (7th Cir. 2013). The doctrine isn't limited to churches and religious schools but also applies to religious organizations whose "mission is marked by clear or obvious [religious] characteristics." *Conlon v. Intervarsity Christian Fellowship/USA*, 777 F.3d 829, 833-34 (6th Cir. 2015) (citation omitted). And it applies broadly to religious organizations' "personnel decision[s] based on religious doctrine." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 658-60 & n.2 (10th Cir. 2002). The doctrine thus protects the Mission's decision to only hire coreligionists who adhere to its statement of beliefs and the district court's ruling should be affirmed.

## ARGUMENT

## I. The church autonomy doctrine protects the Mission's hiring decisions.

### A. The doctrine protects religious organizations.

While the church autonomy doctrine applies to churches and religious schools, *see, e.g., Our Lady*, 591 U.S. at 746; *Hosanna-Tabor v. EEOC*, 565 U.S. 171, 186 (2012), it also applies to organizations whose "purpose and character are primarily religious," *see EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 618 (9th Cir. 1988). In evaluating

5

whether an organization is secular or religious, courts weigh "[a]ll significant religious and secular characteristics." *Id.* And that includes considering various factors like the organization's mission statement, whether it holds itself out as secular or religious, whether a religious entity participates in the organization's management, whether coreligionists make up its membership or provide support to the organization, and more. *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 221, 226-29 (3d Cir. 2007). But this inquiry into whether an organization is "sufficiently religious" must be undertaken with care to avoid impermissible entanglement with religion. *See id.* at 229-30 (declining to "hold that the [organization was] a center for Jewish culture rather than religion … because to engage in such an analysis would risk precisely the sort of state entanglement with religion that the Supreme Court has repeatedly warned against").

*Conlon* is instructive. There, the Sixth Circuit considered whether InterVarsity Christian Fellowship ("IVCF")—an on-campus Christian organization—was a "religious group" under *Hosanna-Tabor*, 777 F.3d at 833-34. The court held it "clearly" was. *Id.* at 834. It didn't matter that IVCF wasn't a "traditional religious organization such as a church,

6

diocese, or synagogue, or an entity operated by a traditional religious organization." *Id.* (quoting *Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 225 (6th Cir. 2007)). What mattered was that its "mission [was] marked by clear or obvious religious characteristics," *id.* (quoting *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 310 (4th Cir. 2004))—that is, "its mission of Christian ministry and teaching." *Id.* So IVCF was entitled to invoke the ministerial exception to Title VII under *Hosanna-Tabor*.

Other cases confirm this focus on the organization's mission. Looking to the organizations' missions, rather than the religious status of the entity, courts have held that a variety of religiously affiliated entities are "religious groups" and thus entitled to exemptions from federal anti-discrimination statutes and related laws. *See, e.g.*, *Hebrew Home*, 363 F.3d at 310 (Jewish nursing home); *Penn. v. N.Y. Methodist Hosp.*, 884 F.3d 416, 425 (2d Cir. 2018) (Methodist hospital); *Hollins*, 474 F.3d at 225 (Methodist hospital); *Scharon v. St. Luke's Episcopal Presbyterian Hosp.*, 929 F.2d 360, 362 (8th Cir. 1991) (Episcopal Presbyterian hospital); *see also, e.g.*, *Natal v. Christian & Missionary All.*, 878 F.2d 1575, 1576-77 (1st Cir. 1989) (non-profit religious corporation). In each case, the

7

organization's mission was "marked by clear or obvious religious charac-teristics." *See Hebrew Home*, 363 F.3d at 310.

So too here. The Mission is a Christian ministry dedicated to "spread[ing] the Gospel of the Lord Jesus Christ" through humanitarian outreach. 3-ER-247, ¶4. It operates like a church in that its "religious beliefs guide and permeate everything" it does, including its evangelism to "to others of what it means to be a Christian and how to strive to properly represent Christ." 3-ER-248, ¶9; 3-ER-250, ¶20. It requires cur-rent and prospective employees to affirm and comply with its beliefs, 3-ER-251, ¶29, including its view "the only proper form of sexual expres-sion is between one man and one woman in the context of marriage," and that "all other sexual expression is immoral and sin." 3-ER-251, ¶27. At bottom, the Mission is "marked by clear or obvious religious characteris-tics" and is thus a "religious group" under *Hosanna-Tabor*. *Conlon*, 777 F.3d at 834 (citation omitted).

