**No. 24-7246**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNION GOSPEL MISSION OF YAKIMA, WASHINGTON,
*Plaintiff-Appellee,*

v.

FERGUSON, ET AL.,
*Defendants-Appellants.*

Appeal from the United States District Court for the
Eastern District of Washington
Case No. 1:23-cv-03027-MKD

**Brief of *Amici Curiae* THE CHRISTIAN AND MISSIONARY ALLIANCE;
COUNCIL FOR CHRISTIAN COLLEGES AND UNIVERSITIES; GRACE TO
YOU; ECO: A COVENANT ORDER OF EVANGELICAL PRESBYTERIANS;
CHURCH EDUCATIONAL SYSTEM OF THE CHURCH OF JESUS CHRIST
OF LATTER-DAY SAINTS; ALLIANCE REDWOODS CONFERENCE
GROUNDS; THE MASTER'S UNIVERSITY AND SEMINARY; TOWN &
COUNTRY MANOR OF THE CHRISTIAN AND MISSIONARY ALLIANCE;
and THE FULLER FOUNDATION in Support of Plaintiff-Appellee**

John Melcon
Taylor Huse
Stuart Lark
TAFT STETTINIUS & HOLLISTER LLP
90 South Cascade Avenue, Suite 1500
Colorado Springs, CO 80903
(719) 475-2440
jmelcon@taftlaw.com
thuse@taftlaw.com
slark@taftlaw.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici* certifies that *amici* do not have any parent corporations, and no publicly-held corporation owns 10% or more of the stock of any of *amici*.

# TABLE OF CONTENTS

**Page(s)**

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES .................................................................... iii

INTEREST OF AMICI CURIAE ............................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 3

ARGUMENT ........................................................................................... 8

    I.    Faith communities like *amici* employ fellow believers as a form of associational religious exercise and expression protected under the First Amendment. ................................... 8

    II.   The First Amendment requires reading the WLAD's religious exemption broadly enough to protect coreligionist hiring as a form of associational religious exercise and expression ........................................ 15

        A.    The district court's analysis aligns with the "reasonable grounds" framework required by the Washington Supreme Court's *Woods* decision. ........... 17

        B.    The First Amendment protections for religious exercise, autonomy, and expression provide reasonable grounds for the WLAD's religious exemption to apply to the employment by religious organizations of coreligionist non-ministers. .............. 19

CONCLUSION ...................................................................................... 29

CERTIFICATE OF SERVICE ................................................................. 30

ii

# TABLE OF AUTHORITIES

## Cases

*Bostock v. Clayton County,*
140 S. Ct. 1731 (2020) ............................................................................28

*Boy Scouts of America v. Dale,*
530 U.S. 640 (2000) ........................................................... 13, 25, 26

*Burwell v. Hobby Lobby,*
573 U.S. 682 (2014) .....................................................................8, 27

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) .......................................................................21, 26

*Corp. of the Presiding Bishop v. Amos,*
483 U.S. 327 (1987) .................................................... 10, 12, 18, 19, 22

*Employment Division v. Smith,*
494 U.S. 872 (1990) .......................................................................21, 23

*Fellowship of Christian Athletes v. San Jose Unified School District,,*
82 F.4th 664 (9th Cir. 2023)................................................................23

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021) ...............................................................................23

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
546 U.S. 418 (2006) ...............................................................................27

*Hobby Lobby Stores, Inc. v. Sebelius,*
723 F.3d 1114 (10th Cir. 2013) ..........................................................13

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC,*
565 U.S. 171 (2012) ...................................................... 11, 12, 14, 24, 25

*Kennedy v. St Joseph's Ministries,*
657 F.3d 189 (4th Cir. 2011) ........................................................4, 15

*Korte v. Sebelius,*
735 F.3d 654 (7th Cir. 2013) ..............................................................14

*Kumar v. Gate Gourmet, Inc.,*
325 P.3d 193 (Wash. 2014)....................................................................3

*Larson v. Valente,*
456 U.S. 228 (1982) ...............................................................................27

*Little v. Wuerl,*
    929 F.2d 944 (3rd Cir. 1991) .......................................................... 4, 14

*Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc.,*
    475 P.3d 164 (Wash. 2020) ................................................................. 17

