No. 24-7246

# In the United States Court of Appeals for the Ninth Circuit

UNION GOSPEL MISSION OF YAKIMA, WASHINGTON,

PLAINTIFF-APPELLEE,

V.

ROBERT FERGUSON, ET AL.,

DEFENDANTS-APPELLANTS.

On Appeal from the United States District Court
for the Eastern District of Washington
No. 1:23-3:20-cv-06145-RJB / Hon. Robert J. Bryan

**BRIEF OF *AMICUS CURIAE***
**ETHICS AND PUBLIC POLICY CENTER**
**IN SUPPORT OF APPELLEE**

ERIC N. KNIFFIN
ETHICS & PUBLIC POLICY CENTER
1730 M Street, N.W.
  Suite 910
Washington, DC 20036
(202) 682-1200
ekniffin@eppc.org

*Counsel for* Amicus Curiae

February 3, 2025

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................... i

TABLE OF AUTHORITIES ........................................................ ii

INTEREST OF *AMICUS CURIAE* .............................................. 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................. 1

ARGUMENT ............................................................................. 4

I.  THE FIRST AMENDMENT WAS DESIGNED TO END GOVERNMENT INTERFERENCE WITH RELIGION, INCLUDING GOVERNANCE OF RELIGIOUS INSTITUTIONS. ...................................................... 4

II.  THE FIRST AMENDMENT'S CHURCH AUTONOMY DOCTRINE PROTECTS THE MISSION'S RIGHT TO HIRE CORELIGIONISTS. ................................ 8

III.  THE CONCURRING OPINIONS IN THE RECENTLY-DECIDED *HUNTSMAN* CASE ILLUSTRATE THE IMPORTANCE AND RELEVANCE OF THE CHURCH AUTONOMY DOCTRINE. ...................................................... 14

CONCLUSION ........................................................................ 20

# TABLE OF AUTHORITIES

## Cases

*Bryce v. Episcopal Church in the Diocese of Colo.*,
   289 F.3d 648 (10th Cir. 2002) ............................................................... 8

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day
   Saints v. Amos*,
   483 U.S. 327 (1987) ........................................................... 10, 11, 12, 13

*EEOC v. Miss. Coll.*,
   626 F.2d 477 (5th Cir. 1980) ............................................................... 18

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.
   Bd. of Educ.*, 82 F.4th 664 (9th Cir. 2023) ......................................... 20

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
   565 U.S. 171 (2012) ..................................................................... passim

*Huntsman v. Corp. of the President of the Church of Jesus Christ
   of Latter-Day Saints*,
   No. 21-56056, 2025 WL 351595 (9th Cir. Jan. 31, 2025). ........... passim

*Kedroff v. Saint Nicholas Cathedral of Russ. Orthodox Church in
   N. Am.*, 344 U.S. 94 (1952) ...................................................... 8, 15, 18

*Our Lady of Guadalupe Sch. v. Morissey-Berru*,
   591 U.S. 732 (2020) .............................................................. 5, 7, 8, 10

*Presb. Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presb.
   Church*,
   393 U.S. 440 (1969) ............................................................................ 15

*Seattle Pac. Univ. v. Ferguson*, 104 F.3th 50 (9th Cir. 2024) ................... 2

*Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*,
   426 U.S. 696 (1976) .............................................................................. 9

*Spencer v. World Vision, Inc.*,
   570 F. Supp. 2d 1279 (W.D. Wash. 2008) ............................................ 13

*Tucker v. Faith Bible Chapel Int'l*,
   36 F.4th 1021 (10th Cir. 2022) ........................................................... 10

*Watson v. Jones*,
   80 U.S. (13 Wall.) 679 (1871) ......................................................... 8, 9

*Woods v. Seattle's Union Gospel Mission*,
   481 P.3d 1060 (Wash. 2021) ................................................................ 2

**Statutes**

Act of Uniformity of 1662, 1 W. & M., ch. 18 ........................................... 5

**Other Authorities**

Alexander Hamilton, *Remarks on the Quebec Bill: Part Two*,
   Rivington's N.Y. Gazetteer (June 22, 1775) ....................................... 20

John Locke, *A Letter Concerning Toleration* (Bennett ed. 2010)
   (1689) ................................................................................................. 6

Jonathan Mayhew, *Observations on the Charter and Conduct of
   the Society for the Propagation of the Gospel in Foreign Parts*
   (1763) ................................................................................................. 7

