No. 24-7246

# In the United States Court of Appeals for the Ninth Circuit

ROBERT FERGUSON
Defendant-Appellant,

v.

UNION GOSPEL MISSION OF YAKIMA
Plaintiff-Appellee.

Appeal from the United States District Court
for the Eastern District of Washington
Honorable Mary K. Dimke
No. 1:23-CV-3027-MKD

**BRIEF *AMICI CURIAE* OF CHRISTIAN LEGAL SOCIETY, THE CENTER FOR PUBLIC JUSTICE, THE CHRISTIAN MEDICAL AND DENTAL ASSOCIATIONS, CITYGATE NETWORK, CRISTA MINISTRIES, THE GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS, THE INSTITUTIONAL RELIGIOUS FREEDOM ALLIANCE, AND THE ISLAM AND RELIGIOUS FREEDOM ACTION TEAM OF THE RELIGIOUS FREEDOM INSTITUTE SUPPORTING PLAINTIFF-APPELLEE AND AFFIRMANCE**

Steven T. McFarland
 *Counsel of Record*
CHRISTIAN LEGAL SOCIETY CENTER FOR
 LAW & RELIGIOUS FREEDOM
8001 Braddock Road
Suite 302
Springfield, Virginia 22151
(703) 894-1041
smcfarland@clsnet.org

*Counsel for Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 29(a)(4)(A) and 26.1, amici represent

they have no parent entities and issue no stock.

Dated: February 3, 2025        */s/ Steven T. McFarland*
CHRISTIAN LEGAL SOCIETY
   CENTER FOR LAW & RELIGIOUS
   FREEDOM
8001 Braddock Road
Suite 302
Springfield, Virginia 22151
(703) 894-1041
smcfarland@clsnet.org

*Counsel for Amici Curiae*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF CONTENTS ................................................................ ii

TABLE OF AUTHORITIES .............................................................. iv

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................. 1

SUMMARY OF ARGUMENT ........................................................... 5

ARGUMENT ............................................................................... 8

I.     Strict Scrutiny Under the Free Exercise Clause Is Triggered When a Law That Substantially Burdens Religion Denies to Religious Persons an Exemption Extended to Comparable Secular Groups or Extends Exemptions Through Case-by-Case Assessments by Government Officials. ....................................................... 8

II.    WLAD Is Not a Generally Applicable Law Under Supreme Court Free Exercise Precedent as it Extends Comparable Secular Exemptions That it Denies to Many Religious Employers Like Appellee and Involves Individualized Assessments by Government Officials. .............................................. 12

    A. The small employer exemption. ................................... 12

    B. The bona fide occupational qualification exemption. ..................... 14

    C. The religious nonprofit employer exemption as interpreted in *Woods v. Seattle's Union Gospel Mission* ................... 16

    D. Underinclusive silence about other similarly injurious discrimination. ................................................. 17

E. Only one secular exemption causing similar
injury is needed. ................................................................ 19

III. The Governmental Interest Underlying Washington's
Non-discrimination Law Is Not Sufficiently
Compelling to Satisfy Strict Scrutiny. ........................... 20

IV. *Employment Division v. Smith* Was Wrongly
Decided, and This Court Should Urge That
it be Reconsidered. ......................................................... 22

CONCLUSION .................................................................... 29

CERTIFICATE OF COMPLIANCE ..................................... 30

CERTIFICATE OF SERVICE ............................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023) ........................................................... 20

*Bostock v. Clayton Ctny,*
   590 U.S. 644 (2030) .................................................... 22, 27

*Brady v. Daily World,*
   718 P.2d 785 (1986) ..................................................... 14-15

*Cantwell v. Connecticut,*
   310 U.S. 296 (1940) ........................................................... 24

*Church of Lukumi Babalu Aye, Inc. v.*
   *City of Hialeah,*
   508 U.S. 520 (1993) ................................... 9, 11-13, 17-18, 20, 26

*Combs v. Homer-Center Sch. Dist.,*
   540 F.3d 231 (3d Cir. 2008) ......................................... 24-25

*Emp't Div. v. Smith,*
   494 U.S. 872 (1990) ........................... 11, 13, 15, 22-24, 26, 28

*Fellowship of Christian Athletes v. San Jose*
   *Unified Sch. Dist. Bd. Of Educ.,*
   82 F.4th 664 (9th Cir. 2023) (en banc) ................................. 4, 9-10, 26

*Florida Star v. B.J.F.,*
   491 U.S. 524 (1989) ........................................................... 18

*Foothill Church v. Watanabe,*
   3 F.4th 1201 (9th Cir. 2021) ........................................... 26

iv

*Franklin Cnty Sheriff's Office v. Sellers*,
  646 P.2d 113 (1982) ...................................................... 14-15

*Fraternal Order of Police v. City of Newark*,
  170 F.3d 359 (3d Cir. 1999) ............................................ 19

*Frazee v. Ill. Dep't of Emp't Sec.*,
  489 U.S. 829 (1989) ...................................................... 25

