No. 24-7246

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

UNION GOSPEL MISSION OF YAKIMA, WASHINGTON,

Plaintiff-Appellee,

v.

NICHOLAS W. BROWN, in his official capacity as Attorney General of Washington, ANDRETA ARMSTRONG, in her official capacity as Executive Director of the Washington State Human Rights Commission; and GUADALUPE GAMBOA, HAN TRAN, JEFF SBAIH, LUC JASMIN, and CHELSEA DIMAS, in their official capacities as Commissioners of the Washington State Human Rights Commission,

Defendants-Appellants.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON AT YAKIMA
No. 1:23-cv-3027-MKD

The Honorable Mary K. Dimke
United States District Court Judge

---

## APPELLANTS' REPLY BRIEF

---

NICHOLAS W. BROWN
  *Attorney General*

CYNTHIA L. ALEXANDER, WSBA 46019
TERA M. HEINTZ, WSBA 54921
  *Deputy Solicitors General*
1125 Washington St SE
Olympia, WA 98504
Cynthia.Alexander@atg.wa.gov
Tera.Heintz@atg.wa.gov
(206) 326-5488

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................. 1

II.   STATUTORY AUTHORITIES ...................................... 1

III.  ARGUMENT ................................................................. 2

      A.  Whether This Court Applies Standing or Mootness Principles,
          UGM Cannot Establish Article III Jurisdiction .......................... 2

      B.  UGM Is Not Likely to Succeed on Its Free Exercise Claim ....... 5

          1.  The WLAD does not treat comparable secular activity more
              favorably than religious exercise ......................................... 6

          2.  The WLAD does not provide for individualized exemptions
              10

      C.  UGM Is Not Likely to Succeed on Its Church Autonomy Claim
          14

      D.  UGM is Not Likely to Succeed on Its Expressive Association
          Claim ................................................................................... 18

      E.  UGM Is Not Likely to Succeed on Its Free Speech Claim ........ 22

      F.  The Remaining Preliminary Injunction Factors Also Foreclose
          UGM's Request for Relief ...................................................... 23

IV.   CONCLUSION ............................................................. 25

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023) ................................................................ 18-19

*Am. Cargo Transp., Inc. v. United States,*
  625 F.3d 1176 (9th Cir. 2010) ....................................................... 2-3

*Bayer v. Neiman Marcus Grp., Inc.,*
  861 F.3d 853 (9th Cir. 2017) .......................................................... 4

*Behrend v. San Francisco Zen Ctr., Inc.,*
  108 F.4th 765 (9th Cir. 2024) ......................................................... 5

*Benisek v. Lamone,*
  585 U.S. 155 (2018) ................................................................... 24

*Billard v. Charlotte Cath. High Sch.,*
  101 F.4th 316 (4th Cir. 2024) ........................................................ 14

*Boy Scouts of Am. v. Dale,*
  530 U.S. 640 (2000) ............................................................... 19-20

*Bryce v. Episcopal Church in the Diocese of Colorado,*
  289 F.3d 648 (10th Cir. 2002) .................................................... 16, 17

*Burwell v. Hobby Lobby Stores, Inc.,*
  573 U.S. 682 (2014) ................................................................... 9

*CDK Glob. LLC v. Brnovich,*
  16 F.4th 1266 (9th Cir. 2021) ........................................................ 23

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
  447 U.S. 557 (1980) .................................................................. 23

*CompassCare v. Hochul,*
  125 F.4th 49 (2d Cir. 2025) ...................................................... 20, 21

*Coral Springs St. Sys., Inc. v. City of Sunrise*,
   371 F.3d 1320 (11th Cir. 2004) ................................................. 3

*Corporation of Presiding Bishop of Church of Jesus Christ of
   Latter-day Saints v. Amos*,
   483 U.S. 327 (1987) ............................................................ 15-16

*Earth Island Inst. v. U.S. Forest Serv.*,
   351 F.3d 1291 (9th Cir. 2003) ................................................ 14

*Emp. Div. v. Smith*,
   494 U.S. 872 (1990) .............................................................. 9

*Evans v. Shoshone-Bannock Land Use Pol'y Comm'n*,
   736 F.3d 1298 (9th Cir. 2013) ................................................ 14

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*,
   82 F.4th 664 (9th Cir. 2023) ......................................... 7-8, 11-12

*Friends of the Earth, Inc. v. Laidaw Environmental Services (TOC), Inc.*,
   528 U.S. 167 (2000) .............................................................. 5

*Fulton v. City of Philadelphia*,
   593 U.S. 522 (2021) ...........................................................11, 12

*Hishon v. King & Spalding*,
   467 U.S. 69 (1984) ............................................................18, 20

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
   565 U.S. 171 (2012) .................................................... 15, 17-18

*Iron Arrow Honor Soc'y v. Heckler*,
   464 U.S. 67 (1983) ............................................................... 3

*Lyons v. City of Los Angeles*,
   615 F.2d 1243 (9th Cir. 1980) ................................................ 3

*Maryland v. King*,
   567 U.S. 1301 (2012) ........................................................... 24

