No. 24-7246

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNION GOSPEL MISSION OF YAKIMA WASHINGTON,

*Plaintiff-Appellee,*

*v.*

NICK BROWN, in his official capacity as Attorney General of Washington State; ANDRETA ARMSTRONG, in her official capacity as Executive Director of the Washington State Human Rights Commission; DEBORAH COOK, in her official capacity as Commissioner of the Washington State Human Rights Commission; GUADALUPE GAMBOA, in her official capacity as Commissioner of the Washington State Human Rights Commission; JEFF SBAIH, in his official capacity as Commissioner of the Washington State Human Rights Commission; HAN TRAN, in his official capacity as Commissioner of the Washington State Human Rights Commission,

*Defendants-Appellants.*

ON PETITION FOR REHEARING OR REHEARING *EN BANC*

**BRIEF FOR *AMICI CURIAE* MASSACHUSETTS, ARIZONA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA, HAWAI'I, ILLINOIS, MINNESOTA, NEVADA, NEW YORK, OREGON, AND RHODE ISLAND IN SUPPORT OF DEFENDANTS-APPELLANTS' PETITION FOR REHEARING OR REHEARING *EN BANC***

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*
David C. Kravitz*
  *State Solicitor*
Adam M. Cambier
  *Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
david.kravitz@mass.gov
(617) 963-2427
  *\*Counsel of Record*
*Additional counsel listed on signature page*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

INTERESTS OF AMICI.................................................................................1

ARGUMENT ................................................................................................3

    I.     In the context of employment, the church autonomy doctrine is coextensive with the ministerial exception. ..........................................4

    II.    States have a compelling interest in enforcing employment discrimination laws because of the enormous harm that such discrimination causes. ......................................................................11

CONCLUSION ...........................................................................................15

CERTIFICATE OF COMPLIANCE...........................................................17

i

# TABLE OF AUTHORITIES

## Cases

*Billard v. Charlotte Catholic H.S.*, 101 F.4th 316 (4th Cir. 2024) ...........................4

*Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d
    648 (10th Cir. 2002) ...................................................................... 8-9

*Catholic Charities Bureau, Inc. v. Wisc. Labor & Indus. Rev.
    Comm'n*, 605 U.S. 238 (2025)..........................................................5

*Corporation of the Presiding Bishop v. Amos*, 483 U.S. 327 (1987) ................... 6-8

*DeWeese-Boyd v. Gordon College*, 163 N.E.3d 1000 (Mass. 2021),
    *cert. denied*, 142 S.Ct. 952 (2022).................................................. 4

*EEOC v. Mississippi Coll.*, 626 F.2d 477 (5th Cir. 1980) .......................................12

*EEOC v. Pacific Press Pub. Ass'n*, 676 F.2d 1272 (9th Cir. 1982),
    *abrogation on other grounds recognized by Am. Friends
    Serv. Comm. Corp. v. Thornburgh*, 951 F.2d 957, 960 (9th
    Cir. 1991)......................................................................................11

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560
    (6th Cir. 2018), *aff'd, Bostock v. Clayton County*, 590 U.S.
    644 (2020).....................................................................................12

*EEOC v. Roman Cath. Diocese of Raleigh,* 213 F.3d 795
    (4th Cir. 2000) .......................................................................10, 12

*General Conf. of Seventh Day Adventists v. Horton*, 787 F. Supp.
    3d 99 (D. Md. 2025) ......................................................................10

*Gordon College v. DeWeese-Boyd*, 142 S. Ct. 952 (2022)......................................5

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
    565 U.S. 171 (2012)........................................................... 3, 5-6, 8

*Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94 (1952) ............................................. 4

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ......................................13

*McRaney v. N. Am. Mission Bd. of the Southern Baptist Convention, Inc.*, 157 F.4th 627 (5th Cir. 2025) ...........................................10

*New York State Club Ass'n, Inc. v. City of New York*, 505 N.E.2d 915 (N.Y. 1987), *aff'd*, 487 U.S. 1 (1988) .....................................................15

*Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 723 (2020)................................................................................... 3-5

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985) ......................................................................... 9-10, 12

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) .................................................. 14-15

