APPEAL NO. 24-7246

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNION GOSPEL MISSION OF YAKIMA, WASHINGTON,

*Plaintiff-Appellee,*

v.

NICK BROWN, in his official capacity as Attorney General of Washington State, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Eastern District of Washington
Case No. 1:23-cv-03027-MKD

## APPELLEE'S RESPONSE TO PETITION FOR REHEARING OR REHEARING EN BANC

JOHN J. BURSCH
DAVID A. CORTMAN
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
dcortman@ADFlegal.org

JAMES A. CAMPBELL
JACOB E. REED
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jcampbell@ADFlegal.org
jreed@ADFlegal.org

RYAN TUCKER
JEREMIAH GALUS
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rtucker@ADFlegal.org
jgalus@ADFlegal.org

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

Table of Authorities................................................................ii

Introduction.........................................................................1

Argument.............................................................................3

I.    The panel decision faithfully applies church autonomy and Supreme Court precedent. .................................................3

II.   The panel decision is consistent with this Court's and other Circuits' precedent. ...........................................................8

      A.    The panel's decision aligns with those of other Circuits........9

      B.    The panel's decision aligns with precedents of this Circuit.......................................................................11

III.  The panel decision brings Washington back into line with the rest of the country and affords the Mission the same protection enjoyed by other religious organizations.....................14

IV.  The State's petition repackages justiciability arguments that two separate panels have unanimously rejected...........................17

Conclusion ..........................................................................19

Certificate of Service ...........................................................20

# TABLE OF AUTHORITIES

## Cases

*Boardman v. Estelle*,
957 F.2d 1523 (9th Cir. 1992) ......................................................... 13

*Bryce v. Episcopal Church in the Diocese of Colorado*,
289 F.3d 648 (10th Cir. 2002) ................................................... 10, 11

*Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry
Review Commission*,
605 U.S. 238 (2025) ........................................................................ 8

*Christian Healthcare Centers, Inc. v. Nessel*,
117 F.4th 826 (6th Cir. 2024) ....................................................... 13

*Dennis v. Higgins*,
498 U.S. 439 (1991) ...................................................................... 13

*Dixon v. Edwards*,
290 F.3d 699 (4th Cir. 2002) ......................................................... 13

*EEOC v. Fremont Christian Schools*,
781 F.2d 1362 (9th Cir. 1986) ....................................................... 12

*EEOC v. Mississippi College*,
626 F.2d 477 (5th Cir. 1980) ......................................................... 10

*EEOC v. Pacific Press Publishing Association*,
676 F.2d 1272 (9th Cir. 1982) ....................................................... 12

*EEOC v. Townley Engineering & Manufacturing Co.*,
859 F.2d 610 (9th Cir. 1988) ......................................................... 11

*Hall v. Baptist Memorial Health Care Corp.*,
215 F.3d 618 (6th Cir. 2000) ......................................................... 10

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*,
565 U.S. 171 (2012) ................................................. 5, 6, 7, 8, 16, 18

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*,
 344 U.S. 94 (1952) ................................................................. 4, 8, 13

*Kennedy v. St. Joseph's Ministries, Inc.*,
 657 F.3d 189 (4th Cir. 2011) ........................................................ 10

*Killinger v. Samford University*,
 113 F.3d 196 (11th Cir. 1997) ....................................................... 11

*Korte v. Sebelius*,
 735 F.3d 654 (7th Cir. 2013) .......................................................... 5

*Little v. Wuerl*,
 929 F.2d 944 (3d Cir. 1991) ........................................................... 9

*Markel v. Union of Orthodox Jewish Congregations of America*,
 124 F.4th 796 (9th Cir. 2024) ......................................................... 7

*McMahon v. World Vision*,
 147 F.4th 959 (9th Cir. 2025) ........................................................ 12

*Northside Bible Church v. Goodson*,
 387 F.2d 534 (5th Cir. 1967) ......................................................... 13

*Our Lady of Guadalupe School v. Morrissey-Berru*,
 591 U.S. 732 (2020) ............................................................... 4, 7, 15

*Paul v. Watchtower Bible & Tract Society of New York, Inc.*,
 819 F.2d 875 (9th Cir. 1987) ......................................................... 12

*Seattle's Union Gospel Mission v. Woods*,
 142 S. Ct. 1094 (2022) ............................................................... 6, 9

