## Docket No. 24-7246

# In the United States Court of Appeals for the Ninth Circuit

UNION GOSPEL MISSION OF YAKIMA WASHINGTON,
*Plaintiff-Appellee,*

v.

NICK BROWN, in his official capacity as Attorney General of Washington State; ANDRETA ARMSTRONG, in her official capacity as Executive Director of the Washington State Human Rights Commission; and GUADALUPE GAMBOA, HAN TRAN, JEFF SBAIH, LUC JASMIN, and CHELSEA DIMAS, in their official capacities as Commissioners of the Washington State Human Rights Commission,

*Defendants-Appellants,*

*Appeal from a Decision of the United States District Court for the Eastern District of Washington, Case No. 1:23-cv-3027 Honorable Mary K. Dimke, District Judge*

## BRIEF OF *AMICI CURIAE* 18 CURRENT AND FORMER WASHINGTON STATE LEGISLATORS IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE

STEVEN T. O'BAN
**ATTORNEY-AT-LAW**
1575 S. SEASHORE DRIVE
TACOMA, WA 98465
(213) 312-1688 Telephone
stevenoban@gmail.com

THOMAS BREJCHA
PETER BREEN
**THOMAS MORE SOCIETY**
121 West Wacker Dr., Ste. 650
Chicago, IL 60601
(312) 782-1680 Telephone
pbreen@thomasmoresociety.org

CHARLES S. LiMANDRI
PAUL M. JONNA
JEFFREY M. TRISSELL
**LiMANDRI & JONNA LLP**
Post Office Box 9120
Rancho Santa Fe, CA 92067
(858) 759-9930 Telephone
jtrissell@limandri.com

*Attorneys for Amici Curiae
Washington State Legislators*

## TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE*.......................................................................1

SUMMARY OF ARGUMENT ...........................................................................4

ARGUMENT .....................................................................................................5

I.   American legislatures have a long history of
     accommodating citizens whose religious convictions
     were at odds with government mandates.....................................5

     A.   Military Service and National Security...............................5

     B.   Swearing of Oaths...............................................................6

     C.   Medical Treatment...............................................................7

     D.   Medical Providers................................................................8

     E.   Civil Rights..........................................................................9

     F.   The WLAD Religious Organization Exemption ................11

II.  The Washington State Legislature exempted religious
     organizations to shield them from burdensome laws
     which interfere with their constitutional rights.........................12

     A.   The exemption protected the religious freedoms
          guaranteed by Washington's Constitution and the
          First Amendment. ..............................................................13

     B.   The exemption protects the limited resources of
          religious nonprofits, such as homeless shelters
          and private schools, which derive much of their
          funding from coreligionists. ..............................................17

III. The religious nonprofit exemption is consistent with
     the policy behind other exemptions that shield the
     majority of Washington employers from the burdens of
     state and federal anti-discrimination laws................................21

IV.   Unless the Court intervenes, every Washington
      religiously-affiliated school and social service
      organization continues to be exposed to the risks of
      intrusive forays into their religious decision-making. ................23

CONCLUSION ....................................................................................24

CERTIFICATE OF COMPLIANCE......................................................26

CERTIFICATE OF SERVICE..............................................................27

iii

# TABLE OF AUTHORITIES

**CASES**

*Bolling v. Superior Ct.*,
  16 Wash. 2d 373 (1943) ............................................. 13

*Corp. of Presiding Bishop of Church of Jesus Christ of
  Latter-Day Saints v. Amos*,
  483 U.S. 327 (1987) ............................................. 14

*Does 1-11 v. Bd. of Regents of Univ. of Colo.*,
  100 F.4th 1251 (10th Cir. 2024) ................................. 16

*First Covenant Church v. Seattle*,
  120 Wash. 2d 203 (1992) ......................................... 13

*Griffith v. Schnitzer Steel Indus., Inc.*,
  128 Wash. App. 438 (2005) ....................................... 15

*Hosanna-Tabor Evangelical Lutheran Church and
  Sch. v. EEOC*,
  565 U.S. 171 (2012) .......................................... 12, 23

*In re Marriage of Jensen-Branch*,
  78 Wash. App. 482 (1995) ........................................ 13

*Jones v. Kitsap Cty. Sanitary Landfill, Inc.*,
  60 Wash. App. 369 (1991) ........................................ 15

*Kedroff v. St. Nicholas Cathedral of Russ. Orthodox Church
  in N. Am.*,
  344 U.S. 94 (1952) .............................................. 12

*Mitchell v. Helms*,
  530 U.S. 793 (2000) ............................................. 16

*NLRB v. Cath. Bishop of Chi.*,
  440 U.S. 490 (1979) ............................................. 16

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  591 U.S. 732 (2020) ............................................. 23

iv

*Rice v. Offshore Sys., Inc.*, .......................................................... 15, 16
   167 Wash. App. 77 (2012)

*Roberts v. United States Jaycees*, ........................................... 12
   468 U.S. 609 (1984)

*Roe v. Wade*, ................................................................................. 8
   410 U.S. 113 (1973)