## B. The doctrine applies to personnel decisions based on religious doctrine.

The ministerial exception—a "component" of the church autonomy doctrine—bars claims brought by employees who perform important re-ligious duties. *Our Lady*, 591 U.S. at 746. For good reason: these

8

employees play an important "role in conveying the [religious group]'s message and carrying out its mission." *Hosanna-Tabor*, 565 U.S. at 174, 192. But the church autonomy doctrine extends beyond the ministerial exception to "matters of internal government," *Our Lady*, 591 U.S. at 747, including religious decisions about employment qualifications. When religious organizations make "personnel decision[s] based on religious doctrine"—even if the employee is not a "minister"—the "broader church autonomy doctrine" applies. *Bryce*, 289 F.3d at 656-58 & n.2.

Courts have no power or authority "to revise or question ordinary acts of church discipline … or excision from membership." *Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 139 (1872); *see also, e.g.*, *Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 883 (9th Cir. 1987) (church members "concluded that they no longer want to associate with her" and "they are free to make that choice"). And that extends to employment decisions related to employees who represent the religious group publicly and who carry out its mission. Requiring that "only those committed to [an organization's religious] mission" should conduct its activities is one way "a religious community defines itself." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring).

9

And courts permit these conditions because it is "vital that, if certain activities constitute part of a religious community's practice, then a religious organization should be able to require that only members of its community perform" them. *Id.* at 342-43.

*Bryce* is instructive. There, a church employee alleged that church officials' statements opposing homosexuality and her same-sex marriage constituted sex discrimination under Title VII. 289 F.3d at 651-53. But the Tenth Circuit sidestepped the "ministerial exception" and instead held that the "broader church autonomy doctrine"—which extends beyond the ministerial exception to "personnel decision[s] based on religious doctrine"—applied and barred her suit. *Id.* at 658-59 & n.2, 660.

And *Bryce* isn't alone. Other courts have also applied the church autonomy doctrine to bar employment claims against doctrinally grounded employment decisions when the employee wasn't a minister under *Hosanna-Tabor*. *See, e.g.*, *Garrick v. Moody Bible Inst.,* 412 F. Supp. 3d 859, 871-73 (N.D. Ill. 2019) (applying Bryce's "religious autonomy" principle to dismiss challenged to doctrinally grounded employment decision); *Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.,* 796 N.E. 2d 286, 293-94, 296 (Ind. 2003) (applying *Bryce*'s "church

10

autonomy" principle to bar tortious interference claim against diocese); *Butler v. St. Stanislas Kostka Cath. Acad.*, 609 F. Supp. 3d 184, 191 (E.D.N.Y. 2022) ("church autonomy … would mandate summary judgment" on Title VII claim "even if Butler had not been hired into a ministerial role").

*Bryce*'s analysis applies here too. The Mission's hiring policy is a quintessential matter of church government. Allowing WLAD to regulate those decisions "would impermissibly inject … [the] government into [decisions on] religious doctrine and governance." *Garrick*, 412 F. Supp. 3d at 871-72; *see also Natal*, 878 F.2d at 1577 ("The principle is an important one, steeped in our tradition as well as in our jurisprudence": courts must avoid "tread[ing] on this forbidden terrain.").

The Court has repeatedly recognized the need to avoid inquiries that entangle courts in religious disputes. *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 501-02 (1979). Consider *Catholic Bishop*. There, the National Labor Relations Board ("Board") ordered two Catholic schools to collectively bargain with their lay teachers, *id.* at 495-96, but the Supreme Court barred the Board's action because it raised "serious constitutional questions," *id.* at 501. Because resolving the dispute between the

11

teachers and schools—especially when the schools claimed that their practices "were mandated by their religious creeds"—would "necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission," the Court found the "very process of inquiry" into the dispute "may impinge on rights guaranteed by the Religion Clauses." *Id.* at 502.