*Masterpiece Cakeshop Ltd. v. Colorado Civil Rights Commission,*
    138 S. Ct. 1719 (2018) ....................................................................... 23

*McMahon v. World Vision,*
    704 F. Supp. 3d 1121 (W.D. Wash. 2023) ........................................... 6

*Ockletree v. Franciscan Health System,*
    317 P.3d 1009 (Wash. 2014) ................................................ 5, 15, 17, 19

*Our Lady of Guadalupe School v. Morrissey-Berru,*
    591 U.S. 732 (2020) ............................................................... 6, 11, 12

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
    141 S. Ct. 63 (2020) .......................................................................... 27

*Seattle Pacific University v. Ferguson,*
    104 F.4th 50 (9th Cir. 2024) ............................................................ 2, 16

*Sherbert v. Verner,*
    374 U.S. 398 (1963) .......................................................................... 27

*Spencer v. World Vision,*
    633 F.3d 723 (9th Cir. 2011) .................................................. 14, 22, 25

*Tagore v. United States,*
    735 F.3d 324 (5th Cir. 2013) ............................................................ 27

*Tandon v. Newsom,*
    593 U.S. 61 (2021) ..................................................................... 23, 24

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972) ............................................................................ 9

*Woods v. Seattle's Union Gospel Mission,*
    481 P.3d 1060 (Wash. 2021) ............................................ 5, 15, 17, 18, 20

## Statutes

42 U.S.C. § 2000e-1(a) ............................................................... 4, 22, 25

RCW 49.60.040 ........................................................................ 4, 15, 24

RCW 49.60.180 ...................................................................................3

RCW 49.60.208 ...................................................................................3

## INTEREST OF AMICI CURIAE[1]

*Amici* are nonprofit religious organizations involved in many different activities including education, evangelism, discipleship, missionary work, Bible teaching, broadcasting, publishing, elder care, financial stewardship, and congregational support. *Amici* are located in Washington, California, and other areas throughout the United States. Collectively, *amici* employ hundreds of individual workers.

*Amici* conduct all their activities as an exercise of their religious beliefs and in furtherance of their respective religious missions. In addition, and importantly, *amici* are guided by their beliefs to carry out their activities as *communities* or *associations* of like-minded believers, and doing so is an expression of those beliefs. Indeed, the experience of community within religious associations often inspires and energizes their service to others. Moreover, the shared religious beliefs and practices among those carrying out *amici*'s activities ensure that these

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored any part of this brief, and no person other than *amici* made a monetary contribution toward the preparation or submission of this brief.

activities are conducted in a manner that distinctly expresses and exercises each organization's religious convictions.

With respect to federal and state laws limiting associational rights, *amici* have a vital interest in, and increasingly rely upon, religious exemptions such as the one included in the Washington Law Against Discrimination ("WLAD"). The elimination or narrowing of these exemptions abridges *amici*'s legal rights to exercise and express their religious beliefs not just through their activities but also through their associations as faith communities.

In this case, the district court below correctly ruled that enforcing a "new interpretation" of the WLAD—one where the statute's religious exemption is read to offer no greater protection than that already afforded by the ministerial exception—would likely violate the Free Exercise rights of the Union Gospel Mission of Yakima (the "Mission") and, by extension, organizations like *amici*. The present appeal provides an important opportunity for this Court to "address the constitutionality of the Washington law," *Seattle Pacific University v. Ferguson*, 104 F.4th 50, 63 (9th Cir. 2024), and confirm the First Amendment protections—

beyond the ministerial exception—that apply to faith communities like *amici*.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case is about whether religious organizations may require their employees to agree with or live in accordance with their religious beliefs, including beliefs about God, scripture, salvation, and the afterlife.

Many religious organizations like the Mission and *amici* exercise and express their religious beliefs in part by nurturing one or more communities of like-minded believers. Such religious exercise clashes with operative language in nondiscrimination statutes like the WLAD, which prohibits covered employers from "refus[ing] to hire any person because of . . . creed." RCW 49.60.180(1). *See Kumar v. Gate Gourmet, Inc.*, 325 P.3d 193, 197 & n.4 (Wash. 2014) (explaining "the term 'creed' in the WLAD refers to religious belief"). The WLAD also bars covered employers from "[r]equir[ing] an employee to disclose his or her sincerely held religious affiliation or beliefs, unless the disclosure is for the purpose of providing a religious accommodation at the request of the employee." RCW 49.60.208(1).