Kevin Pybas, *Disestablishment in the Louisiana and Missouri
   Territories*, in *Disestablishment and Religious Dissent: Church-
   State Relations in the New American States 1776–1833* (Esbeck
   & Hartog eds., 2019) ......................................................................... 8

Letter from James Madison to John Carroll (Nov. 20, 1806) .................. 8

Michael W. McConnell, *Establishment and Disestablishment of
   Religion*, 44 Wm. & Mary L. Rev. 2105 (2003) ............................... 7, 8

## INTEREST OF *AMICUS CURIAE*[1]

The Ethics and Public Policy Center is a nonprofit research institution dedicated to applying the Judeo-Christian moral tradition to critical issues of public policy, law, culture, and politics, including on matters of church autonomy and religious liberty.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

This case asks: ***Is it still legal to operate a religious organization in Washington State?*** Appellants, the Washington State Attorney General and other State officials (collectively, "Washington State") would reject this framing. *Of course* Union Gospel Mission ("the Mission") is free to exist, Appellants say. It just has to follow the Washington Law Against Discrimination ("WLAD"). And that law (not as passed by the Washington Legislature, but as narrowed by the Washington Supreme Court in *Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060 (Wash. 2021) and

---

[1] Counsel for *Amicus Curiae* states pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E) that (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (3) no person, other than *Amicus Curiae* or its counsel, contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief pursuant to Rule 29(a)(2).

as applied by the Washington Attorney General's office in *Seattle Pac. Univ. v. Ferguson*, 104 F.3th 50, 96 (9th Cir. 2024)) states that the Mission cannot use religious criteria in its hiring decisions unless the position qualifies for the First Amendment's ministerial exception. Wash. Br. at 37. So, according to Appellants, the Mission is free to exist. So to speak. It can keep its religious mission, it can still use religious criteria to select its key leaders, *and that is enough*.

But that's not the way the Mission sees it. And that's not the way the district court saw it. As the Mission notes in its brief, it is "a religious *organization*, so it advances its religious goals through its 165-plus employees, who are its hands, feet, and voice. To this end, the Mission only employs coreligionists." Mission Br. at 9.

The Mission insists on hiring coreligionists for many reasons, which are detailed in its answering brief. *See id.* at 9–10. But the bottom line is that the Mission, as a religious organization, has concluded that hiring coreligionists is *essential to its religious mission*. "If the Mission cannot foster an inward community of co-believers who share the same belief and seek to advance the same goals with the same spirit cannot achieve its overarching purpose to spread the Gospel through its social welfare

work." *Id*. As the district court noted, if the Mission "is forced to hire those who do not [share its religious views], or those who do not adhere to those views, it may eventually be extinguished from public life." 1-ER-15 (quoting ECF No. 34 at 5).

According to the Mission and the district court, the freedom to determine which employees must affirm and follow its religious convictions is essential. It's essential to the Mission's ability to accomplish it's God-given mission. It's essential to the Mission's identity, its self-understanding, and to its public witness. The mission, like many organizations, understands that personnel is policy. If it cannot live out this conviction, it cannot be itself.

This Court need not decide here the full contours of the church autonomy doctrine as applied to a religious organization's non-ministerial employees. As the Mission notes in its answering brief, it is not asking for "blanket immunity." Mission Br. at 46–47. Nor is it asking for the full bundle of sticks that comes with the ministerial exception. To uphold the district court's preliminary injunction, it is enough to hold that the First Amendment protects the Mission's right to use religious criteria when hiring those employees it relies on to carry out its religious mission.

3

As shown below, the district court got this right. The First Amendment church autonomy doctrine, as understood throughout American history, and as applied by the Ninth Circuit, allows religious ministries the freedom to ask their employees to comply with their core religious teachings. This Court's en banc decision in the *Huntsman* case, filed January 31, also supports the district court's analysis.

The right the Mission asks this Court to uphold, the right that Washington State seeks to deny it, is a natural and essential aspect of the Constitution's protection of a "separate sphere" for religious authorities. *Amicus* urges the Court to affirm the district court on First Amendment grounds and thus ensure that the Mission and countless other Washington State religious organizations remain free to operate and carry out their religious missions.

## ARGUMENT

## I. The First Amendment was designed to end government interference with religion, including governance of religious institutions.