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021) ............................ 8, 11-12, 15-17, 20-21, 26-27

*Hobbie v. Unemployment Appeals Comm'n*,
  480 U.S. 136 (1987) ...................................................... 25

*Hosanna-Tabor Evangelical Lutheran Church &*
  *Sch. v. EEOC*,
  565 U.S. 171 (2012) ............................................... 16-17, 22

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*
  *of Boston, Inc.*,
  515 U.S. 557 (1995) ...................................................... 20-21

*Kastanis v. Educ. Employees Credit Union*,
  865 P.2d 507 (1993) ...................................................... 14-15

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022) ...................................................... 26

*Masterpiece Cakeshop v. Colorado Civil Rights Comm'n*,
  584 U.S. 617 (2018) ...................................................... 27

*Midrash Sephardi, Inc. v. Town of Surfside*,
  366 F.3d 1214 (11th Cir. 2004) .......................................... 19

*Obergefell v. Hodges*,
  576 U.S. 644 (2015) ...................................................... 27

v

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  591 U.S. 732 (2020) .................................................................. 16-17

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020) (per curium) ................................................ 9, 13-14

*Sherbert v. Verner*,
  374 U.S. 398 (1963) ...................................................... 15-16, 19, 23-25

*Tandon v. Newsom*,
  593 U.S. 61 (2021) (per curium) .............................. 8-14, 16, 18-20, 26

*Tandon v. Newsom*,
  992 F.3d 916 (9th Cir. 2021) ........................................................ 17-18

*Thomas v. Review Bd.*,
  450 U.S. 707 (1981) ........................................................ 16, 19, 25-26

*Union Gospel Mission of Yakima v. Ferguson*,
  2024 WL 4660918 (E.D. Wash., Nov. 1, 2024) .................................... 4

*West Virginia State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1942) .................................................................... 25

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ............................................................ 11, 22, 25

*Woods v. Seattle's Union Gospel Mission*,
  481 P.3d 1060 (Wash. 2021) (en banc),
  *cert denied*, 142 S. Ct. 1094 (2022) ................................ 7, 12-13, 16-17

## Statutes & Rules

20 U.S.C. § 4071 *et seq.*. ............................................................ 10

Wash. Rev. Code § 49.60.040(11) ................................................ 8, 12

Wash. Rev. Code § 49.60.180(1) ............................................ 6, 8, 12, 14

vi

## Other Authorities

Fed. R. App. P. 29(a)(4)(E) ........................................................ 1

Stephanie H. Barclay, *Replacing* Smith,
   133 Yale L.J. Forum 436 (2023) ...................................... 28

Stephanie H. Barclay & Mark L. Rienzi, *Constitutional*
   *Anomalies or As-Applied Challenges? A Defense of*
   *Religious Exemptions*,
   59 B.C. L. Rev. 1595 (2018) ........................................... 25

Douglas Laycock, *Regulatory Exemptions of Religious*
   *Behavior and the Original Understanding of the*
   *Establishment Clause*,
   81 Notre Dame L. Rev. 1793 (2006) ................................. 25

Douglas Laycock, *The Remnants of Free Exercise*
   1990 Sup. Ct. Rev. 1 (1991) ........................................... 24

Douglas Laycock & Steven T. Collis, *Generally*
   *Applicable Law and the Free Exercise of Religion*,
   95 Nev. L. Rev. 1 (2016) ...................................... 10-11, 18

Douglas Laycock & Thomas C. Berg, *Protecting*
   *Free Exercise Under* Smith *and After* Smith,
   2020-2021 Cato Sup. Ct. Rev. 33 ..................................... 28

Michael W. McConnell, *Accommodation of Religion:*
   *An Update and a Response to the Critics*,
   60 Geo. Wash. L. Rev. 685 (1992) .................................... 25

Michael W. McConnell, *Free Exercise Revisionism*
   *and the* Smith *Decision*,
   57 Chi. L. Rev. 1109 (1990) ......................................... 24-26

Michael W. McConnell, *The Origins and Historical*
   *Understanding of Free Exercise of Religion*,
   103 Harv. L. Rev. 1409 (1990) ........................................ 23

Michael Stokes Paulsen, *Freedom for Religion*,
    133 Yale L.J. Forum 403 (2023) ...................................................... 24

Zalman Rothschild, *Free Exercise Partisanship*,
    107 Cornell L. Rev. 1067 (2022) ...................................................... 28

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

Amici are religious organizations representing millions of Americans from diverse faith communities. **Christian Legal Society** ("CLS") is a nonprofit, non-denominational association of Christian attorneys, law students, and law professors with members in every state and chapters on over 125 law school campuses. CLS believes that the integrity and anchoring of the mission of a religious organization depends on who the group chooses to represent it, lead it, and be its hands and feet. So CLS continues to prioritize defending religious hiring rights under the First Amendment, Title VII of the Civil Rights Act of 1964, and the Religious Freedom Restoration Act of 1993. CLS, therefore, urges this Court's strict scrutiny of the unconstitutional rewriting by the Washington Supreme Court of that state's antidiscrimination law. *See* Sections II and III, pp. 12-22, *infra.* In addition, CLS urgently calls for reconsideration by the U.S. Supreme Court of its malignant holding in *Emp't Division v. Smith* (1990). *See* Section IV, pp. 22-28, *infra.*

---

[1] Both parties have consented to the filing of this amicus brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), amici affirm that no counsel for a party authored this brief in whole or in part and that no person other than amici or their counsel have made any monetary contributions intended to fund the preparation or submission of this brief.