*Our Lady of Guadalupe Sch. v Morrissey-Berru,*
   591 U.S. 732 (2020) ....................................................... 1, 6, 10, 15

*Picrin-Peron v. Rison,*
   930 F.2d 773 (9th Cir. 1991).......................................................... 3

*Pimentel v. Dreyfus,*
   670 F.3d 1096 (9th Cir. 2012) ..................................................... 23

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.,*
   413 U.S. 376 (1973) .................................................................19, 23

*Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of*
   *Health & Hum. Servs.,*
   946 F.3d 1100 (9th Cir. 2020) ..................................................... 14

*Ragsdale v. Turnock,*
   841 F.2d 1358 (7th Cir. 1988) .................................................... -4

*Roberts v. U.S. Jaycees,*
   468 U.S. 609 (1984) .................................................................... 22

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.,*
   547 U.S. 47 (2006) ...................................................................... 19

*Seattle Pac. Univ. v. Ferguson,*
   104 F.4th 50 (9th Cir. 2024) ......................................................... 6

*Serbian Eastern Orthodox Diocese for United States &*
   *Canada v. Milivojevich,*
   426 U.S. 696 (1976) .................................................................... 16

*Slattery v. Hochul,*
   61 F.4th 278 (2d Cir. 2023) ........................................................ 20

*State v. Arlene's Flowers,*
   441 P.3d 1203 (Wash. 2019) ...................................................... 13

iv

*Tandon v. Newsom,*
   593 U.S. 61 (2021) ................................................................ 6-8

*Teamsters Loc. Union 117 v. Wash. Dep't of Corr.,*
   789 F.3d 979 (9th Cir. 2015) ..................................................... 13

*Tingley v. Ferguson,*
   47 F.4th 1055 (9th Cir. 2022),
   *cert denied*, 144 S. Ct. 33 (2023) ......................................... 5-6, 11

*Valle Del Sol Inc. v. Whiting,*
   709 F.3d 808 (9th Cir. 2013) ..................................................... 19

*Winsness v. Yocom,*
   433 F.3d 727 (10th Cir. 2006) ..................................................... 3

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ............................................................... 23-24

*Wisconsin v. Mitchell,*
   508 U.S. 476 (1993) ................................................................ 18

*Woods v. Seattle's Union Gospel Mission,*
   481 P.3d 1060 (Wash. 2021) ......................................................... 5

## Constitutional Provisions

U.S. Const. amend. I .................................................. 7, 14, 16, 22-23

## Federal Statutes

42 U.S.C. §2000e *et seq.* ................................................ 1, 16, 18

## Washington Statues

Wash. Rev. Code § 49.60 ................................. 2, 4-7, 9-13, 20, 22-24

Wash. Rev. Code § 49.60.180(1) ....................................................... 11

Wash. Rev. Code § 49.60.208(1) .................................................................. 23

## Regulations

Wash. Admin. Code § 162-16-210................................................................. 12

Wash. Admin. Code § 162-16-240................................................................. 12

## Rules

Fed. R. Civ. P. 65(d) .................................................................................... 14

## Other Authorities

Wash. State Emp. Sec. Dep't,
    *Establishment Size by Number of Employees 2024*,
    https://esd.wa.gov/media/xlsx/3167/establishment-size-2024xlsx ................ 9

## I.     INTRODUCTION

Rather than disputing the extraordinary implications of the district court's unprecedented ruling here, Plaintiff Union Gospel Mission (UGM) embraces them. Under the district court's ruling and UGM's theory, any law that exempts small businesses—such as Title VII , the Fair Labor Standards Act, the ADA, and innumerable state laws—is subject to strict scrutiny whenever it burdens a religious employer. Such a rule would relieve religious organizations like UGM—as well as for-profit companies that claim a religious objection—from complying with countless laws of all types. But the U.S. Supreme Court has admonished that the right of free exercise "does not mean that religious institutions enjoy a general immunity from secular laws." *Our Lady of Guadalupe Sch. v Morrissey-Berru*, 591 U.S. 732, 746 (2020). UGM's contrary theory, embraced by the district court, is untenable. UGM is unlikely to succeed on the merits of any of its claims, and this Court should reverse the district court's preliminary injunction.

## II.     STATUTORY AUTHORITIES

All relevant statutory authorities appear in the Addendum to this brief.

### III.  ARGUMENT

### A.  Whether This Court Applies Standing or Mootness Principles, UGM Cannot Establish Article III Jurisdiction

UGM asserts that this Court should analyze justiciability under the mootness doctrine rather than the standing principles the State articulated in its opening brief, but either approach leads to the same result: UGM's claims are not justiciable. The State has, by stipulation, disavowed that it will "enforce the WLAD against UGM in connection with the positions and Religious Hiring Policy as identified in its Complaint and related attachments." 2-ER–105. This disavowal expressly relates to all of the positions identified in UGM's Complaint.