*Schmidt v. Univ. of Northwestern-St. Paul*, No. 23-2199, 2024 WL 477166 (D. Minn. Feb. 7, 2024) ................................................................. 4-5

*Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094 (2022) ..................... 5-6

*Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976) ............................4

*Union Gospel Mission of Yakima Washington v. Brown*, 162 F.4th 1190 (9th Cir. 2026) ................................................................. 2, 6-9

*Union Gospel Mission of Yakima, Wash. v. Ferguson*, No. 1:23-CV-3027-MKD, 2024 WL 4660918 (E.D. Wash. Nov. 1, 2024) .......................................................................11

*United States v. Burke*, 504 U.S. 229 (1992) .........................................................12

## Statutes and Rules

42 U.S.C. § 2000e-1 ................................................................................................7

**Other Authorities**

Jenny Bourne, *"A Stone of Hope": The Civil Rights Act of 1964 and Its Impact on the Economic Status of Black Americans*, 74 La. L. Rev. 1195 (2014) .................................................................. 1-2

Khristopher J. Brooks, *Nearly 60% of U.S. workers say they've seen workplace discrimination*, CBS News (Oct. 23, 2019), https://www.cbsnews.com/news/nearly-60-of-us-workers-say-they-seen-or-experienced-discrimination-at-their-job/ ................................13

EEOC, *American Experiences versus American Expectations* (2015), https://www.eeoc.gov/special-report/american-experiences-versus-american-expectations ....................................................2

David Freeman Engstrom, *The Lost Origins of American Fair Employment Law: Regulatory Choice and the Making of Modern Civil Rights, 1943-1972*, 63 Stan. L. Rev. 1071 (2011)..........................................................1

Desta Fekedulegn *et al.*, *Prevalence of workplace discrimination and mistreatment in a national sample of older U.S. workers: The REGARDS cohort study*, 8 SSM – Population Health 1 (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6612926/pdf/main.pdf ...........................................................................13

H. Rep. 102-40, 1991 U.S.C.C.A.N. 549 (Apr. 24, 1991).......................................13

Institute for Women's Policy Research, *The 2023 Weekly Gender Wage Gap by Race, Ethnicity, and Occupation* (Mar. 2024), https://iwpr.org/wp-content/uploads/2024/03/Occupational-Wage-Gap-2024-Fact-Sheet-1.pdf ................................14

Justia, "Employment Discrimination Laws: 50-State Survey" (Sept. 2022), https://www.justia.com/employment/employment-laws-50-state-surveys/employment-discrimination-laws-50-state-survey ...............................................................................1

Brad Sears *et al.*, *LGBTQ People's Experiences of Workplace Discrimination and Harassment*, Williams Institute (Aug. 2024), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Workplace-Discrimination-Aug-2024.pdf ......................... 14

U.S. Bureau of Labor Statistics, *Highlights of Women's Earnings in 2023*, at 1 (Aug. 2024), https://www.bls.gov/opub/reports/womens-earnings/2023/home.htm ............................................................................ 14

Valerie Wilson & William Darity Jr., *Understanding Black-White Disparities in Labor Market Outcomes Requires Models That Account for Persistent Discrimination and Unequal Bargaining Power*, Econ. Pol'y Inst. (Mar. 25, 2022), https://files.epi.org/uploads/215219.pdf ....................................................... 14

## INTERESTS OF AMICI

The *Amici* States—Massachusetts, Arizona, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawai'i, Illinois, Minnesota, Nevada, New York, Oregon, and Rhode Island—share sovereign and compelling interests in protecting workers within our jurisdictions from discrimination in employment.[1]  States have long been at the forefront of fighting employment discrimination.  "[B]y the time Congress passed Title VII to the Civil Rights Act of 1964, nearly two dozen states had already enacted laws mandating equal treatment in employment and engaged in nearly two decades' worth of enforcement efforts."  David Freeman Engstrom, *The Lost Origins of American Fair Employment Law: Regulatory Choice and the Making of Modern Civil Rights, 1943-1972*, 63 Stan. L. Rev. 1071, 1073 (2011).  Today, nearly every State has some form of employment discrimination law in place.[2]

These efforts to level the playing field in the labor market have borne fruit.  According to one researcher, "real wages among employed, black, male household heads aged 20 to 60 years old increased sharply during the 1960s across all ages

---

[1] *Amici* file as of right pursuant to Fed. R. App. P. 29(b)(2) and Circuit Rule 29-2(a).