*Serbian Eastern Orthodox Diocese for United States & Canada v. Milivojevich*,
 426 U.S. 696 (1976) ................................................................... 4

*Spencer v. World Vision, Inc.*,
 633 F.3d 723 (9th Cir. 2011) .................................................... 11, 12

*Tandon v. Newsom*,
 593 U.S. 61 (2021) ........................................................ 16

*Union Gospel Mission of Yakima v. Ferguson*,
 2024 WL 3755954 (9th Cir. Aug. 12, 2024) .................... 17

*Watson v. Jones*,
 80 U.S. (13 Wall.) 679 (1872) ..................................... 3, 8

## <u>Statutes</u>

775 Ill. Comp. Stat. 5/2-101 ............................................. 5

Ariz. Rev. Stat. § 41-1462 ................................................. 5

Cal. Gov. Code § 12926 ................................................ 5, 16

Colo. Rev. Stat. § 24-34-402 ............................................. 5

Conn. Gen. Stat. § 46a-81p ............................................... 5

D.C. Code § 2-1401.03 ..................................................... 5

Del. Code Ann. tit. 19, § 710 ........................................... 5

Haw. Rev. Stat. § 378-3 ................................................... 5

Mass. Gen. Laws ch. 151B, § 4 .......................................... 5

Minn. Stat. § 363A.20 ..................................................... 5

N.Y. Exec. Law § 296 ...................................................... 5

Nev. Rev. Stat. § 613.320 ............................................. 5, 16

Or. Rev. Stat. § 659A.006 ............................................. 5, 16

R.I. Gen. Laws § 28-5-6 ................................................... 5

## INTRODUCTION

Washington subjects religious organizations to an employment rule that applies virtually nowhere else. Elsewhere, religious and secular organizations alike may require employees to share their vision and values. But the Washington Supreme Court's interpretation of the State's Law Against Discrimination (WLAD) exposes religious groups to liability for declining to fill non-ministerial positions with people who oppose and subvert the organization's religious beliefs and mission.

That rule threatens the very existence of ministries like the Union Gospel Mission of Yakima. As the panel recognized, the Mission is not merely a social-service provider. It is a ministry devoted to proclaiming and living out the Gospel through every aspect of its work—from sheltering the homeless to counseling those struggling with addiction. Because the Mission's effectiveness depends on employees who share and embody its faith, forcing it to hire people who oppose its beliefs would undermine its ability to function as a religious ministry at all.

The panel rightly rejected that result. For more than 70 years, the WLAD categorically exempted religious organizations, reflecting the longstanding view that religious institutions must be free to structure their employment relationships in accordance with their faith. The panel decision honors that tradition and confirms that the First Amendment protects co-religionist hiring as part of religious autonomy.

1

The panel's decision is also firmly grounded in precedent. It faithfully applies the Supreme Court's church-autonomy decisions and this Court's precedents recognizing that religious organizations must be free to define their own communities and associate with like-minded believers. The decision also aligns with other circuits and brings Washington back into line with the rest of the country.

The State's contrary position is untenable. The State asks this Court to hold—for the first time—that religious organizations have no constitutional to right to hire and associate with individuals who share their faith for non-ministerial roles central to their mission. The panel wisely declined to take that unprecedented step. Otherwise, religious ministries in Washington would face legal obligations imposed nowhere else, forcing them to choose between abandoning the shared faith that defines and guides them or risking crushing liability under state law. No decision of the Supreme Court, this Court, or any other circuit compels that.

Because the panel decision is fully consistent with Supreme Court precedent, this Court's decisions, and the nationwide consensus protecting co-religionist hiring, rehearing is unwarranted, and the State's petition should be denied.

# ARGUMENT

## I. The panel decision faithfully applies church autonomy and Supreme Court precedent.

The panel correctly held that the ministerial exception is a core component of the church-autonomy doctrine in employment, but not its limit. Washington disagrees: It insists the doctrine was confined to the ministerial exception in *Hosanna-Tabor* and *Our Lady of Guadalupe.* Pet. for Reh'g or Reh'g En Banc ("Pet.") 7–13. But those cases, which provide broad protection for religious organizations, didn't consider the co-religionist question presented here. And the Supreme Court precedents on which they rely—*Watson, Kedroff,* and *Milivojevich*—broadly protect a religious organization's autonomy to decide matters of faith and doctrine without government intrusion.