*Sellsted v. Wash. Mut. Sav. Bank*, ........................................... 16
   69 Wash. App. 852 (1993)

*Spencer v. World Vision, Inc.*, ................................................... 16
   633 F.3d 723 (9th Cir. 2011)

*Woods v. Seattle's Union Gospel Mission*, .............................. 4, 23
   197 Wash. 2d 231 (2021)

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. II, § 1 ................................................................... 7

U.S. Const. art. VI, § 3 .................................................................. 7

Wash. Const. art. I, § 11 ............................................................. 13

## STATUTES & RULES

1949 Wash. Laws, ch. 183, § 3(b) .............................................. 11

2006 Wash. Laws, ch. 4 ............................................................... 11

2010 Wash. Laws, ch. 175, § 1 ................................................... 19

2012 Wash. Laws, ch. 3, § 1 ....................................................... 11

9th Cir. R. 29-2(c)(2) .................................................................. 26

9th Cir. R. 29-2(c)(3) .................................................................. 26

42 U.S.C. § 300a-7(b) ................................................................... 8

42 U.S.C. § 300a-7(c)(1) ........................................................ 8

42 U.S.C. § 2000e(b) ............................................................ 21

42 U.S.C. § 2000e(j) ............................................................. 9

42 U.S.C. § 2000e-1(a) ......................................................... 10

42 U.S.C. § 2000e-2(a) .......................................................... 9

Fed. R. App. P. 29(a)(5) ........................................................ 26

Fed. R. App. P. 32(f) ............................................................. 26

Fed. R. App. P. 32(a)(5) ........................................................ 26

Fed. R. App. P. 32(a)(6) ........................................................ 26

Wash. Rev. Code § 49.60.040(11) ........................................ 21

## JOURNAL ARTICLES

James E. Ryan, *Smith and the Religious Freedom
    Restoration Act: An Iconoclastic Assessment,* ........................ 5
    78 Va. L. Rev. 1407 (1992)

Mark Rienzi, *The Constitutional Right Not to Kill,* ................. 6, 9
    62 Emory L.J. 121 (2012)

Michael W. McConnell, *The Origins and Historical
    Understanding of Free Exercise of Religion,* ........................ 6, 7
    103 Harv. L. Rev. 1409 (1990)

Nadia Sawicki, *Protections From Civil Liability in State
    Abortion Conscience Laws,* ................................................ 8
    322 JAMA 1918 (2019)

## REPORTS & TREATISES

4 J.G. Randall & Richard N. Current, *Lincoln the President, Last Full Measure* (University of Illinois Press, 1991) (1955) ................................................................................................................... 6

Louis Fischer, *Congressional Protection of Religious Liberty* (2003) .................................................................................................. 6

Robert D. Putnam & David E. Campbell, *American Grace: How Religion Divides and Unites Us* (2012) ............................. 17

Yakima Union Gospel Mission, *Impact: Fiscal Year 2024 Annual Report* (2025), https://yugm.org/wp-content/uploads/2025/06/AR-CY2024.pdf ................................ 19

## LEGIS. & ADMIN. MATERIALS

119 Cong. Rec. 9595 (daily ed. Mar. 27, 1973) .......................... 9

U.S. Equal Employment Opportunity Commission, EEOC Compliance Manual, § 12, Religious Discrimination (Jan. 15, 2021), http://www.eeoc.gov/policy/docs/religion.html ...................... 9

Fin. B. Rep. HB 2661 (Wash. 2006) ......................................... 11

## ONLINE SOURCES

Arthur C. Brooks, *Religious Faith and Charitable Giving*, Policy Review, Oct. & Nov. 2003, https://www.hoover.org/research/religious-faith-and-charitable-giving ..................................................................... 17

Brian J. Grim, *Religion may be bigger business than we thought. Here's why*, World Economic Forum (Jan. 5, 2017), https://www.weforum.org/agenda/2017/01/religion-bigger-business-than-we-thought ......................................... 21

Nat'l Conf. of State Legislatures, *Discrimination—*
*Employment Laws* (July 27, 2015),
https://www.ncsl.org/research/labor-and-
employment/discrimination-employment.aspx ............... 10

Nat'l Conf. of State Legislatures, *States with Religious and*
*Philosophical Exemptions from School Immunization*
*Requirements* (May 1, 2026),
http://www.ncsl.org/research/health/school-immunization-
exemption-state-laws.aspx ............... 8

Nat'l All. to End Homelessness, *Faith-Based Organizations:*
*Fundamental Partners in Ending Homelessness* (May
2017), https://endhomelessness.org/resource/faith-based-
organizations-fundamental-partners-in-ending-
homelessness/ ............... 19, 20

World Population Review, *Per Pupil Spending by State 2026,*
https://worldpopulationreview.com/state-rankings/per-
pupil-spending-by-state (last viewed July 14, 2026) ............... 20

Small Bus. & Entrepreneurship Council, *Facts & Data on*
*Small Business and Entrepreneurship*,
https://www.census.gov/data/tables/2019/econ/susb/2019-
susb-annual.html (last viewed July 14, 2026). ............... 22

The Wash. State Bd. of Educ., *Private Schools*,
https://www.sbe.wa.gov/our-work/private-schools (last
viewed July 14, 2026) ............... 20

## INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* are 18 current and former members of the Washington State Legislature, which enacted the Washington Law Against Discrimination and the exemption accommodating the right of religious employers, *inter alia*, to hire coreligionists, invalidated by the Washington State Supreme Court.