The same entanglement concerns are in play here. To determine whether it is necessary for the Mission to hire coreligionists who affirm its teachings on sexuality would "necessarily involve [an] inquiry into the good faith the position [it] asserted … and its relationship to [Union Gospel]'s religious mission." *See id.* And that inquiry would no doubt "impermissibly inject … [the] government into [decisions on] religious doctrine and governance." *Garrick*, 412 F. Supp. 3d at 871-72. If religious organizations aren't free to uphold their core religious beliefs in their employment decisions, the Religion Clauses' promise of "independence in matters of faith and doctrine" and "internal govern[ance]" rings hollow. *Our Lady*, 591 U.S. at 746.

Courts have rejected an approach to the doctrine that would "essentially disregard what the employer"—a religious organization—"thought

12

about its own organization and operations." *Sterlinski v. Cath. Bishop of Chi.*, 934 F.3d 568, 570 (7th Cir. 2019); *see also Butler*, 609 F. Supp. 3d at 191 ("Butler was terminated for religious reasons, and the principle of church autonomy precludes a jury from questioning the veracity of those reasons ... under the guise of pretext[.]"). To be sure, insisting that every employment decision was made on the basis of religious doctrine could raise concerns about "pretext," but the Mission's requirement that its employees affirm its basic religious beliefs when witnessing to others "is on solid ground." *Sterlinski*, 934 F.3d at 570-71; *see also* Helen M. Alvaré, *Church Autonomy After* Our Lady of Guadalupe School*: Too Broad? Or Broad as It Needs to Be?*, 25 TEX. REV. LAW & POL. 319, 333 (2021) (explaining the Christian theology of personal witness).

## CONCLUSION

Allowing WLAD to regulate the hiring practices of religious organizations invites courts to engage in the sort of entangling inquiry into what is secular or religious that the church autonomy doctrine seeks to avoid. *Sterlinski*, 934 F.3d at 569-70; *see Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 660 (7th Cir. 2018) ("drawing distinction between secular and religious teaching ... is inappropriate" when it

13

"involves the government challenging a religious institution's honest assertion that a particular practice is a tenet of its faith"); *Natal*, 878 F.2d at 1576 ("[W]e deem it beyond peradventure that civil courts cannot adjudicate disputes turning on church policy or administration or on religious doctrine and practice."). Amici States urge this Court to affirm.

DATED this 3rd day of February, 2025.

AUSTIN KNUDSEN
 *Montana Attorney General*

CHRISTIAN B. CORRIGAN
 *Solicitor General*

*/s/ Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.
 *Deputy Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Counsel for Amicus Curiae*
*State of Montana*

14

## ADDITIONAL COUNSEL

STEVE MARSHALL
*Attorney General of
Alabama*

TIM GRIFFIN
*Attorney General of
Arkansas*

JOHN GUARD
*Acting Attorney General of
Florida*

RAÚL R. LABRADOR
*Attorney General of
Idaho*

BRENNA BIRD
*Attorney General of
Iowa*

KRIS KOBACH
*Attorney General of
Kansas*

LIZ MURRILL
*Attorney General of
Louisiana*

LYNN FITCH
*Attorney General of
Mississippi*

ANDREW BAILEY
*Attorney General of
Missouri*

MICHAEL T. HILGERS
*Attorney General of
Nebraska*

DAVE YOST
*Attorney General of
Ohio*

GENTNER F. DRUMMOND
*Attorney General of
Oklahoma*

ALAN WILSON
*Attorney General of
South Carolina*

MARTY J. JACKLEY
*Attorney General of
South Dakota*

JONATHAN SKRMETTI
*Attorney General and
Reporter of Tennessee*

KEN PAXTON
*Attorney General of
Texas*

DEREK E. BROWN
*Attorney General of
Utah*

JASON MIYARES
*Attorney General of
Virginia*

JOHN B. MCCUSKEY
*Attorney General of*
*West Virginia*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, Peter M. Torstensen, Jr., an employee in the Office of the Attorney General of the Montana, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 2,601 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)–(7), and Circuit Rule 29-2(c)(3).

/s/ *Peter M. Torstensen, Jr.*

PETER M. TORSTENSEN, JR.