Consistent with this country's long tradition of recognizing religious association as a form of protected religious exercise and expression, the WLAD—as written—includes a broad religious exemption from these prohibitions. The definition of "employer" under the WLAD does not include "any religious or sectarian organization not organized for private profit." RCW 49.60.040(11).

This exemption preserves associational religious exercise and expression by permitting religious employers to require their employees to agree with or live in accordance with their religious beliefs. In this respect, the exemption plays the same role as religious exemptions in other employment nondiscrimination statutes, including the religious employer exemption in Title VII of the federal Civil Rights Act of 1964, which "enable[s] religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices" and "to employ only persons whose beliefs and conduct are consistent with the [organizations'] religious precepts." *Kennedy v. St Joseph's Ministries*, 657 F.3d 189, 194 (4th Cir. 2011) (quoting *Little v. Wuerl*, 929 F.2d 944, 951 (3rd Cir. 1991)).

The WLAD's religious exemption also "accommodates the broad protections to religious freedoms afforded by Washington's article I, section 11," i.e., "the state free exercise clause." *Ockletree v. Franciscan Health System*, 317 P.3d 1009, 1017–18 (Wash. 2014) (lead opinion). Indeed, the religious liberty protections afforded by Washington's state constitution are "greater . . . than that of the First Amendment." *Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060, 1067 (Wash. 2021).

Recently, though, the WLAD's exemption for religious nonprofits has come under fire. In 2021, the Washington Supreme Court ruled that applying the exemption to Seattle's Union Gospel Mission ("SUGM") with respect to a discrimination claim brought by a non-coreligionist applicant for a staff attorney job at SUGM might violate the applicant's rights under the antifavoritism principles embodied in the Washington Constitution unless "the SUGM staff attorneys qualify as ministers." *Woods*, 481 P.3d at 1070.

In the wake of the *Woods* decision, courts have begun to characterize the WLAD's religious exemption as no broader than the so-called "ministerial exception," a well-established but limited First Amendment doctrine that protects a religious employer's "selection of the individuals

5

who play *certain key roles.*" *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (emphasis added). *See, e.g.*, *McMahon v. World Vision*, 704 F. Supp. 3d 1121, 1135 (W.D. Wash. 2023) (stating the WLAD's religious exemption "applies only to discrimination claims brought by employees who fall under the First Amendment's ministerial exception"), *appeal filed*, No. 24-3259 (May 22, 2024). This view is shared by Defendants-Appellants, the Washington state officials who enforce the WLAD (collectively, the "State"). *See* Opening Br., p. 8 (construing the *Woods* decision as limiting the WLAD's religious exemption "to employees who are 'ministers' as defined by the U.S. Supreme Court's First Amendment jurisprudence").

The problem is that enforcing this new interpretation of the WLAD would require a religious organization like the Mission to employ individuals who reject, violate, or disparage the organization's religious beliefs—something the U.S. Constitution cannot tolerate. Beyond its safeguards for the selection and supervision of "ministers," the First Amendment generally protects religious organizations' rights to exercise and express their religious beliefs as communities of fellow believers. Recognizing as much, the district court preliminarily enjoined the State

6

"from enforcing . . . the WLAD against [the Mission] for preferring and hiring only coreligionists—those who agree with and will adhere to the religious tenets and behavior requirements—for its non-ministerial positions." *Union Gospel Mission of Yakima v. Ferguson*, No. 1:23-cv-3027-MKD, 2024 WL 4660918, at *5 (E.D. Wash. Nov. 1, 2024).

The State takes issue with the district court's ruling, saying it "makes no sense" and "would relieve religious organizations . . . from complying with innumerable laws of all types." Opening Br., p. 2. The State's *amici* go even further in their catastrophizing, claiming that affirming the district court's order "would effectively strip an enormous number of employees of critical antidiscrimination protections." ACLU Br., p. 5. "That cannot be the law," they say. ACLU Br., p. 6.