As the Supreme Court demonstrated in *Hosanna-Tabor* and *Our Lady of Guadalupe*, to apply the First Amendment properly, courts must consider that amendment's text against its historic backdrop.

4

Western history is full of controversy and turmoil relating to who, precisely, determines religious orthodoxy. For many centuries, the answer many advanced was that it should be resolved by the state. This was particularly true in England following the Protestant Reformation, where, in response to the (actual and perceived) foreign influence of the Roman Catholic Church on English politics, Parliament passed the Act of Supremacy of 1534, 26 Hen. VIII, ch. 1, declaring the King to be the "supreme head of the Church of England."

Vesting supreme secular and religious power in the person of the monarch was designed—at least in part—to settle the disputes of the day and to achieve peace. In reality, however, it had the opposite effect, culminating in the 1642 English Civil War and its aftermath. *See Our Lady of Guadalupe Sch. v. Morissey-Berru*, 591 U.S. 732, 748–49 (2020) (quoting Act of Uniformity of 1662, 14 Cha. II, ch. 4).

Looking back on this bloodshed, some, like John Locke, asked if such a close union of political and religious authority might after all be corrosive to both. *See* John Locke, *A Letter Concerning Toleration* 3 (Bennett ed. 2010) (1689). While these arguments led to some reforms, *see* Act of Toleration of 1689, 1 W. & M., ch. 18, many Protestant non-conformists

5

and Roman Catholics in England and its colonies nevertheless remained subject to state interference with church government. It was in this context that the Pilgrims, and later the Puritans, fled England in search of religious liberty.

But even the Puritans were often wary of religious freedom for others. Puritan minister Jonathan Mayhew, for example, vehemently protested the mere residence of an Anglican missionary in Puritan Cambridge, Massachusetts, in 1763, accusing him of a "formal design to root out Presbyterianism" and of seeking to "establish[ ] both Episcopacy and Bishops in the colonies," complete with religious tests and persecution of Puritans. Jonathan Mayhew, *Observations on the Charter and Conduct of the Society for the Propagation of the Gospel in Foreign Parts* 103 (1763), *available at* https://tinyurl.com/5n75ctzd. Consistent with this sentiment, colonial governments routinely interfered in matters of church doctrine, governance, and personnel. Michael W. McConnell, *Establishment and Disestablishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2131 (2003).

With their experience of this history, many leaders of "the founding generation sought to prevent a repetition of these practices in our country," *Our Lady*, 591 U.S. at 748, by setting a new and firmer boundary: the First Amendment's categorical prohibition on federal laws "respecting an establishment of religion, or prohibiting the free exercise thereof," *id.* at 746 (quoting U.S. Const. amend. I). And while many during the founding era debated the merits of state (as opposed to federal) support of favored religious institutions, virtually all rejected claims of "governmental control over the character and teachings" of any church. McConnell, *supra*, at 2133; *see also* Letter from James Madison to John Carroll (Nov. 20, 1806), *available at* https://founders.archives.gov/documents/Madison/99-01-02-1094 (refusing to opine on "the selection of [religious] functionaries" on the ground that such decisions are "entirely ecclesiastical"); Kevin Pybas, *Disestablishment in the Louisiana and Missouri Territories*, in *Disestablishment and Religious Dissent: Church-State Relations in the New American States 1776–1833*, at 273, 281 (Esbeck & Hartog eds., 2019).

This early American history demonstrates why the First Amendment was designed to protect the autonomy of religious organizations in

7

their decisions about "theological controversy, church discipline, ecclesiastical government, [and] the conformity of members" to required standards. *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1871).

## II.  The First Amendment's church autonomy doctrine protects the Mission's right to hire coreligionists.

From the time of the American founding, First Amendment caselaw has reflected the historical lessons described above and has affirmed that the First Amendment broadly safeguards religious institutions' right to govern their own internal affairs whenever their actions are "based on religious doctrine." *See Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 656–60 & n.2 (10th Cir. 2002). Thus, as the Supreme Court explained in *Our Lady*, the First Amendment "protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government.'" 591 U.S. at 737 (quoting *Kedroff v. Saint Nicholas Cathedral of Russ. Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)).