1

**The Center for Public Justice** ("CPJ") is a Christian, nonpartisan, civic education and policy organization. Working outside the familiar categories of right and left, conservative and liberal, CPJ seeks to help citizens and public officeholders respond to God's call to do justice. CPJ's mission is to serve God by equipping citizens, developing leaders, and shaping policy to advance justice for the transformation of public life.

As a religious organization, the **Christian Medical & Dental Associations** ("CMDA") highly values the religious freedom to hire employees who align with its religious values. As a national organization, CMDA hires employees nationwide, including in the state of Washington. CMDA also strives to protect the ability of its healthcare members nationwide to exercise their ability under the Free Exercise Clause to hire employees who align with their religious beliefs.

**Citygate Network** is a 119-year-old nonprofit membership organization made up of over 300 ministries that provide emergency services and life-transforming programs for the hungry, homeless, abused, and addicted throughout the U.S. and Canada. Appellee Union Gospel Mission of Yakima is an active member of Citygate Network. Citygate

Network respectfully joins this brief because faith-based personnel policies are both mission critical and constitutionally protected for gospel missions.

**CRISTA Ministries** is a 75-year-old organization headquartered just outside of Seattle, Washington. CRISTA is comprised of five ministries that work in the areas of senior living, education, media, camping, and international relief and development. CRISTA seeks to serve the needs of the world with the Gospel of Jesus Christ. CRISTA believes that the ability of religious organizations to preserve religion-based beliefs and conduct standards for its employees is of paramount concern with long-lasting impact on preserving freedom of religious belief and expression.

The **General Conference of Seventh-day Adventists** is the highest administrative level of the Seventh-day Adventist Church and represents more than 154,000 congregations with more than 22 million members worldwide, including 6,300 congregations and more than 1.2 million members in the United States. The work of the church in the United States is divided between 51 conferences, 8 union of conferences,

the North American Division, and finally the General Conference it-self. The Adventist Church has employees in all 50 states, and it exercises religious rights when making employment decisions.

The **Institutional Religious Freedom Alliance** ("IRFA") is a di-vision of the Center for Public Justice. IRFA works with a multi-faith and multi-sector network of faith-based organizations and associations, and with religious freedom advocates and First Amendment attorneys, to pro-tect and advance the religious freedom that faith-based organizations need to make their distinctive and best contributions to the common good.

While amici cherish different religious convictions, amici are united in our commitment to defend religious freedom. That is what is at stake in this case: religious freedom for faith-based organizations, more specif-ically whether this circuit will continue to apply the Free Exercise Clause according to U.S. Supreme Court precedent, as it did in *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664 (9th Cir. 2023) (en banc). Because the district court's decision does, it should be affirmed.

4

## SUMMARY OF ARGUMENT

Amici address the district court's correct analysis of the defense of Appellee Yakima Union Gospel Mission ("YUGM") under the First Amendment's Free Exercise Clause. In its Order of November 1, 2024, the district court concluded:

> That certain secular employers are shielded from WLAD [Washington Law Against Discrimination] enforcement and religious organizations are not—except with respect to ministerial positions—likely undermines the statute's stated interest in "eliminat[ing]" and "prevent[ing]" discrimination.

Order Granting Plaintiff's Motion for Preliminary Injunction ("PI Order"), *Union Gospel Mission of Yakima v. Ferguson*, No. 1:23-CV-3027-MKD, 2024 WL 4660918, at *9 (E.D. Wash., Nov. 1, 2024).

But to trigger strict scrutiny of those laws under the Free Exercise Clause, YUGM need not show that Washington's state legislature was motivated by a desire to selectively burden YUGM's religious conduct. As will be discussed, it is enough that these laws either 1) have one or more exemptions for comparable secular activity _or_ 2) afford the government the opportunity—with malign or benign motives—to grant exemptions in the individualized discretion of a government official. The court below

5

reasonably concluded that YUGM would probably be successful in proving that the Washington Law Against Discrimination ("WLAD") fails both of these free exercise tests here.

First, the district court properly applied the other Free Exercise Clause test for whether a law is "generally applicable" in holding that WLAD exempts small secular employers but not religious employers of eight or more employees. *Id.* at *9, *12. The court below correctly noted that WLAD is impermissibly underinclusive because it limits certain activities but allows others that "create the same problem." *Id.* at *12.