UGM's contention that Defendants bear the " 'formidable burden of showing that it is absolutely clear that,' " the alleged conduct will not reoccur disregards that this is the standard for *private* parties, not government parties who are " 'treated with more solicitude[.]' " UGM Br. at 23 (quoting *Friends of the Earth, Inc. v. Laidaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 190 (2000)); *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010) (citation omitted). A change in government conduct "presents a special circumstance in the world of mootness" because "unlike in the case of a private party, [courts] presume the government is acting in good faith." *Am. Cargo*

2

*Transp.*, 625 F.3d at 1180; *see also Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328-29 (11th Cir. 2004) ("[G]overnmental entities and officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities.").

In accord with these principles, courts regularly hold cases moot when the government commits that it will not engage in the challenged conduct. *See, e.g.*, *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70-71 (1983) (holding that dispute implicating university policy was "classically 'moot'" where the "[u]niversity has stated unequivocally" that it had changed its policy); *Picrin-Peron v. Rison*, 930 F.2d 773, 776 (9th Cir. 1991) (dismissing appeal as moot where government's filings confirmed petitioner would not be re-detained absent a change in the facts or the law); *Lyons v. City of Los Angeles*, 615 F.2d 1243, 1245 & n.4 (9th Cir. 1980) (affirming grant of judgment on the pleadings to defendant city where "[t]he city attorney has now announced an official policy[,]" and "given the change in policy, there is not a strong possibility of a recurrence of the behavior of which the appellant complains[ ]"); *Winsness v. Yocom*, 433 F.3d 727, 736 (10th Cir. 2006) (affirming dismissal on mootness where prosecutor dismissed pending prosecution against plaintiff and "has foresworn any intention to bring criminal charges" in the future); *Ragsdale v.*

3

*Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988) (requiring dismissal for mootness following state's concession that statutory provision was "not being enforced").

Defendants' Notice moots this case. UGM's Complaint alleges harms with respect to the hiring of an IT technician and operations assistant, and a desire to post a Religious Hiring Statement. 3-ER-314–17, 3-ER-320–22. UGM alleged, despite having no interaction with Defendants, that it feared Defendants would imminently enforce the WLAD against it. 3-ER-322. Defendants' Notice speaks directly to these same two positions and the Religious Hiring Statement. 2-ER-109–11. The Notice therefore is a "subsequent event[]" establishing that "the conduct alleged as the basis for the requested relief"—Defendants' potential enforcement of the WLAD regarding these precise employment practices—could not reasonably be expected to occur, much less "recur." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 864 (9th Cir. 2017). And the Notice implicitly recognizes that the only two jobs UGM chose to include in its Complaint—jobs with duties as alleged and taken as true—are ministerial roles. 3-ER-314–17; FER-4, FER-7, FER-12. UGM has not since sought leave to amend its Complaint to add any additional jobs, so only these two positions are properly before the Court. And because Defendants accept based on the pleadings that these positions are ministerial, the WLAD does not apply to them. *See, e.g.*,

*Behrend v. San Francisco Zen Ctr., Inc.*, 108 F.4th 765, 767 (9th Cir. 2024); *Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060, 1070 (Wash. 2021). At this point, UGM has already obtained the relief it seeks.

Moreover, Defendants never enforced the WLAD against UGM in the first place, so the idea that the State must prove that the conduct will not "recur" has no place here. *See Friends of the Earth*, 528 U.S. at 189 (holding that the party asserting mootness must establish that the conduct will not "start up *again*" or that the alleged conduct will not "*recur*" (emphases added)). The State has made it abundantly clear that it will not enforce the WLAD against UGM for the only concrete employment actions identified in this lawsuit: hiring the IT technician and operations assistant, and posting the Religious Hiring Statement. There is no credible basis for UGM to fear that the Defendants will act contrary to a Notice filed in federal court. This case is therefore moot.

**B.     UGM Is Not Likely to Succeed on Its Free Exercise Claim**

The WLAD is neutral and generally applicable, foreclosing UGM's free exercise challenge. *Tingley v. Ferguson*, 47 F.4th 1055, 1084 (9th Cir. 2022), *cert denied*, 144 S. Ct. 33 (2023) (neutral, generally applicable laws are subject to rational basis review even if they incidentally burden religious practice).

UGM urges this Court to embrace a rule that no court has ever adopted: that anytime a law exempts small businesses, it is not neutral and generally applicable, and thus is subject to strict scrutiny. That would sweep in innumerable state and federal laws regulating workplace safety, discrimination, wages, and other basic protections. Opening Br. at 31-32. Nowhere does UGM explain how this rule can be squared with the Supreme Court's admonition that the right of free exercise "does not mean that religious institutions enjoy a general immunity from secular laws." *Our Lady of Guadalupe Sch.*, 591 U.S. at 746; *see also Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 58 (9th Cir. 2024) ("A religious employer is not given carte blanche with respect to all employees, ministerial and non-ministerial alike."); *Tingley*, 47 F.4th at 1084 (The Free Exercise Clause "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." (quoting *Emp. Div. v. Smith*, 494 U.S. 872, 879 (1990))).

1.   **The WLAD does not treat comparable secular activity more favorably than religious exercise**

UGM fundamentally misreads *Tandon v. Newsom*, 593 U.S. 61 (2021), when it argues that the WLAD treats comparable secular activity more favorably than religious activity by exempting small businesses, both secular and religious. Under *Tandon*, "whether two activities are comparable for purposes of the Free

Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* at 62. "Comparability is concerned with the risks various activities pose." *Id.*; *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.* (*FCA*), 82 F.4th 664, 689 (9th Cir. 2023) (en banc).