[2] *See* Justia, "Employment Discrimination Laws: 50-State Survey" (Sept. 2022), https://www.justia.com/employment/employment-laws-50-state-surveys/employment-discrimination-laws-50-state-survey/.  All URLs cited in this brief were last visited on March 2, 2026.

and educational levels."  Jenny Bourne, *"A Stone of Hope": The Civil Rights Act of 1964 and Its Impact on the Economic Status of Black Americans*, 74 La. L. Rev. 1195, 1195-96 (2014).  Those gains have continued in more recent years among a wide variety of groups protected by employment discrimination laws.  *See, e.g.*, EEOC, *American Experiences versus American Expectations* (2015) (collecting data from 1965 through 2015 showing that African Americans, Hispanics, Asian Americans, American Indians/Alaskan Natives, and women gained in most, but not all, of nine different job categories), https://www.eeoc.gov/special-report/american-experiences-versus-american-expectations.

We also share interests in upholding the rights protected by the First Amendment.  We respect and do not seek to abridge the right of religious organizations to hold and express their views, and to operate free of interference from secular authorities within the existing confines of the church autonomy doctrine.  But the panel's dramatic expansion of that doctrine, *see generally Union Gospel Mission of Yakima Washington v. Brown*, 162 F.4th 1190 (9th Cir. 2026) ("*UGM*"), goes well beyond existing precedent and threatens our ability to combat employment discrimination.  We urge this Court to grant rehearing or rehearing *en banc*.

2

## **ARGUMENT**

Neither the Supreme Court nor (until now) this Court has ever recognized a First Amendment right to discriminate in employment to the extent the panel decision authorizes. To the contrary, the cases and doctrines upon which the panel relies are limited, shielding employment decisions by religious employers for some—but not all—employees from scrutiny by secular authorities. In particular, as the Supreme Court has explained, the so-called "ministerial exception" requires that courts "stay out of employment disputes involving those holding *certain important positions* with churches and other religious institutions." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (emphasis added); *see also id.* (rejecting proposition that "religious institutions enjoy a general immunity from secular laws"); *cf. Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 204 (2012) (Alito, J., concurring) (noting that "a purely secular teacher would not qualify for the 'ministerial' exception" at a religious school). To allow religious employers to flout employment discrimination laws to the extent of the panel's decision would strip many thousands of workers of the most basic job protections. The First Amendment does not require such a drastic result.

I.    **In the context of employment, the church autonomy doctrine is coextensive with the ministerial exception.**

As the Supreme Court has explained, the ministerial exception is the employment "component" of a broader First Amendment doctrine encompassing a variety of aspects of religious institutions' "autonomy." *Our Lady*, 591 U.S. at 746. Other such components include the control of church property, *see Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94 (1952), and internal matters of church discipline and governance, *see Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976).

In the employer-employee context, however, the Supreme Court has never extended religious institutions' "autonomy" beyond the ministerial exception, which shields from governmental scrutiny a religious institution's ability to determine who shall fill "certain key roles." *Our Lady*, 591 U.S. at 746.[3] Justice

---

[3] It is well established that "[w]hat matters" for the ministerial exception analysis is "what an employee does," *Our Lady*, 591 U.S. at 753, i.e., "whether *each particular position* implicate[s] the fundamental purpose of the ministerial exception," *id.* at 758 (emphasis added). And, as the Fourth Circuit recently observed, "[t]he ministerial exception remains just that—an exception—and each case must be judged on its own facts to determine whether a 'particular position' falls within the exception's scope." *Billard v. Charlotte Catholic H.S.*, 101 F.4th 316, 333 (4th Cir. 2024) (quoting *Our Lady*, 591 U.S. at 758); *see also DeWeese-Boyd v. Gordon College*, 163 N.E.3d 1000, 1017 (Mass. 2021) (rejecting religious college's effort to exempt "all its employees" from state antidiscrimination law as a "significant expansion of the ministerial exception well beyond" existing doctrine), *cert. denied*, 142 S.Ct. 952 (2022); *cf. Schmidt v. Univ. of Northwestern-St. Paul*, No. 23-2199, 2024 WL 477166, at *4-5 (D. Minn. Feb. 7, 2024) (denying
(footnote continued)