Start with *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1872). There, the Supreme Court first recognized the church-autonomy doctrine in a church property dispute brought by one Presbyterian faction against another. The Court refused to contradict the Presbyterian Church's determination as to which faction was the true owner, accepting as final the church's answer to questions of religious discipline, faith, rule, custom, or law. *Id.* at 727. The government has no business meddling in matters that concern "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Id.* at 733.

Next, in *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, the Court invoked church autonomy to strike down a legislative attempt to alter the polity of a church. 344 U.S. 94 (1952). A New York law sought to transfer control of New York Russian Orthodox churches from the governing hierarchy of the Russian Orthodox Church to the Russian Church in America. When a church subject to the law sued, the Court invalidated New York's legislative action. The First Amendment guarantees religious organizations the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Id.* at 116.

The Supreme Court reaffirmed these principles in *Serbian Eastern Orthodox Diocese for United States & Canada v. Milivojevich*, 426 U.S. 696 (1976). There, the Court refused to second guess a church's decision to remove a bishop, reiterating that the First Amendment creates space for religious organizations "to establish their own rules and regulations for internal discipline and government." *Id.* at 724–25.

As the panel recognized, these cases show the church-autonomy doctrine is not "exclusively concerned [with] the selection or supervision of clergy." Op. 22 (quoting *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020)). They demonstrate that the church-autonomy doctrine broadly prohibits "government interference with an *internal church decision* that affects the faith and mission of the church itself." *Id.* (quoting *Hosanna-Tabor Evangelical Lutheran Church &*

*Sch. v. EEOC*, 565 U.S. 171, 190 (2012)). While that necessarily includes ministerial hiring decisions, it also includes a "policy of hiring co-religionists for non-ministerial roles." *Id.*

The reason is obvious. A religious institution may reasonably conclude that it "would undermine the institution's identity and mission … if its own employees contradict or disavow the tenets it teaches." Op. 8–9. And, like the Mission here, a group may "decide that its religious mission is best served"—and its religious principles "more effectively promote[d]"—by employees "who adhere to and follow its religious beliefs." Op. 8.

That is why the federal government and nearly every state protect co-religionist hiring for all positions. *See Korte v. Sebelius*, 735 F.3d 654, 678 (7th Cir. 2013) (Title VII's religious exemption is a "legislative application[ ] of the church-autonomy doctrine").[1] Though those "federal statutory exemptions and their state analogs"[2] have kept the Supreme Court from "confront[ing] whether freedom for religious employers to

---

[1] In fact, all the *amici* states supporting Washington's petition allow religious organizations to prefer members of their own faith in employment. Ariz. Rev. Stat. § 41-1462; Cal. Gov. Code § 12926(d); Colo. Rev. Stat. § 24-34-402(6); Conn. Gen. Stat. § 46a-81p; Del. Code Ann. tit. 19, § 710(7); D.C. Code § 2-1401.03(b); Haw. Rev. Stat. § 378-3(5); 775 Ill. Comp. Stat. 5/2-101(B)(2); Mass. Gen. Laws ch. 151B, § 4(18); Minn. Stat. § 363A.20; Nev. Rev. Stat. § 613.320(1)(b); N.Y. Exec. Law § 296(11); Or. Rev. Stat. § 659A.006(5)(c); R.I. Gen. Laws § 28-5-6(8)(ii).

[2] *See* n.1, *supra.*

5

hire [only] co-religionists is constitutionally required," that Court's precedents establish "that the guarantee of church autonomy is not [ ] narrowly confined" to the ministerial exception. *Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094, 1094, 1096 (2022) (Alito, J., statement respecting the denial of certiorari) (citations omitted).

The State is therefore wrong to say that the panel decision conflicts with *Hosanna-Tabor* and *Our Lady of Guadalupe* in "four crucial respects." Pet. 10.

First, it was not "pointless" for the Supreme Court to "develop and apply the ministerial exception" in *Hosanna-Tabor* if the First Amendment also protects co-religionist hiring. Pet. 10. The ministerial exception and co-religionist doctrine have different applications and breadth. While the ministerial exception applies only to ministers, it protects employment decisions made for *any* reason, even a non-religious one. In contrast, the co-religionist doctrine applies to all employees but *only* if the organization's religious beliefs are at issue.