1.    Senator Mark Schoesler was first elected to the legislature in 1995 and represents the 9th Legislative District. He serves on the Ways and Means Committee.

2.    Senator John Braun was first elected to the legislature in 2012 and represents the 20th Legislative District. He is the Senate Minority Leader and a member of the Senate Ways and Means Committee.

3.    Senator Judy Warnick was elected to the legislature in 2007 and represents the 13th Legislative District. She is the Ranking Member of the Higher Education and Workforce Development Committee.

4.    Former Senator Mike Padden, now retired, was first elected to the legislature in 1980 and represented the 4th Legislative District. He was the Chair and Ranking Member of the Law and Justice Committee.

---

[1] All parties have indicated they do not oppose the motion for leave of court to file this *amici curiae* brief. No party's counsel authored this brief in whole or in part, and no person or entity other than *amici curiae* or their counsel made a monetary contribution intended to fund the brief's preparation or submission.

5. Senator Shelly Short was first elected to the legislature in 2009 and represents the 7th Legislative District. She is the Assistant Ranking Member of the Agriculture and Natural Resources Committee.

6. Senator Jim McCune was first elected to the legislature in 1998 and represents the 2nd Legislative District. He serves on the Business, Trade and Economic Development Committee.

7. Senator Phil Fortunato was first appointed to the legislature in 2017 and represents the 31st Legislative District. He serves on the Law and Justice Committee.

8. Senator Matt Boehnke was first elected to the legislature in 2019 and represents the 8th Legislative District. He is the Ranking Member of the Environment, Energy, and Technology Committee.

9. Senator Keith Wagoner was elected to the legislature in 2018 and represents the 39th Legislative District. He serves on the Agriculture, Water, Natural Resources and Parks Committee.

10. Former Senator Jim Honeyford was elected to the legislature in 1994 and represented the 15th Legislative District. He was the Assistant Ranking Member of the Ways and Means Committee.

11. Former Senator Steve O'Ban was first elected to the legislature in 2013 and represented the 28th Legislative District. He was the Chair of the Human Services Committee.

2

12. Representative Chris Corry was first elected to the legislature in 2019 and represents the 15th Legislative District. He serves on the Appropriations Committee.

13. Representative Cyndy Jacobsen was first elected to the legislature in 2020 and represents the 25th Legislative District. She is the Assistant Ranking Member of the Finance Committee.

14. Representative Joe Schmick was first elected to the legislature in 2007 and represents the 9th Legislative District. He is Ranking Member of the Health Care and Wellness Committee.

15. Representative Stephanie McClintock was first elected to the legislature in 2022 and represents the 18th Legislative District. She is the Ranking Member of the Consumer Protection & Business Committee.

16. Representative Tom Dent was first elected to the legislature in 2014 and represents the 13th Legislative District. He is the Ranking Member on the Agriculture and Natural Resources Committee.

17. Former Representative J.T. Wilcox was first elected to the legislature in 2010 and represented the 2nd Legislative District. He served as the Minority Leader and on the Appropriations Committee.

18. Representative Keith Goehner was first elected to the legislature in 2018 and represents the 12th Legislative District. He is the Assistant Ranking Minority Member of the House Local Government Committee.

*Amici Curiae,* 18 current and former Washington State Legislators, submit this brief to assist the Court in understanding the important

3

public policy reasons for accommodating the First Amendment interests of individuals and religious organizations to self-define and carry out their religious purposes. *Amici Curiae* urge the en banc Court to affirm the panel's decision and the district court's preliminary injunction, and rule in favor of the Union Gospel Mission of Yakima to protect its First Amendment rights.

## SUMMARY OF ARGUMENT

Throughout the history of our nation, colonial, state, and federal legislatures have enacted accommodations to protect individual conscience and the autonomy of religious organizations. Protecting religious freedom is in our nation's DNA. Shielding religious institutions from government interference has allowed coreligionists to pool their resources and talents and form religious associations to pursue charitable missions that have made enormous contributions to American society. In that tradition, in 1949 the Washington State Legislature adopted the religious organization exemption at the same time it adopted one of the very first anti-discrimination laws.