These fears are exaggerated, but the real issue is that the First Amendment's broad protections for associational religious exercise and expression are not grounds for reading the WLAD's religious exemption *out of* the statute, as the State's logic would have it. Just the opposite. Properly weighed, the robust protections afforded by the First Amendment provide reasonable grounds—under the framework of *Woods* itself—for applying the WLAD's religious exemption to the Mission's

7

practice of preferring and hiring only coreligionists. The district court's analysis and injunction perfectly align with this approach; there was no abuse of discretion.

Accordingly, this Court should affirm the district court's order.

## ARGUMENT

**I. Faith communities like *amici* employ fellow believers as a form of associational religious exercise and expression protected under the First Amendment.**

Religious exercise often includes both *individual* and *associational* (or communal) elements. In a case protecting employers' religious exercise rights, Justice Kennedy described how our country's commitment to religious liberty encompasses the *individual* element as exercised throughout society:

> In our constitutional tradition, freedom means that all persons have the right to believe or strive to believe in a divine creator and a divine law. For those who choose this course, free exercise is essential in preserving their own dignity and in striving for a self-definition shaped by their religious precepts. Free exercise in this sense implicates more than just freedom of belief. It means, too, the right to express those beliefs and to establish one's religious (or nonreligious) self-definition in the political, civic, and economic life of our larger community.

*Burwell v. Hobby Lobby*, 573 U.S. 682, 737 (2014) (Kennedy, J., concurring).

8

On this same foundation, the U.S. Supreme Court has regularly recognized that our laws also protect the *communal* element of religious exercise. For example, in *Wisconsin v. Yoder*, the Court held that the Free Exercise Clause protects Amish communities from mandatory school attendance obligations. The Court observed that "Old Order Amish communities today are characterized by a fundamental belief that salvation requires life in a church community separate and apart from the world and worldly influence." 406 U.S. 205, 210 (1972). The Court further noted that the Amish base this concept on "their literal interpretation of the Biblical injunction from the Epistle Of Paul to the Romans, 'be not conformed to this world . . . .'" *Id.* at 216.

In the Supreme Court's leading case upholding the religious employer exemption in Title VII, Justices Brennan and Marshall accurately captured the communal or associational aspect of religious exercise when they observed that "determining that certain activities are in furtherance of an organization's religious mission, *and that only those committed to that mission should conduct them*, is . . . a means by which a religious community defines itself." *Corp. of the Presiding Bishop v.*

9

*Amos*, 483 U.S. 327, 342 (1987) (emphasis added) (Brennan and Marshall, JJ., concurring). They further explained:

> [R]eligious organizations have an interest in autonomy in ordering their internal affairs so that they may be free to: select their own leaders, define their own doctrines, resolve their own disputes, and run their own institutions. Religion includes important communal elements for most believers. They exercise their religion through religious organizations . . . . For many individuals, religious activity derives meaning in large measure from participation in a larger religious community. *Such a community represents an ongoing tradition of shared beliefs, an organic entity not reducible to a mere aggregation of individuals.*

*Id.* at 341–43 (emphasis added) (internal quotation omitted).

Different religious organizations, even those of the same general faith tradition, will reach different conclusions regarding the associational requirements of their faith. Perhaps not many religious organizations believe the requirements apply as extensively as do the Amish. What matters is that in each case the determination is based on religious beliefs as interpreted and applied by the religious community and is therefore an instance of religious exercise and expression (and self-definition) by such community.

Religious organizations like *amici* intertwine their carrying out of activities in service to God and society with their cultivating of an

10

association of employees committed to their beliefs and mission. Indeed, the latter often energizes the former. To this end, religious organizations commonly require employees to embrace and model the organization's religious beliefs. Such requirements help these organizations ensure that their activities—some of which may be facially similar to those of secular organizations—maintain their distinctive religious character. For *amici*, the point is not just that services are provided, but that services are provided by individuals committed to the organization's religious beliefs as an expression and exercise of those beliefs.

The First Amendment provides additional protection, beyond the Free Exercise Clause alone, for this associational religious exercise and expression. In *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012), and *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732 (2020), the Supreme Court applied the ministerial exception under which religious employers can make employment decisions in relation to employees in certain key roles based on *any criteria*.

The Court grounded this exception in a broader constitutional doctrine giving religious organizations autonomy from government

intervention in their affairs. *Our Lady of Guadalupe*, 591 U.S. at 746. Tracing the caselaw back to 1872, the Supreme Court recognized a long-standing principle grounded in the First Amendment that permits religious communities "to establish their own rules and regulations for internal discipline and government." *Hosanna-Tabor,* 565 U.S. at 187. Based on this principle, the Court held that "[b]y imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments." *Id.* at 188.