This doctrine of church autonomy has important implications for the role of secular courts in resolving legal claims over religious organizations' employment decisions. For example, it is well established that religious groups have autonomy with respect to the appointment of their

spiritual leaders, including their clergy and bishops. *See Watson*, 80 U.S. (13 Wall.) at 726–29; *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 712–21, 724–25 (1976) ("[T]he First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government[.]… When this choice is exercised … the Constitution requires that civil courts accept their decisions as binding upon them."); This principle has become known as the "ministerial exception." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188–89 (2012). It is one aspect of the religious autonomy the Supreme Court has recognized that the First Amendment requires.

The ministerial exception does not exhaust what the First Amendment has to say about a religious organization's necessary autonomy regarding employment decisions. The church autonomy doctrine more broadly prohibits "government interference with an internal church decision that affects the faith and mission of the church itself." *Id*. at 190. As the Court noted in *Our Lady*, the ministerial exception is just one "component" of the First Amendment principle that government may not interfere with "the independence of religious institutions in matters of

'faith and doctrine.'" 591 U.S. at 746; *see also Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1028–29 (10th Cir. 2022) ("The 'ministerial exception' is a narrower offshoot of the broader church autonomy doctrine.").

The federal government has long understood that this principle requires that government give a religious organization the freedom to employ coreligionists when it sincerely determines that doing so is necessary to carry out its religious mission. This conviction is a central premise of Title VII's religious organization exemption and how it has been interpreted by the Supreme Court.

This principle placed a central role in *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, where the Supreme Court considered the constitutionality of Title VII's religious organization exemption, which exempts religious organization from the law's general prohibition against discrimination, including on the basis of religion. 483 U.S. 327, 329–30 (1987). As the Mission's brief notes, *Amos* is far from the only case to discuss the broader coreligionist implications of the First Amendment's church autonomy doctrine. Mission Br. at 47–50. However, given the important role that *Amos* continues to play in the Court's First Amendment religious autonomy jurisprudence, the

10

remainder of this part explores that case in detail to supplement the Mission's opening brief.

The *Amos* case was brought by Arthur Frank Mayson, a janitor at a nonprofit gymnasium run by the LDS Church, who was fired after he failed to qualify for a "temple recommend."[2] *Amos*, 483 at 330. The case centered on Mayson's contention that though the religious organization exemption was legitimate as applied to religious positions, it should not be applied to a "secular" position such as his own. *Id*. at 332.

The Court disagreed with Mayson, holding that Title VII's religious organization exemption allows qualifying employers to use religious criteria in employment decisions *regardless of whether the employee in question had religious duties. Id*. at 339–40. The Supreme Court assumed for the purposes of argument that none of Mayson's duties at the gymnasium were "even tangentially related to any conceivable religious belief or ritual of the Mormon Church or church administration." *Id*. at 332.

Critical to the Court's decision in *Amos* to broadly interpret Title VII's religious organization exemption was its recognition that denying a

---

[2] A temple recommend is a certificate indicating that one is a Mormon in good standing and, thus, eligible to enter a Mormon temple.

religious employer's right to employ coreligionists would raise important Establishment Clause concerns. Justice Brennan expressed these concerns well in his concurring opinion:

> For many individuals, religious activity derives meaning in large measure from participation in a larger religious community. Such a community represents an ongoing tradition of shared beliefs, an organic entity not reducible to a mere aggregation of individuals. Determining that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them, is thus a means by which a religious community defines itself. Solicitude for a church's ability to do so reflects the idea that furtherance of the autonomy of religious organizations often furthers individual religious freedom as well. . . .
>
> [W]e deem it vital that, if certain activities constitute part of a religious community's practice, then a religious organization should be able to require that only members of its community perform those activities.

*Id.* at 342–43 (Brennan, J., concurring).

The Court as a whole also stressed that the First Amendment augers against any rule that would put government in the position of second-guessing a religious organization's decision that its mission required it to hire a coreligionist for any given position:

> [I]t is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious. The line is hardly a bright one, and an organization might understanda-

bly be concerned that a judge would not understand its religious tenets and sense of mission. *Fear of potential liability might affect the way an organization carried out what it understood to be its religious mission.*

*Id.* at 336 (emphasis added). Justice Thomas quoted this passage in his concurrence in *Hosanna-Tabor*, adding that "These are certainly dangers that the First Amendment was designed to guard against." 565 U.S. at 197 (Thomas, J., concurring).