In addition, WLAD is also not generally applicable because it only dispenses its exemptions (other than the employer with less than eight employees) through subjective, case-by-case assessment by a government official or judge, under either the bona fide occupational qualification ("BFOQ") law, Wash. Rev. Code § 49.60.180(1),[2] or the application of the

---

[2] "It is an unfair practice for any employer: (1) To refuse to hire any person because of age, sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability, *unless based upon a bona fide occupational qualification . . . .*" (emphasis added).

6

"ministerial exception" analysis that the state supreme court has written into WLAD's religious employer exemption.[3]

The state supreme court has held that the religious exemption only applies to jobs that are proven to be "minister"-like. *Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060, 1068-69 (Wash. 2021), *cert denied*, 142 S. Ct. 1094 (2022); PI Order, at *3. That standard necessarily means the state exemption is awarded only case by case in the subjective judgment of the Washington Human Rights Commission or a judge.

As the district court below correctly held, the Free Exercise Clause requires application of strict scrutiny to WLAD because it is not generally applicable under either test. PI Order, at *8.

Finally, WLAD cannot satisfy strict scrutiny when denying YUGM an exemption here from the state's intrusive fishing expedition.

---

[3] The Washington Supreme Court rewrote that statute's religious exemption in *Woods v. Seattle's Union Gospel Mission*. 481 P.3d 1060 (Wash. 2021), *cert denied*, 142 S. Ct. 1094 (2022) (Alito, J., dissenting with Thomas, J., joining).

## ARGUMENT

**I. Strict Scrutiny Under the Free Exercise Clause Is Triggered When a Law That Substantially Burdens Religion Denies to Religious Persons an Exemption Extended to Comparable Secular Groups or Extends Exemptions Through Case-by-Case Assessments by Government Officials.**

Since 1949, the Washington Law Against Discrimination has exempted from nondiscrimination law 1) every small employer in the state, meaning every business with fewer than eight employees, Wash. Rev. Code § 49.60.040(11), and 2) bona fide occupational qualifications that have the effect of discrimination, Wash. Rev. Code § 49.60.180(1). Any law such as WLAD that substantially burdens religious exercise and either 1) allows one or more comparable secular exemptions but denies it to religious persons <u>or</u> 2) allocates exemptions through case-by-case discretion thereby triggers strict scrutiny under the Free Exercise Clause. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (*per curiam*); *see also Fulton v. City of Philadelphia*, 593 U.S. 522 (2021). Both triggers are present here.

The first inquiry triggering strict scrutiny under the Free Exercise Clause looks into how government exempts similar or comparable *secular* activities:

> Government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorably than religious exercise. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. ——, —— – ——, 141 S. Ct. 63, 67-68 (2020) (*per curiam*).

*Tandon*, 593 U.S. at 62.

The U.S. Supreme Court is quite clear about what makes religious and secular conduct comparable such that an exemption for the latter requires an exemption for the former: that the "nonreligious conduct . . . endangers these [state] interests in a similar or greater degree" as the burdened religious conduct. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993); *Tandon*, 593 U.S. at 62 ("whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue").

Less than a year ago, this Court issued its latest *en banc* interpretation and application of the Free Exercise Clause since *Tandon* and *Fulton*. In *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664 (9th Cir. 2023), this Court blew away the

9

smoke and held that a school violated the Free Exercise Clause[4] when it discriminated against a religious student club while recognizing similar student clubs that had secular purposes (e.g., Senior Women Club). *Id.* at 689. As the district court below in this case stated:

> Like the regulations at issue in *Tandon*, the WLAD likely is not neutral or generally applicable. While Plaintiffs argue the WLAD treats comparable secular activity more favorably than religious exercise in three respects, see ECF No. 37 at 12-13, it is sufficient to scrutinize just one of the WLAD's exemptions. *Tandon*, 593 U.S. at 62 ("[G]overnment regulations are not neutral and generally applicable . . . whenever they treat any comparable secular activity more favorably than religious exercise.") (citation omitted).

PI Order, at *9.

Respected legal experts have elaborated on what makes secular and religious activity comparable. "We must look to the reasons the state offers for regulating religious conduct and then ask whether it permits secular conduct that causes the same or similar harms." Douglas Laycock and Steven T. Collis, *Generally Applicable Law and the Free Exercise of Religion*, 95 Neb. L. Rev. 1, 11 (2016).

---

[4] This Court also ruled that the school district violated the Free Speech Clause and the Equal Access Act, 20 USC § 4071 *et seq.*, 82 F.4th at n.8 and n.12.

Here, therefore, Appellant must identify a real difference in the harm itself, not just a difference in the source of the harm. *Id*. at 17. Amici respectfully submit that it is self-evident that the harm from employment discrimination by any and every small employer in the state is the same as that for which the state is trolling here. This alone triggers strict scrutiny under the Free Exercise Clause.

The second trigger for strict scrutiny present here is explained in a long line of U.S. Supreme Court decisions:

> [O]ur decisions in the unemployment cases stand for the proposition that where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of "religious hardship" without compelling reason.