In *Tandon*, the Supreme Court determined that California's pandemic restrictions prohibiting more than three households from gathering for religious exercise were not generally applicable because the state allowed more than three households to participate in comparable secular activities, such as gathering at hair salons, retail stores, movie theaters, and more. 593 U.S. at 63. Therefore, the Court held, California treated some comparable secular activities more favorably than at-home religious exercise.

Here, by contrast, small religious employers and small secular employers are treated alike—they are both exempt from the WLAD. And large religious employers and large secular employers are also both treated alike: both are subject to the WLAD. This case would be like *Tandon* if the WLAD exempted small secular employers but not small religious employers, but that is not what the WLAD does. Applying UGM's theory to the *Tandon* case demonstrates the absurdity of their proposed rule. Under UGM's theory, if California had allowed small gatherings for both religious and secular purposes, then it would have had

7

to allow large gatherings for religious purposes even if it barred them for secular purposes, because otherwise California would be treating some secular gatherings (small ones) better than some religious gatherings (large ones). That is not what *Tandon* held.

Correctly applying *Tandon* here refutes UGM's argument. UGM's untenable contention is that small employers' hiring activities are comparable to UGM's "because they 'pose[] an identical risk' to the State's interest in preventing and eliminating discrimination." UGM Br. at 30 (quoting *FCA*, 82 F.4th at 689). But the risk posed by discrimination on the part of large employers is self-evidently greater than the risk posed by small employers because it would affect more people. As Amici Curiae American Civil Liberties Union (ACLU), American Civil Liberties Union of Washington (ACLU-WA), and Americans United for Separation of Church and State (Americans United) explain, if a small employer adopts a discriminatory policy, it would affect a maximum of seven employees. If a large employer does so, the discrimination would harm more people, potentially thousands. The risk is not the same. The risk is also not the same cumulatively: nearly 90% of Washington employees work for companies

with more than 10 employees.[1] Allowing such companies to discriminate affects vastly more people.

The district court's ruling would exempt all religious employers from every type of discrimination proscribed by the WLAD, and would open the door to widescale discrimination in the State. Indeed, Amici ACLU, ACLU-WA and Americans United note that nearly 50% of the hospitals in Washington–and 100% in some counties–are run by religious healthcare systems. Br. of Amici ACLU, ACLU-WA & Americans United at 15. And, as Amici further observe, under *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), even large secular employers whose owners have religious objections to complying with the WLAD (or any number of other laws containing exceptions) could assert free exercise claims and exempt themselves from these laws. As Amici accurately conclude, affirming the district court's misguided ruling "would open the prospect of constitutionally required religious exemptions from civil obligations of almost every conceivable kind . . . ." *Smith*, 494 U.S. at 888; *see* Br. of Amici ACLU, ACLU-WA and Americans United at 18. The district court not only

---

[1] Wash. State Emp. Sec. Dep't, *Establishment Size by Number of Employees 2024*, https://esd.wa.gov/media/xlsx/3167/establishment-size-2024xlsx (last visited Feb. 17, 2025) (showing that 3.1 million Washingtonians work for companies employing more than 10 people, totaling 87% of all Washington employees).

misread *Tandon's* holding, but would impermissibly expand that holding to swallow the ministerial exception and provide religious organizations the "general immunity from secular laws" that the Supreme Court has consistently denied. *See Our Lady of Guadalupe Sch.*, 591 U.S. at 746. Exclusions for small businesses from the definition of "employer" in the WLAD do not destroy general applicability and neutrality. To the contrary, the WLAD applies even-handedly to comparable secular and religious organizations with fewer than eight employees.

The district court's ruling would severely hamstring the State's ability to enforce employment discrimination laws and ensure that employment opportunities remain open to all, and the ability of states and the federal government to exempt small businesses from all manner of regulations—including those that apply even-handedly to secular and religious organizations—without essentially immunizing religious groups from compliance. UGM has established *no* differential treatment between secular and religious employers under the WLAD.

### 2. The WLAD does not provide for individualized exemptions

Nor does UGM's contention that the WLAD contains "'a mechanism for individualized exemptions'" hold up under analysis. *See* UGM Br. at 38-40

10

(quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021)). According to UGM, both the "bona fide occupational qualification" (BFOQ) provision in Wash. Rev. Code § 49.60.180(1) and the Attorney General's discretionary ability to enforce the WLAD create individualized exemptions that defeat neutrality and general applicability under *Fulton*. UGM Br. at 38. But this too is a distortion of the law.