4

Alito, for example, has explained that "[r]eligious autonomy *means* that religious authorities must be free to determine who is qualified to serve in positions of *substantial* religious importance." *Hosanna-Tabor*, 565 U.S. at 200 (concurring opinion) (emphasis added); *see also Gordon College v. DeWeese-Boyd*, 142 S. Ct. 952, 954 (2022) (statement of Alito, J., respecting denial of certiorari) (noting that "[i]n *Our Lady of Guadalupe School*, we explained that the 'ministerial exception' protects the 'autonomy' of 'churches and other religious institutions'" (quoting *Our Lady*, 591 U.S. at 746)).  Similarly, Justice Thomas recently explained that "the church autonomy doctrine" provides, *inter alia*, that "'courts are bound to stay out of employment disputes involving those holding *certain important positions* with churches and other religious institutions.'" *Catholic Charities Bureau, Inc. v. Wisc. Labor & Indus. Rev. Comm'n*, 605 U.S. 238, 256 (2025) (Thomas, J., concurring) (quoting *Our Lady*, 591 U.S. at 746) (emphasis added).  The only indication from anyone on the Supreme Court that the church autonomy doctrine might extend further with respect to employment comes from a statement accompanying the Court's refusal to hear a case.  In *Seattle's Union Gospel Mission v. Woods*, Justice Alito noted that "we have yet to confront whether freedom for religious employers to hire their co-religionists is constitutionally

---

motion to dismiss based on ministerial exception where defendant college pointed to doctrinal affirmation required of all applicants, students, and employees, pending further factual development about plaintiff's specific role).

required."  142 S. Ct. 1094, 1094 (2022) (Alito, J., respecting the denial of certiorari).  But a statement accompanying the denial of a petition for certiorari, which was joined by only one other Justice, hardly indicates that a majority of the Court is prepared to expand the church autonomy doctrine in the way the panel has done.

Indeed, it is difficult to explain the *Hosanna-Tabor* decision under the panel's view of church autonomy.  In *Hosanna-Tabor*, a teacher at a religious school had been discharged because "her threat to sue the Church violated the Synod's belief that Christians should resolve their disputes internally."  565 U.S. at 180.  That conduct fits squarely within the panel's theory that a religious institution may fire (or refuse to hire) anyone—ministerial or not—who does not abide by the organization's sincerely-held religious beliefs.  *See UGM*, 162 F.4th at 1204.  Yet, rather than simply upholding the teacher's discharge based on an expansive theory of "autonomy" like that adopted by the panel, *Hosanna-Tabor* carefully examined "all the circumstances of [the teacher's] employment," 565 U.S. at 190-94, ultimately concluding that she "was a minister within the meaning of the exception," *id.* at 194.

No other Supreme Court authority supports the panel's decision.  In particular, the panel's heavy reliance on the majority and concurring opinions in *Corporation of the Presiding Bishop v. Amos*, 483 U.S. 327 (1987), is misplaced.

6

*See UGM*, 162 F.4th at 1204, 1209-10.  That case asked whether the exemption for religious organizations in Section 702 of Title VII violated the Establishment Clause when applied to religious organizations' secular activities.[4]  *See* 483 U.S. at 329-30.  It thus has little relevance to this case, which concerns the church autonomy doctrine's scope of protection for religious organizations—i.e., this case concerns what the Free Exercise Clause requires, while *Amos* concerned what the Establishment Clause forbids.  Indeed, *Amos* "assume[d] for the sake of argument that the pre-1972 exemption [of Section 702, which was limited to a religious organization's religious activities] was adequate in the sense that the Free Exercise Clause required no more."  *Id.* at 336.  That assumption is obviously not consistent with the panel's decision.  Moreover, Justice Brennan's separate opinion—which the panel repeatedly quotes, *see UGM*, 162 F.4th at 1204, 1209—emphasized that "the infringement on [an individual's] religious liberty that results from conditioning performance of secular activity upon religious belief *cannot be defended as necessary* for the community's self-definition."  483 U.S. at 343 (Brennan, J., concurring in the judgment) (emphasis added).  Justice Brennan thus squarely rejected the entire premise of Plaintiff's argument, and the panel's

---

[4] The Section 702 exemption provides that Title VII "shall not apply to … a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities."  42 U.S.C. § 2000e-1(a).