In addition, the applicability of the ministerial exception was the only question presented in *Hosanna-Tabor*, so the Court could decide no others. The employee there also alleged that the employer's "asserted religious reason" for her firing was "pretextual." *Hosanna-Tabor*, 565 U.S. at 194. By invoking the ministerial exemption—rather than the co-religionist doctrine—the employer and the Court cut off the pretext inquiry because the ministerial exemption's protection doesn't require

6

"a religious reason." *Id.*; *see also Markel v. Union of Orthodox Jewish Congregations of Am.*, 124 F.4th 796, 808 (9th Cir. 2024) (no "religious justification" needed "to invoke the ministerial exception").

Second, neither *Hosanna-Tabor* nor *Our Lady of Guadalupe* narrowed the First Amendment's protection to ministerial positions. *Contra* Pet. 10. Those cases explain that the exception is just one "component" of church autonomy. *Our Lady of Guadalupe*, 591 U.S. at 746. As noted, the ministerial exception "serves an entirely different purpose" than an exemption for co-religionist hiring. *Id.* at 760 (distinguishing "the quintessential" ministerial-exception case—a minister dismissed "for poor performance"—from a case where the minister is dismissed after converting "to some other faith").

Third, *Our Lady of Guadalupe* said that an employee need not be a "coreligionist" to qualify for the ministerial exception. 591 U.S. at 760. It never said that a state can *prohibit* religious organizations from conditioning employment on shared faith commitments. *Contra* Pet. 11–12.[3] In fact, the Supreme Court held just last Term that "eligibility" for a religious exemption cannot "turn[ ] on inherently religious choices," such as whether to "serve only co-religionists." *Cath. Charities Bureau,*

---

[3] The State's purported concern about entangling itself in questions over who counts as a co-religionist is easily resolved by deferring to the religious organization's own good-faith determination, as the panel explained. Op. 25 (the government cannot "question the veracity of sincerely held religious views").

*Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 250 (2025). Yet that is exactly what Washington demands.

Fourth, *Hosanna-Tabor* did not depart from precedent allowing the church-autonomy doctrine to be raised affirmatively. *Contra* Pet. 13. The decision reflected the procedural posture of that case: whether, in an employment-discrimination suit, the ministerial exception functions as a "jurisdictional bar or a defense on the merits." *Hosanna-Tabor*, 565 U.S. at 195 n.4. Nothing in *Hosanna-Tabor* suggests an intent to limit religious autonomy or to implicitly overrule the Court's precedent allowing affirmative religious-autonomy claims. *See, e.g.*, *Kedroff*, 344 U.S. at 96–100 (allowing such a claim); *Watson*, 80 U.S. at 714 (same).

In sum, the panel faithfully applied Supreme Court precedent recognizing that church autonomy predates—and extends beyond—the ministerial exception. The State's attempt to confine that doctrine misreads *Hosanna-Tabor* and *Our Lady of Guadalupe*, and runs roughshod over *Watson*, *Kedroff*, and *Milivojevich*. The panel properly rejected it. And because the panel's analysis is firmly grounded in the Court's church-autonomy jurisprudence and creates no conflict with controlling precedent, rehearing is unwarranted and should be denied.

## II. The panel decision is consistent with this Court's and other Circuits' precedent.

The State next argues that the panel decision will allow religious organizations to apply their faith "in a way never before allowed by a

8

federal appellate court." Pet. 1. Not so. "[C]ourts of appeals have generally protected the autonomy of religious organization[s] to hire personnel who share their beliefs." *Seattle's Union Gospel Mission*, 142 S. Ct. at 1094 (Alito, J., respecting the denial of certiorari) (citing decisions from the Third, Fourth, Fifth, Sixth, and Eleventh Circuits).

### A.  The panel's decision aligns with those of other Circuits.

Consider the Third Circuit. In *Little v. Wuerl*, the court upheld a Catholic school's right not to renew a teacher's contract after she divorced. 929 F.2d 944, 945–46 (3d Cir. 1991). Applying Title VII to such a decision would "arguably violate both" Religion Clauses, so the court barred discrimination claims brought by "non-minister employees where the position involved has any religious significance." *Id.* at 947–48. The court found it "difficult to imagine an area of the employment relationship *less* fit for scrutiny" than whether an "employee's beliefs or practices make her unfit to advance" a religious nonprofit's mission. *Id.* at 949. So in the Third Circuit, religious organizations may "employ only persons whose beliefs and conduct are consistent with [their] religious precepts." *Id.* at 951.