Ignoring this rich tradition, the Washington State Supreme Court mischaracterized the exemption as a "license to discriminate,"[2]

---

[2] *Woods v. Seattle's Union Gospel Mission*, 197 Wash. 2d 231, 253 (2021) (Yu, J., concurring) ("I also agree with the majority that this license to discriminate belongs only to religious institutions and . . . only with respect to the institution's choice of ministers."); *id.* at 252 (Maj. Opn.) ("Justice Yu's concurring opinion is helpful in this regard.").

displaying shocking anti-religious animus, and narrowed it to apply to ministerial employees only. Religious social service organizations, private K-12 schools, and even houses of worship are left without legal protection from intrusive and potentially ruinous employment-related enforcement actions and lawsuits. *Amici Curiae* Washington State Legislators urge this Court to hold that the First Amendment protects the right of Washington religious nonprofits to hire coreligionists.

## ARGUMENT

### I. American legislatures have a long history of accommodating citizens whose religious convictions were at odds with government mandates.

The Washington State Legislature's religious employer exemption was within the well-established tradition of American legislative bodies exempting conscience from the mandates of important policy objectives. One commentator has catalogued over 2,000 federal and state laws accommodating religious activity.[3] Several examples underscore the wide range of religious activity protected even when such protections were regarded as incompatible with important and popular policy objectives.

### A. Military Service and National Security

Starting with Quakers in the late 1600's, the rights of conscientious objectors were recognized by the majority of colonial legislative bodies,

---

[3] James E. Ryan, *Smith and the Religious Freedom Restoration Act: An Iconoclastic Assessment*, 78 Va. L. Rev. 1407, 1445 (1992).

5

and later the Continental Congress.[4] With the future of the Union and the American democratic experiment hanging in the balance, President Lincoln protected conscience during the Civil War.[5] Remarkably, through the great 20th Century conflicts of World War I, World War II, and the Cold War,[6] Congress protected conscience, despite a national consensus that the totalitarian enemies of those wars posed direct existential threats to the nation.

### B. Swearing of Oaths

Oaths have been regarded as essential for ensuring the loyalty and fidelity of citizens and elected officials. Local, state, and federal government officials, judges, and military personnel take an oath to uphold the U.S. Constitution. Oaths have also been viewed as critically important for the effective functioning of judicial systems to solemnize the importance of providing truthful testimony and deter perjury.

Yet Quakers, many Moravians, Mennonites, and other faith traditions have had religious objections to taking oaths. Even with little or no political influence, by 1710, many American colonies allowed Quakers to

---

[4] Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1468 (1990); Louis Fischer, *Congressional Protection of Religious Liberty* 11–12 (2003).

[5] 4 J.G. Randall & Richard N. Current, *Lincoln the President*, *Last Full Measure* 172–75 (University of Illinois Press, 1991) (1955).

[6] *See generally* Mark Rienzi, *The Constitutional Right Not to Kill*, 62 Emory L.J. 121 (2012).

6

use affirmations instead of oaths, and by the Founding era, all states permitted Quakers and other religious minorities to affirm rather than swear.[7] Thus by the time of the Constitutional Convention in 1787, the drafters of the U.S. Constitution permitted all officeholders and justices "by oath or affirmation" to support the U.S. Constitution. *See* U.S. Const. art. II, § 1; *id.* art. VI, § 3.

### C. Medical Treatment

As medical knowledge improved during the 19th century, particularly with respect to the efficacy and safety of vaccines, government vaccine mandates followed. On religious grounds, some refused the vaccinations. With the recent world pandemic, it is not difficult to imagine the intensity of the argument for vaccine mandates and against religious objections to those mandates.

Advocates of vaccinations contended that deadly rubella, rotavirus, diphtheria, smallpox, hepatitis A and B, and the crippling polio virus necessitated mandates to protect both the health of the individuals vaccinated and to deter the spread of the disease. Legislatures in all 50 states enacted laws requiring specified vaccines for students attending

---

[7] McConnell, *supra* note 4, at 1467–68.

school, and yet 45 states have granted exemptions for parents with religious objections.[8]

### D. Medical Providers

Perhaps even more contentious over the past half-century is the right to an abortion and the refusal of medical providers to participate in the procedure. Despite abortion becoming a constitutionally protected right in 1973, Congress and nearly every state legislature enacted laws protecting medical providers who by reason of conscience decline to participate in abortions.[9] Just weeks after *Roe v. Wade,* 410 U.S. 113 (1973), Congress overwhelmingly passed the Church Amendment, which prohibits the government from requiring anyone to assist in an abortion.[10] In arguing in favor of these protections, Senator Frank Church (D–ID) stated:

> [N]othing is more fundamental to our national birthright than freedom of religion. Religious belief must remain above the reach of secular authority. It is the duty of Congress to fashion the law in such a manner that no Federal funding of hospitals,

---

[8] *See* Nat'l Conf. of State Legislatures, *States with Religious and Philosophical Exemptions from School Immunization Requirements* (May 1, 2026), http://www.ncsl.org/research/health/school-immunization-exemption-state-laws.aspx.

[9] Nadia Sawicki, *Protections From Civil Liability in State Abortion Conscience Laws*, 322 JAMA 1918 (2019).