This religious autonomy doctrine extends beyond the ministerial exception to encompass the right of a religious employer to make employment decisions in regard to *non-minister employees* based on the alignment of their religious beliefs or conduct with those of the employer. In their *Amos* concurrence, Justices Brennan and Marshall indicated that "[c]oncern for the autonomy of religious organizations *demands*" the "categorical exemption" for religious organizations in Title VII. 483 U.S. at 345 (emphasis added).

The First Amendment right to expressive association provides separate and additional protection for the fellow-believer employment

standards of faith communities. In *Boy Scouts of America v. Dale*, the Supreme Court held that applying a state law prohibiting discrimination on the basis of sexual orientation in places of public accommodation to force the Boy Scouts to readmit a member who was a gay rights activist would "significantly affect" the organization's protected expressive association and would represent a "severe intrusion" on such rights. 530 U.S. 640, 656, 659 (2000). The Court went on to conclude that the burden was so severe that the state's interest in preventing discrimination in public accommodations was not sufficient to justify applying the state law to the Boy Scouts. *Id.* at 659.

The expressive association interests of *amici* and the Mission are enhanced by the fact that they are religious organizations because "the Religion Clauses add to the mix when considering freedom of association." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1136 (10th Cir. 2013) (en banc), *aff'd sub nom. Burwell v. Hobby Lobby*, 573 U.S. 682. As Justices Alito and Kagan put it, the principle recognized in *Dale* that "forcing a group to accept certain members may impair [its ability] to express those views, and only those views, that it intends to express . . . applies with special force with respect to religious groups,

13

whose very existence is dedicated to the collective expression and propagation of shared religious ideals." *Hosanna-Tabor*, 565 U.S. at 200 (Alito and Kagan, JJ., concurring).

Reflecting these broad constitutional protections, statutory religious exemptions—like the ones in the WLAD and Title VII—provide specific safeguards for the faith-based employment standards of religious organizations. *See Spencer v. World Vision*, 633 F.3d 723, 742 (9th Cir. 2011) (Kleinfeld, J., concurring) ("[W]ithout an exemption for religious institutions, [Title VII] would have the unintended consequence of preventing the free exercise of religion."); *Korte v. Sebelius*, 735 F.3d 654, 678 (7th Cir. 2013) ("The religious-employer exemptions in Title VII and the ADA are legislative applications of the church-autonomy doctrine.").

These statutory exemptions enable religious employers to "create and maintain communities composed solely of individuals faithful to their doctrinal practices" and "employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Little*, 929 F.2d at 951. In crafting the religious employer exemption in Title VII, Congress "painted with a broad brush" to ensure associational religious exercise and expression would remain "free from government intervention."

14

*Kennedy*, 657 F.3d at 194. Likewise, the WLAD's exemption for religious nonprofits "gives effect" to the state and federal constitutions' free exercise protections. *Ockletree*, 317 P.3d at 1018.

## II. The First Amendment requires reading the WLAD's religious exemption broadly enough to protect coreligionist hiring as a form of associational religious exercise and expression.

For all the reasons identified in the Mission's Answering Brief, the district court's ruling that the Mission will likely succeed on its Free Exercise challenge to the State's new narrow interpretation of the WLAD's religious exemption is correct. Moreover, the district court's conclusion dovetails perfectly with the "reasonable grounds" framework prescribed in the Washington Supreme Court's *Woods* decision itself, notwithstanding the State's parade of horribles.

The plain text of the WLAD religious exemption clearly and expressly exempts nonprofit religious organizations like the Mission entirely from the WLAD's scope. RCW 49.60.040(11). But the State has adopted a much more limited view, saying the exemption is restricted to employment actions already protected by the ministerial exception. Opening Br., p. 9 (citing *Woods*, 481 P.3d at 1068–69). The State—and its *amici*—argue that applying the exemption as the district court did, i.e.,

to allow a religious organization to prefer and hire only individuals who agree with and will adhere to the organization's religious beliefs—even for non-ministerial positions—would be "absurd" and an "extreme result." Opening Br., p. 32. The State contends that the district court's First Amendment analysis would open the floodgates of discrimination by giving religious organizations "carte blanche" to disregard almost any law. *Id.* at 21.