Title VII's religious exemption was meant "to prevent excessive government entanglement." *Spencer v. World Vision, Inc.*, 570 F. Supp. 2d 1279, 1283 (W.D. Wash. 2008), *aff'd*, 619 F.3d 1109 (9th Cir. 2010), *and aff'd*, 633 F.3d 723 (9th Cir. 2011) (en banc). In other words, the exemption reflects not Congress' largesse but its judgment that without it Title VII would unconstitutionally infringe on the rights of religious employers.

The Washington Supreme Court, by rewriting WLAD's religious exemption, has endangered the legitimate autonomy of religious groups that the First Amendment protects. *Amicus* urges this Court to heed the Supreme Court's caution in *Amos* as it resolves the First Amendment issues at play in this case.

13

### III. The concurring opinions in the recently-decided *Huntsman* case illustrate the importance and relevance of the church autonomy doctrine.

Just last week, five Ninth Circuit judges underlined the breadth and significance of the church autonomy doctrine. On January 31, the court, sitting en banc, unanimously affirmed summary judgment for the Church of Jesus Christ of Latter-day Saints ("LDS Church") on former-member James Huntsman's fraud claim. *Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, No. 21-56056, 2025 WL 351595 (9th Cir. Jan. 31, 2025). Huntsman alleged "that the Church had committed fraud by using tithing funds to finance commercial endeavors despite saying that it would not do so." *Id*. at *2.

All eleven judges agreed with the district court that "no reasonable juror could find that the Church had misrepresented how it used tithing funds." *Id*. But five of those eleven wrote separately to stress the "obvious": "there is no way in which the plaintiff here could prevail without running headlong into basic First Amendment prohibitions on courts resolving ecclesiastical disputes." *Id*. at *7 (Bress, J., concurring).

1. Judge Bress, writing for himself and judges M. Smith, Nguyen, and VanDyke, rejected as an "illusion" Huntsman's claim "that this

14

is merely a secular lawsuit about civil fraud." *Id.* at *8. His opinion stresses "why a suit like this could never succeed under the First Amendment's church autonomy doctrine" given the case's "overwhelming First Amendment impediments." *Id.*

Breen's concurrence quotes extensively from major Supreme Court church autonomy cases to show that this doctrine is "a logically necessary feature of the Constitution's protections for religious freedom." *Id.* *10. Breen notes that "First Amendment values are plainly jeopardized when … litigation is made turn to turn on the resolution by civil courts of controversies over religious doctrine and practice." *Id.* (quoting *Presb. Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presb. Church*, 393 U.S. 440, 449 (1969)). Likewise, the First Amendment protects against judicial involvement that "would lead to the to the total subversion of such religious bodies." *Id.* (quoting *Kedroff*, 344 U.S. at 114).

Judge Breen also warned that courts must avoid the temptation to "override the First Amendment protections by abstracting [a religious dispute] from [its] religious context." *Id.* at *11. Just as Huntsman's fraud claim *could* be viewed as a garden variety fraud claim, the "Supreme Court has confronted analogous situations in which disputes involving

15

religious organizations could have been characterized in secular terms, but the Court held that the Religion Clauses and church autonomy principles prevented judicial resolution." *Id.* (collecting cases).

"The most notable example [of such situations] in recent years," Judge Breen noted, "concerns employment discrimination suits involving employees performing certain religious duties." *Id.* at *12 (citing *Hosanna-Tabor* and *Our Lady*). Breen noted that the Supreme Court held that "'[t]he interest of society in the enforcement of employment discrimination statutes is undoubtedly important,' [but] 'so too is the interest of religious groups' in deciding how to 'carry out their mission.'" *Id.* (quoting *Hosanna-Tabor*, 565 U.S. at 196). Courts must avoid interfering with these decisions, Judge Breen cautioned, to avoid answering "inherently religious questions," including "the importance of particular church doctrines and the importance of those doctrines to the religion." *Id.* at *13.

2. Judge Bumatay wrote separately from the other four concurring judges to argue that Huntsman's fraud claim *not only could* but *must* be resolved on church autonomy grounds because "the church autonomy doctrine is a structural limit on our authority." *Id.* at *14, *23 (Bumatay,

16

J., concurring). After reviewing the Establishment Clause's text and historical understanding, *id*. at \*15-22, Bumatay turns to Supreme Court precedent, *id*. at \*23-24. Altogether, Bumatay argues that "[c]onstitutional text, history and tradition, and precedent *all* confirm that the doctrine has structural roots. It operates as a strict bar to federal courts deciding matters of faith, doctrine, and church governance." *Id*. at \*25.