*Emp't Div. v. Smith*, 494 U.S. 872, 884 (1990).

If either trigger—treating secular comparable activity more favorably or picking and choosing employers who qualify for exemption—is present, then strict scrutiny replaces the lower bar of rational basis review. Strict scrutiny requires the government to prove that the discriminatory burden on religious exercise is the least restrictive means of furthering "only those interests of the highest order and those not otherwise served." *Wisconsin v. Yoder,* 406 U.S. 205, 215 (1972); *Tandon,*

11

593 U.S. at 64-65; *Lukumi*, 508 U.S. at 546; *Fulton,* 593 U.S. at 546 ("A government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests.").

## II. WLAD Is Not a Generally Applicable Law Under Supreme Court Free Exercise Precedent as it Extends Comparable Secular Exemptions That it Denies to Many Religious Employers Like Appellee and it Involves Individualized Assessments by Government Officials.

WLAD is not generally applicable under *Tandon* for any or all of the following reasons: 1) it carves out a generous nonreligious exemption for small employers, Wash. Rev. Code § 49.60.040(11); 2) it permits individualized assessment in exempting bona fide occupational qualifications, Wash. Rev. Code § 49.60.180(1); and 3) it allows for individualized discretion in conferring a religious exemption since the Washington State Supreme Court rewrote it in *Woods*. Each of these is independently sufficient to trigger strict scrutiny.

### A. The small employer exemption.

WLAD is not generally applicable because it expressly and totally exempts the thousands of Washington employers with fewer than eight employees. This secular exemption, which the state supreme court did

not address in *Woods*, is not afforded to all religious employers.[5] Therefore, strict scrutiny is triggered under the Free Exercise Clause as interpreted in *Smith* and *Lukumi*—a level of scrutiny that WLAD cannot survive in this case, as will be shown in Section III, *infra*, pp. 20-22.

This huge, secular carveout permits employment discrimination based on *every* protected characteristic (race, religion, sex, sexual orientation, gender identity, *et al.*) by the thousands of small businesses in the state of Washington. Yet YUGM, because of its workforce being over eight employees, is denied this across-the-board exemption, even though the small business exemption inflicts much more injury to the government's interest in eliminating employment discrimination than by permitting a religious organization to exercise its religion with a sincere religious conduct standard for all staff.

It matters not that large secular employers also are treated less favorably:

> It is no answer that a State treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue.

---

[5] Indeed, in *Woods,* the Washington Supreme Court did not address this First Amendment issue. *Woods* was decided at the trial court on statutory—not federal constitutional—grounds, and the appeal was about the *state* constitution's privileges and immunities clause.

*Tandon*, 593 U.S. at 62 (citing *Cuomo*, 592 U.S. at ___, 141 S. Ct. at 66-67 (Kavanaugh, J., concurring)). The fact remains that religious ministries with eight or more employees do not enjoy the same carveout that WLAD affords thousands of nonreligious small employers. The district court below specifically and properly held this exemption adequate to trigger strict scrutiny. PI Order, at *9.

The U.S. Supreme Court in its recent Free Exercise Clause jurisprudence did not employ a "but for" causation analysis ("but for religion the small employer would be exempt"). Rather, the Court simply looked at the injury to the government's interest and asked: "Does this law treat the religious litigant less favorably than persons whose exempted activity inflicts the same or similar injury to the state interest?"

**B. The bona fide occupational qualification exemption.**

WLAD allows an employer to discriminate on the grounds of religion, sex, or national origin if the employer can prove that such discrimination is *"based upon a bona fide occupational qualification."* Wash. Rev. Code § 49.60.180(1) (emphasis added). This is not a categorical exemption, but rather one that requires the Washington State Human Rights Commission or a court to make an individualized assessment of whether the

14

discrimination is "bona fide." *See, e.g., Franklin Cnty Sheriff's Office v. Sellers*, 646 P.2d 113, 119 (1982) (BFOQ defense requires employer to prove that, without the discriminatory criterion, the required function could not be performed or the essential function of the program would be undermined); *Brady v. Daily World*, 718 P.2d 785, 789 (1986) (based on the facts of workplace safety needs, court affirmed dismissal of claim of disability discrimination, as freedom from intoxication was proven to be BFOQ of plaintiff's position); *Kastanis v. Educ. Employees Credit Union*, 859 P.2d 26, 29 (1993) ("Business necessity can only qualify as a bona fide occupational qualification if the employer's actions are based upon a 'compelling and essential need to avoid business-related conflicts of interest, or to avoid the reality or appearance of improper influence or favor.'")

This fact-intensive inquiry for the BFOQ exemption is indistinguishable from the individualized exemptions required where "unemployment-compensation law allowed individuals to receive benefits if they refused work for 'good cause,' thus creating 'individualized exemptions' from the requirement of accepting available work." *Smith*, 494 U.S. at 884. These state laws, the Supreme Court held, are invalid as to the

15

employee unless the government can satisfy strict scrutiny. *Sherbert v. Verner* 374 U.S. 398 (1963); *Thomas v. Review Bd.*, 450 U.S. 707 (1981).