In *Fulton*, the Supreme Court held that a law prohibiting discrimination against same-sex foster parents "'unless an exemption is granted by the Commissioner . . . in his/her sole discretion[]'" was not generally applicable. *Fulton*, 593 U.S. at 535 (citation omitted). According to the Court, "the inclusion of a formal system of entirely discretionary exceptions in [the challenged law] renders the contractual non-discrimination requirement not generally applicable." *Id.* at 536-37. Similarly, in *FCA*, this Court held that a school district policy was not generally applicable because it granted the district discretion to decide "on an ad hoc basis" whether to allow student groups to exclude other students on prohibited grounds. *FCA*, 82 F.4th at 687. In *Tingley*, however, this Court found a state law prohibiting licensed therapists from engaging in conversion therapy was generally applicable because the statute lacked a formal discretionary mechanism for individual exceptions. *Tingley*, 47 F.4th at 1088.

UGM's claim that the Washington Human Rights Commission can "apply a BFOQ in its sole discretion when it 'believes' a 'protected status will be essential to or will contribute to the accomplishment of the purposes of the job,'" UGM Br. at 38, is wrong on multiple levels. First, it misquotes Wash. Admin. Code § 162-16-240. That provision simply states: "The commission believes that the BFOQ exception should be applied narrowly to jobs for which a particular quality of protected status will be essential to or will contribute to the accomplishment of the purposes of the job." *Id.* And contrary to UGM's contention that "[n]o criteria are provided," the provision lists examples showing how the Commission applies BFOQs, illustrating the general principles that are applicable. Wash. Admin. Code § 162-16-240(1)-(4); *see* UGM Br. at 39-40.

More importantly, unlike in *Fulton* or *FCA*, this provision does not give the Commission any authority to exempt anyone from the WLAD. It simply says that individuals may petition the Commission for its "opinion determining whether protected status would be a bona fide occupational qualification in particular circumstances." *See* Wash. Admin. Code § 162-16-210. Such an advisory opinion does not "exempt" anyone from the WLAD. Under both state and federal antidiscrimination law, in the rare circumstances where a protected classification is a bona fide occupational qualification—e.g., certain positions in

12

a women's prison may require female guards—the hiring practice actually complies with the law. *See, e.g.*, *Teamsters Loc. Union 117 v. Wash. Dep't of Corr.*, 789 F.3d 979, 986 (9th Cir. 2015) (upholding prison policy of hiring only female guards for certain positions and explaining that "a facially discriminatory employment practice, such as the sex-based hiring practice we have here, may pass legal muster if sex is a bona fide occupational qualification or BFOQ[]"). Thus, proving a BFOQ demonstrates compliance with the law, it is not an exemption from the law.

Even more outlandish is UGM's claim that the Attorney General's discretion about what cases to bring under the WLAD amounts to a system of individualized exemptions. Under that theory, every criminal law everywhere would fail the "neutral and generally applicable" test, because prosecutors always have discretion about which cases to bring.

As a neutral and generally applicable law, the WLAD rationally relates to the government's legitimate interest in preventing discrimination and is plainly constitutional. *State v. Arlene's Flowers*, 441 P.3d 1203, 1231 (Wash. 2019).

**C.    UGM Is Not Likely to Succeed on Its Church Autonomy Claim[2]**

UGM cites no case in which this Court or the Supreme Court has adopted or supported the existence of a "coreligionist exemption" under which First Amendment protection of church autonomy extends beyond the ministerial exception. UGM Br. at 43-44. Indeed, Defendants are aware of no federal appellate court that has so held. *See Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 328 (4th Cir. 2024) ("No federal appellate court in the country has embraced the . . . argument that Title VII permits religiously motivated sex discrimination by religious organizations.").

---

[2] The district court's order granting UGM's request for a preliminary injunction rested entirely on its holding that the WLAD was not neutral or generally applicable. *See* 1-ER-008 n.4 (noting expressly that the court addresses only the free exercise claim). UGM's arguments for limitless expansion of the First Amendment are wrong for the reasons explained below, but this Court need not address UGM's arguments in the first instance. *See, e.g., Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1298 (9th Cir. 2003) ("The scope of our review is generally limited to whether the district court employed the proper preliminary injunction standard and whether the court correctly apprehended the underlying legal issues in the case."). This is particularly true here, as assessing whether UGM is entitled to a preliminary injunction is " 'a matter committed to the discretion of the trial judge.' " *Evans v. Shoshone-Bannock Land Use Pol'y Comm'n*, 736 F.3d 1298, 1307 (9th Cir. 2013) (quoting *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984)); *see also Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1111 (9th Cir. 2020) ("A district court is usually best positioned to apply the law to the record."); Fed. R. Civ. P. 65(d) (listing the required factual determinations in any order granting a preliminary injunction).

To the contrary, the Supreme Court has interpreted the church autonomy doctrine as granting limited protections to churches and other religious institutions "to decide matters 'of faith and doctrine' without government intrusion" and to make internal management decisions that are "essential to the institution's central mission," such as "the selection of the individuals who play certain key roles" within the organization. *Our Lady of Guadalupe Sch.*, 591 U.S. at 746 (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012)). However, in the employment context, the Supreme Court has specifically limited the doctrine's application to employees performing a ministerial role, as determined through a number of factors including the level of religious training and examination required for the job, any religious commission the employee received, any requirement to instruct on religious subjects, any duties to pray with others or attend religious services as part of the job, and the extent to which the church and the employer hold the employee out to the world as a minister. *Id.* at 749-51; *cf. Hosanna-Tabor*, 565 U.S. at 204 (Alito, J. concurring) (observing that "a purely secular teacher would not qualify for the 'ministerial' exception" at a religious school).