7

decision, in this case.  Justice Brennan went on to explain that "the authorization of religious discrimination with respect to nonreligious activities goes beyond reasonable accommodation, and has the effect of furthering religion in violation of the Establishment Clause." *Id.*  He concurred in the Court's judgment that Section 702's "categorical exemption" nonetheless does not violate the Establishment Clause only because of his "[c]oncern" that "case-by-case determination" of which activities are "religious" carried a "substantial potential for chilling religious activity" and therefore "justifie[d] a categorical exemption for nonprofit activities." *Id.* at 345.  Neither Justice Brennan nor the majority opinion even hinted at the possibility that the Free Exercise Clause might *require* an exemption of Section 702's scope.

Nor do cases from other Courts of Appeals support the panel's decision.  In particular, the panel erroneously relies on *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648 (10th Cir. 2002).  *See UGM*, 162 F.4th at 1204, 1207.  There, an employee and a non-employee claimed sexual harassment by the church, so the case focused not on the church's prerogatives as an employer, but rather on "the First Amendment rights of the church to discuss church doctrine and policy freely."  289 F.3d at 658.[5]  *Bryce*'s holding that a church may not be held

---

[5] Moreover, *Bryce* predates *Hosanna-Tabor*, and therefore the *Bryce* court did not have the benefit of the Supreme Court's adoption of the ministerial exception.

(footnote continued)

liable for sexual harassment based on statements—i.e., speech—made in the course of "an internal ecclesiastical dispute and dialogue" on homosexuality, *id.* at 659, has little relevance to the question whether this Plaintiff may shield itself from potential liability for firing or refusing to hire non-ministerial employees.

The panel also inappropriately relied on *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985), incorrectly suggesting that *Rayburn* "doesn't preclude the hiring of non-ministerial positions from involving a spiritual function." *UGM*, 162 F.4th at 1207. Quite the contrary: *Rayburn*, in holding that a church's "employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions," 772 F.2d at 1171, used the term "spiritual functions" to refer to what particular employees *actually did*—precisely the inquiry required under the ministerial exception. *See Rayburn*, 772 F.2d at 1168, 1171-72 (holding that, while Title VII could not be applied to a hiring decision for an "associate in pastoral care" because of that position's "significan[ce] in the expression and realization of Seventh-day Adventist beliefs," Title VII could apply to employment decisions "not involv[ing] the church's spiritual functions," which could include "secular teacher[s] in religious

(And in *Bryce*, the plaintiff-employee—the church's "Youth Minister"—seems clearly to fall within the ministerial exception, *see* 289 F.3d at 651, such that any holding with respect to her sheds no light on whether church autonomy extends beyond that exception in the context of employment.)

9

educational institution[s]," "administrative and support staff at a seminary," an "editorial secretary at church-affiliated publishing house," and a "typist-receptionist"). *Rayburn* nowhere suggests that a religious institution's *motivation* for a hiring decision could constitute a "spiritual function" with respect to non-ministerial employees; the panel's apparent contrary conclusion is simply a misreading of that case.

In summary, nobody doubts that "the ministerial exception … is one component of the church autonomy doctrine." *McRaney v. N. Am. Mission Bd. of the Southern Baptist Convention, Inc.*, 157 F.4th 627, 636 (5th Cir. 2025) (internal quotation marks omitted), *cert. denied*, No. 25-807, 2026 WL 490870 (U.S. Feb. 23, 2026). As noted *supra* at 4, the church autonomy doctrine indisputably also extends to, for example, control over church property and resolution of internal ecclesiastical disputes. But *in the context of employment*, the church autonomy doctrine *is* the ministerial exception, as other courts have correctly concluded. *See General Conf. of Seventh Day Adventists v. Horton*, 787 F. Supp. 3d 99, 113 (D. Md. 2025) (holding that "the ministerial exception is the manifestation of the church autonomy principle" where employment is concerned (citing *EEOC v. Roman Cath. Diocese of Raleigh,* 213 F.3d 795, 800-01 (4th Cir. 2000))), *appeal pending*, No. 25-1735 (4th Cir.). The church autonomy doctrine therefore cannot justify the broad exemption from antidiscrimination laws that Plaintiff seeks in this