The Fourth Circuit has similarly held that, based in part on "the doctrine of *constitutional* avoidance," courts cannot apply Title VII to punish religious groups for parting ways with an employee whose

conduct is inconsistent with its beliefs. *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 195 (4th Cir. 2011).

The Fifth Circuit likewise barred an EEOC sex-discrimination probe into a religious college involving a professor denied a full-time position. *EEOC v. Mississippi Coll.*, 626 F.2d 477, 479–80 (5th Cir. 1980). To avoid "conflicts [with] the religion clauses," the court held that if a religious organization "presents convincing evidence that the challenged employment practice" derived from religious reasons, the EEOC lacks jurisdiction to investigate. *Id.* at 485.

The Sixth Circuit similarly ruled against a student-services specialist who was let go by a religious college after disclosing her ordination by a church with different beliefs. *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 622–23 (6th Cir. 2000). The court reasoned that (1) religious groups have a "constitutionally-protected interest ... in making religiously-motivated employment decisions," *id.* at 623, and (2) the government cannot "dictate to religious institutions how to carry out their religious missions or how to enforce their religious practices," *id.* at 626.

For its part, the Tenth Circuit has held that the church-autonomy doctrine "extends beyond the selection of clergy to other internal church matters." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 656 (10th Cir. 2002). The employee in that case alleged sex dis-crimination based on church officials' statements about homosexuality

and her same-sex marriage. *Id.* at 651–53. The court declined to apply the ministerial exception and instead held that the "broader church autonomy doctrine"—which covers "personnel decision[s] based on religious doctrine"—applied and barred the lawsuit. *Id.* at 658 n.2, 660.

And the Eleventh Circuit has said that Title VII "allows religious institutions to employ only persons whose beliefs are consistent with the employer's when the work is connected with carrying out the institution's activities." *Killinger v. Samford Univ.*, 113 F.3d 196, 200–01 (11th Cir. 1997). Broadly construing Title VII's religious exemption "avoid[ed] the First Amendment concerns" that "tower over [courts] when [they] face a case" concerning such employment decisions. *Id.*

### B. The panel's decision aligns with precedents of this Circuit.

This Court's precedents point the same direction. In *EEOC v. Townley Engineering & Manufacturing Co.*, this Court stated that the First Amendment would "[o]f course" limit the government's "ability to regulate the employment relationships within churches and similar organizations" in the absence of Title VII's religious exemption. 859 F.2d 610, 618 n.13 (9th Cir. 1988) (citing *Kedroff*, 344 U.S. at 107).

Judge O'Scannlain likewise explained in *Spencer v. World Vision, Inc.*, that a "cramped reading" of Title VII's religious exemption would "raise[ ] serious questions under both the Free Exercise Clause and the Establishment Clause." 633 F.3d 723, 729 (9th Cir. 2011) (per curiam)

(O'Scannlain, J., concurring). And Judge Kleinfeld warned in the same case that "the shield against discrimination would destroy the freedom of Americans to practice their religions" if the government could "co-erce[ ] staffing of religious institutions by persons who rejected or even were hostile to the religions the institutions were intended to advance." *Id.* at 742 (Kleinfeld, J., concurring). *See also Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 883 (9th Cir. 1987) (church members are free to decide with whom they associate).

None of Washington's cited cases say otherwise. Pet. 14–17. In *McMahon v. World Vision*, the Court ruled for the religious employer by finding that the employee was covered by the ministerial exception. 147 F.4th 959 (9th Cir. 2025). So there was no need to consider whether the church-autonomy doctrine extends to non-ministerial positions. *Id.* at 966 n.2 (declining to address World Vision's church-autonomy claim).

And unlike here, the challenged laws in *Pacific Press* and *Fremont Christian Schools* had "no significant impact" on the employers' religious beliefs or doctrines, nor did they "prohibit an activity rooted in religious belief." *EEOC v. Pac. Press Publ'g Ass'n*, 676 F.2d 1272, 1279 (9th Cir. 1982); *EEOC v. Fremont Christian Schs.*, 781 F.2d 1362, 1368–69 (9th Cir. 1986).