[10] 42 U.S.C. § 300a-7(b), (c)(1).

medical research, or medical care may be conditioned upon the violation of religious precepts.[11]

The Church amendment has been joined by many other federal laws expanding the right.[12] It has also been joined by conscience protections in 47 states, many of which provide full exemptions to any health care practitioner who conscientiously refuses to "participate," "refer," "assist," "arrange for," "accommodate," or "advise" in an abortion.[13]

### E. Civil Rights

Legislators have passed laws to protect religious citizens from discrimination by both private and governmental entities. Most prominently, Title VII of the Civil Rights Act of 1964, as amended, prohibits employers with 15 or more employees from (among other things) refusing to hire because of their religion. The statute also requires private businesses to make "reasonable accommodations" for their employees' or potential employees' sincerely held religious convictions unless the accommodation would create an undue hardship for the employer.[14]

---

[11] 119 Cong. Rec. 9595 (daily ed. Mar. 27, 1973).

[12] Rienzi, *supra* note 6, at 147–52 (collecting examples)

[13] *Id.* at 152.

[14] 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 2000e(j). For a general overview how Title VII protects religious Americans, *see* U.S. Equal Employment Opportunity Commission, EEOC Compliance Manual, § 12, Religious Discrimination (Jan. 15, 2021), http://www.eeoc.gov/policy/docs/religion.html.

Yet the Congress that passed Title VII recognized that *some* religious distinction is required and protected by the First Amendment. Accordingly, it crafted an accommodation to Title VII that permits religious institutions to make employment decisions on the basis of religion. Specifically, "a religious corporation, association, educational institution, or society" is exempt "with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities."[15] In other words, the Title VII exemption protects the First Amendment right of religious employers to hire only coreligionists.

Nearly all state legislatures when enacting their own anti-discrimination laws, accommodated the First Amendment interests of religious organizations to make employment decisions based on religion.[16] Washington State was no exception when the Legislature enacted its own Washington Law Against Discrimination (WLAD) while

---

[15] 42 U.S.C. § 2000e-1(a). Religious liberty concerns prompted Congress to similarly carve out religious institutions from the mandates of the Fair Housing Act, the Americans with Disabilities Act, and Title IX of the Educational Amendments Act of 1972.

[16] *See* Nat'l Conf. of State Legislatures, *Discrimination— Employment Laws* (July 27, 2015), https://www.ncsl.org/research/labor-and-employment/discrimination-employment.aspx (archived).

10

simultaneously accommodating the First Amendment interests of religious organizations by exempting them from the WLAD.

## F. The WLAD Religious Organization Exemption

The Washington State Legislature clearly determined that the religious organization exemption did not frustrate the objectives of the WLAD, even years later when it added sexual orientation as a protected class, and later extended civil marriage laws to same sex couples.

The religious employer exemption existed, unchanged, since the WLAD was enacted in 1949. 1949 Wash. Laws, ch. 183, § 3(b). The WLAD has been amended seventeen times, including to add sexual orientation as a protected class in 2006 when the Washington State Legislature passed ESHB 2661. 2006 Wash. Laws, ch. 4. The religious employer exemption was explicitly mentioned in the final bill report. Fin. B. Rep. HB 2661, at 1 (Wash. 2006) ("non-profit religious or sectarian organizations are exempt from this law.").

The Washington State Legislature later extended civil marriage to same sex couples. Not only did it keep the religious entity exemption intact, but legislators also created additional protections for religious organizations. 2012 Wash. Laws, ch. 3, § 1.

There is little evidence that the foregoing accommodations—and hundreds of other accommodations granted to individuals and religious entities—harmed the nation or significantly undermined important policy objectives. On the contrary, legislators, such as Washington State

11

Legislators, erected these protections against overzealous government regulators and intrusive lawsuits because they would undermine the ability of religious institutions to govern themselves, appeal to coreligionists for support, and pursue their charitable missions. Addressing the significant threat of anti-discrimination litigation to self-governance, Justice Samuel Alito, joined by Justice Elena Kagan, wrote:

> Throughout our Nation's history, religious bodies have been the preeminent example of private associations that have "act[ed] as critical buffers between the individual and the power of the State." *Roberts v. United States Jaycees*, 468 U.S. 609, 619, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). In a case like the one now before us—where the goal of the civil law in question, the elimination of discrimination against persons with disabilities, is so worthy—it is easy to forget that the autonomy of religious groups, both here in the United States and abroad, has often served as a shield against oppressive civil laws. To safeguard this crucial autonomy, we have long recognized that the Religion Clauses protect a private sphere within which religious bodies are free to govern themselves in accordance with their own beliefs.

*Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 199 (2012) (Alito, J., concurring) (citing *Kedroff v. St. Nicholas Cathedral of Russ. Orthodox Church in N. Am.,* 344 U.S. 94, 116 (1952)).

## II. The Washington State Legislature exempted religious organizations to shield them from burdensome laws which interfere with their constitutional rights.

The Washington State Legislature enacted the religious employer exemption to the WLAD for two reasons: first, to preserve the broad religious freedoms guaranteed under the Washington State Constitution and the First Amendment of the U.S. Constitution; and second, to

increase the availability of charitable and social services to Washington citizens by minimizing the burdens on religious nonprofits that rely predominantly on donations or tuition from coreligionists.