The problem—aside from the hyperbole—is that this treats the First Amendment's broad safeguards as grounds *not* to accommodate and protect associational religious exercise, which is precisely backwards. Even post-*Woods*, the First Amendment provides a basis for applying the WLAD's religious exemption to coreligionist hiring standards for non-ministerial employees, which the district court's preliminary injunction order appropriately captures.

This Court should affirm the district court's order and provide clarity about how the First Amendment informs the statutory exemption's application. *See Seattle Pacific University*, 104 F.4th at 63 ("[W]e have the authority to address the constitutionality of [the WLAD] as applied to [religious employers].").

16

A. **The district court's analysis aligns with the "reasonable grounds" framework required by the Washington Supreme Court's *Woods* decision.**

In *Woods*, the issue was whether "reasonable grounds" supported the Washington legislature's decision to provide an exemption from the WLAD for religious nonprofit employers such that the exemption's application would not violate the privileges and immunities clause in the Washington Constitution. 481 P.3d at 1062. The reasonable grounds test was first recognized in 2002 and has been applied by the Washington Supreme Court in privileges-and-immunities cases since that time. *See, e.g.*, *Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc.*, 475 P.3d 164 (Wash. 2020); *Ockletree*, 317 P.3d at 1014. In holding that reasonable grounds supported the *facial* constitutionality of the religious exemption, the *Woods* court noted that the Washington Constitution affords "greater protection" for the religious liberty rights of religious organizations than the First Amendment does. 481 P.3d at 1066–67.

It is true that when the court turned to Woods's *as-applied* challenge, the court limited its reasonable grounds analysis to the ministerial exception. But this was just because the ministerial exception was the reasonable grounds offered by the employer in defense of its employment

17

action. *Id.* at 1063 ("SUGM now argues that [the religious] exemption applies to its hiring decisions because its employees are expected to minister to their clients.").

Importantly, the state court declined to hold that the ministerial exception provides "a fair and useful approach" for balancing the relevant competing interests in all cases, *id.* at 1070, and "d[id] not opine on the effect of th[e] decision on *every* prospective employee seeking work with any religious nonprofit." *Id.* at 1065 n.2. The majority even cited the U.S. Supreme Court's opinion in *Amos*, a non-ministerial-exception case, as supporting the reasonable grounds for upholding the WLAD's religious exemption against a facial challenge. *Id.* at 1067.

As the *Woods* court recognized, the gravamen is determining "whether reasonable grounds exist to support a constitutional application" of the religious exemption to a particular employment action. *Id.* at 1067. Instead of embracing this framework, the State simply assumes there can be no reasonable grounds that would render the religious exemption broad enough to allow coreligionist hiring for non-minister roles.

**B.** **The First Amendment protections for religious exercise, autonomy, and expression provide reasonable grounds for the WLAD's religious exemption to apply to the employment by religious organizations of coreligionist non-ministers.**

In addition to the fact that *Woods* expressly did not engraft a ministerial exception limitation into the WLAD religious nonprofit exemption in every case, both Washington Supreme Court precedent and recent developments in First Amendment jurisprudence dictate that such a limitation is inappropriate.

For example, in *Ockletree*, a case involving an employee who was part of a protected class but whose role did not involve religious practice, the lead opinion held that the WLAD's religious exemption "satisfies the reasonable ground test because it . . . accommodates the broad protections to religious freedom afforded by" Washington's free exercise clause and the federal First Amendment. 317 P.3d at 1018 (citing *Amos*, 483 U.S. at 336). The controlling concurrence held that application of the exemption was unreasonable only on the assumption that "there is *no relationship* between [the employee's] duties and religion or religious practices." *Id.* at 1028 (emphasis added). But because of the way religious organizations like *amici* view their work and structure their communities

19

(see Section I, *supra*), there will be very few situations where their employees' duties have "no relationship" with religion or religious practices. The key point is that a majority of the justices in *Ockletree* recognized that reasonable grounds exist that support the exemption's application beyond the ministerial exception. The *Woods* court's as-applied holding did not disturb this consensus.