Judge Bumatay supplements his historical and doctrinal survey of the Establishment Clause by stressing the "dangers of skipping church autonomy" and deciding a fraud claim over church finances on the merits. *Id*. Here, again, Bumatay turns to the American founders. He cites early American concerns that "government action on church tithes would involve government interference in church affairs," *id*. (cleaned up, citation omitted), and credits Alexander Hamilton's caution that "a government's interference with a church's tithes, even in a positive way, 'converts it into an establishment,'" *id*.   (quoting Alexander Hamilton, *Remarks on the Quebec Bill: Part Two*, Rivington's N.Y. Gazetteer (June 22, 1775)). Bumatay emphasizes that Hamilton stood his ground, though proponents of the Quebec Bill argued it was "far short of the idea of an establishment." *Id*.

17

3.     Both Judge Bress's and Judge Bumatay's concurrences stress the doctrinal significance of the church autonomy doctrine and explain why it is critical that courts guard this doctrine with care. Though their opinions address the church autonomy doctrine in a different context—a disgruntled former LDS Church member's fraud claim—their arguments and their warnings are applicable to Washington State's efforts to intrude on the Mission's ability to live out its religious mission through its hiring decisions.

As Judge Bress notes, the church autonomy doctrine protects religious groups against government intrusions that would lead to "the total subversion of [] religious bodies." *Id.* at *10 (quoting *Kedroff*, 224 U.S. at 114). Likewise, this Court should heed the district court's caution that if the Mission "is forced to hire those who do not [share its religious views], or those who do not adhere to those views, it may eventually be extinguished from public life." 1-ER-15 (quoting ECF No. 34 at 5).

Additionally, while Washington State would limit the church autonomy doctrine to matters that are "*purely* of ecclesiastical concern," Wash. Br. at 41 (emphasis added) (quoting *EEOC v. Miss. Coll.*, 626 F.2d 477, 485 (5th Cir. 1980)), the *Huntsman* concurrences show the church

18

autonomy doctrine cannot be so neatly cabined. Huntsman's fraud allegations *could* be described as an internal LDS Church matter (as could much corporate fraud), but it also involved U.S. currency and the financing of a mall in Salt Lake City, with obvious impacts on interstate commerce. Similarly, Judge Breen notes that the church autonomy doctrine applies to "employment discrimination suits," even though the "interest of society in the enforcement of employment discrimination statutes is undoubtedly important." *Huntsman*, 2025 WL 351595 at *12 (quoting *Hosanna Tabor*, 565 U.S. at 196). In both cases, Judge Breen notes, the church autonomy doctrine focuses courts' attention on whether judicial involvement interferes in a religious group's decisions on how to "carry out their mission." *Id*. As Judge Bumatay emphasizes, the First Amendment protects religious groups' right "to shape [their] own faith and mission[.]" *Id*. at *14 (quoting *Hosanna Tabor*, 565 U.S. at 188).

\*     \*     \*

The concurring opinions in the *Huntsman* case demonstrate the important role that the First Amendment church autonomy doctrine plays in shaping the way that courts approach disputes that threaten to intrude on the way religious organizations carry out their religious mission.

19

Fraud claims brought by former members, like employment discrimination claims brought by former employees, raise important public policy concerns. But in these instances, as the Court said in *Hosanna-Tabor*, "the First Amendment has struck the balance for us." 565 U.S. at 196.

The Washington Legislature that passed WLAD's religious employer exemption, like the Congress that passed Title VII's religious organization exception, got this balance right. The Washington Supreme Court upset this balance when it narrowed WLAD's religious employer exemption by judicial fiat. The district court got it right when it found that this "'hamper[ing] of [the Mission's] ability to hire staff with its religious beliefs likely 'constitut[es] an enduring harm that will irreparably risk [the Mission's] continued existence." 1-ER 15 (quoting *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023)).

## CONCLUSION

This Court should hold that the WLAD, as interpreted by the Washington Supreme Court and as applied by Appellants, infringes on the Mission's rights under the First Amendment's church autonomy doctrine, and should affirm the court below on that basis.

20

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*Eric N. Kniffin*
Eric N. Kniffin

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief of *amicus curiae* complies with Federal Rule of Appellate Procedure 29(a)(5) because it has 3971 words, excluding those parts of the brief exempted by Rule 32(f).

*Eric N. Kniffin*
Eric N. Kniffin