Does the fact that employers in any of these situations are free (or obliged) to discriminate in employment on multiple bases, including sex and sexual orientation, pose the same risk of sex discrimination that is posed by YUGM's religious conduct policy? Obviously, "yes." The BFOQ exemption triggers strict scrutiny under the Free Exercise Clause. *Fulton*, 593 U.S. at 544; *Tandon*, 593 U.S. at 62.

## C. The religious nonprofit employer exemption as interpreted in *Woods v. Seattle's Union Gospel Mission.*

In *Woods*, the Washington Supreme Court rewrote and redlined the Washington legislature's blanket exemption for all religious nonprofit employers. The court held that the state constitution required that religious ministries may only exercise sexual orientation discrimination in employment if the job in question is a "minister." The court dissected the job description at issue in *Woods* and concluded that it did not meet its definition of "minister," using the case-by-case criteria used by the U.S. Supreme Court in First Amendment "ministerial exception" cases. *See Hosanna-Tabor Evangelical Lutheran Church & Sch., v. EEOC*, 565 U.S.

16

171 (2012); *Our Lady of Guadalupe School, v. Morrissey-Berru*, 140 S. Ct. 2049 (2020).

Since *Woods*, the Washington State Human Rights Commission's employees have been doing individualized assessments of every job in which religious nonprofit employers in the state seek applicants who share their creed and conduct standards. For the same reason under *Fulton* that the BFOQ assessment triggers strict scrutiny, so does the application of the religious nonprofit exemption after the *Woods* decision.

### D. Underinclusive silence about other similarly injurious discrimination.

Both this Court and the U.S. Supreme Court are clear about when a law fails the general applicability test under the Free Exercise Clause, including when the exemptions are selectively underinclusive:

> All laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice. . . . The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause. . . . Ordinances 87–40, 87–52, and 87–71 . . . are underinclusive . . . . They fail to prohibit nonreligious conduct that endangers these interests in a similar or greater degree than Santeria sacrifice does. The underinclusion is

17

substantial, not inconsequential. . . . The ordinances "ha[ve] every appearance of a prohibition that society is prepared to impose upon [Santeria worshippers] but not upon itself." *Florida Star v. B.J.F.,* 491 U.S. 524, 542, 109 S. Ct. 2603, 2614, 105 L.Ed.2d 443 (1989) (Scalia, J., concurring in part and concurring in judgment). This precise evil is what the requirement of general applicability is designed to prevent.

*Lukumi*, 508 U.S. at 542-546; *see also Tandon*, 992 F.3d 916, 923 (9th Cir. 2021).

Unequal treatment of religious and secular conduct requires strict scrutiny, whether or not that inequality is explicitly stated in the text of the challenged law or simply allowed by omission. In *Lukumi*, the U.S. Supreme Court expressly rejected the city's contention that judicial "inquiry must end with the text of the law at issue." 508 U.S. at 534. In addition to evaluating the text of the city's ordinances, the Court reviewed an array of other sources to find analogous secular conduct left unregulated. Laycock and Collis, *supra*, at 6. As in *Lukumi*, here the "nonreligious conduct . . . endangers these [state] interests in a similar or greater degree" as the burdened religious conduct. 508 U.S. at 543. Therefore, in this case, as in *Lukumi*, the Free Exercise Clause demands

18

strict scrutiny of that omission and its discriminatory burdening of religious employers.

### E. Only one secular exemption causing similar injury is needed.

As the district court below correctly noted, even one secular exemption, written or unwritten, is sufficient to render WLAD not generally applicable and to trigger strict scrutiny. PI Order, at *9. *See also Tandon*, 593 U.S. at 62; *Fraternal Order of Police v. City of Newark*, 170 F.3d 359 (3d Cir. 1999) (holding of then Judge Alito); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214 (11th Cir. 2004); *Sherbert,* 374 U.S. 398; *Thomas*, 450 U.S. 707.

Amici respectfully offer any of the exemptions outlined above as reasons why WLAD is not generally applicable here. Therefore, because YUGM's free exercise rights are substantially burdened, and the laws being applied are not neutral and generally applicable, its free exercise interests must receive strict scrutiny analysis.

## III. The Governmental Interest Underlying Washington's Non-discrimination Law Is Not Sufficiently Compelling to Satisfy Strict Scrutiny.

Anti-discrimination laws generally must yield an exemption when faced with strict scrutiny; the government must prove that the law's burdening of religious exercise, free speech, or free association is the least restrictive means of furthering a compelling interest. As the U.S. Supreme Court reiterated:

> And historically, strict scrutiny requires the State to further "interests of the highest order" by means "narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546, 113 S. Ct. 2217, 124 L.Ed.2d 472 (1993) (internal quotation marks omitted). That standard "is not watered down"; it "really means what it says." *Ibid.* (quotation altered).