The cases that UGM cites do not advance its argument. *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483

15

U.S. 327 (1987), does not support the existence of a co-religionist exemption broader than the ministerial exception. *Amos* was an Establishment Clause case in which the Court held that Title VII permissibly exempted religious organizations from religious discrimination claims. The case does not support the argument that the First Amendment requires religious organizations to be exempt from laws that contradict their faith.

*Serbian Eastern Orthodox Diocese for United States & Canada v. Milivojevich*, 426 U.S. 696, 720 (1976), reversed a state court that held a church did not abide by its internal laws and regulations when it defrocked a church bishop, finding it was a purely ecclesiastical dispute that was not subject to judicial abrogation. The case has nothing to say about whether a religious employer may ignore state laws it disagrees with.

The nonbinding cases UGM cites from other jurisdictions likewise do not stand for the proposition UGM advances. For example, *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648 (10th Cir. 2002), involved allegations of sexual harassment brought against a church by its youth minister and her partner based on ecclesiastical communications on church policy regarding sexual orientation and same-sex unions. Noting that "churches do not operate above the law," the Tenth Circuit found that the dispute was "'an

16

ecclesiastical one'" and not a "'purely secular dispute' with a third party." *Id.* at 658 (citation omitted). Moreover, the claims in *Bryce* were "based solely on communications that are protected by the First Amendment[.]" *Id.* at 658 n.2. The court's holding is much more limited than UGM suggests: "When a church makes a personnel decision based on religious doctrine, and holds meetings to discuss that decision and the ecclesiastical doctrine underlying it, the courts will not intervene." *Id.* at 660. None of the cases UGM proffers holds that a religious employer may discriminate against non-ministerial employees or job applicants based on a protected characteristic such as sex or sexual orientation; the cases overwhelmingly address ministerial employees or involve a statutory exemption for religious organizations.

The Supreme Court conclusively confirmed that religious employers are not exempt from laws they disagree with in *Hosanna-Tabor*, 565 U.S. at 171. In *Hosanna-Tabor*, the Court held that the ministerial exception is an affirmative defense "to an otherwise cognizable claim," *id.* at 195 n.4, and nowhere stated that courts must first address "church autonomy" before addressing claims involving employment decisions based on religious reasons.

17

**D.     UGM is Not Likely to Succeed on Its Expressive Association Claim**

Neither the Supreme Court nor this Court has ever recognized the broad associational right UGM asserts in the employment context. *See* UGM Br. at 53-59. UGM relies on a concurrence by Justice Alito in *Hosanna-Tabor*, 565 U.S. at 200-01, but a concurrence is not binding on this Court. *See Green v. Miss U.S.A.*, 52 F.4th 773, 804 (9th Cir. 2022). What is binding on this Court is the Supreme Court's rejection of a free association right to discriminate in employment in *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984). There, the Court held that the right of expressive association does not permit discrimination on the basis of sex against law firm partners in violation of Title VII. UGM contends that *Hishon* did not hold that the right to expressive association is inapplicable to employment disputes, but the Supreme Court disagrees: "In *Hishon*, we rejected the argument that Title VII infringed employers' First Amendment rights." *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993). Further, in *303 Creative LLC v. Elenis*, the Court rejected the assertion that the right of expressive association extends to hiring decisions, refuting the dissent's suggestion that the majority's decision was "akin to endorsing a 'separate but equal' regime that would allow law firms to refuse women admission into partnership, restaurants to deny service to Black Americans, or businesses

18

seeking employees to post something like a 'White Applicants Only' sign." *303 Creative*, 600 U.S. 570, 598 (2023) (citation omitted).

The Supreme Court has never treated *employment* discrimination as similarly expressive; rather, it has treated employment discrimination as commercial and transactional conduct. For example, in upholding an ordinance prohibiting discriminatory help-wanted advertisements, the Supreme Court held that "[d]iscrimination in employment is not only commercial activity, it is illegal commercial activity[.]" *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 388 (1973); *see also Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006) (acknowledging that government "can prohibit employers from discriminating in hiring on the basis of race[]"). And this Court has similarly characterized regulations in the employment context as regulating commercial conduct or commercial speech rather than an expressive relationship or speech. *E.g.*, *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 818 (9th Cir. 2013) (solicitation of day laborers and "attempts to hire, hiring, picking up and transporting workers to work at a different location" constitute commercial speech subject to intermediate scrutiny). UGM's reliance on *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000), is unpersuasive, as *Dale* did not arise in the employment context. Rather, it addressed a *private club's*

right to choose volunteer leaders, not the right of an *employer* to discriminate in hiring and firing non-ministerial employees, and highlighted this private aspect as material to its analysis. *Dale*, 530 U.S. at 657.