10

case. Rehearing or rehearing *en banc* is needed to correct the panel's erroneous contrary conclusion.[6]

## II. States have a compelling interest in enforcing employment discrimination laws because of the enormous harm that such discrimination causes.

While *Amici* do not fully address the basis on which the district court decided this case—whether application of Washington's law to Plaintiff would survive strict scrutiny, *see Union Gospel Mission of Yakima, Wash. v. Ferguson*, No. 1:23-CV-3027-MKD, 2024 WL 4660918, at *4 (E.D. Wash. Nov. 1, 2024)— as that question depends on the specific details of the Washington law at issue, *Amici* emphasize that it is beyond dispute that federal and state governments have a compelling interest in prohibiting discrimination in employment. This Court has previously recognized as much, holding that "Congress' purpose to end employment discrimination is equally if not more compelling than other interests that have been held to justify legislation that burdened the exercise of religious convictions." *EEOC v. Pacific Press Pub. Ass'n*, 676 F.2d 1272, 1280 (9th Cir. 1982), *abrogation on other grounds recognized by Am. Friends Serv. Comm. Corp. v. Thornburgh*, 951 F.2d 957, 960 (9th Cir. 1991). Other courts have held

---

[6] The panel's expansion of the church autonomy doctrine is especially inappropriate here, where Washington conceded at oral argument that this case could be resolved by holding that the employee positions at issue fall within the ministerial exception. *See* Pet. for reh'g at 6, 20; Oral arg. at 37:58-38:17, https://www.youtube.com/watch?v=8G3TvO-9pN4&t=2278s.

similarly. *See, e.g.*, *Rayburn*, 772 F.2d at 1169 (holding in litigation over the interplay between Title VII and the Free Exercise Clause that "Title VII is an interest of the highest order," such that the statute is "properly applied to the secular employment decisions of a religious institution, such as those relating to a secular teacher in a church-approved school"); *Roman Cath. Diocese*, 213 F.3d at 801 (noting "the profound state interest in assuring equal employment opportunities for all, regardless of race, sex, or national origin" (citation and internal quotation marks omitted)); *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 591 & n.12 (6th Cir. 2018) (noting EEOC's "compelling interest in combating discrimination in the workforce"; collecting cases), *aff'd*, *Bostock v. Clayton County*, 590 U.S. 644 (2020); *EEOC v. Mississippi Coll.*, 626 F.2d 477, 488 (5th Cir. 1980) ("[T]he government has a compelling interest in eradicating discrimination in all forms.").

This universally recognized governmental interest in combating employment discrimination is grounded in the "grave harm" such discrimination creates for both individuals and the marketplace. *United States v. Burke*, 504 U.S. 229, 238 (1992). For individuals, employment discrimination "depriv[es an affected employee or applicant] of her livelihood and harm[s] her sense of self-worth." *Harris Funeral*, 884 F.3d at 592. Congress has noted that employment discrimination leads to "humiliation; loss of dignity; psychological (and sometimes

12

physical) injury; resulting medical expenses; damage to the victim's professional reputation and career; loss of all forms of compensation and other consequential injuries." H. Rep. 102-40, 1991 U.S.C.C.A.N. 549, 603 (Apr. 24, 1991). And laws prohibiting employment discrimination serve "societal as well as personal interests." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973). Left unchecked, racially discriminatory employment practices "foster[] racially stratified job environments to the disadvantage of minority citizens"; the same is true of sex discrimination. *Id.* at 800.