Washington's procedural objection fares no better. The State maintains that the panel decision conflicts with *Youth 71Five Ministries v. Williams*, 160 F.4th 964 (9th Cir. 2025), because it allows the Mission

to raise church autonomy as an affirmative claim. Pet. 17. But Washington never before argued that the right to religious autonomy could not be raised affirmatively, and "arguments raised for the first time in a petition for rehearing" are "deemed waived." *Boardman v. Estelle*, 957 F.2d 1523, 1535 (9th Cir. 1992). Nor can a conflict exist on an issue the panel did not even address.

In any event, the Supreme Court has "rejected attempts to limit the types of constitutional rights" that can be asserted as claims under 42 U.S.C. § 1983. *Dennis v. Higgins*, 498 U.S. 439, 445 (1991). And the Supreme Court and other circuits have adjudicated affirmative church-autonomy claims. *E.g.*, *Kedroff*, 344 U.S. at 96–100 (allowing such a claim); *Dixon v. Edwards*, 290 F.3d 699, 703–04 (4th Cir. 2002) (allowing a bishop to assert such a claim and obtain an order declaring the defendant was not the "Rector of St. John's Parish"); *Northside Bible Church v. Goodson*, 387 F.2d 534, 538 (5th Cir. 1967) (allowing such a claim to strike down legislation that "intrude[d] upon [a] very basic and traditional practice of The Methodist Church"); *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 852–55 (6th Cir. 2024) (allowing such a claim against state law that forbids hiring co-religionists).[4]

---

[4] Relying on these precedents, Youth 71Five Ministries has asked the Supreme Court to review this Court's decision in that case. Petition for Writ of Cert., *Youth 71Five Ministries v. Williams*, No. 25-776 (U.S. Dec. 23, 2025). That petition is supported by six amici briefs, and the

In short, the panel decision breaks no new ground and aligns with decades of precedent from this Court and every other circuit to consider similar issues. Far from authorizing practices "never before allowed," Pet. 1, the decision reflects the common-sense principle—embodied in more than a century of Supreme Court precedent—that the First Amendment allows a religious organization to employ only people who share its religious beliefs and mission. Because the State identifies no circuit split and no departure from this Court's cases, the petition should be denied.

### III. The panel decision brings Washington back into line with the rest of the country and affords the Mission the same protection enjoyed by other religious organizations.

The panel decision will not cause the sky to fall. *Contra* Pet. 17–19. The decision resolves a question unique to Washington due to the WLAD's "outlier status," "breaks no new ground," restores to the Mission protection it previously enjoyed for over 70 years, and brings Washington in line with other states and federal law. Op. 36.

Far from lacking any "limiting principle at all," Pet. 18, the panel devoted an entire section to the co-religionist doctrine's limits, Op. 24–26. First, the doctrine does not give "religious institutions ... general immunity from secular laws." Op. 24 (quoting *Our Lady of Guadalupe*,

Supreme Court ordered a response to the petition only four days after Respondents waived their right to file one.

14

591 U.S. at 746). Second, it protects employment decisions for non-ministers only when the decision "rests on the institution's sincerely held religious beliefs." Op. 25. Third, unlike the ministerial exception, the protection for non-ministers must be tied to a religious belief, "and the religious motivation cannot be a pretext for non-religious discrimination." Op. 26 (citation modified). Fourth, the protection applies only to religious organizations like the Mission that "rely on their non-ministerial personnel to advance their religious mission and message," Op. 22, and it may not extend to "umbrella" entities like "commercial businesses or hospitals," Op. 26.

Nor will the decision lead to the State's imagined parade-of-horribles. *Contra* Pet. 18. Religious nonprofits like the Mission serve those in need because of their faith, and there is no reason to suspect that they will suddenly concoct fake beliefs to fire people who are disabled or injured or cause increased insurance costs. *Contra id.* The panel decision merely gives religious ministries the protection they "would receive under Title VII and various state analogs." Op. 35. Indeed, Washington *did* exempt religious organizations from the WLAD from 1949 to 2021. Yet the State points to no historical evidence of religious employers misbehaving in the way the State supposedly fears.

Arizona, California, Hawaii, Nevada, and Oregon say the decision "threatens [their] ability to combat employment discrimination," Amici Br. 2. But the decision just puts Washington on equal footing with those

15

states. Op. 36 (citing those states' religious employer exemptions). It is beyond ironic for those states to worry about the Mission's faith-based employment practices when their own laws would provide the Mission even greater protection. California, for example, categorically exempts nonprofit religious organizations from its employment laws. Cal. Gov. Code § 12926(d). And Nevada and Oregon specifically exempt nonprofits and religious organizations from their laws' sexual-orientation and gender-identity provisions. Nev. Rev. Stat. § 613.320(2); Or. Rev. Stat. § 659A.006(5).