### A. The exemption protected the religious freedoms guaranteed by Washington's Constitution and the First Amendment.

The exemption properly accommodated the broad protections to religious sentiment, belief, and practice afforded by Washington's Constitution. *In re Marriage of Jensen-Branch*, 78 Wash. App. 482, 491 (1995) (citing *First Covenant Church v. Seattle*, 120 Wash. 2d 203, 226 (1992)). The Washington State Legislature gave effect to these greater protections by choosing to avoid potential entanglements between the state and religion through the enactment of the WLAD exemption.

Under the Washington Constitution, "[a]bsolute freedom of conscience in all matters of religious sentiment, belief and worship" are "guaranteed," and the provision even "bars conduct that merely 'disturbs' another on the basis of religion." *First Covenant Church*, 120 Wash. 2d at 224 (quoting Wash. Const. art. I, § 11). This constitutional guaranty of free exercise is "of vital importance." *Bolling v. Superior Ct.*, 16 Wash. 2d 373, 381 (1943). The conduct prohibited by article I, section 11, is not *religious* activity that "disturbs" others, but *other* actions that disturb another person "*on account of* [his or her] religion." *First Covenant Church*, 120 Wash. 2d at 226. Judicial and government enforcement of the WLAD is the intrusive foray into the religiously-based decision-

13

making of nonprofits that is the type of conduct the Washington State Legislature sought to avoid by enacting the exemption.

The Washington State Legislature, by enacting the exemption to the WLAD, made a policy choice to avoid the potential pitfalls of secular bureaucrats and courts trying to reconcile Washington's ever-growing list of protected categories—many with an arguably religious aspect—with a myriad of religious belief systems.

Similarly, the exemption advanced an important state interest—protecting the autonomy of religious freedom by avoiding state interference with religious practice. In *Amos*, Justice White, writing for a unanimous court, succinctly explained the chilling effect of narrow exemptions on religious organizations when they are left to wonder what is and is not considered "religious":

> Nonetheless, it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious. The line is hardly a bright one, and an organization might understandably be concerned that a judge would not understand its religious tenets and sense of mission. *Fear of potential liability might affect the way an organization carried out what it understood to be its religious mission.*

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 336 (1987) (emphasis added). Eliminating this fear was one of the primary reasons the Washington State Legislature enacted the exemption.

14

For religious nonprofits like Petitioner Union Gospel Mission of Yakima (YUGM), predicting which of their activities the Washington State Human Rights Commission or a secular court will consider religious creates an actual chilling effect. Secular bureaucrats, judges and juries in discrimination litigation would weigh the sincerity of a religious employer's belief and the credibility of its application as the basis for an employer's decision to discharge an employee.

This is because once a plaintiff makes out a prima facie case of discrimination, the burden shifts to the employer to provide a legitimate, non-discriminatory basis for the dismissal. If the employer carries this burden, the employee must put on evidence that the employer's non-discriminatory reason is unworthy of belief or pretextual. *Griffith v. Schnitzer Steel Indus., Inc.*, 128 Wash. App. 438, 447 (2005); *Jones v. Kitsap Cty. Sanitary Landfill, Inc.*, 60 Wash. App. 369, 371 (1991). An employee can show that the employer's proffered reason is pretextual in several ways: (1) the company's reasons have no basis in fact; or (2) if they have a basis in fact, by showing that they were not really motivating factors; or (3) if they are factors, by showing they were insufficient to motivate the adverse employment decision. *Rice v. Offshore Sys., Inc.*,

15

167 Wash. App. 77, 90 (2012); *Sellsted v. Wash. Mut. Sav. Bank*, 69 Wash. App. 852, 859 n.14 (1993).[17]

The Ninth Circuit concurs with this reasoning, having held that it was not just the potential adverse result that infringed on First Amendment rights of religious organizations, but also discovery and trial: "It is not only the conclusions that may be reached by the government agency which may impinge on rights guaranteed by the Religion Clauses, *but also the very process of inquiry leading to findings and conclusions.*" *Spencer v. World Vision, Inc.*, 633 F.3d 723, 731 (9th Cir. 2011) (quoting *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 502 (1979)) (brackets omitted). "Inquiry into religious views is not only unnecessary but also offensive. It is well established that courts should refrain from trolling though a person's or institution's religious beliefs." *Spencer*, 633 F.3d at 731 (brackets and ellipses omitted) (quoting *Mitchell v. Helms*, 530 U.S. 793, 828 (2000)); *accord Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1270–72 (10th Cir. 2024).

Accordingly, because of the evidentiary standards for discrimination claims, the Washington State Legislature concluded that religious organizations should be shielded from the burden of requiring them, on

---

[17] Summary judgment in favor of employers is often inappropriate in employment discrimination cases. *Sellsted*, 69 Wash. App. at 860.

pain of substantial liability, to predict when their religious beliefs would be regarded as sufficient justification for a hiring or discharge decision.