Recent cases recognizing the expansive religious liberty protections for religious organizations further undermine the notion that only the ministerial exception can provide reasonable grounds for applying WLAD's religious exemption to employment actions based on an employee's alignment with the organization's religion. The broad First Amendment protections for religious exercise, religious autonomy, and expressive association discussed in Section I and below each provide reasonable grounds for applying the exemption in such cases.

### i. *Free exercise*

First, failing to exempt the Mission's coreligionist hiring practices from the WLAD would violate the Free Exercise Clause, as the district court recognized.

In applying the Free Exercise Clause, the U.S. Supreme Court has held that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (citing *Employment Division v. Smith*, 494 U.S. 872 (1990)). However, "[a] law *failing to satisfy these requirements* must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id.* at 531–32 (emphasis added).

Applying this framework, there is no doubt the WLAD's general restrictions on creed-based hiring would burden the religious exercise of the Mission and similar religious organizations, which exercise their religious beliefs as communities of fellow believers. The very existence of the religious organization exemption evinces such burden, since alleviating the burden is the reason for the exemption. Requiring a religious organization like the Mission to employ individuals who reject the organization's religious beliefs would substantially burden such an organization's associational religious exercise as a faith community. As Judge Kleinfeld put it: "If the government coerced staffing of religious

institutions by persons who rejected or even were hostile to the religions the institutions were intended to advance, then the shield against discrimination would destroy the freedom of Americans to practice their religions." *Spencer*, 633 F.3d at 742.

Relatedly, limiting the WLAD's exemption to positions that are sufficiently religious (e.g., "ministerial") would impose an additional burden on religious exercise. In *Amos*, the Supreme Court noted that "Congress' purpose in [extending Title VII's religious exemption beyond religious activities] was to minimize governmental interference with the decision-making process in religions." 483 U.S. at 336 (cleaned up). The Court further observed that "[t]he line [between religious and secular activities] is hardly a bright one, and an organization might understandably be concerned that a judge would not understand its religious tenets and sense of mission." *Id*. Thus, the Court concluded that "it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious." *Id*.

In post-*Woods* cases, courts have emphasized the strict and comprehensive requirements for general applicability and religious

neutrality. *See, e.g.*, *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021); *Fellowship of Christian Athletes v. San Jose Unified School District*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc) (collecting cases). *Accord Masterpiece Cakeshop Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719, 1731 (2018) ("The Free Exercise Clause bars even subtle departures from neutrality on matters of religion.") (internal quotation omitted).[2]

For example, in *Tandon v. Newsom*, 593 U.S. 61, 62 (2021), the Supreme Court held that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorably than religious exercise." The Court further stated that "whether two activities are comparable for purposes of the Free Exercise

---

[2] The Supreme Court has held that certain religiously neutral laws may also be subject to strict scrutiny. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 n.2 (2017) ("This is not to say that any application of a valid and neutral law of general applicability is necessarily constitutional under the Free Exercise Clause"). In addition, the Mission's expressive association rights discussed below constitute "hybrid" rights that, as such, trigger strict scrutiny under *Smith*. 494 U.S. at 882.

Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.*

Absent a robust religious exemption that protects all religion-based employment practices, the WLAD would fail *Tandon*'s general applicability standard because, among other reasons, it includes a blanket exemption for employers with fewer than eight employees. RCW 49.60.040(11). As a result of this broad exemption, thousands of secular employers in Washington can discriminate *on any basis* when making *any employment decisions* under the WLAD. A law that asserts a greater interest in eliminating discrimination in employment decisions of religious organizations than in those of small employers is not generally applicable.

ii. *Religious autonomy*

Laws that substantially burden a religious organization's free exercise rights often also violate the religious autonomy doctrine (sometimes labeled "church autonomy"). For example, the U.S. Supreme Court has applied this doctrine to laws that "interfere[] with an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor*, 565 U.S. at 190. The WLAD's restrictions on creed-based

hiring constitute exactly this type of interference. Similarly, this Court previously rejected an interpretation of Title VII's religious employer exemption that would have required examination of the religiosity of an employer's own activities on the grounds that "[t]he Supreme Court . . . has repeatedly cautioned courts against venturing into this constitutional minefield." *Spencer*, 633 F.3d at 730 (O'Scannlain, J., concurring). The religious autonomy rights recognized in *Hosanna-Tabor* (and discussed in Section I, *supra*) are not subject to any competing governmental interests. *Hosanna-Tabor*, 565 U.S. at 190.