*Tandon*, 593 U.S. at 64-65.

The nondiscrimination law of the City of Philadelphia failed against Free Exercise Clause rights. *Fulton,* 593 U.S. 522. Colorado's Anti-Discrimination Act failed to outweigh religiously informed creative speech. *303 Creative LLP v. Elenis*, 600 U.S. 570 (2023). A state court's application of the Massachusetts public accommodations law failed against the First Amendment's guaranty of free association. *Hurley v. Irish-Am. Gay,*

20

*Lesbian and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557 (1995) (unanimous).

Is whatever interest the government has in prohibiting sexual orientation discrimination through WLAD *by this particular*[6] homeless ministry "compelling"?  Specifically, is it compelling in applying it against a religious ministry with a sincerely held religious creed about how serious followers of Jesus conduct themselves? There are many factors that bear on the answer to that question, and they all point to the same answer: "No."  Exemptions are evidence that the government's interest falls well short of compelling:[7]

- WLAD has several broad exemptions as discussed above.

- For over seven decades, Washington's legislature and the Washington State Human Rights Commission have provided broad exemptions for BFOQs and for sectarian organizations not organized for private profit, despite how those exemptions

---

[6] "[C]ourts must "scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants" when analyzing a free exercise claim. *Fulton*, 593 U.S. at 541.

[7] "The creation of a system of exceptions . . . undermines the . . . contention that . . . non-discrimination policies can brook no departures." *Id.* at 542.

21

compromise the government interest in employment nondiscrimination.

- The First Amendment protects some employment discrimination by religious employers whenever the job has ministerial duties.[8]

Therefore, the government's interest here is not compelling. Whatever interest in advancing employment nondiscrimination the Washington legislature had in 1949 cannot fairly be said to be compelling, rising to an interest of the "highest order," *Yoder*, 406 U.S. at 215, at least not when it would force religious nonprofit employers to jettison sincere religious conduct standards for their staff.

## IV. *Employment Division v. Smith* Was Wrongly Decided, and This Court Should Urge That it be Reconsidered.

This case is about a religious organization's right to observe its religious beliefs and faithfully pursue its religious mission. It is about the central promise of constitutional free exercise. It is about the incomplete

---

[8] "This Court has also recognized that the First Amendment can bar the application of employment discrimination laws "to claims concerning the employment relationship between a religious institution and its ministers. *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U. S. 171, 188 (2012)." *Bostock v. Clayton Cnty.,* 590 U.S. 644, 682 (2020).

carveout in WLAD that protects the observance and practice, as well as belief, of only small religious adherents.

Unfortunately, *Smith*, by focusing courts primarily on whether a law is neutral and generally applicable, has caused free exercise analysis to often miss the forest for the trees, ignoring that First Amendment promise.

We urge this Court to 1) acknowledge the obvious fact that *Smith* hinders and sometimes even undermines the purpose of the Free Exercise Clause and 2) urge the U.S. Supreme Court to reconsider whether *Smith* was wrongly decided.

The Free Exercise Clause's history has been well documented. Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990). Indeed, the text of the first freedom in the First Amendment is "free *exercise*."

"Government may neither compel affirmation of a repugnant belief, nor penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities." *Sherbert*, 374 U.S. at 402 (citations omitted). The *Sherbert* case involved specific pressure on the plaintiff to abandon the precepts of her religion to keep her job. *Id.* at

23

410. Free exercise is not limited to beliefs but protects the twin guaranties of "freedom to believe and freedom to act." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

These strong statements clarify that the promise of free exercise is more than protection from direct discrimination; it is freedom to live faithfully. *Smith*, however, has functionally prevented courts from directly implementing that purpose, instead requiring them—after noting a significant burden on religious exercise—to ask if the law involved is neutral and generally applicable rather than consider whether the law is the least intrusive means of advancing a government interest that is compelling. *Smith* did not have strong reasoning for this change; significant scholarship has documented how *Smith* mischaracterized prior holdings. *See* Michael W. McConnell, *Free Exercise Revisionism and the* Smith *Decision*, 57 U. Chi. L. Rev. 1109 (1990); Douglas Laycock, *The Remnants of Free Exercise*, 1990 Sup. Ct. Rev. 1 (1991); Michael Stokes Paulsen, *Freedom for Religion*, 133 Yale L.J. Forum 403 (2023).

Lower courts have not been able to consistently apply aspects of its holding like the "hybrid rights" theory. *Combs v. Homer-Center Sch.*

24

*Dist.*, 540 F.3d 231, 244–247 (3d Cir. 2008) (describing differing approaches by the circuits). Prior to *Smith,* the government consistently made individualized assessments and provided accommodations for religious reasons, and the Court had mandated exemptions for free exercise when warranted. *See, e.g., Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829 (1989); *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136 (1987); *Thomas*, 450 U.S. 707; *Yoder*, 406 U.S. 205; *Sherbert*, 374 U.S. 398; *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943). Scholars have clarified that exemptions are historically grounded, common ways to prevent violations of fundamental rights. *See, e.g.*, Michael W. McConnell, *Accommodation of Religion: An Update and A Response to the Critics*, 60 Geo. Wash. L. Rev. 685, 692 (1992); Stephanie H. Barclay & Mark L. Rienzi, *Constitutional Anomalies or As-Applied Challenges? A Defense of Religious Exemptions*, 59 B.C. L. Rev. 1595, 1611 (2018); Douglas Laycock, *Regulatory Exemptions of Religious Behavior and the Original Understanding of the Establishment Clause*, 81 Notre Dame L. Rev. 1793 (2006).