UGM asserts that the Second Circuit has twice held that expressive association applies in the employment context. But, as explained in Defendants' opening brief, *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023), which held that a crisis pregnancy center adequately alleged an expressive association challenge to a state law prohibiting discrimination against employees based on their reproductive health decisions, did not consider the Supreme Court's rejection of a free association right to discriminate in employment in *Hishon* and similar cases, or the distinction between private and public organizations. *See* Opening Br. at 46-47. *Slattery* also departs from this Court's treatment of employment discrimination as transactional conduct or speech. *Id.* Moreover, unlike the WLAD, the state law in *Slattery* did not forbid discrimination on constitutionally protected traits or grounds. *Id.*

In *CompassCare v. Hochul*, 125 F.4th 49, 58-59 (2d Cir. 2025), the Second Circuit acknowledged that it had not explicitly addressed the scope of an employer's freedom of expressive association in *Slattery*. In *CompassCare*, the court explained that "just as a voluntary association cannot 'erect a shield against

20

antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message,' nor can an employer." 125 F.4th at 61 (quoting *Dale*, 530 U.S. at 653). An employer "must show that the [statute] threatens its very mission not only in a vague and generalized sense, but in the context of a specific employment decision." *Id.* at 61. This requires assessment of "(1) the responsibilities of the position at issue, including whether it is client-facing and whether it involves expressly or implicitly speaking for the organization, and (2) the particular conduct or attribute of the employee that renders the employment of that person, in that position, a threat to the employer's mission." *Id.* Thus, even if these Second Circuit decisions were binding on this Court, which they are not, UGM could not prevail on an expressive associational claim without making a showing akin to that required by the ministerial exception analysis in a free exercise claim, and doing so for each position and prospective employee.

As explained in detail in Defendants' opening brief, UGM fails to show a significant burden on its expressive activities, much less one that threatens its mission. Instead it makes conclusory assertions about a desire to shield employees and guests "from sinful habits, behaviors, and temptations," 3-ER-248, and provides unsupported hypotheticals. 3-ER-251–52. These bald

assertions about burden are similar to those found insufficient in *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626-27 (1984) (rejecting First Amendment associational claim by private club seeking to exclude women members because Jaycees had not proven that admitting women "serious[ly] burdens" its expressive association by "imped[ing] the organization's ability to engage in [its] protected activities or to disseminate its preferred views[]"). UGM distorts Defendants' opening brief as the State "think[ing] sexual orientation 'has nothing to do' . . . with [UGM's] faith or how it impacts the ministry." UGM Br. at 59. But that's not what Defendants said. The opening brief simply said that "[r]efraining from the use of foul language or acting with patience and sensitivity has nothing to do with sexual orientation," a seemingly self-evident point. Opening Br. at 49.

UGM's expressive association claim is not consistent with the law in this Circuit, and is unlikely to succeed.

**E.  UGM Is Not Likely to Succeed on Its Free Speech Claim**

The WLAD does not infringe on UGM's speech rights, and UGM does not raise any colorable argument that it is likely to succeed on its free speech claims, which the district court did not reach. If this Court rejects UGM's argument that it has a constitutional right to discriminate against non-ministerial employees on the basis of sexual orientation, then its desire to place

discriminatory job advertisements falls outside First Amendment protection altogether because it proposes illegal activity. *Pittsburgh Press Co.*, 413 U.S. at 388; *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563-64 (1980) (holding that when speech proposes illegal activity, First Amendment protections do not apply and the court's inquiry ends). And UGM fails to explain how Wash. Rev. Code § 49.60.208(1), which prohibits employers from requiring employees to disclose their sincerely held religious beliefs unless the disclosure is for providing a religious accommodation, has any relation to its hiring process at issue in this case.

## F.    The Remaining Preliminary Injunction Factors Also Foreclose UGM's Request for Relief

Because UGM cannot show a likelihood of success on the merits, the Court need not consider the remaining preliminary injunction factors and should vacate the preliminary injunction on this ground alone. *See CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1274 (9th Cir. 2021); *Pimentel v. Dreyfus*, 670 F.3d 1096, 1111 (9th Cir. 2012) (per curiam). But if this Court considers the remaining *Winter* factors, they weigh heavily against UGM. UGM's only argument for demonstrating irreparable harm below was that it was likely to succeed on the merits. 3-ER-239. But as explained in Defendants' opening brief, even in the First Amendment context "a preliminary injunction does not follow

23

as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 585 U.S. 155, 158, 160-61 (2018) (per curiam) (affirming denial of a preliminary injunction based on equities and public interest even assuming likelihood of success on First Amendment challenge). Moreover, UGM cannot demonstrate irreparable harm regardless of the merits of its First Amendment claims on the record here, because the State has disavowed enforcement of the WLAD against UGM for the two positions at issue in this litigation. 2-ER-105. There is no "likelihood" that UGM will suffer any harm related to those actions, let alone the irreparable harm that is required to enjoin the State.

The balance of the equities and the public interest also weigh heavily against UGM because "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (quoting *New Motor Vehicle Bd. of Cal. V. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Roberts, C.J., in chambers)). And the public has a strong interest in ensuring equal opportunity in employment. Because UGM satisfies none of the *Winter* factors, this Court should reverse the preliminary injunction entered by the district court.

## IV.   CONCLUSION

For the reasons set forth above, the State respectfully requests that this

Court reverse the district court's preliminary injunction order.