Unfortunately, in the States' experience, "workplace discrimination remains a pervasive problem."[7] Over 60% of American workers report that they have experienced or witnessed discrimination in the workplace based on race, age, gender, or LGBTQ status.[8] Research indicates that Black workers experience higher unemployment and underemployment rates than white workers across

---

[7] Desta Fekedulegn *et al.*, *Prevalence of workplace discrimination and mistreatment in a national sample of older U.S. workers: The REGARDS cohort study*, 8 SSM – Population Health 1, 1 (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6612926/pdf/main.pdf.

[8] Khristopher J. Brooks, *Nearly 60% of U.S. workers say they've seen workplace discrimination*, CBS News (Oct. 23, 2019), https://www.cbsnews.com/news/nearly-60-of-us-workers-say-they-seen-or-experienced-discrimination-at-their-job/.

education levels.[9]  Similarly, studies report a substantial wage gap between men and women,[10] especially for some women of color.[11]  And nearly a quarter of LGBTQ workers in a recent survey reported having suffered adverse treatment at work because of their sexual orientation or gender identity within the last five years—a figure that nearly doubles for transgender and nonbinary workers.[12]

Relatedly, Plaintiff does not contend that statutes barring employment discrimination are animated by a government interest in the "suppression of ideas"—nor could it.  *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).  As with the public accommodations law at issue in *Roberts*, employment discrimination statutes reflect a "strong historical commitment to eliminating discrimination," which is a "goal … unrelated to the suppression of expression."

---

[9] Valerie Wilson & William Darity Jr., *Understanding Black-White Disparities in Labor Market Outcomes Requires Models That Account for Persistent Discrimination and Unequal Bargaining Power*, Econ. Pol'y Inst. (Mar. 25, 2022), at 5, https://files.epi.org/uploads/215219.pdf.

[10] U.S. Bureau of Labor Statistics, *Highlights of Women's Earnings in 2023*, at 1 (Aug. 2024), https://www.bls.gov/opub/reports/womens-earnings/2023/home.htm.

[11] Institute for Women's Policy Research, *The 2023 Weekly Gender Wage Gap by Race, Ethnicity, and Occupation*, at 7 (Mar. 2024), https://iwpr.org/wp-content/uploads/2024/03/Occupational-Wage-Gap-2024-Fact-Sheet-1.pdf.

[12] Brad Sears *et al.*, *LGBTQ People's Experiences of Workplace Discrimination and Harassment*, Williams Institute, at 13-15 (Aug. 2024), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Workplace-Discrimination-Aug-2024.pdf.

*Id.* at 624; *see also, e.g.*, *New York State Club Ass'n, Inc. v. City of New York*, 505 N.E.2d 915, 921 (N.Y. 1987) (noting that "the City's strong public policy to eliminate discrimination against women and minorities" is a "compelling governmental interest[] unrelated to the suppression of ideas"), *aff'd*, 487 U.S. 1 (1988).

## <u>CONCLUSION</u>

The petition for rehearing or rehearing *en banc* should be granted.

Respectfully submitted,

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*

*/s/ David C. Kravitz*
David C. Kravitz*
  *State Solicitor*
Adam M. Cambier
  *Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
david.kravitz@mass.gov
(617) 963-2427
    *Counsel of Record*

Dated: March 2, 2026

KRISTIN K. MAYES
*Attorney General of Arizona*
2005 N. Central Ave.
Phoenix, AZ 85004

ROB BONTA
*Attorney General of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General of Colorado*
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General of Delaware*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General for the District of
Columbia*
400 6th Street, NW, Suite 8100
Washington, DC 20001

ANNE E. LOPEZ
*Attorney General of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General of Illinois*
115 South LaSalle Street
Chicago, IL 60603

KEITH ELLISON
*Attorney General of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General of Nevada*
100 North Carson Street
Carson City, NV 89701

LETITIA JAMES
*Attorney General of New York*
28 Liberty Street
New York, NY 10005

DAN RAYFIELD
*Attorney General of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General of Rhode Island*
150 South Main Street
Providence, RI 02903

## CERTIFICATE OF COMPLIANCE

1.      This Brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B), and Ninth Circuit Rule 29-2(c)(2), because it contains 3,232 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word (version 2508) in Times New Roman style, 14-point font.

/s/ David C. Kravitz
*Counsel of Record*

17