Nor does the panel decision prevent the government from inquiring into a specific, non-ministerial employment decision. The panel was clear that for non-ministers, "religious motivation cannot be a pretext." Op. 26 (citation modified). So the government can conduct fact-finding to determine whether a decision was "rooted in" a "sincerely held" "religious belief." Op. 25 (citation modified). Although this doesn't allow the government to second guess the "veracity" of beliefs, courts can ask whether beliefs are sincere and if they truly motivated the decision. Op. 25; *see also Hosanna-Tabor*, 565 U.S. at 205–06 (Alito, J., concurring) (evaluating pretext does not permit "adjudication" of "the importance and priority of the religious doctrine in question").

The Court should reject the State's invitation to "assume the worst" about religious employers. *Tandon v. Newsom*, 593 U.S. 61, 64 (2021) (per curiam) (citation modified).

## IV. The State's petition repackages justiciability arguments that two separate panels have unanimously rejected.

The State also says the panel decision was unnecessary because the Mission "may never experience any injury." Pet. 20. Noting that it eventually disavowed enforcement against two positions it now says are protected by the ministerial exception, the State suggests that other open positions "may well similarly qualify as ministerial." *Id.* That just recycles justiciability arguments this Court twice rejected—unanimously. Op. 14–16; *Union Gospel Mission of Yakima v. Ferguson*, No. 23-2602, 2024 WL 3755954, at *1–3 (9th Cir. Aug. 12, 2024).

As the panel explained, when this litigation began over two years ago, the Mission anticipated needing to fill more than 50 positions. Op. 13. Those included "a wide range of non-ministerial roles, such as people to work at its thrift stores, to run its soup kitchens, and to help provide its healthcare services." Op. 15–16. While the State has since said it won't enforce the WLAD against the IT technician and operations-assistant positions, it has "expressly refused to disavow" enforcement against the Mission "for the hiring of other non-ministerial positions." Op. 15. That limited disavowal provides the Mission with "little assurance," *id.*, and confirms the Mission remains at substantial risk of investigations, fines, and penalties for its faith-based employment decisions.

The State is seemingly oblivious to the tension created by its scattershot arguments. Earlier, it argues the sky will fall if the co-religionist doctrine protects the Mission's faith-based hiring for all its positions. Pet. 17–19. But later, the State suggests the Mission's job positions "could *all* fall within the [ministerial] exception." Pet. 20 (emphasis added). If that's true—which the State obviously doesn't believe because it won't concede that all Mission positions are ministerial—employees who sue the Mission would have *fewer* available claims and arguments. That's because, as mentioned, the ministerial exception does not depend on employer motives or allow employees' pretext arguments. *Hosanna-Tabor*, 565 U.S. at 194. Assuming the panel's decision is as "bad" as the State says, the State's speculation about the ministerial exception would actually make the situation *worse*.

In the end, the State's repeated refusal to disclaim enforcement for *all* the Mission's positions confirms that a credible threat of enforcement exists and demonstrates this is still a live case.

## CONCLUSION

For all these reasons, the Court should deny the State's petition.


Respectfully submitted,


Dated: March 16, 2026

By: */s/ Jeremiah Galus*

JOHN J. BURSCH
DAVID A. CORTMAN
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org
dcortman@ADFlegal.org

JAMES A. CAMPBELL
JACOB E. REED
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jcampbell@ADFlegal.org
jreed@ADFlegal.org

RYAN TUCKER
JEREMIAH GALUS
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rtucker@ADFlegal.org
jgalus@ADFlegal.org

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2026, I electronically filed the foregoing Response to Petition for Rehearing or Rehearing En Banc with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Jeremiah Galus*
Jeremiah Galus
Attorney for Plaintiff-Appellee

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* https://www.ca9.uscourts.gov/forms/form11instructions.pdf

**9th Cir. Case Number(s)** 24-7246

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel

rehearing/petition for rehearing en banc/response to petition is *(select one)*:

◉ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** 4,055 .
*(Petitions and responses must not exceed 4,200 words)*

**OR**

◯ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** s/ Jeremiah Galus      **Date** 03/16/2026
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 11**                                                    *Rev. 12/01/24*