The exemption also accommodates the unique associational nature of religious organizations. Religious organizations routinely make employment decisions based on religious criteria. For these organizations and their employees, religious faith is expressed through their employment and is not limited to service attendance on sabbath days. By exempting religious nonprofits, the Washington State Legislature provided them the freedom to hire coreligionists who can more effectively appeal to the religious beliefs of like-minded donors and volunteers. One study estimated that more than 90 percent of those who attend weekly worship services donate to charity, and nearly 70 percent volunteer for charitable causes.[18] Permitting religious nonprofits to hire coreligionists builds needed social capital.

### B. The exemption protects the limited resources of religious nonprofits, such as homeless shelters and private schools, which derive much of their funding from coreligionists.

The Washington State Legislature exempted religious nonprofits like YUGM because of the enormous contributions they make to the common

---

[18] Arthur C. Brooks, *Religious Faith and Charitable Giving*, Policy Review, Oct. & Nov. 2003, https://www.hoover.org/research/religious-faith-and-charitable-giving. Similar statistics are found in Harvard University's *Faith Matters Survey 2006*, as cited in Robert D. Putnam & David E. Campbell, *American Grace: How Religion Divides and Unites Us* (2012).

17

good, by allowing them to devote their limited resources to some of the most vulnerable and consequently lessen the burden on governmental assistance programs and public education.

Litigation costs are significant for any employer; they are potentially ruinous for many, if not most, religious nonprofits. Even for those that obtain liability insurance, there are significant costs incurred in these situations prior to a claim being filed and most policies have a substantial retention, requiring religious nonprofits to expend tens of thousands of dollars before insurance coverage is triggered.

Donations to cover these new expenses would necessarily divert resources from the work of these religious organizations. As charitable operations that rely mostly on donations from coreligionists, the organizations could not price these increased expenses into the cost of the "goods" they provide. For every dollar spent on compliance, defense, and judgment costs, one fewer dollar is available for services.

The Washington State Legislature is cognizant that the State benefited directly from the exemption because its financial burden was reduced by the services that Washington nonprofits provide. With respect to homelessness:

> The legislature finds that there are many homeless persons in our state that are in need of shelter and other services that are not being provided by the state and local governments. The legislature also finds that in many communities, religious organizations play an important role in providing needed services to the homeless, including the provision of shelter upon property owned by the

18

religious organization. By providing such shelter, the religious institutions in our communities perform a valuable public service that, for many, offers a temporary, stopgap solution to the larger social problem of increasing numbers of homeless persons.

2010 Wash. Laws, ch. 175, § 1.

YUGM plays a vital role serving Yakima's homeless. In 2024 alone, YUGM served 134,814 meals, provided 37,856 nights of safe shelter, served 728 individuals in the adult shelter, found permanent housing for 32 shelter clients, and lifted 126 children in 66 families off the street and into shelter. YUGM's Medical Care Center provided $7.1 million in uncompensated, medical and dental care completely free of charge and for more than 8,000 patient visits. Ninety-nine percent of YUGM's revenue was derived from individuals, churches, and other private sector sources.[19]

Like YUGM, other faith-based homeless shelters serve tens of thousands of clients and provide hundreds of thousands of shelter-nights and more than two million meals per year to vulnerable residents. According to the National Alliance to End Homelessness, homelessness will not be ended without faith-based organizations such as YUGM which provide at least 30% of all shelter beds.[20]

---

[19] Yakima Union Gospel Mission, *Impact: Fiscal Year 2024 Annual Report* (2025), https://yugm.org/wp-content/uploads/2025/06/AR-CY2024.pdf.

[20] Nat'l All. to End Homelessness, *Faith-Based Organizations: Fundamental Partners in Ending Homelessness* (May 2017),

The Washington State Legislature enacted the exemption to preserve the limited resources of faith-based social service organizations like YUGM instead of those resources being redirected towards litigation costs and increased premiums for liability insurance, leaving the State to fill the gap at a time it can least afford to do so.

The Washington State Legislature also recognizes the enormous savings in education expenses by nonprofit religious schools. There are over 500 private schools in Washington State,[21] the vast majority of which are religiously-affiliated schools. These private schools enrolled over 80,000 Washington State students who would otherwise be part of the public school system. Based on the $18,564 average expenditure per student in Washington State,[22] private school students represent a savings of nearly $1.48 billion to the state. The State benefits enormously by not incurring expenses for these students, while simultaneously

---

https://endhomelessness.org/resource/faith-based-organizations-fundamental-partners-in-ending-homelessness/.

[21] The Wash. State Bd. of Educ., *Private Schools*, https://www.sbe.wa.gov/our-work/private-schools (last viewed July 14, 2026).

[22] World Population Review, *Per Pupil Spending by State 2026,* https://worldpopulationreview.com/state-rankings/per-pupil-spending-by-state (last viewed July 14, 2026).

collecting revenue from their parents through the general taxes that support Washington's schools.[23]

The Washington State Legislature concluded that the religious nonprofit exemption provides significantly greater benefits to the people of Washington State than exposing religious organizations to increased employment practices liability and hindering them from appealing to coreligionists for employees, donors, and volunteers.