### iii. *Expressive association*

Finally, as *Dale* demonstrates, the First Amendment's protections for expressive association provide independent reasonable grounds for applying the WLAD's religious exemption in cases like this one. The State's attempt at distinguishing *Dale* is inapposite. The primary distinction drawn by the State is that *Dale* involved "membership in a private organization," not employment. Opening Br., p. 44. But the reasoning in *Dale* makes it apparent that an organization's expressive association interests are generally stronger in the case of an employee versus a club member or volunteer. It was the "forced inclusion" and

25

"presence" of the gay rights activist as a member that the Supreme Court highlighted as creating the significant burden on the Boy Scouts. 530 U.S. at 648. An employee is nearly always going to be included to a much greater degree and present with much higher frequency and for longer durations than a member or volunteer, making the burden only more severe.

    *iv.*    *Strict scrutiny of governmental interests*

Laws subject to strict scrutiny under the First Amendment are unlikely to survive. The Supreme Court has emphasized that the Free Exercise strict scrutiny test must be rigorous:

> A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny. To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance "interests of the highest order" and must be narrowly tailored in pursuit of those interests.

*Lukumi*, 508 U.S. at 546 (citations omitted).

Those seeking to apply state statutes in a manner that burdens religious exercise may argue that any applicable legislative interest is compelling, and that exempting persons whose religious exercise is burdened will materially impair such interest. But the two parts of the strict scrutiny test push against each other, such that it is difficult to

maintain that a law is narrowly tailored where the asserted interest is stated broadly. Accordingly, courts must "look beyond broadly formulated interests to scrutinize the asserted harm of granting specific exemptions to particular religious claimants—in other words, to look to the marginal interest in enforcing the law" in the particular case. *Burwell v. Hobby Lobby*, 573 U.S. at 726–27 (cleaned up).

As a result, many broadly-asserted important interests have had to yield to religious liberty rights under strict scrutiny, including protecting public health during a pandemic (*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020)), enforcing federal drug laws (*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 433 (2006)), and protecting personnel in federal buildings (*Tagore v. United States*, 735 F.3d 324, 330–31 (5th Cir. 2013)). In addition, the strict scrutiny burden cannot be satisfied with mere speculation, but instead must be supported by evidence. *Larson v. Valente*, 456 U.S. 228, 249 (1982).

Although it might be argued that Washington's broad interests in reducing employment discrimination are compelling, there is no reason to think the State's marginal interest in enforcing the WLAD as to the

27

Mission's religious employment standards is also compelling, especially given the long history of the WLAD's religious exemption being interpreted broadly as written (prior to *Woods*). Such a position is even less tenable when taking into account the U.S. Supreme Court's assurance in *Bostock*—the case expanding Title VII's protection in the context of sexual orientation—that the case would not force religious employers to "violate their religious convictions." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1753–54 (2020).

In sum, the First Amendment's protections for religious exercise, autonomy, and expression—individually and collectively—provide straightforward reasonable grounds for applying the WLAD's religious exemption to faith communities like the Mission and *amici* with respect to their employment of coreligionists, regardless of whether the ministerial exception also applies. The State's alarm at this prospect is therefore unfounded. In contrast, the district court came out in exactly the right place when it held that enforcement of the State's new interpretation of the WLAD against the Mission would likely run afoul of these First Amendment protections.

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that this Court affirm the district court's preliminary injunction order.

Respectfully submitted,

<u>/s/ John Melcon</u>
John Melcon
Taylor Huse
Stuart Lark
TAFT STETTINIUS & HOLLISTER LLP.
90 South Cascade Avenue, Suite 1500
Colorado Springs, CO  80903
(719) 475-2440
jmelcon@taftlaw.com
thuse@taftlaw.com
slark@taftlaw.com

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on February 3, 2025, the foregoing document was filed electronically through the Court's AMCS system. I certify that all participants in the case who are registered AMCS users will be served by the appellate AMCS system.

Date: February 3, 2025

/s/ John Melcon
John Melcon
*Counsel for Amici Curiae*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-7246

I am the attorney or self-represented party.

**This brief contains** | 5,235 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select
only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/John T. Melcon | **Date** | 02/03/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**       *Rev. 12/01/22*