 *Smith* is inconsistent with the history of free exercise of religion. Free exercise scholar Michael W. McConnell concludes that *Smith* "is

contrary to the deep logic of the First Amendment." McConnell, *Free Exercise Revisionism*, at 1111. Justice O'Connor's concurrence in *Smith* noted that the "sweeping result" drastically altered free exercise doctrine and that it would likely fail to protect minority religions with less favored views and practices. 494 U.S. at 892, 902. This prophecy has proved prescient as the exceptions outlined in *Smith* have had to grow to provide protection for religious practice. *See, e.g.*, *Lukumi*, 508 U.S. 520; *Fulton*, 593 U.S. 522; *Tandon,* 593 U.S. 61; *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022); *FCA*, 82 F.4th 664; *Foothill Church v. Watanabe*, 3 F.4th 1201 (9th Cir 2021). Such efforts feel like a game, trying to find an exception to actually get to the logic of treating religious individuals and organizations in a manner that takes seriously their need for protection of religious exercise. Justice Gorsuch, in his *Fulton* concurrence, takes note of this very practice when he describes the complex "circumnavigation of *Smith*" in the latter majority's analysis. *Fulton*, 593 U.S. at 621.

The U.S. Supreme Court continues to point to the promise of religious freedom protections grounded in the First Amendment. Since *Smith*, the Court has repeatedly used reassuring statements that *Smith*

26

should not be construed to diminish religious freedom, including specifically in relation to beliefs about sexuality and marriage that clash with nondiscrimination interests in that area. In *Obergefell v. Hodges*, the Court stated:

> The First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered.

576 U.S. 644, 679-80 (2015).

In *Bostock*, the majority stated: "We are also deeply concerned with preserving the promise of the free exercise of religion enshrined in our Constitution; that guarantee lies at the heart of our pluralistic society." 590 U.S. at 681. The Court, in *Fulton,* acknowledged that religious exercise had clearly been burdened and indicated that the government interests had to be "properly narrowed" to rightly consider the impact of exemptions for particular religious claimants. 593 U.S. at 541. In *Masterpiece Cakeshop v. Colorado Civil Rights Comm'n,* the Court identified the hostility to Phillips as likely "showing lack of due consideration for Phillips' free exercise rights and the dilemma he faced." 584 U.S. 617, 635 (2018).

These stated values matter *in principle*. Yet the ambiguity of the law because of *Smith*'s uncertain application has eroded the promises of protection *in practice*, allowing lower courts to be susceptible to partisanship in how cases are argued. *See, e.g.,* Zalman Rothschild, *Free Exercise Partisanship*, 107 Cornell L. Rev. 1067, 1126-1132 (2022) (noting "doctrinal confusion" in lower court decisions and describing the need for clarity about how to analyze religious discrimination in the free exercise context). Courts must focus on whether an exception to *Smith*'s rule applies rather than on how to faithfully apply the first freedom of the Bill of Rights. *Smith* requires a serpentine analysis. We urge this Court to ask the U.S. Supreme Court to reconsider *Smith* and to create a clear path forward.[9]

---

[9] Scholars have described options if *Smith* is overruled. *See, e.g.,* Stephanie H. Barclay, *Replacing* Smith, 133 Yale L.J. Forum 436 (2023); Douglas Laycock & Thomas C. Berg, *Protecting Free Exercise Under* Smith *and After* Smith, 2020-2021 Cato Sup. Ct. Rev. 33.

## CONCLUSION

For all these reasons, the Court should affirm the district court's decision.

February 3, 2025                                   Respectfully submitted,

/s/ Steven T. McFarland
CHRISTIAN LEGAL SOCIETY
  CENTER FOR LAW & RELIGIOUS
  FREEDOM
8001 Braddock Road
Suite 302
Springfield, Virginia 22151
(703) 894-1041
smcfarland@clsnet.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLAINCE

I certify that this brief complies with the length limits permitted by Ninth Circuit Rule 32-1. The brief is 5,388 words, excluding the portions exempted by Fed. R. App. P. 32(f). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Dated: February 3, 2025 */s/ Steven T. McFarland*
Steven T. McFarland

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2025, the foregoing brief *amici curiae* was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the Court's AMCS system. I certify that all participants in the case who are registered AMCS users will be served by the appellate AMCS system.

*/s/ Steven T. McFarland*
Steven T. McFarland

*Counsel for Amici Curiae*