RESPECTFULLY SUBMITTED this 18th day of February 2025.

ROBERT W. FERGUSON
  *Attorney General*

*s/Cynthia L. Alexander*
CYNTHIA L. ALEXANDER, WSBA 46019
TERA M. HEINTZ, WSBA 54921
  *Deputy Solicitors General*
1125 Washington St SE
Olympia, WA 98504
Cynthia.Alexander@atg.wa.gov
Tera.Heintz@atg.wa.gov
360-753-6200

## Table of Contents
## Addendum – Pages 1-12

| Statute | Description | Page |
|---|---|---|
| Wash. Rev. Code § 49.60.180 | Discrimination – Human Rights Commission - Unfair practices of employers | 1 |
| Wash. Rev. Code § 49.60.208 | Discrimination – Human Rights Commission - Unfair practice— Religious affiliation disclosure | 3 |
| Wash. Admin. Code § 162-16-210 | Advice of commission | 4 |
| Wash. Admin. Code §162-16-240 | Bona fide occupational qualification | 5 |

**Wash. Rev. Code § 49.60.180**
**Unfair practices of employers.**

It is an unfair practice for any employer:

(1)　To refuse to hire any person because of age, sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability, unless based upon a bona fide occupational qualification: PROVIDED, That the prohibition against discrimination because of such disability shall not apply if the particular disability prevents the proper performance of the particular worker involved: PROVIDED, That this section shall not be construed to require an employer to establish employment goals or quotas based on sexual orientation.

(2) To discharge or bar any person from employment because of age, sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability.

(3) To discriminate against any person in compensation or in other terms or conditions of employment because of age, sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability: PROVIDED, That it shall not be an unfair practice for an employer to segregate washrooms or locker facilities on the basis of sex, or to base other terms and conditions of employment on the sex of employees where the commission by regulation or ruling in a particular instance has found the employment practice to be appropriate for the practical realization of equality of opportunity between the sexes.

(4) To print, or circulate, or cause to be printed or circulated any statement, advertisement, or publication, or to use any form of application for employment, or to make any inquiry in connection with prospective employment, which expresses any limitation, specification, or discrimination as to age, sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, honorably discharged veteran or military status, or the presence of any sensory,

1

mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability, or any intent to make any such limitation, specification, or discrimination, unless based upon a bona fide occupational qualification: PROVIDED, Nothing contained herein shall prohibit advertising in a foreign language.

**Wash. Rev. Code § 49.60.208**
**Discrimination – Human Rights Commission**
**Unfair practice—Religious affiliation disclosure**

It is an unfair practice for an employer to:

(1) Require an employee to disclose his or her sincerely held religious affiliation or beliefs, unless the disclosure is for the purpose of providing a religious accommodation at the request of the employee; or

(2) Require or authorize an employee to disclose information about the religious affiliation of another employee, unless the individual whose religious affiliation will be disclosed (a) expressly consents to the disclosure, and (b) has knowledge of the purpose for the disclosure.

**Wash. Admin. Code § 162-16-210**
**Advice of commission**

(1) When requested to do so, the commission's staff will advise persons on how to meet particular employment needs consistently with the law against discrimination.

(2) Persons may petition the commission for an executive director's opinion determining whether protected status would be a bona fide occupational qualification in particular circumstances, unless the commission or another public agency with comparable jurisdiction has directed or authorized the action. (Please see WAC 162-04-070 on executive director's opinions and WAC 162-16-240 on bona fide occupational qualification.)

**Wash. Admin. Code §162-16-240**
**Bona fide occupational qualification**

Under the law against discrimination, there is an exception to the rule that an employer, employment agency, labor union, or other person may not discriminate on the basis of protected status; that is if a bona fide occupational qualification (BFOQ) applies. The commission believes that the BFOQ exception should be applied narrowly to jobs for which a particular quality of protected status will be essential to or will contribute to the accomplishment of the purposes of the job. The following examples illustrate how the commission applies BFOQs:

(1) Where it is necessary for the purpose of authenticity or genuineness (e.g., model, actor, actress) or maintaining conventional standards of sexual privacy (e.g., locker room attendant, intimate apparel fitter) the commission will consider protected status to be a BFOQ.

(2) A 911 emergency response service needs operators who are bilingual in English and Spanish. The job qualification should be spoken language competency, not national origin.

(3) An employer refuses to consider a person with a disability for a receptionist position on the basis that the person's disability "would make customers and other coworkers uncomfortable." This is **not** a valid BFOQ.

(4) A person with a disability applies for promotion to a position at a different site within the firm. The firm does not promote the person because doing so would compel the firm to install an assistive device on equipment at that site to enable the person to properly perform the job. This is **not** a valid BFOQ.

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32 (a)(7)(C), and Ninth Circuit Rule 32-1, I certify that the attached answering brief is proportionately spaced, has a typeface of 14 points or more, and contains 5,229 words.

DATED this 18th day of February 2025.

*s/Cynthia L. Alexander*
CYNTHIA L. ALEXANDER, WSBA 46019
*Deputy Solicitor General*