### III. The religious nonprofit exemption is consistent with the policy behind other exemptions that shield the majority of Washington employers from the burdens of state and federal anti-discrimination laws.

The small business exemptions to the WLAD and Title VII both exhibit similar policy choices albeit in a secular context, providing relief from those statutes for organizations that provide a valuable social benefit but are the least likely to be able to bear the costs of compliance. The WLAD exempts all employers with seven or fewer employees. Wash. Rev. Code § 49.60.040(11). Title VII exempts all employers with fourteen or fewer employees. 42 U.S.C. § 2000e(b).

---

[23] One study concluded that religious organizations and their members provide more than $1.2 trillion, annually, in socio-economic value to the U.S. economy. Brian J. Grim, *Religion may be bigger business than we thought. Here's why*, World Economic Forum (Jan. 5, 2017), https://www.weforum.org/agenda/2017/01/religion-bigger-business-than-we-thought.

21

The exemptions from the WLAD and Title VII for businesses based on the number of employees reflect legislative judgments that the employment opportunities provided by smaller businesses outweigh the benefits of imposing compliance on these employers. The majority of businesses in both Washington State and the nation are exempted by these provisions. As of 2019—the latest year employment figures are available from the U.S. Census Bureau—at least 60 percent of Washington employers are completely exempted from the WLAD and at least 78.5 percent of employers nationwide are completely exempted from Title VII.[24]

The exemption of religious nonprofits without regard to their size is no less rational, and no more a "license to discriminate," than the exemption of smaller, for-profit businesses. In each case, the Washington State Legislature determined that such organizations provide benefits to society that are important enough to refrain from interfering with their hiring practices.

---

[24] Small Bus. & Entrepreneurship Council, *Facts & Data on Small Business and Entrepreneurship*, https://www.census.gov/data/tables/2019/econ/susb/2019-susb-annual.html (last viewed July 14, 2026).

**IV. Unless the Court intervenes, every Washington religiously-affiliated school and social service organization continues to be exposed to the risks of intrusive forays into their religious decision-making.**

The Washington Supreme Court's decision in *Woods* not only struck down the exemption enacted over 50 years ago, but it also precludes the Washington State Legislature from attempting to enact an even narrower exemption to protect against lawsuits such as this one. Tens of thousands of Washington religious organizations, including houses of worship, have no protection against the invasive enforcement actions of government bureaucrats and secular courts where a plaintiff asserts a fundamental right of citizenship and the employment position does not implicate the ministerial exemption. *Woods v. Seattle's Union Gospel Mission*, 197 Wash. 2d 231, 251 (2021) ("The ministerial exception, recognized by the United States Supreme Court . . . provides a fair and useful approach for determining whether application of [the religious organization exemption] unconstitutionally infringes on Woods' fundamental right to his sexual orientation and right to marry.") (citing *Hosanna-Tabor,* 565 U.S. 171; *Our Lady of Guadalupe Sch. v. Morrissey-Berru,* 591 U.S. 732 (2020)).

The chilling effect of the *Woods* decision has been felt across the state by nearly every religious organization. The Court should follow the panel in affirming the district court and rule that the First Amendment

23

protects the autonomy of religious organizations to make hiring decisions with respect to coreligionists.

## CONCLUSION

Rather than a "license to discriminate," as it was pejoratively described by the Washington Supreme Court, the religious employer exemption was a legislative accommodation to shield donation-dependent religious nonprofits from the extraordinary costs and risks of the WLAD, and to protect their federal and state constitutional rights to be free of state interference so that they may pursue their religious missions undisturbed. The exemption must be seen in the context of the long line of statutory accommodations to citizens and religious institutions since before the founding of the nation.

The Court should restore the coreligionist accommodation by ruling it is guaranteed by the First Amendment.

Respectfully submitted,

Dated: July 22, 2026

/s/ Steven T. O'Ban
Steven T. O'Ban
ATTORNEY-AT-LAW
1575 S. Seashore Drive
Tacoma, WA 98465
Tel: (213) 312-1688
stevenoban@gmail.com

24

Charles S. LiMandri
Paul M. Jonna
Jeffrey M. Trissell
LIMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Tel: (858) 759-9930
Facsimile:(858) 759-9938
jtrissell@limandri.com

Thomas Brejcha
Peter Breen
THOMAS MORE SOCIETY
121 West Wacker Dr., Ste. 650
Chicago, IL 60601
Tel: (312) 782-1680
pbreen@thomasmoresociety.org

*Attorneys for Amici Curiae
Washington State Legislators*

25

# CERTIFICATE OF COMPLIANCE

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**          24-7246

I am the attorney or self-represented party.

**This brief contains 5,018 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Steven T. O'Ban          **Date** July 22, 2026
*(use "*s/[typed name]*" to sign electronically-filed documents)*

26

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

/s/ Steven T. O'Ban
Steven T. O'Ban